APPEAL,JAWRECUSED,LEAD,LEWRECUSED,STANDARD
# U.S. District Court
## District of Maine (Bangor)
## CIVIL DOCKET FOR CASE #: <u>1:23−cv−00450−NT</u>

CENTRAL MAINE POWER COMPANY v. MAINE
COMMISSION ON GOVERNMENTAL ETHICS AND
ELECTION PRACTICES et al
Assigned to: JUDGE NANCY TORRESEN
Referred to: MAGISTRATE JUDGE JOHN C. NIVISON
Member cases:
    1:23−cv−00451−NT
    1:23−cv−00452−NT
    1:23−cv−00453−NT
Cause: 28:1331 Fed. Question

Date Filed: 12/12/2023
Jury Demand: None
Nature of Suit: 950 Constitutional − State
Statute
Jurisdiction: Federal Question

**<u>Consol Plaintiff</u>**

**VERSANT POWER**      represented by  **JOHN A. WOODCOCK , III**
BERNSTEIN SHUR
100 MIDDLE STREET
P.O. BOX 9729
PORTLAND, ME 04104−5029
207−228−7115
Email: jwoodcock@bernsteinshur.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PAUL MCDONALD**
BERNSTEIN SHUR
100 MIDDLE STREET
P.O. BOX 9729
PORTLAND, ME 04104−5029
207−774−1200
Email: pmcdonald@bernsteinshur.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Consol Plaintiff</u>**

**ENMAX CORPORATION**      represented by  **JOHN A. WOODCOCK , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PAUL MCDONALD**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Consol Plaintiff</u>**

**MAINE PRESS ASSOCIATION**    represented by  **ALEXANDRA A. HARRIMAN**
PRETI, FLAHERTY
ONE CITY CENTER
P.O. BOX 9546
PORTLAND, ME 04112−9546
207−791−3000
Fax: 207−791−3111
Email: aharriman@preti.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SIGMUND D. SCHUTZ**
PRETI, FLAHERTY
ONE CITY CENTER
P.O. BOX 9546
PORTLAND, ME 04112−9546
207−791−3000
Fax: 207−791−3111
Email: sschutz@preti.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**BENJAMIN S. PIPER**
PRETI, FLAHERTY
ONE CITY CENTER
PO BOX 9546
PORTLAND, ME 04112−9546
207−791−3000
Email: bpiper@preti.com
*TERMINATED: 03/14/2024*

<u>Consol Plaintiff</u>

**MAINE ASSOCIATION OF
BROADCASTERS**    represented by  **ALEXANDRA A. HARRIMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SIGMUND D. SCHUTZ**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**BENJAMIN S. PIPER**
(See above for address)
*TERMINATED: 03/14/2024*

<u>Consol Plaintiff</u>

**JANE P PRINGLE**    represented by  **TIMOTHY C. WOODCOCK**
*Individually and in her capacity as a*
*registered voter and Elector*
EATON PEABODY
P.O. BOX 1210
BANGOR, ME 04402

207−947−0111
Email: twoodcock@eatonpeabody.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**KENNETH FLETCHER**
*Individually and in his capacity as a*
*registered voter and Elector*

represented by **TIMOTHY C. WOODCOCK**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**BONNIE S GOULD**
*Individually and in her capacity as a*
*registered voter and Elector*

represented by **TIMOTHY C. WOODCOCK**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**BRENDA GARRAND**
*Individually and in her capacity as a*
*registered voter and Elector*

represented by **TIMOTHY C. WOODCOCK**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consol Plaintiff**

**LAWRENCE WOLD**
*Individually and in his capacity as a*
*registered voter and Elector*

represented by **TIMOTHY C. WOODCOCK**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CENTRAL MAINE POWER**
**COMPANY**

represented by **JOSHUA D. DUNLAP**
PIERCE ATWOOD LLP
254 COMMERCIAL STREET
PORTLAND, ME 04101
Email: jdunlap@pierceatwood.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KATHERINE E. CLEARY**
PIERCE ATWOOD LLP
254 COMMERCIAL STREET
PORTLAND, ME 04101
207−791−1100
Email: kcleary@pierceatwood.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**NOLAN L. REICHL**
PIERCE ATWOOD LLP
254 COMMERCIAL STREET

PORTLAND, ME 04101
207−791−1100
Fax: 207−791−1350
Email: nreichl@pierceatwood.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MAINE COMMISSION ON**
**GOVERNMENTAL ETHICS AND**
**ELECTION PRACTICES**

represented by **JONATHAN R. BOLTON**
OFFICE OF THE ATTORNEY
GENERAL
STATE HOUSE STATION 6
AUGUSTA, ME 04333−0006
207−626−8551
Email: jonathan.bolton@maine.gov
*ATTORNEY TO BE NOTICED*

**PAUL E. SUITTER**
OFFICE OF THE MAINE ATTORNEY
GENERAL
6 STATE HOUSE STATION
AUGUSTA, ME 04333
207−626−8800
Email: paul.suitter@maine.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**WILLIAM J SCHNEIDER**
*in his official capacity as Chairman of*
*the Maine Commission on Governmental*
*Ethics and Election Practices*

represented by **JONATHAN R. BOLTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**PAUL E. SUITTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DAVID R HASTINGS, III**
*in his official capacity as a Member of*
*the Maine Governmental Ethics and*
*Election Practices*

represented by **JONATHAN R. BOLTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**PAUL E. SUITTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SARAH E LECLAIRE**
*in her official capacity as a Member of*
*the Maine Commission on Governmental*

represented by **JONATHAN R. BOLTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

*Ethics and Election Practices*

**PAUL E. SUITTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**DENNIS MARBLE**                              represented by    **JONATHAN R. BOLTON**
*in his official capacity as a Member of*                      (See above for address)
*the Maine Commission on Governmental*                         *ATTORNEY TO BE NOTICED*
*Ethics and Election Practices*

**PAUL E. SUITTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**STACEY D NEUMANN**                           represented by    **JONATHAN R. BOLTON**
*in her official capacity as a Member of*                      (See above for address)
*the Maine Commission on Governmental*                         *ATTORNEY TO BE NOTICED*
*Ethics and Election Practices*

**PAUL E. SUITTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**AARON FREY**                                 represented by    **JONATHAN R. BOLTON**
*in his official capacity as Attorney*                         (See above for address)
*General for the State of Maine*                               *ATTORNEY TO BE NOTICED*

**PAUL E. SUITTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**PROTECT MAINE ELECTIONS**                    represented by    **MEGHAN P. MCALLEN**
CAMPAIGN LEGAL CENTER
1101 14TH ST. NW
SUITE 400
WASHINGTON, DC 20005
202−736−2200
Email: <u>mmcallen@campaignlegalcenter.org</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**TARA MALLOY**
CAMPAIGN LEGAL CENTER
1101 14TH ST. NW
SUITE 400
WASHINGTON, DC 20005
202−736−2200

Fax: 202−736−2222
Email: tmalloy@campaignlegalcenter.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PETER L. MURRAY**
MURRAY PLUMB & MURRAY
75 PEARL STREET
P.O. BOX 9785
PORTLAND, ME 04104−5085
207−773−5651
Fax: 773−8023
Email: pmurray@mpmlaw.com
*ATTORNEY TO BE NOTICED*

**SEAN R. TURLEY**
MURRAY PLUMB & MURRAY
75 PEARL STREET
P.O. BOX 9785
PORTLAND, ME 04104−5085
207−699−3141
Email: sturley@mpmlaw.com
*ATTORNEY TO BE NOTICED*

**Movant**

**FREE SPEECH FOR PEOPLE**     represented by

**AMIRA MARCELLA MATTAR**
FREE SPEECH FOR PEOPLE
1320 CENTRE ST.
#405
NEWTON, MA 02459
206−619−6642
Email: amira@freespeechforpeople.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**BEN CLEMENTS**
FREE SPEECH FOR PEOPLE
1320 CENTRE ST.
#405
NEWTON, MA 02459
617−244−0234
Email: bclements@freespeechforpeople.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**COURTNEY HOSTETLER**
FREE SPEECH FOR PEOPLE
1320 CENTRE ST.
#405

NEWTON, MA 02459
617−249−3015
Email: chostetler@freespeechforpeople.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOHN C. BONIFAZ**
FREE SPEECH FOR PEOPLE
1320 CENTRE ST.
#405
NEWTON, MA 02459
617−244−0234
Email: jbonifaz@freespeechforpeople.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PETER J. BRANN**
BRANN & ISAACSON
113 LISBON STREET
P.O. BOX 3070
LEWISTON, ME 04243−3070
207−786−3566
Fax: 207−783−9325
Email: pbrann@brannlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RONALD A. FEIN**
FREE SPEECH FOR PEOPLE
1320 CENTRE ST.
#405
NEWTON, MA 02459
617−244−0234
Fax: 512−628−0146
Email: rfein@freespeechforpeople.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS**

represented by

**SCOTT D. DOLAN**
PETRUCCELLI MARTIN & HADDOW
LLP
TWO MONUMENT SQUARE
SUITE 900
P.O. BOX 17555
PORTLAND, ME 04112−8555
207−253−6420
Email: sdolan@pmhlegal.com
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 12/12/2023 | 1 | | COMPLAINT against MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, WILLIAM J HASTINGS, III, SARAH E LECLAIRE, DENNIS MARBLE, STACEY D NEUMANN and AARON FREY filed by CENTRAL MAINE POWER COMPANY. Service of Process Deadline due by 3/11/2024. Fee due by 12/14/2023. **PAYMENT OF FILING FEE DUE WITHIN 48 HOURS. IF FILING FEE IS BEING PAID WITH A CREDIT CARD COUNSEL ARE INSTRUCTED TO LOGIN TO CMECF AND DOCKET** *Case Opening Filing Fee Paid* **FOUND IN THE** *Complaints and Other Initiating Documents* **CATEGORY. CHECK PAYMENTS DUE WITHIN 48 HOURS.** (Attachments: # 1 Exhibit A − Foreign Spending Initiative Maine 2023)(mnd) (Entered: 12/12/2023) |
| 12/12/2023 | 2 | | CIVIL COVER SHEET. (mnd) (Entered: 12/12/2023) |
| 12/12/2023 | 3 | | CORPORATE DISCLOSURE STATEMENT filed by CENTRAL MAINE POWER COMPANY. (mnd) (Entered: 12/12/2023) |
| 12/12/2023 | 4 | | MOTION for Temporary Restraining Order, MOTION for Preliminary Injunction filed by CENTRAL MAINE POWER COMPANY. (Attachments: # 1 Letter from Counsel)(mnd) (Entered: 12/12/2023) |
| 12/13/2023 | | | Filing Fee Paid via Credit Card ( Filing fee $ 405 receipt number AMEDC−2888950.), filed by CENTRAL MAINE POWER COMPANY.(DUNLAP, JOSHUA) (Entered: 12/13/2023) |
| 12/13/2023 | 5 | | ORDER OF RECUSAL. By JUDGE LANCE E. WALKER. (jwr) (Entered: 12/13/2023) |
| 12/13/2023 | | | Case Randomly Reassigned to JUDGE NANCY TORRESEN. (jwr) (Entered: 12/13/2023) |
| 12/13/2023 | 6 | | Summons Issued as to MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, WILLIAM J SCHNEIDER, DAVID R HASTINGS, III, SARAH E LECLAIRE, DENNIS MARBLE, STACEY D NEUMANN and AARON FREY. **Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.** **Note−If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).** First Attached Document: MCGEEP Summons (Attachments: # 1 Schneider Summons, # 2 Hastings Summons, # 3 LeClaire Summons, # 4 Marble Summons, # 5 Neumann Summons, # 6 Frey Summons)(mnd) (Entered: 12/13/2023) |
| 12/13/2023 | 7 | | NOTICE of Hearing: Telephone Conference set for 12/13/2023 01:00 PM before JUDGE NANCY TORRESEN. All parties will be provided with the |

| | | |
|---|---|---|
| | | Court's call–in information.(slg) (Entered: 12/13/2023) |
| 12/13/2023 | 8 | Minute Entry for proceedings held before JUDGE NANCY TORRESEN: Telephone Conference held. Set Deadlines as to Motion for TRO, Motion for Preliminary Injunction. Responses due by 12/22/2023. Reply due by 12/27/2023. (Court Reporter: Lori Dunbar) (slg) (Entered: 12/13/2023) |
| 12/14/2023 | 9 | NOTICE of Appearance by JONATHAN R. BOLTON on behalf of All Defendants (BOLTON, JONATHAN) (Entered: 12/14/2023) |
| 12/14/2023 | 10 | NOTICE of Appearance by PAUL E. SUITTER on behalf of All Defendants (SUITTER, PAUL) (Entered: 12/14/2023) |
| 12/15/2023 | 11 | Consent MOTION to Amend Scheduling Order *to Set New Briefing Schedule for Motions for Preliminary Relief* by AARON FREY, DAVID R HASTINGS, III, SARAH E LECLAIRE, MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, DENNIS MARBLE, STACEY D NEUMANN, WILLIAM J SCHNEIDER Responses due by 1/5/2024. (BOLTON, JONATHAN) (Entered: 12/15/2023) |
| 12/15/2023 | 12 | ***FILED IN ERROR****Consent MOTION for Order – *Scheduling Order* by AARON FREY, DAVID R HASTINGS, III, SARAH E LECLAIRE, MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, DENNIS MARBLE, STACEY D NEUMANN, WILLIAM J SCHNEIDER Responses due by 1/5/2024. (BOLTON, JONATHAN) Modified on 12/15/2023 to mark filed in error as duplicate of ECF NO. 11(slg). (Entered: 12/15/2023) |
| 12/18/2023 | 13 | ORDER granting 11 Motion to Amend Scheduling Order to Set New Briefing Schedule for Motions for Preliminary Relief. By JUDGE NANCY TORRESEN. (slg) (Entered: 12/18/2023) |
| 12/18/2023 | | Reset Deadlines as to 4 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction per Order #13: Responses due by 1/12/2024. Reply due by 1/31/2024. (slg) (Entered: 12/18/2023) |
| 01/03/2024 | 14 | WAIVER OF SERVICE Returned Executed as to all defendants. Waivers sent on 12/13/2023. (Attachments: # 1 Waiver of Service – Aaron Frey, # 2 Waiver of Service – David Hastings, III, # 3 Waiver of Service – Dennis Marble, # 4 Waiver of Service – Sarah LeClaire, # 5 Waiver of Service – Stacey Neumann, # 6 Waiver of Service – William Schneider)(DUNLAP, JOSHUA) Modified on 1/3/2024 to clean up text and add date waivers sent (mnd). (Entered: 01/03/2024) |
| 01/03/2024 | 15 | MOTION For Leave to Participate as Amicus Curiae Plus by PROTECT MAINE ELECTIONS Responses due by 1/24/2024. (MURRAY, PETER) (Entered: 01/03/2024) |
| 01/03/2024 | | Set Answer Deadline for All Defendants – Per Waivers of Service Returned Executed #14: Answers due by 2/12/2024. (mnd) (Entered: 01/03/2024) |
| 01/05/2024 | 16 | RESPONSE in Opposition re 15 MOTION For Leave to Participate as Amicus Curiae Plus filed by CENTRAL MAINE POWER COMPANY. Reply due by 1/19/2024. (DUNLAP, JOSHUA) (Entered: 01/05/2024) |
| 01/05/2024 | 17 | |

| | | |
|---|---|---|
| | | Joint MOTION to Consolidate Cases ( Responses due by 1/26/2024.), MOTION Concerning Page Limits by CENTRAL MAINE POWER COMPANY (DUNLAP, JOSHUA) (Entered: 01/05/2024) |
| 01/09/2024 | 18 | NOTICE of Appearance by SEAN R. TURLEY on behalf of PROTECT MAINE ELECTIONS (TURLEY, SEAN) (Entered: 01/09/2024) |
| 01/09/2024 | 19 | RESPONSE in Opposition re 15 MOTION For Leave to Participate as Amicus Curiae Plus filed by PROTECT MAINE ELECTIONS. Reply due by 1/23/2024. (TURLEY, SEAN) (Entered: 01/09/2024) |
| 01/09/2024 | 20 | ORDER TO CONSOLIDATE CASES − granting 17 Motion to Consolidate Cases; granting 17 Motion Concerning Page Limits − By JUDGE NANCY TORRESEN. (mnd) (Entered: 01/09/2024) |
| 01/09/2024 | 21 | NOTICE : Please be advised that in accordance with the Court's Order to Consolidate Cases, ECF No. 20, that cases 1:23−cv−00451−NT, 1:23−cv−00452−NT and 1:23−cv−00453−NT have been consolidated into case 1:23−cv−00450−NT. Case 1:23−cv−00450−NT is now the lead case. All further docket entries must be made in the lead case, 1:23−cv−00450−NT. (mnd) (Entered: 01/09/2024) |
| 01/09/2024 | 22 | MOTION for Temporary Restraining Order filed by VERSANT POWER and ENMAX CORPORATION. No PDF document is attached to this docket entry. Motion originally filed in case 1:23−cv−00451−NT. To view PDF document, see ECF No. 4 in case 1:23−cv−00451−NT. (mnd) (Entered: 01/09/2024) |
| 01/09/2024 | 23 | MOTION for Leave to File Excess Pages Instanter by VERSANT POWER and ENMAX CORPORATION. No PDF document is attached to this docket entry. The motion was originally filed in case 1:23−cv−00451−NT. To view PDF document, see ECF No. 5 in case 1:23−cv−00451−NT. (mnd) (Entered: 01/09/2024) |
| 01/09/2024 | 24 | MOTION for Leave to Participate as Amicus Curiae Plus by PROTECT MAINE ELECTIONS. No PDF document is attached to this docket entry. Motion originally filed in case 1:23−cv−00451. To view PDF document, see ECF No. 15 in case 1:23−cv−00451−NT. (mnd) (Entered: 01/09/2024) |
| 01/09/2024 | 25 | MOTION for Preliminary Injunction filed by MAINE PRESS ASSOCIATION and MAINE ASSOCIATION OF BROADCASTERS. NO PDF document is attached to this entry. Motion originally filed in case 1:23−cv−00452−NT. To view PDF document, see ECF No. 3 in case 1:23−cv−00452−NT. (mnd) (Entered: 01/09/2024) |
| 01/09/2024 | 26 | MOTION for Leave to Participate as Amicus Curiae Plus by PROTECT MAINE ELECTIONS. No PDF document is attached to this entry. Motion originally filed in case 1:23−cv−00452−NT. To view PDF document, see ECF No. 22 in case 1:23−cv−00452−NT. (mnd) (Entered: 01/09/2024) |
| 01/09/2024 | 27 | MOTION for Temporary Restraining Order & MOTION for Preliminary Injunction by KENNETH FLETCHER, BRENDA GARRAND, BONNIE S GOULD, JANE P PRINGLE & LAWRENCE WOLD. No PDF document is attached to this docket entry. Motion originally filed in case 1:23−cv−00453−NT. To view PDF document, see ECF No. 8 in case 1:23−cv−00453−NT. (mnd) (Entered: 01/09/2024) |

| 01/09/2024 | 28 | | MOTION for Leave to Participate as Amicus Curiae Plus by PROTECT MAINE ELECTIONS. No PDF document is attached to this docket entry. Motion originally filed in case 1:23−cv−00453−NT. To view PDF document, see ECF No.12 in case 1:23−cv−00453−NT. (mnd) (Entered: 01/09/2024) |
|---|---|---|---|
| 01/09/2024 | | | Set Deadlines as to 4 MOTION for Temporary Restraining Order, MOTION for Preliminary Injunction, 22 MOTION for Temporary Restraining Order, 25 MOTION for Preliminary Injunction, 27 MOTION for Temporary Restraining Order, MOTION for Preliminary Injunction − Per Orders #13 and #20: Consolidated Response due by 1/12/2024. Replies due by 1/31/2024. (mnd) (Entered: 01/09/2024) |
| 01/09/2024 | | | Set Deadlines − Per Order #20: Parties to confer about page limits for the Plaintiffs' reply memoranda and submit to the court a proposal, or competing proposals, concerning reply page limits by 1/19/2024. (mnd) (Entered: 01/09/2024) |
| 01/09/2024 | 29 | | ORDER granting 23 Motion for Leave to File Excess Pages Instanter − By JUDGE NANCY TORRESEN. (mnd) (Entered: 01/09/2024) |
| 01/09/2024 | 30 | | ORDER granting in part 15 Motion for Leave to Participate as Amicus Curiae Plus ; granting in part 24 Motion for Leave to Participate as Amicus Curiae Plus ; granting in part 26 Motion for Leave to Participate as Amicus Curiae Plus and granting in part 28 Motion for Leave to Participate as Amicus Curiae Plus. No party objects to Protect Maine Elections' request to file an amicus brief. Several parties do, however object to Protect Maine Elections' request to act as "amicus curiae plus" and also submit evidence and testimony on factual issues. At this stage, I will allow Protect Maine Elections to submit an amicus brief on the pending motions for preliminary injunction as a traditional amicus curiae, but will not allow it to also present evidence as an "amicus curiae plus." Protect Maine Elections may renew its request to provide evidence and testimony on factual issues at a later stage of the case, and I will reconsider the limits of amicus participation then. At this time, Protect Maine Elections will receive service of documents and notice of events and may submit an amicus brief of up to 35 pages by January 12, 2024. By JUDGE NANCY TORRESEN. (mnd) (Entered: 01/09/2024) |
| 01/09/2024 | | | Set Deadlines − Per Order #30: Amicus Brief by Protect Maine Elections due by 1/12/2024. (mnd) (Entered: 01/09/2024) |
| 01/12/2024 | 31 | | *FILED IN ERROR* MOTION Admission of Tara Malloy pro hac vice by PROTECT MAINE ELECTIONS Responses due by 2/2/2024. (MURRAY, PETER) Modified on 1/12/2024 re: error (mlm). (Entered: 01/12/2024) |
| 01/12/2024 | 32 | | *FILED IN ERROR* MOTION Admission of Megan P. McAllen pro hac vice by PROTECT MAINE ELECTIONS Responses due by 2/2/2024. (MURRAY, PETER) Modified on 1/12/2024 re: error (mlm). (Entered: 01/12/2024) |
| 01/12/2024 | 33 | | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by FREE SPEECH FOR PEOPLE Responses due by 2/2/2024. (Attachments: # 1 Exhibit Proposed Amicus Brief)(BRANN, PETER) (Entered: 01/12/2024) |
| 01/12/2024 | 34 | | NOTICE re 31 MOTION Admission of Tara Malloy pro hac vice , 32 MOTION Admission of Megan P. McAllen pro hac vice: These documents were marked filed in error and should be re−filed in accordance with Local |

| | | |
|---|---|---|
| | | Rule 83.1(c)(1) using the docketing option: Civil Events, Other Filings, Notices, Certification for Admission Pro Hac Vice (mlm) (Entered: 01/12/2024) |
| 01/12/2024 | 35 | CERTIFICATION for Admission Pro Hac Vice of Tara Malloy filed by PETER L. MURRAY on behalf of PROTECT MAINE ELECTIONS (Total admission fee $ 100 receipt number AMEDC−2900093.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (MURRAY, PETER) (Entered: 01/12/2024) |
| 01/12/2024 | 36 | CERTIFICATION for Admission Pro Hac Vice of Megan McAllen filed by PETER L. MURRAY on behalf of PROTECT MAINE ELECTIONS (Total admission fee $ 100 receipt number AMEDC−2900105.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (MURRAY, PETER) (Entered: 01/12/2024) |
| 01/12/2024 | | Set Deadlines: Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney TARA MALLOY, MEGHAN P. MCALLEN must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 1/19/2024. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (mlm) (Entered: 01/12/2024) |
| 01/12/2024 | 37 | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS Responses due by 2/2/2024. (DOLAN, SCOTT) (Entered: 01/12/2024) |
| 01/12/2024 | 38 | CERTIFICATION for Admission Pro Hac Vice of Amira Mattar filed by PETER J. BRANN on behalf of FREE SPEECH FOR PEOPLE (Total admission fee $ 100 receipt number CMEDC−2900167.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (BRANN, PETER) (Entered: 01/12/2024) |
| 01/12/2024 | 39 | CERTIFICATION for Admission Pro Hac Vice of Ben Clements filed by PETER J. BRANN on behalf of FREE SPEECH FOR PEOPLE (Total admission fee $ 100 receipt number AMEDC−2900199.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (BRANN, PETER) (Entered: 01/12/2024) |
| 01/12/2024 | 40 | CERTIFICATION for Admission Pro Hac Vice of Courtney Hostetler filed by PETER J. BRANN on behalf of FREE SPEECH FOR PEOPLE (Total admission fee $ 100 receipt number AMEDC−2900210.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at |

| | | |
|---|---|---|
| | | www.pacer.uscourts.gov (BRANN, PETER) (Entered: 01/12/2024) |
| 01/12/2024 | 41 | CERTIFICATION for Admission Pro Hac Vice of John C. Bonifaz filed by PETER J. BRANN on behalf of FREE SPEECH FOR PEOPLE (Total admission fee $ 100 receipt number AMEDC−2900225.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (BRANN, PETER) (Entered: 01/12/2024) |
| 01/12/2024 | 42 | CERTIFICATION for Admission Pro Hac Vice of Ronald A. Fein filed by PETER J. BRANN on behalf of FREE SPEECH FOR PEOPLE (Total admission fee $ 100 receipt number AMEDC−2900232.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (BRANN, PETER) (Entered: 01/12/2024) |
| 01/12/2024 | 43 | ORDER granting 33 Unopposed Motion for Leave to File Amicus Curiae Brief. Counsel is instructed to separately file its amicus curiae brief on the docket. By JUDGE NANCY TORRESEN. (RGK) (Entered: 01/12/2024) |
| 01/12/2024 | 44 | ORDER granting 37 Unopposed Motion for Leave to File Amicus Curiae Brief. The Reporters Committee for Freedom of the Press may file a brief of no more than 20 pages by January 22, 2024. By JUDGE NANCY TORRESEN. (RGK) (Entered: 01/12/2024) |
| 01/12/2024 | 45 | AMICUS CURIAE BRIEF/RESPONSE to Motion re 22 MOTION for Temporary Restraining Order, 27 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction, 25 MOTION for Preliminary Injunction, 4 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by FREE SPEECH FOR PEOPLE. Reply due by 1/26/2024. (BRANN, PETER) Modified on 1/16/2024 to reflect Amicus Curiae Brief (cjd). (Entered: 01/12/2024) |
| 01/12/2024 | | Set Deadlines : Amicus Brief Deadline from REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS due by 1/22/2024. (cjd) (Entered: 01/12/2024) |
| 01/12/2024 | 46 | BRIEF OF AMICUS CURIAE/RESPONSE in Opposition re 22 MOTION for Temporary Restraining Order, 27 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction, 25 MOTION for Preliminary Injunction, 4 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by PROTECT MAINE ELECTIONS. Reply due by 1/26/2024. (TURLEY, SEAN) Modified on 1/16/2024 to reflect Amicus Curiae Brief (cjd). (Entered: 01/12/2024) |
| 01/12/2024 | 47 | RESPONSE to Motion re 27 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction, 4 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction, 22 MOTION for Temporary Restraining Order, 25 MOTION for Preliminary Injunction filed by AARON FREY, DAVID R HASTINGS, III, SARAH E LECLAIRE, MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, DENNIS MARBLE, STACEY D NEUMANN, WILLIAM J SCHNEIDER. Reply due by 1/26/2024. (Attachments: # 1 Affidavit of Jonathan Wayne, # 2 Exhibit A: Commercial Source Contributions 2013−2023, |

| | | |
|---|---|---|
| | | # 3 Exhibit B: Aggregate Commercial Source Contributions 2013−2023, # 4 Affidavit of Jonathan Bolton, # 5 Exhibit A: Hydro−Quebec Form 18−K, # 6 Exhibit B: Letter to Hydro−Quebec, # 7 Exhibit C: Press Clippings, # 8 Exhibit D: LD 194 Committee File, # 9 Exhibit E: LD 1610 Committee File, # 10 Exhibit F: Governor's Proclamation, # 11 Exhibit G: Text of LD 1610 (the Act))(BOLTON, JONATHAN) (Entered: 01/12/2024) |
| 01/16/2024 | | Set Deadlines : Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorneys Ben Clements, Courtney Hostetler and Ronald Fein must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 1/22/2024. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (cjd) (Entered: 01/16/2024) |
| 01/19/2024 | 48 | Consent MOTION Concerning the Parties' Respective Positions on Page Limits for Plaintiffs' Reply Briefs by ENMAX CORPORATION, VERSANT POWER Responses due by 2/9/2024. (WOODCOCK, JOHN) (Entered: 01/19/2024) |
| 01/22/2024 | 49 | ORDER on Consent Motion 48 . The Court has considered the parties' respective positions on page limits for the Plaintiffs' reply briefs. Each Plaintiff may file a reply of no more than 15 pages. Alternatively, if the Plaintiffs prefer and agree, they may reallocate the Plaintiffs' combined 60 pages among themselves however they see fit. By JUDGE NANCY TORRESEN. (RGK) (Entered: 01/22/2024) |
| 01/22/2024 | 50 | AMICUS CURIAE BRIEF/RESPONSE to Motion re 25 MOTION for Preliminary Injunction, 22 MOTION for Temporary Restraining Order, 27 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction, 4 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS. Reply due by 2/5/2024. (DOLAN, SCOTT) Modified on 1/23/2024 to reflect Amicus Curie Brief (slg). (Entered: 01/22/2024) |
| 01/31/2024 | 51 | REPLY to Response to Motion re 25 MOTION for Preliminary Injunction filed by MAINE ASSOCIATION OF BROADCASTERS, MAINE PRESS ASSOCIATION. (SCHUTZ, SIGMUND) (Entered: 01/31/2024) |
| 01/31/2024 | 52 | REPLY to Response to Motion re 4 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by CENTRAL MAINE POWER COMPANY. (DUNLAP, JOSHUA) (Entered: 01/31/2024) |
| 01/31/2024 | 53 | REPLY to Response to Motion re 22 MOTION for Temporary Restraining Order filed by ENMAX CORPORATION, VERSANT POWER. (MCDONALD, PAUL) (Entered: 01/31/2024) |
| 01/31/2024 | 54 | REPLY to Response to Motion re 27 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by KENNETH FLETCHER, BRENDA GARRAND, BONNIE S GOULD, JANE P PRINGLE, LAWRENCE WOLD. (WOODCOCK, TIMOTHY) (Entered: 01/31/2024) |
| 02/06/2024 | 55 | MOTION for Oral Argument/Hearing re 25 MOTION for Preliminary Injunction by MAINE ASSOCIATION OF BROADCASTERS, MAINE PRESS ASSOCIATION Responses due by 2/27/2024. (SCHUTZ, SIGMUND) |

| | | |
|---|---|---|
| | | (Entered: 02/06/2024) |
| 02/06/2024 | 56 | MOTION for Oral Argument/Hearing re 22 MOTION for Temporary Restraining Order by ENMAX CORPORATION, VERSANT POWER Responses due by 2/27/2024. (WOODCOCK, JOHN) (Entered: 02/06/2024) |
| 02/06/2024 | 57 | NOTICE of Hearing on Motions re 4 22 , 25 , 27 , Oral Argument set for 2/23/2024 09:30 AM in Portland Courtroom 2 before JUDGE NANCY TORRESEN. (slg) (Entered: 02/06/2024) |
| 02/12/2024 | 58 | NOTICE of RESCHEDULED Hearing on Motions (LOCATION CHANGE ONLY) 22 MOTION for Temporary Restraining Order, 25 MOTION for Preliminary Injunction, 27 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction, 4 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction. Motion Hearing set for 2/23/2024 09:30 AM in Portland Courtroom 1 before JUDGE NANCY TORRESEN. (slg) (Entered: 02/12/2024) |
| 02/23/2024 | 59 | Minute Entry for proceedings held before JUDGE NANCY TORRESEN: Motion Hearing held re 22 MOTION for Temporary Restraining Order filed by ENMAX CORPORATION, VERSANT POWER, 27 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by LAWRENCE WOLD, JANE P PRINGLE, BONNIE S GOULD, BRENDA GARRAND, KENNETH FLETCHER, 25 MOTION for Preliminary Injunction filed by MAINE ASSOCIATION OF BROADCASTERS, MAINE PRESS ASSOCIATION, 4 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by CENTRAL MAINE POWER COMPANY. Opinion to issue. (Court Reporter: Tammy Martell) (jad) (Entered: 02/23/2024) |
| 02/23/2024 | 60 | NOTICE/CORRESPONDENCE Re: Proposed Rules Implementing 21−A MRSA §1064 by AARON FREY, DAVID R HASTINGS, III, SARAH E LECLAIRE, MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, DENNIS MARBLE, STACEY D NEUMANN, WILLIAM J SCHNEIDER (Attachments: # 1 Exhibit Proposed Rules)(BOLTON, JONATHAN) (Entered: 02/23/2024) |
| 02/29/2024 | 61 | ORDER granting the Plaintiffs' Motions for Preliminary Injunction [ECF No. 4] [ECF No. 22] [ECF No. 25] [ECF No. 27]. BY JUDGE NANCY TORRESEN. (RGK) (Entered: 02/29/2024) |
| 02/29/2024 | | Set Answer Deadline for MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, WILLIAM J SCHNEIDER, DAVID R HASTINGS, III, SARAH E LECLAIRE, DENNIS MARBLE, STACEY D NEUMANN, AARON FREY per Order #13: Answer due by 4/1/2024. (slg) (Entered: 03/01/2024) |
| 03/13/2024 | 62 | **FILED IN ERROR* NOTICE/CORRESPONDENCE Re: withdrawal of counsel of Benjamin S. Piper by MAINE ASSOCIATION OF BROADCASTERS, MAINE PRESS ASSOCIATION (PIPER, BENJAMIN) Modified on 3/13/2024 to mark filed in error (mlm). (Entered: 03/13/2024) |
| 03/13/2024 | 63 | NOTICE regarding 62 Notice (Other)/Correspondence : This filing has been marked FILED IN ERROR. Per Local Rule 83.2(c), no attorney may withdraw an appearance in any action except by leave of Court. (mlm) (Entered: 03/13/2024) |

| 03/13/2024 | 64 | | MOTION by Attorney Benjamin S. Piper to Withdraw as Attorney by MAINE ASSOCIATION OF BROADCASTERS, MAINE PRESS ASSOCIATION Responses due by 4/3/2024. (PIPER, BENJAMIN) (Entered: 03/13/2024) |
|---|---|---|---|
| 03/14/2024 | 65 | | ORDER granting 64 Motion by Attorney Benjamin Piper to Withdraw as Attorney. By MAGISTRATE JUDGE JOHN C. NIVISON. (NIVISON, JOHN) (Entered: 03/14/2024) |
| 03/15/2024 | 66 | | NOTICE OF APPEAL by AARON FREY, DAVID R HASTINGS, III, SARAH E LECLAIRE, MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, DENNIS MARBLE, STACEY D NEUMANN, WILLIAM J SCHNEIDER . ( Filing fee $ 605 receipt number AMEDC−2927849.)<br><br>**NOTICE TO FILER:** A transcript Report/Order form **MUST** be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov.<br><br>**NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (BOLTON, JONATHAN) (Entered: 03/15/2024) |
| 03/15/2024 | | | COPIES of Notice of Appeal Sent to Counsel Re: 66 Notice of Appeal filed by DENNIS MARBLE, DAVID R HASTINGS, III, AARON FREY, WILLIAM J SCHNEIDER, SARAH E LECLAIRE, STACEY D NEUMANN, MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES. (slg) (Entered: 03/15/2024) |
| 03/15/2024 | 67 | | APPEAL COVER SHEET Re: 66 Notice of Appeal (slg) (Entered: 03/15/2024) |
| 03/15/2024 | 68 | | CLERK'S CERTIFICATE Re: 66 Notice of Appeal Documents sent to the U.S. Court of Appeals. (slg) (Entered: 03/15/2024) |

# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

## APPEAL COVER SHEET

| D.C. #   1:23-cv-00450-NT | | C.C.A. # | |
|---|---|---|---|
| CASE TITLE: CENTRAL MAINE POWER COMPANY v. MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES et a | | | |
| Name of Counsel for Appellant(s): | Jonathan R. Bolton, Esq. Paul E. Suitter, Esq. | | |
| Name of Counsel for Appellee(s): | John A. Woodcock, III, Esq. Paul McDonald, Esq. Alexandra A. Harriman, Esq. Sigmund D. Schutz, Esq. Timothy C. Woodcock, Esq. Joshua D. Dunlap, Esq. Katherine E. Cleary, Esq. Nolan L. Reichl, Esq. | | |
| Name of Judge: | Nancy Torresen, U.S. District Judge | | |
| Court Reporter(s) & Dates: | 2/23/2024 - Tammy Martell | | |
| Transcript Ordered? | ☐ Yes | ☐ No | |
| Court Appointed Counsel? | ☐ Yes | ☒ No | |
| Fee Paid? | ☒ Yes | ☐ No | |
| In Forma Pauperis? | ☐ Yes | ☒ No | |
| Motions Pending? | ☐ Yes | ☒ No | |
| Guidelines Case? | ☐ Yes | ☒ No | |
| Related Case on Appeal? | ☐ Yes | ☒ No | |
| C. C. A. # (if available) | | | |

| Date of Last Appeal | |
|---|---|
| Special Comments: | |

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| CENTRAL MAINE POWER COMPANY | ) | |
| | ) | |
| v. | ) | CIVIL NO.  1:23-cv-00450-NT |
| | ) | |
| MAINE COMMISSION ON | ) | |
| GOVERNMENTAL ETHICS AND | ) | |
| ELECTION PRACTICES et al | ) | |

## CLERK'S CIVIL CERTIFICATE

I, Christa K. Berry, Clerk of the United States District Court for the District of Maine, hereby certify that the following are hereby electronically transmitted to the First Circuit Court of Appeals and constitute the Abbreviated record on appeal:

| Documents Numbered: | 67 | Appeal Cover Sheet |
|---|---|---|
| | 68 | Clerk's Certificate |
| | 66 | Notice of Appeal |
| | 61 | Order on Motions |
| | 4 | Motion |
| | 22 | Motion |
| | 25 | Motion |
| | 27 | Motion |

I hereby certify that the record and docket sheet available through ECF to be the certified record and docket entries. All non-electronic documents of record have been forwarded this date with a copy of this Certificate.

Non-Electronic Documents:

Dated *March 15, 2024.*

CHRISTA K. BERRY, Clerk

By: _____/s/ Stacey Graf_____
Case Manager

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CENTRAL MAINE POWER CO., et al., | |
| Plaintiffs, | |
| v. | Docket No. 1:23-cv-00450-NT |
| MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTIONS PRACTICES, et al., | |
| Defendants. | |

## <u>NOTICE OF APPEAL</u>

Pursuant to Fed. R. App. P. 3 and 28 U.S.C. § 1292(a)(1), Defendants hereby appeal to the

United States Court of Appeals for the First Circuit from this Court's Order (ECF No. 61) on

Plaintiffs' Motions for Preliminary Injunction (ECF Nos. 4, 22, 25, and 27), granting preliminary

injunctive relief, which was issued on February 29, 2024.


Dated:  March 15, 2024                          AARON M. FREY
                                                Attorney General


                                                /s/ Jonathan R. Bolton
                                                Jonathan R. Bolton
                                                Paul Suitter
                                                Assistant Attorneys General
                                                Office of the Attorney General
                                                6 State House Station
                                                Augusta, ME 04333-0006
                                                Tel. (207) 626-8800
                                                jonathan.bolton@maine.gov
                                                paul.suitter@maine.gov

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

CENTRAL MAINE POWER           )
COMPANY, et al.,              )
                             )
      Plaintiffs,         )
                             )
v.                            )    Docket No. 1:23-cv-00450-NT
                             )
MAINE COMMISSION ON           )
GOVERNMENTAL ETHICS AND       )
ELECTION PRACTICES, et al.,   )
                             )
      Defendants.         )

## ORDER ON PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

Before me are preliminary injunction motions by Plaintiffs Central Maine Power Company (ECF No. 4), Versant Power and ENMAX Corporation (ECF No. 22), the Maine Press Association and the Maine Association of Broadcasters (ECF No. 25), and a group of Maine voters and electors (ECF No. 27), seeking to enjoin the Defendants from implementing and enforcing "An Act to Prohibit Campaign Spending by Foreign Governments" (the **Act**") until a final judgment is entered in this matter. For the reasons stated below, the motions are **GRANTED**. Because I am granting the preliminary injunction on the issues that Central Maine Power Company's motion and Versant Power and ENMAX Corporation's motion raise, and because time is limited given that the Act is slated to go into effect on March 1, 2024, I do not address the arguments put forth by the remaining Plaintiffs.

## FACTUAL BACKGROUND

### A.  Central Maine Power Company and Versant Power

There are two large electric transmission and distribution utility companies operating in the State of Maine. Verified Compl. ("**CMP Compl.**") ¶ 26 (ECF No. 1).[1] The largest, Central Maine Power Company ("**CMP**"), was incorporated in Maine in 1905 and has remained a Maine company, operating and deriving its revenue from Maine customers. CMP Compl. ¶¶ 16–17, 26. It is run by a board of directors and its executive officers, all of whom are United States citizens. CMP Compl. ¶ 18. Currently, CMP's shares are 100% owned by another Maine corporation, CMP Group, Inc., which in turn is wholly owned by Avangrid Networks, Inc., another Maine corporation. CMP Compl. ¶¶ 20–21. Avangrid Networks, Inc. is 100% owned by Avangrid, Inc., a New York corporation whose shares of common stock are listed on the New York Stock Exchange and are publicly traded so anyone can buy them. CMP Compl. ¶¶ 22–23. Iberdrola, S.A., a publicly traded corporation headquartered in Spain, currently owns over 80% of Avangrid, Inc.'s shares. CMP Compl. ¶ 23. Other owners of Avangrid, Inc. stock are:

- The Qatar Investment Authority (the State of Qatar's sovereign wealth fund) – owning approximately 3.7% of outstanding Avangrid, Inc. shares; and

- Norges Bank (the central bank of the Kingdom of Norway) – owning approximately 0.4% of outstanding Avangrid, Inc. shares.

CMP Compl. ¶ 24. In addition, the Qatar Investment Authority holds approximately 8.7% and Norges Bank holds approximately 3.6% of outstanding Iberdrola, S.A.

---

[1]     Unless otherwise indicated, cites to ECF entries refer to Docket No. 1:23-cv-00450-NT.

shares. CMP Compl. ¶ 24. No one from the Qatar Investment Authority or Norges Bank serves as an officer or director of CMP (or CMP Group, Avangrid Networks, Inc., or Avangrid, Inc.). CMP Compl. ¶ 25. Nor is any officer or director of CMP, CMP Group, Avangrid Networks, Inc., or Avangrid, Inc. a Qatari or Norwegian national. CMP Compl. ¶ 25.

The other significant electric transmission and distribution utility company in Maine is Versant Power ("**Versant**"). Verified Compl. for Declaratory and Injunctive Relief ("**Versant Compl.**") ¶ 62 (ECF No. 1), Docket No. 1:23-cv-00451-NT. Versant is incorporated in Maine and (with its predecessors) has operated exclusively in Maine for more than ninety-nine years. Versant Compl. ¶¶ 15, 62. Versant's common stock is 100% owned by ENMAX US Holdco, Inc., which in turn is wholly owned by ENMAX Corporation. Versant Compl. ¶¶ 63–65. The City of Calgary in Alberta, Canada is the sole shareholder of ENMAX Corporation. Versant Compl. ¶ 58. Notwithstanding its ownership of the stock of ENMAX Corporation, the City of Calgary does not have any decision-making authority over, or the ability to participate in, the operations or management of ENMAX Corporation or the operations, management, or governance of Versant. Versant Compl. ¶ 66. It is expressly prohibited from such participation by orders of the Maine Public Utilities Commission ("**PUC**") and a stipulation that Versant entered with the PUC. Versant Compl. ¶¶ 66–87. No representative of the City of Calgary has ever served as an officer or director of Versant and no representative of ENMAX Corporation has ever served as an officer of Versant. Versant Compl. ¶ 88.

### B. The Corridor Referendum

In 2021, Maine voters faced a ballot initiative question seeking to prohibit the construction of an electric transmission line that was proposed to run through Maine from Canada and was frequently referred to as the "CMP Corridor." CMP Compl. ¶ 28. CMP engaged in political advocacy to oppose the CMP Corridor initiative. CMP Compl. ¶ 28. In addition, a corporate entity named H.Q. Energy Services (U.S.) Inc. ("**HQUS**"), a subsidiary of Hydro-Québec, made contributions, totaling over $22 million, to encourage Maine voters to reject the corridor referendum. Decl. of Jonathan Wayne ("**Wayne Decl.**") ¶¶ 13–14 (ECF No. 47-1). HQUS's massive election spending on the corridor referendum caused concern. For example, during the corridor referendum campaign, a bipartisan group of current and former Maine legislators sent a letter to the Premier of Québec and the CEO of Hydro-Québec demanding that Hydro-Québec "cease all further campaign activities in Maine and let the people of Maine vote without further meddling in our elections." Decl. of Jonathan Bolton ("**Bolton Decl.**"), Ex. B (ECF No. 47-6). And following the corridor referendum campaign, elected leaders from both major parties publicly criticized HQUS's election spending. *See* State Defs.' Combined Opp'n to the Mots. for Prelim. Relief ("**State Opp'n**") 6 (ECF No. 47) (collecting articles). This concern provoked a legislative response. In January 2021, a group of legislators introduced L.D. 194, "An Act to Prohibit Contributions, Expenditures, and Participation by Foreign Government-owned Entities to Influence Referenda." CMP Compl. ¶ 38. L.D. 194 passed by a significant margin, but the Governor vetoed it, citing concerns about L.D.

194's constitutionality. CMP Compl. ¶ 39; *see also* Bolton Decl., Ex. E (ECF No. 47-9).

### C. The Act

Undaunted, supporters of L.D. 194 then gathered enough signatures to seek enactment of a similar law—the Act—under the direct democracy provision of the Maine Constitution. Versant Compl. ¶¶ 29–30. As required by the Maine Constitution, the Act was presented to the Legislature as L.D. 1610 for additional proceedings, and it passed, but it was again vetoed by the Governor who reiterated her constitutional concerns. Versant Compl. ¶¶ 26, 31–33. As a result, the Act was placed on the November 2023 ballot as Question 2. Versant Compl. ¶ 35.

Maine voters enacted the Act by a vote of 348,781 to 55,226—the biggest win for a citizens' initiative in either percentage or absolute terms in Maine's history. Bolton Decl., Ex. F (ECF No. 10); Maine State Legislature, Legislative History Collection, Citizen Initiated Legislation, 1911–Present, https://www.maine.gov/legis/lawlib/lldl/citizeninitiated/. The Governor proclaimed the results of the election on December 6, 2023. Bolton Decl., Ex. F. As explained in greater detail below, the Act bars foreign governments and "foreign government-influenced" entities from spending on Maine's elections. 21-A M.R.S. § 1064(1)(E), (2).[2] It bolsters that ban with additional provisions, including prohibitions on solicitation or assistance activities, disclosure requirements, and affirmative duties on the media to ensure they do not

---

[2]    For ease of reference, I use the proposed statutory citation. The Act was attached to CMP's complaint as Exhibit A (ECF No. 1-1).

publish otherwise-barred communications. *Id.* § 1064(3), (4), (6), (7). Violations of the

Act are punishable by monetary penalty or imprisonment. *Id.* § 1064(8), (9).

The Act was scheduled to take effect in early January of this year and is

intended to be codified at Title 21-A, Section 1064 of the Maine Revised Statutes.

CMP Compl. ¶¶ 46, 48. The central provision of the Act, subsection 2, provides:

> **Campaign spending by foreign governments prohibited**. A
> foreign government-influenced entity may not make, directly or
> indirectly, a contribution, expenditure, independent expenditure,
> electioneering communication or any other donation or disbursement of
> funds to influence the nomination or election of a candidate or the
> initiation or approval of a referendum.

21-A M.R.S. § 1064(2). Under the Act, a "foreign government-influenced entity" is:

> (1) A foreign government; or
> (2) A firm, partnership, corporation, association, organization or other
> entity with respect to which a foreign government or foreign
> government-owned entity:
>> (a) Holds, owns, controls or otherwise has direct or indirect
>> beneficial ownership of 5% or more of the total equity,
>> outstanding voting shares, membership units or other applicable
>> ownership interests; or
>> (b) Directs, dictates, controls or directly or indirectly participates
>> in the decision-making process with regard to the activities of the
>> firm, partnership, corporation, association, organization or other
>> entity to influence the nomination or election of a candidate or the
>> initiation or approval of a referendum, such as decisions
>> concerning the making of contributions, expenditures,
>> independent expenditures, electioneering communications or
>> disbursements.

*Id.* § 1064(1)(E). A "foreign government-owned entity" means "any entity in which a

foreign government owns or controls more than 50% of its equity or voting shares."

*Id.* § 1064(1)(F). The Act also includes a disclosure provision that would require any

public communication made by a foreign government-influenced entity—that is not

otherwise prohibited—to "clearly and conspicuously contain the words 'Sponsored

by' " immediately followed by the name of the foreign government-influenced entity and a statement identifying it as a "foreign government" or a "foreign government-influenced entity." *Id.* § 1064(6).

In addition to the subsections aimed at foreign government-influenced entities, the Act contains a provision directed to "television [and] radio broadcasting station[s], provider[s] of cable or satellite television, print news outlet[s] and Internet platform[s]." *Id.* § 1064(7). Each such media-related entity must "establish due diligence policies, procedures and controls that are reasonably designed to ensure that it does not broadcast, distribute or otherwise make available to the public" any public communication that violates the Act. *Id.* § 1064(7). And, "[i]f an Internet platform discovers that it has distributed a public communication" that does violate the Act, it must "immediately remove the communication and notify the commission." *Id.* § 1064(7).

The Act imposes monetary penalties of up to $5,000 or up to double the amount expended in the prohibited action, whichever is greater, for each violation. *Id.* § 1064(8). Anyone who knowingly violates subsection 2 commits a Class C crime, *Id.* § 1064(8), which may subject the person to a term of incarceration of up to five years. 17-A M.R.S. § 1604(1)(C).

CMP and the Versant Plaintiffs have stated that they plan to engage in political speech again, but that such spending and communications are now barred under the Act. CMP Compl. ¶¶ 32–35; Versant Compl. ¶ 6.

## PROCEDURAL BACKGROUND

In mid-December 2023, four complaints were filed seeking declaratory and injunctive relief relating to the Act. CMP brought the first case against the Maine Commission on Governmental Ethics and Election Practices (the "**Commission**"), the Chairman and the four other members of the Commission, and the Attorney General of the State of Maine (collectively, the "**State**"). CMP Compl., <u>Docket No. 1:23-cv-00450</u>-NT. CMP alleged six counts: (1) that the Act's ban on referenda spending violates the First Amendment; (2) that the Act's ban on candidate campaigns violates the First Amendment; (3) that the Act's disclaimer requirement violates the First Amendment; (4) that the Act violates the Due Process Clause of the Fourteenth Amendment; (5) that the Act violates the free speech rights guaranteed by the Maine Constitution; and (6) that the remaining provisions in subsection 1 of the Act cannot be severed from the offending provisions. CMP Compl. ¶¶ 66–95. Along with its complaint, CMP also filed a motion for a temporary restraining order and preliminary injunction seeking to enjoin enforcement of the Act. Pl.'s Mot. for TRO and Prelim. Inj. ("**CMP PI Mot.**") (<u>ECF No. 4</u>).

Versant and ENMAX Corporation (together hereinafter, the "**Versant Plaintiffs**" or "**Versant**") also filed a complaint against the same Defendants. Versant Compl., <u>Docket No. 1:23-cv-00451</u>-NT. The Versant Plaintiffs alleged four counts: (1) that the Act violates the Supremacy Clause because it is preempted by federal election law; (2) that the Act violates the First and Fourteenth Amendments; (3) that the Act violates Article I, Section 4 of the Maine Constitution; and (4) that the Act violates the Foreign Commerce Clause. Versant Compl. ¶¶ 104–141. Like

CMP, Versant filed a motion for a temporary restraining order and preliminary injunction along with their complaint. Pls.' Mot. for TRO and Prelim. Inj. ("**Versant PI Mot.**") (ECF No. 22), *see* Docket No. 1:23-cv-00451-NT (ECF No. 4).

Plaintiffs Maine Press Association and Maine Association of Broadcasters (together, the "**Media Plaintiffs**") filed the third Act-related complaint against the Defendants. Compl. for Declaratory and Injunctive Relief ("**Media Compl.**") (ECF No. 1), Docket No. 1:23-cv-00452-NT. The Media Plaintiffs' complaint focuses on subsection 7 of the Act and alleges four counts: (1) that the Act is void for vagueness under the First and Fourteenth Amendments; (2) that the Act violates the First Amendment because it places an unconstitutional burden on news outlets; (3) that the Act violates the First Amendment because it constitutes a prior restraint; and (4) that the Act violates the First Amendment by imposing strict liability on the publication of political speech. Media Compl. ¶¶ 46–66. The Media Plaintiffs assert that they rely on revenue from advertisements, including political advertisements, but may have to stop running political advertisements they would otherwise accept to avoid "legal risk." Media Compl. ¶¶ 40, 43. With their complaint, the Media Plaintiffs filed a motion for preliminary injunction. Pls.' Mot. for Prelim. Inj. (ECF No. 25), *see* Docket No. 1:23-cv-00452-NT (ECF No. 3).

The last case was brought by Plaintiffs Jane Pringle, Kenneth Fletcher, Bonnie Gould, Brenda Garrand, and Lawrence Wold in their capacities as registered voters and electors (collectively, the "**Electors**"). Verified Compl. ("**Electors Compl.**") (ECF No. 1), Docket No. 1:23-cv-00453-NT. The Electors' complaint alleges eleven counts:

(1) that the Act violates their constitutional right to petition the government; (2) that the Act violates their First Amendment right to free speech by limiting the sources of information available to the Electors; (3) that the Act violates the Electors' constitutional right to freedom of assembly; (4) that the Act violates the constitutional right to freedom of the press; (5) that the Act violates Due Process Clause notice standards; (6) that the Act violates the Maine Constitution's right to petition the government; (7) that the Act violates the Maine Constitution's protection of freedom of speech; (8) that the Act violates the Maine Constitution's right of freedom of assembly; (9) that the Act violates the Maine Constitution's protection of freedom of the press; (10) that the Act violates the separation of powers set forth in the Maine Constitution; and (11) that the Act violates the due process rights guaranteed by the Maine Constitution. Electors Compl. ¶¶ 79–167. The Electors intend to continue to seek, acquire, consider, and share information covered by the Act. Electors Compl. ¶¶ 93–94. The Electors also filed a motion for a temporary restraining order and preliminary injunction. Pls.' Mot. for TRO and Prelim. Inj. (ECF No. 27), *see* Docket No. 1:23-cv-00453-NT (ECF No. 8).

On December 13, 2023, I held a teleconference, in which counsel in all four cases participated, to discuss the tight timing of the Plaintiffs' motions for a temporary restraining order given that the Act was to go into effect on January 5, 2024. Minute Entry (ECF No. 8). Following the conference, the State agreed to voluntarily refrain from enforcing the Act until February 29, 2024 to give the parties time to fully brief the issues. Following the conference, I entered an agreed-upon

scheduling order for the briefing. Order Granting Mot. to Amend Scheduling Order to Set New Briefing Schedule for Mots. for Prelim. Relief (ECF No. 13). At the joint request of the parties, the four cases were consolidated on January 9, 2024. Order to Consolidate Cases (ECF No. 20). The State filed their omnibus opposition to the motions for preliminary injunctions on January 12, 2024. State Opp'n (ECF No. 47). On January 31, 2024, the Plaintiffs all filed their replies. *See* ECF Nos. 51–54.[3] The matter came before me for oral argument on February 23, 2024.

## LEGAL STANDARD

In deciding whether to grant a preliminary injunction, district courts "must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). "In the First Amendment context, likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam).

---

[3]    In January, I also granted permission for three groups to participate as amicus curiae. An organization called Free Speech for People filed an amicus brief in support of the State's position. Amicus Curiae Br. of Free Speech for People in Supp. of Defs.' Opp'n to Pls.' Mots. for Prelim. Inj. and TROs (ECF No. 45). Another organization called Protect Maine Elections also filed an amicus brief in support of the State. Br. of Amicus Curiae Protect Maine Elections in Supp. of Defs. (ECF No. 46). And the Reporters Committee for Freedom of the Press filed an amicus brief supporting the Media Plaintiffs' position. Amicus Curiae Br. of the Reporters Committee for Freedom of the Press (ECF No. 50).

## DISCUSSION

### I.   Preemption

In their motion for a preliminary injunction, the Versant Plaintiffs assert that the Act violates the Supremacy Clause of the United States Constitution. Versant PI Mot. 9. Versant argues that the Act is expressly preempted by the Federal Election Campaign Act ("**FECA**"), 52 U.S.C. § 30101 *et seq.*, and is also impliedly preempted by FECA because the Act conflicts with Congress's framework for regulating foreign influences in United States elections. Versant PI Mot. 9–13.

#### A.   General Preemption Principles

The Supremacy Clause of the United States Constitution provides, in relevant part, that: "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Accordingly, because federal law is the supreme law of the land, Congress "has the power to pre-empt state law." *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).

Preemption may be either express or implied depending on "whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Implied preemption then consists of two types, conflict and field. *Capron v. Off. of Att'y Gen. of Mass.*, 944 F.3d 9, 21 (1st Cir. 2019); *see Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 52 (1st Cir. 2024) ("There are three types of preemption:

conflict, express, and field.”). The Versant Plaintiffs maintain that all three types of preemption—express, conflict, and field—apply here.

The party asserting preemption bears the burden of proving it. *Me. Forest Prods. Council*, 51 F.4th at 6. The “ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole.” *Gade*, 505 U.S. at 98.

## B.    Express Preemption

“Where a federal statute contains a clause expressly purporting to preempt state law” courts must “focus on the plain wording of the clause, which necessarily contains the best evidence of Congress’ preemptive intent.” *Medicaid and Medicare Advantage Prods. Ass’n of P.R., Inc. v. Hernández*, 58 F.4th 5, 11 (1st Cir. 2023) (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)); *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (same).

FECA’s express preemption provision states: “the provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office.” 52 U.S.C. § 30143(a); *see also* 11 C.F.R. § 108.7. FECA defines the term “Federal office” to mean “the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress.” 52 U.S.C. § 30101(3). The Act’s funding prohibition applies to “the nomination or *election of a candidate* or the initiation or approval of a referendum,” 21-A M.R.S. § 1064(2) (emphasis added). It does not exclude federal elections, so on its face the Act would apply to the election of a candidate to federal office.

Despite the fact that the Act does not expressly carve out elections for federal office, the State contends that the Act falls outside FECA's preemption provision. The State contends that the Act "cannot reasonably be read—and is not read by the enforcing agencies—to regulate federal elections in any way." State's Opp'n 53 (citation omitted). In support of its claim that the Act cannot reasonably be read to encompass federal elections, the State notes that, if allowed to go into effect, the Act will be housed in the Maine Revised Statutes in a chapter and subchapter that contain definitions that would limit the scope of the Act to just state and local elections. *See* State Opp'n 53 (quoting 21-A M.R.S. §§ 1011, 1051); *see also* 21-A M.R.S. § 1001(2) (defining "election" as "any primary, general or special election for state, county or municipal offices"). But at oral argument, the Versant Plaintiffs pointed to other Maine statutory provisions that could lead to the opposite conclusion. *See, e.g.*, 21-A M.R.S. §§ 335, 354.

In support of the claim that the State's enforcing agencies do not read the Act to regulate federal elections, the State offers a declaration from the current executive director of the Commission to that effect. *See* Wayne Decl. ¶¶ 5–10. But courts "may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction," and courts will "not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *United States v. Stevens*, <u>559 U.S. 460, 480</u>–81 (2010) (citations omitted).

I conclude that FECA likely expressly preempts the Act insofar as the Act covers foreign spending in elections for federal office.

## C. Implied Preemption

The next question is whether FECA impliedly preempts the Act. The Versant Plaintiffs contend that the Act is preempted by FECA under both conflict and field preemption. The State, arguing that the Act is not preempted, claims that two presumptions against preemption apply here. I consider the presumption arguments first and then go on to analyze the merits of Versant's preemption argument.

### 1. Presumptions

First, the State argues that a presumption against preemption applies because state elections are a traditional area of state regulation. "In all pre-emption cases, and particularly in those in which Congress has 'legislated in a field which the States have traditionally occupied,' [courts] 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Me. Forest Prods. Council*, <u>51 F.4th at 6</u> (quoting *Medtronic, Inc. v. Lohr*, <u>518 U.S. 470, 485</u> (1996)). "The presumption does not apply, though, 'when the State regulates in an area where there has been a history of significant federal presence.' " *Id.* (quoting *United States v. Locke*, <u>529 U.S. 89, 108</u> (2000)). The Versant Plaintiffs maintain that the presumption does not apply because the Act addresses issues of foreign affairs, which is an area the federal government typically reserves for itself.

Although the Act does touch upon an aspect of foreign affairs—how foreign governments may spend money in Maine campaigns—the Act's main focus is the

regulation of Maine elections,[4] and "the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections." *Shelby Cnty., Ala. v. Holder*, <u>570 U.S. 529, 543</u> (2013); *see Minn. Chamber of Com. v. Choi*, No. 23-CV-2015 (ECT/JFD), --- F. Supp. 3d ----, <u>2023 WL 8803357</u>, at *12 (D. Minn. Dec. 20, 2023) ("[S]tate elections are a traditional area of state regulation, and states' historical authority to exclude aliens from participating in their democratic political institutions includes prohibiting foreign nationals from spending money in their elections."). Accordingly, this presumption against preemption likely applies.

Second, the State maintains that, because FECA contains an express preemption clause, that provision provides a "reliable indicium of congressional intent" as to the scope of FECA's preemption and therefore shows that Congress did not intend to preempt laws regulating state and local elections. State Opp'n 54 (quoting *Cipollone v. Liggett Grp., Inc.*, <u>505 U.S. 504, 517</u> (1992)). In *Cipollone*, the Supreme Court stated that "Congress' enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not preempted." *Cipollone*, <u>505 U.S. at 517</u>. But a few years later, in *Freightliner Corporation v. Myrick*, <u>514 U.S. 280</u> (1995), the Supreme Court explained that *Cipollone* did "not establish a rule" that "implied pre-emption cannot exist when Congress has chosen to include an express pre-emption clause in a statute." *Freightliner*, <u>514 U.S. at 287</u>–

---

[4]      As discussed above, the State asserts that it does not interpret the Act to apply to federal elections, and I have concluded in any event that the Act is likely expressly preempted as to federal elections.

89. Instead, "[t]he fact that an express definition of the pre-emptive reach of a statute 'implies'—*i.e.,* supports a reasonable inference—that Congress did not intend to preempt other matters does not mean that the express clause entirely forecloses any possibility of implied pre-emption." *Id.* at 288. "At best, *Cipollone* supports an inference that an express pre-emption clause forecloses implied pre-emption." *Id.* at 289.

The *Cipollone* inference against implied preemption likely applies here. The Act contains an express preemption provision that states that FECA supersedes and preempts state law only "with respect to election to Federal office." 52 U.S.C. § 30143(1). That express language does not entirely foreclose the possibility that Congress intended FECA's exclusive reach to go beyond federal candidate elections to cover state and local elections too, but there is at least an inference that that was not Congress's intent. With the presumption and inference in mind, I turn to whether FECA impliedly preempts state regulation of foreign spending in candidate elections for state and local office and state referendum elections. Neither the Supreme Court nor the First Circuit has addressed this issue.

### 2. Conflict Preemption

Conflict preemption is "where compliance with both federal and state regulations is a physical impossibility or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade*, 505 U.S. at 98 (internal citations and quotations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Me. Forest Prods. Council*,

51 F.4th at 6 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). Thus, in order to decide the preemptive effect of FECA on the Act, I have to "juxtapose the state and federal laws, demarcate their respective scopes, and evaluate the extent to which they are in tension." *See Teper v. Miller*, 82 F.3d 989, 993 (11th Cir. 1996).

### a.  Juxtaposition of Federal and State Provisions on Foreign Involvement in Elections

Under FECA, a foreign national is prohibited from making, directly or indirectly, "a contribution or donation of money or other thing of value . . . in connection with a Federal, State, or local election." 52 U.S.C. § 30121(a). FECA defines "foreign national" as either an individual who is not a United States citizen or national, and who is not lawfully admitted for permanent residence, or "a foreign principal." 52 U.S.C. § 30121(b). The term "foreign principal" includes "the government of a foreign country" and "a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country." 22 U.S.C. § 611(b).

The Maine Act provides that "[a] foreign government-influenced entity may not make, directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum." 21-A M.R.S. § 1064(2). A "foreign government-influenced entity" means:

(1) A foreign government; or

(2) A firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity[5]:

   (a) Holds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests; or

   (b) Directs, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the firm, partnership, corporation, association, organization or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements.

21-A M.R.S. § 1064(1)(E).

I have already found that FECA preempts regulation of foreign spending in federal candidate elections. That leaves referenda and state and local candidate elections to review for conflict preemption. Because FECA's intended scope and the rationale for regulating these two categories of elections differ, I consider them separately.

### b. Referenda

FECA prohibits any foreign national (which includes a foreign government or a foreign corporation) from contributing or donating money "in connection with a Federal, State, or local election." 52 U.S.C. § 30121(a). Under FECA, the term "election" means "a general, special, primary, or runoff election" or "a convention or caucus of a political party which has authority to nominate a candidate." 52 U.S.C.

---

[5]     A "foreign government-owned entity" is "any entity in which a foreign government owns or controls more than 50% of its equity or voting shares." 21-A M.R.S. § 1064(1)(F).

§ 30101(1). The Supreme Court has said that FECA "regulates only candidate elections, not referenda or other issue-based ballot measures." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356 (1995); *see also FEC v. Bluman*, 800 F. Supp. 2d 281, 284 (D.D.C. 2011) (then-Judge Kavanaugh, interpreting Section 30121's identically-worded predecessor, stated "[t]his statute . . . does not bar foreign nationals from issue advocacy—that is, speech that does not expressly advocate the election or defeat of a specific candidate."). And the Federal Election Commission ("**FEC**")[6] interprets FECA as excluding referenda. *See* MUR 7523 (Stop I-186 to Protect Mining and Jobs, et al.), at 5 n.18 (FEC Oct. 4, 2021), *available at* https://www.fec.gov/files/legal/murs/7523/7523_23.pdf (noting that there has been a "longstanding distinction between elections and ballot initiative activity" and that the FEC has advised "that ballot measure activity was 'nonelection activity' that foreign nationals may lawfully engage in so long as it is not connected to a candidate's campaign"). In fact, the FEC recently recommended "that Congress amend FECA's foreign national prohibition to include ballot initiatives, referenda and any recall elections not covered by the current version of FECA." Legis. Recommendations of the FEC 2023, at 7, *available at* https://www.fec.gov/resources/cms-content/

---

[6]      Congress created the Federal Election Commission ("**FEC**") to "administer[ ] and enforc[e]" the Federal Election Campaign Act ("**FECA**") and it delegated to the FEC "extensive rulemaking and adjudicative powers." *See Buckley v. Valeo*, 424 U.S. 1, 109–10 (1976). The Supreme Court has instructed that the FEC "is precisely the type of agency to which deference should presumptively be afforded." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981); *see also Becker v. FEC*, 230 F.3d 381, 390 (1st Cir. 2000) (affording *Chevron* deference to the FEC's interpretation of several FECA statutory provisions because "[t]he FEC is the type of agency which is entitled to such deference where congressional intent is ambiguous"). *Cf. Teper v. Miller*, 82 F.3d 989, 997–98 (11th Cir. 1996) (noting tension inherent in deferring to the FEC in cases involving preemption).

documents/legrec2023.pdf.[7] Because FECA does not currently cover referenda, I conclude that it likely does not preempt the Act with respect to regulation of foreign spending on a referendum.

### c.    State and Local Candidate Elections

By contrast, FECA's prohibition on contributions by foreign nationals does extend to State and local candidate elections. FECA prohibits "foreign principals"—including foreign governments and foreign-based corporations—from "directly or indirectly" spending "in connection with a Federal, State, or local election" of a candidate. 52 U.S.C. § 30121(a). But FECA does not on its face prohibit domestic subsidiaries of foreign corporations from making donations or contributions to such elections. The Versant Plaintiffs argue that this omission "should be viewed as Congress's considered choice, not an inadvertent hole meant to be filled by state regulation." Versant PI Mot. 12. The Versant Plaintiffs assert that, because the failure to regulate domestic subsidiaries of foreign corporations was by design, the Act's prohibition on spending by United States companies with foreign ownership conflicts with Congress's intention. Versant PI Mot. 12. The State counters that the fact that FECA does not go as far as the Act in regulating foreign influence in elections is insufficient to overcome the presumption against preemption. State Opp'n 57.

---

[7]    In its recommendation, the FEC explained that it considered foreign national donations made in opposition to a Montana ballot initiative and "determined that FECA's foreign national prohibition does not reach ballot initiatives that do not appear to be linked to an office-seeking candidate at the federal, state or local level." Legis. Recommendations at 7; *see also* MUR 7523 (Stop I-186 to Protect Mining and Jobs, et al.), at 3–4, *available at* https://www.fec.gov/files/legal/murs/7523/7523_23.pdf.

The history of the foreign prohibition on spending shows that Congress has been active in this area over the last fifty years. Even before FECA was introduced in 1971, Congress had, in 1966, "amended the Foreign Agents Registration Act to prohibit foreign governments and entities from contributing to American political candidates." *United States v. Singh*, 979 F.3d 697, 709 (9th Cir. 2020) (citing Pub. L. No. 89-486, § 8, 80 Stat. 244, 248–49). When Congress amended FECA in 1974, it expanded on the existing bans by prohibiting any "foreign national"—defined as a foreign principal under the Foreign Agents Registration Act or an individual who is not a United States citizen or lawful permanent resident—from making contributions to candidates. Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93–443, 88 Stat. 1263.

"But those restrictions did not eliminate the possibility of foreign citizens influencing American elections," *Bluman*, 800 F. Supp. 2d at 283, and "suspicions of foreign influence in American elections remained a pervasive concern." *Singh*, 979 F.3d at 709. The 1996 election cycle prompted the Senate Committee on Governmental Affairs to investigate foreign campaign contributions. *Id.* "The Committee found that foreign citizens had used soft-money contributions to political parties to essentially buy access to American political officials." *Bluman*, 800 F. Supp. 2d at 283. In response to the Committee's report, Congress (eventually) passed the Bipartisan Campaign Reform Act of 2002 ("**BCRA**"), which amended FECA and further limited foreign nationals' ability to participate in elections. Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, § 303, 116 Stat. 81, 96; *see Singh*,

979 F.3d at 709. FECA, now with the BCRA amendments, bans foreign nationals from directly or indirectly making contributions or donations to a committee of a political party or "in connection with a Federal, State, or local election." 52 U.S.C. § 30121 (formerly cited as 2 U.S.C. § 441e but editorially reclassified as 52 U.S.C. § 30121).

In support of its argument that Congress intended not to regulate certain foreign-related entities that the Act encompasses, the Versant Plaintiffs point to FEC rulemaking after BCRA amended FECA. Versant PI Mot. 10–12. The FEC had sought comments on whether FECA's use of the word " 'indirectly' should be interpreted to cover U.S. subsidiaries of foreign corporations that make non-Federal donations with corporate funds or that have a separate segregated fund that makes Federal contributions." 67 Fed. Reg. 69928, 69943 (Nov. 19, 2002). BCRA's sponsors commented that "Congress in this legislation did not address 'contributions by foreign-owned U.S. corporations, including U.S. subsidiaries of foreign corporations.' " Id.

At this preliminary stage, Versant has not met its burden of showing that Congress's silence on the issue of contributions made by American subsidiaries of corporations with foreign ownership in non-federal elections means that Congress intended to preempt state efforts to regulate such contributions at both the state and local level. In enacting BCRA, Congress intended to include candidate elections for state and local office in FECA's prohibitive sweep. See Singh, 979 F.3d at 709. And the FEC recently noted that Section 30121's reach to state and local elections is

"exceptional" given that FECA "otherwise is limited to federal elections." Legis. Recommendations at 7. But the fact that FECA covers state and local elections does not mean that the Act is in conflict.

It is true that "the United States has a compelling interest . . . in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." *Bluman*, 800 F. Supp. 2d at 288. The State, however, has an equally strong interest in regulating its own state and local elections. And allowing the State of Maine to continue to exercise its traditional powers in the area of state and local candidate elections likely will not hinder Congress's intentions as set forth in FECA.

Further, when Congress added the Section 30121 prohibition preventing foreign nationals from contributing in federal, state, and local elections, it could also have amended the express preemption provision in Section 30143 to include state and local candidate elections along with those for federal office. But it did not.

Ultimately, whether the Act is in conflict with FECA's prohibition on foreign participation in state and local candidate elections is a close question, but I believe it is likely that Congress intended FECA's prohibition as a floor, and it did not intend to prohibit states from doing more to regulate foreign government influence on state and local elections. The Versant Plaintiffs' arguments to the contrary do not overcome the presumption and inference against preemption. Accordingly, I find that the Act is likely not impliedly preempted because it conflicts with FECA.

### 3.   Field Preemption[8]

Field preemption occurs when states try to "regulat[e] conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. "Where Congress occupies an entire field, . . . even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.* at 401. Thus, the critical question in field preemption is whether the "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone*, 505 U.S. at 517 (quotation omitted).

The same reasons discussed above with respect to conflict preemption apply to the field preemption analysis.[9] Versant points to the fact that Section 30121 prohibits foreign spending in federal, state, and local elections in support of its field preemption argument, and it suggests that, under the federal scheme, Congress made a deliberate choice to not include domestic corporations with foreign shareholders in FECA's ban on foreign principals' spending. But, as the *Choi* court recently explained in a similar case, "Congress does not preempt state law every time it considers

---

[8]    Although the field preemption argument was not developed in Versant's motion for preliminary injunction, I address it briefly here because they alleged field preemption in their complaint and maintained at oral argument that Congress through FECA's federal scheme has occupied the field of foreign nationals' campaign spending. *See* Versant Compl. ¶¶ 107, 110.

[9]    "Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990).

regulating a topic but ultimately declines to do so." 2023 WL 8803357, at *12; *see P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988) (explaining that "deliberate federal inaction" does not "always imply pre-emption"). And I agree with the *Choi* court's observation that "when Congress regulates, it just as often creates a floor rather than a uniform rule preempting stricter state laws." 2023 WL 8803357, at *12. On the preliminary injunction record before me, that appears to be the case, and the Versant Plaintiffs have not met their burden of showing "that Congress intended federal law to occupy [the] field exclusively." *Freightliner*, 514 U.S. at 287. Therefore, Versant is not likely to succeed on their field preemption argument.

Having concluded that FECA likely preempts the Act insofar as it regulates elections for federal office, I move on to consider the First Amendment arguments only in the context of referenda and state and local candidate elections.

## II.  First Amendment

Under *Citizens United v. FEC*, 558 U.S. 310, 365–66 (2010), corporations have a First Amendment right to engage in political speech, which includes certain types of campaign-related spending. Among other questions, this case asks whether domestic corporations with some foreign government ownership also have this right.[10]

---

[10]     The *Citizens United* decision dealt with the First Amendment rights of corporations generally, but it did not resolve whether these rights also apply to domestic corporations with foreign shareholders. *Citizens United v. FEC*, 558 U.S. 310, 362 (2010). The Supreme Court has since held that "foreign organizations operating abroad have no First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2088 (2020). This subsequent authority provides some guidance, but it does not address or resolve the open questions this case presents.

### A.  Facial Challenge

CMP and Versant (collectively, the "**Corporate Plaintiffs**") assert that subsection 2 of the Act is facially unconstitutional because it violates the First Amendment. In general, "facial challenges leave no room for particularized considerations and must fail as long as the challenged regulation has any legitimate application." *Gaspee Project v. Mederos*, 13 F.4th 79, 92 (1st Cir. 2021). However, First Amendment facial challenges based on overbreadth are different. They succeed if "a 'substantial number' of [the law's] applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.' " *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (quoting *New York v. Ferber*, 458 U.S. 747, 769–71 (1982)).

### B.  Level of Scrutiny

The Corporate Plaintiffs maintain that subsection 2 of the Act is subject to strict scrutiny. Versant PI Mot. 14–15; Central Maine Power Company's Reply in Supp. of its Mot. for Prelim. Inj. ("**CMP Reply**") 1–2 (ECF No. 52). The State advocates for more lenient "closely drawn" scrutiny. State Opp'n 13–15. Based on my review of the parties' authorities, including *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1 (1st Cir. 2012), I conclude that strict scrutiny is the appropriate standard of review. Strict scrutiny requires that the State show that the Act (1) furthers a compelling interest; and (2) is narrowly tailored to achieve that interest. *Citizens United*, 558 U.S. at 340.

## C.     Compelling Interest

The first step of strict scrutiny analysis is to assess whether the State has articulated a compelling governmental interest. The State identifies an interest in "limiting foreign-government influence in its elections" and an interest in "limiting the appearance of such influence." State Opp'n 23. The Corporate Plaintiffs respond that the State's identified interests cannot support restrictions on spending on elections or referenda by domestic corporations with foreign government shareholders. Versant PI Mot. 16–17; CMP Reply 4–5.

Neither the Supreme Court nor the First Circuit has weighed in on the First Amendment rights of domestic corporations with some foreign government ownership to spend money on elections and referenda. The closest case on point is *Bluman v. Federal Election Commission*. The plaintiffs in *Bluman* were two foreign citizens temporarily living in the United States on work visas. 800 F. Supp. 2d at 282. They wanted to make financial contributions to candidates in federal and state elections, print flyers supporting a presidential candidate to distribute in a park, and contribute money to national political parties and political groups. *Id.* at 285. But FECA's prohibition on foreign national involvement in elections barred these activities. *Id.* at 282–83 (citing 2 U.S.C. § 441e(a)). In upholding the law, then-Judge Kavanaugh wrote that the United States "has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." *Id.* at 288. This interest was based on the "straightforward principle" that "foreign citizens do not have a constitutional right to

participate in, and thus may be excluded from, activities of democratic self-government." *Id.* The *Bluman* court noted that its holding would extend to foreign corporations, but it did not address "the circumstances under which a corporation may be considered a foreign corporation for purposes of First Amendment analysis." *Id.* at 292 n.4. The Supreme Court summarily affirmed, <u>565 U.S. 1104</u> (2012), which makes the *Bluman* decision binding precedent. *See Hicks v. Miranda*, <u>422 U.S. 332, 344</u>–45 (1975).

### 1.   Interest in Limiting Foreign Government Influence in Candidate Elections

*Bluman* supports the State's claim that it has a compelling interest when it comes to limiting foreign government influence in candidate elections. *Bluman* approved limiting the participation of foreign citizens and foreign corporations "in activities of American democratic self-government" for the purpose of "preventing foreign influence over the U.S. political process." *Bluman*, <u>800 F. Supp. 2d at 288</u>; *see also Bluman*, <u>800 F. Supp. 2d at 292</u> n.4 ("Our holding means, of course, that foreign corporations are likewise barred from making contributions and expenditures prohibited by <u>2 U.S.C. § 441e(a)</u>."). This interest extends to the State interest here in limiting foreign government influence in candidate elections.

CMP argues that this interest is not compelling when it comes to corporations with just some foreign government ownership,[11] because, unlike the foreign nationals in *Bluman*, such entities could be Maine companies (like CMP itself) led by United

---

[11]      I use foreign government "ownership" as a shorthand for the full definition in 21-A M.R.S. § 1064(1)(E)(2)(a).

States citizens with long-term stakes in issues decided by Maine's elections. CMP PI Mot. 12. This argument essentially takes aim at the Act's 5% foreign government ownership threshold. *See* 21-A M.R.S. § 1064(1)(E)(2)(A). The argument is that 5% foreign government ownership is not foreign enough to sustain an interest in limiting the First Amendment rights of domestic corporations to participate in election activities. But whether this amount of foreign government ownership is sufficient to justify the Act is better tested on narrow tailoring, not whether a compelling interest exists in the first place.[12] *Bluman* thus likely extends to the State's articulated interest here with respect to state and local candidate elections.

### 2. Interest in Limiting Foreign Government Influence in Referenda Elections

A much closer question is whether *Bluman* can support the State's compelling interest when it comes to referenda elections. *Bluman* "does not address" and "should not be read to support" bans on "issue advocacy" or "speaking out on issues of public policy" by foreign individuals. 800 F. Supp. 2d at 292. But *Bluman* does support excluding those who are not "members of the American political community" from participating in "activities of American democratic self-government" in the interest of "preventing foreign influence over the U.S. political process." 800 F. Supp. 2d at 288, 290. When Maine citizens vote on referenda they are certainly participating in an activity of democratic self-government. *See* Me. Const. art. IV, pt. 3, § 18 (Maine

---

[12]  I recognize that the court in *Minnesota Chamber of Commerce v. Choi*, --- F. Supp. 3d ----, 2023 WL 8803357, at *6 (D. Minn. Dec. 20, 2023) evaluated "[t]he scope of the compelling interest" on prong one of the strict scrutiny test. But I will save this analysis for prong two.

citizens have the right to enact legislation directly by popular vote). At this initial stage of the case, and based on the reasoning that follows on narrow tailoring, I assume without deciding that limiting foreign government influence in referenda elections is a compelling interest.

### 3. Interest in Limiting the Appearance of Foreign Government Influence in Elections

In addition to the interest in limiting foreign government influence in candidate and referenda elections, the State also asserts an independent interest in limiting the *appearance* of such influence. State Opp'n 20–21. For support, the State cites cases that endorse avoiding the appearance of corruption as a compelling government interest. State. Resp. 20 (citing *Nixon v. Shrink Mo. Gov't PAC*, <u>528 U.S. 377, 390</u> (2000); *Buckley v. Valeo*, <u>424 U.S. 1, 27</u> (1976)). In addition, the State points to the historic margin of victory for the Act as evidence that Maine voters do indeed perceive that foreign government influence in elections is an urgent problem. State Opp'n 21. The Corporate Plaintiffs maintain that this interest does not make sense in the context of referenda, and moreover, that the "appearance of" justification has been strictly confined to cases involving quid pro quo corruption. CMP PI Mot. 7–8; Versant PI Mot. 16–17; CMP Reply 8–9.

*Bluman*, the authority for the compelling interest in limiting foreign government influence in candidate elections, says nothing about an independent "appearance" interest. And I am not convinced that the interest in avoiding the appearance of quid pro quo corruption also means there is an interest in avoiding the

appearance of foreign government influence. Ultimately I agree with the Corporate Plaintiffs that the appearance interest is likely not compelling.

### D. Narrow Tailoring

The Corporate Plaintiffs contend that even if there is a compelling state interest, the Act is not narrowly tailored. CMP PI Mot. 9–13; Versant PI Mot. 17–20. They primarily focus their tailoring analysis on the inclusion of entities that are 5% or more owned by foreign governments or foreign government-owned entities in the Act's definition of "foreign government-influenced entit[ies]." Versant PI Mot. 19–21; CMP PI Mot. 13; Versant Reply 8–9; CMP Reply 3–5. In the context of their facial challenge, the Corporate Plaintiffs' overbreadth argument is that too many of the Act's applications are unconstitutional as compared to the applications that are constitutionally permissible.

As explained above, subsection 2 of the Act bars campaign spending by any "foreign government-influenced entity," of which there are three types. 21-A M.R.S. § 1064(1)(E). In broad strokes they are: (1) foreign governments[13]; (2) entities that are 5% or more foreign government-owned[14]; and (3) entities with actual foreign government influence.[15]

---

[13]     21-A M.R.S. § 1064(1)(E)(1).

[14]     21-A M.R.S. § 1064(1)(E)(2)(a).

[15]     21-A M.R.S. § 1064(1)(E)(2)(b).

### 1. Foreign Governments

Subsection 2 of the Act is likely narrowly tailored when it comes to foreign governments (the 21-A M.R.S. § 1064(1)(E)(1) category). Foreign governments are obviously not members of the American political community, and like the foreign citizens in *Bluman*, they likely can be barred from election spending in Maine. *See Bluman,* 800 F. Supp. 2d at 288. FECA already bars foreign governments from spending on candidate elections, 52 U.S.C. § 30121, but it provides no protection to Maine on its referenda elections. *See McIntyre,* 514 U.S. at 356; MUR 7523 (In re Stop I-186 to Protect Mining and Jobs et al.) at *3–4. Thus, this part of the Act is necessary to further Maine's interest in limiting foreign government influence in its elections.

### 2. 5% or More Foreign Government Owned

I reach, however, a different conclusion on the narrow tailoring question when it comes to entities with 5% or more foreign government ownership (the 21-A M.R.S. § 1064(1)(E)(2)(a) category). The Act provides that: a "foreign government-influenced entity" means: "[a] firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity: [h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests." 21-A M.R.S. § 1064(1)(E)(2)(a).

CMP's main argument is that this subsection of the Act shuts domestic corporations out of the political process based on too small a percentage of foreign government ownership, which they maintain is a faulty proxy for actual foreign government influence. CMP PI Mot. 13; *see also* Versant PI Mot. 20–21. They further

contend that this ban cannot be squared with *Citizens United*, which held that corporations have a First Amendment right to spend on campaigns. CMP PI Mot. 6.

I agree that a 5% foreign ownership threshold would prohibit a substantial amount of protected speech. I cannot reconcile the Supreme Court's holding in *Citizens United* with a law that would bar a company like CMP—incorporated in Maine, governed by a Board of Directors comprised of United States citizens and run by United States citizen executive officers who reside in Maine—from campaign spending. *See Citizens United*, 558 U.S. at 362; CMP Compl. ¶¶ 16, 18. The 5% threshold would deprive the United States citizen shareholders—potentially as much as 95% of an entity's shareholders—of their First Amendment right to engage in campaign spending. Simply put, it would be overinclusive.

The State defends the 5% threshold by pointing out that it is not random; rather, in the federal securities context, "it is the amount of ownership that federal securities law recognizes as so significant as to require a special disclosure if it occurs in a publicly traded company." State Opp'n 24; *see* 15 U.S.C. § 78m(d)(1)–(3). CMP counters that the 5% figure used by the securities laws is not a proxy for control, but rather a signal to the marketplace that a hostile takeover may be in the offing. CMP Reply at 11. *See also Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 123 (2d Cir. 2001) ("By requiring the disclosure of information by a potential takeover bidder, the [Williams] Act strikes a careful balance among the interests of the bidder, the incumbent management in defending against such bid by explaining its position, and the shareholders so that they can evaluate the bidders' intentions in deciding whether

to throw in their lot with them."). It strikes me that the 5% foreign government ownership found in Maine's Act was arbitrarily chosen.[16] Moreover, I do not see how it can survive the observation in *Citizens United* that a restriction "not limited to corporations or associations that were created in foreign countries or funded *predominantly* by foreign shareholders" would be overbroad. 558 U.S. at 362 (emphasis added); *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 140 S. Ct. 2082, 2087 (2020) (foreign organizations operating abroad have no First Amendment rights, notwithstanding their affiliations with United States organizations).

Nor, at this stage, has the State offered any evidence that a foreign government or foreign government-owned entity with less than full ownership of a domestic entity has exerted influence over that entity's election spending in Maine. This evidence may come with discovery, but without it, I cannot say that this part of the law is narrowly tailored.[17]

### 3. Actual Foreign Government Influence

Unlike the other two categories, the third category of foreign government influence—found at 21-A M.R.S. § 1064(1)(E)(2)(b)—targets entities based on

---

[16]    I note that the legislative history provided by the State shows that an earlier bill (Representative Ackley's bill from the 129th Legislature) had restricted spending only for contributors who were "at least half foreign-based." Test. of Sen. Richard Bennett Before the Joint Standing Committee on Veterans & Legal Affairs, March 15, 2021 (ECF No. 47-8 at 17). And L.D. 194, which passed but was vetoed by the Governor, set the percentage for foreign ownership at 10%. (ECF No. 47-8 at 4).

[17]    I note that simply pointing to outsized spending by entities that are 5% or more owned by a foreign government or foreign government-owned entity is not sufficient. *See Citizens United*, 558 U.S. at 349–50 (rejecting the "antidistortion rationale" for restricting corporate campaign spending).

conduct, rather than identity or ownership. It provides that a "foreign government-influenced entity" means:

> A firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity: . . . [d]irects, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the firm, partnership, corporation, association, organization or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements.

21-A M.R.S. § 1064(1)(E)(2)(b).

At first blush, the conduct that subsection (E)(2)(b) targets—participation by foreign governments or foreign government-owned entities in decision-making on election spending—fits the state's interest in limiting foreign government influence in its elections more closely than the second category. The (E)(2)(b) subsection also bears a close resemblance to a definition found in a FECA regulation, 11 C.F.R. § 110.20(i),[18] which has been in effect for over twenty years without any significant challenge.

The Corporate Plaintiffs argue that the subsection (E)(2)(b) category is overly broad and too unclear to follow. *See* CMP PI Mot. 10–11, 13, 17; Versant PI Mot. 24–25. CMP claims, for example, that under the State's interpretation of "directly or

---

[18]     "Participation by foreign nationals in decisions involving election-related activities. A foreign national shall not direct, dictate, control, or directly or indirectly participate in the decision-making process of any person, such as a corporation, labor organization, political committee, or political organization with regard to such person's Federal or non-Federal election-related activities, such as decisions concerning the making of contributions, donations, expenditures, or disbursements in connection with elections for any Federal, State, or local office or decisions concerning the administration of a political committee." 11 C.F.R. § 110.20(i).

indirectly participates in the decision-making process" a foreign government-owned entity could send an unsolicited email to a domestic corporation with *no* foreign ownership about an election-related issue and the domestic corporation would lose its First Amendment right to spend on elections or referenda. CMP Reply 15.

At oral argument, the State rejected that broad reading of subsection (E)(2)(b), but the State referred to definitions contained in its proposed rules. The Maine Commission on Governmental Ethics and Election Practices has proposed definitions of direct and indirect "participation in a decision-making process." *See* 94-270, § 15(1)(C).[19] Besides being difficult to follow, these proposed definitions would appear to read out the requirement that the foreign government or foreign government-owned entity participate in the actual decision-making process. Instead, they make the communication of a preference sufficient to "influence" another entity. Thus, a domestic corporation could be barred from engaging in otherwise-protected speech not based on its own conduct, but based on unsolicited communications from a foreign government-owned entity even when no actual influence is shown. This category casts an overly broad net, and it is likely to stifle the speech of domestic corporations regardless of whether a member of a foreign government or foreign government-

---

[19]     The proposed rules state that "To 'directly participate in a decision-making process' means to communicate a direction or preference concerning the outcome of the decision-making process through a person who is an employee or official of a foreign government or an employee, director or member of a foreign government-owned entity." "To 'indirectly participate in the decision-making process' means to knowingly communicate a direction or preference concerning the outcome of the decision-making process using an intermediary, whether or not the intermediary has any formal affiliation with the foreign government or foreign government-owned entity." Notice/Correspondence re: Proposed Rules Implementing 21-A MRSA § 1064 (ECF No. 60).

owned entity has any actual influence over their decision-making on campaign spending.[20] This category is likely unconstitutional.[21]

### E. Severability

Based on this analysis, I find that a substantial number of the Act's applications are likely unconstitutional judged against the Act's plainly legitimate sweep. It is therefore likely facially invalid. Because the 5% or more foreign ownership category cannot be squared with Supreme Court precedent, and because the State's proposed interpretation of direct and indirect participation is likely overbroad, a substantial portion of the Act—two of the three foreign government-influenced entity categories—are likely unconstitutional.

Perhaps anticipating that the Act was on shaky First Amendment grounds, the State invites me to sever the Act. It maintains that I have the authority to enjoin only the unconstitutional portions or applications of the Act, while letting the constitutionally permissible portions and applications go into effect. State Opp'n 69–70. Under Maine law, if a provision or application of a law is invalid, but its "invalidity does not affect other provisions or applications which can be given effect without the invalid provision or application," the law is severable. 1 M.R.S. § 71(8); *see also Nat'l Fire Adjustment Co. v. Cioppa*, 357 F. Supp. 3d 38, 49 n.13 (D. Me. 2019). However,

---

[20]     Moreover, this definition is likely overly broad to the extent a domestic corporation would lose its First Amendment rights by discussing a topic of mutual interest with a foreign government-owned entity if that topic was the subject of a referendum.

[21]     My conclusion may change, however, if the State adopts a rule that clarifies that the foreign government or foreign government-owned entity must actually participate *in the decision-making process* regarding election spending. *Cf. OneAmerica Votes v. State*, 23 Wash. App. 2d 951, 983–84 (Wash. App. Ct. 2022) (distinguishing between debate on issue advocacy on the one hand, and decision-making on financial support to specific candidates or ballot measures on the other).

if "the provisions of a statute 'are so related in substance and object that it is impossible to determine that the legislation would have been enacted except as an entirety, if one portion offends the Constitution, the whole must fall.' " *Op. of the Justs.*, 2004 ME 54, ¶ 25, 850 A.2d 1145 (quoting *Town of Windham v. LaPointe*, 308 A.2d 286, 292 (1973)).

Given the expedited and preliminary nature of this proceeding, I decline to sever the Act at this stage. I will reserve those questions until I have the benefit of further briefing from all parties on how these changes would affect the Act's remaining provisions.

### F. Remaining Preliminary Injunction Factors

"In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Fortuño*, 699 F.3d at 10. Resolution of the remaining factors in a First Amendment case necessarily flow from the initial likelihood assessment, particularly where plaintiffs are likely to succeed on their claim. The loss of First Amendment rights, even briefly, constitutes irreparable injury. *Id.* at 10–11. On the balance of hardships, the Plaintiffs' "interest in avoiding interference with their rights to free speech outweighs the [State's] interest in enforcing an unconstitutional [law]." *Cutting v. City of Portland*, No. 2:13-cv-359-GZS, 2014 WL 580155, at *10 (D. Me. Feb. 12, 2014). And finally, the public interest could not be served by allowing enforcement of an unconstitutional bar on First Amendment-protected political speech. *Fortuño*, 699 F.3d at 15.

Accordingly, a preliminary injunction is required here. Because this is the relief sought by each Plaintiff, and preliminary resolution of Versant's preemption

claim and the Corporate Plaintiffs' First Amendment facial challenge requires an injunction, I need not reach the Corporate Plaintiffs' remaining arguments or address the arguments of the Electors or the Media Plaintiffs at this time. The Act is enjoined while this litigation proceeds.

## CONCLUSION

For the reasons stated above, I **GRANT** the Plaintiffs' motions for preliminary injunction (ECF Nos. 4, 22, 25, 27) and **ENJOIN** enforcement of 21-A M.R.S. § 1064 until final judgment is entered in this case.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 29th day of February, 2024.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

CENTRAL MAINE POWER COMPANY,

                Plaintiff,

v.

MAINE COMMISSION ON
GOVERNMENTAL ETHICS AND
ELECTION PRACTICES, *et al.*

                Defendants.

Civil Action No. _____

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WITH INCORPORATED MEMORANDUM OF LAW

NOW COMES Plaintiff Central Maine Power Company ("CMP") and hereby moves this Court on an emergency basis, pursuant to Fed. R. Civ. P. 65, for the entry of a temporary restraining order and/or preliminary injunction preventing Defendants Maine Commission on Governmental Ethics and Election Practices (the "Commission"); William J. Schneider, David R. Hastings III, Sarah E. LeClaire, Dennis Marble, Stacey D. Neumann, in their official capacities as members of the Commission; and Aaron Frey, in his official capacity as Attorney General for the State of Maine, from implementing "An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution" (the "Initiative"). The Initiative serves one undeniable purpose: to silence political speech by CMP, a 124-year-old Maine company that has been repeatedly targeted by proposed legislation and referenda hostile to its interests, including a ballot initiative that posed an existential threat to its continued operation. The proposal failed after CMP engaged in the arena of public debate; but that advocacy is now banned by the Initiative. The Initiative strikes at the heart of the First Amendment by imposing a gag on

1

CMP, forbidding it from engaging in political speech on penalty of imprisonment of its executives. Given the Initiative's egregious burden on speech, the Court should enjoin its enforcement.

FACTUAL BACKGROUND[1]

### I.    The Initiative.

Federal law already prohibits foreign nationals, *i.e.*, non-U.S. citizens, including foreign governments and foreign corporations, from making campaign expenditures and contributions in federal, state, and local elections. 52 U.S.C. § 30121. The Initiative goes much further, banning certain U.S. companies from participating in candidate and referendum elections in Maine.

Specifically, the Initiative prohibits "foreign government-influenced entit[ies]" from making, "directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence" two election activities: (1) "the nomination or election of a candidate," or (2) "the initiation or approval of a referendum." 21-A M.R.S.A. § 1064(2).[2] The Initiative defines "foreign government-influenced entity" (FGIE) broadly, to include not only a "foreign government" but also any "firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity" either (1) "[h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity" or "other applicable ownership interests," or (2) "[d]irects, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the … entity to influence the nomination or election of a candidate or the initiation or approval of a referendum." *Id.* § 1064(1)(E).

To promote this ban on campaign spending and electioneering communications, the Initiative includes other related prohibitions. It makes it unlawful to solicit, accept, or receive a

---

[1] The facts stated herein are drawn from the Verified Complaint filed contemporaneously with this Motion.
[2] For ease, Plaintiff adopts the section numbering identified in the Initiative, which is yet to be codified.

2

prohibited contribution or donation. *Id.* § 1064(3). It makes it unlawful to knowingly or recklessly provide substantial assistance in the making, solicitation, acceptance, or receipt of a prohibited contribution, expenditure, or electioneering communication. *Id.* § 1064(4). And it further makes it unlawful to "structure" a transaction to evade any of the preceding prohibitions. *Id.* § 1064(5).

The Initiative also imposes a content-based disclaimer requirement. If an FGIE "disburses funds to finance a public communication not otherwise prohibited . . . to influence the public or any state, county or local official or agency regarding the formulation, adoption or amendment of any state or local government policy or regarding the political or public interest of or governmental relations with a foreign country or foreign political party," then that communication must "clearly and conspicuously" disclose that it is sponsored by and name the FGIE making the communication, and must further describe the speaker as a "foreign government-influenced entity," *i.e.*, an actor under the aegis of a foreign state. *Id.* § 1064(6).

A violation of the Initiative is punishable by a fine of up to $5,000 or double the amount of the relevant contribution, expenditure, electioneering communication, donation, or disbursement, whichever is greater. *Id.* § 1064(8). Additionally, the Initiative makes knowing violations of the Initiative's prohibitions Class C felonies punishable by up to five years of incarceration and a fine of up to $20,000. *Id.* § 1064(9); *see* 17-A M.R.S. §§ 1604, 1704, 1705.

## II.    Central Maine Power Company.

CMP, Maine's largest electric utility company, incorporated as a Maine company in 1905 and has remained a Maine corporation ever since. Compl. ¶¶ 15-17, 26. It delivers electricity to more than 600,000 retail customers in central, western, and southern Maine. *Id.* ¶ 4. By operation of Maine law, CMP's daily operations are directed by its board of directors and executive officers, most of whom are Maine residents and all of whom are U.S. citizens. *Id.* ¶ 18.

As with many other companies, the persons holding an equity interest in CMP has changed over time. *Id.* ¶ 19. Currently, its common stock is 100% owned by CMP Group, Inc., which in turn is wholly owned by Avangrid Networks, Inc., both Maine corporations. *Id.* ¶¶ 20-21. Avangrid Networks is wholly owned by Avangrid, Inc., a New York corporation and a publicly traded company. *Id.* ¶¶ 22-23. Iberdrola, S.A., a corporation based in but not owned by Spain, owns 81.6% of Avangrid's shares. *Id.* ¶ 23. Two government entities—the Qatar Investment Authority ("QIA"), a sovereign wealth fund, and Norges Bank, the central bank of Norway—own shares of Iberdrola: the QIA owns 8.7% and Norges Bank owns 3.6% of its shares. *Id.* ¶ 24. No representative of the QIA or Norges Bank serves as an officer or director of any of the CMP or Avangrid companies. *Id.* ¶ 25. By virtue of their investments, however, these entities will likely be deemed to indirectly possess more than 5% of CMP's ownership interests. *Id.* ¶ 61.

As a major utility, CMP is closely regulated under Maine law and is routinely the subject of proposed legislation. *Id.* ¶ 26. Indeed, at the same election in which the Initiative was approved, voters rejected another initiative that would have effectively liquidated CMP by creating a new quasi-governmental entity to seize CMP's assets while approving an initiative that would have required voter approval for any such entity to borrow more than $1 billion in order take CMP's assets. *Id.* ¶ 27. Further, in 2021, CMP was the target of an initiative attempting to ban completion of the New England Clean Energy Connect transmission line (often referred to as the "CMP Corridor"). *Id.* ¶ 28. CMP engaged in political advocacy regarding these initiatives. *Id.* ¶¶ 27-28.

In addition to these major referenda, CMP's activities are routinely impacted by legislation addressing energy issues such as electric grid reliability and modernization, renewable generation development and interconnection, beneficial electrification, and greenhouse gas emission reduction. *Id.* ¶ 29. CMP has a wealth of experience and knowledge in these areas, and therefore

regularly engages in political advocacy on energy-related issues—including at the request of policy-makers—before Maine's legislative and executive branches. *Id.* ¶¶ 29-30, 35.

Given the legislative issues it confronts, CMP routinely makes contributions and expenditures relating to candidates and referenda. *Id.* ¶ 31. CMP has contributed more than $25,000 to political action committees supporting candidates for public office since 2013. *Id.* ¶ 32. CMP has contributed more than $7 million to ballot question committees supporting or opposing referenda since 2019. *Id.* ¶ 33. CMP has also expended more than $500,000 on public communications regarding matters of state policy, apart from specific campaigns. *Id.* ¶ 34. CMP intends to continue expending funds for these purposes, including during the current election cycle, and has received solicitations for contributions since the Initiative's passage. *Id.* ¶¶ 32-34, 60, 63.

The Initiative, however, bars such election advocacy. *Id.* ¶ 60. Indeed, this was a central purpose of the Initiative, whose sponsors made clear that they developed the legislation to target CMP and silence it on matters of concern to it and the public. *Id.* ¶ 55. CMP's opponents specifically cited CMP's advocacy in opposition to referenda targeting its business as a justification for the Initiative. *Id.* ¶¶ 41, 56-59. In both design and effect, therefore, the Initiative silences domestic companies from engaging in political speech on issues directly affecting them.

## DISCUSSION

CMP seeks declaratory and injunctive relief under the Civil Rights Act, <u>42 U.S.C. § 1983</u>, precluding enforcement of the Initiative as violating the First and Fourteenth Amendments of the U.S. Constitution.[3] In determining whether to grant Plaintiff's requested preliminary injunctive relief, the Court examines (1) the plaintiff's likelihood of success on the merits; (2) the potential irreparable harm to the plaintiff if the injunction is denied; (3) the balance of that harm against any

---

[3] Plaintiff does not separately address Article I, section 4 of the Maine Constitution in this Motion, but expressly reserves the argument that the state constitution guarantees broader speech rights.

hardship to the defendant; and (4) the public interest. *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012). Each prong favors entry of preliminary injunctive relief.

## I.    Plaintiff Has an Overwhelming Likelihood of Success on the Merits.

Likelihood of success is the "linchpin of the preliminary injunction analysis" in First Amendment cases. *Id.* Plaintiff is highly likely to succeed on its claims. The First Amendment protects the right of U.S. companies to engage in political speech by making campaign contributions and expenditures. *Citizens United v. FEC*, 558 U.S. 310, 336-62 (2010). Accordingly, Maine law has explicitly recognized that corporations may participate in campaigns by engaging in campaign-related spending. *See generally* 21-A M.R.S. §§ 1015, 1015-A. "If the First Amendment has any force, it prohibits [the state] from fining or jailing citizens, or associations of citizens, for simply engaging in political speech." *Citizens United*, 558 U.S. at 349.

> When Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves.

*Fortuno*, 699 F.3d at 11 (quoting *Citizens United*, 558 U.S. at 356). The Initiative is fatally flawed.

### A.    Plaintiff likely will succeed on its First Amendment claims.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *McCutcheon v. FEC*, 572 U.S. 185, 210 (2014). Laws that burden political speech by forbidding speakers from presenting facts and opinions to the public "are subject to strict scrutiny, requiring the government to prove that any restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Fortuno*, 699 F.3d at 11 (quoting *Citizens United*, 558 U.S. at 340); *see id.* at 12. Only laws imposing lesser burdens, such as disclosure requirements, are subject to lesser "exacting scrutiny," *id.* at 12—a standard requiring the state to show the law is "narrowly tailored to serve a sufficiently important governmental

interest," *Gaspee Project v. Mederos*, <u>13 F.4th 79, 85</u> (1st Cir. 2021) (citing *Ams. for Prosperity Found. v. Bonta*, <u>141 S. Ct. 2373, 2383</u> (2021)). To carry its burden, the Government "must do more than simply posit the existence of the disease sought to be cured" but "must instead point to record evidence or legislative findings demonstrating the need to address a special problem." *FEC v. Cruz*, <u>596 U.S. 289, 307</u> (2022). Defendants cannot make the necessary showing.

>    **1. The ban on campaign spending for referenda is unconstitutional.**

By banning political speech in the form of contributions, expenditures, and electioneering communications regarding referenda, the Initiative strikes at the "essence of First Amendment expression." *McIntyre v. Ohio Elections Comm'n*, <u>514 U.S. 334, 347</u> (1995). "The First Amendment affords the broadest protection to . . . political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Id.* at 346 (alterations and quotation marks omitted); *see Mills v. Alabama*, <u>384 U.S. 214, 218</u> (1966). The ban serves no compelling interest, nor is it narrowly tailored.

>    **a. There is no compelling justification for the onerous burden on the public's right to unfettered speech about referenda.**

Defendants cannot establish a compelling justification for banning speech by certain U.S. companies regarding referenda. "Whatever may be the state interest or degree of that interest in regulating and limiting contributions to or expenditures of a candidate . . . there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, <u>454 U.S. 290, 299</u> (1981) (striking down $250 limit on contributions to ballot question committees). On the other hand, limiting speech about referenda impedes the public interest in the free flow of information regarding ballot issues.

Referenda do not implicate any state interest in avoiding the appearance of improper influence and political *quid pro quos*. Because referenda are "held on issues, not candidates for

public office," it follows that "[t]he risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978). It is true, of course, that speech in the context of referenda "may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it." *Id.* Thus, any state interest in preserving the "integrity of the electoral process" cannot support a ban on campaign spending in the context of referenda campaigns. *Id.* at 788-91 (striking down ban on corporate spending on referenda).[4]

Nor does an interest in "protecting democratic self-government" justify the ban. The Supreme Court has sharply limited the interests which may be recognized as "compelling," holding that the "only" acceptable justification is prevention of *quid pro quo* corruption or its appearance. *Cruz*, 596 U.S. at 305; *see McCutcheon*, 572 U.S. at 192. Any other justification for restricting speech turns on disfavor toward certain speakers—a result the First Amendment prohibits. *See McCutcheon*, 572 U.S. at 192; *Citizens United*, 558 U.S. at 341. Thus, any "claimed interest in protecting democratic self-government does not constitute a compelling interest justifying interference with political speech" on referenda. *SD Voice v. Noem*, 380 F. Supp. 3d 939, 948-49 (D.S.D. 2019) (striking down ban on out-of-state contributions to ballot question committees).[5]

While the State lacks a compelling interest in banning speech relating to referenda, the public has a strong interest in receiving all information potentially relevant to referenda. *See*

---

[4] *See, e.g., Mich. State Chamber of Com. v. Austin*, 832 F.2d 947, 949 (6th Cir. 1987); *Let's Help Fla. v. McCrary*, 621 F.2d 195, 199-200 (5th Cir. 1980); *Mont. Chamber of Com. v. Argenbright*, 28 F. Supp. 2d 593, 600 (D. Mont. 1998), *aff'd*, 226 F.3d 1049 (9th Cir. 2000).

[5] *Bluman v. FEC* supports this conclusion. 800 F. Supp. 2d 281 (D.D.C. 2011). In that case, the court recognized an interest in protecting democratic self-government by preventing "foreign influence over the U.S. political process." *Id.* at 288. The law in *Bluman* targeted only foreign nationals, however, as discussed below; moreover, it addressed only candidate elections. *Id.* at 284. The court carefully distinguished between candidate and referenda campaigns, observing that any "risk of undue foreign influence" may well be "greater in the context of candidate elections than it is in the case of ballot initiatives." *Id.* at 291. As the court noted, it is "sensible" to conclude that the electorate is less susceptible to foreign influence. *Id.*

*Citizens United*, 558 U.S. at 339 (citizens' right "to hear" is a "precondition to enlightened self-government"). In *Bellotti*, the Supreme Court struck down Massachusetts' ban on corporate contributions and expenditures regarding referenda. 435 U.S. at 767. The Court noted that political speech is "indispensable to decisionmaking in a democracy," regardless of its source, because "[t]he inherent worth of the speech in terms of its capacity for informing the public" does not depend on the identity of the speaker. *Id.* at 776-77. Accordingly, the Court rejected the state's asserted interest in ensuring that corporations did not have undue influence in referendum elections. "[T]he direct participation of the people in a referendum . . . increases the need for the widest possible dissemination of information from diverse and antagonistic sources." *Id.* at 790 n.29 (quotation marks omitted). The First Amendment leaves "the responsibility for judging and evaluating the relative merits of conflicting arguments" to "the people in our democracy." *Id.* at 791. "[I]f there be any danger that the people cannot evaluate the information and arguments advanced . . ., it is a danger contemplated by the Framers of the First Amendment." *Id.* at 792.

There is no justification that would allow the government to silence political speech in the context of referenda campaigns. The people of Maine have a right to hear a wide variety of information from a wide variety of sources, and to weigh it based on its persuasive value.

### b. The ban is not narrowly tailored to any possible state interest.

Even if Defendants could establish a compelling interest in protecting democratic self-governance in the context of referenda campaigns, it cannot show that the law fits that purpose. A law, like the Initiative, that bans speech must be narrowly tailored—*i.e.*, it must be the least restrictive means to accomplish the state interest. *Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016). Further, the necessary fit between the state's ends and means is lacking if a law is underinclusive. *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004). Far from being

#16623884v10

the least restrictive means to achieving a valid state interest, the Initiative is so overinclusive that it prohibits the speech of Maine corporations relating to Maine referenda affecting their operations in Maine—enforced by the threat of a criminal conviction and jail time for Maine executives. Compl. ¶¶ 15-18, 26-28, 47. And the law is underinclusive in that it leaves FGIEs free to engage in substantial political activities. The Initiative is shockingly ill-tailored to any valid purpose.

If the asserted state interest is protecting democratic self-governance, a narrowly tailored law would "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy," *Frisby v. Schultz*, 487 U.S. 474, 485 (1988), by focusing on speech by foreign governments. But the Initiative does no such thing. Instead, it sweeps in U.S. companies—like CMP—that are incorporated in Maine, governed by board directors and officers who are U.S. citizens, and which make independent decisions concerning their political spending. Compl. ¶¶ 16-18, 37. The law considered in *Bluman v. FEC* stands as a useful contrast. The federal law that was upheld in that case targeted only campaign spending by *foreign nationals*, and expressly excluded domestic subsidiaries of foreign corporations whose contributions and expenditures were derived from funds generated by U.S. operations and whose decisions regarding political spending were made by U.S. citizens. 800 F. Supp. 2d at 284; *see* 52 U.S.C. § 30121 (formerly codified at 2 U.S.C. § 441e); FEC Advisory Op. No. 2006-15, at *2 (May 19, 2006). By contrast, the Initiative bans speech by many U.S. corporations, including those with indirect foreign government ownership interests as low as 5%. 21-A M.R.S. § 1064(1)(E)(2)(a). As such, the law turns on the vicissitudes of the stock market and the daily purchase and sale of equity interests by, among others, sovereign pension funds investing the retirement funds of state employees. It also includes those with *no* ownership by foreign governments or foreign government-owned entities, if a foreign entity "indirectly participates" in the U.S. company's decisionmaking on campaign activities—such as where a U.S.

10

company merely communicates with a foreign-owned company because their interests coincide. *Id.* § 1064(1)(E)(2)(b). Accordingly, the Initiative, rather than introducing a targeted prohibition on foreign government spending, bans political speech by a wide swath of U.S. companies.

In addition, the Initiative's ban is meaningfully underinclusive to any state interest in protecting the legislative process from foreign participation because it does not restrict the most prevalent forms of influencing the democratic process, including lobbying. "[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015) (quotation marks omitted); *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (*NIFLA*) ("[U]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker."). Only a few pieces of legislation are adopted via initiative in Maine; the vast majority are adopted through regular legislative process. Yet the Initiative does not preclude FGIEs from participating in that legislative process by engaging in speech supporting or opposing bills in the halls of the Maine state house or the Governor's mansion, as CMP does. Compl. ¶ 35. As such, the terms of the Initiative shield only one small part of the legislative process from "participation"—such as it is—by foreign governments, but not the most substantial.

A law that is both overinclusive and underinclusive violates the First Amendment. *See Citizens United*, 558 U.S. at 362 (finding lack of fit between asserted interest in avoiding foreign influence in elections and the scope of the law, which banned speech by U.S. companies); *Bellotti*, 435 U.S. at 790-94 (finding lack of fit between the governmental interest asserted and the law's scope). The ban on spending by FGIEs on referenda is therefore unconstitutional.

11

     **2.**    **The ban on campaign spending for candidate campaigns is unconstitutional because, even if there is a compelling reason for limiting foreign participation in candidate elections, it is not narrowly tailored.**

As with the ban on speech relating to referenda campaigns, the prohibition on contributions, expenditures, or electioneering communications regarding candidate campaigns also strikes at the "essence of First Amendment expression"—"it can hardly be doubted that the [First Amendment] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *McIntyre*, 514 U.S. at 346-47 (quotation marks omitted). The candidate spending prohibition simply does not fit any possibly relevant state interest.

Because a ban on political speech cannot be premised on the corporate nature of a speaker, *Citizens United*, 558 U.S. at 342, Defendants must—but cannot—point to something more to justify the Initiative. Based on Supreme Court precedent recognizing the limited rights and privileges of foreign citizens, *Bluman* recognized a compelling interest in "limiting the participation of *non-Americans* in the activities of democratic self-government." 800 F. Supp. 2d at 290; *see id.* at 287-88. The conclusion in *Bluman* hinged on the notion that foreign nationals could be prohibited from participating in U.S. elections because they have no "long-term stake in the flourishing of American society"—a rationale that does not apply to those who do share such a stake. *Id.* at 291; *see id.* at 290-92 (distinguishing lawful permanent residents). *Bluman*'s rationale is therefore inapplicable to U.S. companies, like Plaintiff, that have long-standing interests relating to a host of issues that have been and will continue to be the subject of legislative efforts. CMP has been a Maine company for over a hundred years, is led by U.S. citizens, and is not only a participant in Maine society, but it is in fact one of two major electric transmission and distribution utilities in the state. Compl. ¶¶ 4, 15-18, 26. As such, CMP is frequently confronted by serious policy questions which require political engagement by the company both because of

its expertise and because it must directly participate in the execution of the State's energy policy. *Id.* ¶¶ 26, 29-30. There is no adequate justification for the Initiative's broad sweep.

Further, the ban on spending in the context of candidate elections is not narrowly tailored to any interest in preventing foreign governments from influencing the political process. In *Citizens United*, the Supreme Court declined to determine whether the state "has a compelling interest in preventing foreign individuals or associations from influencing our Nation's political process" because the ban on candidate spending by U.S. corporations was "not limited to corporations . . . that were created in foreign countries or funded predominately by foreign shareholders." 558 U.S. at 362. As discussed above, that is precisely the problem with the Initiative: it shuts U.S. companies out of the political process by banning speech by U.S. companies with as little as 5% foreign government ownership interests, as well as U.S. companies with no foreign government ownership interests if there is some "direct or indirect" participation by a foreign government in relation to campaign activities. 21-A M.R.S. § 1064(1)(E)(2)(a)-(b). The scope of the Initiative thus turns on happenings in the stock market (decisions beyond a company's control) and the nature of the issue at stake (namely, whether the issue at hand might generate discussion between a U.S. company and a similarly affected foreign government-owned company), rather than any real link to foreign meddling. The mismatch between any purported end and the means employed to achieve that end shows that the candidate spending ban is fatally overinclusive. *See McIntyre*, 514 U.S. at 350-52 (lack of fit between state law and any state interest in false or misleading statements showed that the statute was overinclusive, and thus infirm).

### 3. The disclaimer provision is unconstitutional because it imposes a severe burden that is not narrowly tailored to serve a sufficient state interest.

The requirement that U.S. companies qualifying as FGIEs place disclaimers on public communications influencing the formulation of state or local government policy is also

unconstitutional. This requirement is fatally flawed, whether the Court applies strict or exacting scrutiny, because it imposes a severe burden that does not fit a sufficient state justification.

The disclaimer requirement imposes a severe burden that necessitates strict scrutiny. To be sure, disclaimer requirements that simply require the speaker to include basic factual information (such as its name) on the communication are subject to exacting scrutiny because they are minimally burdensome and are justified by the state interest in promoting an informed electorate. *Gaspee Project*, 13 F.4th at 83, 90-92, 95 (applying exacting scrutiny to disclaimer requirement that did not compel speech because it was factual in nature and did not impose a requirement to state a message contrary to the speaker's beliefs); *see Citizens United*, 558 U.S. at 366-71. The Initiative imposes no ordinary factual disclaimer requirement, however. Rather, it requires U.S. companies qualifying as FGIEs—including, as discussed above, those with little or no foreign government ownership—to characterize themselves as "foreign government-influenced entities." 21-A M.R.S. § 1064(6). This characterization is potentially damaging to the company's reputation because it implies a level of foreign control that may be misleading or even false (as is the case with CMP). Because the Initiative compels U.S. companies to convey a government message— namely, that the company is suspect because it has some relation to a foreign government, no matter how attenuated and no matter whether that government has any real influence—it is a content-based regulation subject to strict scrutiny. *NIFLA*, 138 S. Ct. at 2371 (applying strict scrutiny and striking down law compelling speakers to convey a substantive government script).

Nevertheless, the Initiative fails any applicable scrutiny. First, it fails strict scrutiny because it does not serve a compelling state interest. Content-based regulations of political speech must be justified only by anti-corruption interests, *see Citizens United*, 558 U.S. at 356-61, but the simple transmission of public-policy related communications does not pose the threat of *quid pro*

14

*quo* corruption. Speech relating to public policy is just that—speech. The people of Maine are fully capable of listening to speech, assessing the persuasive value of that speech, and shaping their opinions based on their informed judgment. That is precisely what the First Amendment protects. *Bellotti*, 435 U.S. at 790-91. Second, the Initiative fails under exacting scrutiny because it does not serve a substantial state interest. The primary justification for disclaimers is ensuring an informed electorate. *Gaspee Project*, 13 F.4th at 86-88. While this interest may ordinarily suffice for purposes of exacting scrutiny, *id.*, it does not justify the Initiative's disclaimer requirement. The requirement does not even apply to electioneering communications, which are completely prohibited by the Initiative, 21-A M.R.S. § 1064(2); instead, it applies only to public communications regarding public policy issues generally, outside the election context, *id.* § 1064(6); *cf. Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 40, 41-44 (1st Cir. 2011) (upholding disclosure and disclaimer laws applicable to "election-related advocacy"). Stated simply, the requirement does not aim at any electorate, much less inform that electorate. The Initiative's disclaimer requirement thus compels speech, including even false speech, for no valid reason.

Further, even assuming the Interest serves a sufficiently substantial state interest, the Initiative fails both strict scrutiny and exacting scrutiny because the disclaimer requirement does not fit any asserted interest. As noted above, to satisfy strict scrutiny, the law must be the least restrictive means to achieving the state's interest. *Bonta*, 141 S. Ct. at 2383. To satisfy exacting scrutiny, the law must have not only a "substantial relation" to the state interest, but also "fit" the state interest in a manner that "represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective." *Id.* at 2384 (quotation marks omitted); *see Gaspee Project*, 13 F.4th at 85. The disclaimer standard fails under either standard.

#16623884v10

The disclaimer requirement is substantially overinclusive. *See Bonta*, 141 S. Ct. at 2385-87 (finding a "dramatic mismatch" between the disclosure requirement and the purported state interest). The Initiative does not target just those companies that potentially present the threat the Initiative purports to address, namely, those that reflect actual foreign control. The ownership threshold in the definition of FGIE is so minimal, at an "indirect" 5%, that it includes many companies that are not controlled by foreign governments at all. 21-A M.R.S. § 1064(1)(E)(2).[6] Nevertheless, the Initiative slaps these companies with a pejorative label that the affected companies themselves must convey, regardless of their disagreement with that message or its accuracy. Moreover, the topics to which the disclaimer requirement applies have no relation to the identity of the speaker as a "foreign government influenced entity," even if that term is taken at face value. Communications regarding "*any* state or local government policy," not just those affecting foreign interests, are subject to the disclaimer requirement. *Id.* § 1064(6) (emphasis added). This means that a U.S. company that happens to have investments by foreign sovereign pension funds is prohibited from speaking on *any* matter of public policy absent a disclaimer that has no relation to either the speaker or the topic at hand—and which may be false. Accordingly, the disclosure requirement is constitutionally infirm.

**B. Plaintiff is likely to succeed on its due process claim.**

The Initiative's flaws are compounded by its unconstitutionally vague definition of what constitutes an FGIE. A law is impermissibly vague under the Fourteenth Amendment if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*,

---

[6] The default standard of Maine corporate law requires a corporation to be governed by its board of directors, the members of which owe the corporation fiduciary duties, and thus a Maine corporation cannot as a matter of law blindly follow the interests of its shareholders, foreign or domestic. *See* 13-C M.R.S. §§ 801, 831.

553 U.S. 285, 304 (2008); *see McKee*, 649 F.3d at 62. "To prevent the chilling of constitutionally protected speech, we apply a heightened standard in cases involving the First Amendment and require a greater degree of specificity in a statute that restricts speech," particularly when criminal penalties may be imposed. *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022) (alterations and quotation marks omitted); *see Local 8027 v. Edelblut*, 651 F. Supp. 3d 444, 460 (D.N.H. 2023).

The Initiative fails to provide adequate notice regarding its scope, and further fails to provide sufficient guidance for enforcement. *See Local 8027*, 651 F. Supp. 3d at 462-63; *Fayetteville Pub. Libr. v. Crawford Cnty*, 2023 WL 4845636, at *17 (W.D. Ark. 2023). The Initiative defines an FGIE as a business entity "with respect to which a foreign government or foreign government-owned entity" holds an ownership interest of 5% or more. 21-A M.R.S. § 1604(1)(E)(2)(a). But this definition is entirely unclear on a crucial point: whether a company is an FGIE when there are multiple foreign governments or foreign-government owned entities each holding less than a 5% ownership interest but, in the aggregate, more than a 5% ownership interest, or, alternatively, whether a company is an FGIE only if a single foreign government or foreign government-owned entity owns more than a 5% ownership interest.[7] The Initiative also defines an FGIE as an entity "with respect to which a foreign government or foreign government owned entity . . . directly or indirectly participates in the decision-making" regarding campaign spending. *Id.* § 1604(1)(E)(2)(b). What this means is open-ended: for example, does it sweep in mere expressions of opinion by an executive of a domestic, but foreign-owned, corporation to an executive of a domestic, and U.S.-owned, corporation on a political matter of mutual interest?

---

[7] This ambiguity highlights the Initiative's overinclusive and underinclusive nature. If the Initiative does not require more than a 5% ownership interest by a single foreign entity, then it would ban speech by companies that have small interests held by various foreign entities, none of which have any say in the company's operations. If, however, the law requires more than a 5% ownership interest by a single foreign entity, it means that the law would not foreclose speech by companies that, in the aggregate, have foreign interests exceeding 5% and that therefore present a greater chance of foreign influence on campaigns.

Given the lack of clarity regarding the scope of the Initiative, the Initiative fails to adequately identify those potentially subject to the law. This, in turn, will result in the chilling of protected speech. For the same reason, the Initiative leaves open the possibility of discriminatory enforcement, the risks of which are highlighted by the fact that the Initiative was targeted at Plaintiff. Compl. ¶¶ 55-59. The law is therefore unconstitutionally vague.

### C. The Initiative must fall in its entirety as facially unconstitutional.[8]

In the context of a First Amendment challenge, a law is facially unconstitutional "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Bonta*, 141 S. Ct. at 2387 (quotation marks omitted). As discussed above, subsections 2 and 6 impose unconstitutional burdens on U.S. companies with minimal or nonexistent ownership by foreign governments. The Initiative is thus overbroad. *Id.*

Moreover, given the fatal flaws of subsections 2 and 6, the remainder of the Initiative must fall as well. *See N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 19 (1st Cir. 1996). Under Maine law, which controls whether the Initiative's provisions are severable, *see R.I. Med. Soc. v. Whitehouse*, 239 F.3d 104, 106 (1st Cir. 2001), the entire Initiative must be invalidated if (1) the invalid provisions are "integral to the initiated bill," and (2) the remaining provisions cannot "function and be given effect absent the invalid provisions," *Op. of the Justices*, 2004 ME 54, ¶ 24, 850 A.2d 1145. The provisions of the Initiative entirely revolve around the ban on campaign spending and disclaimer requirements. Absent subsections 2 and 6, the Initiative's other provisions relating to solicitations, substantial assistance, structuring, due diligence, and penalties make no sense. 21-A M.R.S. § 1064(3)-(5), (7)-(9). Thus, except as to its hortatory provision regarding an anticorruption constitutional amendment, the Initiative's provisions are not severable.

---

[8] Plaintiff expressly reserves the right to assert as-applied First and Fourteenth Amendment challenges.

18

## II.    Enforcement of the Initiative Will Cause CMP Irreparable Harm.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Fortuno*, 699 F.3d at 10–11; *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981) ("It is well established that the loss of first amendment freedoms constitutes irreparable injury."). Thus, "irreparable injury is presumed upon a determination that [Plaintiff is] likely to prevail upon [its] First Amendment claim," *Fortuno*, 699 F.3d at 11, and it is reversible error to find that deprivation of First Amendment rights is not irreparable, *id.* at 15. That presumption is fully justified in this case, where the Initiative imposes criminal penalties. Compl. ¶ 47. Absent the Initiative, CMP would otherwise engage in the now-prohibited political activities. *Id.* ¶¶ 26-34, 60, 63. Thus, unless granted the relief sought here, CMP executives will face a choice between foregoing the company's First Amendment rights or risking jail. CMP would have no adequate remedy for its injury.

## III.    The Balance of Hardships Favors an Injunction.

The State has no real argument that the balance of hardship weighs in its favor. "First Amendment freedoms must always be protected; that is why they have a special, separate place in the Constitution." *Firecross Ministries v. Mun. of Ponce*, 204 F. Supp. 2d 244, 251 (D.P.R. 2002). On the other hand, the State "is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302-03 (4th Cir. 2011); *see Cutting v. City of Portland*, 2014 WL 580155, at *10 (D. Me. Feb. 12, 2014), *aff'd*, 802 F.3d 79 (1st Cir. 2015). Accordingly, "the balance weighs heavily against Defendant[]" in a First Amendment case. *Firecross Ministries*, 204 F. Supp. 2d at 251.

There is no extraordinary concern that would tip the scale in favor of Defendants in this case. An injunction would simply restore the *status quo ante* and would not require Defendants to

take any action. *See Faraone v. City of E. Providence*, <u>935 F. Supp. 82, 90</u> (D.R.I. 1996). Therefore, the only real consequence of an injunction would be that Plaintiff, which would otherwise be unlawfully prevented from exercising its free speech rights, would be able to continue participating in the political process as it has for decades. *Fortuno*, <u>699 F.3d at 16</u> (injunction is appropriate where it simply allows the plaintiff to exercise its First Amendment rights).

## IV.  The Public Interest Would Be Served by an Injunction.

"It is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation." *Condon v. Andino, Inc.*, <u>961 F. Supp. 323, 331</u> (D. Me. 1997). To the contrary, "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights.'" *Magriz v. Union de Tronquista de P.R., Local 901*, <u>765 F. Supp. 2d 143, 157</u> (D.P.R. 2011) (quotation marks omitted).

That is particularly true here. Because freedom of speech is one of the cornerstones of our Republic, suppressing First Amendment rights "innately harms the public interest as a whole." *Firecross Ministries*, <u>204 F. Supp. 2d at 251</u>. "[S]uppression of political speech harms not only the speaker, but also the public to whom the speech would be directed: 'The right of citizens to inquire to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it.'" *Fortuno*, <u>699 F.3d at 15</u> (quoting *Citizens United*, <u>558 U.S. at 339</u>). The public good will thus be served by an injunction.

## CONCLUSION

Plaintiff respectfully requests that the Court preliminarily enjoin Defendants from enforcing the Initiative until the Court has issued a final judgment in this matter.

Dated at Portland, Maine this 12th day of December, 2023.

Respectfully submitted,

/s/ Joshua D. Dunlap
Joshua D. Dunlap
Nolan L. Reichl
Katherine E. Cleary
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial St.
Portland, ME 04101
Phone: 207-791-1100
Email: jdunlap@pierceatwood.com
Email: nreichl@pierceatwood.com
Email: kcleary@pierceatwood.com

*Attorneys for Plaintiff Central Maine Power Co.*

#16623884v10

# CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2023, I electronically filed the foregoing document, via e-mail to the United States District Court for the District of Maine, with a copy to counsel for Defendants and will serve the same upon Defendants.


DATED: December 12, 2023

*/s/ Joshua D. Dunlap*
Joshua D. Dunlap
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial St.
Portland, ME 04101
Phone: 207-791-1100
Email: jdunlap@pierceatwood.com

*Attorneys for Plaintiff*
*Central Maine Power Co.*

.

# PIERCE ATWOOD LLP

**JOSHUA D. DUNLAP**

Merrill's Wharf
254 Commercial Street
Portland, ME 04101

**P** 207.791.1103
**F** 207.791.1350
jdunlap@pierceatwood.com
pierceatwood.com

Admitted in: MA, ME, NH

December 12, 2023

**VIA EMAIL to MaineECFIntake@med.uscourts.gov**

Christa K. Berry
Clerk of Court, United States District Court of the District of Maine
Edward T. Gignoux United States Courthouse
156 Federal Street
Portland, ME 04101

Re:     *Central Maine Power Company v. Maine Commission on Governmental Ethics and Election Practices, et al.*

Dear Ms. Berry:

I write on behalf of Plaintiff Central Maine Power Company ("CMP") with respect to CMP's Motion for Preliminary Injunction and Incorporated Memorandum of Law (the "Motion"), filed this same day with CMP's Complaint in this matter.

This action concerns "An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution" (the "Initiative"), which Maine voters adopted in Maine's November 2023 general election.  By operation of Maine law, the Initiative will become effective on Friday, January 5, 2024.

The Initiative violates, among other things, the First and Fourteenth Amendments to the United States Constitution.  As set forth in the Motion, the effectiveness and imminent enforcement of the Initiative—which includes criminal penalties for violations of its terms—will cause CMP irreparable harm.  Accordingly, CMP respectfully requests the Court convene a conference of counsel as soon as possible to discuss a briefing schedule for the Motion.

Undersigned counsel for CMP can represent to the Court that all Defendants are represented by Assistant Attorneys General Jonathan R. Bolton and Paul Suitter, who have been aware of this action for several weeks and with whom undersigned counsel has conferred about a potential briefing schedule.  Undersigned counsel copied Attorney Bolton and Attorney Suitter on the case opening email sent to the Court, which included the Motion and all documents filed in support thereof.

Lastly, CMP is aware that three other complaints have been or will be filed by other parties challenging the Initiative.  CMP respectfully suggests that the Court may wish to hold one conference of counsel that includes all parties challenging the Initiative, as the Court ultimately may wish to consolidate these cases pursuant to Rule 42(a) of the Federal Rules of Civil Procedure.

Christa K. Berry
December 12, 2023
Page 2

Thank you for your attention and consideration.

Sincerely,

Joshua D. Dunlap

cc:     Jonathan R. Bolton, AAG (via email:  jonathan.bolton@maine.gov)
        Paul Suitter, AAG (via email:  paul.suitter@maine.gov)

```
MIME-Version:1.0
From:cmecf@med.uscourts.gov
To:cmecfnef@med.uscourts.gov
Bcc:
--Case Participants: JONATHAN R. BOLTON (jonathan.bolton@maine.gov,
laura.solisfarias@maine.gov), KATHERINE E. CLEARY (kcleary@pierceatwood.com,
mclifford@pierceatwood.com), JOSHUA D. DUNLAP (hstevens@pierceatwood.com,
jdunlap@pierceatwood.com), ALEXANDRA A. HARRIMAN (aharriman@preti.com, ncondon@preti.com),
PAUL MCDONALD (jsmith@bernsteinshur.com, mthomas@bernsteinshur.com,
pmcdonald@bernsteinshur.com, sgagnon@bernsteinshur.com), PETER L. MURRAY
(mmcardle@mpmlaw.com, pmurray@gwi.net, pmurray@mpmlaw.com), BENJAMIN S. PIPER
(bpiper@preti.com, jtreuhaft@preti.com), NOLAN L. REICHL (hstevens@pierceatwood.com,
nreichl@pierceatwood.com), SIGMUND D. SCHUTZ (jcharron@preti.com, sschutz@preti.com), PAUL
E. SUITTER (pamela.chaput@maine.gov, paul.suitter@maine.gov), SEAN R. TURLEY
(sturley@mpmlaw.com), JOHN A. WOODCOCK, III (jsmith@bernsteinshur.com,
jwoodcock@bernsteinshur.com), TIMOTHY C. WOODCOCK (amckinnon@eatonpeabody.com,
jwilliams@eatonpeabody.com, kdisley@eatonpeabody.com, twoodcock@eatonpeabody.com),
MAGISTRATE JUDGE JOHN C. NIVISON (cmecfnef@med.uscourts.gov), JUDGE NANCY TORRESEN
(cmecfnef@med.uscourts.gov, rebecca_klotzle@med.uscourts.gov), JUDGE LANCE E. WALKER
(cmecfnef@med.uscourts.gov)
--Non Case Participants: ECF In Box (maineecfintake@med.uscourts.gov)
--No Notice Sent:

Message-Id:3008253@med.uscourts.gov
Subject:Activity in Case 1:23-cv-00450-NT CENTRAL MAINE POWER COMPANY v. MAINE COMMISSION
ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES et al Motion for TRO
```
Content−Type: text/html

# U.S. District Court

## District of Maine

**Notice of Electronic Filing**

The following transaction was entered on 1/9/2024 at 1:24 PM EST and filed on 1/9/2024

| | |
|---|---|
| **Case Name:** | CENTRAL MAINE POWER COMPANY v. MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES et al |
| **Case Number:** | 1:23−cv−00450−NT |
| **Filer:** | ENMAX CORPORATION<br>VERSANT POWER |
| **Document Number:** | 22(No document attached) |

**Docket Text:**
 **MOTION for Temporary Restraining Order filed by VERSANT POWER and ENMAX CORPORATION. No PDF document is attached to this docket entry. Motion originally filed in case 1:23−cv−00451−NT. To view PDF document, see ECF No. 4 in case 1:23−cv−00451−NT. (mnd)**

**1:23−cv−00450−NT Notice has been electronically mailed to:**

ALEXANDRA A. HARRIMAN &nbsp &nbsp aharriman@preti.com, ncondon@preti.com

BENJAMIN S. PIPER &nbsp &nbsp bpiper@preti.com, jtreuhaft@preti.com

JOHN A. WOODCOCK , III &nbsp &nbsp jwoodcock@bernsteinshur.com, jsmith@bernsteinshur.com

JONATHAN R. BOLTON &nbsp &nbsp jonathan.bolton@maine.gov, Laura.SolisFarias@maine.gov

JOSHUA D. DUNLAP &nbsp &nbsp jdunlap@pierceatwood.com, hstevens@pierceatwood.com

KATHERINE E. CLEARY &nbsp &nbsp kcleary@pierceatwood.com, mclifford@pierceatwood.com

NOLAN L. REICHL &nbsp &nbsp nreichl@pierceatwood.com, hstevens@pierceatwood.com

PAUL MCDONALD &nbsp &nbsp pmcdonald@bernsteinshur.com, jsmith@bernsteinshur.com, mthomas@bernsteinshur.com, sgagnon@bernsteinshur.com

PAUL E. SUITTER &nbsp &nbsp paul.suitter@maine.gov, Pamela.Chaput@maine.gov

PETER L. MURRAY &nbsp &nbsp pmurray@mpmlaw.com, mmcardle@mpmlaw.com, pmurray@gwi.net

SEAN R. TURLEY &nbsp &nbsp sturley@mpmlaw.com

SIGMUND D. SCHUTZ &nbsp &nbsp sschutz@preti.com, jcharron@preti.com

TIMOTHY C. WOODCOCK &nbsp &nbsp twoodcock@eatonpeabody.com, amckinnon@eatonpeabody.com, jwilliams@eatonpeabody.com, kdisley@eatonpeabody.com

**1:23−cv−00450−NT Notice has been delivered by other means to:**

```
MIME-Version:1.0
From:cmecf@med.uscourts.gov
To:cmecfnef@med.uscourts.gov
Bcc:
--Case Participants: JOSHUA D. DUNLAP (hstevens@pierceatwood.com,
jdunlap@pierceatwood.com), JONATHAN R. BOLTON (jonathan.bolton@maine.gov,
laura.solisfarias@maine.gov), SEAN R. TURLEY (sturley@mpmlaw.com), TIMOTHY C. WOODCOCK
(amckinnon@eatonpeabody.com, jwilliams@eatonpeabody.com, kdisley@eatonpeabody.com,
twoodcock@eatonpeabody.com), BENJAMIN S. PIPER (bpiper@preti.com, jtreuhaft@preti.com),
KATHERINE E. CLEARY (kcleary@pierceatwood.com, mclifford@pierceatwood.com), ALEXANDRA A.
HARRIMAN (aharriman@preti.com, ncondon@preti.com), PETER L. MURRAY (mmcardle@mpmlaw.com,
pmurray@gwi.net, pmurray@mpmlaw.com), PAUL MCDONALD (jsmith@bernsteinshur.com,
mthomas@bernsteinshur.com, pmcdonald@bernsteinshur.com, sgagnon@bernsteinshur.com), JOHN
A. WOODCOCK, III (jsmith@bernsteinshur.com, jwoodcock@bernsteinshur.com), PAUL E. SUITTER
(pamela.chaput@maine.gov, paul.suitter@maine.gov), NOLAN L. REICHL
(hstevens@pierceatwood.com, nreichl@pierceatwood.com), SIGMUND D. SCHUTZ
(jcharron@preti.com, sschutz@preti.com), JUDGE NANCY TORRESEN (cmecfnef@med.uscourts.gov,
rebecca_klotzle@med.uscourts.gov), MAGISTRATE JUDGE JOHN C. NIVISON
(cmecfnef@med.uscourts.gov), JUDGE LANCE E. WALKER (cmecfnef@med.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:3008279@med.uscourts.gov
Subject:Activity in Case 1:23-cv-00450-NT CENTRAL MAINE POWER COMPANY v. MAINE COMMISSION
ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES et al Motion for Preliminary Injunction
```
Content−Type: text/html

## U.S. District Court

### District of Maine

## Notice of Electronic Filing

The following transaction was entered on 1/9/2024 at 1:38 PM EST and filed on 1/9/2024

| | |
|---|---|
| **Case Name:** | CENTRAL MAINE POWER COMPANY v. MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES et al |
| **Case Number:** | 1:23−cv−00450−NT |
| **Filer:** | MAINE ASSOCIATION OF BROADCASTERS |
| | MAINE PRESS ASSOCIATION |
| **Document Number:** | 25(No document attached) |

**Docket Text:**
**MOTION for Preliminary Injunction filed by MAINE PRESS ASSOCIATION and MAINE
ASSOCIATION OF BROADCASTERS. NO PDF document is attached to this entry. Motion
originally filed in case 1:23−cv−00452−NT. To view PDF document, see ECF No. 3 in case
1:23−cv−00452−NT. (mnd)**


**1:23−cv−00450−NT Notice has been electronically mailed to:**

ALEXANDRA A. HARRIMAN &nbsp &nbsp aharriman@preti.com, ncondon@preti.com

BENJAMIN S. PIPER &nbsp &nbsp bpiper@preti.com, jtreuhaft@preti.com

JOHN A. WOODCOCK , III &nbsp &nbsp jwoodcock@bernsteinshur.com, jsmith@bernsteinshur.com

JONATHAN R. BOLTON &nbsp &nbsp jonathan.bolton@maine.gov, Laura.SolisFarias@maine.gov

JOSHUA D. DUNLAP &nbsp &nbsp jdunlap@pierceatwood.com, hstevens@pierceatwood.com

KATHERINE E. CLEARY &nbsp &nbsp kcleary@pierceatwood.com, mclifford@pierceatwood.com

NOLAN L. REICHL &nbsp &nbsp nreichl@pierceatwood.com, hstevens@pierceatwood.com

PAUL MCDONALD &nbsp &nbsp pmcdonald@bernsteinshur.com, jsmith@bernsteinshur.com, mthomas@bernsteinshur.com, sgagnon@bernsteinshur.com

PAUL E. SUITTER &nbsp &nbsp paul.suitter@maine.gov, Pamela.Chaput@maine.gov

PETER L. MURRAY &nbsp &nbsp pmurray@mpmlaw.com, mmcardle@mpmlaw.com, pmurray@gwi.net

SEAN R. TURLEY &nbsp &nbsp sturley@mpmlaw.com

SIGMUND D. SCHUTZ &nbsp &nbsp sschutz@preti.com, jcharron@preti.com

TIMOTHY C. WOODCOCK &nbsp &nbsp twoodcock@eatonpeabody.com, amckinnon@eatonpeabody.com, jwilliams@eatonpeabody.com, kdisley@eatonpeabody.com

**1:23−cv−00450−NT Notice has been delivered by other means to:**

```
MIME-Version:1.0
From:cmecf@med.uscourts.gov
To:cmecfnef@med.uscourts.gov
Bcc:
--Case Participants: JOSHUA D. DUNLAP (hstevens@pierceatwood.com,
jdunlap@pierceatwood.com), JONATHAN R. BOLTON (jonathan.bolton@maine.gov,
laura.solisfarias@maine.gov), SEAN R. TURLEY (sturley@mpmlaw.com), TIMOTHY C. WOODCOCK
(amckinnon@eatonpeabody.com, jwilliams@eatonpeabody.com, kdisley@eatonpeabody.com,
twoodcock@eatonpeabody.com), BENJAMIN S. PIPER (bpiper@preti.com, jtreuhaft@preti.com),
KATHERINE E. CLEARY (kcleary@pierceatwood.com, mclifford@pierceatwood.com), ALEXANDRA A.
HARRIMAN (aharriman@preti.com, ncondon@preti.com), PETER L. MURRAY (mmcardle@mpmlaw.com,
pmurray@gwi.net, pmurray@mpmlaw.com), PAUL MCDONALD (jsmith@bernsteinshur.com,
mthomas@bernsteinshur.com, pmcdonald@bernsteinshur.com, sgagnon@bernsteinshur.com), JOHN
A. WOODCOCK, III (jsmith@bernsteinshur.com, jwoodcock@bernsteinshur.com), PAUL E. SUITTER
(pamela.chaput@maine.gov, paul.suitter@maine.gov), NOLAN L. REICHL
(hstevens@pierceatwood.com, nreichl@pierceatwood.com), SIGMUND D. SCHUTZ
(jcharron@preti.com, sschutz@preti.com), MAGISTRATE JUDGE JOHN C. NIVISON
(cmecfnef@med.uscourts.gov), JUDGE LANCE E. WALKER (cmecfnef@med.uscourts.gov)
--Non Case Participants: ECF In Box (maineecfintake@med.uscourts.gov)
--No Notice Sent:

Message-Id:3008291@med.uscourts.gov
Subject:Activity in Case 1:23-cv-00450-NT CENTRAL MAINE POWER COMPANY v. MAINE COMMISSION
ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES et al Motion for TRO
Content-Type: text/html
```

## U.S. District Court

## District of Maine

**Notice of Electronic Filing**

The following transaction was entered on 1/9/2024 at 1:44 PM EST and filed on 1/9/2024

| | |
|---|---|
| **Case Name:** | CENTRAL MAINE POWER COMPANY v. MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES et al |
| **Case Number:** | <u>1:23−cv−00450−NT</u> |
| **Filer:** | KENNETH FLETCHER |
| | BRENDA GARRAND |
| | BONNIE S GOULD |
| | JANE P PRINGLE |
| | LAWRENCE WOLD |
| **Document Number:** | 27(No document attached) |

**Docket Text:**
 **MOTION for Temporary Restraining Order & MOTION for Preliminary Injunction by KENNETH FLETCHER, BRENDA GARRAND, BONNIE S GOULD, JANE P PRINGLE & LAWRENCE WOLD. No PDF document is attached to this docket entry. Motion originally filed in case 1:23−cv−00453−NT. To view PDF document, see ECF No. 8 in case 1:23−cv−00453−NT. (mnd)**


**1:23−cv−00450−NT Notice has been electronically mailed to:**

ALEXANDRA A. HARRIMAN &nbsp &nbsp aharriman@preti.com, ncondon@preti.com

BENJAMIN S. PIPER &nbsp &nbsp bpiper@preti.com, jtreuhaft@preti.com

JOHN A. WOODCOCK , III &nbsp &nbsp jwoodcock@bernsteinshur.com, jsmith@bernsteinshur.com

JONATHAN R. BOLTON &nbsp &nbsp jonathan.bolton@maine.gov, Laura.SolisFarias@maine.gov

JOSHUA D. DUNLAP &nbsp &nbsp jdunlap@pierceatwood.com, hstevens@pierceatwood.com

KATHERINE E. CLEARY &nbsp &nbsp kcleary@pierceatwood.com, mclifford@pierceatwood.com

NOLAN L. REICHL &nbsp &nbsp nreichl@pierceatwood.com, hstevens@pierceatwood.com

PAUL MCDONALD &nbsp &nbsp pmcdonald@bernsteinshur.com, jsmith@bernsteinshur.com, mthomas@bernsteinshur.com, sgagnon@bernsteinshur.com

PAUL E. SUITTER &nbsp &nbsp paul.suitter@maine.gov, Pamela.Chaput@maine.gov

PETER L. MURRAY &nbsp &nbsp pmurray@mpmlaw.com, mmcardle@mpmlaw.com, pmurray@gwi.net

SEAN R. TURLEY &nbsp &nbsp sturley@mpmlaw.com

SIGMUND D. SCHUTZ &nbsp &nbsp sschutz@preti.com, jcharron@preti.com

TIMOTHY C. WOODCOCK &nbsp &nbsp twoodcock@eatonpeabody.com, amckinnon@eatonpeabody.com, jwilliams@eatonpeabody.com, kdisley@eatonpeabody.com

**1:23−cv−00450−NT Notice has been delivered by other means to:**