# United States Court of Appeals
## For the First Circuit

CENTRAL MAINE POWER COMPANY; VERSANT POWER; ENMAX CORPORATION;
MAINE PRESS ASSOCIATION; MAINE ASSOCIATION OF BROADCASTERS; JANE P.
PRINGLE, individually and in her capacity as a registered voter and elector; KENNETH
FLETCHER, individually and in his capacity as a registered voter and elector; BONNIE S. GOULD,
individually and in her capacity as a registered voter and elector; BRENDA GARRAND,
individually and in her capacity as a registered voter and elector; LAWRENCE WOLD, individually
and in his capacity as a registered voter and elector,

*Plaintiffs – Appellees,*

v.

MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES;
WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on
Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in his official capacity as a
Member of the Maine Governmental Ethics and Election Practices; SARAH LECLAIRE, in her
official capacity as a Member of the Maine Commission on Governmental Ethics and Election
Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on
Governmental Ethics and Election Practices; STACEY D. NEUMANN, in her official capacity as a
Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M.
FREY, in his official capacity as Attorney General for the State of Maine,

*Defendants – Appellants.*

*On appeal from the United States District Court, District of Maine*

## BRIEF OF DEFENDANTS-APPELLANTS

|  |  |
|---|---|
|  | AARON M. FREY<br>Attorney General |
| Thomas A. Knowlton<br>Deputy Attorney General | Jonathan R. Bolton & Paul Suitter<br>Assistant Attorneys General<br>6 State House Station |
| Of Counsel | Augusta, Maine 04333-0006<br>(207) 626-8800<br>jonathan.bolton@maine.gov<br>paul.suitter@maine.gov |
|  | *Attorneys for Appellants* |

# Table of Contents

Table of Contents ........................................................i

Table of Authorities.................................................. iii

Jurisdictional Statement...............................................1

Statement of the Issues Presented for Review ..........................2

Statement of the Case .................................................3

    Introduction.......................................................3

    Statement of Facts ................................................6

    Procedural History ...............................................16

Summary of the Argument ...............................................20

Argument...............................................................24

I.     Standard of review. ............................................24

II.   The district court abused its discretion in concluding that the Act is likely facially unconstitutional. ..........................25

    A.    The district court erred in concluding that the Act is subject to strict scrutiny.............................................26

    B.    The district court erred by failing to recognize the full scope of Maine's compelling interests in regulating foreign government–influenced corporations. .............................30

        1.    The district court correctly recognized Maine's compelling interest in preventing foreign-government influence in candidate elections.................................30

        2.    The district court should have recognized Maine's equally compelling interest in regulating its referendum elections.................................................34

3. The district court erred by rejecting Maine's compelling interest in preventing the appearance of foreign-government influence in its elections. .......................... 39

C. The district court erred by concluding that the Act is likely not narrowly tailored. .......................................... 43

1. The Act's 5% ownership threshold is narrowly tailored. .................................................... 44

2. The ban on foreign-government participation in corporate decision-making is narrowly tailored. .......... 54

D. Even if the Act has unconstitutional applications, it is not facially invalid. .................................................... 57

III. The district court's express preemption holding misconstrues the scope of the Act. .................................................... 62

IV. The district court's injunction is overbroad. .................................. 68

V. The remaining preliminary injunction factors do not favor an injunction. ........................................................ 71

Conclusion ........................................................ 72

Addendum

Certificate of Compliance with Rule 32(a)

Certificate of Service Form for Electronic Filing

# Table of Authorities

## CASES

*Abrams v. McGuireWoods LLP*,
518 B.R. 491 (N.D. Ind. 2014)........................................ 48, 60

*Avangrid Networks, Inc. v. Sec'y of State*,
2020 ME 109, 237 A.3d 882 ................................................ 7

*Bernal v. Fainter*,
467 U.S. 216 (1984) ............................................................ 32

*Bluman v. F.E.C.*,
565 U.S. 1104 (2012) ................................................... 28, 33

*Bluman v. F.E.C.*,
800 F. Supp. 2d 281 (D.D.C. 2011) ........................ 28, 31, 32, 33, 38, 49

*Brox v. Hole*,
83 F.4th 87 (1st Cir. 2023) ................................................ 24

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........................................................ 21, 39

*Burson v. Freeman*,
504 U.S. 191 (1992) ............................................................ 53

*Citizens Against Rent Control/Coal. For Fair Hous. v. Berkeley*,
454 U.S. 290 (1981) .................................................... 35, 37, 38

*Citizens United v. F.E.C.*,
558 U.S. 310 (2010) ................................................... 26, 50, 59

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) ............................................................ 68

*Corp. Techs., Inc. v. Harnett*,
731 F.3d 6 (1st Cir. 2013) .................................................. 24

*Daggett v. Comm'n on Govtl. Ethics & Election Pracs.*,
205 F.3d 445 (1st Cir. 2000) ........................................ 27, 42, 43

*Doe v. Trustees of Bos. Coll.,*
   942 F.3d 527 (1st Cir. 2019) ............................................................. 25

*F.E.C.  v. Beaumont,*
   539 U.S. 146 (2003) .................................................................... 20, 43

*First Nat'l Bank of Bos. v. Bellotti,*
   435 U.S. 765 (1978) ............................................................ 35, 36, 37

*Fla. Commercial Banks v. Culverhouse,*
   772 F.2d 1513 (11th Cir. 1985) ...................................................... 51

*Foley v. Connelie,*
   435 U.S. 291 (1978) ............................................ 20, 27, 32, 33, 38

*Frese v. Formella,*
   53 F.4th 1 (1st Cir. 2022) ............................................................... 25

*Gaspee Project v. Mederos,*
   13 F.4th 79 (1st Cir. 2021) ................................................ 25, 61, 71

*Gustafson v. Alloyd Co.,*
   513 U.S. 561, 575 (1995) ............................................................... 65

*In re KKR Fin. Holdings LLC S'holder Litig.,*
   101 A.3d 980 (Del. Ch. 2014) ........................................................ 58

*In re Stop I-186 to Protect Mining and Jobs et al.,*
   MUR 7523 (FEC Oct. 4, 2021) .................................................. 7, 54

*Indep. Oil and Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg.*
   *Co.*, 864 F.2d 927 (1st Cir. 1988) ................................................ 24

*Janvey v. Democratic Senatorial Campaign Comm., Inc.,*
   712 F.3d 185 (5th Cir. 2013) .......................................................... 62

*Kahn v. Lynch Commc'ns Sys., Inc.,*
   638 A.2d 1110 (Del. 1994) ............................................................. 59

*Kansas City Broadcasting Co.,*
   5 Rad. Reg. (P & F) 1057 (1952) .................................................. 58

iv

*Karl Rove & Co. v. Thornburgh,*
39 F.3d 1273 (5th Cir. 1994) ................................................................ 62

*Kittery Retail Ventures, LLC v. Town of Kittery,*
2004 ME 65, 856 A.2d 1183 ......................................................... 22, 69

*March v. Mills,*
867 F.3d 46 (1st Cir. 2017) .................................................................. 68

*Minnesota Chamber of Com. v. Choi,* No. 23-CV-2015,
2023 WL 8803357 (D. Minn. Dec. 20, 2023) ...................................... 53

*Moving Phones P'ship L.P. v. FCC,*
998 F.2d 1051 (D.C. Cir. 1993) ........................................................... 58

*Nat'l Org. for Marriage v. McKee,*
649 F.3d 34 (1st Cir. 2011) .......................................................... 26, 68

*Nixon v. Shrink Mo. Gov't PAC,*
528 U.S. 377 (2000) ............................................................... 27, 39, 42

*O'Connor v. Oakhurst Dairy,*
851 F.3d 69 (1st Cir. 2017) .................................................................. 64

*OneAmerica Votes v. State,*
518 P.3d 230 (Wash. Ct. App. 2022) ................................................... 43

*Opinion of the Justices,*
2004 ME 54, 850 A.2d 1145 ................................................................ 70

*Pharm. Care Mgmt. Ass'n v. Maine Att'y Gen.,*
324 F. Supp. 2d 74 (D. Me. 2004) ....................................................... 70

*Randall v. Sorrell,*
548 U.S. 230 (2006) .............................................................................. 27

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
699 F.3d 1 (1st Cir. 2012) ............................................................. 28, 29

*Stern v. General Electric Co.,*
924 F.2d 472 (2d Cir. 1991) ................................................................ 62

*Third Point LLC v. Ruprecht*, No. CIV.A. 9469-VCP,
  2014 WL 1922029 (Del. Ch. May 2, 2014) ........................................ 47

*Tornetta v. Musk*,
  250 A.3d 793, 800 (Del. Ch. 2019) ..................................................... 59

*U. S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
  413 U.S. 564 (1973) ............................................................................ 39

*United States v. Singh*,
  979 F.3d 697 (9th Cir. 2020) ............................................................. 33

*United States v. Williams*,
  553 U.S. 285 (2008) ......................................................... 22, 26, 57, 61

*VFB LLC v. Campbell Soup Co.*,
  482 F.3d 624, 634 (3d Cir. 2007) ..................................................... 48

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982) ............................................................................ 67

*Voigt v. Metcalf*, No. CV 2018-0828-JTL,
  2020 WL 614999 (Del. Ch. Feb. 10, 2020) ...................................... 46

*Weaver v. Henderson*,
  984 F.2d 11 (1st Cir. 1993) ............................................................... 71

*Williams-Yulee v. Fla. Bar*,
  575 U.S. 433 (2015) ............................................................... 41, 43, 53

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................ 24

*Yates v. United States*,
  574 U.S. 528 (2015) ............................................................................ 65

## STATUTES

1 M.R.S.A. § 71 ....................................................................................... 69

15 U.S.C.A. § 78m ................................................................................. 51

21 M.R.S.A. § 1013-A ................................................................ 64

21-A M.R.S.A. § 1001 ............................................................... 66

21-A M.R.S.A. § 1003 ............................................................... 63

21-A M.R.S.A. § 1011 .......................................................... 63, 66

21-A M.R.S.A. § 1013-A ...................................................... 64, 66

21-A M.R.S.A. § 1051 ............................................................... 67

21-A M.R.S.A. § 1052 ........................................................... 8, 64

21-A M.R.S.A. § 1064 .......................................... 2, 13, 14, 61, 64, 65, 70

21-A M.R.S.A. § 335 ................................................................. 65

21-A M.R.S.A. § 354 ................................................................. 65

21-A M.R.S.A. §§ 1001–1004-C .................................................. 63

28 U.S.C.A. § 1291 .................................................................... 1

28 U.S.C.A. § 1292 .................................................................... 1

47 U.S.C.A. § 310 ..................................................................... 58

5 M.R.S.A. § 8056 .................................................................... 55

52 U.S.C.A. § 30121 ................................................................... 6

52 U.S.C.A. § 30143 .................................................................. 62

Minn. Stat. § 211B.15 ............................................................... 52

Seattle Ordinance 126035 ......................................................... 52

## OTHER AUTHORITIES

Alon Brav, et al., *Hedge Fund Activism, Corporate Governance, and Firm Performance*, 63 J. Fin. 1729 (2008) ......................................... 48

Brian Remler, *Foreign Threats, Local Solutions: Assessing St. Petersburg, Florida's "Defend Our Democracy" Ordinance As Potential Model Legislation to Curb Foreign Influence in U.S. Elections*, 49 Stetson L. Rev. 643 (2020) .................................................. 52

Federal Election Commission, Letter to Jonathan D. Simon, Esq., 2006 WL 1502610 (May 19, 2006) ................................................ 56

Maine State Legislature, Legislative History Collection ................. 6, 12

Thomas W. Briggs, *Corporate Governance and the New Hedge Fund Activism: An Empirical Analysis*, 32 J. Corp. L. 681 (2007).............. 48

TREATISES

3 *Fletcher Cyc. Corp.* ....................................................... 48, 49

REGULATIONS

11 C.F.R. § 108.7 .............................................................. 62

11 C.F.R. § 110.20 ......................................................... 14, 54

17 C.F.R. § 240.14a-8 ....................................................... 46

CONSTITUTIONAL PROVISIONS

Me. Const. art. IV, pt. 3, § 18............................................. 6, 11

Me. Const. art. IV, pt. 3, § 19............................................. 12

Me. Const. art. IV, pt. 3, §§ 17 ........................................... 6

U.S. Const. art. I, § 4, cl. 1 ............................................. 66

LEGISLATIVE DOCUMENTS

L.D. 194 (130th Legis. 2021) ............................................ 10, 11

L.D. 479 (130th Legis. 2021) ............................................. 53

## Jurisdictional Statement

This appeal is from an interlocutory order of the district court, dated February 29, 2024 (ECF No. 61), granting a preliminary injunction. Defendants-Appellants filed a timely notice of appeal on March 15, 2024 (ECF No. 66). This Court therefore has jurisdiction over this appeal under 28 U.S.C.A. § 1292(a)(1).

## Statement of the Issues Presented for Review

1.     Whether the district court abused its discretion in issuing a preliminary injunction based on its conclusion that Maine's law barring foreign governments and entities they control or influence from seeking to influence Maine elections, 21-A M.R.S. § 1064 (the "Act"), is likely facially unconstitutional under the First Amendment.

2.     Whether the district court abused its discretion in concluding that the Act, which does not expressly apply to federal elections and delegates primary enforcement to an agency with no jurisdiction over federal elections, was likely preempted by federal law "insofar as the Act covers foreign spending in elections for federal office."

3.     Whether the district court abused its discretion by enjoining the Act in all its applications, despite Maine's state-law presumption of severability and the Court's recognition that at least some of the Act's applications were likely constitutional.

## Statement of the Case

*Introduction*

Maine was recently consumed with controversy over a proposal to build a billion-dollar electric transmission line across the state so that a hydropower company 100% owned by a foreign government could sell electricity to Massachusetts.  Opponents tried to stop the project by placing referenda on the ballot in 2020 and 2021.  The hydropower company's wholly owned U.S. subsidiary responded with a massive advertising blitz, spending over $20 million—a near record-breaking sum in recent elections—to influence the outcomes of those referenda. Many Mainers, including prominent members of both major parties, were incensed by what they saw as foreign-government interference in Maine elections.

The Act preliminarily enjoined by the district court (Torresen, J.) was Maine's response to this foreign-government intrusion.  It was placed on the ballot as a citizens' initiative in November 2023. Confirming voters' alarm over foreign-government influence in their elections, the Act was approved with 86% of the vote—the largest margin of victory for any initiative in Maine history.

The Act bars foreign governments and entities they control or influence from spending to influence Maine elections. The Act addresses a major loophole in federal campaign finance law, which bars some attempts by foreign governments to influence state and local *candidate* elections but leaves referendum elections completely unregulated. The Act thus responds to a real-world problem with which Mainers have dramatic firsthand experience.

Despite ample record evidence of recent and massive election spending by multiple foreign government–influenced entities in Maine, the district court concluded that the Act was likely facially unconstitutional. This was an abuse of discretion. The Act addresses Maine's compelling interest in preventing foreign governments from influencing Maine elections, as well as in protecting Mainers' confidence in the integrity of Maine elections against such foreign-government manipulation. It does so in a narrowly tailored manner, barring election spending by foreign governments, entities that invite or acquiesce to foreign-government participation in their spending decisions, and entities in which foreign governments have a substantial enough ownership stake to exercise influence over corporate decision-

making. Given the importance of the interests at stake and the Act's carefully calibrated definitions, it withstands any level of constitutional scrutiny, including the strict scrutiny erroneously applied by the district court.

What is more, even if the Act could be found to have isolated unconstitutional applications, it does not come close to meeting the high standard for facial invalidation. Even the district court acknowledged that the Act had some likely constitutional applications and further suggested that other applications could be made constitutional with certain clarifications to the draft rules implementing the Act—clarifications that have since been made. And the district court did not even address the constitutionality of a key provision requiring disclaimers on certain advertising by foreign government–influenced entities involving policy matters. Given the many constitutional applications of the Act, the district court, at most, should have issued a narrow injunction tailored to just those portions of the Act it found objectionable.

Because the preliminary injunction issued by the district court was an abuse of discretion, this Court should vacate it.

*Statement of Facts*

*Impetus for the Act*

Maine is a direct-democracy State. It allows citizens to directly enact legislation by popular vote (a citizens' initiative), and to veto legislation enacted by the Legislature (a People's veto). *See* Me. Const. art. IV, pt. 3, §§ 17, 18. Successful petitions to place such matters on the ballot are frequent; since 2018, Maine voters have considered six citizen initiatives and two People's vetoes, including four initiatives in the 2023 November election.[1]

Prior to passage of the Act, there were no restrictions on foreign-government spending to influence Maine referenda. State law contained no such restrictions. And, while there has long been a federal ban on foreign-government spending in federal, state, and local candidate elections, *see* 52 U.S.C.A. § 30121(a), the Federal Election Commission (FEC) has opined that the ban does not stop foreign governments from seeking to influence state and local referendum

---

[1] *See* Maine State Legislature, Legislative History Collection, *Citizen Initiated Legislation, 1911–Present*, at https://www.maine.gov/legis/lawlib/lldl/citizeninitiated/ (last visited June 10, 2024); Maine State Legislature, Legislative History Collection, *Maine Laws Suspended by People's Veto* (last visited June 10, 2024), at https://www.maine.gov/legis/lawlib/lldl/peoplesveto/.

elections. *See In re Stop I-186 to Protect Mining and Jobs et al.*, MUR 7523 (FEC Oct. 4, 2021).[2]

This loophole in the campaign-finance laws was brought into stark relief for Mainers in 2020, when the first of two referenda concerning the fate of the New England Clean Energy Connect project (better known as the "CMP Corridor") was placed on the ballot. The CMP Corridor is a billion-dollar transmission line that is now being constructed through Maine to supply Canadian hydropower to Massachusetts utilities. ECF No. 47-5 at 19; A019. A Canadian hydropower company wholly owned by the Government of Québec, Hydro-Québec, is the seller of the energy that will be transmitted. ECF No. 47-5 at 19. Hydro-Québec describes itself in corporate filings as "an agent of Québec." *Id.* at 14.

Opponents of the CMP Corridor secured sufficient signatures to place a question on the 2020 ballot that would have revoked a crucial permit necessary for the CMP Corridor to be built. *See Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, 237 A.3d 882. After the

---

[2] Available at https://www.fec.gov/files/legal/murs/7523/7523_22.pdf.

Maine Supreme Judicial Court removed that question from the ballot due to constitutional infirmities, *see id.*, opponents placed a revised question on the ballot in 2021.  A019; A136.

The two ballot questions provoked unprecedented levels of campaign spending by corporate interests, including, most controversially, by Hydro-Québec's indirect wholly owned U.S. subsidiary, H.Q. Energy Services (U.S.) Inc. ("HQUS").  ECF No. 47-5 at 15.  HQUS contributed $22.4 million to a Maine ballot question committee[3] called the Hydro-Québec Maine Partnership ("HQMP") to defeat the two referenda.  A135–36.  These contributions made HQUS the third-largest contributor to the referenda campaigns (for or against) as well as the third-largest aggregate contributor by a commercial source to influence Maine elections over the last decade, behind only two CMP-affiliated entities.  A136.

HQUS was not the only company linked to a foreign government that spent substantial sums to influence the CMP Corridor referenda.

---

[3]  A ballot question committee, as defined in Maine law, is an entity that receives contributions or makes expenditures of more than $5,000 to initiate or influence a referendum campaign.  *See* 21-A M.R.S.A. § 1052(2-A).  Ballot question committees are regulated similarly to political action committees ("PACs").

Two ballot question committees established by CMP and its affiliates spent roughly $45 million to influence the two referenda. A137. CMP is wholly owned (through two intermediaries) by Avangrid, Inc., which is 3.7% owned by the Qatar Investment Fund, the State of Qatar's sovereign wealth fund. A017–18. Avangrid, Inc., in turn, is 81.6% owned by the Spanish company Iberdrola, which itself is 8.7% owned by the Qatar Investment Fund. A018. Qatar's total indirect ownership of CMP is thus 10.8%.[4]

Overall, the ballot question committees funded by HQUS and CMP were three of the four largest spenders among committees to influence the referenda on the CMP Corridor. A137.

*Proposal of Question 2*

The effort by HQUS to influence the CMP Corridor referenda through massive election spending was deeply controversial in Maine. During the 2020 campaign, a bipartisan group of 25 current and former Maine lawmakers sent a letter to the Premier of Québec and the CEO of

---

[4] News reports suggest that this figure may be out-of-date, although Qatar's ownership appears to remain well above 5%. *See* David French, *Iberdrola to buy rest of US power firm Avangrid in $2.6 billion deal*, Reuters (May 17, 2024), at https://www.reuters.com/markets/deals/iberdrola-nears-26-billion-deal-buy-rest-avangrid-sources-say-2024-05-17/ (last visited June 10, 2024).

Hydro-Québec demanding that Hydro-Québec "cease all further campaign activities in Maine and let the people of Maine vote without further meddling in our elections." A175. Following the referendum campaign, elected leaders from both major parties denounced the spending of HQUS to influence Mainers to approve a project that would have produced billions of dollars in revenue for a foreign government–owned company. A178–A181.[5]

The foreign government influence seen in the 2020 and 2021 referenda also provoked a legislative response. In January 2021, a bipartisan group of legislators introduced L.D. 194, a bill with provisions similar to the Act. A183. At the public hearing, legislators, individuals, and organizations testified in favor of the law. *See* A186–244. Participants criticized Hydro-Québec's "ability to flood Maine with false advertising in order to change the perceptions of Maine voters." A193. They noted that HQUS was supporting "a highly lucrative contract with Massachusetts" that would "benefit enormously" the

---

[5] *See also* Jared Golden and Rick Bennett, *American voters, not foreign interests, should decide American elections,* Piscataquis Observer (Jun. 5, 2022), http://tinyurl.com/bpa9xwkh; Ken Fredette, *We need to protect Maine elections from foreign influence,* Bangor Daily News (Feb. 6, 2022), http://tinyurl.com/yc4wf2y7.

government, communities, and taxpayers of Québec. A194. They detailed an alleged "relentless, expensive print ad campaign" by HQMP that included "deceptive, manipulative ads" as well as alleged attempts by Hydro-Québec "to hide [its] foreign government ownership." A237–38.

Although L.D. 194 was passed by significant margins, it was vetoed by the Governor.[6] Initiators then gathered enough signatures to seek enactment of a similar law—the Act—as a citizens' initiative. As required by the Maine Constitution, the Act was first presented to the Legislature for consideration, prompting additional public proceedings in which many testified in favor of the Act. A252–284. As with L.D. 194, the Legislature passed the Act, but the Governor vetoed it.[7] As a result, it was placed on the November 2023 ballot as Question 2. Maine voters enacted it by a vote of 348,781 to 55,226—the largest margin of victory for a citizens' initiative in either percentage or absolute terms in

---

[6] *See* Maine Legislature Bill Tracking, 130th Legislature, SP 82, L.D. 194, at https://legislature.maine.gov/billtracker/#Paper/SP0082?legislature=130 (showing House vote of 87-54 in favor and Senate vote of 22-12 in favor).

[7] *See* Maine Legislature Bill Tracking, 130th Legislature, IB 1, L.D. 1610, at https://legislature.maine.gov/billtracker/#Paper/1610?legislature=131 (showing Senate vote of 19-13, House vote of 73-53).

Maine history.  A285; Maine State Legislature, Legislative History

Collection, *Citizen Initiated Legislation, 1911–Present*, at https://

www.maine.gov/legis/lawlib/lldl/citizeninitiated/.

The Governor proclaimed the results of the election on December

6, 2023.  A285.  Under the Maine Constitution, the law took effect 30

days later, on January 5, 2024.  Me. Const. art. IV, pt. 3, § 19.  To allow

adequate time to brief the injunction motions, the defendants agreed

not to enforce the law through February 29, 2024.

*Statutory Framework*

The Act bars the type of influence by foreign governments seen in

the 2020 and 2021 elections.  It also builds on federal law to ensure that

entities that are influenced by foreign governments cannot spend money

to influence either candidate or referendum elections in Maine.

Subsection 2 is the heart of the Act.  It prohibits any "foreign

government–influenced entity" (FGIE) from making, directly or

indirectly, "a contribution, expenditure, independent expenditure,

electioneering communication or any other donation or disbursement of

funds to influence the nomination or election of a candidate or the initiation or approval of a referendum." 21-A M.R.S. § 1064(2).[8]

"Foreign government–influenced entity" is meticulously defined. It includes three classes of entities:

- *Foreign Governments*:  The Act applies to any national government outside the United States and any political subdivisions of such a government.  *Id.* § 1064(1)(D) & (1)(E)(1).

- *Entities Partly Owned by a Foreign Government.*  The Act applies to any entity in which a foreign government or foreign-government owned entity (FGOE) has a direct or indirect ownership stake of 5% or more of the entity.  *Id.* § 1064(1)(E)(2)(a).  An FGOE is defined as an entity in which a foreign government owns or controls more than 50% of its equity or voting shares.  *Id.* § 1064(1)(F).

- *Entities Influenced in their Political Decision-making by Foreign Governments.*  Also covered by the Act are entities in which a foreign government or FGOE "[d]irects, dictates, controls or directly or indirectly participates in the decision-making process" of the entity regarding activities "to influence the nomination or election of a candidate or the initiation or approval of a referendum." *Id.* § 1064(1)(E)(2)(b).

The definition of the final class of entities is derived from language in federal regulations implementing the provision in the Federal Election

---

[8]   The Act is reproduced in its entirety starting at page 41 of the Addendum.

Campaign Act (FECA) barring foreign nationals from participating in U.S. candidate elections.  *See* 11 C.F.R. § 110.20(i).

The Act also contains provisions requiring that FGIEs include disclaimers on certain "public communications" (i.e., advertisements) to influence policy.  *Id.* § 1064(6).  And it requires media outlets to establish due-diligence policies to avoid running illegal advertising by FGIEs and to take down any such advertising upon discovery.  *Id.* § 1064(7).  These provisions were challenged by some of the plaintiffs but were not addressed by the district court.

*Mandatory Rulemaking*

The Act requires the Commission on Governmental Ethics and Election Practices (the "Commission"), the state agency that regulates campaign finance, to promulgate rules implementing the Act.  *Id.* § 1064(10).  In January 2024, the Commission published for public comment an initial draft of a proposed rule.  *See* ECF No. 60.  Following the district court's decision, the Commission revised the draft rule to address public comments received and the court's stated concerns.  The revised rule, which becomes effective if and to the extent the injunction is lifted, was finally adopted on May 29, 2024.  *See* Maine Comm'n on

Gov't Ethics & Election Practices, *May 29, 2024 Commission Meeting*, Item No. 6, at https://www.maine.gov/ethics/meeting/2024-05-29 (last visited June 10, 2024).

*Other Foreign-Government Influence in Recent Elections*

In addition to Hydro-Québec's and CMP's efforts to influence the referenda on the CMP Corridor, there have been other notable recent efforts by FGIEs to influence Maine elections.

Plaintiffs Versant Power and its parent company, ENMAX Power, have spent substantial funds to influence Maine elections. ENMAX is 100% owned by the City of Calgary in Alberta, Canada. A052. In 2020, ENMAX Power acquired 100% of Versant Power, an electric transmission and distribution utility that operates in portions of Maine. A053. Versant is therefore also 100% owned, indirectly, by the City of Calgary.

ENMAX and Versant have worked to influence Maine elections since ENMAX's acquisition of Versant. ENMAX's aggregate contributions of $15.9 million to influence Maine elections are the fifth-most from any commercial source in the last decade. A137. Versant has made $85,500 in contributions to various PACs that support state

legislative candidates of both parties.  A136.  Versant and ENMAX together contributed $16.3 million to their ballot question committee opposing the 2023 Pine Tree Power referendum.  *Id.*

CMP and its affiliates have also spent vast sums to influence recent Maine elections.  In the last decade, these entities have spent a combined total of $73 million in Maine elections, with the vast majority of that spending occurring since 2019.  A137.  Two CMP affiliates alone spent approximately $32 million and $24 million respectively, making them the two biggest commercial-source election spenders in Maine in the past decade.  A137.

Overall, FGIEs account for four of the five largest commercial-source contributors in Maine elections in the past decade.  *Id.*

*Procedural History*

Following voter approval of the Act, four actions were filed seeking to enjoin the Commission, its five commissioners, and the Attorney General from enforcing the Act: a complaint by Versant Power and ENMAX Corporation ("Versant"), a complaint by Central Maine Power Co. ("CMP"), a complaint by five Maine voters (the "Electors"), and a complaint by the Maine Association of Broadcasters and Maine Press

Association (the "Media").  By joint motion of the parties, the district court consolidated the four cases.  ECF No. 20.  Each of the four sets of plaintiffs filed motions for preliminary relief, making various arguments that the Act is unconstitutional.  ECF Nos. 4, 22, 25, 27.

Following briefing and oral argument, the court, on February 29, 2024, issued a preliminary injunction barring the Commission and the Attorney General from enforcing the Act.  Add. at 1.  On likelihood of success, the court considered only whether the Act was preempted and whether the Act was facially unconstitutional under the First Amendment.  The court did not address Versant's additional legal theories, nor did it address any of the additional arguments raised by the Electors or the Media.

On preemption, the court concluded that the Act was unclear as to whether it applied to federal elections and that, therefore, the Act was preempted "insofar as the Act covers foreign spending in elections for federal office."  Add. at 14.  The court rejected Versant's further arguments that federal law impliedly preempted the Act, concluding that federal law likely establishes a "floor" for regulation of foreign-

government spending in state and local elections and does not preclude more restrictive state laws.  Add. at 24.

On Versant's and CMP's facial First Amendment challenge, the court concluded that the challenge was likely to succeed.  The court concluded that strict scrutiny applies to the entire Act.  *Id.* at 27.  The court concluded that Maine had a compelling interest in limiting foreign government influence in candidate elections and assumed without deciding that it had a similar interest with regard to referendum elections.  *Id.* at 29–30.  The court rejected Maine's proffered interest in preventing the appearance of foreign-government influence in elections. *Id.* at 31.

The court then concluded that the Act was not narrowly tailored. *Id.* at 32–38.  It concluded that the Act's 5% foreign government–ownership threshold was overbroad.  *Id.* at 34.  It further concluded, relying on draft rules implementing the Act that have since been revised, that the Act's ban on direct and indirect participation by foreign governments in an entity's decision-making on election spending was overbroad because it seemed to "read out the requirement that the

foreign government or foreign government owned entity participate in the actual decision-making process." *Id.* at 37.

The court concluded that the likely unconstitutionality of these applications of the Act satisfied the standard for facial invalidation. *Id.* at 38. The court further rejected the State's argument that any injunction should apply only to those aspects of the Act the court determined to be likely unconstitutional. *Id.*

This appeal followed.

## Summary of the Argument

The district court's entry of a preliminary injunction against enforcement of the entirety of the Act was based on compounding errors that led it to overestimate Plaintiffs' likelihood of success on the merits.

First, the court applied the wrong level of scrutiny to the Act. Although some types of campaign-finance laws are properly subject to strict scrutiny, laws regulating the participation of foreigners in U.S. democratic processes are properly subject to more relaxed scrutiny. *Foley v. Connelie*, 435 U.S. 291, 295–96 (1978). Moreover, caselaw is clear that at least the Act's restrictions on candidate contributions—as distinct from its expenditure restrictions—should be reviewed under "closely drawn" scrutiny, not strict scrutiny. *F.E.C. v. Beaumont*, 539 U.S. 146, 161 (2003). The district court therefore should have applied closely drawn scrutiny to some or all of the Act's provisions.

Second, the district court erred by failing to appreciate the full scope of Maine's compelling interests in regulating foreign-government influence in its elections. Although it correctly recognized that preventing actual foreign-government influence in candidate elections is a compelling interest, it erred by rejecting Maine's proffered interest of

preventing the appearance of foreign-government influence in elections. This interest directly parallels the long-recognized compelling governmental interest in preventing the appearance of corruption in elections. *See Buckley v. Valeo*, 424 U.S. 1, 27 (1976). The court's rejection of this interest led it to disregard compelling record evidence demonstrating Mainers' concern that foreign governments are interfering in their elections.

Third, the district court erred by misapplying the tailoring analysis to find that two of the Act's three definitions of a FGIE were overbroad. With regard to the 5% foreign-government ownership threshold, the court failed to appreciate the substantial practical and formal influence that a 5% "blockholder" can wield in the affairs of a corporation. And with regard to the Act's ban on foreign-government participation in decision-making on election spending, the court's conclusion was based on a provision in an early draft of proposed rules implementing the Act that has since been clarified to prevent enforcement of the Act in the manner that the court suggested was possible.

Fourth, the district court erred in its likelihood-of-success analysis by apparently crediting Versant with showing that the Act may regulate federal elections and therefore is expressly preempted by federal law to the extent it does so.  In fact, there is no reasonable construction of the Act or the statutory framework into which it was placed that would allow the Act to be applied to a federal election.

These errors by the Court led it to incorrectly conclude that Plaintiffs are likely to establish that the Act is facially unconstitutional. In fact, even if certain isolated applications of the Act could be questioned, the Act has, at a minimum, a wide swath of constitutional applications.  Because it has a "plainly legitimate sweep" that dwarfs any unconstitutional applications, *United States v. Williams*, 553 U.S. 285, 292 (2008), it falls well short of the high standard necessary for facial invalidation on First Amendment overbreadth grounds.

For similar reasons, the district court abused its discretion by issuing a broad injunction barring enforcement of the entire Act.  Maine law contains a presumption in favor of severability.  *See Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 18, 856 A.2d 1183. Here, there can be no serious question that the voters who

overwhelmingly approved the Act would have wanted as much of the Act to take effect as possible.  The district court therefore abused its discretion by failing to limit its injunction to those portions of the Act it found likely unconstitutional.

## Argument

## I.    Standard of review.

A preliminary injunction is an "extraordinary form of relief." *Brox v. Hole*, 83 F.4th 87, 91 (1st Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  It may be granted only if a movant demonstrates that it is "likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* (quoting *Winter*, 555 U.S. at 20).

This Court reviews the grant of a motion for preliminary injunction for abuse of discretion.  *Id.* at 92.  But in conducting this review, "appellate deference is not unbridled." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013).  "[A] material error of law invariably constitutes an abuse of discretion." *Id.*  A court also abuses its discretion "when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when the court makes a serious mistake in weighing the relevant factors." *Id.* (cleaned up) (quoting *Indep. Oil and Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir. 1988)).

Because likelihood of success is the "most important factor" in evaluating a preliminary injunction, "[w]hen this probability finding is made in error, the district court has abused its discretion and [this Court is] required to vacate the injunction." *Doe v. Trustees of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019).

## II. The district court abused its discretion in concluding that the Act is likely facially unconstitutional.

The district court based its likelihood of success determination primarily on its conclusion that the Act is likely facially unconstitutional under the First Amendment. Add. at 38–39. Facial challenges "are disfavored because they often rest on speculation, run contrary to the fundamental principle of judicial restraint, and threaten to short circuit the democratic process." *Frese v. Formella*, 53 F.4th 1, 7 (1st Cir. 2022) (cleaned up). Generally, a facial challenge to a law cannot succeed if "the challenged regulation has any legitimate application." *Gaspee Project v. Mederos*, 13 F.4th 79, 92 (1st Cir. 2021).

The standard is only slightly more forgiving in a facial challenge under the First Amendment alleging overbreadth, where the law may be struck down only if it "prohibits a substantial amount of protected speech." *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 51 (1st Cir.

2011) (quoting *Williams*, 553 U.S. at 292). To balance the "obvious harmful effects" of enjoining a law with constitutional applications with the chilling effect on speech from unconstitutional applications, the Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292.

## A.     The district court erred in concluding that the Act is subject to strict scrutiny.

The district court's initial error was in determining that the Act was subject, in its entirety, to strict scrutiny. Under strict scrutiny, the government must show that the challenged law "furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. F.E.C.*, 558 U.S. 310, 340 (2010).

Section 2 of the Act regulates two distinct types of campaign transactions: "contributions" and "donations" on the one hand, and "expenditures" and "disbursements" on the other. The Supreme Court has long treated these two types of regulation differently. While expenditure restrictions are typically subject to strict scrutiny, contribution restrictions "have been treated as merely 'marginal' speech

restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression." *Beaumont*, 539 U.S. at 161; *see also Randall v. Sorrell*, 548 U.S. 230, 241 (2006). Under this more deferential standard, contribution limits must be "'closely drawn' to match a 'sufficiently important interest.'" *Daggett v. Comm'n on Govtl. Ethics & Election Pracs.*, 205 F.3d 445, 454 (1st Cir. 2000) (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 385 (2000)). Thus, at the very least, the district court should have reviewed the Act's restrictions on contributions and donations to candidates under "closely drawn" scrutiny.

Moreover, caselaw supports reviewing even the Act's expenditure regulations under a lower level of scrutiny. The Supreme Court has recognized that classifications involving aliens may be subject to more relaxed scrutiny where the law involves "participation in [a state's] democratic political institutions" or "substantially affects members of the political community." *Foley*, 435 U.S. at 295–96. Here, the Act regulates foreign entities and U.S.-based entities that are controlled or influenced by those foreign entities. Moreover, it squarely regulates

their ability to influence Maine's "democratic political institutions."
The Court should therefore apply "closely drawn" scrutiny to the
expenditure restrictions in the Act as well as the contribution
restrictions.  *Cf. Bluman v. F.E.C.*, 800 F. Supp. 2d 281, 288 n.3 (D.D.C.
2011), *aff'd*, 565 U.S. 1104 (2012) (noting that the "constitutional
distinction between contributions and expenditures is based on the
government's anti-corruption interest," not its interest in "preventing
foreign influence over U.S. elections").

Despite these authorities indicating that lower levels of scrutiny
apply to the Act—or, at the very least, the Act's regulation of
contributions and donations—the district court concluded that the
entirety of subsection 2 of the Act was subject to strict scrutiny.  Add. at
27.  For this conclusion, the district court relied on *Sindicato
Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1 (1st Cir. 2012),
in which this Court held that a state law imposing various onerous
threshold requirements on unions and corporations to engage in
political spending was subject in its entirety to strict scrutiny.  *Id*. at 12.
But *Fortuño* is distinguishable for two reasons.

First, the law at issue in *Fortuño* imposed myriad procedural requirements that collectively made it difficult, if not impossible, for *any* corporate entity to engage in political speech. *Id.* at 13–14. Indeed, the law's requirement that an entity hold a meeting in which a majority of the entity's members attend *and* vote in favor of the proposed election spending, *see id.*, seems so onerous as to potentially accomplish indirectly what *Citizens United* forbade directly. Given that context, uniform application of strict scrutiny to the law's requirements made sense.

Here, in contrast, the challenged law applies not to all entities in Maine, but only the small subset of corporate entities subject to foreign-government control or influence. The Act thus cannot be understood as an attempt to end-run *Citizens United* through a package of broadly applicable and burdensome requirements.

Second, there is no indication in *Fortuño* that the state argued for a narrow injunction leaving some of the challenged portions of the law in effect. There was thus no need for the Court to differentiate between different aspects of the law. Here, Defendants are expressly urging that certain aspects of the Act should be excluded from any injunction even if

other aspects are found to be properly enjoined. *See* Part IV below. A granular application of the proper level of scrutiny is therefore appropriate.

**B.** **The district court erred by failing to recognize the full scope of Maine's compelling interests in regulating foreign government–influenced corporations.**

The district court correctly recognized that Maine's interest in protecting Maine's candidate elections from foreign-government influence is likely "compelling." Add. at 29. But it erred in rejecting Maine's equally compelling interest in preventing the appearance of foreign-government influence in its elections. This error of law (together with application of the wrong level of scrutiny), led it misapply the tailoring analysis—rejecting provisions of the Act, such as the 5% ownership threshold, that directly further Maine's interest in protecting voter confidence in the democratic process.

1. *The district court correctly recognized Maine's compelling interest in preventing foreign-government influence in candidate elections.*

As an initial matter, the court's conclusion that preventing foreign-government influence in Maine elections is a compelling governmental interest is both correct and well-supported. As the court

recognized, "[t]he closest case on point," Add. at 28, directly supports this conclusion.

That case is then-Judge Kavanaugh's opinion on behalf of a three-judge panel in *Bluman v. F.E.C.* The plaintiffs in *Bluman* challenged on First Amendment grounds FECA's ban on contributions and expenditures by foreign nationals. 800 F. Supp. 2d at 282. Plaintiffs were Canadian and Israeli citizens temporarily living in the U.S. on work visas who wished to make contributions and expenditures to support various federal candidates. *Id.* at 285. The panel affirmed the statute's constitutionality, even if strict scrutiny applied (which the court assumed without deciding). *Id.* at 292.

In reaching that conclusion, the panel took pains to distinguish the constitutional issue in *Bluman* from the "great debates" that played out in cases like *Buckley* and *Citizens United*. *Id.* at 286. Unlike those cases, FECA's foreign-national ban raised a "preliminary and foundational question about the definition of the American political community and, in particular, the role of foreign citizens in the U.S. electoral process." *Id.* The panel went on to discuss Supreme Court decisions involving the constitutional rights of foreign citizens residing

in the United States, synthesizing them as drawing "a fairly clear line: The government may exclude foreign citizens from activities 'intimately related to the process of democratic self-government.'" *Id.* at 287 (quoting *Bernal v. Fainter*, 467 U.S. 216, 220 (1984)).

Applying these legal principles, the panel held it to be "straightforward" that making contributions and expenditures to influence elections "constitute part of the process of democratic self-government." *Id.* at 288. As the Court observed, contributions and expenditures "are an integral aspect of the process by which Americans elect officials to federal, state, and local government offices." *Id.* It reasoned that barring foreign citizens from election spending followed from the established principle that the government may bar foreign nationals from voting and holding office, since, unlike other kinds of expressive activities, election spending is "closely tied to the voting process." *Id.* at 290. Limitations on foreign nationals participating in that process are "part of the sovereign's obligation to preserve the basic conception of a political community." *Id.* at 287 (quoting *Foley*, 435 U.S. at 295–96).

*Bluman*'s holding was summarily affirmed by the U.S. Supreme

Court, *see* 565 U.S. 1104, making nationwide precedent its necessary

holding that the government "has a compelling interest for purposes of

First Amendment analysis in limiting the participation of foreign

citizens in activities of American democratic self-government, and in

thereby preventing foreign influence over the U.S. political process."

*See United States v. Singh*, 979 F.3d 697, 711 (9th Cir. 2020)

(recognizing *Bluman* as authoritative precedent on the issues presented

and necessarily decided).

Like the federal law upheld in *Bluman*, the Act is an effort by the

people of Maine to "preserve the basic conception of a political

community." *Bluman*, 800 F. Supp. 2d at 287 (quoting *Foley*, 435 U.S.

at 295–96).  Indeed, the Act targets a more invidious threat to that

political community than contributions by foreign nationals generally.

It is concerned with efforts (and the appearance of efforts) by foreign

*governments* to influence Maine's electoral process.

While foreign individuals residing and working within the United

States for years, like the unsuccessful *Bluman* plaintiffs, might

reasonably be expected in many cases to engage in electioneering

activities out of some sense of loyalty or civic duty to the country in which they reside, the same cannot be said about foreign governments. Foreign governments exist to protect and further their own national interests, which may not align with those of Maine or the United States. Thus, when foreign governments seek to influence U.S. elections, they may be assumed to be acting based on *realpolitik* considerations of national interest, and not out of any sort of concern for the best interests of Mainers or even Americans. At best, a foreign government should be expected to be indifferent to whether a particular electoral outcome benefits Maine citizens. At worst, hostile foreign governments may seek to influence Maine elections precisely because they believe that a particular outcome would harm the United States, to the foreign government's advantage.

2. *The district court should have recognized Maine's equally compelling interest in regulating its referendum elections.*

Although the district court merely assumed without deciding that the compelling interest recognized in *Bluman* extended to regulation of referenda campaigns, Add. at 31, there is no reason to treat such campaigns any differently. The court correctly recognized that "[w]hen Maine citizens vote on referenda they are certainly participating in an

activity of democratic self-government." Add. at 30. Foreign governments should have no greater ability to interfere in such activities than they do in candidate elections. If anything, the harm that the Act seeks to prevent is even greater in referendum elections, since Maine voters are deciding whether a specific law will govern them, an arguably even more significant decision than who will represent them.

Plaintiffs argued below that the First Amendment precludes regulation of referenda in the same manner as candidate elections under a pair of Supreme Court decisions, *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978), and *Citizens Against Rent Control/Coalition For Fair Housing v. Berkeley*, 454 U.S. 290 (1981). But neither of those decisions is as sweeping as Plaintiffs have claimed. *Bellotti* held that Massachusetts failed to demonstrate that it had a sufficient government interest to justify barring businesses from advocating on ballot initiatives that do not involve their own business interests. 435 U.S. at 788–90. But *Bellotti* did not hold that such a showing was impossible, merely that Massachusetts had not made it. The Court observed that Massachusetts failed to show that "the relative

voice of corporations has been overwhelming or even significant in influencing referenda in Massachusetts, or that there has been any threat to the confidence of the citizenry in government." *Id.* at 789–90.

The record here could not be more different. The record shows that a corporation 100% beneficially owned by a foreign government (HQUS) spent more than $22 million to influence the outcome of Maine's 2020 and 2021 referendums. A135–36. The record further shows that ENMAX, a company directly owned by the government of Calgary, spent nearly $16 million to seek to defeat last year's referendum to reorganize how Maine transmits and distributes electricity within its borders. A136–37. And the record shows that CMP and its affiliates—companies owned indirectly by a parent whose largest investor is the sovereign wealth fund of Qatar[9]—spent over $70 million on influencing Maine elections in the last decade. A137.

The amounts spent by these FGIEs in Maine are staggering; six of the top seven spenders on Maine elections in the last decade are FGIEs,

---

[9] *See* Iberdrola, *Holdings of significant shareholders and the Board of Directors*, at https://www.iberdrola.com/shareholders-investors/share/share-capital/shares (last visited June 10, 2024).

with two of those 100% beneficially owned by foreign governments. A136, 140. Spending by these six FGIEs in the last decade is higher than the spending of all other commercial sources *combined* during the same period. *See* A140–172. This evidence establishes what Massachusetts could not in *Bellotti*.

*Citizens Against Rent Control* is similarly inapposite. That decision struck down a law limiting contributions to entities that made expenditures in support of or opposition to ballot questions. 454 U.S. at 292. The state sought to justify the regulation as promoting transparency by preventing advocates from funneling spending through opaque entities. *Id.* at 298. As the Supreme Court observed, however, the law already required public disclosure of contributions to such entities. *Id.* The state's transparency rationale therefore was insufficient. The Act, in contrast, is seeking to address a new problem that is not—and cannot be—otherwise addressed.

Finally, while *Bellotti* and *Citizens Against Rent Control* have some sweeping dicta about the lack of a governmental interest in regulating spending in referendum elections, *see Bellotti*, 435 U.S. at 790; *Citizens Against Rent Control*, 290 U.S. at 297, these observations

must be understood in light of the Supreme Court's view at the time that preventing corruption and the appearance of corruption were the only state interests that could support restrictions on political speech. *See Citizens Against Rent Control*, 290 U.S. at 297. In a referendum election, there is no candidate to bribe. But the interest being furthered by the Act is not (or at least not primarily) preventing corruption; it is preventing foreign-government interference in Maine elections. That interest was not at issue in *Bellotti* or *Citizens Against Rent Control* and would not be recognized by the Supreme Court as a compelling governmental interest until it affirmed *Bluman* decades later.

Given the interest at stake, there is no reason to analyze candidate and referendum elections differently. Referendum elections are as much a "democratic political institution," in which Maine has an obligation to "preserve the basic conception of a political community," *Foley*, 435 U.S. at 296, as are candidate elections. Thus, although *Bluman* does not address referenda other than to observe their exclusion from the challenged law did not render it underinclusive, 800 F. Supp. 2d at 291, this Court should find that Maine has an equally

weighty interest in preventing foreign-government influence in its referendum elections as it does in its candidate elections.

3.  *The district court erred by rejecting Maine's compelling interest in preventing the appearance of foreign-government influence in its elections.*

In its decisions reviewing campaign finance regulations aimed at preventing corruption, the Supreme Court has long recognized that the government is not limited to combating actual corruption; "of almost equal concern" is the appearance of corruption. *Buckley*, 424 U.S. at 27. The Court has explained that "avoidance of the appearance of improper influence is also critical if confidence in the system of representative Government is not to be eroded to a disastrous extent." *Id.* (cleaned up) (quoting *U. S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 564 (1973)). "Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance." *Shrink Mo.*, 528 U.S. at 390.

Like laws that prevent the appearance of corruption, the Act will prevent voters' confidence in Maine's democratic institutions from being "eroded to a disastrous extent." *Buckley*, 424 U.S. at 27. If foreign

governments and their U.S. proxies can lawfully spend tens of millions of dollars to influence Maine's referendum elections, voters may well develop a similar "cynical assumption" that Maine elections—and thus democratic outcomes—are being manipulated by foreign governments, with Mainers and other non-governmental voices drowned out.  Such assumptions could lead to disillusionment and disengagement with Maine's electoral processes, just as assumptions of rampant corruption bred by unregulated contributions—whether or not accurate in every case—would lead to such results.

The district court erred in concluding that Maine's interest in preventing the appearance of foreign-government influence in elections is "likely not compelling."  Add. at 32.  The only reason the court offered for its conclusion is that "*Bluman* . . . says nothing about an independent 'appearance' interest."  *Id.*  But there was no reason for *Bluman* to consider the issue, where the plaintiffs were themselves foreign nationals—as opposed to here, where the question is whether entities can be regulated, regardless of formal nationality, because they are subject to foreign influence or control.  Nor is it surprising that no

other decision recognizes such an interest, given the overall dearth of caselaw on this area of regulation.

Just because an asserted state interest is novel does not mean it is invalid. The Supreme Court recently recognized such a novel interest in upholding a restriction on fundraising in judicial elections. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (recognizing compelling interest in "public confidence in the integrity of the judiciary"). New compelling interests are especially plausible in a nascent area of constitutional law like regulation of foreign electioneering. A public perception that foreign governments are influencing the outcome of referendum elections through massive spending is just as corrosive to democracy as is a public perception that candidates are trading legislative favors for campaign contributions. The lack of legal authority for this straightforward analogy is not a valid reason to reject it.

The court's error in failing to recognize this interest led it to disregard the remarkable evidence in the record establishing a widespread perception that foreign governments are meddling in Maine's elections. The most important such evidence is the historically

lopsided margin of victory for the Act at the polls. A285. Courts have

recognized far less than the 86% support given to the Act as evidence

supporting a state interest in avoiding the appearance of corruption.

*See Shrink Mo.*, 528 U.S. at 394 (citing 74% approval of contribution-

limits referendum as "attest[ing] to the perception" by voters of

corruption); *Daggett*, 205 F.3d at 458 (citing referendum that passed by

56% of voters[10] as "indicative of [Maine voters'] perception of

corruption").

The record further shows a high level of bipartisan concern in

Maine over foreign-government influence, both during the 2020 and

2021 referenda campaign and in the legislative work sessions to

consider laws to address it. A175–284. Both the Legislature-created

bill to address foreign-government influence and the Act itself passed

the House and Senate by near-veto-proof majorities. *See* n.6 & n.7,

*supra*. Testimony in support of both bills show widespread concern

about foreign-government influence in elections. A182–284. Such

evidence of public concern may be properly considered in assessing the

_____

[10] *See* L.D. 1823 (117th Legis. 1996), *at* https://www.maine.gov/legis/lawlib/lldl/
citizeninitiated/ (last visited June 10, 2024).

State's interest in curbing such influence. *Daggett*, 205 F.3d at 457 (relying on "an abundant file of press clippings" as supporting Mainers' perception of corruption).

## C. The district court erred by concluding that the Act is likely not narrowly tailored.

As shown above, the district court erred by applying the tailoring analysis required by strict scrutiny, as opposed to the more "complaisant" tailoring analysis under exacting scrutiny. *Beaumont*, 539 U.S. at 161. But even under the too-restrictive tailoring analysis applied by the Court the Act is constitutional.

Under strict scrutiny the law must be "narrowly tailored to advance the State's compelling interest through the least restrictive means." *Williams-Yulee*, 575 U.S. at 452. Though strict scrutiny is "demanding," it is not automatically fatal. *Id*. The Supreme Court has upheld campaign-finance restrictions under strict scrutiny where the state has shown them to be narrowly tailored. *See id*. (upholding state ban on judicial candidates directly soliciting campaign funds); *see also OneAmerica Votes v. State*, 518 P.3d 230, 250 (Wash. Ct. App. 2022) (holding state law barring foreign participation in elections satisfied strict scrutiny).

1. *The Act's 5% ownership threshold is narrowly tailored.*

Although the district court recognized that the Act's restrictions on actual foreign governments would likely survive strict scrutiny, Add. at 33, it erroneously found fault with the Act's application of those restrictions to entities that are more than 5% owned by a foreign government or an entity controlled by a foreign government.

The main problem with the court's analysis is that it failed to recognize that, particularly with regard to large publicly traded corporations like CMP's ultimate parent, Iberdrola, an ownership stake of 5% or more gives the shareholder an extraordinary ability to influence the decisions of that corporation. Qatar's 8.7% ownership stake in Iberdrola amounts to 6.8 *billion* euros in equity.[11] It is the largest stake held by any single investor.[12] A decision by such a large investor to sell its shares due to dissatisfaction with corporate management would be a major event for Iberdrola. Corporate

---

[11] *See* Iberdrola, *Fact Sheet*, at https://www.iberdrola.com/shareholders-investors/fact-sheet (last visited June 10, 2024).

[12] Iberdrola, *Holdings of significant shareholders and the Board of Directors*, at https://www.iberdrola.com/shareholders-investors/share/share-capital/shares (last visited June 10, 2024).

managers must necessarily pay attention to preferences and interests of such large investors.

Publicly available information reflects the unsurprisingly close relationship between Qatar and Iberdrola. According to one press release, upon Qatar's acquisition of its stake in Iberdrola, the parties signed a "strategic Memorandum of Understanding setting forth the framework for collaboration in developing their respective business activities through the establishment of a long-term, mutually beneficial, strategic partnership." Scottish Power, "Qatar Holding To Become Strategic Partner Of Iberdrola And One Of Its Major Shareholders" (Mar. 14, 2011).[13] Another promotes "Iberdrola's commitment to Qatar." *See* Iberdrola, "Ignacio Galán meets with the CEO of Qatar Investment Authority in New York" (Sept. 24, 2021).[14] These releases show that large investors have both access to and influence on a corporation's management.

---

[13] Available at https://tinyurl.com/ws7ba26d.

[14] At https://www.iberdrola.com/press-room/news/detail/ignacio-galan-meets-ceo-qatar-investment-authority.

More generally, courts have recognized that investors who own stakes of well below 50% in corporations—so called "blockholders"—can wield significant, even overwhelming, power at shareholder meetings.[15] As the Delaware Court of Chancery has explained, a 40% block holder will have a controlling vote at a typical shareholder meeting, in which about 80% of eligible voting shares are present. *See Voigt v. Metcalf*, No. CV 2018-0828-JTL, 2020 WL 614999, at *18 (Del. Ch. Feb. 10, 2020). Blockholders with substantially lower ownership also enjoy substantial voting power, since unaffiliated shares typically need to split decisively against the blockholder—something that rarely happens—to overcome the blockholder's mathematical advantage in a plurality election in which some voting shares are not present. *Id.* What is more, "[a] large block also gives its owner additional rhetorical cards to play in the boardroom, particularly if the owner can claim to have the most at stake." *Id.* at *19.

---

[15] Federal law sets ownership thresholds as low as $2,000—well below 5% for a corporation of any size—for an investor to place a shareholder proposal on the company's proxy statement. *See* 17 C.F.R. § 240.14a-8.

Real-world examples of blockholders exercising significant influence abound. *See, e.g.*, *Third Point LLC v. Ruprecht*, No. CIV.A. 9469-VCP, 2014 WL 1922029, at **3–15 (Del. Ch. May 2, 2014) (describing efforts by blockholders to influence Sotheby's); *EBay, Carl Icahn settle proxy fight*, Associated Press (Apr. 10, 2014) (describing settlement of dispute between eBay management and 2% blockholder).[16] Indeed, news reports indicate that the Qatar Investment Authority—CMP's foreign-government part owner—has aggressively used a minority ownership stake to influence corporate affairs. *See* Dinesh Nair, *Qatar flexes muscle in shock Glencore move*, Reuters (June 27, 2012) (describing Qatar as "a potential kingmaker" in a takeover bid due to 11% ownership stake).[17]

An academic review of hedge-fund blockholders recounts examples of funds with 5.8% and 7.9% stakes in companies influencing the companies to, in one case, sell off a portion of its business and, in another, alter its board and corporate governance. Alon Brav, et al., *Hedge Fund Activism, Corporate Governance, and Firm Performance*, 63

---

[16] Available at https://tinyurl.com/4y26s6jd.

[17] Available at https://tinyurl.com/yc22t2f4.

J. Fin. 1729, 1739–40 (2008). Another such review lists numerous cases in which funds with ownership stakes of less than 10% used their influence to obtain board seats or secure other corporate changes. Thomas W. Briggs, *Corporate Governance and the New Hedge Fund Activism: An Empirical Analysis*, 32 J. Corp. L. 681, 724–37 (2007). These examples show that blockholders with relatively small ownership stakes hold substantial power to influence the actions of corporate management and that the Act is not overinclusive in regulating entities in which foreign governments own such stakes.

Indeed, the susceptibility of corporate managers to the wishes and preferences of blockholders is reinforced by their legal obligations. U.S. managers are inextricably linked to their foreign-government investors by the duty of loyalty that corporate directors owe to their shareholders. *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 634 (3d Cir. 2007); *Abrams v. McGuireWoods LLP*, 518 B.R. 491, 501 (N.D. Ind. 2014); 3 *Fletcher Cyc. Corp.* § 837.60. "Corporations have a legal responsibility to manage their business for the benefit of their shareholders." *Abrams*, 518 B.R. at 501. Indeed, while authority differs across jurisdictions, some jurisdictions have even concluded that directors and

officers owe fiduciary duties to "individual shareholders."  *See* 3 *Fletcher Cyc. Corp.* § 848 (citing caselaw in many jurisdictions).

*Bluman* notes that the government's compelling interest in barring temporary residents from election spending was based in part on the fact that such residents "have primary loyalty to other national political communities, many of which have interests that compete with those of the United States."  800 F. Supp. 2d at 291.  Those same loyalty concerns exist when U.S. companies with significant foreign-government ownership make decisions about election spending.

The fiduciary duty of corporate managers to manage the company for the benefit of its owners also obviates any need for the state to show, as the district court suggested was necessary, "evidence that a foreign government or foreign government-owned entity with less than full ownership of a domestic entity has exerted influence over that entity's election spending in Maine."  Add. at 35.  In addition to the fact that the mere potential for such direct influence, whether or not it occurs, implicates the state's compelling interest in preventing the appearance of foreign-government influence, it is unrealistic to assume that corporate managers will not take action to protect the interests of its

major shareholders unless and until one of those shareholders expressly directs it to do so. Rather, corporate managers carrying out their fiduciary duties can be expected to anticipate and infer the wishes and interests of their largest owners and act accordingly.

The district court stated that it could not reconcile the state's defense of the 5% threshold with *Citizens United*, and, in particular *Citizens United*'s dicta that a law targeting "corporations or associations that were created in foreign countries or funded *predominately* by foreign shareholders" might survive constitutional challenge. Add. at 35 (quoting *Citizens United*, 558 U.S. at 362). But the Court in *Citizens United* was confronted with a sweeping ban on expenditures by all corporate entities, foreign and domestic; it had no occasion to consider the question of exactly how much foreign ownership is enough to trigger a state's compelling interest in regulation. And it certainly had no occasion to consider how far states may go in regulating the far more pernicious problem of foreign *government* interference in their elections. The importance of *Citizens United*'s observation is that it left the door open to state laws to address such problems; the ownership stake it

happened to mention without the benefit of briefing should not be taken as an established limit.

The district court also erred in concluding that the 5% threshold was "arbitrarily chosen" by the Act's drafters. Add. at 35. No evidence in the legislative record supports this conclusion. To the contrary, the Act uses the same ownership threshold that Congress selected in the Williams Act as a trigger to require a special disclosure if it occurs in a publicly traded company. Specifically, "[a]ny person" who acquires "directly or indirectly the beneficial ownership . . . of more than 5 per centum" of any equity security subject to registration, must file a statement with the SEC. 15 U.S.C.A. § 78m(d).

While the court noted that the purposes of the Williams Act are not the same as the purposes of the Act, they are close enough to support the use of a 5% threshold in the Act. Specifically, the purpose of the Williams Act is to "protect the investors in target corporations from takeover bidders who up to that point had been able to operate in secrecy." *Fla. Commercial Banks v. Culverhouse*, 772 F.2d 1513, 1515 (11th Cir. 1985). That Congress deemed a 5% owner in a company to have a plausible chance of a successful takeover bid confirms that such

owners have a substantial amount of power and influence.  Preventing foreign governments from having such power and influence over entities that influence Maine elections is a key purpose of the Act.

The district court also overlooked that laws and proposed laws around the country seeking to limit foreign influence in elections use 5% ownership as a relevant measuring stick.  Possibly the first such law, enacted by St. Petersburg, Florida, defined a foreign-influenced entity based on the same 5% ownership threshold.  *See* Brian Remler, *Foreign Threats, Local Solutions: Assessing St. Petersburg, Florida's "Defend Our Democracy" Ordinance As Potential Model Legislation to Curb Foreign Influence in U.S. Elections*, 49 Stetson L. Rev. 643, 660 (2020). Alaska adopted a similar 5% threshold.  Alaska Stat. § 15.13.068(e)(5)(A).  Similar laws in Seattle and Minnesota define foreign-influenced companies based on 5% aggregate ownership by foreign nationals or 1% ownership by a single foreign national.  Seattle Ordinance 126035;[18] Minn. Stat. § 211B.15.  Though these latter laws have a much broader sweep than the Act, and, as a result, raise more

---

[18]  Available at https://tinyurl.com/55apcc4x.

difficult legal questions,[19] they at least demonstrate that 5% is a commonly used threshold in such laws.

That the Maine Legislature has considered differing proposals with different ownership thresholds, *see* Add. at 35 n.16, does not establish that 5% was arbitrarily chosen. Rather, it shows thoughtful consideration to different approaches to the problem of foreign influence. While some of those proposals were more restrained than the Act, some were more sweeping. *See, e.g.*, L.D. 479 (130th Legis. 2021) (regulating any entity 5% or more owned by a single foreign national or 20% or more owned by a combination of foreign nationals). At the end of the day, the drafters had to choose a number for the threshold. That number needed to be only narrowly tailored, not "perfectly tailored." *Williams-Yulee*, 575 U.S. at 454 (quoting *Burson v. Freeman*, 504 U.S. 191, 209 (1992)). It was reasonable for the drafters to choose one that is well supported by federal securities law, state and local laws throughout the country, and legal scholarship.

---

[19]  The Minnesota law has been preliminarily enjoined while its constitutionality is determined. *Minnesota Chamber of Com. v. Choi*, No. 23-CV-2015, 2023 WL 8803357 (D. Minn. Dec. 20, 2023).

2. *The ban on foreign-government participation in corporate decision-making is narrowly tailored.*

The Court also erred by concluding that the Act's ban on foreign-government participation in corporate decisions concerning election spending is not narrowly tailored.

This element of the FGIE definition is lifted almost verbatim from FEC regulations implementing FECA: "A foreign national shall not direct, dictate, control, or directly or indirectly participate in the decision-making process of any person . . . with regard to such person's Federal or non-Federal election-related activities. . . ." 11 C.F.R. § 110.20(i). This aspect of the Act is largely an effort to close the loophole opened by the FEC when it interpreted the law implemented by this federal regulation to exclude referendum elections. *See In re Stop I-186 to Protect Mining and Jobs et al.*, MUR 7523.

The district court based its conclusion that this element of the Act was likely not narrowly tailored largely on an early draft of the Commission's rules implementing the Act that, in the Court's view, might have placed an entity within the definition of a FGIE based solely on receiving unsolicited input on election spending from a foreign government or FGOE. Add. at 37.

Though Defendants disavowed that interpretation at oral argument, *id.*, they subsequently rewrote the draft rule's definition of "directly or indirectly participate" to remove all doubt. The final rules, adopted by the Commission on May 29, 2024,[20] define "participate" to mean:

> with the invitation, consent, or acquiescence of the firm, partnership, corporation, association, organization, or other entity, to deliberate or vote on a decision of that firm, partnership, corporation, association, organization or other entity concerning donations and disbursements to influence the nomination or election of a candidate or the initiation or approval of a referendum.

Jonathan Wayne, Memo to Commissioners at ETH-2 (May 17, 2024).[21]

The new definition also includes specific exclusions, including "sending an unsolicited communication regarding a decision-making process" or participating in "general budget decisions" subject to certain limitations. *Id.* The latter exclusion directly tracks FEC guidance

---

[20] *See* Maine Comm'n on Gov't Ethics & Election Practices, *May 29, 2024 Commission Meeting*, Item No. 6, at https://www.maine.gov/ethics/meeting/2024-05-29. The adopted rules are currently undergoing final legal review by the Office of Attorney General. *See* 5 M.R.S.A. § 8056(1). By their terms, they will become effective only if and to the extent the injunction is lifted.

[21] At https://tinyurl.com/22ekykj7.

interpreting the federal regulation. *See* Federal Election Commission, Letter to Jonathan D. Simon, Esq., 2006 WL 1502610, at *4 (May 19, 2006).

Particularly as it has now been clarified, the participation ban is narrowly tailored to further Maine's compelling interest in limiting foreign influence in Maine elections. Just like federal law, it requires U.S. corporations to insulate their decision-making processes about election spending from foreign-government influence. Moreover, there is no longer any chance that a U.S. corporation could be "barred from engaging in otherwise-protected speech . . . based on unsolicited communications from a foreign government-owned entity even when no actual influence is shown." Add. at 37. To trigger the provision, the company must affirmatively invite, or at least acquiesce to, the efforts of the foreign-government entity to influence its decisions concerning election spending.

Further, there is no less restrictive means to effectively protect Maine's compelling interest in preventing foreign-government meddling in its elections. A law that targeted only foreign governments themselves would pose nearly insurmountable enforcement challenges.

To police efforts by foreign governments to influence Maine elections, the state must be allowed to also regulate the U.S.-based recipients of such influence.

### D. Even if the Act has unconstitutional applications, it is not facially invalid.

In considering an overbreadth challenge, courts should "vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292.

The district court erred in its application of this demanding standard. The district court recognized that the Act is likely constitutional as applied to foreign governments themselves. Add. at 33. And, as shown above, the ban on direct and indirect participation in decisions about election spending, as clarified by the Commission, is no more unconstitutional than the FEC regulation from which it was derived. These categories alone reflect two out of the three categories of FGIEs regulated by the Act.

Moreover, even if the district court were correct that the 5% ownership threshold is too low, the Act would still have constitutional applications against FGIEs with higher foreign-government ownership

stakes. Federal telecommunications law, for example, bars broadcasting companies from obtaining licenses if they are more than 20% foreign owned. *See* 47 U.S.C.A. § 310(b)(3). These provisions "reflect a long-standing determination to 'safeguard the United States from foreign influence' in broadcasting." *Moving Phones P'ship L.P. v. FCC*, 998 F.2d 1051, 1055 (D.C. Cir. 1993) (quoting *Kansas City Broadcasting Co.*, 5 Rad. Reg. (P & F) 1057, 1093 (1952)). The same considerations motivating that federal law would support applying the Act against FGIEs with similar or greater foreign-government ownership stakes.

And, if nothing else, the Act could be constitutionally applied to U.S. companies controlled—as opposed to just influenced—by foreign governments or FGOEs. Under principles of corporate law, a stockholder may be considered to have such control in two ways: if it "(1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but 'exercises control over the business affairs of the corporation.'" *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (quoting *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1113–14

(Del. 1994)).  Such entities—which would include HQUS, ENMAX, and Versant[22] based on their 100% beneficial ownership by foreign governments—differ from other FGIEs in that the ability of the government to direct the corporation's affairs is significantly greater. As the Chancery Court has noted, a controlling stockholder is an "'800-pound gorilla' . . . able to exert coercive influence over the board and unaffiliated stockholders."  *Tornetta v. Musk*, 250 A.3d 793, 800 (Del. Ch. 2019).  The concern is thus not just foreign-government influence, but full-blown control over the entity's affairs.

The Supreme Court has suggested that such corporate entities might be properly excluded from election spending in U.S. elections.  In *Citizens United* it observed that the overbreadth of the law made it unnecessary to decide whether the law might be constitutional as applied "to corporations or associations that were created in foreign countries or funded predominately by foreign shareholders."  558 U.S. at 362.  The Supreme Court's phrasing of this observation suggests it

---

[22]  Versant claims, in an as-applied challenge not yet considered by the district court, that its foreign-government owner is barred from exercising control over it under certain voluntary agreements.

saw little distinction between a corporation created in a foreign country and a corporation funded predominately by foreign shareholders.

That makes sense. A controlling shareholder has the right to direct the affairs of the corporation, subject only to any duties that it might owe to minority shareholders. And, in the case of 100% foreign-government owned corporations, like Versant, ENMAX, and HQUS, the duty of loyalty owed by corporate managers makes the interests of the U.S. subsidiary and the foreign-government owner one and the same. As one federal court has explained:

> In the wholly-owned subsidiary context . . . there is only one shareholder—the parent corporation. The manager of the wholly-owned subsidiary, then, is obligated to act for the good of the parent company. There's no reason to consider the subsidiary's interest apart from the parent's, as, by definition, what's good for the parent is good for the subsidiary. Or, putting it another way, wholly-owned subsidiaries are expected to operate for the benefit of their parent corporations; that is why they are created.

*Abrams*, 518 B.R. at 501 (internal citations omitted). Thus, when HQUS or Versant acts, they can be assumed to be acting to further the interests of their ultimate owners—the governments of Québec and Calgary respectively. This assumption holds regardless of whether they

are receiving explicit direction from those governments on Maine election spending.

Finally, the Act contains an important provision requiring FGIEs to place disclaimers in advertising they fund seeking to sway public opinion on certain political questions. 21-A M.R.S.A. § 1064(6). The district court's decision did not address—and thus did not endorse—plaintiffs' mistaken contention that the disclaimer provision is unconstitutional. Indeed, the disclaimer provision easily survives the lower level of constitutional scrutiny that this Court applies to such provisions. *See Gaspee Project*, 13 F.4th at 85. Since the district court did not conclude that this disclaimer provision is likely unconstitutional, it too should be considered part of the "plainly legitimate sweep" of the Act. *Williams*, 553 U.S. at 292.

In short, even if this Court agrees with the district court that the 5% ownership threshold in § 1064(1)(E)(2)(a) is too low, it should nonetheless, in light of the Act's many constitutional applications, reverse the court's decision to enjoin the Act in its entirety.

## III. The district court's express preemption holding misconstrues the scope of the Act.

The district court correctly concluded that the Act was likely not preempted under doctrines of implied, conflict, or field preemption, Add. at 17–26, but erred by concluding that the Act was expressly preempted under FECA "insofar as the Act covers foreign spending in elections for federal office." Add. at 14. To the extent the district court relied on this holding to inform its conclusion on overall likelihood of success, it abused its discretion.

FECA's preemption provision states in relevant part that "the provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office." 52 U.S.C.A. § 30143(a). Courts have recognized that its scope is narrow. *See Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200 (5th Cir. 2013); *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273 (5th Cir. 1994); *Stern v. General Electric Co.*, 924 F.2d 472, 475 (2d Cir. 1991). The FEC has adopted rules clarifying that the provision preempts, in relevant part, state "[l]imitation[s] on contributions and expenditures regarding Federal candidates and political committees." 11 C.F.R. § 108.7(b)(3).

FECA's preemption provision might well apply if the Act regulated FGIE spending in federal elections. But it does not. First, the Act places its operative statutory provision, 21-A M.R.S. § 1064, within Chapter 13 of Title 21-A of the Maine Revised Statutes, "Campaign Reports and Finances." The primary enforcer of that chapter is the Commission. *See* 21-A M.R.S.A. §§ 1001–1004-C. Under state law, the Commission "does not have jurisdiction over financial activities to influence the nomination or election of candidates for federal office." 21-A M.R.S.A. § 1011.

Because the Act has no language expanding the Commission's jurisdiction, reading the Act to cover federal elections would create a bizarre situation in which Maine's campaign-finance regulator would lack jurisdiction to investigate or enforce a significant category of campaign finance violation contained within its statutes. The only way such violations could be enforced would be through felony criminal prosecutions, which the Attorney General would have to initiate *sua sponte* without a referral from the Commission. *See* 21-A M.R.S.A. § 1003(4) (requiring the Commission to refer apparent crimes to the

Attorney General).  The drafters of the Act could not have intended such a result.

Second, a close examination of the Act's statement of "applicability," 21-A M.R.S.A. § 1064(11), shows that the drafters meant the Act to apply broadly within the Commission's existing jurisdiction, but not outside it.  Specifically, while § 1064(11) provides that the Act applies to all "persons," it also gives a list of examples of such "persons" that is limited to participants in state and local elections: "candidates, their treasurers and authorized committees under [21-A M.R.S.A. § 1013-A(1)];[23] party committees under [21 M.R.S.A. § 1013-A(3)]; and committees under [21-A M.R.S.A. § 1052(2)]."  Participants in federal elections are outside the scope of these cross-referenced statutes, which define who must register with the Commission for reporting purposes. They are therefore not among subsection 11's examples of "persons."

---

[23]   Here the Act is referring not just to any candidate but specifically to a "candidate . . . under [§ 1013-A]"—i.e., a candidate required to register with the Commission because they are a candidate for "state or county office or a candidate for municipal office [in certain circumstances]."  21-A M.R.S.A. § 1013-A(1)(A). Maine's legislative drafting convention is to eschew the serial comma.  *See O'Connor v. Oakhurst Dairy*, 851 F.3d 69, 73 (1st Cir. 2017).  That § 1064(11)'s cross-reference to § 1013-A modifies "candidate" is confirmed by § 1013-A(1), which similarly speaks of "[c]andidates, their treasurers and political committees" as a single category.

Under the canon of *noscitur a sociis*—a word is known by the company it keeps—the Court should "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth" to the statute in question. *Yates v. United States*, 574 U.S. 528, 543 (2015) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). Here, subsection 11's use of an illustrative list that is limited to participants in state and local elections requires that "persons" in § 1064(11) be given a similarly limited scope, consistent with the Commission's limited jurisdiction. In other words, if the drafters had intended to include participants in federal elections within the scope of the Act, they would have mentioned them in § 1064(11)'s otherwise broad list of "persons."

The district court based its skepticism that the Act's scope could be read as limited to state and local elections on "other Maine statutory provisions that could lead to the opposite conclusion," citing specifically 21-A M.R.S.A. §§ 335 and 354. The court erred in relying on these and other non-campaign-finance statutes cited by Versant.

Title 21-A contains two distinct sets of laws. Chapters 1–11, which include the two provisions relied on by the Court, largely govern

election administration.  Chapters 13–14 regulate campaign finance.

Chapters 1–11 extensive rules governing federal elections because the

states are responsible for regulating the "Times, Places, and Manner" of

those elections.  U.S. Const. art. I, § 4, cl. 1.  The two provisions cited by

the court, for example, contain ballot-access requirements for federal

candidates—classic time, place, and manner regulations found in every

state.  The existence of such federal ballot access requirements in no

way suggests that Maine's campaign-finance laws implicitly extend to

federal candidates as well.

Moreover, unlike Chapters 1–11, Chapter 13 contains several

express indicia that its provisions apply only to state and local elections.

In addition to its express limitation of the Commission's jurisdiction in

§ 1011, it contains a definition of "election" that conspicuously excludes

federal elections.  21-A M.R.S.A. § 1001(2).  It excludes federal

candidates from the list of who must register with the Commission.  *Id.*

§ 1013-A(1)(A).  And it limits the scope of PAC and ballot question

committee regulations to entities that work to influence elections for "state, county or municipal office."[24]  *Id.* § 1051.

Even where provisions of Chapter 13 do not have express language excluding federal elections, the Commission has understood them to be inapplicable to federal elections.  The Commission's Executive Director explained in his declaration the Commission's historical understanding that Chapter 13's provisions do not apply to federal elections and indicated Commission staff plan to apply this same interpretation to the Act.  A134–35.  The Attorney General will do the same.  Given that the Commission's position is longstanding and well-supported by statute, the Court should adopt that interpretation in considering whether an injunction is necessary.  *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 n.5 (1982) (recognizing that, in a facial challenge to a statute, court must consider limiting interpretation offered by an enforcement agency); *March v.*

---

[24]  Section 1064(11) states that the Act applies to persons "notwithstanding" § 1051. But that carve-out is consistent with the State's interpretation, as it simply makes clear that the Act regulates entities beyond just PACs and ballot question committees.

*Mills*, 867 F.3d 46, 45 n.11 (1st Cir. 2017) (same); *Nat'l Org. for Marriage*, 649 F.3d 34, 66 (1st Cir. 2011) (same).

Simply put, the trial court failed to appreciate that the Act—like all other Maine campaign-finance laws—regulates only state elections, not federal elections. And, even if there were any doubt, the Court should have been guided by the enforcing agencies' authoritative interpretation of state law.

## IV. The district court's injunction is overbroad.

As shown above, the Act would have many constitutional applications even if the district court were correct that the 5% ownership threshold is constitutionally suspect. Yet even though the district court acknowledged that the Act was likely constitutional as applied to foreign governments and offered no opinion on the constitutionality of the Act's disclaimer requirements, it declined the State's request to tailor its injunction to those portions of the Act it found to be likely unconstitutional. This was an abuse of discretion.

Severability in this context is a question of state law. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 772 (1988) (remanding for determination of whether partly unconstitutional

ordinance was severable under state law). And Maine law expressly provides that Maine statutes are severable. *See* 1 M.R.S.A. § 71(8). This default rule severs not just invalid "provision[s]" from Maine statutes but also invalid "application[s]." *Id.* Thus, under Maine law "[a]n invalid portion of a statute or an ordinance will result in the entire statute or ordinance being void only when it is such an integral portion of the entire statute or ordinance that the enacting body would have only enacted the legislation as a whole." *Kittery Retail Ventures, LLC*, 2004 ME 65, ¶ 18, 856 A.2d 1183.

The Court undertook no analysis of severability, and instead simply declined to consider it "[g]iven the expedited and preliminary nature of this proceeding." Add. at 39. Given Maine's presumption of severability, this was an abuse of discretion. The definition of an FGIE is cleanly divided into three parts, each of which can be easily severed from the other two if necessary. The court itself found that one of the three definitions—foreign governments—was properly regulated by the Act. Add. at 33. Moreover, all three prongs of the FGIE definition merely reflect different tactics for solving the same problem: foreign-government influence in Maine elections. The notion that voters would

have rejected the ballot question had they known that the 5%

ownership threshold, or the ban on participating in corporate election

decisions would be struck down, is implausible.  Given the

overwhelming support for the Act, voters surely would have taken half

a loaf—barring some forms of foreign-government influence—over no

loaf.

Moreover, to the extent there is any uncertainty about voters'

wishes, the presumption of severability places the burden on the

plaintiffs to demonstrate voters would have wanted the statute to fall in

its entirety if any portion was unconstitutional.  *See Pharm. Care*

*Mgmt. Ass'n v. Maine Att'y Gen.*, 324 F. Supp. 2d 74, 79 (D. Me. 2004).

Specifically, they must show that it is "impossible" to determine that

the Act "would have been enacted except as an entirety."  *Opinion of the*

*Justices*, 2004 ME 54, ¶ 25, 850 A.2d 1145.  They did not (and cannot)

do so.

The court also erred by failing to narrow its injunction to exclude

the disclaimer requirement in § 1064(6).  This is an entirely distinct

requirement that does not bar speech at all; it merely requires

disclaimers on advertising.  Nowhere does the court suggest that this

discrete regulation might be unconstitutional. And, indeed, this Court's precedents suggest exactly the opposite. *See Gaspee Project*, 13 F.4th at 85. Yet the Court enjoined enforcement of that provision as well. The Court abused its discretion by enjoining a discrete provision of the Act without finding either that this portion of the Act was likely unconstitutional or that voters would not have enacted the provision by itself.

## V. The remaining preliminary injunction factors do not favor an injunction.

The district court's analysis of the remaining injunction factors is largely derivative of its likelihood of success analysis. And that is as it should be: likelihood of success is the *sine qua non* of the preliminary injunction analysis. *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993). Thus, while it is true that the public interest would not be served by allowing enforcement of an "unconstitutional" law, Add. at 39, it is unquestionably served by allowing enforcement of a constitutional regulation of foreign-government influence approved overwhelmingly by Maine voters. With likelihood of success properly assessed, the other injunction factors shift to the State's favor.

## Conclusion

For the foregoing reasons, the Court should vacate the preliminary injunction issued by the district court.

DATED: June 10, 2024

AARON M. FREY
Attorney General

/s/ Jonathan R. Bolton
_____

JONATHAN R. BOLTON
PAUL SUITTER
Assistant Attorneys General
6 State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov
paul.suitter@maine.gov

*Attorneys for Defendants-Appellants*

**Addendum**

Order Granting Preliminary Injunction (ECF No. 61).............. A01

Text of Initiated Bill, Chapter 2 (the Act) ................................. A41

**UNITED STATES DISTRICT COURT
DISTRICT OF MAINE**

| | |
|---|---|
| CENTRAL MAINE POWER COMPANY, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )   Docket No. 1:23-cv-00450-NT ) |
| MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, et al., | ) ) ) ) |
| Defendants. | ) ) |

**ORDER ON PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

Before me are preliminary injunction motions by Plaintiffs Central Maine Power Company (ECF No. 4), Versant Power and ENMAX Corporation (ECF No. 22), the Maine Press Association and the Maine Association of Broadcasters (ECF No. 25), and a group of Maine voters and electors (ECF No. 27), seeking to enjoin the Defendants from implementing and enforcing "An Act to Prohibit Campaign Spending by Foreign Governments" (the "**Act**") until a final judgment is entered in this matter. For the reasons stated below, the motions are **GRANTED**. Because I am granting the preliminary injunction on the issues that Central Maine Power Company's motion and Versant Power and ENMAX Corporation's motion raise, and because time is limited given that the Act is slated to go into effect on March 1, 2024, I do not address the arguments put forth by the remaining Plaintiffs.

## FACTUAL BACKGROUND

### A.   Central Maine Power Company and Versant Power

There are two large electric transmission and distribution utility companies operating in the State of Maine. Verified Compl. ("**CMP Compl.**") ¶ 26 (ECF No. 1).[1] The largest, Central Maine Power Company ("**CMP**"), was incorporated in Maine in 1905 and has remained a Maine company, operating and deriving its revenue from Maine customers. CMP Compl. ¶¶ 16–17, 26. It is run by a board of directors and its executive officers, all of whom are United States citizens. CMP Compl. ¶ 18. Currently, CMP's shares are 100% owned by another Maine corporation, CMP Group, Inc., which in turn is wholly owned by Avangrid Networks, Inc., another Maine corporation. CMP Compl. ¶¶ 20–21. Avangrid Networks, Inc. is 100% owned by Avangrid, Inc., a New York corporation whose shares of common stock are listed on the New York Stock Exchange and are publicly traded so anyone can buy them. CMP Compl. ¶¶ 22–23. Iberdrola, S.A., a publicly traded corporation headquartered in Spain, currently owns over 80% of Avangrid, Inc.'s shares. CMP Compl. ¶ 23. Other owners of Avangrid, Inc. stock are:

- The Qatar Investment Authority (the State of Qatar's sovereign wealth fund) – owning approximately 3.7% of outstanding Avangrid, Inc. shares; and

- Norges Bank (the central bank of the Kingdom of Norway) – owning approximately 0.4% of outstanding Avangrid, Inc. shares.

CMP Compl. ¶ 24. In addition, the Qatar Investment Authority holds approximately 8.7% and Norges Bank holds approximately 3.6% of outstanding Iberdrola, S.A.

---

[1]     Unless otherwise indicated, cites to ECF entries refer to Docket No. 1:23-cv-00450-NT.

**Add. 02**

shares. CMP Compl. ¶ 24. No one from the Qatar Investment Authority or Norges Bank serves as an officer or director of CMP (or CMP Group, Avangrid Networks, Inc., or Avangrid, Inc.). CMP Compl. ¶ 25. Nor is any officer or director of CMP, CMP Group, Avangrid Networks, Inc., or Avangrid, Inc. a Qatari or Norwegian national. CMP Compl. ¶ 25.

The other significant electric transmission and distribution utility company in Maine is Versant Power ("**Versant**"). Verified Compl. for Declaratory and Injunctive Relief ("**Versant Compl.**") ¶ 62 (ECF No. 1), Docket No. 1:23-cv-00451-NT. Versant is incorporated in Maine and (with its predecessors) has operated exclusively in Maine for more than ninety-nine years. Versant Compl. ¶¶ 15, 62. Versant's common stock is 100% owned by ENMAX US Holdco, Inc., which in turn is wholly owned by ENMAX Corporation. Versant Compl. ¶¶ 63–65. The City of Calgary in Alberta, Canada is the sole shareholder of ENMAX Corporation. Versant Compl. ¶ 58. Notwithstanding its ownership of the stock of ENMAX Corporation, the City of Calgary does not have any decision-making authority over, or the ability to participate in, the operations or management of ENMAX Corporation or the operations, management, or governance of Versant. Versant Compl. ¶ 66. It is expressly prohibited from such participation by orders of the Maine Public Utilities Commission ("**PUC**") and a stipulation that Versant entered with the PUC. Versant Compl. ¶¶ 66–87. No representative of the City of Calgary has ever served as an officer or director of Versant and no representative of ENMAX Corporation has ever served as an officer of Versant. Versant Compl. ¶ 88.

3

**B.    The Corridor Referendum**

In 2021, Maine voters faced a ballot initiative question seeking to prohibit the construction of an electric transmission line that was proposed to run through Maine from Canada and was frequently referred to as the "CMP Corridor." CMP Compl. ¶ 28. CMP engaged in political advocacy to oppose the CMP Corridor initiative. CMP Compl. ¶ 28. In addition, a corporate entity named H.Q. Energy Services (U.S.) Inc. ("**HQUS**"), a subsidiary of Hydro-Québec, made contributions, totaling over \$22 million, to encourage Maine voters to reject the corridor referendum. Decl. of Jonathan Wayne ("**Wayne Decl.**") ¶¶ 13–14 (ECF No. 47-1). HQUS's massive election spending on the corridor referendum caused concern. For example, during the corridor referendum campaign, a bipartisan group of current and former Maine legislators sent a letter to the Premier of Québec and the CEO of Hydro-Québec demanding that Hydro-Québec "cease all further campaign activities in Maine and let the people of Maine vote without further meddling in our elections." Decl. of Jonathan Bolton ("**Bolton Decl.**"), Ex. B (ECF No. 47-6). And following the corridor referendum campaign, elected leaders from both major parties publicly criticized HQUS's election spending. *See* State Defs.' Combined Opp'n to the Mots. for Prelim. Relief ("**State Opp'n**") 6 (ECF No. 47) (collecting articles). This concern provoked a legislative response. In January 2021, a group of legislators introduced L.D. 194, "An Act to Prohibit Contributions, Expenditures, and Participation by Foreign Government-owned Entities to Influence Referenda." CMP Compl. ¶ 38. L.D. 194 passed by a significant margin, but the Governor vetoed it, citing concerns about L.D.

4

194's constitutionality. CMP Compl. ¶ 39; *see also* Bolton Decl., Ex. E (ECF No. 47-9).

## C.    The Act

Undaunted, supporters of L.D. 194 then gathered enough signatures to seek enactment of a similar law—the Act—under the direct democracy provision of the Maine Constitution. Versant Compl. ¶¶ 29–30. As required by the Maine Constitution, the Act was presented to the Legislature as L.D. 1610 for additional proceedings, and it passed, but it was again vetoed by the Governor who reiterated her constitutional concerns. Versant Compl. ¶¶ 26, 31–33. As a result, the Act was placed on the November 2023 ballot as Question 2. Versant Compl. ¶ 35.

Maine voters enacted the Act by a vote of 348,781 to 55,226—the biggest win for a citizens' initiative in either percentage or absolute terms in Maine's history. Bolton Decl., Ex. F (ECF No. 10); Maine State Legislature, Legislative History Collection, Citizen Initiated Legislation, 1911–Present, https://www.maine.gov/legis/lawlib/lldl/citizeninitiated/. The Governor proclaimed the results of the election on December 6, 2023. Bolton Decl., Ex. F. As explained in greater detail below, the Act bars foreign governments and "foreign government-influenced" entities from spending on Maine's elections. 21-A M.R.S. § 1064(1)(E), (2).[2] It bolsters that ban with additional provisions, including prohibitions on solicitation or assistance activities, disclosure requirements, and affirmative duties on the media to ensure they do not

---

[2]        For ease of reference, I use the proposed statutory citation. The Act was attached to CMP's complaint as Exhibit A (ECF No. 1-1).

publish otherwise-barred communications. *Id.* § 1064(3), (4), (6), (7). Violations of the Act are punishable by monetary penalty or imprisonment. *Id.* § 1064(8), (9).

The Act was scheduled to take effect in early January of this year and is intended to be codified at Title 21-A, Section 1064 of the Maine Revised Statutes. CMP Compl. ¶¶ 46, 48. The central provision of the Act, subsection 2, provides:

> **Campaign spending by foreign governments prohibited**. A foreign government-influenced entity may not make, directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum.

21-A M.R.S. § 1064(2). Under the Act, a "foreign government-influenced entity" is:

> (1) A foreign government; or
> (2) A firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity:
>> (a) Holds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests; or
>> (b) Directs, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the firm, partnership, corporation, association, organization or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements.

*Id.* § 1064(1)(E). A "foreign government-owned entity" means "any entity in which a foreign government owns or controls more than 50% of its equity or voting shares." *Id.* § 1064(1)(F). The Act also includes a disclosure provision that would require any public communication made by a foreign government-influenced entity—that is not otherwise prohibited—to "clearly and conspicuously contain the words 'Sponsored

by' " immediately followed by the name of the foreign government-influenced entity and a statement identifying it as a "foreign government" or a "foreign government-influenced entity." *Id.* § 1064(6).

In addition to the subsections aimed at foreign government-influenced entities, the Act contains a provision directed to "television [and] radio broadcasting station[s], provider[s] of cable or satellite television, print news outlet[s] and Internet platform[s]." *Id.* § 1064(7). Each such media-related entity must "establish due diligence policies, procedures and controls that are reasonably designed to ensure that it does not broadcast, distribute or otherwise make available to the public" any public communication that violates the Act. *Id.* § 1064(7). And, "[i]f an Internet platform discovers that it has distributed a public communication" that does violate the Act, it must "immediately remove the communication and notify the commission." *Id.* § 1064(7).

The Act imposes monetary penalties of up to $5,000 or up to double the amount expended in the prohibited action, whichever is greater, for each violation. *Id.* § 1064(8). Anyone who knowingly violates subsection 2 commits a Class C crime, *Id.* § 1064(8), which may subject the person to a term of incarceration of up to five years. 17-A M.R.S. § 1604(1)(C).

CMP and the Versant Plaintiffs have stated that they plan to engage in political speech again, but that such spending and communications are now barred under the Act. CMP Compl. ¶¶ 32–35; Versant Compl. ¶ 6.

7

## PROCEDURAL BACKGROUND

In mid-December 2023, four complaints were filed seeking declaratory and injunctive relief relating to the Act. CMP brought the first case against the Maine Commission on Governmental Ethics and Election Practices (the "**Commission**"), the Chairman and the four other members of the Commission, and the Attorney General of the State of Maine (collectively, the "**State**"). CMP Compl., Docket No. 1:23-cv-00450-NT. CMP alleged six counts: (1) that the Act's ban on referenda spending violates the First Amendment; (2) that the Act's ban on candidate campaigns violates the First Amendment; (3) that the Act's disclaimer requirement violates the First Amendment; (4) that the Act violates the Due Process Clause of the Fourteenth Amendment;  (5) that the Act violates the free speech rights guaranteed by the Maine Constitution; and (6) that the remaining provisions in subsection 1 of the Act cannot be severed from the offending provisions. CMP Compl. ¶¶ 66–95. Along with its complaint, CMP also filed a motion for a temporary restraining order and preliminary injunction seeking to enjoin enforcement of the Act. Pl.'s Mot. for TRO and Prelim. Inj. ("**CMP PI Mot.**") (ECF No. 4).

Versant and ENMAX Corporation (together hereinafter, the "**Versant Plaintiffs**" or "**Versant**") also filed a complaint against the same Defendants. Versant Compl., Docket No. 1:23-cv-00451-NT. The Versant Plaintiffs alleged four counts: (1) that the Act violates the Supremacy Clause because it is preempted by federal election law; (2) that the Act violates the First and Fourteenth Amendments; (3) that the Act violates Article I, Section 4 of the Maine Constitution; and (4) that the Act violates the Foreign Commerce Clause. Versant Compl. ¶¶ 104–141. Like

CMP, Versant filed a motion for a temporary restraining order and preliminary injunction along with their complaint. Pls.' Mot. for TRO and Prelim. Inj. ("**Versant PI Mot.**") (ECF No. 22), *see* Docket No. 1:23-cv-00451-NT (ECF No. 4).

Plaintiffs Maine Press Association and Maine Association of Broadcasters (together, the "**Media Plaintiffs**") filed the third Act-related complaint against the Defendants. Compl. for Declaratory and Injunctive Relief ("**Media Compl.**") (ECF No. 1), Docket No. 1:23-cv-00452-NT. The Media Plaintiffs' complaint focuses on subsection 7 of the Act and alleges four counts: (1) that the Act is void for vagueness under the First and Fourteenth Amendments; (2) that the Act violates the First Amendment because it places an unconstitutional burden on news outlets; (3) that the Act violates the First Amendment because it constitutes a prior restraint; and (4) that the Act violates the First Amendment by imposing strict liability on the publication of political speech. Media Compl. ¶¶ 46–66. The Media Plaintiffs assert that they rely on revenue from advertisements, including political advertisements, but may have to stop running political advertisements they would otherwise accept to avoid "legal risk." Media Compl. ¶¶ 40, 43. With their complaint, the Media Plaintiffs filed a motion for preliminary injunction. Pls.' Mot. for Prelim. Inj. (ECF No. 25), *see* Docket No. 1:23-cv-00452-NT (ECF No. 3).

The last case was brought by Plaintiffs Jane Pringle, Kenneth Fletcher, Bonnie Gould, Brenda Garrand, and Lawrence Wold in their capacities as registered voters and electors (collectively, the "**Electors**"). Verified Compl. ("**Electors Compl.**") (ECF No. 1), Docket No. 1:23-cv-00453-NT. The Electors' complaint alleges eleven counts:

(1) that the Act violates their constitutional right to petition the government; (2) that the Act violates their First Amendment right to free speech by limiting the sources of information available to the Electors; (3) that the Act violates the Electors' constitutional right to freedom of assembly; (4) that the Act violates the constitutional right to freedom of the press; (5) that the Act violates Due Process Clause notice standards; (6) that the Act violates the Maine Constitution's right to petition the government; (7) that the Act violates the Maine Constitution's protection of freedom of speech; (8) that the Act violates the Maine Constitution's right of freedom of assembly; (9) that the Act violates the Maine Constitution's protection of freedom of the press; (10) that the Act violates the separation of powers set forth in the Maine Constitution; and (11) that the Act violates the due process rights guaranteed by the Maine Constitution. Electors Compl. ¶¶ 79–167. The Electors intend to continue to seek, acquire, consider, and share information covered by the Act. Electors Compl. ¶¶ 93–94. The Electors also filed a motion for a temporary restraining order and preliminary injunction. Pls.' Mot. for TRO and Prelim. Inj. (ECF No. 27), *see* Docket No. 1:23-cv-00453-NT (ECF No. 8).

On December 13, 2023, I held a teleconference, in which counsel in all four cases participated, to discuss the tight timing of the Plaintiffs' motions for a temporary restraining order given that the Act was to go into effect on January 5, 2024. Minute Entry (ECF No. 8). Following the conference, the State agreed to voluntarily refrain from enforcing the Act until February 29, 2024 to give the parties time to fully brief the issues. Following the conference, I entered an agreed-upon

Add. 10

scheduling order for the briefing. Order Granting Mot. to Amend Scheduling Order to Set New Briefing Schedule for Mots. for Prelim. Relief (ECF No. 13). At the joint request of the parties, the four cases were consolidated on January 9, 2024. Order to Consolidate Cases (ECF No. 20). The State filed their omnibus opposition to the motions for preliminary injunctions on January 12, 2024. State Opp'n (ECF No. 47). On January 31, 2024, the Plaintiffs all filed their replies. *See* ECF Nos. 51–54.[3] The matter came before me for oral argument on February 23, 2024.

## LEGAL STANDARD

In deciding whether to grant a preliminary injunction, district courts "must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). "In the First Amendment context, likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam).

---

[3]    In January, I also granted permission for three groups to participate as amicus curiae. An organization called Free Speech for People filed an amicus brief in support of the State's position. Amicus Curiae Br. of Free Speech for People in Supp. of Defs.' Opp'n to Pls.' Mots. for Prelim. Inj. and TROs (ECF No. 45). Another organization called Protect Maine Elections also filed an amicus brief in support of the State. Br. of Amicus Curiae Protect Maine Elections in Supp. of Defs. (ECF No. 46). And the Reporters Committee for Freedom of the Press filed an amicus brief supporting the Media Plaintiffs' position. Amicus Curiae Br. of the Reporters Committee for Freedom of the Press (ECF No. 50).

Add. 11

## DISCUSSION

### I. Preemption

In their motion for a preliminary injunction, the Versant Plaintiffs assert that the Act violates the Supremacy Clause of the United States Constitution. Versant PI Mot. 9. Versant argues that the Act is expressly preempted by the Federal Election Campaign Act ("**FECA**"), 52 U.S.C. § 30101 *et seq.*, and is also impliedly preempted by FECA because the Act conflicts with Congress's framework for regulating foreign influences in United States elections. Versant PI Mot. 9–13.

#### A. General Preemption Principles

The Supremacy Clause of the United States Constitution provides, in relevant part, that: "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Accordingly, because federal law is the supreme law of the land, Congress "has the power to pre-empt state law." *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).

Preemption may be either express or implied depending on "whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Implied preemption then consists of two types, conflict and field. *Capron v. Off. of Att'y Gen. of Mass.*, 944 F.3d 9, 21 (1st Cir. 2019); *see Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 52 (1st Cir. 2024) ("There are three types of preemption:

Add. 12

conflict, express, and field.”). The Versant Plaintiffs maintain that all three types of preemption—express, conflict, and field—apply here.

The party asserting preemption bears the burden of proving it. *Me. Forest Prods. Council*, 51 F.4th at 6. The “ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole.” *Gade*, 505 U.S. at 98.

## B. Express Preemption

“Where a federal statute contains a clause expressly purporting to preempt state law” courts must “focus on the plain wording of the clause, which necessarily contains the best evidence of Congress’ preemptive intent.” *Medicaid and Medicare Advantage Prods. Ass’n of P.R., Inc. v. Hernández*, 58 F.4th 5, 11 (1st Cir. 2023) (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)); *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (same).

FECA’s express preemption provision states: “the provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office.” 52 U.S.C. § 30143(a); *see also* 11 C.F.R. § 108.7. FECA defines the term “Federal office” to mean “the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress.” 52 U.S.C. § 30101(3). The Act’s funding prohibition applies to “the nomination or *election of a candidate* or the initiation or approval of a referendum,” 21-A M.R.S. § 1064(2) (emphasis added). It does not exclude federal elections, so on its face the Act would apply to the election of a candidate to federal office.

13

Add. 13

Despite the fact that the Act does not expressly carve out elections for federal office, the State contends that the Act falls outside FECA's preemption provision. The State contends that the Act "cannot reasonably be read—and is not read by the enforcing agencies—to regulate federal elections in any way." State's Opp'n 53 (citation omitted). In support of its claim that the Act cannot reasonably be read to encompass federal elections, the State notes that, if allowed to go into effect, the Act will be housed in the Maine Revised Statutes in a chapter and subchapter that contain definitions that would limit the scope of the Act to just state and local elections. *See* State Opp'n 53 (quoting 21-A M.R.S. §§ 1011, 1051); s*ee also* 21-A M.R.S. § 1001(2) (defining "election" as "any primary, general or special election for state, county or municipal offices"). But at oral argument, the Versant Plaintiffs pointed to other Maine statutory provisions that could lead to the opposite conclusion. *See, e.g.*, 21-A M.R.S. §§ 335, 354.

In support of the claim that the State's enforcing agencies do not read the Act to regulate federal elections, the State offers a declaration from the current executive director of the Commission to that effect. *See* Wayne Decl. ¶¶ 5–10. But courts "may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction," and courts will "not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480–81 (2010) (citations omitted).

I conclude that FECA likely expressly preempts the Act insofar as the Act covers foreign spending in elections for federal office.

### C.    Implied Preemption

The next question is whether FECA impliedly preempts the Act. The Versant Plaintiffs contend that the Act is preempted by FECA under both conflict and field preemption. The State, arguing that the Act is not preempted, claims that two presumptions against preemption apply here. I consider the presumption arguments first and then go on to analyze the merits of Versant's preemption argument.

### 1.    Presumptions

First, the State argues that a presumption against preemption applies because state elections are a traditional area of state regulation. "In all pre-emption cases, and particularly in those in which Congress has 'legislated in a field which the States have traditionally occupied,' [courts] 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Me. Forest Prods. Council*, 51 F.4th at 6 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). "The presumption does not apply, though, 'when the State regulates in an area where there has been a history of significant federal presence.'" *Id.* (quoting *United States v. Locke*, 529 U.S. 89, 108 (2000)). The Versant Plaintiffs maintain that the presumption does not apply because the Act addresses issues of foreign affairs, which is an area the federal government typically reserves for itself.

Although the Act does touch upon an aspect of foreign affairs—how foreign governments may spend money in Maine campaigns—the Act's main focus is the

regulation of Maine elections,[4] and "the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 543 (2013); *see Minn. Chamber of Com. v. Choi*, No. 23-CV-2015 (ECT/JFD), --- F. Supp. 3d ----, 2023 WL 8803357, at *12 (D. Minn. Dec. 20, 2023) ("[S]tate elections are a traditional area of state regulation, and states' historical authority to exclude aliens from participating in their democratic political institutions includes prohibiting foreign nationals from spending money in their elections."). Accordingly, this presumption against preemption likely applies.

Second, the State maintains that, because FECA contains an express preemption clause, that provision provides a "reliable indicium of congressional intent" as to the scope of FECA's preemption and therefore shows that Congress did not intend to preempt laws regulating state and local elections. State Opp'n 54 (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992)). In *Cipollone*, the Supreme Court stated that "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone*, 505 U.S. at 517. But a few years later, in *Freightliner Corporation v. Myrick*, 514 U.S. 280 (1995), the Supreme Court explained that *Cipollone* did "not establish a rule" that "implied pre-emption cannot exist when Congress has chosen to include an express pre-emption clause in a statute." *Freightliner*, 514 U.S. at 287–

---

[4]    As discussed above, the State asserts that it does not interpret the Act to apply to federal elections, and I have concluded in any event that the Act is likely expressly preempted as to federal elections.

89. Instead, "[t]he fact that an express definition of the pre-emptive reach of a statute 'implies'—*i.e.,* supports a reasonable inference—that Congress did not intend to pre-empt other matters does not mean that the express clause entirely forecloses any possibility of implied pre-emption." *Id.* at 288. "At best, *Cipollone* supports an inference that an express pre-emption clause forecloses implied pre-emption." *Id.* at 289.

The *Cipollone* inference against implied preemption likely applies here. The Act contains an express preemption provision that states that FECA supersedes and preempts state law only "with respect to election to Federal office." 52 U.S.C. § 30143(1). That express language does not entirely foreclose the possibility that Congress intended FECA's exclusive reach to go beyond federal candidate elections to cover state and local elections too, but there is at least an inference that that was not Congress's intent. With the presumption and inference in mind, I turn to whether FECA impliedly preempts state regulation of foreign spending in candidate elections for state and local office and state referendum elections. Neither the Supreme Court nor the First Circuit has addressed this issue.

### 2.   Conflict Preemption

Conflict preemption is "where compliance with both federal and state regulations is a physical impossibility or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade*, 505 U.S. at 98 (internal citations and quotations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Me. Forest Prods. Council*,

Add. 17

51 F.4th at 6 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). Thus, in order to decide the preemptive effect of FECA on the Act, I have to "juxtapose the state and federal laws, demarcate their respective scopes, and evaluate the extent to which they are in tension." *See Teper v. Miller*, 82 F.3d 989, 993 (11th Cir. 1996).

### a.   Juxtaposition of Federal and State Provisions on Foreign Involvement in Elections

Under FECA, a foreign national is prohibited from making, directly or indirectly, "a contribution or donation of money or other thing of value . . . in connection with a Federal, State, or local election." 52 U.S.C. § 30121(a). FECA defines "foreign national" as either an individual who is not a United States citizen or national, and who is not lawfully admitted for permanent residence, or "a foreign principal." 52 U.S.C. § 30121(b). The term "foreign principal" includes "the government of a foreign country" and "a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country." 22 U.S.C. § 611(b).

The Maine Act provides that "[a] foreign government-influenced entity may not make, directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum." 21-A M.R.S. § 1064(2). A "foreign government-influenced entity" means:

(1) A foreign government; or

18

(2) A firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity[5]:

>   (a) Holds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests; or
>
>   (b) Directs, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the firm, partnership, corporation, association, organization or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements.

21-A M.R.S. § 1064(1)(E).

I have already found that FECA preempts regulation of foreign spending in federal candidate elections. That leaves referenda and state and local candidate elections to review for conflict preemption. Because FECA's intended scope and the rationale for regulating these two categories of elections differ, I consider them separately.

### b.     Referenda

FECA prohibits any foreign national (which includes a foreign government or a foreign corporation) from contributing or donating money "in connection with a Federal, State, or local election." 52 U.S.C. § 30121(a). Under FECA, the term "election" means "a general, special, primary, or runoff election" or "a convention or caucus of a political party which has authority to nominate a candidate." 52 U.S.C.

---

[5]     A "foreign government-owned entity" is "any entity in which a foreign government owns or controls more than 50% of its equity or voting shares." 21-A M.R.S. § 1064(1)(F).

§ 30101(1). The Supreme Court has said that FECA "regulates only candidate elections, not referenda or other issue-based ballot measures." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356 (1995); *see also FEC v. Bluman*, 800 F. Supp. 2d 281, 284 (D.D.C. 2011) (then-Judge Kavanaugh, interpreting Section 30121's identically-worded predecessor, stated "[t]his statute . . . does not bar foreign nationals from issue advocacy—that is, speech that does not expressly advocate the election or defeat of a specific candidate."). And the Federal Election Commission ("**FEC**")[6] interprets FECA as excluding referenda. *See* MUR 7523 (Stop I-186 to Protect Mining and Jobs, et al.), at 5 n.18 (FEC Oct. 4, 2021), *available at* https://www.fec.gov/files/legal/murs/7523/7523_23.pdf (noting that there has been a "longstanding distinction between elections and ballot initiative activity" and that the FEC has advised "that ballot measure activity was 'nonelection activity' that foreign nationals may lawfully engage in so long as it is not connected to a candidate's campaign"). In fact, the FEC recently recommended "that Congress amend FECA's foreign national prohibition to include ballot initiatives, referenda and any recall elections not covered by the current version of FECA." Legis. Recommendations of the FEC 2023, at 7, *available at* https://www.fec.gov/resources/cms-content/

---

[6]     Congress created the Federal Election Commission ("**FEC**") to "administer[ ] and enforc[e]" the Federal Election Campaign Act ("**FECA**") and it delegated to the FEC "extensive rulemaking and adjudicative powers." *See Buckley v. Valeo*, 424 U.S. 1, 109–10 (1976). The Supreme Court has instructed that the FEC "is precisely the type of agency to which deference should presumptively be afforded." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981); *see also Becker v. FEC*, 230 F.3d 381, 390 (1st Cir. 2000) (affording *Chevron* deference to the FEC's interpretation of several FECA statutory provisions because "[t]he FEC is the type of agency which is entitled to such deference where congressional intent is ambiguous"). *Cf. Teper v. Miller*, 82 F.3d 989, 997–98 (11th Cir. 1996) (noting tension inherent in deferring to the FEC in cases involving preemption).

**Add. 20**

documents/legrec2023.pdf.[7] Because FECA does not currently cover referenda, I conclude that it likely does not preempt the Act with respect to regulation of foreign spending on a referendum.

### c.   State and Local Candidate Elections

By contrast, FECA's prohibition on contributions by foreign nationals does extend to State and local candidate elections. FECA prohibits "foreign principals"—including foreign governments and foreign-based corporations—from "directly or indirectly" spending "in connection with a Federal, State, or local election" of a candidate. 52 U.S.C. § 30121(a). But FECA does not on its face prohibit domestic subsidiaries of foreign corporations from making donations or contributions to such elections. The Versant Plaintiffs argue that this omission "should be viewed as Congress's considered choice, not an inadvertent hole meant to be filled by state regulation." Versant PI Mot. 12. The Versant Plaintiffs assert that, because the failure to regulate domestic subsidiaries of foreign corporations was by design, the Act's prohibition on spending by United States companies with foreign ownership conflicts with Congress's intention. Versant PI Mot. 12. The State counters that the fact that FECA does not go as far as the Act in regulating foreign influence in elections is insufficient to overcome the presumption against preemption. State Opp'n 57.

---

[7]     In its recommendation, the FEC explained that it considered foreign national donations made in opposition to a Montana ballot initiative and "determined that FECA's foreign national prohibition does not reach ballot initiatives that do not appear to be linked to an office-seeking candidate at the federal, state or local level." Legis. Recommendations at 7; *see also* MUR 7523 (Stop I-186 to Protect Mining and Jobs, et al.), at 3–4, *available at* https://www.fec.gov/files/legal/murs/7523/7523_23.pdf.

The history of the foreign prohibition on spending shows that Congress has been active in this area over the last fifty years. Even before FECA was introduced in 1971, Congress had, in 1966, "amended the Foreign Agents Registration Act to prohibit foreign governments and entities from contributing to American political candidates." *United States v. Singh*, 979 F.3d 697, 709 (9th Cir. 2020) (citing Pub. L. No. 89-486, § 8, 80 Stat. 244, 248–49). When Congress amended FECA in 1974, it expanded on the existing bans by prohibiting any "foreign national"—defined as a foreign principal under the Foreign Agents Registration Act or an individual who is not a United States citizen or lawful permanent resident—from making contributions to candidates. Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93–443, 88 Stat. 1263.

"But those restrictions did not eliminate the possibility of foreign citizens influencing American elections," *Bluman*, 800 F. Supp. 2d at 283, and "suspicions of foreign influence in American elections remained a pervasive concern." *Singh*, 979 F.3d at 709. The 1996 election cycle prompted the Senate Committee on Governmental Affairs to investigate foreign campaign contributions. *Id.* "The Committee found that foreign citizens had used soft-money contributions to political parties to essentially buy access to American political officials." *Bluman*, 800 F. Supp. 2d at 283. In response to the Committee's report, Congress (eventually) passed the Bipartisan Campaign Reform Act of 2002 ("**BCRA**"), which amended FECA and further limited foreign nationals' ability to participate in elections. Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, § 303, 116 Stat. 81, 96; *see Singh*,

**Add. 22**

979 F.3d at 709. FECA, now with the BCRA amendments, bans foreign nationals from directly or indirectly making contributions or donations to a committee of a political party or "in connection with a Federal, State, or local election." 52 U.S.C. § 30121 (formerly cited as 2 U.S.C. § 441e but editorially reclassified as 52 U.S.C. § 30121).

In support of its argument that Congress intended not to regulate certain foreign-related entities that the Act encompasses, the Versant Plaintiffs point to FEC rulemaking after BCRA amended FECA. Versant PI Mot. 10–12. The FEC had sought comments on whether FECA's use of the word " 'indirectly' should be interpreted to cover U.S. subsidiaries of foreign corporations that make non-Federal donations with corporate funds or that have a separate segregated fund that makes Federal contributions." 67 Fed. Reg. 69928, 69943 (Nov. 19, 2002). BCRA's sponsors commented that "Congress in this legislation did not address 'contributions by foreign-owned U.S. corporations, including U.S. subsidiaries of foreign corporations.' " *Id*.

At this preliminary stage, Versant has not met its burden of showing that Congress's silence on the issue of contributions made by American subsidiaries of corporations with foreign ownership in non-federal elections means that Congress intended to preempt state efforts to regulate such contributions at both the state and local level. In enacting BCRA, Congress intended to include candidate elections for state and local office in FECA's prohibitive sweep. *See Singh*, 979 F.3d at 709. And the FEC recently noted that Section 30121's reach to state and local elections is

**Add. 23**

"exceptional" given that FECA "otherwise is limited to federal elections." Legis. Recommendations at 7. But the fact that FECA covers state and local elections does not mean that the Act is in conflict.

It is true that "the United States has a compelling interest . . . in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." *Bluman*, 800 F. Supp. 2d at 288. The State, however, has an equally strong interest in regulating its own state and local elections. And allowing the State of Maine to continue to exercise its traditional powers in the area of state and local candidate elections likely will not hinder Congress's intentions as set forth in FECA.

Further, when Congress added the Section 30121 prohibition preventing foreign nationals from contributing in federal, state, and local elections, it could also have amended the express preemption provision in Section 30143 to include state and local candidate elections along with those for federal office. But it did not.

Ultimately, whether the Act is in conflict with FECA's prohibition on foreign participation in state and local candidate elections is a close question, but I believe it is likely that Congress intended FECA's prohibition as a floor, and it did not intend to prohibit states from doing more to regulate foreign government influence on state and local elections. The Versant Plaintiffs' arguments to the contrary do not overcome the presumption and inference against preemption. Accordingly, I find that the Act is likely not impliedly preempted because it conflicts with FECA.

**Add. 24**

### 3.    Field Preemption[8]

Field preemption occurs when states try to "regulat[e] conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. "Where Congress occupies an entire field, . . . even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id*. at 401. Thus, the critical question in field preemption is whether the "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone*, 505 U.S. at 517 (quotation omitted).

The same reasons discussed above with respect to conflict preemption apply to the field preemption analysis.[9] Versant points to the fact that Section 30121 prohibits foreign spending in federal, state, and local elections in support of its field preemption argument, and it suggests that, under the federal scheme, Congress made a deliberate choice to not include domestic corporations with foreign shareholders in FECA's ban on foreign principals' spending. But, as the *Choi* court recently explained in a similar case, "Congress does not preempt state law every time it considers

---

[8]    Although the field preemption argument was not developed in Versant's motion for preliminary injunction, I address it briefly here because they alleged field preemption in their complaint and maintained at oral argument that Congress through FECA's federal scheme has occupied the field of foreign nationals' campaign spending. *See* Versant Compl. ¶¶ 107, 110.

[9]    "Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990).

Add. 25

regulating a topic but ultimately declines to do so." 2023 WL 8803357, at *12; *see P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988) (explaining that "deliberate federal inaction" does not "always imply pre-emption"). And I agree with the *Choi* court's observation that "when Congress regulates, it just as often creates a floor rather than a uniform rule preempting stricter state laws." 2023 WL 8803357, at *12. On the preliminary injunction record before me, that appears to be the case, and the Versant Plaintiffs have not met their burden of showing "that Congress intended federal law to occupy [the] field exclusively." *Freightliner*, 514 U.S. at 287. Therefore, Versant is not likely to succeed on their field preemption argument.

Having concluded that FECA likely preempts the Act insofar as it regulates elections for federal office, I move on to consider the First Amendment arguments only in the context of referenda and state and local candidate elections.

## II.   First Amendment

Under *Citizens United v. FEC*, 558 U.S. 310, 365–66 (2010), corporations have a First Amendment right to engage in political speech, which includes certain types of campaign-related spending. Among other questions, this case asks whether domestic corporations with some foreign government ownership also have this right.[10]

---

[10]     The *Citizens United* decision dealt with the First Amendment rights of corporations generally, but it did not resolve whether these rights also apply to domestic corporations with foreign shareholders. *Citizens United v. FEC*, 558 U.S. 310, 362 (2010). The Supreme Court has since held that "foreign organizations operating abroad have no First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2088 (2020). This subsequent authority provides some guidance, but it does not address or resolve the open questions this case presents.

**Add. 26**

## A.    Facial Challenge

CMP and Versant (collectively, the "**Corporate Plaintiffs**") assert that subsection 2 of the Act is facially unconstitutional because it violates the First Amendment. In general, "facial challenges leave no room for particularized considerations and must fail as long as the challenged regulation has any legitimate application." *Gaspee Project v. Mederos*, 13 F.4th 79, 92 (1st Cir. 2021). However, First Amendment facial challenges based on overbreadth are different. They succeed if "a 'substantial number' of [the law's] applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.' " *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (quoting *New York v. Ferber*, 458 U.S. 747, 769–71 (1982)).

## B.    Level of Scrutiny

The Corporate Plaintiffs maintain that subsection 2 of the Act is subject to strict scrutiny. Versant PI Mot. 14–15; Central Maine Power Company's Reply in Supp. of its Mot. for Prelim. Inj. ("**CMP Reply**") 1–2 (ECF No. 52). The State advocates for more lenient "closely drawn" scrutiny. State Opp'n 13–15. Based on my review of the parties' authorities, including *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1 (1st Cir. 2012), I conclude that strict scrutiny is the appropriate standard of review. Strict scrutiny requires that the State show that the Act (1) furthers a compelling interest; and (2) is narrowly tailored to achieve that interest. *Citizens United*, 558 U.S. at 340.

Add. 27

C.      **Compelling Interest**

The first step of strict scrutiny analysis is to assess whether the State has articulated a compelling governmental interest. The State identifies an interest in "limiting foreign-government influence in its elections" and an interest in "limiting the appearance of such influence." State Opp'n 23. The Corporate Plaintiffs respond that the State's identified interests cannot support restrictions on spending on elections or referenda by domestic corporations with foreign government shareholders. Versant PI Mot. 16–17; CMP Reply 4–5.

Neither the Supreme Court nor the First Circuit has weighed in on the First Amendment rights of domestic corporations with some foreign government ownership to spend money on elections and referenda. The closest case on point is *Bluman v. Federal Election Commission*. The plaintiffs in *Bluman* were two foreign citizens temporarily living in the United States on work visas. 800 F. Supp. 2d at 282. They wanted to make financial contributions to candidates in federal and state elections, print flyers supporting a presidential candidate to distribute in a park, and contribute money to national political parties and political groups. *Id.* at 285. But FECA's prohibition on foreign national involvement in elections barred these activities. *Id.* at 282–83 (citing 2 U.S.C. § 441e(a)). In upholding the law, then-Judge Kavanaugh wrote that the United States "has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." *Id.* at 288. This interest was based on the "straightforward principle" that "foreign citizens do not have a constitutional right to

28

participate in, and thus may be excluded from, activities of democratic self-government." *Id.* The *Bluman* court noted that its holding would extend to foreign corporations, but it did not address "the circumstances under which a corporation may be considered a foreign corporation for purposes of First Amendment analysis." *Id.* at 292 n.4. The Supreme Court summarily affirmed, 565 U.S. 1104 (2012), which makes the *Bluman* decision binding precedent. *See Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975).

### 1. Interest in Limiting Foreign Government Influence in Candidate Elections

*Bluman* supports the State's claim that it has a compelling interest when it comes to limiting foreign government influence in candidate elections. *Bluman* approved limiting the participation of foreign citizens and foreign corporations "in activities of American democratic self-government" for the purpose of "preventing foreign influence over the U.S. political process." *Bluman*, 800 F. Supp. 2d at 288; *see also Bluman*, 800 F. Supp. 2d at 292 n.4 ("Our holding means, of course, that foreign corporations are likewise barred from making contributions and expenditures prohibited by 2 U.S.C. § 441e(a)."). This interest extends to the State interest here in limiting foreign government influence in candidate elections.

CMP argues that this interest is not compelling when it comes to corporations with just some foreign government ownership,[11] because, unlike the foreign nationals in *Bluman*, such entities could be Maine companies (like CMP itself) led by United

---

[11]    I use foreign government "ownership" as a shorthand for the full definition in 21-A M.R.S. § 1064(1)(E)(2)(a).

**Add. 29**

States citizens with long-term stakes in issues decided by Maine's elections. CMP PI Mot. 12. This argument essentially takes aim at the Act's 5% foreign government ownership threshold. *See* 21-A M.R.S. § 1064(1)(E)(2)(A). The argument is that 5% foreign government ownership is not foreign enough to sustain an interest in limiting the First Amendment rights of domestic corporations to participate in election activities. But whether this amount of foreign government ownership is sufficient to justify the Act is better tested on narrow tailoring, not whether a compelling interest exists in the first place.[12] *Bluman* thus likely extends to the State's articulated interest here with respect to state and local candidate elections.

### 2.   Interest in Limiting Foreign Government Influence in Referenda Elections

A much closer question is whether *Bluman* can support the State's compelling interest when it comes to referenda elections. *Bluman* "does not address" and "should not be read to support" bans on "issue advocacy" or "speaking out on issues of public policy" by foreign individuals. 800 F. Supp. 2d at 292. But *Bluman* does support excluding those who are not "members of the American political community" from participating in "activities of American democratic self-government" in the interest of "preventing foreign influence over the U.S. political process." 800 F. Supp. 2d at 288, 290. When Maine citizens vote on referenda they are certainly participating in an activity of democratic self-government. *See* Me. Const. art. IV, pt. 3, § 18 (Maine

---

[12]      I recognize that the court in *Minnesota Chamber of Commerce v. Choi*, --- F. Supp. 3d ----, 2023 WL 8803357, at *6 (D. Minn. Dec. 20, 2023) evaluated "[t]he scope of the compelling interest" on prong one of the strict scrutiny test. But I will save this analysis for prong two.

citizens have the right to enact legislation directly by popular vote). At this initial stage of the case, and based on the reasoning that follows on narrow tailoring, I assume without deciding that limiting foreign government influence in referenda elections is a compelling interest.

### 3. Interest in Limiting the Appearance of Foreign Government Influence in Elections

In addition to the interest in limiting foreign government influence in candidate and referenda elections, the State also asserts an independent interest in limiting the *appearance* of such influence. State Opp'n 20–21. For support, the State cites cases that endorse avoiding the appearance of corruption as a compelling government interest. State. Resp. 20 (citing *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 390 (2000); *Buckley v. Valeo*, 424 U.S. 1, 27 (1976)). In addition, the State points to the historic margin of victory for the Act as evidence that Maine voters do indeed perceive that foreign government influence in elections is an urgent problem. State Opp'n 21. The Corporate Plaintiffs maintain that this interest does not make sense in the context of referenda, and moreover, that the "appearance of" justification has been strictly confined to cases involving quid pro quo corruption. CMP PI Mot. 7–8; Versant PI Mot. 16–17; CMP Reply 8–9.

*Bluman*, the authority for the compelling interest in limiting foreign government influence in candidate elections, says nothing about an independent "appearance" interest. And I am not convinced that the interest in avoiding the appearance of quid pro quo corruption also means there is an interest in avoiding the

**Add. 31**

appearance of foreign government influence. Ultimately I agree with the Corporate Plaintiffs that the appearance interest is likely not compelling.

### D.     Narrow Tailoring

The Corporate Plaintiffs contend that even if there is a compelling state interest, the Act is not narrowly tailored. CMP PI Mot. 9–13; Versant PI Mot. 17–20. They primarily focus their tailoring analysis on the inclusion of entities that are 5% or more owned by foreign governments or foreign government-owned entities in the Act's definition of "foreign government-influenced entit[ies]." Versant PI Mot. 19–21; CMP PI Mot. 13; Versant Reply 8–9; CMP Reply 3–5. In the context of their facial challenge, the Corporate Plaintiffs' overbreadth argument is that too many of the Act's applications are unconstitutional as compared to the applications that are constitutionally permissible.

As explained above, subsection 2 of the Act bars campaign spending by any "foreign government-influenced entity," of which there are three types. 21-A M.R.S. § 1064(1)(E). In broad strokes they are: (1) foreign governments[13]; (2) entities that are 5% or more foreign government-owned[14]; and (3) entities with actual foreign government influence.[15]

---

[13]     21-A M.R.S. § 1064(1)(E)(1).

[14]     21-A M.R.S. § 1064(1)(E)(2)(a).

[15]     21-A M.R.S. § 1064(1)(E)(2)(b).

Add. 32

### 1. Foreign Governments

Subsection 2 of the Act is likely narrowly tailored when it comes to foreign governments (the 21-A M.R.S. § 1064(1)(E)(1) category). Foreign governments are obviously not members of the American political community, and like the foreign citizens in *Bluman*, they likely can be barred from election spending in Maine. *See Bluman,* 800 F. Supp. 2d at 288. FECA already bars foreign governments from spending on candidate elections, 52 U.S.C. § 30121, but it provides no protection to Maine on its referenda elections. *See McIntyre*, 514 U.S. at 356; MUR 7523 (In re Stop I-186 to Protect Mining and Jobs et al.) at *3–4. Thus, this part of the Act is necessary to further Maine's interest in limiting foreign government influence in its elections.

### 2. 5% or More Foreign Government Owned

I reach, however, a different conclusion on the narrow tailoring question when it comes to entities with 5% or more foreign government ownership (the 21-A M.R.S. § 1064(1)(E)(2)(a) category). The Act provides that: a "foreign government-influenced entity" means: "[a] firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity: [h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests." 21-A M.R.S. § 1064(1)(E)(2)(a).

CMP's main argument is that this subsection of the Act shuts domestic corporations out of the political process based on too small a percentage of foreign government ownership, which they maintain is a faulty proxy for actual foreign government influence. CMP PI Mot. 13; *see also* Versant PI Mot. 20–21. They further

contend that this ban cannot be squared with *Citizens United*, which held that corporations have a First Amendment right to spend on campaigns. CMP PI Mot. 6.

I agree that a 5% foreign ownership threshold would prohibit a substantial amount of protected speech. I cannot reconcile the Supreme Court's holding in *Citizens United* with a law that would bar a company like CMP—incorporated in Maine, governed by a Board of Directors comprised of United States citizens and run by United States citizen executive officers who reside in Maine—from campaign spending. *See Citizens United*, 558 U.S. at 362; CMP Compl. ¶¶ 16, 18. The 5% threshold would deprive the United States citizen shareholders—potentially as much as 95% of an entity's shareholders—of their First Amendment right to engage in campaign spending. Simply put, it would be overinclusive.

The State defends the 5% threshold by pointing out that it is not random; rather, in the federal securities context, "it is the amount of ownership that federal securities law recognizes as so significant as to require a special disclosure if it occurs in a publicly traded company." State Opp'n 24; *see* 15 U.S.C. § 78m(d)(1)–(3). CMP counters that the 5% figure used by the securities laws is not a proxy for control, but rather a signal to the marketplace that a hostile takeover may be in the offing. CMP Reply at 11. *See also Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 123 (2d Cir. 2001) ("By requiring the disclosure of information by a potential takeover bidder, the [Williams] Act strikes a careful balance among the interests of the bidder, the incumbent management in defending against such bid by explaining its position, and the shareholders so that they can evaluate the bidders' intentions in deciding whether

**Add. 34**

to throw in their lot with them."). It strikes me that the 5% foreign government ownership found in Maine's Act was arbitrarily chosen.[16] Moreover, I do not see how it can survive the observation in *Citizens United* that a restriction "not limited to corporations or associations that were created in foreign countries or funded *predominantly* by foreign shareholders" would be overbroad. 558 U.S. at 362 (emphasis added); *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 140 S. Ct. 2082, 2087 (2020) (foreign organizations operating abroad have no First Amendment rights, notwithstanding their affiliations with United States organizations).

Nor, at this stage, has the State offered any evidence that a foreign government or foreign government-owned entity with less than full ownership of a domestic entity has exerted influence over that entity's election spending in Maine. This evidence may come with discovery, but without it, I cannot say that this part of the law is narrowly tailored.[17]

### 3.    Actual Foreign Government Influence

Unlike the other two categories, the third category of foreign government influence—found at 21-A M.R.S. § 1064(1)(E)(2)(b)—targets entities based on

---

[16]    I note that the legislative history provided by the State shows that an earlier bill (Representative Ackley's bill from the 129th Legislature) had restricted spending only for contributors who were "at least half foreign-based." Test. of Sen. Richard Bennett Before the Joint Standing Committee on Veterans & Legal Affairs, March 15, 2021 (ECF No. 47-8 at 17). And L.D. 194, which passed but was vetoed by the Governor, set the percentage for foreign ownership at 10%. (ECF No. 47-8 at 4).

[17]    I note that simply pointing to outsized spending by entities that are 5% or more owned by a foreign government or foreign government-owned entity is not sufficient. *See Citizens United*, 558 U.S. at 349–50 (rejecting the "antidistortion rationale" for restricting corporate campaign spending).

Add. 35

conduct, rather than identity or ownership. It provides that a "foreign government-influenced entity" means:

> A firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity: . . . [d]irects, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the firm, partnership, corporation, association, organization or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements.

21-A M.R.S. § 1064(1)(E)(2)(b).

At first blush, the conduct that subsection (E)(2)(b) targets—participation by foreign governments or foreign government-owned entities in decision-making on election spending—fits the state's interest in limiting foreign government influence in its elections more closely than the second category. The (E)(2)(b) subsection also bears a close resemblance to a definition found in a FECA regulation, 11 C.F.R. § 110.20(i),[18] which has been in effect for over twenty years without any significant challenge.

The Corporate Plaintiffs argue that the subsection (E)(2)(b) category is overly broad and too unclear to follow. *See* CMP PI Mot. 10–11, 13, 17; Versant PI Mot. 24–25. CMP claims, for example, that under the State's interpretation of "directly or

---

[18]    "Participation by foreign nationals in decisions involving election-related activities. A foreign national shall not direct, dictate, control, or directly or indirectly participate in the decision-making process of any person, such as a corporation, labor organization, political committee, or political organization with regard to such person's Federal or non-Federal election-related activities, such as decisions concerning the making of contributions, donations, expenditures, or disbursements in connection with elections for any Federal, State, or local office or decisions concerning the administration of a political committee." 11 C.F.R. § 110.20(i).

36

Add. 36

indirectly participates in the decision-making process" a foreign government-owned entity could send an unsolicited email to a domestic corporation with *no* foreign ownership about an election-related issue and the domestic corporation would lose its First Amendment right to spend on elections or referenda. CMP Reply 15.

At oral argument, the State rejected that broad reading of subsection (E)(2)(b), but the State referred to definitions contained in its proposed rules. The Maine Commission on Governmental Ethics and Election Practices has proposed definitions of direct and indirect "participation in a decision-making process." *See* 94-270, § 15(1)(C).[19] Besides being difficult to follow, these proposed definitions would appear to read out the requirement that the foreign government or foreign government-owned entity participate in the actual decision-making process. Instead, they make the communication of a preference sufficient to "influence" another entity. Thus, a domestic corporation could be barred from engaging in otherwise-protected speech not based on its own conduct, but based on unsolicited communications from a foreign government-owned entity even when no actual influence is shown. This category casts an overly broad net, and it is likely to stifle the speech of domestic corporations regardless of whether a member of a foreign government or foreign government-

---

[19]     The proposed rules state that "To 'directly participate in a decision-making process' means to communicate a direction or preference concerning the outcome of the decision-making process through a person who is an employee or official of a foreign government or an employee, director or member of a foreign government-owned entity." "To 'indirectly participate in the decision-making process' means to knowingly communicate a direction or preference concerning the outcome of the decision-making process using an intermediary, whether or not the intermediary has any formal affiliation with the foreign government or foreign government-owned entity." Notice/Correspondence re: Proposed Rules Implementing 21-A MRSA § 1064 (ECF No. 60).

**Add. 37**

owned entity has any actual influence over their decision-making on campaign spending.[20]  This category is likely unconstitutional.[21]

### E.   Severability

Based on this analysis, I find that a substantial number of the Act's applications are likely unconstitutional judged against the Act's plainly legitimate sweep. It is therefore likely facially invalid. Because the 5% or more foreign ownership category cannot be squared with Supreme Court precedent, and because the State's proposed interpretation of direct and indirect participation is likely overbroad, a substantial portion of the Act—two of the three foreign government-influenced entity categories—are likely unconstitutional.

Perhaps anticipating that the Act was on shaky First Amendment grounds, the State invites me to sever the Act. It maintains that I have the authority to enjoin only the unconstitutional portions or applications of the Act, while letting the constitutionally permissible portions and applications go into effect. State Opp'n 69–70. Under Maine law, if a provision or application of a law is invalid, but its "invalidity does not affect other provisions or applications which can be given effect without the invalid provision or application," the law is severable. 1 M.R.S. § 71(8); *see also Nat'l Fire Adjustment Co. v. Cioppa*, 357 F. Supp. 3d 38, 49 n.13 (D. Me. 2019). However,

---

[20]     Moreover, this definition is likely overly broad to the extent a domestic corporation would lose its First Amendment rights by discussing a topic of mutual interest with a foreign government-owned entity if that topic was the subject of a referendum.

[21]     My conclusion may change, however, if the State adopts a rule that clarifies that the foreign government or foreign government-owned entity must actually participate *in the decision-making process* regarding election spending. *Cf. OneAmerica Votes v. State*, 23 Wash. App. 2d 951, 983–84 (Wash. App. Ct. 2022) (distinguishing between debate on issue advocacy on the one hand, and decision-making on financial support to specific candidates or ballot measures on the other).

Add. 38

if "the provisions of a statute 'are so related in substance and object that it is impossible to determine that the legislation would have been enacted except as an entirety, if one portion offends the Constitution, the whole must fall.'" *Op. of the Justs.*, 2004 ME 54, ¶ 25, 850 A.2d 1145 (quoting *Town of Windham v. LaPointe*, 308 A.2d 286, 292 (1973)).

Given the expedited and preliminary nature of this proceeding, I decline to sever the Act at this stage. I will reserve those questions until I have the benefit of further briefing from all parties on how these changes would affect the Act's remaining provisions.

### F.    Remaining Preliminary Injunction Factors

"In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Fortuño*, 699 F.3d at 10. Resolution of the remaining factors in a First Amendment case necessarily flow from the initial likelihood assessment, particularly where plaintiffs are likely to succeed on their claim. The loss of First Amendment rights, even briefly, constitutes irreparable injury. *Id.* at 10–11. On the balance of hardships, the Plaintiffs' "interest in avoiding interference with their rights to free speech outweighs the [State's] interest in enforcing an unconstitutional [law]." *Cutting v. City of Portland*, No. 2:13-cv-359-GZS, 2014 WL 580155, at *10 (D. Me. Feb. 12, 2014). And finally, the public interest could not be served by allowing enforcement of an unconstitutional bar on First Amendment-protected political speech. *Fortuño*, 699 F.3d at 15.

Accordingly, a preliminary injunction is required here. Because this is the relief sought by each Plaintiff, and preliminary resolution of Versant's preemption

Add. 39

claim and the Corporate Plaintiffs' First Amendment facial challenge requires an injunction, I need not reach the Corporate Plaintiffs' remaining arguments or address the arguments of the Electors or the Media Plaintiffs at this time. The Act is enjoined while this litigation proceeds.

## CONCLUSION

For the reasons stated above, I **GRANT** the Plaintiffs' motions for preliminary injunction (ECF Nos. 4, 22, 25, 27) and **ENJOIN** enforcement of 21-A M.R.S. § 1064 until final judgment is entered in this case.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 29th day of February, 2024.

Add. 40

PUBLIC APPROVAL
NOVEMBER 7, 2023

EFFECTIVE DATE
JANUARY 5, 2024

CHAPTER

2

INITIATED BILL

## STATE OF MAINE

———

## IN THE YEAR OF OUR LORD

## TWO THOUSAND TWENTY-THREE

———

### I.B. 1 - L.D. 1610

### An Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution

**Be it enacted by the People of the State of Maine as follows:**

**Sec. 1. 21-A MRSA §1064** is enacted to read:

**§1064. Foreign government campaign spending prohibited**

**1. Definitions.** As used in this section, unless the context otherwise indicates, the following terms have the following meanings.

A. "Contribution" has the meanings given in section 1012, subsection 2 and section 1052, subsection 3.

B. "Electioneering communication" means a communication described in section 1014, subsection 1, 2 or 2-A.

C. "Expenditure" has the meanings given in section 1012, subsection 3 and section 1052, subsection 4.

D. "Foreign government" includes any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country other than the United States or over any part of such country and includes any subdivision of any such group and any group or agency to which such sovereign de facto or de jure authority or functions are directly or indirectly delegated. "Foreign government" includes any faction or body of insurgents within a country assuming to exercise governmental authority, whether or not such faction or body of insurgents has been recognized by the United States.

E. "Foreign government-influenced entity" means:

(1) A foreign government; or

(2) A firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity:

(a) Holds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests; or

Add. 41

(b)  Directs, dictates, controls or directly or indirectly participates in the decision-making process with regard to the activities of the firm, partnership, corporation, association, organization or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements.

F.  "Foreign government-owned entity" means any entity in which a foreign government owns or controls more than 50% of its equity or voting shares.

G.  "Independent expenditure" has the meaning given in section 1019-B, subsection 1.

H.  "Public communication" means a communication to the public through broadcasting stations, cable television systems, satellite, newspapers, magazines, campaign signs or other outdoor advertising facilities, Internet or digital methods, direct mail or other types of general public political advertising, regardless of medium.

I.  "Referendum" means any of the following:

(1)  A people's veto referendum under the Constitution of Maine, Article IV, Part Third, Section 17;

(2)  A direct initiative of legislation under the Constitution of Maine, Article IV, Part Third, Section 18;

(3)  A popular vote on an amendment to the Constitution of Maine under the Constitution of Maine, Article X, Section 4;

(4)  A referendum vote on a measure enacted by the Legislature and expressly conditioned upon ratification by a referendum vote under the Constitution of Maine, Article IV, Part Third, Section 19;

(5)  The ratification of the issue of bonds by the State or any state agency; and

(6)  Any county or municipal referendum.

**2.  Campaign spending by foreign governments prohibited.**  A foreign government-influenced entity may not make, directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum.

**3.  Solicitation or acceptance of contributions from foreign governments prohibited.**  A person may not knowingly solicit, accept or receive a contribution or donation prohibited by subsection 2.

**4.  Substantial assistance prohibited.**  A person may not knowingly or recklessly provide substantial assistance, with or without compensation:

A.  In the making, solicitation, acceptance or receipt of a contribution or donation prohibited by subsection 2; or

B.  In the making of an expenditure, independent expenditure, electioneering communication or disbursement prohibited by subsection 2.

**5. Structuring prohibited.** A person may not structure or attempt to structure a solicitation, contribution, expenditure, independent expenditure, electioneering communication, donation, disbursement or other transaction to evade the prohibitions and requirements in this section.

**6. Communications by foreign governments to influence policy; required disclosure.** Whenever a foreign government-influenced entity disburses funds to finance a public communication not otherwise prohibited by this section to influence the public or any state, county or local official or agency regarding the formulation, adoption or amendment of any state or local government policy or regarding the political or public interest of or government relations with a foreign country or a foreign political party, the public communication must clearly and conspicuously contain the words "Sponsored by" immediately followed by the name of the foreign government-influenced entity that made the disbursement and a statement identifying that foreign government-influenced entity as a "foreign government" or a "foreign government-influenced entity."

**7. Due diligence required.** Each television or radio broadcasting station, provider of cable or satellite television, print news outlet and Internet platform shall establish due diligence policies, procedures and controls that are reasonably designed to ensure that it does not broadcast, distribute or otherwise make available to the public a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement in violation of this section. If an Internet platform discovers that it has distributed a public communication for which a foreign government-influenced entity has made an expenditure, independent expenditure, electioneering communication or disbursement in violation of this section, the Internet platform shall immediately remove the communication and notify the commission.

**8. Penalties.** The commission may assess a penalty of not more than $5,000 or double the amount of the contribution, expenditure, independent expenditure, electioneering communication, donation or disbursement involved in the violation, whichever is greater, for a violation of this section. In assessing a penalty under this section, the commission shall consider, among other things, whether the violation was intentional and whether the person that committed the violation attempted to conceal or misrepresent the identity of the relevant foreign government-influenced entity.

**9. Violations.** Notwithstanding section 1004, a person that knowingly violates subsections 2 through 5 commits a Class C crime.

**10. Rules.** The commission shall adopt rules to administer the provisions of this section. Rules adopted under this subsection are routine technical rules as defined in Title 5, chapter 375, subchapter 2-A.

**11. Applicability.** Notwithstanding section 1051, this section applies to all persons, including candidates, their treasurers and authorized committees under section 1013-A, subsection 1; party committees under section 1013-A, subsection 3; and committees under section 1052, subsection 2.

**Sec. 2. Accountability of Maine's Congressional Delegation to the people of Maine with respect to federal anticorruption constitutional amendment.**

**1. Definitions.** As used in this section, unless the context otherwise indicates, the following terms have the following meanings.

A.  "Actively support and promote" means to sponsor or cosponsor in Congress a joint resolution proposing pursuant to the United States Constitution, Article V an anticorruption constitutional amendment, and to advance such constitutional amendment by engaging, working and negotiating with others in Congress, the State of Maine and the United States in good faith and without respect to party partisanship to secure passage of such constitutional amendment in Congress so that Maine and the several states may consider ratification of such constitutional amendment.

B.  "Anticorruption constitutional amendment" means a proposed amendment to the United States Constitution that is consistent with the principles of the Maine Resolution and the reaffirmation of the Maine Resolution.

C.  "The Maine Resolution" means the joint resolution, Senate Paper 548, adopted by the 126th Legislature of the State of Maine on April 30, 2013 calling for an amendment to the United States Constitution to "reaffirm the power of citizens through their government to regulate the raising and spending of money in elections."

**2.  Reaffirmation of the Maine Resolution.**  The Maine Resolution is hereby reaffirmed and clarified to call on each member of Maine's Congressional Delegation to actively support and promote an effective anticorruption amendment to the United States Constitution to secure the following principles and rights:

A.  That governmental power derives from the people, and influence and participation in government is a right of all the people and under the Constitution of Maine and the United States Constitution, should not be allocated or constrained based on the use of wealth to influence the outcome of elections and referenda; and

B.  That Maine and the several states, and Congress with respect to federal elections, must have the authority to enact reasonable limits on the role of money in elections and referenda to secure the rights of the people of Maine to free speech, representation and participation in self-government; the principles of federalism and the sovereignty of the State of Maine and the several states; and the integrity of Maine elections and referenda against corruption and foreign influence.

**3.  Accountability.**  For 7 consecutive years beginning on July 31, 2023, the Commission on Governmental Ethics and Election Practices shall issue a report, following public comment, identifying anticorruption amendment proposals introduced in Congress, and the members of Maine's Congressional Delegation sponsoring such proposals.

## Certificate of Compliance with Rule 32(a)

1.    This brief contains 12,917 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 with 14-point typeface and Century Schoolbook type style.

/s/ Jonathan R. Bolton

JONATHAN R. BOLTON
Assistant Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov

**Certificate of Service Form
for Electronic Filing**

I hereby certify that on June 10, 2024, I electronically filed the

foregoing document with the United States Court of Appeals for the

First Circuit by using the CM/ECF system. I certify that the following

parties or their counsel of record are registered as ECF Filers and that

they will be served by the CM/ECF system:

**Versant Power & ENMAX Corporation**
Paul McDonald, Esq.
John A. Woodcock, III, Esq.
Bernstein Shur
100 Middle Street
P.O. Box 9729
Portland, ME 04104-5029
pmcdonald@bernsteinshur.com
jwoodcock@bernsteinshur.com

**Maine Press Association & Maine Association of
Broadcasters**
Sigmund D. Schutz, Esq.
Alexandra A. Harriman, Esq.
Preti, Flaherty
One City Center
P.O. Box 9546
Portland, ME 04112-9546
sschutz@preti.com
aharriman@preti.com

**Jane P. Pringle, Kenneth Fletcher, Bonnie S. Gould, Brenda Garrand, and Lawrence Wold**
Timothy C. Woodcock, Esq.
Eaton Peabody
P.O. Box 1210
Bangor, ME 04402
twoodcock@eatonpeabody.com


**Central Maine Power Company**
Joshua D. Dunlap
Katherine E. Cleary
Nolan L. Reichl
Pierce Atwood LLP
254 Commercial Street
Portland, ME 04101
jdunlap@pierceatwood.com
kcleary@pierceatwood.com
nreichl@pierceatwood.com

/s/ Jonathan R. Bolton

JONATHAN R. BOLTON
Assistant Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov