No. 24-1265

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

CENTRAL MAINE POWER COMPANY; VERSANT POWER; ENMAX CORPORATION; MAINE PRESS ASSOCIATION; MAINE ASSOCIATION OF BROADCASTERS; JANE P. PRINGLE, individually and in her capacity as a registered voter and elector; KENNETH FLETCHER, individually and in his capacity as a registered voter and elector; BONNIE S. GOULD, individually and in her capacity as a registered voter and elector; BRENDA GARRAND, individually and in her capacity as a registered voter and elector; LAWRENCE WOLD, individually and in his capacity as a registered voter and elector,

*Plaintiffs-Appellees*,

*v.*

WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in his official capacity as a Member of the Maine Governmental Ethics and Election Practices; SARAH LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; STACEY D. NEUMANN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in his official capacity as Attorney General for the State of Maine,

*Defendants-Appellants*.

On Appeal from the United States District Court, District of Maine

## BRIEF OF AMICUS CURIAE PROTECT MAINE ELECTIONS IN SUPPORT OF DEFENDANTS-APPELLANTS

Tara Malloy
David Kolker
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
tmalloy@campaignlegalcenter.org
dkolker@campaignlegalcenter.org

Peter L. Murray
Sean R. Turley
MURRAY PLUMB & MURRAY
75 Pearl Street
P.O. Box 9785
Portland, Maine 04104-5085
(207) 773-5651
pmurray@mpmlaw.com
sturley@mpmlaw.com

*Counsel for Amicus Curiae Protect Maine Elections*

## CORPORATE DISCLOSURE STATEMENT

Since August 5, 2022, Protect Maine Elections has been a Maine corporation in good standing. Protect Maine Elections neither has a parent corporation nor issues stock. There are no publicly held corporations that own ten percent or more of the stock of Protect Maine Elections.

# TABLE OF CONTENTS

INTERESTS OF AMICUS CURIAE ........................................................... 1

SUMMARY OF ARGUMENT .................................................................... 1

BACKGROUND ........................................................................................ 3

    A. History of Question 2 ...................................................................... 3

    B. Federal Law .................................................................................... 6

ARGUMENT .............................................................................................. 8

I.  The Spending Ban Is Constitutional ................................................... 8

    A. Restrictions on spending by foreign governments in ballot measure

        elections are constitutional .............................................................. 8

    B. The "5% ownership" definition of "foreign government-influenced

        entity" is valid ............................................................................... 11

    C. The "actual influence" definition is neither overbroad nor vague ............... 20

II.  The District Court's Failure to Review All Provisions of the Act Is an

Abuse of Discretion ................................................................................. 23

    A. The disclaimer requirement is a stand-alone measure that advances distinct
        governmental interests and is subject to only an intermediate standard of
        scrutiny .......................................................................................... 24

    B. The injunction is overbroad ......................................................... 28

CONCLUSION ......................................................................................... 29

CERTIFICATE OF COMPLIANCE ....................................................... 31

CERTIFICATE OF SERVICE ................................................................ 32

## TABLE OF AUTHORITIES

**Cases**                                                          **Page**

*Ambach v. Norwick*, 441 U.S. 68 (1979)........................................................9

*Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) ...................21

*Attorney General of U.S. v. Irish People, Inc*., 684 F.2d 928 (D.C. Cir. 1982),
    *cert. denied sub nom*., *Irish People Inc. v. Smith*, 459 U.S. 1172 (1983)..... 26-27

*Attorney General v. Irish Northern Aid Committee*, 346 F. Supp. 1384
    (S.D.N.Y. 1972), *aff'd*, 465 F.2d 1405 (2d Cir. 1972)........................................27

*Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995) ...........................................................18

*Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011), *summ. aff'd*,
    565 U.S. 1104 (2012)............................................................................8, 9, 11, 14

*Buckley v. Valeo*, 424 U.S. 1 (1976)........................................................18, 19, 20, 27

*Cabell v. Chavez–Salido*, 454 U.S. 432 (1982) ........................................................9

*California Medical Association v. FEC*, 453 U.S. 182 (1981) ................................19

*Citizens United v. FEC*, 558 U.S. 310 (2010).....................................................*passim*

*Daggett v. Commission on Governmental Ethics & Election Practices*,
    205 F.3d 445 (1st Cir. 2000) ..................................................................................19

*Foley v. Connelie*, 435 U.S. 291 (1978)..............................................................9, 10

*GAF Corporation v. Milstein*, 453 F.2d 709 (2d Cir. 1971) ...................................15

*Gaspee Project v. Mederos*, 13 F.4th 79 (1st Cir. 2021) .........................................22

*McConnell v. FEC*, 540 U.S. 93 (2003).....................................................18, 19, 26

*National Organization for Marriage v. Daluz*, 654 F.3d 115 (1st Cir. 2011) .........22

*National Organization for Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011) ....18, 26

*Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000)....................16, 19

*OneAmerica Votes v. State*, 518 P.3d 230 (Wash. Ct. App. 2022) ...........................10

*SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) ..........................................26

*United States v. Williams*, 553 U.S. 285 (2008).....................................................23

**Federal Statutes and Regulations:**

15 U.S.C. § 78m(d) ..........................................................................................13

22 U.S.C. § 611(b)(3) .........................................................................................6

22 U.S.C. § 612(a) ...........................................................................................27

22 U.S.C. § 614(b) ...........................................................................................27

52 U.S.C. § 30118(a)......................................................................................8, 14

52 U.S.C. § 30121 ...........................................................................................20

52 U.S.C. § 30121(a)(1) .....................................................................................6

52 U.S.C. § 30121(b)(1) .....................................................................................6

52 U.S.C. § 30121(b)(2) .....................................................................................6

11 C.F.R. § 110.20(i)......................................................................................2, 21

11 C.F.R. § 114.5(b) .........................................................................................8

17 C.F.R. § 240.14a–8........................................................................................16

17 C.F.R. § 240.13d-1 ........................................................................................13

17 C.F.R. § 240.13d-101 .....................................................................................13

Contribution Limitations and Prohibitions, 67 Fed. Reg. 69928-01
(Nov. 19, 2002) ..........................................................................................21

SEC Procedural Requirements and Resubmission Thresholds under Exchange
Act Rule 14a-8, 84 Fed. Reg. 66,458 (Dec. 4, 2019) ..........................................16

**State Statutes and Regulations:**

1 Me. Rev. Stat. § 71(8) ..................................................................................23, 28

21-A Me. Rev. Stat. § 1064....................................................................................1

21-A Me. Rev. Stat. § 1064(1)-(2) ........................................................1, 24

21-A Me. Rev. Stat. § 1064(1)(E)(1) ...............................................2, 28, 29

21-A Me. Rev. Stat. § 1064(1)(E)(2)(a) ............................................2, 28, 29

21-A Me. Rev. Stat. § 1064(1)(E)(2)(b) ......................................2, 20, 28, 29

21-A Me. Rev. Stat. § 1064(6) ...........................................................1, 24

21-A Me. Rev. Stat. § 1064(7) .................................................................1

Cal. Gov't Code § 85320 ........................................................................10

Colo. Rev. Stat. § 1-45-107.5 .................................................................10

Fla. Stat. § 106.08(12)(b) .......................................................................10

Idaho Code Ann. § 67-6610d ..................................................................10

Md. Code, Elec. Law § 13-236.1 ............................................................10

N.D. Cent. Code § 16.1-08.1-03.15 ........................................................10

Neb. Rev. Stat. § 49-1479.03 ..................................................................10

Nev. Rev. Stat. § 294A.325 .....................................................................10

S.D. Codified Laws § 12-27-21 ..............................................................10

Wash. Rev. Code § 42.17A.417 ..............................................................10

**Other Authorities**

Anna Massoglia, *Foreign company's subsidiary poured millions into influencing Maine ballot referendum*, Ctr. For Responsive Politics, Nov. 3, 2021, https://www.opensecrets.org/news/2021/11/foreign-companys-millions-influence-maine-ballot-referendum/ ...................................................................4

Ellen Weintraub, *Taking On Citizens United*, N.Y. Times, Mar. 30, 2016, https://www.nytimes.com/2016/03/30/opinion/taking-n-citizens-united.html ...12

FEC Advisory Opinion 1984-62 (Mar. 21, 1985), https://www.fec.gov/files/legal/aos/1984-62/1984-62.pdf ..................................7

FEC Advisory Opinion 1989-20 (Oct. 27, 1989),
  https://saos.fec.gov/saos/searchao?AONUMBER=1989-20 ............................21

FEC Advisory Opinion 1989-32 (Jul. 2, 1990),
  https://www.fec.gov/files/legal/aos/1989-32/1989-32.pdf ...................................7

FEC Advisory Opinion 2006-15 (May 19, 2006),
  https://www.fec.gov/files/legal/aos/2006-15/2006-15.pdf ................................21

FEC, *Campaign Guide; Corporations and Labor Organizations* (Jan. 2018)
  https://www.fec.gov/resources/cms-content/documents/policy-
  guidance/colagui.pdf ..........................................................................................8

FEC, *Draft Legislative Recommendations 2023*,
  https://www.documentcloud.org/documents/24233992-2023-legislative-
  recommendations?responsive=1&title=1 ............................................................7

H.R. Rep. No.1711, 90th Cong., 2d Sess. 4 (1968) .................................................15

*Hearing on LD 194*,
  https://www.mainelegislature.org/legis/bills/display_ps.asp?ld=194&PID
  =1456&snum=130&sec3# ....................................................................................5

*Hearing on LD 1610*,
  https://www.mainelegislature.org/legis/bills/display_ps.asp?PID=1456
  &snum=131&paper=&paperId=l&ld=1610# .......................................................5

Maine Commission on Governmental Ethics & Election Practices,
  May 29, 2024 Meeting, Item No. 6,
  https://www.maine.gov/ethics/meeting/2024-05-29 ..................................... 22-23

Maine Commission on Governmental Ethics & Election Practices, Proposed Rule
  Amendments, Feb. 5, 2024,
  https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-
  files/Draft%20Amendments%20for%20Public%20Comment_0.pdf ...............22

*Maine Question 3, Pine Tree Power Company Initiative (2023)*, *Campaign
  Finance*, Ballotpedia.com, https://ballotpedia.org/Maine_Question_3,_Pine_
  Tree_Power_Company_Initiative_(2023)#cite_note-oppfinance-10 ..................4

Prof. Laurence H. Tribe, Statement re: St. Petersburg legislation,
  (October 25, 2016), https://freespeechforpeople.org/wp-
  content/uploads/2016/10/7.-Prof.-Laurence-Tribe-Letter-of-Support.pdf .........12

S. Rep. No. 550, 90th Cong., 1st Sess. 4 (1967).......................................................15

*Section 13(d) and Disclosure of Corporate Equity Ownership*,
  119 U. Pᴀ. L. Rᴇᴠ. 853, 862 (1971)............................................................. 15-16

Statement of Reasons of Chair Broussard, MURs 7523 & 7512 (Nov. 2, 2021)
https://www.fec.gov/files/legal/murs/7523/7523_28.pdf. ....................................7

Statement of Reasons of Vice Chairman Petersen, et al., MUR 6678 (Apr. 20,
2015), https://www.fec.gov/files/legal/murs/6678/15044372963.pdf..................7

Testimony of Ron Fein re: Political spending by foreign-influenced corporations
LD 479, 194, 641 (Mar. 12, 2021), https://www.mainelegislature.org/
legis/bills/getTestimonyDoc.asp?id=146572........................................................5

## INTERESTS OF AMICUS CURIAE[1]

Protect Maine Elections ("PME") is a nonpartisan campaign organization launched by Maine citizens to pass Question 2, a citizen's initiative to restrict foreign influence in Maine elections, now codified at 21-A Me. Rev. Stat. § 1064 (the "Act"). PME thus has a unique interest in defending the Act and specialized knowledge about its purpose and design.

All parties have consented to this filing.

## SUMMARY OF ARGUMENT

On November 7, 2023, 86% of the Maine electorate voted to pass Question 2, the largest margin of approval in the 115-year history of the state's ballot questions.

The Act sought to correct loopholes in federal and state law that had allowed foreign-owned domestic corporations to spend tens of millions of dollars in Maine elections and statehouses, and to engage in this spending without full disclosure. It comprises three subparts: a ban on campaign contributions and expenditures by a "foreign government-influenced entity" ("FGIE"), *see* 21-A Me. Rev. Stat. § 1064(1)-(2) (the "spending ban"); due diligence requirements for media platforms to help effectuate the ban, *see id*. § 1064(7); and a separate disclosure provision requiring FGIEs to include disclaimers on certain lobbying communications, *see id*.

---

[1] Amicus affirms that no counsel for a party authored this brief in whole or in part, and no person other than amicus or its counsel contributed money to fund the preparation or submission of this brief.

§ 1064(6). The Act sets forth three alternative definitions of the regulated class, defining FGIEs to include "foreign government[s]," *id*. § 1064(1)(E)(1); entities wherein a foreign government or "foreign government-owned entity" has "ownership of 5% or more of the total equity," *id*. § 1064(1)(E)(2)(a); and entities wherein a foreign government or foreign government-owned entity "[d]irects, dictates, controls or directly or indirectly participates in [the entity's] decision-making process" regarding its campaign activities, *id*. § 1064(1)(E)(2)(b).

After consolidating four lawsuits into the instant case, the district court in February 2024 preliminary enjoined the Act in its entirety. Despite the sweeping nature of the relief, the opinion addressed the constitutionality of only the spending ban, without discussing the disclaimer requirement or due diligence provisions.

Amicus PME makes two principal arguments here. First, the lower court erred in holding that the "5% ownership" and "actual influence" FGIE definitions, 21-A Me. Rev. Stat. § 1064(1)(E)(2)(a) & (b), were overbroad and vague. The 5% threshold reflects a well-recognized, widely used benchmark for corporate control in existing federal securities law, and targets only a narrow subset of domestic entities controlled or influenced by foreign governments. Section 1064(1)(E)(2)(b)'s "actual influence" standard is nearly identical to a federal regulation, *see* 11 C.F.R. § 110.20(i), that the Federal Election Commission ("FEC") has enforced without

legal challenge or difficulty for over two decades. A standard that is sufficiently tailored and clear in federal law is equally so in Maine.

Second, even accepting the lower court's constitutional analysis, its injunction sweeps too broadly. The court "reserved the question" raised by Maine, Add. at 39,[2] as to whether § 1064(1)(E)(2)(a) and (b) could be severed from the Act, declining to consider whether the spending ban could be preserved as to "foreign governments," even as it acknowledged the latter application was likely constitutional, *id.* at 31. The court also gave *no reason* for enjoining the disclaimer provision and media due diligence requirements. While the media requirements might be seen as auxiliary to the spending ban, the disclaimer requirement is a stand-alone provision supported by distinct informational interests, yet the opinion ignored § 1064(6) altogether.

For these reasons, the district court's injunction should be vacated.

## BACKGROUND

### A. History of Question 2

The enactment of Question 2 represented the culmination of a multi-year endeavor that included both legislative efforts and a citizen-led campaign to enact restrictions on campaign spending by foreign governments in Maine elections.

---

[2] Amicus cites the February 29, 2024 opinion as reproduced in the Addendum ("Add.") to Appellants' Brief.

The endeavor began after foreign-owned companies made massive campaign expenditures to influence successive Maine referenda. In 2020, for instance, a Quebec government-owned public utility, HydroQuebec, and its affiliates, dwarfed all other spenders that year in Maine by pouring more than $20 million into an effort to defeat Question 1, a measure aimed at blocking the utility's power line project through the state. Anna Massoglia, *Foreign company's subsidiary poured millions into influencing Maine ballot referendum*, Ctr. For Responsive Politics, Nov. 3, 2021, https://www.opensecrets.org/news/2021/11/foreign-companys-millions-influence-maine-ballot-referendum/.

Then, in 2023, appellee ENMAX, a corporation owned by the City of Calgary, contributed over $15 million through a political committee to spend against Question 3, a measure that would have created an electric utility, governed by an elected board, to acquire and operate Maine's utilities. Avangrid Management Company, a corporation owned by the Spain-based Iberdrola, contributed another $24 million. These foreign-owned companies outspent Maine-based groups supporting Question 3 by almost $40 million to $1 million. *Maine Question 3, Pine Tree Power Company Initiative (2023)*, *Campaign Finance*, Ballotpedia.com, https://ballotpedia.org/Maine_Question_3,_Pine_Tree_Power_Company_Initiative _(2023)#cite_note-oppfinance-10.

Both Maine citizens and their lawmakers were alarmed by this huge influx of foreign spending. In 2021 and again in 2023, the Maine Legislature passed legislation to ban foreign government spending in state elections, but the Governor vetoed the bill both times. PME was founded to pass this reform by citizen initiative instead and worked to qualify it for the ballot as Question 2, which was ultimately passed with overwhelming public support.

In debating legislation to prevent foreign corporate spending, the Legislature heard hours of public testimony from dozens of citizens and lawmakers in both its 2021 and 2023 sessions.[3] The Legislature also heard from legal experts who addressed the constitutionality of foreign campaign spending restrictions. The nonprofit organization Free Speech for People submitted testimony on this subject, including letters from Professor Laurence Tribe of Harvard Law School, Professor John Coates of Harvard Law School ("Coates Ltr.") and FEC Commissioner Ellen L. Weintraub. Testimony of Ron Fein, LD 479, 194, 641, Mar. 12, 2021), https://www.mainelegislature.org/legis/bills/getTestimonyDoc.asp?id=146572. Professor Coates discussed at length how minority shareholders with ownership levels between 1% and 5% can wield significant influence—both formal and

---

[3] *See Hearing on LD 194*, https://www.mainelegislature.org/legis/bills/display_ps.asp?ld=194&PID=1456&snum=130&sec3#; *Hearing on LD 1610*, https://www.mainelegislature.org/legis/bills/display_ps.asp?PID=1456&snum=131&paper=&paperld=l&ld=1610#.

informal—over the management and decision-making of corporations. *See* Coates Ltr. at 6-9.

## B. Federal Law

Until passage of Question 2, Maine elections were protected from foreign spending only by the Federal Election Campaign Act ("FECA"), which bars "foreign national[s]" from "directly or indirectly" making contributions or expenditures "in connection with a Federal, State, or local election." 52 U.S.C. § 30121(a)(1). Section 30121 defines "foreign nationals" to include: (1) "an individual who is not a citizen of the United States or a national of the United States," *id*. § 30121(b)(2); and (2) a "foreign principal, as such term is defined by section 611(b) of Title 22," *id*. § 30121(b)(1). In turn, Section 611(b) of the Foreign Agents Registration Act ("FARA"), defines "foreign principal" to include, inter alia, "a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country." 22 U.S.C. § 611(b)(3).

This ban is marked by two significant limitations. First, Section 30121 has been construed to apply only to candidate elections, leaving state referenda vulnerable to foreign spending. In the last decade, the FEC has twice declined to find that FECA governed spending in state ballot measure elections, explaining that it was "sensitive to the unique balance of power between the federal government and

the states" and therefore would not extend the statute beyond its explicit terms.[4] *See* Stmt. of Reasons of Chair Broussard, MURs 7523 & 7512 (Nov. 2, 2021), at 3, https://www.fec.gov/files/legal/murs/7523/7523_28.pdf. *See also* Stmt. of Reasons of Vice Chairman Petersen, et al., MUR 6678 (Apr. 20, 2015), at 2, https://www.fec.gov/files/legal/murs/6678/15044372963.pdf. Notably, however, the FEC based these decisions on its interpretation of FECA, not on any constitutional concerns about prohibiting foreign money in state referenda. Indeed, the FEC has frequently urged Congress to amend Section 30121 to explicitly cover ballot measure elections—including as recently as December of last year—confirming that the FEC believes such an extension would be constitutional. *See* FEC, *Draft Legislative Recommendations 2023*, at 9, https://www.documentcloud.org/documents/24233992-2023-legislative-recommendations?responsive=1&title=1.

Second, the federal foreign money ban does not apply to corporations incorporated in the United States, even those wholly owned by foreign nationals. This limitation only became evident after *Citizens United v. FEC*, 558 U.S. 310

---

[4] *See also* FEC Adv. Op. 1989-32 (Jul. 2, 1990) at 3, https://www.fec.gov/files/legal/aos/1989-32/1989-32.pdf ("[C]ontributions or expenditures relating only or exclusively to ballot referenda issues . . . do not fall within the purview of [FECA]."); FEC Adv. Op. 1984-62 (Mar. 21, 1985) at 1 n.2, https://www.fec.gov/files/legal/aos/1984-62/1984-62.pdf (same).

(2010), because before that decision, no corporation—regardless of its foreign ownership—could lawfully make contributions or expenditures from its treasury funds to influence federal elections. *See* 52 U.S.C. § 30118(a). Instead, federal law required corporations to make any contributions or expenditures through "separate segregated funds," i.e., highly regulated political committees (or "PACs"). *See* 11 C.F.R. § 114.5(b). These PACs could not spend a corporation's treasury funds on campaign advocacy and instead were limited to soliciting funds for this purpose from a restricted class of employees and officers, none of whom could be foreign nationals. *See, e.g.*, FEC, *Campaign Guide: Corporations and Labor Organizations*, at 32, https://www.fec.gov/resources/cms-content/documents/policy-guidance/colagui.pdf. Thus, prior to *Citizens United*, federal elections did not face the specter of foreign-owned corporations directly spending their treasury funds without the significant limitations of the PAC structure.

## ARGUMENT

### I.     The Spending Ban Is Constitutional.

#### A.     Restrictions on spending by foreign governments in ballot measure elections are constitutional.

The district court noted that it was bound by *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (three-judge court), *summ. aff'd*, 565 U.S. 1104 (2012), and its holding that restrictions on contributions and expenditures by foreign nationals are constitutional in connection to candidate elections. Add. at 29. It also found that

the spending ban was "likely narrowly tailored when it comes to foreign governments" in "the 21-A M.R.S. § 1064(1)(E)(1) category." Add. at 33.

But the lower court declined to decide whether "limiting foreign government influence in referenda elections" likewise serves a "compelling interest." Add. at 31. Although the court "assume[d]" this was the case, *id*., insofar as its tentative holding suggested the Act's application to referenda was a "closer" constitutional question, *id*. at 30, any such suggestion would be erroneous.

When *Bluman* rejected a challenge to FECA's foreign money ban, it held that the government has "a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." 800 F. Supp. 2d at 288. *Bluman* thus highlighted that the Supreme Court has long upheld the exclusion of foreign nationals from a range of "activities of democratic self-government." *Id*. Such exclusions are a "necessary consequence of the community's process of political self-definition." *See Cabell v. Chavez–Salido*, 454 U.S. 432, 439-40 (1982) (upholding state requirement that peace officers be U.S. citizens); *Ambach v. Norwick*, 441 U.S. 68 (1979) (upholding state provision that prohibited noncitizens from being certified as public school teachers); *Foley v. Connelie*, 435 U.S. 291 (1978) *(*upholding state statute requiring police officers to be U.S. citizens). In these cases, the Court applied rational basis review in

9

recognition of the "[s]tate's historical power to exclude aliens from participation in its democratic political institutions as part of the sovereign's obligation to preserve the basic conception of a political community." *Foley*, 435 U.S. at 295-96 (internal quotations and citation omitted).

Although the facts in *Bluman* involved candidate elections, its reasoning thus applies equally to efforts by states to prevent foreign spending in referenda. So concluded a Washington state court that held that it was bound by *Bluman* to uphold Washington state's law prohibiting foreign spending in both candidate and ballot measure campaigns. *See OneAmerica Votes v. State*, 518 P.3d 230, 247 (Wash. Ct. App. 2022) ("[Washington] State's interest in prohibiting foreign nationals from making political contributions and the corresponding interest in prohibiting citizens or domestic organizations from using money from foreign nationals to make such contributions is a compelling one.").[5]

Indeed, *Bluman* highlighted that foreign nationals could be constitutionally excluded from a wide range of "activities of democratic self-government"—

---

[5] In addition to Maine and Washington, nine other states have enacted laws prohibiting foreign nationals from spending to influence ballot measure elections. Cal. Gov't Code § 85320; Colo. Rev. Stat. § 1-45-107.5; Md. Code, Elec. Law § 13-236.1; Nev. Rev. Stat. § 294A.325; N.D. Cent. Code § 16.1-08.1-03.15; S.D. Codified Laws § 12-27-21; Fla. Stat. § 106.08(12)(b); Idaho Code Ann. § 67-6610d; Neb. Rev. Stat. § 49-1479.03. *See also* Wash. Rev. Code § 42.17A.417.

regardless of their connection to a formal "electoral process." 800 F. Supp. 2d at 288. If exclusion is permissible with respect to employment as a public school teacher, it is all the more urgent in connection to the state's actual processes of direct self-governance. As the district court affirmed, "[w]hen Maine citizens vote on referenda they are certainly participating in an activity of democratic self-government." Add. at 30.

### B.     The "5% ownership" definition of "foreign government-influenced entity" is valid.

Applying strict scrutiny, the district court held that the Act's 5% threshold was not narrowly tailored, Add. at 34, but did so by devising an overly narrow test for which entities constitute "foreign nationals" and imposing undue evidentiary obligations on the state without any basis in law.[6]

The Act's threshold of 5% ownership by a foreign government represents a targeted approach to the problem of foreign government influence, relying on a well-recognized, widely used benchmark already incorporated into existing federal securities law.

---

[6] Notably, *Bluman* declined to decide the level of scrutiny, avoiding this "complex" question by finding that the federal ban survived even strict scrutiny. 800 F. Supp. 2d at 285 (recognizing that limitations on foreign nationals often draw only "rational basis review"). Insofar as this Court deems the level of scrutiny more "decisive" to the outcome here, *id.*, it should question the lower court's application of strict scrutiny to a law that comprises both contribution restrictions and expenditure restrictions, as Maine urges, *see* Appellants' Br. at 26.

Indeed, *Citizens United* can be fairly read to permit restrictions on election activities of corporations with *any* equity held by foreign investors. The Supreme Court understood that U.S. corporations derive their First Amendment rights from the fact that they are "associations of *citizens*." 558 U.S. at 349 (emphasis added). Because a corporation's right to participate in elections is premised on the rights of its individual shareholders to participate in elections, the corporation cannot assert any derivative First Amendment rights based on its *non*-citizen shareholders. As FEC Commissioner Weintraub has reasoned, "[i]ndividual foreigners are barred from spending to sway elections" so it would "def[y] logic to allow groups of foreigners, or foreigners in combination with American citizens, to fund political spending through corporations." Ellen Weintraub, *Taking On Citizens United*, N.Y. Times, Mar. 30, 2016, https://www.nytimes.com/2016/03/30/opinion/taking-n-citizens-united.html. Thus, *Citizens United* supports the proposition that a corporation with *any* foreign shareholders may be barred from making expenditures in U.S. elections, or at the least, must do so through a PAC funded and controlled entirely by U.S. citizens. *See also* Prof. Laurence H. Tribe, Statement re: St. Petersburg legislation (Oct. 25, 2016) at 4, https://freespeechforpeople.org/wp-content/uploads/2016/10/7.-Prof.-Laurence-Tribe-Letter-of-Support.pdf     (noting that *Bluman* "suggests [foreign spending] limit could apply to corporations with *any* equity held by foreign nationals").

The Act takes a narrower approach. The 5% threshold for foreign government ownership parallels a provision of the Securities Exchange Act of 1934 that requires beneficial owners to file with the SEC their name, address, and number of shares if they obtain more than 5% of any class of stock. *See* 15 U.S.C. § 78m(d); 17 C.F.R. §§ 240.13d-1, 240.13d-101. This reporting requires disclosure of the purchaser's citizenship, *see* 17 C.F.R. § 240.13d-101 (item #6), and is publicly available on commonly used websites such as MSN Finance, as well as through the SEC's EDGAR online database. Coates Ltr. at 12. By incorporating the SEC threshold for mandatory reporting, the Act relies on Congressional and agency expertise regarding what level of ownership is influential and should be disclosed to shareholders and the public.

In enjoining this provision, the decision below errs in at least three respects:

1.      First, the decision below discounts the power of those who ultimately own a corporation, asking, for instance, whether *Citizens United* might preclude a spending ban as applied to a foreign-owned company "incorporated in Maine, governed by a Board of Directors comprised of United States citizens and run by United States citizen executive officers." Add. at 34.

But neither *Citizens United* nor *Bluman* held that a corporation's operations in the United States—or the nationality of its executive officers—is dispositive as to whether it is a "foreign national." *Bluman* recognized that the question of when "a

corporation may be considered a foreign corporation for purposes of First Amendment analysis" was an open one. 800 F. Supp. 2d at 292 n.4. The decision below in this case misconstrues *Citizens United* to hold that any foreign money ban "'not limited to corporations or associations that were created in foreign countries or funded predominantly by foreign shareholders' would be overbroad." Add. at 35 (quoting 558 U.S. at 362). But *Citizens United* held only that the federal ban on *all* corporate treasury expenditures was overbroad, in part because this sweeping ban was not limited to foreign corporations and associations. Neither *Citizens United* nor *Bluman* forecloses the conclusion that the compelling interest in limiting electoral spending by foreign corporations applies equally to domestic corporations owned or influenced by foreign governments.

Indeed, the likely reason the existing federal foreign money ban does not address foreign-owned domestic corporations is because until the 2010 *Citizen United* decision, FECA barred *all* corporations, regardless of their foreign ownership, from making expenditures of treasury funds in federal elections. 52 U.S.C. § 30118(a). *See supra* at 7-8. Neither governing precedent nor the history of FECA suggests that Maine lacks the authority to prevent foreign government money from entering its elections indirectly through corporations and other vehicles.

2.    The district court also had no legal grounds for assuming that the Act's spending ban could permissibly extend to only those corporations *controlled* by

foreign governments *See, e.g.*, Add. at 34 (questioning whether securities law used 5% benchmark as "a proxy for control"). Neither *Citizens United* nor *Bluman* mandate that foreign ownership be "controlling" as opposed to simply "influential" for a corporation to be deemed "foreign" for the purposes of campaign finance regulation.

It is thus neither "arbitrary" nor overinclusive, Add. at 34-35, to incorporate a 5% threshold in a statute that seeks to set a bright line for when a foreign government is capable of significantly influencing an entity's decisions regarding political spending. And the threshold's careful tailoring is reflected in the narrow subset of domestic corporations that it covers. Even among publicly-traded corporations in the S&P 500, only about 9% have a foreign stockholder with more than 5% ownership of the company's voting shares. *See* Coates Ltr. at 6. Far fewer will have a foreign *governmental* investor with this level of ownership.

To those unfamiliar with the world of corporate stock ownership, takeover, and control, 5% may seem like a small number. In fact, a 5% interest in a publicly held corporation is a "substantial interest." *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971) (quoting S. Rep. No. 550, 90th Cong., 1st Sess. 4 (1967); H.R. Rep. No.1711, 90th Cong., 2d Sess. 4 (1968)). In establishing the 5% threshold for public disclosure under the Williams Act, Congress acted, "because the acquisition of a substantial block of stock would enable a stockholder to 'achieve the power to

influence the management and control of the corporation.'" *Section 13(d) and Disclosure of Corporate Equity Ownership*, 119 U. PA. L. REV. 853, 862 (1971).

Indeed, it is not just the formal power of a 5% investor, but its informal influence that is critical to corporate governance.[7] The lower court's focus on whether the typical 5% investor will or will not assume formal control through a corporate takeover is thus beside the point. As Professor Coates has explained in the context of shareholder proposals, "the SEC itself recognizes that [even] one percent ownership is so significant that investors with that level of ownership don't even need [the proposal] process; they can easily get executive-suite management on the phone." Coates Ltr. at 9.

3.     The Act's concerns are "neither novel nor implausible," *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 397 (2000), and consequently "the quantum of empirical evidence needed to satisfy heightened judicial scrutiny" is correspondingly light, *id*. at 378. Maine need not establish the constitutional

---

[7] Even 1% ownership is deemed substantial in corporate governance because, for decades, the ability to present a shareholder proposal occurred at this threshold (or alternatively, a $2,000 monetary threshold). 17 C.F.R. § 240.14a–8 (2018). In 2019, the 1% threshold was reconsidered, but not because it was too low, but rather unrealistically high. *See* SEC, Procedural Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8, 84 Fed. Reg. 66,458 (Dec. 4, 2019). The SEC explained that proposals in the past were typically submitted by shareholders that did not meet the 1% threshold, and cited authority indicating that shareholders of this size instead often communicated with corporate leadership directly to influence decisions. *Id*. at 66,464. *See also* Coates Ltr. 8-9.

foundation for a foreign corporate money ban in the first instance—this is not in dispute—but only that its threshold for determining significant foreign government shareholder influence is reasonable.

All that Maine need show is that 5% ownership is a level at which a foreign government shareholder has the *capacity* to influence a corporation's political spending. *See* Appellants' Br. at 44-52. The lower court decision required the state to show that *in fact* "a foreign government or foreign government-owned entity with less than full ownership of a domestic entity has exerted influence over that entity's election spending in Maine," Add. at 35. This is an impracticable evidentiary standard without precedent. There is no question that Maine has experienced large-scale campaign spending by foreign government-owned entities in multiple elections. *See supra* at 3-4. And based on the positions taken by the corporations regarding those referenda, one can surmise that these positions furthered the interests of their foreign government shareholders.

However, Maine has little access to information about whether these corporations' internal decisions on election spending were in fact "influenced" or "controlled" by their foreign governmental investors. This is uniquely within the knowledge of the entity itself, and the typical organization is hardly inclined to publicize the details of its political decision-making. It is thus virtually impossible to produce the information that the district court decision requires—absent a state

investigation or discovery in litigation. In circumstances like these, the Supreme Court has allowed legislatures to take a prophylactic approach when the problem targeted is "neither easily detected nor practical to criminalize." *McConnell v. FEC*, 540 U.S. 93, 153 (2003). Maine was thus reasonable to incorporate a bright-line threshold into its law, and "no smoking gun is needed" in terms of evidence, "where, as here, the conflict of interest is apparent, the likelihood of stealth great, and the legislative purpose prophylactic." *Blount v. SEC*, 61 F.3d 938, 945 (D.C. Cir. 1995).

Furthermore, even when reviewing for narrow tailoring, courts grant the legislature substantial discretion in setting the level of monetary limits and thresholds, and other structural features of campaign finance laws. For example, almost every political disclosure law relies on a monetary threshold to trigger its reporting requirements, which, if the disclosure law is otherwise permissible, need only to be "reasonable" and not "without rationality." *Buckley v. Valeo*, 424 U.S. 1, 83 (1976) (this "line is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion"). *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 60 (1st Cir. 2011) (noting courts pay "judicial deference to plausible legislative judgments as to the appropriate location of a reporting threshold, and have upheld such legislative determinations unless they are wholly without rationality") (internal quotations omitted).

18

Likewise, contribution restrictions often include varying monetary limits that reflect the legislature's judgment about the relative risks from various types of contributors. *See, e.g.*, *Daggett v. Comm'n on Gov't Ethics & Election Pracs.*, 205 F.3d 445, 459 (1st Cir. 2000) ("'[I]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000.'") (quoting *Buckley*, 424 U.S. at 30). To defend the monetary amounts at which contribution limits are set, the government is not required to "prove" that, for instance, contributors of $250 and $500 intend to corrupt a candidate, *id.* at 458, or that contributors of exactly this amount have done so in the past, *id.* at 456-57. *See also Citizens United*, 558 U.S. at 357 (noting that "restrictions on direct contributions are preventative, because few if any contributions to candidates will involve quid pro quo arrangements"). Instead, the Supreme Court has consistently counseled deference to legislative judgments—including those of citizen legislators in referenda—regarding the structure of contribution limits. *See, e.g.*, *Shrink Missouri*, 528 U.S. at 395-97. *See also McConnell*, 540 U.S. at 137; *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 201 (1981); *Buckley*, 424 U.S. at 30.

In reviewing the 5% threshold at § 1064(1)(E)(2)(a), the court below was similarly considering a structural aspect of an otherwise valid and well-established type of campaign finance law. Federal law has for decades barred foreign governments and foreign corporations from making contributions or expenditures in

19

federal and state candidate elections, 52 U.S.C. § 30121. And here, because it is difficult to "isolate suspect contributions [and expenditures]," *Buckley*, 424 U.S. at 29-30, or ascertain actual foreign influence on a case-by-case basis, it was "reasonable" for Maine to adopt a bright line for shareholder influence drawn from longstanding federal laws.

**C.     The "actual influence" definition is neither overbroad nor vague.**

The district court also found the "actual influence" definition, 21-A Me. Rev. Stat. § 1064(1)(E)(2)(b), "overly broad and too unclear," Add. at 36, but did so based upon a single hypothetical application of the Act posited by plaintiffs, which is insufficient grounds for the facial relief they sought.

Plaintiffs argued that § 1064(1)(E)(2)(b) was vague and overbroad because the language "directly or indirectly participates" could be interpreted to cover "a domestic corporation with no foreign ownership" that receives an "unsolicited email" from a foreign government-owned entity "about an election-related issue." Add. at 37. This hypothetical relies on a misreading of the statute and an implausible series of events. But even if it did not suffer these defects, a single conjectural application of § 1064(1)(E)(2)(b) would not justify invalidating this provision on its face. To sustain an overbreadth challenge, plaintiffs must show "a substantial number of [the Act's] applications are unconstitutional, judged in relation to the

statute's plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021).

As the district court conceded, the "actual influence" definition "bears a close resemblance" to a long-standing FEC regulation, 11 C.F.R. § 110.20(i), which has governed foreign campaign activity at the federal level "for over twenty years without any significant challenge." Add. at 36; *see also* Contribution Limitations and Prohibitions, 67 Fed. Reg. 69928-01, 69946 (Nov. 19, 2002).[8] The "legitimate sweep" of § 1064(1)(E)(2)(b) is thus plain, and the district court did not find otherwise. And insofar as the court had lingering doubts as to the scope of the "actual influence" definition, it could draw upon decades of FEC precedents interpreting the federal rule.[9] Finally, in the unlikely event that the Maine Commission on Governmental Ethics ("Commission") was to apply § 1064(1)(E)(2)(b) to the passive receipt of unsolicited emails, "individual challenges, including those

---

[8] 11 C.F.R. §110.20(i) ("A foreign national shall not direct, dictate, control, or directly or indirectly participate in the decision-making process of any person, such as a corporation, . . . with regard to such person's Federal or non-Federal election-related activities.").

[9] *See, e.g.*, FEC Adv. Op. 2006-15 (May 19, 2006), https://www.fec.gov/files/legal/aos/2006-15/2006-15.pdf (permitting election expenditures by U.S. subsidiaries of a foreign corporation provided the funds were drawn from the subsidiary's domestic operations and political decisions were made by U.S. citizens); FEC Adv. Op. 1989-20 (Oct. 27, 1989), https://saos.fec.gov/saos/searchao?AONUMBER=1989-20 (declining to approve a contribution by a U.S. company to state candidates because its PAC was funded primarily by its foreign parent corporation).

alleging that the requirements impose an unusual burden in particular circumstances . . . [could] be brought in the form of as-applied challenges." *Gaspee Project v. Mederos*, 13 F.4th 79, 93 (1st Cir. 2021).

Nor does plaintiffs' lone hypothetical justify finding that the "indirectly participates" language in § 1064(1)(E)(2)(b) is unconstitutionally vague. That the Act did not itself "expressly define the phrase" does not "render the phrase vague." *Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 121 (1st Cir. 2011). Indeed, the lower court did not so much fault the statutory definition for vagueness as question the clarity of certain implementing regulations considered by the Commission in connection to § 1064(1)(E)(2)(b) in early 2024.[10]

The lower court found that these "proposed definitions" eliminated the Act's requirement that "foreign government or foreign government-owned entity participate in the [corporation's] actual decision-making process." Add. at 37. The proposed regulations did not make this change, but even assuming they did, this would be reason to invalidate the *regulation*, not the statute. And, in fact, the regulation the lower court considered was not even adopted; instead, the Commission has promulgated new regulations, revised in part to address the lower

---

[10] Maine Comm'n on Gov't Ethics, Proposed Rule Amendments, Feb. 5, 2024, https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-files/Draft%20Amendments%20for%20Public%20Comment_0.pdf.

court's expressed concerns about § 1064(1)(E)(2)(b). *See* Maine Comm'n on Gov't Ethics, May 29, 2024 Meeting, Item No. 6, https://www.maine.gov/ethics/meeting/2024-0529.

Nor is it tenable to claim that the *statute* itself is so vague that it could be understood to cover unsolicited email. Plaintiffs provide no other context, legal or otherwise, where "participate in the decision-making process," is understood to encompass the sending of unsolicited emails to a passive recipient. And one is hard-pressed to even imagine the circumstances in which a foreign government would take it upon itself to send unsolicited "spam" email to unrelated corporations, without any knowledge about whether these corporations even have political interests in Maine or the capacity to take action on such interests.

Plaintiffs' conjecture that § 1064(1)(E)(2)(b) reaches unsolicited email thus both defies the language of the Act and is implausible on its own terms. But even if this reading of the Act were more tenable, it would not demonstrate that the Act is so "standardless" as to justify its facial invalidation. *United States v. Williams*, 553 U.S. 285, 304 (2008).

## II. The District Court's Failure to Review All Provisions of the Act Is an Abuse of Discretion.

The district court's failure to analyze whether it could enjoin only those provisions of the spending ban it found invalid runs contrary to the presumption of severability under state law, *see* 1 Me. Rev. Stat. § 71(8). Even worse, the court also

enjoined provisions of the Act, such as the disclaimer requirement, without *any* consideration of their constitutionality. This is an abuse of discretion.

**A.    The disclaimer requirement is a stand-alone measure that advances distinct governmental interests and is subject to only an intermediate standard of scrutiny.**

In addition to the ban on foreign spending, *see* 21-A Me. Rev. Stat. § 1064(1)-(2), the Act includes a separate disclosure provision requiring FGIEs to include a disclaimer identifying themselves as a "foreign government" or a "foreign government-influenced entity" on any public communication "to influence the public or any state, county or local official or agency regarding the formulation, adoption or amendment of any state or local government policy or regarding the political or public interest of or government relations with a foreign country or a foreign political party," *see id*. § 1064(6). The district court wholly failed to address the constitutionality of this disclaimer requirement.

Beyond their common reliance on the definition of "foreign government-influenced entity" at § 1064(1)(E), the disclaimer and the spending ban are unconnected. The disclosure requirement in no way turns on the operation of the spending ban, nor is it intended to implement the ban.

Further, the lower court's analysis of the spending ban does not implicate the constitutionality of the disclaimer provision because the two types of laws are subject to different standards of scrutiny and supported by different governmental

interests. The lower court's failure to consider whether § 1064(6) could be given effect if applications of the spending ban were found invalid thus cannot be justified.

The governmental interest advanced by disclosure laws is well-established: to enable citizens to "make informed decisions and give proper weight to different speakers and messages." *Citizens United*, 558 U.S. at 370-71. Although this informational interest is particularly acute in connection to political advocacy conducted by foreign interests—as evinced by longstanding federal laws such as FARA, *see* 22 U.S.C. § 614(b)—this interest is distinct from those furthered by the foreign government spending ban.

Furthermore, unlike a substantive restriction on campaign spending, a disclosure requirement "impose[s] no ceiling on campaign-related activities," *Citizens United*, 558 U.S. at 366 (internal quotation marks omitted), and is consequently reviewed under "exacting," not strict, scrutiny, *id.* at 366-67. Exacting scrutiny does not impose a "least restrictive means" test, and thus the lower court's concerns about the potential overbreadth of § 1064(1)(E)(2)(a) and (b) with respect to the spending ban have little application to the review of a disclosure law.

Indeed, given that disclaimers can be—and often are—required from U.S. citizens and domestic entities in connection to their political communications, it is unclear what "tailoring" is even required with respect to the 5% ownership threshold in connection to a disclosure law. The question here is not whether §

25

1064(1)(E)(2)(a) defines with enough precision those entities that are sufficiently "foreign" to be subject to a campaign spending *ban*. Instead, the constitutionality of this provision turns on whether the disclaimers it requires provide voters with useful information about the sponsors of lobbying communications—including their foreign ownership—and thereby "promote the dissemination of information about those who deliver and finance political speech." *McKee*, 649 F.3d at 41.

Because the distinctions between campaign spending limits and disclaimers are so significant in First Amendment cases, disclosure laws are often upheld even as the substantive campaign finance restrictions they accompany are struck down. *Citizens United*, 558 U.S. at 365-66, 367-371 (striking down corporate expenditure restriction while upholding related disclosure requirements); *SpeechNow.org v. FEC*, 599 F.3d 686, 698 (D.C. Cir. 2010) (en banc) (invalidating contribution limits as applied to super PACs but sustaining the disclosure regime applicable to such PACs).

Here too, Maine's disclaimer requirement is on firm constitutional ground, even if the lower court's holding regarding the spending ban were to be affirmed. The courts have consistently upheld campaign disclaimer requirements, *see, e.g.*, *Citizens United*, 558 U.S. at 367; *McConnell*, 540 U.S. at 196-97, as well as FARA, the federal law upon which § 1064(6) was modeled, *see Att'y Gen. of U.S. v. Irish People, Inc.*, 684 F.2d 928, 935 & n.23 (D.C. Cir. 1982), *cert. denied sub nom.*, *Irish*

*People Inc. v. Smith*, 459 U.S. 1172 (1983) (holding that "it is well settled that FARA is constitutional" and collecting cases).

Since its enactment in 1938, FARA has required "agents" representing "foreign principals"—a term that includes foreign governments and foreign corporations—to register with the Department of Justice and to include disclaimers on any "informational material" they distribute for a foreign principal. 22 U.S.C. §§ 612(a), 614(b). Maine's disclaimer requirement serves as a state counterpart to FARA's disclaimer requirements and is thus further justified by the unique informational interests animating FARA. *See, e.g.*, *Att'y Gen. v. Irish N. Aid Comm.*, 346 F. Supp. 1384, 1390 (S.D.N.Y. 1972), *aff'd*, 465 F.2d 1405 (2d Cir. 1972) (explaining that "purpose of [FARA]" is to "require[e] complete public disclosure by persons acting for . . . foreign principals where their activities are political in nature" thereby "enabl[ing] [citizens] to understand the purposes for which they act"). Like FARA, Maine's disclaimer requirement offers a "reasonable and minimally restrictive method of furthering First Amendment values." *Buckley*, 424 U.S. at 82.

For these reasons, this Court should affirm the constitutionality of the disclaimer requirement at § 1064(6), or, in the alternative, direct the lower court to review the disclaimer requirement under exacting scrutiny in the first instance.

**B.     The injunction is overbroad.**

Under Maine law, if a provision or application of a law is invalid, but its "invalidity does not affect other provisions or applications which can be given effect without the invalid provision or application," the law is severable. 1 Me. Rev. Stat. § 71(8).

The district court found only the second and third definitions of "foreign government-influenced entity" were likely unconstitutional, *see* 21-A Me. Rev. Stat. § 1064(1)(E)(2)(a) & (2)(b); nevertheless, it refused to consider Maine's request that it sever them from the Act and thereby preserve the spending ban as to "foreign governments," *see id*. § 1064(1)(E)(1); Add. at 38. But the district court did not question that the spending ban, limited to foreign *governments*, was likely constitutional, *see* Add. at 31, nor that this more limited ban could easily "be given effect," *see* 1 Me. Rev. Stat. § 71(8).

Although the court stated that it was reserving the question of severability to allow for briefing on how invalidation of the "5% ownership" and "actual influence" FGIE definitions "would affect the Act's remaining provisions," Add. at 39, the court provided no reasoning for this reservation. The Act contains three separate definitions of "foreign government-influenced entity," and the two definitions that the lower court found overbroad have no effect on the ban as applied to "foreign governments," *see* 21-A Me. Rev. Stat. § 1064(1)(E)(1). It may be that the lower

28

court was concerned about how enjoining two of the three FGIE definitions would affect entirely *different* provisions of the Act, i.e., the media "due diligence" requirements and the disclaimer requirement. But the proper solution would be to review *those* provisions and enjoin or narrow them if necessary—which the lower court wholly failed to do—not to block enforcement of the clearly constitutional ban on campaign spending by foreign governments.

## CONCLUSION

For these reasons, the preliminary injunction should be vacated. Alternatively, if this Court affirms the lower court's reasoning, it should direct the lower court to (1) enjoin 21-A Me. Rev. Stat. § 1064(1)(E)(2)(a) and (b) only in connection to the spending ban, (2) preserve the spending ban as to "foreign governments," *id*. § 1064(1)(E)(1), and (3) declare the disclaimer requirement at § 1064(6) constitutional.

**Dated: June 17, 2024**

                                     Respectfully submitted,

_____

Peter L. Murray
  pmurray@mpmlaw.com
Sean R. Turley
  sturley@mpmlaw.com
MURRAY PLUMB & MURRAY
75 Pearl Street
P.O. Box 9785
Portland, Maine 04104-5085
(207) 773-5651

Tara Malloy
  tmalloy@campaignlegalcenter.org
David Kolker
  dkolker@campaignlegalcenter.org
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE WITH RULES 29 AND 32

I hereby certify that this brief contains 6,475 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f)(7)(B)(iii), which complies with the requirements in Fed R. App. P. 32(a)(7)(B)(i) and Fed R. App. P. 29(A)(5).

I further certify that his brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 with 14-point typeface and Times New Roman type style.

<u>/s/ Peter L. Murray</u>
Peter L. Murray

31

**CERTIFICATE OF SERVICE FORM FOR ELECTRONIC FILING**

I hereby certify that on June 17, 2024, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ Peter L. Murray
Peter L. Murray