# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

CENTRAL MAINE POWER COMPANY; VERSANT POWER; ENMAX CORPORATION; MAINE PRESS ASSOCIATION; MAINE ASSOCIATION OF BROADCASTERS; JANE P. PRINGLE, individually and in her capacity as a registered voter and elector; KENNETH FLETCHER, individually and in his capacity as a registered voter and elector; BONNIE S. GOULD, individually and in her capacity as a registered voter and elector; BRENDA GARRAND, individually and in her capacity as a registered voter and elector; LAWRENCE WOLD, individually and in his capacity as a registered voter and elector,

*Plaintiffs-Appellees*,

*v.*

MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES; WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in his official capacity as a Member of the Maine Governmental Ethics and Election Practices; SARAH LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; STACEY D. NEUMANN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in his official capacity as Attorney General for the State of Maine,

*Defendants-Appellants*.

On Appeal from The United States District Court, District Of Maine, Case No. 1:23-cv-00450-NT, Honorable Nancy Torresen, U.S. District Judge

## BRIEF OF *AMICI CURIAE* CORPORATE AND SECURITIES LAW EXPERTS IN SUPPORT OF DEFENDANTS-APPELLANTS AND VACATUR

Shannon Liss-Riordan (C.A.B. 77877)
Jack Bartholet (C.A.B. 1211802)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, Massachusetts 02116
Telephone: (617) 994-5800
sliss@llrlaw.com
jbartholet@llrlaw.com

# RULE 26.1 DISCLOSURE STATEMENT

*Amici curiae* corporate and securities law experts each state that, as individuals, they do not have parent corporations, nor do they issue stock.

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT.............................................................. i

I.  STATEMENT OF INTEREST OF AMICI CURIAE ...................................1

II.  SUMMARY OF THE ARGUMENT ...............................................................2

III.  ARGUMENT......................................................................................................4

    A.  Various corporate law doctrines use ownership thresholds which suggest that a shareholder substantially matters within corporate enterprise when the shareholder's ownership interest falls in the 5% range. ...............................................4

    B.  Shareholders can exercise influence over corporate decision-making at low levels of shareholding, and certainly in the range of 5%. .................................................................................8

    C.  Delaware courts have found *control* of a corporation by a shareholder holding 10 - 15% equity ownership; if *control* can be achieved at those levels of stockholding, then it seems unremarkable that a foreign-government shareholder would have *influence* over the firm at 5% stockholding.....................18

    D.  Foreign-government shareholders may be in a position to exercise greater-than-average influence over corporate decisions-making compared to other types of shareholders. ..............20

    E.  The District Court's order failed to consider changes to the corporate economy that have caused lawmakers, regulators, and courts to adjust assumptions about the percentage of shareholding that confers influence over a public company's board of directors.............................................20

IV.  CONCLUSION..................................................................................................27

ADDENDUM: DESCRIPTION OF *AMICI CURIAE* ...........................................30

# TABLE OF AUTHORITIES

**Cases**

*Business Roundtable v. U.S. Sec. & Exch. Comm'n*,
    647 F.3d 1144 (D.C. Cir., 2011)........................................................5

*Citizens United v. Federal Election Com'n*,
    558 U.S. 310 (2010)........................................................1

*FrontFour Cap. Gp. LLC v. Taube*,
    2019 WL 1313408 (Del. Ch. Mar. 11, 2019) .............................................19

*In re Pattern Energy Gp. Inc. S'holders Litig.*,
    2021 WL 1812674 (Del. Ch. May 6, 2021) ................................................19

*Moran v. Household International, Inc.*,
    500 A.2d 1346 (Del. 1985)........................................................9

*Rosenthal v. Burry Biscuit Corp.*,
    60 A.2d 106 (Del. 1948) ................................................19

*The Williams Companies Stockholders Litig.*,
    2021 WL 754593 (Del. Ch., Feb. 26, 2021)........................................ passim

*Tornetta v. Musk*,
    310 A.3d 430 (Del. Ch. 2024) ......................................................19

*Unocal v. Mesa Petroleum Co.*,
    492 A.2d 946 (Del. 1985) ..............................................................26

**Statutes**

21-A M.R.S. § 1064 ........................................................ 1, 2, 4, 27

52 U.S.C. § 30121 ........................................................2

Ari. Rev. Stat. Ann. § 10-1602 ........................................................5

Cal. Corp. Code § 1600........................................................5

N.D. Cent. Code § 10-35-02 ........................................................6

N.D. Cent. Code § 10-35-08 .....................................................................6

N.R.S. 78.105(c)(2) ..................................................................................5

Section 971 of the Dodd-Frank Wall Street Reform and Consumer
    Protection Act, Pub. L. 111-203 (2010) .........................................5

Texas Bus. Orgs. Code § 21.218(b) ..........................................................5

Wis. Stat. § 180.1601-1604 ......................................................................5

**Other Authorities**

"Facilitating Shareholder Director Nominations,"
    SEC Release Nos. 33-9136; 34-62764, September 16, 2010 ....................5, 6

"Procedural Requirements and Resubmission Thresholds under
    Exchange Act Rule 14a-8,"
    SEC Release No. 34-89964 (Sept. 23, 2000) .............................................6, 7

Anat R. Admati & Paul Pfleiderer,
    *The 'Wall Street Walk' and Shareholder Activism: Exit as a Form
    of Voice*, 22 REV. FIN. STUD. 2445 (2009)..................................................8, 12

Andy Serwer & Barney Gimbel,
    *Prince Alwaleed: Why Chuck Had to Go,* FORTUNE, Nov. 16 2007,
    at
    https://money.cnn.com/2007/11/08/news/companies/citigroup_alw
    aleed.fortune/index.htm .............................................................................14

Anita Indira Anand,
    *Shareholder-Driven Corporate Governance and Its Necessary
    Limitations: An Analysis of Wolf Packs*, 99 B.U. L. REV. 1515
    (2019)..........................................................................................................25

Assaf Hamdani & Sharon Hannes,
    *The Future of Shareholder Activism*, 99 B.U. L. REV. 971 (2019) ...............10

Binyamin Appelbaum,
Saudi Threat to Sell U.S. Assets Could Hurt, but Mostly the
Saudis, N.Y. TIMES, April 19, 2016, at
https://www.nytimes.com/2016/04/20/business/international/saudi
-threat-to-sell-us-assetscould-hurt-but-mostly-the-saudis.html ...................13

Cara Lombardo & Laura Stevens,
Starboard, Elliott Management Call on eBay to Shed StubHub,
Classifieds, WALL ST. J., Jan. 22, 2019 at
https://www.wsj.com/articles/elliott-management-calls-for-ebay-
to-shed-stubhub-classified-ads-business-11548166204................................10

Dominic Chopping,
Norway's Oil Fund to Vote Against Exxon Mobil Amid
Shareholder Rights Concern, WALL ST. J., May 24, 2024, at
https://www.wsj.com/business/energy-oil/norways-oil-fund-to-
vote-against-exxon-mobil-amid-shareholder-rights-concern-
cdb99398......................................................................................................12

Edward B. Rock,
Shareholder Eugenics in the Public Corporation, 97 CORNELL L.
REV. 849 (2012).................................................................................................7

Emily Winston,
Managerial Fixation and the Limitations of Shareholder
Oversight, 71 HASTINGS L. J. 699 (2020) .......................................................10

Exxon Mobil Corporation Form 8-K,
June 2, 2021 at https://ir.exxonmobil.com/static-files/6e0b2aef-
43eb-4a52-bd34-92b283783b6c.....................................................................23

George S. Everly II.,
Sovereign Wealth Funds and Shareholder Democratization: A
New Variable in the CFIUS Balancing Act, 25 MD. J. INT'L L. 374
(2010).........................................................................................................8, 10

Iman Anabtawi & Lynn Stout,
Fiduciary Duties for Activist Shareholders, 60 STAN. L. REV. 1255
(2008)..............................................................................................................9

Iman Anabtawi,
 *Some Skepticism about Increasing Shareholder Power*, 53 UCLA
 L. Rᴇᴠ. 561 (2006) .................................................................................. 18, 21

J. Robert Brown Jr.,
 *The Proxy Rules and Restrictions on Shareholder Voting Rights*,
 47 Sᴇᴛᴏɴ Hᴀʟʟ L. Rᴇᴠ. 45 (2016) ............................................................. 14

Jan Fichtner, Eelke M. Heemskerk & Javier Garcia-Bernardo,
 *Hidden Power of the Big Three? Passive Index Funds, Re-
 Concentration of Corporate Ownership, and New Financial Risk*,
 19 Bᴜs. & Pᴏʟ. 298 (2017) ........................................................................ 10

Lauren Thomas,
 *Activist Browning West Scores Major Victory at Gildan
 Activewear*, Wᴀʟʟ Sᴛ. J., May 24, 2024, at
 https://www.wsj.com/livecoverage/stock-market-today-dow-
 jones-05-24-2024/card/activist-browning-west-scores-major-
 victory-at-gildan-activewear-LvOBNKdsSDdyNiHJWkFp ........................ 11

Lauren Thomas,
 *Activist Investor Irenic Builds Stake in Forward Air*, Wᴀʟʟ Sᴛ. J.,
 May 28, 2024, at https://www.wsj.com/business/logistics/activist-
 investor-irenic-builds-stake-in-forward-air-f2d213de ................................ 11

Leo E. Strine Jr. & Jonathan Macey,
 *Citizens United as Bad Corporate Law*, 2019 Wɪs. L. Rᴇᴠ. 451
 (2019) .......................................................................................................... 27

Lisa M. Fairfax,
 *Mandating Board-Shareholder Engagement*, 2013 U. Iʟʟ. L. Rᴇᴠ.
 821 (2013) .................................................................................................. 13

Liz Hoffman, Corrie Driebusch & Tom McGinty,
 *Big Stock Sales Are Supposed to Be Secret. The Numbers Indicate
 They Aren't*, Wᴀʟʟ Sᴛ. J., March 30, 2022 at
 https://www.wsj.com/articles/big-stock-sales-are-supposed-to-be-
 secret-the-numbers-indicate-they-arent-11648647914 ............................... 12

Lucian Arye Bebchuk,
   *The Case for Increasing Shareholder Power*, 118 HARV. L. REV.
   833 (2005)..................................................................................................16

Marcel Kahan & Edward Rock,
   *The Hanging Chads of Corporate Voting*, 96 GEO. L. J. 1227
   (2008).......................................................................................................14

Mark Mazzetti,
   *Saudi Arabia Warns of Economic Fallout if Congress Passes 9/11
   Bill*, N.Y. TIMES, April 15, 2016, at:
   https://www.nytimes.com/2016/04/16/world/middleeast/saudi-
   arabia-warns-ofeconomic-fallout-if-congress-passes-9-11-bill.html............13

Martin Cremers, Saura Masconale & Simone M. Sepe,
   *Activist Hedge Funds and the Corporation*, 94 WASH. U. L. REV.
   261 (2016)................................................................................................22

Matt Phillips,
   *Exxon Board's Defeat Signals the Rise of Social-Good Activists*,
   N.Y. TIMES, June 9, 2021, at
   https://www.nytimes.com/2021/06/09/business/exxon-mobil-
   engine-no1-activist.html..........................................................................23

Ofer Eldar, Tanja Kirmse & Michael D. Wittry,
   *The Rise of Anti-Activist Poison Pills*, ECGI WORKING PAPER
   SERIES IN FINANCE, Working Paper No. 869/2023 (January 2023). 10, 24, 25,
   26

Panel V: Discussion, Questions and Answers
   (remark of Alan Tonelson, Research Fellow, U.S. Business and
   Industry Council Educational Foundation, Washington DC),
   IMPLICATIONS OF SOVEREIGN WEALTH FUND INVESTMENTS FOR
   NATIONAL SECURITY, HEARING BEFORE THE U.S.-CHINA
   ECONOMIC AND SECURITY REVIEW COMM'N, February 7, 2008 ..................16

Paul H. Edelman, Randall S. Thomas & Robert B. Thompson,
   *Shareholder Voting in an Age of Intermediary Capitalism*, 87 S.
   CAL. L. REV. 1359 (2014)...........................................................................16

Paul Rose,
    *Common Agency and the Public Corporation*, 63 VAND. L. REV.
    1353 (2010) .......................................................................................9

Paul Rose,
    *What Responsibilities Do Sovereign Funds Have to Other*
    *Investors*, 52 WAKE FOREST L. REV. 889 (2017) .........................................16

Robert Mackey,
    *Saudi Investor Suggested Brooks Had to Go*, N.Y. TIMES, July 15,
    2011, at
    https://archive.nytimes.com/thelede.blogs.nytimes.com/2011/07/1
    5/saudi-investor-suggested-brooks-had-to-go/, *archived at*
    https://perma.cc/T8DC-V39X ......................................................................15

S. Karmel,
    *Greenmail, the Control Premium and Shareholder Duty*, 48
    WASH. & LEE L. REV. 937 (1991) ..............................................................10

Sarah C. Haan,
    *Shareholder Proposal Settlements and the Private Ordering of*
    *Public Elections*, 126 YALE L. J. 261 (2016) .......................................... 16, 17

Shai Oster,
    *China's Iron-Ore Discount Hinges on Granting Loans*, WALL ST.
    J., Aug. 18, 2009, at
    https://www.wsj.com/articles/SB125051798719736937 ..............................20

Statement of Dr. Peter Morici, Professor,
    Robert H. Smith School of Business, University of Maryland,
    College Park, Maryland, IMPLICATIONS OF SOVEREIGN WEALTH
    FUND INVESTMENTS FOR NATIONAL SECURITY, HEARING BEFORE
    THE U.S.-CHINA ECONOMIC AND SECURITY REVIEW COMM'N,
    February 7, 2008 .......................................................................................15

Statement of Evan Bayh,
    a U.S. Senator from the State of Indiana, IMPLICATIONS OF
    SOVEREIGN WEALTH FUND INVESTMENTS FOR NATIONAL
    SECURITY, HEARING BEFORE THE U.S.-CHINA ECONOMIC AND
    SECURITY REVIEW COMM'N, February 7, 2008 ............................................14

Sullivan & Cromwell LLP,
    *2023 Proxy Season Review: Part 1: Rule 14a-8 Shareholder*
    *Proposals* (Aug. 11, 2023) ............................................................17

Therese H. Maynard,
    MERGERS AND ACQUISITIONS: CASES, MATERIALS, AND PROBLEMS
    (4th ed. 2017) ..........................................................................21

## Rules

11 C.F.R. § 110.20(i) .......................................................................................2

17 C.F.R § 240.13d-1 (2023) ....................................................................7, 22

17 C.F.R § 240.13d-102 (2023) ....................................................................7

17 C.F.R. § 240.14a-8 ................................................................................6, 7

I.R.C. § 382(g)(2017) ...................................................................................7

NYSE Rule 72.10 ..........................................................................................12

## Regulations

"Order Approving Proposed Rule Change,"
    Exchange Act Release No. 60215, 74 Fed. Reg. 33293 (July 1,
    2009) ....................................................................................14

# I. STATEMENT OF INTEREST OF AMICI CURIAE[1]

*Amici* are experts on corporate and securities law who research, write, and teach about these subjects at law schools around the United States. *Amici* have published scholarship on corporate and securities law in some of the leading law journals in America, including the *Harvard Law Review*, the *Stanford Law Review*, and the *Yale Law Journal*. Many *amici* have specifically published scholarship that analyzes corporate law issues relating to *Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010), upon which the lower court relied in concluding that Maine's law likely violates the First Amendment.

*Amici* submit this brief to share expertise on corporate governance and securities laws and practices that relate directly to the lower court's narrow-tailoring analysis of the Maine statute at the center of this case. While all participating *amici* may not agree with every statement in the brief, all *amici* agree that the Act's 5% equity ownership threshold is not arbitrary and that ownership of 5% or more of a U.S. entity's equity by a foreign government or a foreign-government-influenced entity presents a foreign influence on the U.S. entity's governance and decision-making.

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amici* contributed money intended to fund the brief's preparation or submission.

A full list of *amici* is attached as an addendum to this brief.

## II.    SUMMARY OF THE ARGUMENT

The District Court erred when it held that the Act's 5% foreign-government ownership threshold was chosen arbitrarily and is not narrowly tailored to Maine's compelling interest in limiting foreign government influence on elections. The focus of the Act—and the constitutional law at issue—concerns *influence* by a foreign-government shareholder on corporate decision-making, not control of that decision-making.[2] Influence requires less than control. Though influence is not a black-and-white concept, the 5% ownership threshold is an important metric because it is meaningful, ascertainable, and within business law norms. For example:

- Many modes of shareholder influence[3] are not visible to the public and play out behind closed doors.

- Shareholders exert influence on firm decision-making in a number of ways that can include voting their stock, selling their stock, communicating with

---

[2]    This is consistent with the FEC's own regulations, which do not make control of a corporation by a foreign national necessary to violate 52 U.S.C. § 30121. *See* 11 C.F.R. § 110.20(i) (prohibiting, *inter alia,* "indirect" participation in the decision-making process of a corporation with regard to its election-related activities).

[3]    The use of the word "shareholder" in this brief is intended to include any holder of an equity ownership interest in a business entity, such as membership units in an LLC or limited partnership interests in a limited partnership, etc.

management, and communicating with other shareholders. A major lever of shareholder influence is the ability to sell a large block of stock, which can impact the share price.

- Over the last twenty years, lawmakers, regulators, and courts have adjusted their assumptions about the percentage of equity ownership that confers influence over a public company's board of directors.[4] They have done so to keep pace with changes to the corporate economy. These changes, which are well-known to securities practitioners and experts, help explain why it is no longer valid to assume that a shareholder is only influential on a corporation's decision-making if the shareholder owns half or more of the company's stock. Experts in the field certainly do not assume this.

- Shareholders of widely-held corporations can and routinely do influence corporate decision-making at low levels of shareholding, and certainly in the range of 5%.

- A shareholding block of 5% in a U.S. public company is an investment worth tens or even hundreds of millions of dollars. It is a "large" holding.

- Foreign government shareholders may be in a position to exercise greater-than-average influence over corporate decisions-making, to the extent that

---

[4] The use of the phrase "board of directors" in this brief is intended to include any managerial board in which control of a business entity is vested, such as a board of managers in an LLC or a general partner in a limited partnership, etc.

the corporation operates in that foreign country and thus needs favorable regulatory treatment from that government.

- In a number of cases, Delaware courts have found *control* of a corporation by a shareholder holding 10 - 15% equity ownership. If *control* can be achieved at those levels of stockholding, then it seems unremarkable that a shareholder would have *influence* over the firm at 5% stockholding.

All of this suggests that the lower court's narrow tailoring analysis erred by concluding that the 5% foreign-government shareholding threshold was "arbitrary" and overbroad. The 5% threshold is *not* arbitrary. Rather, it is directly in line with existing laws and regulations that assess shareholder influence and determine when a shareholder's participation in the entity substantially matters. The 5% threshold also is not overbroad, because it reflects an amount of stockholding that matters in corporate organization practically and under the law. It is certainly not so overbroad as to make the Act unconstitutional.

## III.  ARGUMENT

### A.  Various corporate law doctrines use ownership thresholds which suggest that a shareholder substantially matters within corporate enterprise when the shareholder's ownership interest falls in the 5% range.

State and federal corporate and securities laws use ownership thresholds to qualify shareholders for important rights and obligations. The common use of a 5% stockholding threshold suggests that the Act's 5% threshold is not arbitrary but in

line with assumptions in these fields.

**Shareholder Information Rights.** Some states condition shareholder

information rights on ownership thresholds; those states commonly use 5% as the

shareholding threshold. Arizona, California, Nevada, Texas, and Wisconsin, for

example, all grant the right to inspect and copy the corporation's records to any

shareholder holding at least 5% of stock.[5]

**Proxy Access**. An important shareholder right is the right to nominate a

candidate for the board of directors and to place the nomination in the

corporation's proxy statement ("proxy access"). In 2010, the U.S. Securities and

Exchange Commission ("SEC") created a proxy access mechanism that gave

shareholders holding at least 3% of a company's total voting power the right to

nominate candidates to the board.[6] In its rulemaking release, the SEC highlighted

research suggesting that few shareholders of public companies owned blocks as

---

[5]    *See* Ari. Rev. Stat. Ann. § 10-1602; Cal. Corp. Code § 1600; N.R.S. 78.105(c)(2); Texas Bus. Orgs. Code § 21.218(b); Wis. Stat. § 180.1601-1604. In these states, the shareholder must comply with certain procedural requirements, and shareholders holding less than 5 percent of stock cannot exercise the same rights unless they comply with a holding period.

[6]    *See* "Facilitating Shareholder Director Nominations," SEC Release Nos. 33-9136; 34-62764, September 16, 2010; Section 971 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203 (2010). To satisfy the eligibility requirement, shareholders also had to have held their stock for a minimum of 3 years. The SEC's rule was vacated by the United States Court of Appeals for the District of Columbia Circuit on unrelated grounds. See *Business Roundtable v. U.S. Sec. & Exch. Comm'n*, 647 F.3d 1144 (D.C. Cir., 2011).

large as 3% to 5%. Based on the SEC's research at the time, it asserted that only 20% of public companies "had even one shareholder satisfying" a 5% threshold for three years.[7] Before the SEC promulgated its proxy access rule with a 3% threshold, some states, like North Dakota, had already provided proxy access rights to shareholders using a 5% threshold.[8]

**Shareholder proposals**. The shareholder proposal is an important right of qualifying shareholders to bring a matter to the attention of the shareholders for discussion and a vote. Although SEC Rule 14a-8 used to set a qualification threshold for shareholders at $2,000 or 1% of stock, this qualification threshold was amended in 2020 to remove the percentage ownership threshold altogether.[9] In its final rulemaking release, the SEC explained that it removed the 1% threshold in

---

[7] "Facilitating Shareholder Direct Nominations," *supra* note 6, at 56692.

[8] *See* N.D. Cent. Code § 10-35-08 and § 10-35-02 (to qualify for proxy access under this statute, the 5% shareholder must have held shares for a minimum of 2 years).

[9] "Procedural Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8," SEC Release No. 34-89964 (Sept. 23, 2000), at 9; *see also* 17 C.F.R. § 240.14a-8(b)(i). Today Rule 14a-8 specifies that a shareholder is qualified if the shareholder has continuously held:
> (A)   At least $2,000 in market value of the company's securities entitled to vote on the proposal for at least three years; or
> (B)   At least $15,000 in market value of the company's securities entitled to vote on the proposal for at least two years; or
> (C)   At least $25,000 in market value of the company's securities entitled to vote on the proposal for at least one year.

part because "the vast majority of shareholders who use Rule 14a-8 do not hold one percent or more of a company's shares."[10] The SEC noted that, as of April 2020, a $2,000 investment represented 0.21% of the market capitalization of the *smallest* company in the Russell 3000 Index.[11] Nonetheless, this "very low" threshold demonstrated a sufficiently "meaningful" ownership interest to justify recognizing the shareholder's right to tee up a full vote of all the company's shareholders on a qualifying proposal.[12]

**Investor disclosures**. The federal securities laws require any shareholder that crosses the 5% ownership threshold to file a disclosure with the SEC, which the SEC makes public on EDGAR, its public database of securities filings.[13]

---

[10]  "Procedural Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8," SEC Release No. 34-89964 (Sept. 23, 2000), at 9.

[11]  *Id*. at 23. The SEC also determined that $2,000 represented 0.01% of the market cap of the smallest company in the S&P 500, and 0.00002% of the market cap of the largest company in the S&P 500. *Id*.

[12]  *Id*. at 10 & 18.

[13]  See 17 C.F.R § 240.13d-1 (2023); *id.* § 240.13d-102 (2023). Even statutory schemes outside of corporate law commonly use 5% as a key ownership threshold. For example, section 382 of the Internal Revenue Code specifies that a company may lose its ability to shelter income from taxation using net operating losses if the company experiences an ownership change involving 5% blocks of shareholding. *See* I.R.C. § 382(g)(2017); Edward B. Rock, *Shareholder Eugenics in the Public Corporation*, 97 Cornell L. Rev. 849, 891 (2012).

**B.** **Shareholders can exercise influence over corporate decision-making at low levels of shareholding, and certainly in the range of 5%.**

Shareholders have many levers of influence within corporate organization. Many of these are not readily visible to outsiders or even to other shareholders.[14] Shareholders vote their shares in corporate elections, on such matters as the election of directors, shareholder proposals, management proposals, and Say-On-Pay. They can sell their shares, which can affect stock price. They can sue the corporation or its board. Shareholders also gain leverage by nominating and running candidates for the board, submitting shareholder proposals and negotiating them to a settlement, exercising shareholder information rights to gain access to corporate records, and communicating with other shareholders and with management.

In the past twenty years or so, consensus has built among business law experts that shareholders of widely-held corporations can exercise influence over corporate decision-making at levels of shareholding around 5% or less.[15] As Paul

---

[14]    Shareholders' "behind-the scenes negotiations with managers [are] often referred to as 'jawboning,'" and "have been shown to be successful in affecting managerial decisions." Anat R. Admati & Paul Pfleiderer, *The 'Wall Street Walk' and Shareholder Activism: Exit as a Form of Voice*, 22 REV. FIN. STUD. 2445, 2478 (2009).

[15]    *See, e.g.*, George S. Everly II., *Sovereign Wealth Funds and Shareholder Democratization: A New Variable in the CFIUS Balancing Act*, 25 MD. J. INT'L L. 374, 382 (2010) (noting that equity stakes less than 10% "may fall short of

Rose has explained, "[e]ven a shareholder with a relatively small but non-negligible ownership percentage—say, between two and five percent—may have a significant impact on corporate policies."[16] Iman Anabtawi and Lynn Stout have observed that "shareholders with smaller stakes—that is, shareholders who do not have voting power clearly sufficient to determine who sits on the board of directors—might still be able to influence corporate officers or directors in less obvious ways (for example, by threatening a distracting and costly proxy fight or an embarrassing media relations campaign)."[17]

As the nature of shareholding has changed in the United States, the trend in corporate and securities law has been to recognize that holders of smaller and smaller percentages of a corporation's stock can shape a corporation's decision-making.[18] The main change in the nature of shareholding has involved the re-

_____

providing absolute control of a domestic entity to a foreign investor, but they allow a significant amount of influence over" the entity).

[16]    Paul Rose, *Common Agency and the Public Corporation*, 63 VAND. L. REV. 1353, 1373 (2010).

[17]    Iman Anabtawi & Lynn Stout, *Fiduciary Duties for Activist Shareholders*, 60 STAN. L. REV. 1255, 1270 (2008).

[18]    This trend is evident in the evolution of the poison pill since the 1980s, for example. "After the adoption of state anti-takeover statutes, trigger thresholds crept down from the 20% threshold of *Moran* [*v. Household International, Inc.*, 500 A.2d 1346 (Del. 1985)] to 15% and then to 10% in some instances." *The Williams Companies Stockholders Litig.*, 2021 WL 754593, at *1 (Del. Ch., Feb. 26, 2021) (analyzing a poison pill with a 5% trigger threshold); see Ofer Eldar, Tanja Kirmse &

concentration of shareholding in institutional actors, who typically own blocks of stock in public companies in the 5% range. Today, "[a] typical large public corporation has between three to five money managers, each holding approximately 5 – 10% of the corporation's stock. Other institutional investors (mutual funds, pension funds, insurance companies, etc.) hold smaller percentages, comprising together up to an additional 50% of the corporation's shares."[19] Though individual investors' ownership interests generally do not approach 50%, an individual holding of 5% is considered large by modern standards.[20]

---

Michael D. Wittry, *The Rise of Anti-Activist Poison Pills*, ECGI WORKING PAPER SERIES IN FINANCE, Working Paper No. 869/2023 (January 2023), at 2 ("poison pills in the last decade have substantially lowered ownership triggers").

[19] Assaf Hamdani & Sharon Hannes, *The Future of Shareholder Activism*, 99 B.U. L. REV. 971, 973 (2019); *see also* Jan Fichtner, Eelke M. Heemskerk & Javier Garcia-Bernardo, *Hidden Power of the Big Three? Passive Index Funds, Re-Concentration of Corporate Ownership, and New Financial Risk*, 19 BUS. & POL. 298, 311-12 (2017) (asserting that asset manager BlackRock "holds 5 percent blocks of stock in more than one-half of all listed companies in the United States").

[20] *See, e.g.*, Cara Lombardo & Laura Stevens, *Starboard, Elliott Management Call on eBay to Shed StubHub, Classifieds*, WALL ST. J., Jan. 22, 2019 at https://www.wsj.com/articles/elliott-management-calls-for-ebay-to-shed-stubhub-classified-ads-business-11548166204 (describing a block of less than 4% of eBay stock as "a large position"); Emily Winston, *Managerial Fixation and the Limitations of Shareholder Oversight*, 71 HASTINGS L. J. 699, 722 (2020) (describing as "relatively large" shareholdings in the 6% to 8% range); George S. Everly II., *Sovereign Wealth Funds and Shareholder Democratization: A New Variable in the CFIUS Balancing Act*, 25 MD. J. INT'L L. 374, 390-91 (2010) (using the word "large" to refer to an equity stake of 6%); Roberta S. Karmel, *Greenmail, the Control Premium and Shareholder Duty*, 48 WASH. & LEE L. REV. 937, 945 (1991) (describing a 3% block of stock as a "significant block of stock").

A few recent examples underscore the well-recognized influence of shareholders holding ownership interests in the 5% range:

- In May 2024, the *Wall Street Journal* reported that an investor, Irenic Capital Management, had "built a stake of nearly 5% in Forward Air" and was "privately" communicating with Forward Air's directors "calling for a board shake-up" and other options.[21]

- The same month, investor Browning West, holding "a stake of a little over 5%" in Canadian Gildan Activewear Inc., forced the company's entire board of directors to resign, "mark[ing] the second time that Gildan's board resigned en masse during its proxy battle with the Los Angeles-based investment firm."[22]

- Also in May 2024, the world's largest sovereign wealth fund, Norges Bank Investment Management, an "arm of Norway's central bank" and one of "the top 10 largest shareholders" in Exxon Mobil Corporation with a 1.4%

[21]   Lauren Thomas, *Activist Investor Irenic Builds Stake in Forward Air*, WALL ST. J., May 28, 2024, at https://www.wsj.com/business/logistics/activist-investor-irenic-builds-stake-in-forward-air-f2d213de.

[22]   Lauren Thomas, *Activist Browning West Scores Major Victory at Gildan Activewear*, WALL ST. J., May 24, 2024, at https://www.wsj.com/livecoverage/stock-market-today-dow-jones-05-24-2024/card/activist-browning-west-scores-major-victory-at-gildan-activewear-LvOBNKdsSDdyNiHJWkFp.

equity ownership interest, publicly announced that it would oppose a specific director in that company's annual election.[23]

A main lever of shareholder power is the threat to sell a block of stock.[24] As one researcher has observed, "the implicit or explicit threat of exit may be part of the explanation of why minority shareholders are able to" affect managerial decisions.[25] Exit via the sale of a block of stock that is 5% or more of total equity could negatively impact the stock price.[26] Explicit threats of exit by foreign governments are not without precedent. In 2016, for example, the government of

---

[23]    Dominic Chopping, *Norway's Oil Fund to Vote Against Exxon Mobil Amid Shareholder Rights Concern*, WALL ST. J., May 24, 2024, at https://www.wsj.com/business/energy-oil/norways-oil-fund-to-vote-against-exxon-mobil-amid-shareholder-rights-concern-cdb99398.

[24]    *See* Anat R. Admati & Paul Pfleiderer, *The 'Wall Street Walk' and Shareholder Activism: Exit as a Form of Voice*, 22 REV. FIN. STUD. 2445, 2446, 2448 (2009) (observing, in the context of a "large" shareholder, that "the threat of exit itself can be a form of shareholder activism" and "the threat of exit on the basis of private information can have a disciplinary impact").

[25]    *Id.* at 2478.

[26]    *See, e.g.*, Liz Hoffman, Corrie Driebusch & Tom McGinty, *Big Stock Sales Are Supposed to Be Secret. The Numbers Indicate They Aren't*, WALL ST. J., March 30, 2022 at https://www.wsj.com/articles/big-stock-sales-are-supposed-to-be-secret-the-numbers-indicate-they-arent-11648647914 (observing that "[i]nsiders who want to sell a slug of stock have a problem: Posting the order to a public exchange would likely tank the price"). The New York Stock Exchange defines a "block" of stock as "at least 10,000 shares or a quantity of stock having a market value of $200,000 or more, whichever is less." NYSE Rule 72.10. A holder of 5% or more of a company's stock has several options about how to exit the stock, including (but not limited to) a block trade.

Saudi Arabia publicly threatened to sell billions of dollars of U.S. assets, including stocks in U.S. companies, if Congress passed a bill holding the Saudi government responsible for the September 11, 2001 attacks.[27]

Another important lever of shareholder power is the vote; shareholders elect the board of directors. A shareholder's voting strength is enhanced by the phenomenon of broker-non-votes.[28] Because current rules prohibit brokers from voting their clients' shares for director elections—something that was once common—most corporate elections have large numbers of votes that are not exercised, known as "broker-non-votes." Broker-non-votes increase the voting power of votes actually cast at the meeting, so that a voting shareholder who holds 5% of shares generally will exercise more than 5% of the total vote. The rule change that prohibited brokers from voting their clients' stock—thereby increasing

---

[27] *See* Binyamin Appelbaum, *Saudi Threat to Sell U.S. Assets Could Hurt, but Mostly the Saudis*, N.Y. TIMES, April 19, 2016, at https://www.nytimes.com/2016/04/20/business/international/saudi-threat-to-sell-us-assetscould-hurt-but-mostly-the-saudis.html; Mark Mazzetti, *Saudi Arabia Warns of Economic Fallout if Congress Passes 9/11 Bill*, N.Y. TIMES, April 15, 2016, at: https://www.nytimes.com/2016/04/16/world/middleeast/saudi-arabia-warns-ofeconomic-fallout-if-congress-passes-9-11-bill.html.

[28] *See* Lisa M. Fairfax, *Mandating Board-Shareholder Engagement*, 2013 U. ILL. L. REV. 821, 827 (2013) (describing the history and explaining how "the ban on broker discretionary voting could have a considerable impact on shareholders' ability to influence director elections and corporate affairs").

the value of votes cast—is relatively recent; it went into effect in 2010.[29]

In 2008, at a hearing of the U.S.-China Economic and Security Review Commission on the national security implications of sovereign wealth fund investment in U.S. corporations, U.S. Senator Evan Bayh asserted that "it would be naïve for us to believe that influence [in a U.S. corporation] cannot be had for something less than a ten percent ownership stake."[30] Senator Bayh cited the example of a recent "change in leadership" at Citigroup, "our nation's largest bank," which he explained was "brought about, at least in part, by a Saudi prince whose ownership interest constituted about five percent."[31] In fact, the Prince

---

[29]    *See* "Order Approving Proposed Rule Change," Exchange Act Release No. 60215, 74 Fed. Reg. 33293 (July 1, 2009); J. Robert Brown Jr., *The Proxy Rules and Restrictions on Shareholder Voting Rights*, 47 SETON HALL L. REV. 45, 69-70 (2016) (describing how brokers obtained discretionary voting authority over clients' stock); Marcel Kahan & Edward Rock, *The Hanging Chads of Corporate Voting*, 96 GEO. L. J. 1227, 1250 (2008) (describing how brokers tended to vote uninstructed shares in accordance with the board's recommendations).

[30]    Statement of Evan Bayh, a U.S. Senator from the State of Indiana, IMPLICATIONS OF SOVEREIGN WEALTH FUND INVESTMENTS FOR NATIONAL SECURITY, HEARING BEFORE THE U.S.-CHINA ECONOMIC AND SECURITY REVIEW COMM'N, February 7, 2008, at 7.

[31]    *Id.*; *see also* Andy Serwer & Barney Gimbel, *Prince Alwaleed: Why Chuck Had to Go,* FORTUNE, Nov. 16 2007, at https://money.cnn.com/2007/11/08/news/companies/citigroup_alwaleed.fortune/index.htm. In 2011, Prince Alwaleed reportedly ousted Rebekah Brooks from UK company News Corp., where she was CEO. Prince Alwaleed held a 7% interest in that company. *See* Robert Mackey, *Saudi Investor Suggested Brooks Had to Go*, N.Y. TIMES, July 15, 2011, at https://archive.nytimes.com/thelede.blogs.nytimes.com/2011/07/15/saudi-investor-

owned 3.6% of Citigroup.[32] At the same hearing, a business school scholar testified that:

> The United States has campaign finance laws because Americans believe that campaign money can influence legislation and public policy. Hence, major holdings by sovereign funds in U.S. banks that are now emerging should be the focus of attention. It is hard to imagine that a U.S. executive will not be sensitive to the political concerns of large shareholders when they choose candidates to support for public office. You can't work for the Chinese government and not be looking over your shoulder.[33]

During a panel discussion at the hearing, another participant observed that "it's very difficult for any management team to tell a five percent shareholder no[,] or a 4.99 percent shareholder no, and I think that we genuinely delude ourselves into thinking that any U.S. regulatory apparatus of any size … could . . . effectively monitor all the different kinds of informal communications that take place between shareholders and managements of companies on an ongoing basis."[34]

---

suggested-brooks-had-to-go/, *archived at* https://perma.cc/T8DC-V39X.

[32]     *Id*.

[33]     Statement of Dr. Peter Morici, Professor, Robert H. Smith School of Business, University of Maryland, College Park, Maryland, IMPLICATIONS OF SOVEREIGN WEALTH FUND INVESTMENTS FOR NATIONAL SECURITY, HEARING BEFORE THE U.S.-CHINA ECONOMIC AND SECURITY REVIEW COMM'N, February 7, 2008, at 97.

[34]     Panel V: Discussion, Questions and Answers (remark of Alan Tonelson, Research Fellow, U.S. Business and Industry Council Educational Foundation, Washington DC), IMPLICATIONS OF SOVEREIGN WEALTH FUND INVESTMENTS FOR NATIONAL SECURITY, HEARING BEFORE THE U.S.-CHINA ECONOMIC AND SECURITY

The shareholder proposal mechanism, which is commonly used by shareholders of public companies to engage directly with management and influence the company's decision making, is available to holders of stakes well below 5%.[35] It is a powerful tool that small shareholders use to influence a corporation's policies and decision making.[36] Academic research establishes that corporate managers are sensitive to shareholder proposals and routinely engage with shareholders who bring proposals,[37] even though many of those shareholders own a small percentage of stock. Corporate managers and shareholder-proponents will negotiate over a proposal before it is published in the company's proxy statement, with the result that a significant proportion of proposals are withdrawn after the parties reach a settlement agreement. Thus, there are two key routes

---

REVIEW COMM'N, February 7, 2008, at 138; *see also* Paul Rose, *What Responsibilities Do Sovereign Funds Have to Other Investors*, 52 WAKE FOREST L. REV. 889, 904 (2017).

[35] Lucian Arye Bebchuk, *The Case for Increasing Shareholder Power*, 118 HARV. L. REV. 833, 846 (2005) ("Even shareholders with a very small stake may initiate shareholder resolutions, including resolutions that call for management to initiate a charter amendment or a reincorporation or urge that management adopt a certain policy or take a certain course of action.").

[36] *See generally*, Sarah C. Haan, *Shareholder Proposal Settlements and the Private Ordering of Public Elections*, 126 YALE L. J. 261 (2016).

[37] *See id.* at 290–93; Paul H. Edelman, Randall S. Thomas & Robert B. Thompson, *Shareholder Voting in an Age of Intermediary Capitalism*, 87 S. CAL. L. REV. 1359, 1369 (2014) ("Advisory shareholder votes can lead to important governance changes.").

through which the proposal mechanism empowers small shareholders: (1) through the publication of the proposal in the proxy statement, followed by a shareholder vote; and (2) through behind-the-scenes settlement processes that can result in corporate reforms without a shareholder vote.

When management receives a proposal, it will often contact the shareholder-proponent to discuss the proposal, and sometimes to negotiate the proposal away.[38] That is, the submission of a proposal to the corporation can set off a series of private negotiations and, if the shareholder-proponent withdraws the proposal before the proxy statement is published, the proposal will not appear in the proxy statement and the other shareholders may never learn about it. A high proportion of shareholder proposals are, in fact, settled behind the scenes. Sullivan & Cromwell reported that almost 34% of proposals submitted in the first half of 2023 did not go to a vote.[39] For 2022, the percentage was even higher, at approximately 39%.[40]

---

[38] Haan, *Shareholder Proposal Settlements*, 126 YALE L. J. at 295-96 (explaining reasons why a corporation's managers might "prefer to negotiate shareholder proposals away to avoid 'negative publicity or reputational damage' for the company, its directors or its executives").

[39] Sullivan & Cromwell LLP, *2023 Proxy Season Review: Part 1: Rule 14a-8 Shareholder Proposals* (Aug. 11, 2023) at 3. These were proposals on all subjects. Most proposals that did not go to a vote were likely settled, but a small number may have been excluded from the proxy statement for other reasons.

[40] *Id.*

The high rate of proposal settlements is important because it suggests that small shareholders may exercise considerable influence at public companies that is not visible to other shareholders or the public. Voting support for shareholder proposals has also been rising in general, which increases the potency of the threat of a proposal. Before 2016, it was unusual for a shareholder proposal to win a majority of votes, but today this is much less unusual. The prospect that a shareholder proposal opposed by the corporation's management might win the shareholder vote is apparently concerning enough to management that they will sometimes agree to make some or all of the shareholder's desired reforms in exchange for withdrawal of the proposal.

**C.    Delaware courts have found *control* of a corporation by a shareholder holding 10 - 15% equity ownership; if *control* can be achieved at those levels of stockholding, then it seems unremarkable that a foreign-government shareholder would have *influence* over the firm at 5% stockholding.**

In business litigation, courts are sometimes called upon to assess shareholder control over the enterprise.[41] Delaware courts have found it reasonable that a shareholder could exercise *control* of a corporation (for purposes of determining

---

[41]    As one scholar has explained, "The point at which a shareholder becomes a controlling shareholder varies with the facts and circumstances of each case. There is, for example, no minimum percentage ownership requirement that confers controlling status on a shareholder." Iman Anabtawi, *Some Skepticism about Increasing Shareholder Power*, 53 UCLA L. REV. 561, 593 n.171 (2006).

whether the shareholder owes fiduciary duties as a controller) at 10%,[42] "slightly more than 10%,"[43] and "less than 15%" stock ownership.[44] Mathematical voting control "is only one method of establishing controller status," Chancellor McCormick has explained.[45] "Ultimately," she wrote, "[i]t is impossible to identify or foresee all of the possible sources of influence that could contribute to a finding of actual control over a particular decision"; what is necessary is "a holistic evaluation of sources of influence."[46] If 10% to 15% shareholding is sufficient, when paired with other sources of influence, to establish *control*, it is reasonable to expect that shareholders owning 5% of a corporation's stock could exercise *influence* over the entity and its political spending.

---

[42]     *Tornetta v. Musk*, 310 A.3d 430, 500 n.556 (Del. Ch. 2024) (*citing Rosenthal v. Burry Biscuit Corp*., 60 A.2d 106, 110-11 (Del. 1948)).

[43]     *Id*. (*citing In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *41–46 (Del. Ch. May 6, 2021)).

[44]     *Id*. (*citing FrontFour Cap. Gp. LLC v. Taube*, 2019 WL 1313408, at *21–24 (Del. Ch. Mar. 11, 2019)).

[45]     *Id*. at 498.

[46]     *Id*. at 500 (quotations omitted).

**D.    Foreign-government shareholders may be in a position to exercise greater-than-average influence over corporate decisions-making compared to other types of shareholders.**

Foreign-government shareholders may be uniquely positioned to pressure a business entity's leadership and influence its decision-making behind-the-scenes. If the entity operates in the foreign country that is governed by the foreign-shareholder-government, then the entity is subject to regulation by its own shareholder, and may be particularly interested in pleasing that shareholder in order to receive favorable regulatory treatment from it. And foreign-government shareholders may have other unique forms of leverage. For example, in 2009, the *Wall Street Journal* reported that China had obtained a 3% discount on iron ore from Fortesque, a company in which it was a shareholder, by brokering loans to Fortesque from Chinese lenders.[47]

**E.    The District Court's order failed to consider changes to the corporate economy that have caused lawmakers, regulators, and courts to adjust assumptions about the percentage of shareholding that confers influence over a public company's board of directors.**

Years ago, when shareholding was atomized and shareholders were more passive—meaning that shareholders either did not vote at all or acquiesced in management's voting recommendations—management was likely to view a 5%

---

[47]    *See* Shai Oster, *China's Iron-Ore Discount Hinges on Granting Loans*, WALL ST. J., Aug. 18, 2009, at https://www.wsj.com/articles/SB125051798719736937.

block of stock as benign. This is no longer true. "There are numerous strategies that large investors can employ in their relations with management to further their private interests," explains one expert, describing shareholders extracting concessions from management "for agreeing to use its shareholdings to fend off an unwanted takeover."[48]

Changes to regulations that mandate tender offer disclosures demonstrate how lawmakers, regulators, and courts have had to adjust their assumptions about stockholding as the corporate economy changed. The growing hostile takeover threat in the 1960s led to Congress's enactment of the Williams Act, which regulates tender offers. "As originally enacted, [Section] 13(d) required the filing of a disclosure document with the SEC whenever any person (or group of persons) acquired more than 10 percent of a class of equity security of a company that was registered under the 1934 Act … Later, in 1970, however, Congress amended the statute to reduce the reporting threshold from 10 percent to 5 percent."[49]

Under the current version of the rules, a shareholder who acquires more than 5% of a company's stock must disclose this in a public filing within a matter of

---

[48] Iman Anabtawi, *Some Skepticism about Increasing Shareholder Power*, 53 UCLA L. REV. 561, 596 (2006).

[49] Therese H. Maynard, MERGERS AND ACQUISITIONS: CASES, MATERIALS, AND PROBLEMS 408 (4th ed. 2017).

days, along with certain information about itself.[50] More specifically, when a shareholder crosses the 5% threshold, the shareholder must file a Schedule 13D or Schedule 13G and disclose, among other things, the shareholder's name and citizenship.[51]

Since the 1970s and 1980s, the threat of the hostile takeover has given way to a trend of shareholder activism. Most activists "do not aim at accumulating large blocks of a target's stock, as smaller stakes (usually around 5 to 10 percent) may be enough to wage an effective proxy contest for director elections, especially if an activist can count on the support of institutional investors, as has frequently been the case."[52] This was exemplified in 2021, when a shareholder holding 0.02% of Exxon Mobil's stock ran four candidates for election to its board of directors. Three of its candidates won and, as a result, three incumbent directors lost their

---

[50]    *See* Iman Anabtawi, *Some Skepticism about Increasing Shareholder Power*, 53 UCLA L. REV. 561, 595-96 (2006) (describing these as "extensive disclosure requirements that impinge on investor privacy").

[51] Securities Exchange Act, Rule 13d-1, 17 C.F.R. § 240.13d-101.

[52]    Martin Cremers, Saura Masconale & Simone M. Sepe, *Activist Hedge Funds and the Corporation*, 94 WASH. U. L. REV. 261, 319 (2016).

positions.[53] "Analysts say it's hard to overstate the impact that Exxon's defeat will

have on corporations across the country," the *New York Times* reported.[54]

The impact of small-shareholder activism has catalyzed a trend of anti-

activist poison pills, in which corporate managers have repurposed the poison pill,

which was developed and used by corporate managers in the 1980s to defend

against hostile takeovers. Then-Vice Chancellor (now Chancellor) McCormick has

explained that:

> Stockholder activism' is a broad concept that refers to a range of
> stockholder activities intended to change or influence a corporation's
> direction. Activists may pressure a corporation to make management
> changes, implement operational improvements, or pursue a sale
> transaction. They may seek to catalyze or halt a merger or acquisition.
> More recently, "ESG activism" has come to the fore, and stockholders
> have begun pressuring corporations to adopt or modify policies to
> accomplish environmental, social, and governance goals.[55]

Of course, stockholders also stand in a position to pressure companies about their

electoral activities, including campaign finance expenditures. Chancellor

---

[53]    *See* Matt Phillips, *Exxon Board's Defeat Signals the Rise of Social-Good Activists*, N.Y. TIMES, June 9, 2021, at https://www.nytimes.com/2021/06/09/business/exxon-mobil-engine-no1-activist.html; Exxon Mobil Corporation Form 8-K, June 2, 2021 at https://ir.exxonmobil.com/static-files/6e0b2aef-43eb-4a52-bd34-92b283783b6c (reporting election results).

[54]    Phillips, *Exxon Board's Defeat*, *supra* note 53.

[55]    *The Williams Companies Stockholder Litigation*, 2021 WL 754593, at *29 (Del. Ch. Feb. 26, 2021).

McCormick explained further:

> Under Delaware law, the board of directors manages the business and affairs of the corporation. Thus, stockholder activism is directed to the board. And activists' ability to replace directors through the stockholder franchise is the reason why boards listen to activists. Most activists hold far less than a hard majority of a corporation's stock, making the main lever at an activist's disposal a proxy fight. In this way, stockholder activism is intertwined with the stockholder franchise."[56]

Shareholder activism is pursued by a range of institutional investors, including principally hedge funds. "Unlike corporate raiders, hedge fund activists do not seek full control of corporations. Rather, they buy a relatively small percentage of a company's stock, and use their stake to push for changes in the firm's business strategies and corporate governance practices, including running proxy contests to appoint their preferred board representatives and replacing current management."[57]

Twenty-first-century corporate managers have become sensitive to this threat of shareholder activism, at much lower shareholding percentages than the threats posed by corporate raiders in earlier decades.

For example, in *The Williams Companies Stockholder Litigation*, then-Vice Chancellor McCormick reviewed an anti-activist poison pill that had been created by the management of The Williams Companies at the beginning of the COVID-19

---

[56]    *Id.*

[57]    Ofer Eldar, Tanja Kirmse & Michael D. Wittry, *The Rise of Anti-Activist Poison Pills, ECGI Working Paper Series in Finance*, Working Paper No. 869/2023 (January 2023), at 1.

pandemic.[58] The pill's core features included a 5% ownership trigger and an "acting in concert" provision that captured shareholders acting together (in groups often called "wolf packs"[59]). Acting-in-concert provisions "aggregate[] the ownership stakes of all acquirers that coordinate their purchases or are influenced by each other's purchases" for purposes of determining whether a holding threshold is triggered.[60] The opinion notes that the dollar amount of a 5% block of stock at The Williams Companies in March 2020, when the anti-activist poison pill was adopted, was approximately $650 million.[61] This is no *de minimis* amount.

The Williams Companies' management had identified shareholder activism at this level—5% ownership in a single holder or "wolf-pack"/"acting in concert" group—as so serious a threat to the corporation's strategies that it needed to implement an "extreme" defensive tactic to fend them off.

Although the Vice Chancellor ultimately concluded that "all stockholder efforts to change or influence corporate direction" at the 5% level could not,

---

[58]    *The Williams Companies Stockholder Litigation*, *supra* note 55.

[59]    *See* Anita Indira Anand, *Shareholder-Driven Corporate Governance and Its Necessary Limitations: An Analysis of Wolf Packs*, 99 B.U. L. REV. 1515, 1516 (2019) ("A wolf pack is a loose network of parallel-minded shareholders (typically hedge funds) that act together to effect change in a given corporation without necessarily disclosing their collective interest.")

[60]    Eldar et al., *supra* note 57, at 12.

[61]    *The Williams Companies Stockholder Litigation*, 2021 WL 754593, at *10.

without more, "constitute a cognizable threat under the first prong of *Unocal*,"[62] the question in this case is not whether shareholder activism rises to the level of a threat cognizable under that high legal standard, which relates to the Board's fiduciary duties, but rather whether it *influences corporate direction*. The fact that The Williams Companies' Board adopted the anti-activist poison pill in the first place—using the 5% aggregate trigger—demonstrates that the Board feared the power of shareholders with a "toehold" of that size. A 2023 study of anti-activist poison pills found that more than 40 percent had trigger thresholds of only 5% stockholding, suggesting that such fear among boards has become common.[63]

Finally, it is not true to state, as the District Court did, that the 5% threshold would "deprive … potentially as much as 95% of an entity's shareholders" of their First Amendment rights. (Order at 34.) The fact that 95% of a company's stock is held by parties who are *not* a foreign government or a foreign-government-owned entity tells us nothing about the number or percentage of its shareholders who have First Amendment rights; the company could have anywhere from one to one million or more U.S. shareholders. It also could also have numerous private citizen

---

[62]     *Id.* at *30 (citing *Unocal v. Mesa Petroleum Co.*, 492 A.2d 946 (Del. 1985)).

[63]     Eldar et al., *supra* note 57, at 2.

shareholders who are foreign nationals and have no First Amendment right to political speech.[64]

## IV. CONCLUSION

For the foregoing reasons, the judgment of the U.S. District Court for the District of Maine that the Act's 5% foreign-government ownership threshold was arbitrary and overbroad and thus not narrowly tailored to Maine's interest in limiting foreign-government influence on elections is incorrect and should be reversed.

Dated: June 17, 2024   Respectfully submitted,

           *AMICI CURIAE* CORPORATE AND
           SECURITIES LAW EXPERTS

           By their attorneys,

           */s/ Shannon Liss-Riordan*
           Shannon Liss-Riordan, CAB # 77877
           Jack Bartholet, CAB # 1211802
           LICHTEN & LISS-RIORDAN, P.C.
           729 Boylston Street, Suite 2000
           Boston, MA 02116
           Telephone: (617) 994-5800
           Facsimile: (617) 994-5801
           sliss@llrlaw.com
           jbartholet@llrlaw.com

---

[64]  *See* Leo E. Strine Jr. & Jonathan Macey, *Citizens United as Bad Corporate Law*, 2019 Wis. L. Rev. 451, 505 (2019) (noting that "[m]any corporations that are incorporated in the United States have large numbers of foreign stockholders").

_____

**Certificate of Compliance With Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

_____

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this brief contains 6484 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point.

*/s/ Shannon Liss-Riordan*
Attorney for *Amici Curiae*

Dated: June 17, 2024

**UNITED STATES COURT OF APPEALS**

**For the First Circuit**
**Appeal No. 24-1265**
_____

**CERTIFICATE OF SERVICE**
_____

I hereby certify that, on June 22, 2024, I electronically filed the foregoing

with the Clerk of the United States Court of Appeals for the First Circuit by using

the appellate CM/ECF system, which will send a notification of such filing to all

counsel of record.

*/s/ Shannon Liss-Riordan*
Attorney for *Amici Curiae*

Dated: June 22, 2024

# ADDENDUM: DESCRIPTION OF *AMICI CURIAE*[65]

Sarah C. Haan
Class of 1958 Uncas and Anne McThenia Professor of Law
Washington and Lee University School of Law

Benjamin P. Edwards
Professor of Law
University of Nevada, Las Vegas
William S. Boyd School of Law

Gina-Gail S. Fletcher
Professor of Law
Duke University School of Law

George S. Georgiev
Associate Professor of Law
Emory University School of Law

Andrew Jennings
Associate Professor of Law
Emory University School of Law

Paul Rose
J. Gilbert Reese Chair in Contract Law
Executive Director, Program on Law, Finance & Governance
Ohio State University—Moritz College of Law

Faith Stevelman
Professor of Law
New York Law School

Ciara Torres-Spelliscy
Professor of Law
Stetson University College of Law

---

[65] Affiliations are provided for identification purposes only.

Anne M. Tucker
Professor of Law
Georgia State University College of Law

Cynthia A. Williams
Roscoe C. O'Byrne Chair in Law
Indiana University Maurer School of Law

Karen Woody
Associate Professor of Law
Washington and Lee University School of Law