# United States Court of Appeals

*for the*

# First Circuit

---

Case No. 24-1265

---

CENTRAL MAINE POWER COMPANY; VERSANT POWER; ENMAX
CORPORATION; MAINE PRESS ASSOCIATION; MAINE ASSOCIATION
OF BROADCASTERS; JANE P. PRINGLE, individually and in her capacity as a
registered voter and elector; KENNETH FLETCHER, individually and in his
capacity as a registered voter and elector; BONNIE S. GOULD, individually and
in her capacity as a registered voter and elector; BRENDA GARRAND,
individually and in her capacity as a registered voter and elector; LAWRENCE
WOLD, individually and in his capacity as a registered voter and elector,

*Plaintiffs-Appellees,*

v.

MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION
PRACTICES; WILLIAM J. SCHNEIDER, in his official capacity as Chairman of
the Maine Commission on Governmental Ethics and Election Practices;

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE, BANGOR, IN CASE NO. 1:23-CV-00450-NT,
HONORABLE NANCY TORRESEN, U.S. DISTRICT JUDGE

---

## BRIEF FOR *AMICUS CURIAE* FREE SPEECH FOR PEOPLE IN SUPPORT OF DEFENDANTS-APPELLANTS AND VACATUR

---

AMIRA MATTAR (#1211903)
JOHN BONIFAZ (#73656)
BEN CLEMENTS (#30192)
COURTNEY HOSTETLER (#1164088)
FREE SPEECH FOR PEOPLE
*Attorneys for Amicus Curiae*
48 North Pleasant Street, Suite 304
Amherst, Massachusetts 01002
(617) 244-0234
amattar@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
chostetler@freespeechforpeople.org

DAVID R. HASTINGS, III, in his official capacity as a Member of the Maine Governmental Ethics and Election Practices; SARAH LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; STACEY D. NEUMANN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in his official capacity as Attorney General for the State of Maine,

*Defendants-Appellants.*

**Corporate Disclosure Statement**

Amicus curiae is a nonprofit, nongovernmental organization operating under § 501(c)(3) of the Internal Revenue Code. It has no parent corporation nor is owned in part by any publicly held corporation. It has no publicly-traded stock.

# Table of Contents

**Page**

Corporate Disclosure Statement ...............................................................i

Table of Contents  ................................................................... ii

Table of Authorities ................................................................ iii

Interest of Amicus Curiae ......................................................1

Introduction ............................................................................2

Summary of Argument...........................................................4

Argument................................................................................5

I.     The Act advances Maine's compelling interest to preserve
democratic self-government ...........................................5

II.    The triggering threshold of the Act is narrowly tailored...............................12

    a.    The Act does not limit the First Amendment rights of U.S.
investors.................................................................12

    b.    Five percent ownership exceeds the level at which foreign
government-investors may influence a corporate entity ....................17

    c.    Evidence of influence by a foreign government in a domestic
corporation is not required for Maine to advance its
compelling interest ...........................................24

Conclusion ...........................................................................27

**Cases:**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.,*
    591 U.S. 430 (2020)..................................................................................11

*Ambach v. Norwick,*
    441 U.S. 68 (1979)....................................................................................8

*Bernal v. Fainter,*
    467 U.S. 216 (1984)..................................................................................7

*Bluman v. FEC,*
    800 F. Supp. 2d 281 (D.D.C. 2011), *aff'd,* 565 U.S. 1104 (2012).........*passim*

*Brnovich v. Democratic Nat'l Comm.,*
    594 U.S. 647 (2021)............................................................................24, 25

*Burson v. Freeman,*
    504 U.S. 191 (1992).......................................................................... 25-26

*Cabell v. Chavez–Salido,*
    454 U.S. 432 (1982)..................................................................................8

*Caperton v. A.T. Massey Coal Co.,*
    556 U.S. 868 (2009)................................................................................26

*Central Maine Power Co. v.*
    *Maine Comm'n on Governmental Ethics & Election Prac.,*
    No. 23-CV-00450, 2024 WL 866367 (D. Me. Feb. 29, 2024)..............*passim*

*Citizens United v. FEC,*
    558 U.S. 310 (2010)..............................................................................*passim*

*FEC v. Wisconsin Right to Life, Inc.,*
    551 U.S. 449, 464 (2007), *aff'd,* 565 U.S. 1104 (2012)...................................5

*Foley v. Connelie,*
    435 U.S. 291 (1978)..................................................................................8

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972)................................................................................13

*Regan v. Taxation With Representation of Washington,*
    461 U.S. 540 (1983)................................................................................15

*United States v. O'Brien,*
    391 U.S. 367 (1968) ................................................... 13

*United States v. Robert Menendez et al.,*
    23 Crim. 490 (S.D.N.Y. 2023) ................................... 24

*Wagner v. FEC,*
    793 F.3d 1 (D.C. Cir. 2015) ....................................... 25

*Ysursa v. Pocatello Educ. Ass'n,*
    555 U.S. 353 (2009) ................................................... 15

## Statutes & Other Authorities:

U.S. Const., amend. I ........................................... *passim*

1st Cir. R. 29(a)(4)(E) ................................................ 1

15 U.S.C. § 78m(d)(1) ............................................. 20

15 U.S.C. § 78m(d)(2) ............................................. 20

15 U.S.C. § 78m(d)(3) ............................................. 20

22 U.S.C. § 611(b)(1) ................................................. 2

26 U.S.C. § 501(c)(3) ............................................... 15

46 U.S.C. § 55102 ..................................................... 11

46 U.S.C. § 55103 ..................................................... 11

47 U.S.C. § 310(b)(3) ............................................... 11

52 U.S.C. § 30121(a) .............................................. 2, 7

52 U.S.C. § 30121(a)(1)(A) ........................................ 2

52 U.S.C. § 30121(b) .................................................. 2

17 C.F.R. § 240.14a-19 ............................................ 19

17 C.F.R. § 240.14a-8 .............................................. 18

17 C.F.R. § 240.14a-8(b) ......................................... 18

17 C.F.R. § 240.13d-1 .............................................. 20

17 C.F.R. § 240.13d-101 ......................................... 20

84 Fed. Reg. 66458 ................................................. 18

85 Fed. Reg. 70240 ...........................................................................18

85 Fed. Reg. 70241 ...........................................................................18

Fed. R. App. P. 29(a)(4)(e) .............................................................1

21-A M.R.S. § 1064 .....................................................................4, 5

*Apple Inc.*, CNBC, https://www.cnbc.com/quotes/AAPL?tab=ownership (last visited June 14, 2024) ...............................................21

Bernard Vaughan, *Global Power of ExxonMobil Spotlighted in New Coll Book*, Reuters (Apr. 27, 2012), https://www.reuters.com/ article/books-exxonmobil-idUSL2E8FQP6B20120427 ..............................26

Dan Primack, *Yuri Milner adds $1.7 billion to his VC war chest*, Fortune (Aug. 3, 2015)..............................................................................26

*DoorDash Inc.*, CNBC, https://www.cnbc.com/quotes/DASH?qsearchterm= (last visited June 14, 2024)...............................................................................21

Edward B. Rock, *Adapting to the New Shareholder-Centric Reality*, 161 U. Pa. L. Rev. 1907 (2013)..............................................................22

FEC, *Transcript of Forum: Corporate Political Spending and Foreign Influence, Second Panel* (June 23, 2016) ......................................19

GIC Private Limited, https://www.gic.com.sg/ (last visited June 14, 2024)...........21

Henry Hansmann & Reinier Kraakman, *The End of History for Corporate Law*, 89 Geo. L.J. 439 (2001) .................................................. 21-22

Jill E. Fisch & Simon M. Sepe, *Shareholder Collaboration*, 98 Tex. L. Rev. 863, 864-65 (2020)..............................................................22

John C. Coates IV et al., *Quantifying Foreign Institutional Block Ownership At Publicly Traded U.S. Corporations,* Harv. L. Sch. John M. Olin Ctr. For Law, Econ. & Bus., Discussion Paper No. 888 (Dec. 20, 2016), Free Speech For People Issue Report 2016-01, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2857957 .....................2

Kenneth Lovett, *Airbnb to spend $10 million on Super PAC to fund pre-election day ads*, N.Y. Daily News (Oct. 11, 2016)......................................26

Lillian Rizzo & Alex Sherman*, "Nelson Peltz Increases Disney Stake, Reignited Potential Proxy Battle,"* CNBC (Oct. 9, 2023) ............................20

v

Ltr. from Professor John Coates to California Assemb. (Jan. 5, 2024)...........*passim*

Michael R. Levin, *Activist Wins Another Vote Under Universal Proxy*, Harv. L. Sch. Forum on Corporate Governance (May 18, 2023) .................19

Michelle Ye Hee Lee*, Pro-Jeb Bush super PAC improperly accepted $1.3 million from Chinese-owned company, FEC says*, Wash. Post (Mar. 11, 2019) ......................................................................... 24-25

Norges Bank Investment Management, https://www.nbim.no/en/ (last visited June 14, 2024)....................................................................21

Robert J. Rhee, *A Legal Theory of Shareholder Primacy*, 102 Minn. L. Rev. 1951 (2017) ..............................................................................22

Scott Austin, *Airbnb: From Y Combinator to $112M Funding in Three Years*, Wall Street Journal (July 25, 2011).....................................26

SEC, *Transcript of the Roundtable on the Proxy Process* (Nov. 15, 2018)...........19

Simon Clark, *Saudi Wealth Fund May Be the World's Least Transparent*, Wall Street Journal (Nov. 1, 2016)................................................23

Steve Rosenthal & Theo Burke, *Who's Left to Tax? US Taxation of Corporations and Their Shareholders*, Urban-Brookings Tax Policy Ctr. (Oct. 27, 2020), https://bit.ly/3uLjVqE ....................................2

*Uber Technologies Inc.*, CNBC, https://www.cnbc.com/quotes/UBER?tab=ownership (last visited June. 14, 2024).............................................................................23

*Walt Disney Co.*, CNBC, https://www.cnbc.com/quotes/DIS?qsearchterm=walt%20disney (last visited June 14, 2024).........................................................19

**Interest of Amicus Curiae[1]**

Free Speech For People ("FSFP") is a national, non-partisan nonprofit public interest organization dedicated to ensuring equal and meaningful participation in democracy by challenging big money in politics, confronting corruption in government, fighting for free and fair elections, and advancing a new jurisprudence grounded in the promises of political equality and democratic self-government. FSFP has approximately 1,877 supporters in Maine.[2]

Since its founding in 2010, FSFP has been the leading organization in the country to challenge foreign-influenced corporations from interfering in U.S. elections. In consultation with constitutional and corporate governance experts, FSFP has researched, drafted, and successfully fought for state and local legislation to prohibit political spending by foreign-influenced corporations across the country, including in the state of Minnesota, and in the cities of San Jose, California and Seattle, Washington. Its model legislation to bar foreign-influenced corporations from spending money in U.S. elections has also been introduced in several other state legislatures and in the U.S. Congress.

---

[1] FSFP sought and received the consent of all parties prior to the filing of this amicus brief.

[2] Pursuant to Fed. R. App. P. 29(a)(4)(e) and 1st Cir. R. 29(a)(4)(E), no party or party's counsel authored or contributed money to fund this brief in whole or part, and no person or entity other than amicus or its counsel contributed monetarily to preparation or submission of this brief.

## Introduction

The United States has long prohibited *any* spending, either directly or indirectly, in local, state, or federal elections by foreign persons or entities, 52 U.S.C. § 30121(a),[3] a prohibition upheld by the U.S. Supreme Court based on the compelling state interest of preserving democratic self-government. *Bluman v. FEC,* 800 F. Supp. 2d 281 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012). But the state's ability to run its elections free from foreign influence is at risk. Due to the rapid expansion of foreign investment in U.S. corporations that is occurring in lockstep with the exponential growth of corporate spending on elections,[4] in the absence of appropriate legislation, corporations influenced by powerful foreign governments can and do spend unlimited amounts of money on U.S. elections to advance and

---

[3] 52 U.S.C. § 30121(a)(1)(A) makes it unlawful for a foreign national "directly or indirectly, to make a contribution or donation of money . . . in connection with a Federal, State, or local election . . . ." A "foreign national" is defined under 52 U.S.C. § 30121(b) as "a foreign principal, as such term is defined by section 611(b) of title 22 . . . ," which includes "a government of a foreign country and a foreign political party . . . ." 22 U.S.C. § 611(b)(1).

[4] In 1982, only five percent of all corporate equity in the United States came from foreign investments. It took just over thirty years for that figure to quadruple to twenty percent by 2015. Just four years later, it doubled again; by 2019, the figure hovered around forty percent of all corporate equity in the country. John C. Coates IV et al., *Quantifying Foreign Institutional Block Ownership At Publicly Traded U.S. Corporations,* Harv. L. Sch. John M. Olin Ctr. For Law, Econ. & Bus., Discussion Paper No. 888 (Dec. 20, 2016), Free Speech For People Issue Report 2016-01, p. 14, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2857957; Steve Rosenthal & Theo Burke, *Who's Left to Tax? US Taxation of Corporations and Their Shareholders*, Urban-Brookings Tax Policy Ctr., paper presented at N.Y.U. (Oct. 27, 2020), https://bit.ly/3uLjVqE.

protect the interests of foreign government investors, owners, and shareholders. This foreign government influence in elections undermines democratic self-government.

To protect its democratic self-government, Maine voters—85% of them—resoundingly passed a sensible, targeted ballot measure to block foreign government-owned corporations from spending money in Maine elections. But despite the narrow framing of the ballot measure, the district court, at the behest of a small group of corporate interests, enjoined the people's law on the eve before it was slated to go into effect, concluding that the law's application to corporations with 5% or more foreign government ownership was not "narrowly tailored" to meet the state's compelling interest in protecting its elections from foreign interference.

The district court's ruling should be vacated. Its opinion is based on an incorrect understanding that *Citizens United v. FEC*, 558 U.S. 310 (2010), creates an absolute right to spend unlimited amounts to influence our elections, even if those companies are substantially owned by foreign entities that otherwise are federally prohibited from spending money in U.S. elections. It does not. This broad interpretation cannot be squared with *Bluman*, a decision affirmed by the Supreme Court *after* its *Citizens United* decision, which held that the government's compelling interest in preserving democratic self-government justifies a ban on *all* foreign political spending, both directly and indirectly. Further, contrary to the

district court decision, the law's 5% ownership threshold is narrowly tailored to advance the interest in protecting self-government and is based on data, which the district court largely ignored. The evidence shows that shareholders at that ownership level (and below) have substantial ability to influence corporate decisions and may exercise significant control over questions of corporate political spending.

## Summary of Argument

In November 2023, Maine voters overwhelmingly voted in favor of a ballot measure that prohibits foreign government-owned corporations from interfering in elections. That ballot measure, codified at 21-A M.R.S. § 1064 (the "Act"), is constitutional because it advances a compelling state interest, and is narrowly tailored to do so.

First, the Supreme Court has affirmed that the government has a compelling interest in "limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012). The Supreme Court's decision in *Citizens United v. FEC*, 558 U.S. 310 (2010), is not to the contrary, because *Citizens United* did not involve foreign-influenced corporations. Indeed, as the *Citizens United* decision itself repeatedly observed, that case dealt only with corporate entities consisting of "associations of [U.S.] citizens." *Id.* at 349, 354, 356. The later-decided *Bluman*

4

decision, rather than *Citizens United*, governs regulations targeted at foreign spending in elections, such as the Act now challenged here.

Second, the Act is narrowly tailored, excluding only those corporations in which foreign governments hold 5% or greater ownership. This threshold reflects and aligns with established standards of corporate governance.

## Argument

### I. The Act advances Maine's compelling interest to preserve democratic self-government.

Maine Statute 21-A M.R.S. § 1064 is "narrowly tailored to advance a compelling government interest." *Bluman v. FEC*, 800 F. Supp. 2d 281, 286 (D.D.C. 2011) (Kavanaugh, J.) (citing *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 464 (2007), *aff'd*, 565 U.S. 1104 (2012)).

A year after the Supreme Court's ruling in *Citizens United*, a three-judge panel of the U.S. District Court for the District of Columbia, led by then-Judge Brett Kavanaugh of the U.S. Court of Appeals for the D.C. Circuit, sitting by designation, was asked to consider the constitutionality of a long-standing federal law that prohibited *any* foreign national from "directly or indirectly" spending on U.S. elections. *Bluman v. FEC,* 800 F. Supp. 2d 281. One of the plaintiffs was a long-term legal resident who wanted to make limited independent expenditures to print and distribute fliers in support of a presidential candidate. The court upheld the law's total prohibition on contributions and expenditures by foreign individuals or entities

as constitutional.  As Judge Kavanaugh wrote, "*Citizens United* is entirely consistent with a ban on foreign contributions and expenditures." *Id*. at 289. The government has a compelling interest to preserve democratic self-government against encroachment of foreign interests and money—an interest at issue in *Bluman* and here, but not in *Citizens United*.

In *Citizens United*, the Supreme Court struck down restrictions on corporate independent expenditures, concluding that the government cannot limit independent expenditures based on the speaker's corporate identity. 558 U.S. 310, 365 (2010). The Court held that First Amendment protections extended to corporations when a corporation is an "association of citizens." *Id*. at 349, 354, 356. With regards to regulating political spending by *citizens* and *associations of citizens*, the Court held that it would only recognize corruption and the appearance of corruption to be a compelling state interest. *Id*. at 357 ("For the reasons explained above, we now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption.").

*Citizens United* did not consider the question of corporate political spending made by those other than "associations of citizens," such as foreign nationals, foreign corporations, corporations with meaningful foreign ownership, or other foreign-influenced entities. To the contrary, the Supreme Court expressly left that question for another day. *Id*. at 362 ("We need not reach the question whether the

Government has a compelling interest in preventing foreign individuals or associations from influencing our Nation's political process.").[5]

That day came in January 2012, when the Supreme Court affirmed the three-judge district court's opinion in *Bluman* that a total ban on foreign nationals' election spending under 52 U.S.C. § 30121(a) was constitutional. *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012). In upholding the prohibition, the Court affirmed that when it comes to election spending—directly or indirectly—by foreign entities, the state has a separate distinct interest: that of preserving democratic self-government. *Id.* at 287 (collecting cases).

The district court in *Bluman* explained that "the Supreme Court has drawn a fairly clear line: The government may exclude foreign citizens from activities 'intimately related to the process of democratic self-government.'" *Id.* (quoting *Bernal v. Fainter*, 467 U.S. 216, 220 (1984)). Indeed, the *Bluman* district court echoed an assertion made by the Supreme Court that preservation of democratic self-

---

[5] The district court misinterpreted this passing reference. *Central Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Prac.*, No. 23-CV-00450, 2024 WL 866367, at *14 (D. Me. Feb. 29, 2024). It is not, as the district court held, an "observation" on the constitutionality of laws not before it, but rather dicta about the type of issue that the decision was *not* addressing. *Citizens United*, 558 U.S. at 362 ("We need not reach the question whether the Government has a compelling interest in preventing foreign individuals or associations from influencing our Nation's political process."). Far from granting foreign-influenced corporations with unchecked power to spend money on U.S. elections, *Citizens United* expressly declined to address whether the government has a compelling interest in limiting foreign influence over the political process. *Id.*

government is not merely a compelling state interest, but an obligation: "a State's historical power to exclude aliens from participation in its democratic political institutions [is] part of the sovereign's obligation to preserve the basic conception of a political community." *Id.* (citing *Foley v. Connelie,* 435 U.S. 291, 295-96 (1978)) (alteration in original).[6]

Analyzing a line of cases related to the compelling interest in preserving self-government, *Bluman* explained:

> We read these cases to set forth a straightforward principle: it is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government. **It follows, therefore, that the United States has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government,** and in thereby preventing foreign influence over the U.S. political process.

*Id.* at 288 (emphasis added).

---

[6] This line of cases has justified restrictions that limit foreign citizens from participating in certain activities more tangential to our democratic self-government than election spending. *See, e.g.*, *Cabell v. Chavez–Salido*, 454 U.S. 432 (1982) (upholding a law barring foreign citizens from working as probation officers); *Ambach v. Norwick*, 441 U.S. 68 (1979) (upholding a law barring foreign citizens from teaching in public schools unless they intend to apply for citizenship); *Foley v. Connelie*, 435 U.S. 291 (1978) (upholding a law barring foreign citizens from serving as police officers). Those restrictions—on those who reside and wish to work in the United States— concern aspects of U.S. society less central to our democratic self-government than elections and political spending, and all involve plaintiffs who have significantly greater stake in the wellbeing of American society than the foreign governments and foreign-influenced corporations whose money is being restricted here.

The state's interest derives from the stake that individuals have in the democracy. While citizens and lawful permanent residents "have a long-term stake in the flourishing of American society . . . temporary resident foreign citizens by definition have only a short-term interest in the national community." *Id.* at 291. A foreign *government* has even less interest—indeed, has *no* interest—in this country's national community, whether short- or long-term. If the state's compelling interest in preserving democratic self-government allows for the total prohibition of *any* political spending by foreign individuals, even those who are long-term legal residents of our country, then surely it must allow Maine to close the legal door that would otherwise allow unlimited funds to be spent by corporations influenced by foreign government shareholders.

Then-Judge Kavanaugh confirmed that *Bluman* "does not implicate those debates" raised in *Citizens United*, or other "First Amendment issues raised by campaign finance laws" in previous decades. *Id.* at 286 (citing *Citizens United*, 558 U.S. 310). Rather, the political spending at issue in *Bluman* implicated the "foundational question about the definition of the American political community and, in particular, the role of foreign citizens in the U.S. electoral process." *Id.*

This foundational question is also at the core of Maine's ballot measure. This is not a case about limiting spending in elections to prevent corruption between U.S. citizens, but rather to protect Maine's democratic self-government from foreign

government influence. Political spending by foreign entities, especially foreign governments, goes to the heart of our democratic self-government. Indeed, the threat to democratic self-government presented by foreign government funding of political spending dwarfs any such threat posed by the political spending of most individual foreign citizens. If that threat justifies a complete ban on political spending by all individual foreign citizens, as upheld in *Bluman,* it follows *a fortiori* that it justifies Maine's restriction on spending by corporations influenced by foreign governments.

In its ruling, the district court correctly acknowledged the compelling interest identified in *Bluman* allows Maine to prohibit the participation of foreign governments in elections. *Central Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Prac.*, No. 23-CV-00450, 2024 WL 866367, at *12 (D. Me. Feb. 29, 2024). It conceded that "[f]oreign governments are obviously not members of the American political community, and like the foreign citizens in *Bluman*, they likely can be barred from election spending in Maine." *Id.* at *13. But the court then misconstrued *Citizens United* as carving out a broad exception to that principle, even though *Citizens United* was decided before *Bluman* and, by its own terms, applied only to corporations consisting of "associations of citizens." *Citizens United*, 558 U.S. at 349, 354, 356. The district court's interpretation is contrary to the reasoning of both *Bluman* and *Citizens United*.

Maine's compelling interest in preserving its democratic self-governance does not vanish merely because a foreign government has commingled with the U.S. citizens in that corporation. And a foreign entity's affiliation with U.S. investors does not free the foreign entity of the restrictions that the government may place on their activity to preserve the core functions of self-governance for U.S. citizens and permanent residents. As the Supreme Court explained in *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc*., U.S. entities "cannot export their own First Amendment rights" to the foreign entities with which they associate. 591 U.S. 430, 436-38 (2020) (rejecting constitutional challenge to statute that imposed speech-related funding conditions on foreign entities that were affiliated with American organizations).[7] Indeed, the government has long regulated foreign ownership and even foreign employment in multiple industries. *See, e.g.,* 46 U.S.C. §§ 55102-03 (vessels transporting cargo between two points in the United States must be U.S.-built and owned and crewed by U.S. citizens); Communications Act of 1934, codified as amended at 47 U.S.C. § 310(b)(3) (limiting broadcast and common carrier licenses to companies with 20% foreign ownership).

---

[7] In *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.,* the Court did not reach the question of whether the government had a compelling interest in restricting the speech of foreign organizations operating abroad because it determined that, despite those organizations' close affiliation with U.S.-based institutions, they had no First Amendment rights to assert. 591 U.S. at 438.

In other words, U.S. shareholders of corporations cannot extend constitutional protection to fellow foreign government investors that have no First Amendment right to spend money in U.S. elections in the first place.

## II. The triggering threshold of the Act is narrowly tailored.

In holding that the Act was likely to be found insufficiently narrowly tailored to the government's compelling interest in protecting self-governance, the district court eschewed any analysis and instead offered two conclusory assertions: that, (a) the law effectively deprives U.S. citizen shareholders "of their First Amendment right to engage in campaign spending;" and, (b) the 5% threshold was "arbitrarily chosen." *Central Maine Power Co.*, 2024 WL 866367, at *14. Neither conclusion has merit nor justifies the court's determination that the law is likely unconstitutional.

### a. The Act does not limit the First Amendment rights of U.S. investors.

The district court declared that it could not reconcile the Act with *Citizens United* because the "5% threshold would deprive the United States citizen shareholders – potentially as much as 95% of an entity's shareholders – of their First Amendment right to engage in campaign spending." *Central Maine Power Co.*, 2024 WL 866367, at *14. The district court's conclusory assertion is fundamentally flawed for several reasons.

First, the court's assertion that the Act deprives U.S. investors of foreign-government-influenced corporations "of their First Amendment right to engage in political spending" is, simply stated, not true. *Id.* Rather, the law directly restricts only the ability of foreign government-influenced corporations from spending their general treasury funds in Maine elections and, at most, indirectly limits the ability of U.S. investors to spend their money through the vehicle of a corporation in which they share ownership with a foreign government.

When the government regulates speech in line with an important interest, incidental limitations on protected speech do not render the regulation unconstitutional. *United States v. O'Brien,* 391 U.S. 367, 377 (1968). Those limitations are generally upheld; otherwise, under the First Amendment, "every claim would prevail, in which case [the government interest] becomes a nullity . . . ." *Kleindienst v. Mandel,* 408 U.S. 753, 768 (1972) (upholding denial of visa to foreign academic invited by U.S. scholars who claimed a First Amendment right "to meet and speak with" the academic).

Here, an individual U.S. investor can continue to spend unlimited amounts of their *own* money on elections. They can donate to candidate campaigns and referenda committees or pay to print political flyers in the park as any other citizen might do. They can urge the corporation to engage in lobbying and make public statements. They can participate in a corporate political action committee that is

limited to owners that are not foreign governments. They can join other U.S. citizens in a corporation that spends *its* treasury funds on political campaigns. The challenged law only prohibits U.S. investors from seeking to impact elections in the *capacity* of a corporation when that corporation is significantly owned by a foreign government, a restriction that is justified by Maine's compelling interest to preserve elections from unlawful foreign government influence.

Second, the district court again misconstrues *Citizens United* in suggesting that the Act's 5% threshold cannot be reconciled with that decision. Nothing in *Citizens United* suggests that U.S. investors have a First Amendment right to engage in political spending through *any* legal entity they choose. To the contrary, the Court expressly and repeatedly limited its analysis to corporations consisting of "associations of citizens." *Citizens United*, 558 U.S. at 349, 354, 356. No associations of citizens is affected by the Act; at best, the foreign-government-influenced corporations prohibited from political spending pursuant to the Act are mixed associations of citizens and foreign governments.

Third, the district court's assumption that the individual right to engage in political spending includes the right to engage in such spending through any corporate entity in which the individual is invested is untenable and contrary to well-established First Amendment law. Whether and to what extent corporate entities are protected by the First Amendment has always depended on the specific nature and

function of the corporate entity. For example, it is well-established that municipal corporations have no First Amendment rights. *See, e.g., Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009). Municipal corporations in the United States consist primarily and, in most cases, exclusively of U.S. citizens. Under the district court's analysis, *Citizens United* would require a new right of municipal corporations to engage in political spending, but no court has so held and *Ysursa* remains controlling law.

Similarly, not-for-profit organizations established by U.S. citizens to advocate for a social cause or mission under 26 U.S.C. § 501(c)(3) are restricted from influencing legislation and may "not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." The mere fact that the organization consists primarily or exclusively of U.S. citizens who each hold a First Amendment right to engage in political activity does not create an absolute First Amendment right of the not-for-profit corporation to engage in political activity; nor does it render the government interest in regulating that speech void. *See Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 546 (1983) (rejecting First Amendment challenge to prohibition on lobbying activities of entities established under Section 501(c)(3)).

Just as the government may restrict the speech of municipal corporations without violating the First Amendment rights of their citizens, or prohibit political spending by not-for-profit corporations without violating the First Amendment rights of the owners of those not-for-profits, Maine's restriction on the political spending of corporations partially owned by foreign governments does not violate the First Amendment rights of the corporations' U.S. owners.

Finally, the district court's rationale proves too much. If the Act were unconstitutional merely because it, in prohibiting political spending of a corporation partially owned by foreign governments, consequentially prevents a significant number of U.S. citizen shareholders from spending through that corporation, then no restriction on any U.S. corporation with foreign government ownership, regardless of how large, could ever survive First Amendment scrutiny. Whether the U.S. investors consist of 95% of the ownership, under the threshold of the Maine law, or 75%, 50%, or 25%, the impact on the U.S. investors is the same, *i.e.*, they are barred from engaging in political spending through a U.S. corporation in which they have chosen to invest. In other words, the court's analysis would render a ban on political spending by U.S. corporations with even a majority of foreign government investors unconstitutional— a result that cannot be reconciled with *Bluman.*

### b. Five percent ownership exceeds the level at which foreign government-investors may influence a corporate entity.

Aside from its misreading of *Citizens United,* the district court concluded: "It strikes me that the 5% foreign government ownership found in Maine's Act was arbitrarily chosen." *Central Maine Power Co.*, 2024 WL 866367, at *14. As with the court's *Citizens United* musings, the court failed to provide any analysis to support this conclusion.

Far from being randomly chosen, the Act's 5% threshold reflects a reasonable and evidence-based understanding of how foreign governments that hold 5% or more ownership of a corporation have and can wield significant influence over the corporation, including its decisions to expend corporate money on U.S. elections. Indeed, shareholders that hold significantly *less* than 5% ownership stake can influence corporate decision-making, including the decision to spend money on U.S. elections.[8]

For example, owners holding less than 1% stake can exert influence via shareholder proposals. Until September 2020, the federal threshold for presenting a

---

[8] Ltr. from Professor John Coates to California Assemb. Lee at 9 (Jan. 5, 2024), *available at* https://freespeechforpeople.org/wp-content/uploads/2022/04/coates-california-ab1819-written-testimony-20220419.pdf ("[T]he SEC itself recognizes that one percent ownership is large enough that investors with that level of ownership . . . typically can easily get executive-suite management on the phone, and through that direct "engagement" have an influence on corporate managers, strategy, and decision-making.").

shareholder proposal at a publicly-traded company required holding either $2,000 or 1% of a company's shares.[9] Shareholders with this level of ownership can exert substantial leverage over boards of directors. In December 2019, the federal Securities and Exchange Commission (SEC) proposed to *eliminate* the 1% threshold requirement as *too high*—influential shareholders often did not hold such a *large* stake.[10] As the SEC explained:

> We also propose to eliminate the current 1 percent ownership threshold, which historically has not been utilized. **The vast majority of investors that submit shareholder proposals do not meet a 1 percent ownership threshold**. In addition, we understand that **the types of investors that hold 1 percent or more of a company's shares generally do not use Rule 14a-8 as a tool for communicating with boards and management**.[11]

Shareholders that wield proposals to influence a corporation often do so with less than 1% ownership, and significantly less than the 5% threshold at issue here, including powerful investors like the California State Teachers' Retirement System and the New York City Comptroller.[12] They also are powerful enough that they need

---

[9] 17 C.F.R. § 240.14a-8(b) (2019), *available at* https://www.govinfo.gov/content/pkg/CFR-2011-title17-vol3/pdf/CFR-2011-title17-vol3-sec240-14a-8.pdf.

[10] *See* Procedural Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8, 84 Fed. Reg. 66458 (proposed Dec. 4, 2019). The rule was finalized in 2020 without change. *See* 85 Fed. Reg. 70240, 70241 (Nov. 4, 2020) (codified at 17 C.F.R. § 240.14a-8).

[11] 17 C.F.R. § 240.14a-8 (emphasis added).

[12] Ltr. from Professor John Coates to California Assemb. Lee at 8 (Jan. 5, 2024), *available at* https://freespeechforpeople.org/wp-content/uploads/2022/04/coates-california-ab1819-written-testimony-20220419.pdf.

not exert influence via a formal proposal process; they have other avenues for exerting pressure on corporate management—including by simply picking up the phone.[13]

Shareholders can also exert influence through actual or threatened proxy fights to change a company's management, and can do so with small ownership stakes. Under a 2021 SEC amended rule that eliminates minimum ownership requirements for shareholders to nominate directors to corporate boards,[14] a shareholder with only a 2.3% stake in a therapeutics company orchestrated the election of nearly half the company's board, and could have done so with a much smaller stake.[15] In another example, Disney, a behemoth corporation with 1.8 billion in outstanding shares,[16] was twice in 2023 embroiled in a proxy fight with a minority

---

[13] *See, e.g.,* SEC, *Transcript of the Roundtable on the Proxy Process* at 150 (Nov. 15, 2018), *available at* https://www.sec.gov/files/proxy-round-table-transcript-111518.pdf (comments of Brandon Rees, Deputy Director of Corporations & Capital Markets, AFL-CIO); FEC, *Transcript of Forum: Corporate Political Spending and Foreign Influence, Second Panel* (June 23, 2016), *available at* https://www.fec.gov/resources/about-fec/commissioners/weintraub/text/Panel2-Complete.pdf (comments of Robert Jackson, Columbia Law School); Ltr. from Professor John Coates to California Assemb. Lee at 6 (Jan. 5, 2024).
[14] 17 C.F.R. § 240.14a-19.
[15] *See* Michael R. Levin, *Activist Wins Another Vote Under Universal Proxy*, Harv. L. Sch. Forum on Corporate Governance (May 18, 2023), https://bit.ly/3obvM2h.
[16] *Walt Disney Co*, CNBC, https://www.cnbc.com/quotes/DIS?qsearchterm=walt%20disney (last visited June 14, 2024).

shareholder (which held less than 1% in the first proxy fight—still amounting to 9.4 million shares—and less than 2% in the second).[17]

These cases demonstrate the ease with which minority shareholders can and do exert significant influence over a corporation, both formally and informally, when they hold less than 5% of a company's shares. Furthermore, federal law has pegged 5% ownership as the threshold warranting disclosure of the stake, the residence and citizenship of the investors, the source of the funds, and in some cases information about the investors' associates. *See* 15 U.S.C. §§ 78m(d)(1)-(3); 17 C.F.R. §§ 240.13d-1, 240.13d-101 (filing must be done within 10 days of acquisition).

In terms of corporate ownership, 5% is often a sizable stake worth millions of dollars and often lands an investor on the company's list of top owners.[18] DoorDash, for instance, is owned in part by the Singaporean government's investment fund

---

[17] Lillian Rizzo & Alex Sherman, *"Nelson Peltz Increases Disney Stake, Reignited Potential Proxy Battle,"* CNBC (Oct. 9, 2023), https://www.cnbc.com/2023/10/09/nelson-peltz-increases-disney-stake-reignites-potential-proxy-battle.html. The shareholder, Trian Fund Management, withdrew its first proxy fight after Disney announced a restructuring; it then engaged in a second proxy fight in which it sought multiple seats on Disney's Board of Directors. *Id.*

[18] Ltr. from Professor John Coates to California Assemb. Lee at 8 (Jan. 5, 2024), *available at* https://freespeechforpeople.org/wp-content/uploads/2022/04/coates-california-ab1819-written-testimony-20220419.pdf ("In other words, for a publicly-traded corporation, one percent is in fact a very large ownership stake, and some of the largest and most influential-in- governance investors rarely if ever hold that much.").

(GIC Private Limited).[19] Its 5% stake is worth $20.2 million in shares and marks the foreign government-owned investor the fourth largest owner of the company. In some instances, foreign governments may qualify as a top and influential owner with even less stake. Norway's official oil investment account (Norges Bank Investment Management), for example, holds $176 million of shares in Apple, is the eighth largest owner of the company, and still, its ownership percentage floats slightly above 2%.[20]

A foreign government will seek to advance its own interests, not those of the United States or its citizens.[21] Foreign government shareholders will demand bottom line growth, unimpeded and unmitigated by a balancing interest in U.S society.[22]

---

[19] *DoorDash Inc.*, CNBC, https://www.cnbc.com/quotes/DASH?qsearchterm= (last visited June 14, 2024); GIC Private Limited, https://www.gic.com.sg/ (last visited June 14, 2024) ("We are driven by a common purpose—securing Singapore's financial future.")

[20] *Apple Inc.*, CNBC, https://www.cnbc.com/quotes/AAPL?tab=ownership (last visited June 14, 2024); Norges Bank Investment Management, https://www.nbim.no/en/ (last visited June 14, 2024) ("The fund's formal name is the Government Pension Fund Global.").

[21] Ltr. from Professor John Coates to California Assemb. Lee at 2 (Jan. 5, 2024) (citing to *Bluman v. FEC*, 800 F. Supp. 2d 281) ("Foreign nationals have a different set of interests than their U.S. counterparts, as regards a range of policies, such as defense, environmental regulation, and infrastructure. Few dispute the idea that a given government may properly seek to limit foreign influence over, in the words of the U.S. Supreme Court, "activities 'intimately related to the process of democratic self-government.'" There is nothing particularly surprising or pernicious about this fact. Foreign and domestic interests predictably diverge.").

[22] *See, e.g.,* Henry Hansmann & Reinier Kraakman, *The End of History for Corporate Law*, 89 Geo. L.J. 439 (2001), *available at* https://openyls.law.yale.edu/bitstream/handle/20.500.13051/4602/89GeoLJ439.pdf

And corporations will act in the interest of their major shareholders, including foreign governments. In today's corporate world, "[s]hareholders are no longer dispersed and passive but empowered, yet they are using their greater power not to wrest control but to work jointly with insiders, bringing new information and insights to operational decision-making."[23] In general, such "collaboration offers a mechanism for enhancing firm value that unilateral decision-making by either insiders or shareholders cannot provide."[24]

And corporations are responsive. Corporate executives are fully attuned to major investors, act with a fiduciary duty towards those investors, and tend to avoid taking action that they anticipate will displease those major investors.[25] A corporate

---

?sequence=2&isAllowed=y ("There is no longer any serious competitor to the view that corporate law should principally strive to increase long-term shareholder value.").

[23] Jill E. Fisch & Simon M. Sepe, *Shareholder Collaboration*, 98 Tex. L. Rev. 863, 864-65 (2020), *available at* https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=2998&context=faculty_scholarship.

[24] *Id*. at 865.

[25] The shareholder-centric theory of corporate governance suggests that corporations prioritize the maximization of investor profits before considering the interests of others, such as management, employees, or social responsibility initiatives. *See* Robert J. Rhee, *A Legal Theory of Shareholder Primacy*, 102 Minn. L. Rev. 1951 (2017), *available at* https://ssrn.com/abstract=2938806. Over the past 30 years, U.S. corporations have shifted from being management-driven to shareholder-driven, leaving "substantial reason to believe that managers and directors today largely 'think like shareholders.'" Edward B. Rock, *Adapting to the New Shareholder-Centric Reality*, 161 U. Pa. L. Rev. 1907, 1910 (2013), *available at* https://scholarship.law.upenn.edu/faculty_scholarship/457/.

executive at Uber, for example, will make decisions to avoid the upset of Public Investment Fund— the investment wing of the Saudi Arabian government and top investor in Uber— because it would cost the company $72.8 million worth of withdrawn shares.[26]

The district court stated that it agrees with the appellees' incorrect characterization that the 5% threshold is "not a proxy for control, but rather a signal to the marketplace that a hostile takeover may be in the offing." *Central Maine Power Co.*, 2024 WL 866367, at *14. This is wrong on two counts. First, a stakeholder need not *control* a corporation in order to *influence* a corporation and steer corporate behavior. Second, even if a 5% threshold were merely a "signal" that a shareholder is powerful enough to execute a hostile takeover, a hostile takeover occurs precisely when a shareholder wields enough influence to carry one out.

Here, the acceptable quantifier is a percentage already and commonly used in corporate governance law specifically for reporting, documenting, and tracking shareholder influence.

---

[26] *Uber Technologies Inc.*, CNBC, https://www.cnbc.com/quotes/UBER?tab=ownership (last visited June. 14, 2024); Simon Clark, *Saudi Wealth Fund May Be the World's Least Transparent*, Wall Street Journal (Nov. 1, 2016), https://www.wsj.com/articles/saudi-wealth-fund-may-be-worlds-least-transparent-1477997912.  Even with over $72.8 million in shares, the Saudi government's Uber stake would not trigger Maine's 5% threshold.

Far from being overbroad, as the foregoing evidence demonstrates, any threshold *higher* than the Act's 5% threshold would leave foreign governments significant opportunities to influence Maine's elections through corporate ownership and thereby undermine the Act's purpose of protecting self-government. The district court erred in ignoring this evidence and its conclusion that the 5% threshold likely renders the Act unconstitutional should be vacated.

### c. Evidence of influence by a foreign government in a domestic corporation is not required for Maine to advance its compelling interest.

Maine need not wait for proof of an attack on its democratic self-government before enacting measures to protect it. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686 (2021) (noting that when a state has evidence of fraud occurring in another state, it is "not obligated to wait for something similar to happen closer to home."). Its voters are fully aware of the ways in which corporations are responsive to, and therefore both directly and indirectly influenced by, powerful foreign governments.[27] Maine has every reason to prevent foreign government-influenced

---

[27] To be certain, foreign entities have in the past influenced U.S. corporations. For example, in the indictment against U.S. Senator Robert Menendez for federal corruption, it is alleged that him and his wife routed hundreds of thousands of dollars through a foreign-influenced U.S. corporation to benefit the Arab Republic of Egypt. Sealed Indictment, *United States v. Robert Menendez et al.*, 23 Crim. 490 (S.D.N.Y. 2023), at ¶ 1. In 2015, two Chinese citizens who were major owners of a private company in California directed the company to make a $1 million donation to a super PAC in support of Jeb Bush's presidential campaign. Michelle Ye Hee Lee, *Pro-Jeb Bush super PAC improperly accepted $1.3 million from*

corporations from influencing its elections and is entitled to "take action . . . without waiting for it to occur and be detected within its own borders." *Id.*

Maine voters are aware that they may never be privy to either the direct or indirect influence that foreign governments exert over corporations that spend money on Maine elections. It is well understood that influence does not always occur alongside a paper trail.[28] *See, e.g., Citizens United*, 558 U.S. at 455 (Stevens, Ginsburg, Breyer and Sotomayor, J.J., concurring in part and dissenting in part) (arguing that corporate independent expenditures in fact generate *quid pro quo* corruption even though "[p]roving that a specific vote was exchanged for a specific expenditure has always been next to impossible . . . ."). Those conversations, meetings, proposals, and decisions are likely to take place in hallways, conference rooms, and on phone calls, rather than on a public record. *See, e.g., Wagner v. FEC*, 793 F.3d 1, 20 (D.C. Cir. 2015) ("We are also mindful that less direct evidence is required when, as here, the government acts to prevent offenses that 'are successful precisely because they are difficult to detect.'") (citing *Burson v. Freeman*, 504 U.S.

---

*Chinese-owned company, FEC says*, Wash. Post (Mar. 11, 2019), https://www.washingtonpost.com/politics/pro-jeb-bush-super-pac-improperly-accepted-13-million-from-chinese-owned-company-fec-says/2019/03/11/954de630-4436-11e9-aaf8-4512a6fe3439_story.html.
[28] In some cases, there might be a record documenting a specific exchange between a foreign entity and U.S. corporation that proves how a foreign investor directly influenced a U.S. corporation. See *supra* note 26. But those instances are rare at best and usually are accompanied by traces of other unlawful activities that also are difficult to detect and bring to light.

191, 208 (1992)); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883 (2009) ("The difficulties of inquiring into actual bias, and the fact that the inquiry is often a private one, simply underscore the need for objective rules.").

But Maine voters recognize how rapidly a foreign-influenced corporation can move to influence an election.[29] And they recognize the ways in which foreign minority shareholders can wield enormous influence over what decisions a corporation makes, and how it makes them. As the then-chief executive officer of Exxon Mobil proclaimed in describing the role of a CEO in the modern global corporation, "I'm not a U.S. company and I don't make decisions based on what's good for the U.S."[30]

---

[29] For example, in 2016, Airbnb—then a privately-held company with significant investment from foreign sources—poured $10 million into a super PAC to influence New York state legislative races just weeks before the election. Kenneth Lovett, *Airbnb to spend $10 million on Super PAC to fund pre-election day ads*, N.Y. Daily News (Oct. 11, 2016), https://www.nydailynews.com/2016/10/11/airbnb-set-to-spend-10m-on-super-pac-created-to-fund-pre-election-day-ads; *see also* Dan Primack, *Yuri Milner adds $1.7 billion to his VC war chest*, Fortune (Aug. 3, 2015), https://fortune.com/2015/08/03/yuri-milner-adds-1-7-billion-to-his-vc-warchest/ (DST Global is Moscow-based); Scott Austin, *Airbnb: From Y Combinator to $112M Funding in Three Years*, Wall Street Journal (July 25, 2011), https://www.wsj.com/articles/BL-VCDB-11285 (DST Global is a major investor in Airbnb).
[30] Bernard Vaughan, *Global Power of ExxonMobil Spotlighted in New Coll Book*, Reuters (Apr. 27, 2012), https://www.reuters.com/article/books-exxonmobil-idUSL2E8FQP6B20120427.

Maine voters do. They are entitled to protect, and have a compelling interest in preserving, their democratic self-government.

## Conclusion

The Act furthers Maine's compelling interest in protecting its democratic self-government. *Citizens United* does not erase this interest, and this Court should not do so either. For these reasons, we join the Appellants in asking this Court to vacate the lower court ruling.

**Dated**: June 14, 2024

/s/ Amira Mattar
Amira Mattar (#1211903)
John Bonifaz (#73656)
Ben Clements (#30192)
Courtney Hostetler (#1164088)
**FREE SPEECH FOR PEOPLE**
48 N. Pleasant Street, Suite 304
Amherst, MA 01002
(617) 244-0234
amattar@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
chostetler@freespeechforpeople.org

*Counsel for Amicus Curiae*
*Free Speech For People*

## Certificate of Compliance

Pursuant to Fed. R. App. P. 32(g) and 1st. Cir. R. 32(g), I hereby certify that the foregoing filing complies with rules that pertain to the filing of briefs in this Court, including but not limited to the type-volume limitations under Fed. R. App. P. 29(a)(4) and 1st Cir. R. 29(a)(4).

This brief is produced in the proportionally spaced font Times New Roman at size 14, and, excluding those portions exempted by Fed. R. App. P. 32(f) and 1st Cir. R. 32(f), contains 6,448 total words as calculated by the word count feature on Microsoft Word.

**Dated:** June 14, 2024

*/s/ Amira M. Mattar*
Amira M. Mattar
Free Speech For People
48 N. Pleasant Street, Suite 304
Amherst, MA 01002
(617) 244-0234
amattar@freespeechforpeople.org

*Counsel for Amicus Curiae*

**Certificate of Service**

I hereby certify that, on June 14, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system, which will send a notification of such filing to all counsel of record.

**Dated:** June 14, 2024

*/s/ Amira M. Mattar*
Amira M. Mattar
Free Speech For People
48 N. Pleasant Street, Suite 304
Amherst, MA 01002
(617) 244-0234
amattar@freespeechforpeople.org

*Counsel for Amicus Curiae*