## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

CENTRAL MAINE POWER COMPANY; VERSANT POWER; ENMAX CORPORATION; MAINE PRESS ASSOCIATION; MAINE ASSOCIATION OF BROADCASTERS; JANE PRINGLE, individually and in her capacity as a registered voter and elector; KENNETH FLETCHER, individually and in his capacity as a registered voter and elector; BONNIE S. GOULD, individually and in her capacity as a registered voter and elector; BRENDA GARRAND, individually and in her capacity as a registered voter and elector; LAWRENCE WOLD, individually and in his capacity as a registered voter and elector,

Plaintiffs-Appellees

v.

MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES; WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in his official capacity as a Member of the Maine Governmental Ethics and Election Practices; SARAH LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; STACEY D. NEUMANN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in his official capacity as Attorney General for the State of Maine,

Defendants-Appellants

On Appeal from the United States District Court, District of Maine

## BRIEF OF APPELLEES, JANE R. PRINGLE, KENNETH FLETCHER, BONNIE S. GOULD, BRENDA GARRAND AND LAWRENCE WOLD

Timothy C. Woodcock
P. Andrew Hamilton
Jonathan Pottle
William F. Campbell

**EATON PEABODY**
80 Exchange Street
Bangor, ME 04401
(207) 947-0111

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................... iii

STATEMENT OF THE ISSUES .............................................................1

STATEMENT OF THE CASE..................................................................2

PROCEDURAL BACKGROUND...............................................................5

    Appellees Complaint .................................................................5
    District Court Order..................................................................6

SUMMARY OF ARGUMENT..................................................................9

LEGAL AND FACTUAL BACKGROUND --TERMS OF INITIATIVE --
BALLOT MEASURES RESTRICTED ..................................................12

        Initiation and Approval....................................................15
        Petition-Originated Legislation .......................................16
        Legislature-Originated Legislation..................................16
        Contributions/Expenditures/Donations/Disbursements ...............17
        Influence ........................................................................18
        Persons Influenced..........................................................20
        Directly or Indirectly .....................................................20
        Application of Prohibited Conduct to all Persons ........................20
        Civil and Criminal Sanctions...........................................23

ARGUMENT .......................................................................................24

        Standard of Review.........................................................24

I.      Appellees are likely to succeed on their claims that the Initiative violates
their right to petition the government and, as Electors, to be petitioned with
respect to Ballot Measures............................................................25

        A. The right to petition the government on Ballot Measures protects
speech intended to inform voters in exercising the sovereign power
to approve or reject proposed laws.......................................25

B. The Ballot Measures to which the Initiative applies are all authorities for the popular exercise of the lawmaking power .............31

C. Strict scrutiny applies to laws that ban or limit public discussion of Ballot Measures and the Initiative fails strict scrutiny .......................37

D. Appellees are likely to succeed on their claims that the Initiative violates their First Amendment right to Freedom of Speech with respect to the initiation and approval of Ballot Measures ..................43

E. Appellees are likely to succeed on their claims that the Initiative violates their First Amendment right to freedom of assembly with respect to the initiation and approval of Ballot Measures ..................45

F. Appellees are likely to succeed on their claims that the Initiative violates their First Amendment right to freedom of press .................46

G. Appellees are likely to succeed on the merits of their claims that the Initiative violates their rights to due process of law ...........................47

II.    Absent injunctive relief, Appellees will incur irreparable harm ..................51

III.   The balance of equities favors the issuance of injunctive relief ...................51

IV.   The public interest favors the issuance of injunctive relief ...........................52

V.    The Initiative is not Severable ...................................................................52

VI.   A comprehensive injunction barring enforcement of the Initiative in its entirety is required .........................................................................53

SUMMARY ...........................................................................................54

CERTIFICATE OF COMPLIANCE ......................................................56

CERTIFICATE OF SERVICE ...............................................................57

# TABLE OF AUTHORITIES

## CASES

*Asociacion de Educación Privada de Puerto Rico, Inc. v. García–Padilla*
    490 F.3d 1, 21 (1st Cir. 2007) ........................................................51

*Avangrid Networks, Inc. v. Secretary of State*
    2020 ME 109, 237 A.3d 882 ..........................................................45

*Ayotte v. Planned Parenthood of N. New Engl.*
    546 U.S. 320, 329, 330 (2006) ......................................................53

*Bayside Enters., Inc. v. Maine Agr. Bargaining Bd.*
    513 A.2d 1355, 1360 (Me. 1986) ...................................................52

*Bluman v. F.E.C.*
    800 F.Supp.2d 281, 290 (D.D.C 2011) ......................................34, 38, 39, 41

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*
    996 F.3d 37, 44 (1st Cir. 2021) ....................................................24

*Buckley v. F.E.C.*
    424 U.S. 1 (1976) ...........................................................29, 34, 42

*Citizens Against Rent Control v. City of Berkeley*
    454 U.S. 290, 297-98 (1981) ........................................................41

*Citizens United v. Federal Election Commission*
    558 U.S. 310, 321, 330-337, 339 (2010) ...................9, 14, 31, 34, 37, 40, 42

*Coates v. City of Cincinnati*
    402 U.S. 611, 614 (1971) .............................................................51

*Condon v. Andino*
    961 F.Supp. 323, 331 (D. Me. 1997) ............................................52

*Connally v. General Construction*
    269 U.S. 385, 393 (1926) .............................................................48

*Corporate Techs. Inc. v. Harnett*
    731 F.3d 6, 10 (1st Cir. 2013) ..........................................................25

*DeJonge v. Oregon*
    299 U.S. 353 (1938)...........................................................................26

*Elrod v. Burns*
    427 U.S. 347, 373 (1976) .............................................................51, 52

*Farris ex rel. Dorsky v. Goss*
    143 Me. 227, 230 (1948) ...................................................................32

*F.E.C. v. Cruz*
    596 U.S. 289, 305 (2022) ...................................................................42

*F.E.C. v. Wisc. Rt. to Life, Inc.*
    551 U.S. 449, 477-78 (2007) .............................................................34

*Federal Communications Commission v. Fox Television Stations, Inc.*
    567 U.S. 239, 253-254 (2012) ...........................................................48

*First Nat'l Bank of Bos. v. Bellotti*
    435 U.S. 765 (1978)......................................27, 28, 29, 34, 37, 40, 41, 43, 44

*Gertz v. Robert Welch, Inc.*
    418 U.S. 323, 339-340 (1974) ...........................................................30

*Grosjean v. American Press Co.*
    297 U.S. 233, 250 (1936) ...................................................................29

*In re Opinion of the Justs.,*
    132 Me. 502, 167 A. 174, 175 (1933) .................................................52

*Lamont v. Postmaster General*
    318 U.S. 301 (1965)...........................................................................43

*Leavitt v. Jane L.*
    518 U.S. 137, 139 (1996) ...................................................................52

*Maceira v. Pagan*
    649 F.2d 8, 18 (1st Cir.1981) ...........................................................51

*McConnell v. Federal Election Commission*
    540 U.S. 93, 341 (2003) ....................................................26, 31, 40

*McDonald v. City of Portland*
    2020 ME 119, ¶¶ 20-21, 239 A. 3d 662................................16, 18

*McDonald v. Smith*
    472 U.S. 479, 482 (1985) ...............................................................27

*McIntyre v. Ohio Elections Commission*
    514 U.S. 334, 346 (1995) .....................................41, 42,43, 44

*Mills v. Alabama*
    384 U.S. 214, 218 (1966) ...............................................................29

*Moulton v. Scully*
    111 Me. 428, 89 A. 944, 952-953 (1914) ...............................13, 33

*National Council on Compensation Insurance v. Superintendent of Insurance*
    481 A.2d 775, 780 (Me. 1984)........................................................18

*Nebbia v. New York*
    291 U.S. 502, 510-11 (1934) .........................................................49

*Nken v. Holder*
    556 U.S. 418, 434 (2009) ...............................................................24

*Opinion of the Justices*
    623 A.2d 1258, 1262 (Me. 1993).....................................................32

*Pennell v. City of San Jose*
    390 U.S. 485 U.S. 1, 11 (1988) .....................................................50

*Procunier v. Martinez*
    416 U.S. 396, 408-409 (1974) .......................................................44

*Red Lion Broadcasting Co. v. F.C.C.*
    395 U.S. 367, 390 (1969) ..............................................................47

*Rhode Island Med. Soc. v. Whitehouse*
    239 F.3d 104, 106 (1st Cir. 2001) ................................................52

*Robidaux v. Mulholland*
    642 F.3d 20, 23, n. 2 (1st Cir, 2011) .............................................9

*Roth v. United States*
    354 U.S. 476, 484 (1957) ..............................................................29

*Scripps-Howard Radio, Inc. v. F.C.C.*
    316 U.S. 4, 13 (1942)....................................................................24

*Sindicato Puertorriqueno de Trajadoes, SEIU v. Fortuno*
    699 F.3d 1, 11 (1st Cir. 2012) ......................................................37

*Teneco Oil Co., Inc. v. Dep't of Consumer Affairs*
    876 F.2d 1013 1021 (1st Cir. 1989) ..............................................50

*Thomas v. Collins*
    323 U.S. 516, 530 (1945) ......................................................26, 46

*Thornhill v. Alabama*
    310 U.S. 88, 102 (1940) .........................................................29, 30

*Town of Warren v. Norwood*
    138 Me. 180, 192-193 (1941)........................................................32

*Town of Windham v. LaPointe*
    308 A.2d 286, 291 (Me. 1973)......................................................52

*United Mine Workers v. Illinois Bar Ass'n*
    389 U.S. 217, 222 (1967) ......................................................26, 27

*United States v. Castillo-Martinez*
    16 F.4th 906, 915 (1st Cir. 2021) ...................................................9

*United States v. Cruikshank*
 92 US. 542, 552 (1875) ...............................................................26

*Villas at Parkside Partners v. City of Farmers Branch*
 496 F. Supp. 2d 757 (N.D. Tex. 2007)...................................53

*Virginia Bd of Pharmacy v. Virginia Citizens Consumer Council*
 425 U.S. 748 (1976)..................................................29, 30, 34, 43

*Voice of the Arab World Inc. v. MDTV Med. News Now, Inc.*
 645 F.3d 26 (1st Cir. 2011) ...............................................25, 51

*Whitney v. California*
 274 U.S. 357, 377 (1927) ...........................................................30

**STATUTES**

17-A M.R.S. §35 .............................................................................21

17-A M.R.S. §1604 .........................................................................23

17-A M.R.S. §1704 .........................................................................23

17-A M.R.S. §1705 .........................................................................23

21-A M.R.S. §1014 .........................................................................14

21-A M.R.S. §1019 .........................................................................14

21-A M.R.S. §1051 ....................................................................21, 46

21-A M.R.S. §1052 .............................................. 14, 16, 17, 18, 19, 46

21-A M.R.S. §1061 ...........................................................................3

21-A M.R.S. §1064 ................................................................*passim*

Article I, §4, Me. Const...........................................4, 5, 10, 11

Article I, §6, Me. Const..............................................................48

Article I, §15, Me. Const. .........................................................................4, 5, 10, 11

Article IV, Pt. 3d, §§17 - 18, Me. Const. ...............................................................16

Article IV, Pt. 3d, §§17 - 22, Me. Const. ...............................................................32

Article IV, Pt. 3d, §18, Me. Const.......................................................................3, 35

Article IV, Pt. 3d, §19, Me. Const.........................................................................17

Article IX, §14, Me. Const...........................................................................3, 17, 31

Article X, §4, Me. Const. ............................................................................3, 17, 35

U.S. Const., Am. I. ...............................................................................................25, 33

## OTHER AUTHORITIES

The Maine State Constitution, Marshall J. Tinkle (2d ed. 2013).......................31, 35

Merriam-Webster's Collegiate Dictionary (ed. 2003) ......................................16, 18

Pre-Election Judicial Review of Initiatives and Referendums
    J. Gordon and D. Magleby , 64 Notre Dame L.Rev. 298, 299. (1989) .........35

# STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion in issuing a preliminary injunction in favor of Appellees barring enforcement of 21- A M.R.S. § 1064 which limits and conditions Appellees' exercise of their right as individuals and as Electors to petition the government and, as Electors, to be petitioned, with respect to the initiation and approval of Ballot Measures as guaranteed by the Right to Petition the Government as set forth in United States and Maine Constitutions.

2. Whether the district court abused its discretion in issuing a preliminary injunction in favor of Appellees barring enforcement of 21- A M.R.S. § 1064 which limits and conditions Appellees' exercise of their right as individuals and as Electors to receive and share information with respect to the initiation and approval of Ballot Measures in violation of their rights to Freedom of Speech as set forth in United States and Maine Constitutions.

3. Whether the district court abused its discretion in issuing a preliminary injunction in favor of Appellees barring enforcement of 21- A M.R.S. § 1064 which limits and conditions Appellees' exercise of their rights as individuals and as Electors as to receive and share information relating to the initiation and approval of Ballot Measures in violation of their rights to Freedom of Assembly as set forth in United States and Maine Constitutions.

4. Whether the district court abused its discretion in issuing a preliminary injunction in favor of Appellees barring enforcement of 21- A M.R.S. § 1064 which subjects Appellees to the risk of imposition of civil and criminal penalties with respect to the initiation and approval of Ballot Measures in violation of Due Process as set forth in United States and Maine Constitutions.

5. Whether the district court abused its discretion in issuing a preliminary injunction in favor of Appellees barring the enforcement of 21-A M.R.S. § 1064 which imposes duties and conditions on entities engaged in disseminating information from third parties on the initiation and approval of Ballot Measures in violation of Appellees' right to Freedom of the Press as set forth in the United States and Maine Constitutions.

6. Whether the district court's decision in favor of Appellees should be affirmed on some or all of the grounds Appellees raised in their motion for preliminary injunction and at oral argument.

7. Whether the district court abused its discretion in enjoining the enforcement of 21-A M.R.S. § 1064 in its entirety.

## STATEMENT OF THE CASE

On November 7, 2023, Maine voters approved an initiative barring any "Foreign Government-Influenced entity" ("FGIE") "directly or indirectly" seeking "to influence the nomination or election of a candidate or initiation or approval of a

referendum." 21-A M.R.S. § 1064 (the "Initiative"). The Initiative bans any FGIE from providing any information or perspective on any candidate for election to public office or any "referendum."[1] (hereinafter, "Ballot Measures").

The Initiative sweeps broadly silencing FGIEs from expressions of any kind relating to candidates for public office or the entirety of the legislative process for any Ballot Measure. Although the Initiative's ostensible primary targets are FGIE's, including Appellees Central Maine Power and ENMAX/Versant, its true target are Maine citizens in their capacities as individuals and voters (hereinafter, at times, "Electors"). The Initiative denies them communications directly related to their exercise of their sovereign powers to make and repeal laws and even to amend the Maine Constitution, itself.

In service of this illicit goal, the Initiative exposes Appellees, as individual and as Maine voters, to civil and criminal sanctions should they "knowingly" or "recklessly" engage in conduct that causes communications barred by Section 1064(2) to "influence" the "initiation or approval" of any Ballot Measure. 21-A M.R.S. §§ 1064(2)-(4), 1064(8)-(9).

---

[1] The Initiative defines "Referendum" as 1) a peoples veto (Article IV, Pt. 3d, § 17, Me. Cont.); 2) a "direct initiative of legislation" (Article IV, Pt. 3d, § 18, 3, Me. Const.); 3) popular approval of an amendment to the Maine Constitution (Article X, §, 4, Me. Const.); 4) conditional legislation (Article IV, Pt. 3d, § 19; 5) popular approval of bonds (Article IX, § 14; 6) any county or municipal referendum. 21-A M.R.S. § 1061(1)(I)

Withal, the Initiative denies Appellees, as individuals and as Electors, of their right to petition the government and, as Electors, to be petitioned as well as their rights to freedom of speech and freedom of assembly, and the associational rights implicit in each of these rights, as guaranteed by the First Amendment to the U.S. Constitution and by Article I, Sections 4 and 15 of the Maine Constitution.

In addition, Section 1064(6) of the Initiative imposes investigative and reporting duties on entities engaged in receiving and disseminating communications covered by Section 1064(2). The purpose of this is to enlist the media to screen and report Section 1064(2) communications. These burdens and duties could chill members of the press in fulfilling their traditional role of fearlessly informing the public, including Appellees as individuals and as Electors. Therefore, Appellees challenge Section 1064(6) as threatening their ability to be informed by the press on Ballot Measures.

Finally, the Initiative employs vague terms to accomplish its ends, the violation of which can result in grave civil and criminal sanctions. The Initiative fails to meet basic due process requirements intended to ensure that the public is on notice as to prohibited conduct and that those charged with enforcing it will not do so in an arbitrary or discriminatory manner.

## PROCEDURAL BACKGROUND

### Appellees Complaint

After the Initiative was approved, Appellees filed a Verified Complaint against the Attorney General in his official capacity and the Commission on Governmental Ethics and Election Practices ("Commission"; together "the State"). A.85-126.

Each Appellee, Jane Pringle, Kenneth Fletcher, Bonnie S. Gould, Brenda Garrand and Lawrence Wold, is a registered Maine voter. A.88-90. For certain of the Ballot Measures covered by the Initiative, they are "Electors" within the meaning of Article II of the Maine Constitution and, therefore, are, at times hereafter, referred to as "Electors." A.88-90. Appellees challenged the Initiative in their capacities as Electors but challenged it as well in their capacities as individuals seeking to protect the integrity of their rights under the United States and Maine Constitutions. A.86.

Appellees limited their claims for declaratory and injunctive relief to the Initiative's application to Ballot Measures, alleging that the Initiative denied them their rights under First Amendment to the U.S. Constitution and under Article I, Sections 4 and 15 of the Maine Constitution[2], including their right to solicit, obtain, consider and decide for themselves, the merit of communications covered by Section 1064(2) of the Initiative. A.87, 93-94, 102-121. In addition, they asserted that the

---

[2] All of Appellees' claims under the Maine Constitution are premised on the contention that, for each such claim, the Maine Constitution provides at least as much if not more protection as do analogous provisions of the U.S. Constitution.

Initiative unlawfully exposed them to civil fines and criminal felony-level sanctions if they "knowingly" or "recklessly" employed such communications "to influence" the "initiation or approval" of Ballot Measures in violation of the First Amendment, Article I, Sections 4 and 15 of the Maine Constitution, and, Due Process Clauses of the United States and Maine Constitutions.[3] A.94-96, 101-121, 123-124.

In limiting their challenge to the Initiative's application to Ballot Measures, Appellees do not suggest any indifference to or tacit approval of the Initiative's application to candidate nominations and elections. A.87. Rather, Appellees viewed the Initiative frustrating their ability to discharge their sovereign lawmaking duties as Electors with respect to initiation and approval of each of the Ballot Measures and, therefore, posing a mortal threat to the integrity of every exercise of such authority by the people. A.85-126. Therefore, this aspect of the Initiative warranted a distinct and focused challenge.

After the all the motions for preliminary injunctive relief had been filed, the State agreed to forebear from enforcing the Initiative until February 29, 2024.

### District Court Order

On February 23, the district court heard oral argument from all parties. On February 29, the district court issued its Order on Plaintiffs' Motion for Preliminary

---

[3] Appellees Due Process claim under Article I, Section 6-A of the Maine Constitution also includes their claim under the Law of the Land clause of the Maine Constitution, Article I, Section 6.

Injunction ("Order"). Add. 01-40. Although the district court granted the Order with specific reference to claims raised by CMP and Versant, in many respects, its reasoning effectively vindicated Appellees' First Amendment and Due Process claims. In addition, the district court granted injunctive relief to all parties, including Appellees. *Id.* at 40.

The Order summarized the background to the Initiative's enactment which arose out of Ballot Measure to block the New England Clean Energy Connect corridor ("CMP Corridor"). Add. 04. Among other things, it noted that "H.Q. Energy (U.S.), Inc., a subsidiary of Hydro-Quebec" spent "massive" amounts of money to persuade Maine Electors to reject the Ballot Measure. *Id.* It noted further that H.Q.'s spending on the Ballot Measure prompted "a bipartisan group of current and former Maine legislators [to send] a letter to the Premier of Quebec and the CEO of Hydro-Quebec, demanding that Hydro-Quebec 'cease all further campaign activities and let the people of Maine vote without further meddling in our election.'" Add. 04.

The Order applied strict scrutiny to the Initiative requiring that the State show that the Initiative serves a compelling state interest and that it has been narrowly tailored to serve that interest. Add. 27. The Order noted that the State had offered two rationales as compelling interests justifying the Initiative: 1) "limiting foreign-government influence in its elections" and 2) "limiting the appearance of such

influence." Add. 28. The Order found that the State's interests in "limiting foreign influence" as applied to candidate elections was compelling. Add. 30. As applied to Ballot Questions, considered this "a much closer question" and "assumed without deciding" that this interest was sufficient for that as well. Add. 30-31. By contrast, the Order found that the second proffered State interest—the appearance of foreign government influence—was not compelling. Add. 31-32.

The Order then considered whether the Initiative was narrowly tailored with respect to the three types of FGIEs to which it applies.[4] The Order found that Initiative's total prohibition on Section 1062(4) communications from Foreign governments were "necessary to further Maine's interest in limiting foreign government influence in its elections", including Ballot Measures. Add. at 33. In so ruling, the Order did not address Appellees First Amendment claim that, as Electors acting in their sovereign capacity to approve or reject proposed Ballot Measures, they were entitled to solicit, consider, and judge for themselves the value of Section 1062(4) communications information from any source, including foreign governments. At the same time, in this ruling the Order also did not address the civil and criminal sanctions on Appellees as individuals and as Electors for "knowingly" soliciting "contributions" or "knowingly" or "recklessly" providing substantial assistance with respect to contributions or expenditures. 21-A M.R.S. §

---

[4] 21-A M.R.S. §§ 1064(1)(E)(1), (1)(E)(2)(a),(1)(E)(2)(b).

1064(3)-(5). Although not ruling on these particular issues, the district court's injunctive relief protected Appellees (and others similarly situated) from being exposed to these sanctions and penalties.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in providing Appellees with injunctive relief barring the State from enforcing the Initiative against them. While ruling directly on certain of the First Amendment claims of Appellees, Central Maine Power ("CMP") and ENMAX/Versant ("Versant"), the district court did not directly decide all Appellees' arguments or those of Appellee, Maine Press Association, noting that "time is limited given that the Act is slated to go into effect on March 1, 2024." Add. at 01. However, the court tacitly recognized that Appellees' exercise of their First Amendment rights was also at risk and merited judicial protection pending their adjudication on the merits. Add. at 40.[5]

The Initiative strikes at the heart of Appellees' duties as voters and Electors in discharging their shared popular sovereign duties to consider proposals submitted as Ballot Measures for their approval or rejection of said proposals which, if approved,

---

[5] Although the district court did not expressly address the arguments Appellees raised below, this Court may consider and decide the claims Appellees presented to the district court. *United States v. Castillo-Martinez,* 16 F.4th 906, 915 (1st Cir. 2021); *Robidaux v. Mulholland*, 642 F.3d 20, 23, n. 2 (1st Cir, 2011); *see also*, *Citizens United v. Federal Election Commission*, 558 U.S. 310, 330-337 (2010).

have the force of law and, in the case of amendments to the Maine Constitution, the force of fundamental law.   For such proposals, even in their infancy, the Initiative would not only silence FGIEs, but would blind and deafen Appellees and their fellow voters to any communications coming within the capacious confines of Section 1064(2).

In so doing, the Initiative would not only interfere with, impede, and frustrate Appellees' right to petition the government and related associational rights; it would impede their right, as lawmakers exercising the sovereign power to enact or reject Ballot Measures, to be petitioned and, as well, to petition their fellow voters and Electors—all of the foregoing in violation of the Right to Petition the Government as protected by the First Amendment of the U.S. Constitution and Article I, Section 15 of the Maine Constitution.

In addition, by silencing FGIEs and depriving Appellees as individuals from Section 1064(2) communications, the Initiative violates their right to Freedom of Speech and related associational rights, as guaranteed by the First Amendment of the U.S. Constitution and Article I, Section 4 of the Maine Constitution, including the right to receive and consider information as well as their right to share such communications and even advocate to others their merits with respect to a given Ballot Measure.

By barring the generation and dissemination of Section 1064(2) communications to Appellees and other Maine voters, the Initiative also violates Appellees' right to Freedom of Assembly and related associational rights as provided for in the First Amendment to the U.S. Constitution and Article I, Section 15 of the Maine Constitution.

The Initiative undergirds all its suffocating provisions with onerous criminal and civil sanctions, all triggered by the felonious sin of employing Section 1064(2) communications "to influence" others on the merits of a given Ballot Measure. And yet, the Initiative employs terms of such sweeping proportions and generality that neither Appellees nor anyone else, which means everyone else, required to comply with its punitive regime, can be confident when they will have run afoul of its strictures, both chilling their exercise of First Amendment rights as well as their right to fair notice of the law and freedom from its arbitrary enforcement in violation of the Due Process Clause.[6] In this regard, as well to Appellees' First Amendment claims, particularly pernicious is the Initiative's appropriation of the term "to

---

[6] From this point forward, Appellees' reference to the First Amendment will incorporate the comparable rights set forth in Article I, Sections 4 and 15 of the Maine Constitution and their reference to the Due Process Clause of the Fourteenth Amendment will incorporate the comparable rights set forth in the Maine Constitution at Article I, Section 6 and 6-A. As noted above, Appellees contend that the rights guaranteed by the Maine Constitution provide at least as much protection and may provide more protection than the analogous provisions in the U.S. Constitution.

influence", converting this essential staple of political discourse into a weapon against certain voices and all those that wish to hear, consider, and share communications on Ballot Measures coming from those sources.

Finally, the Initiative imposes duties of censorship and publication on a broad spectrum of members of the media in a manner that risks chilling their essential role in fearlessly informing Maine voters and the public at large of information and perspectives on policy choices presented by Ballot Measures; measures which are often potentially far reaching and hotly contested; measures as to which the need for Maine voters and the public at large to be informed is at a premium.

As will be discussed further below, the Initiative violates the most fundamental and essential of political rights and in so doing goes much further than violating the Appellees' rights as individuals and as Electors with respect to their consideration of Ballot Measures; it strikes at the very essence of Maine's political discourse and exercise and execution of popular sovereignty.

## LEGAL AND FACTUAL BACKGROUND—TERMS OF INITIATIVE— BALLOT MEASURES RESTRICTED

Before turning to the merits of the Appellees' challenge and the injunctive relief the district court issued in their favor, a detailed discussion of the both the Initiative's terms and the legislative processes for each of the Ballot Measures to which the Initiative applies is warranted.

The Initiative bars the use of information generated through contributions or donations to, or expenditures or disbursements by, designated foreign entities "to influence…the initiation or approval of a referendum." 21-A M.R.S. § 1064(2).[7]

Section 1 of the Initiative amends Title 21-A of the Maine Revised Statutes by adding a new section—Section 1064. 21-A M.R.S. § 1064(1)-(11). Section 1 is directed at "foreign government-influenced" entities and "foreign government-owned entities".[8] *Id.* at. § 1064(E), (F). The Initiative defines "foreign government-influenced entity" to include a "foreign government" or an entity in which a "foreign government" or "foreign government-owned entity" either "holds, owns, [or] controls . . . 5% or more of the total equity, outstanding voting shares, membership units or other applicable ownership interests" or "directs, dictates, controls or directly or indirectly participates in the decision-making process" of the entity. (hereinafter "FGIE"). The Initiative bars FGIEs from "mak[ing], directly or indirectly, a contribution, expenditure, independent expenditure,[9] electioneering

---

[7] The Initiative includes a second section—Section 2—which did not enact a law but, rather, urged members of the Maine Congressional Delegation to support an "anticorruption" amendment to the United States Constitution. Add. at 44. Section 2 did not enact a law and, therefore, was not the proper subject of an initiative. *See*, *Moulton v. Scully*, 111 Me. 428, 89 A. 944, 952-953 (1914). Nevertheless, Appellees do not challenge the constitutionality of Section 2 in this litigation.

[8] "Foreign government-owned entity" is defined by 21-A M.R.S. § 1064(1)(F) to include "any entity in which a foreign government owns or controls more than 50% of its equity or voting shares."

[9] "Independent expenditures" are defined as expenditures made independent of "a candidate, a candidate's authorized political committee or an agent of either. . . ."

communication,[10] or any other donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum." Add. 44 (Section 2).[11]

Section 1 applies to six forms of popular sovereignty defined in Section 1064(1)(I)(1)-(6). All six grounded in the Maine Constitution, are: (1) the people's veto under Article IV, Part Third, Section 17; (2) the "direct initiative"[12] under Article IV, Part Third, Section 18; (3) the ratification of a constitutional amendment under Article X, Section 4; (4) a legislative proposal issued to the Electors bv the Legislature under Article IV, Part Third, Section 19; (5) the ratification of the issue of bonds under Article IX, Section 14; and (6) any county or municipal referendum.[13]

---

21-A M.R.S. § 1019(1). The term "independent expenditure" is not defined or referred to in Section 1052 of Title 21-A—the definition section governing reports on ballot questions. *See*, 21-A M.R.S. § 1052(1)-(5). It appears, therefore, that "independent expenditures" does not apply to Ballot Measures.

[10] The term "electioneering communication" is referred to at 21 M.R.S. § 1014(1), (2) and (2-A). 21-A M.R.S. § 1064(1)(B); *Cf.*, *Citizens United v. Federal Election Commission*, 558 U.S. 310, 321 (2010) (discussing "electioneering communication" as defined in federal statute.) The term "electioneering communication" is not either defined or referred to in Section 1052 of Title 21-A which governs referenda, initiatives and other ballot measures. *Cf.*, 21-A M.R.S. § 1014(1), (2), (2-A); § 1052(1)-(5). By contrast, the terms "contribution" and "expenditure" are defined at Section 1052(3) and (4). *See*, 21-A M.R.S. § 1052(3)-(4). It appears, therefore, that "electioneering communication" does not apply to Ballot Measures.

[11] Appellees do not, in this litigation, challenge the constitutionality of the Initiative as it applies to "the nomination or election of a candidate."

[12] See discussion, infra, at infra at 37.

[13] Given the number of Maine municipalities and variations in their initiative processes, this memorandum is limited to discussion of the five statewide Ballot Measures listed in Section 1064(1)(I)(1)-(5).

*See* Article IV, Part Third, Section 21. 21-A M.R.S. § 1064(1)(I)(1)-(6) (hereinafter, at times, "Referendum" or "Ballot Measures").

Section 1064(2) is the core of the Initiative. Its sweeping prohibitive terms permeate every aspect of the Initiative and provide the foundation for the criminal and civil sanctions to Appellees and all others are exposed. Therefore, a close examination of its terms is required. As applied to Ballot Measures, Section 1064(2) bars FGIEs from: "mak[ing], directly or indirectly, a contribution, expenditure…or any other donation or disbursement of funds to influence…the initiation or approval of a referendum."

**Initiation and Approval:** Section 1064(2) applies to the "initiation or approval" of any of the Ballot Measures listed at Section 1064(1)(I)(1)-(6).[14] Once a Ballot Measure has been "initiated", the Initiative applies at all points thereafter up to and including "approval" (or rejection) by Maine voters. For all the Section 1064(1)(I) Ballot Measures, "approval" (or rejection) means a vote on a given Ballot Measure by registered voters and Electors exercising their sovereign lawmaking powers. For those Ballot Measures initiated by petition, it applies to the earliest stages of that process, and for those initiated by the Legislature, it applies to

---

[14] Five of the Ballot Measures listed in Section 1064(1)(I) are in the Maine Constitution: 1) the people's veto, art. IV, Pt.3d, § 17; 2) the direct initiative art. IV, Pt. 3d, § 18; 3) Constitutional amendments, art. X, §4; and 4) bond approvals, art. IX, § 14. 21-A M.R.S. § 1064(1)(I)(1)-(5). The last category covers country and municipal Ballot Measures. *Id.,* at § 1064(1)(I)(6).

the first point at which Legislators begin their consideration of a given Ballot Measure. Once a Ballot Measure has been "initiated," the Initiative applies through the point at which a Ballot Measure is considered in a general election. Thus, Section 1064(2) applies to the entirety of the legislative process by which a Ballot Measure is presented to the voters for approval.

**Petition-Originated Legislation**: Section 1064(2)'s use of the word "initiation," itself, must be compared to the broad range of Ballot Measures the Initiative covers.[15] Section 1052 of Title 21-A describes rather than defines "initiation," advising that it "includes the collection of signatures and related activities to qualify a state or local initiative or referendum for the ballot." 21-A M.R.S. § 1052(4-B). This description applies to those Ballot Measures that are commenced by petition, but only two of the statewide Ballot Measures listed in Section 1064(1)(I)—the people's veto and the direct initiative—are commenced by petition. *See*, Me. Const., art. IV, Pt. 3d, §§ 17-18.

**Legislature-Originated Legislation**: The three other statewide Ballot Measures covered by the Initiative—popular approval of an amendment to the Constitution, conditional legislation issued by the Legislature for voter approval, and

---

[15] The Initiative does not define "initiation". Therefore, a dictionary must be consulted. *See McDonald v. City of Portland*, 2020 ME 119, ¶¶ 20-21, 239 A. 3d 662. The definition of "initiation" is tied to the definition of "initiate" which means "to cause or facilitate the beginning of : set going." Merriam-Webster's Collegiate Dictionary (ed. 2003).

the ratification of bonds—all are initiated by the Legislature. *See*, Me. Const., art. X, § 4, art. IV, Pt. 3d, § 19, art. IX, § 14. Therefore, Section 1052(4-B)'s definition does not apply to them. As to Ballot Measures originated by the Legislature, Section 1064(2) applies to the very earliest point at which any individual member of the Legislature may propose a constitutional amendment, a law or a bond for possible submission to the voters at large for approval.[16]

**Contributions/Expenditures/Donations/Disbursements:** Section 1064(2) prohibits "contributions" and "expenditures" as well as "any other donations or disbursement of funds," if they are made "to influence…the initiation or approval of a referendum."[17] The Initiative expressly incorporates by reference Section 1052's definitions of "contribution" and "expenditure." 21-A M.R.S. § 1064(1)(A), (C).

The statutory definition of "contribution" is expansive applying in pertinent part to, "[a] gift, subscription, loan, advance or deposit of money or anything of value by a committee for the purpose of initiating or influencing a campaign."[18] The statutory definition of "expenditure" is also broad applying in pertinent part to "[a] purchase, payment distribution, loan, advance, deposit or gift of money or anything

_____

[16] See, n. 11, supra.

[17] The Initiative expressly incorporates by reference the definitions of "contribution" and "expenditure" in Section 1052 of Title 21-A. 21-A M.R.S. § 1052(A) and (C). The terms "any other donation" and "any…disbursement of funds" are not defined either in the Initiative or in Title 21-A of the Maine Revised Statutes.

[18] The definition of "contribution" is supplemented by more a particular list of acts that constitute contributions. 21-A M.R.S. § 1052(3)(A)-(D).

of value, made for the purpose of initiating or influencing a campaign." 21-A M.R.S. § 1052(4)(1); *see also*, *Id.* at § 1052((1-A)-(3).

Although the meanings of "contribution" and "expenditure" have been defined by statute, that is not true of the terms "any other donation" or "any…disbursement of funds." Therefore, accepted dictionary definitions must be consulted. *McDonald v. City of Portland*, 2020 ME 119, ¶¶ 20-21, 239 A.3d 662. At this point, it is sufficient to note that both terms are modified by the word "any" which means they must be applied broadly. *National Council on Compensation Insurance v. Superintendent of Insurance*, 481 A.2d 775, 780 (Me. 1984) (common meaning of "any" is "no matter which one"). These terms must, therefore, be broadly construed.

**Influence:** Just as Section 1064(4) is the Initiative's core provision, the word "influence", is its key concept. Section 1064(2) bars FGIEs from making contributions, donations, expenditures or disbursements "to influence" the initiation or approval of a referendum. In general usage, the word "influence" is inherently elastic[19], and the Initiative does not define it. Section 1052(4-A) of Title 21-A defines "influence" as meaning "to promote, support, oppose or defeat." 21-A

---

[19] See, *e.g.,* "**Influence**": "The act or power of producing an effect without apparent exertion of force or direct exercise of command." Merriam-Webster's Collegiate Dictionary (ed. 2003)

M.R.S. § 1052(4-A).[20]   These four words are sufficiently broad to encompass the entirety of activities associated with the Electors' consideration of a given Ballot Measure as well as that of interested parties and the public at large.   They cover everything from highly organized and well-funded campaigns to approve or defeat such a measure, with all the myriad ways of communicating internally and to the public such campaigns necessarily entail, to highly individual attempts to communicate with neighbors, friends, and family.

The common concept that knits these four  Section 1052(4-A) words together is that of persuasion. Persuasion, in turn, assumes communication from one to another, or to many others, through a seemingly limitless array of instruments and media now so readily available. In sum, "influence", as used in Section 1062(4), applies to all the means people may employ when they communicate for the purpose of persuading others to promote, support, oppose or defeat a Ballot Measure.  In the arguments that follow, this memorandum uses "influence" in this sense. *See also*, *infra*, 42-45.

---

[20] "Influencing" appears within the definition of "contribution" and "expenditure". 21-A M.R.S.  §§ 1052(3), (4).  As noted, Section 1064(2)'s additional terms "any other donation" and "any…disbursement" are not statutorily defined, and, therefore, it is unclear whether Section 1052(4-A)'s definition of "influence" applies to them. Without conceding the point, for purposes of this brief, Appellees assume that Section 1052(4-A)'s definition applies to Section 1064(2) in its entirety.

**Persons Influenced:** The prohibition on the use of FGIEs' monies to "influence" necessarily applies to those persons with the capacity to "initiate" and those with the capacity to "approve" a given Ballot Measure; that is, to attempt to persuade them to promote, support, oppose or defeat that Ballot Measure. As has been seen, only two Ballot Measures may be initiated by petition—the people's veto and the direct initiative—the remaining three—constitutional amendments, conditional legislation, and bonds—are initiated by the Legislature. Therefore, the Initiative bars FGIEs from contributing or expending monies to influence would-be petitioners or members of the Legislature when a Ballot Measure is being initiated. Ultimately, qualifying Ballot Measures are submitted to the Electors or voters at large for approval. Therefore, the Initiative bars FGIEs from contributing or expending monies to influence Electors or voters at large in the approval of a given Ballot Measure.

**Directly or Indirectly**: Finally, Section 1064(2) bars FGIEs from seeking to influence "directly or indirectly." This phrase is comprehensive and, in effect, encompasses all manner and means by which the FGIEs might seek to communicate—that is, "influence"—legislators or Electors in their exercise of their lawmaking powers with respect to Ballot Measures.

**Application of Prohibited Conduct to all Persons:** Although Section 1064(2) is directed at the FGIEs as defined in Section 1064(1)(E) and (F), the

Initiative's reach is much broader—indeed, it is limitless. Section 1064(11), which is headed "Applicability", expressly eschews the limitations set forth at 21-A M.R.S. § 1051 (governing Ballot Measures) and, instead, provides that the Initiative applies to "all persons." 21-A M.R.S. § 1064(11). In addition, Section 1064(3) through Section 1064(5) describes specific prohibited conduct—all tied by to Section 1064(2)—which apply to **any** person. 21-A M.R.S. § 1064(3)-(5).

First, Section 1064(3) provides that a person may not "knowingly solicit, accept, or receive a contribution or donation prohibited by [Section 1064(2)]." 21-A M.R.S. § 1064(3). Although not cited, the word "knowingly" is derived from the Maine Criminal Code. 17-A M.R.S. § 35(2).

Second, Section 1064(4) provides that a person may not "knowingly or recklessly provide substantial assistance, with or without compensation" for either of the following: A) "the making, solicitation, acceptance or receipt of a contribution or donation prohibited by [Section 1064(2)]" or B) "the making of an expenditure…or disbursement prohibited by [Section 1064(2)]." Although not cited, the word "recklessly" is derived from the Maine Criminal Code. 17-A M.R.S. § 35(3); 21-A M.R.S § 1064(4).

Section 1064(4) extends the reach of Sections 1064(2) and 1064(3) by including not only individuals seeking Section 1064(2) communications but those who provide "substantial assistance" to such individuals.

Third, Section 1064(5) provides that a person "may not structure or attempt to structure a solicitation, contribution, expenditure…or disbursement or other transaction to evade[21] the prohibitions and requirements of [the Initiative in its entirety.]."  21-A M.R.S. § 1064(5).

Sections 1064(3)-(5) apply in full to the Appellees individually and in their capacities as registered voters and Electors.   Section 1064(3)  bars Appellees, and all other persons, from making a contribution or a donation or an expenditure or disbursement to influence the initiation or approval of a Ballot Measure in violation of Section 1064(2).   Section 1064(4) bars Appellees, and all other persons, from providing "substantial assistance" with respect to a contribution or donation or expenditure or disbursement to influence the initiation or approval of a Ballot Measure in violation of Section 1064(2). Section 1064(5) is framed even more broadly than the other prohibitory provisions, barring any "attempt to structure", not only contributions, donations, expenditures, and disbursements, but also "solicitations" or any "other transaction" for the purpose of "evad[ing] the prohibitions and requirements of [the Initiative]."   21-A M..R.S. § 1064(5).

---

[21] Though not singled out for briefing below, it should be noted that the word "evade" as it appears in Section 1064(5) is ambiguous.  It does not necessarily connote wrongful conduct.   When coupled with the word "attempt", it is more ambiguous still.  Yet, a violation of Section 1064(5) could result in the civil or criminal penalties provided in Sections 1064(8) and 1064(9).

**Civil and Criminal Sanctions:** The Initiative subjects all persons, including Appellees, to severe civil and criminal sanctions for transgressing its terms. Section 1064(8) authorizes the Commission to impose penalties of "not more than $5,000 or double the amount of the contribution, expenditure…donation or disbursement involved in the violation, whichever is greater for a violation of [the Initiative]." 21-A M.R.S. § 1064(8). An aggravating factor is whether the violation was "intentional." *Id.*

In addition, Section 1064(9) provides that any violation of Section 1064(2) (barring FGIEs from making contributions, donations, expenditures, or disbursements to influence the initiation or approval of an Initiative) is a Class C crime.[22] 21-A M.R.S. § 1064(9). It provides further that any violation of Sections 1064(3)-(5), which apply to all persons, including Appellees, is also a Class C crime. *Id*.

Section 1064(6) imposes limitations and duties on a broad range of media, including traditional broadcast and print journalism. Those limitations and duties carry the real risk of chilling the willingness of the press to present Section 1064(2)

---

[22] Under Maine criminal law, a Class C crime is a felony and is punishable by imprisonment for to five years and a fine of up to $5,000. 17-A M.R.S. § 1604(C), 17-A M.R.S. § 1704(3). "Organizations" can be fined up to $20,000. 17-A M.R.S. § 1705(4).

communications on Ballot Measures to the public.  Appellees, in their capacities and individuals and as Electors, are entitled to receive such communications in their consideration of the merits of the initiation and approval of any Ballot Measures and, accordingly, in their own right challenge the constitutionality of Section 1064(6) as violative of their First Amendment rights.

The Initiative was passed without legislative findings setting forth the conditions that supported its enactment and the limitations it imposes on Appellees in their ability to weigh the arguments for and against Ballot Measures which, if enacted, will become binding law.

## ARGUMENT

### Standard of Review

This Court's power to issue injunctive relief is "firmly embedded in our judicial system." *Scripps-Howard Radio, Inc. v. F.C.C.*, 316 U.S. 4, 13 (1942). Four factors govern a request for injunction pending appeal: (1) whether the movant "has made a strong showing that [it] is likely to succeed on the merits"; (2) whether the movant "will be irreparably injured absent a stay"; (3) whether issuance of relief "will substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 44 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

On appeal, this Court reviews a district court's rulings on factual matters for clear error and its ruling on legal questions de novo. *Corporate Techs. Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013). Overall, it reviews the district court's decision for abuse of discretion. *Voice of the Arab World Inc. v. MDTV Med. News Now, Inc*., 645 F.3d 26, 31 (1st Cir. 2011).

**I. Appellees are likely to succeed on their First Amendment claims that the Initiative violates their right to petition the government and, as Electors, to be petitioned with respect to the initiation and approval of Ballot Measures.**

### A. The right to petition the government on Ballot Measures protects speech intended to inform voters in exercising the sovereign power to approve or reject proposed laws

Although the district court did not directly rule on Appellees claim that the Initiative violated their right to petition the government and, as Electors, to be petitioned, Appellees demonstrated a likelihood of success on the merits on this claim and raise it as a separate basis for sustaining the district court's issuance of injunctive relief.

To begin with, the Right to Petition the Government is set forth in the First Amendment in unambiguous and unqualified terms. "Congress shall make no law…abridging…the right of the people…to petition the Government for a redress of grievances." U.S. Const., Am. I. The Right to Petition is accompanied in the First Amendment by Freedom of Speech and Freedom of Assembly which also may not be "abridge[ed]." *Id*. All of these rights are reinforced by an unstated but

necessarily implied right of association. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 135 (2003).

In *DeJonge v. Oregon*, 299 U.S. 353 (1938), the Supreme Court observed that, "[f]reedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment of the Federal Constitution." *Id.* at 364 (citations omitted). The Court then went on to explain that "[t]he right to peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *Id.*; *accord Thomas v. Collins*, 323 U.S. 516, 530 (1945).

*DeJonge* quoted *United States v. Cruikshank*, 92 US. 542, 552 (1875): "The very idea of government in republican form, implies a right on the part of its citizens to meet peaceably for consultation and in respect to public affairs and to petition for redress of grievances." *Id. DeJonge* recognized that these First Amendment rights— Freedom of Speech, Freedom of Assembly, Freedom of Press, and the Right to Petition—were, indeed, "cognate"; that is related, interdependent and mutually reinforcing, but also different and distinct. *See United Mine Workers v. Illinois Bar Ass'n*, 389 U.S. 217, 222 (1967). As has been noted, both *DeJonge* and *Cruikshank* tied them all to individual and civic rights essential to representative government.

"The First Amendment guarantees 'the right of the people…to petition the Government for a redress of grievances.' The right to petition is cut from the same

cloth as other guarantees of that Amendment and is the assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482 (1985).

The *McDonald* Court traced the origins of the right to petition at least as far back as the English Bill of Rights of 1689, noting that it was included in Declarations of Rights of several states. *Id.* The right to petition can take many forms including litigation (*United Mine Workers*, 389 U.S. at 221-22) to challenging a potential executive nomination. *McDonald*, 472 U.S. at 484.

In *First Nat'l Bank of Bos.* v. *Bellotti,* 435 U.S. 765 (1978), the Supreme Court considered another way in which the government may be petitioned—that is, by seeking to influence those with lawmaking authority to enact, change or repeal a law.[23] The Massachusetts law in question barred a broad spectrum of corporations from "influencing or affecting the vote" on most initiatives and referenda. 435 U.S. at 768, n. 2.[24]

---

[23] *Bellotti* apparently did not involve a challenge to the Massachusetts law based on the right to petition the government. Nonetheless, the Court noted that, in exercising the initiative power, Massachusetts voters were acting in their "sovereign capacity." *First Nat's Bank of Bos. v. Bellotti,* 735 U.S. 765, 790-91, n. 31.

[24] With an exception for initiatives and referenda "materially affecting" their interests, the law barred the listed corporations from "influencing or affecting any question submitted to the voters." 435 U.S. at 768, n.2. The Massachusetts law was less restrictive than the Initiative in that it applied to "any question **submitted to the voters**" whereas, by contrast, the Initiative applies to the entirety of legislative process for Ballot Measures from "initiation" through "approval." 21-A M.R.S. § 1064(2).

At the outset, *Bellotti* rejected the lower court's emphasis on the corporate status of the restricted parties saying that approach "posed the wrong question" "[because] [t]he First Amendment, in particular, serves societal interests." *Id*. at 776. "Therefore, the question is not whether corporations 'have' First Amendment rights and, if so, whether they are coextensive with those of natural persons. Instead, the question must be whether [the Massachusetts law] abridges expression that the First Amendment was meant to protect." *Id.* at 776.

This being so, the Court observed that, "[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union or individual." *Id.* at 777. Therefore, "in the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address the public issue." *Id.* at 784-85.

While recognizing the importance of "[p]reserving the integrity of the electoral process", the Court noted that, "[t]he risk of corruption perceived in cases involving candidate elections [citation omitted] is simply not present in a popular vote on a public issue." *Id.* at 790.[25] The Court characterized the Massachusetts

---

[25] Although *Bellotti* noted that the Massachusetts law implicated the voters "tak[ing] action in their sovereign capacity (435 U.S. at 791, n. 31) it does not appear that the parties challenging that law included their right to petition the government in their challenge to that law.

law's attempt to insulate the voting public from communications from corporations on Ballot Measures as manifesting "paternalism." *Id.* at 791, n. 13.

*Bellotti* was squarely consistent with the Supreme Court's decisions in two immediately preceding cases—*Buckley v. F.E.C.,* 424 U.S. 1 (1976) and *Virginia Bd of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976).

In *Buckley*, the Court observed that "[t]he First Amendment affords the broadest protection to…political expression in order to 'ensure [the] unfettered interchange of ideas for bringing about political and social changes desired by the people.'" 424 U.S. at 14 (*quoting Roth v. United States*, 354 U.S. 476, 484 (1957)). *Buckley* added that "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs…of course includ[ing] the discussion of candidates." *Id.* (*quoting Mills v. Alabama*, 384 U.S. 214, 218 (1966)).[26] The indispensable precondition was "informed public opinion [which] is the most potent of all restraints on misgovernment." *Id.* at 67, n. 79 (quoting *Grosjean v. American Press Co*., 297 U.S. 233, 250 (1936)); *see also*

---

[26] The full quote from *Mills v. Alabama* reads as follows: "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." 384 U.S. 214, 218-19 (1966); *see also First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. at 777 (quoting *Thornhill v. Alabama*).

*Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("the remedy to be applied [to an apprehended evil] is more speech, not enforced silence").

In *Virginia Board*, the Supreme Court overruled precedent restricting the First Amendment stature of commercial speech emphasizing instead the right of the public to receive and evaluate for itself the value of such speech. 425 U.S. at 770. In reaching this conclusion, the Court observed that although, "[f]reedom of speech presupposes a willing speaker[,]…where such a speaker exists…the protection is afforded to the communication, to its source, and to its recipients both." *Id.* at 756 (citations omitted).[27]

In his concurring opinion, Justice Stewart observed, "[f]reedom of information, if it would fulfill its historic function in this nation, must embrace **all** issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Id.* at 776 (emphasis supplied) (*quoting Thornhill v. Alabama*, 310 U.S. 88, 102 (1940)). Justice Stewart then amplified this point by observing: "'Under the First Amendment there is no such thing as a false idea,' and the only way that ideas can be suppressed is through the 'competition of other ideas.'" *Id.* at 780 (*quoting Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-340 (1974)).

---

[27] *Virginia Board* characterized the State's restrictions on advertisements of pharmaceutical pricing at issue in that case as a "highly paternalistic approach". 425 U.S. at 770.

At base, as the Supreme Court has observed, "[t]he civic discourse belongs to the people, and the Government may not prescribe the means used to conduct it." *Citizens United v. F.E.C.,* 558 U.S. at 372 (*quoting McConnell v. Federal Election Commission*, 540 U.S. 93, 341 (2003) (opinion of Kennedy, J.)).

### B. The Ballot Measures to which the Initiative applies are all authorities for the popular exercise of the lawmaking power

By its application to Ballot Measures, the Initiative is directed at a very particular category of constitutionally-protected petitioning—that is, the right to petition a lawmaking body in its consideration of whether or not to enact a law. That is because, as is explained further below, the power invested in the people by each of the Ballot Measures to which the Initiative applies is the sovereign's power to enact policies having the binding force of law.

From its inception as a State, the Maine Constitution has provided that, while only the Legislature has the power to propose constitutional amendments, only the voters at large have the power to approve them. *Marshall J. Tinkle*, *The Maine State Constitution*, 180-81(2d ed. 2013); *see*, Me. Const., art. X, § 4. The Initiative applies to the amending process. 21-A M.R.S. § 1064(1)(I)(3). Later, the Maine Constitution was amended to provide voters with the right to approve bond proposals which, like constitutional amendments, may only originate exclusively with the Legislature. Me. Const, art. IX, § 14; *see also Tinkle, The Maine State Constitution*,

165-66 (2d ed. 2013).  The Initiative applies to the Legislature's issuance and the Electors' approval of bonds.   21-A M.R.S. § 1064(1)(I)(5).

In 1909, Maine voters amended the State's Constitution to add the people's veto, the direct initiative, conditional legislation, and authorization for municipal Ballot Measures.   Me. Const., art. IV, Pt. 3d, §§ 17-22.   The Initiative applies to all these popular lawmaking measures.  21-A M.R.S. § 1064(1)(I)(1)-(2), (4), (6).

These amendments vested the Electors with lawmaking powers that were comparable to, but not entirely the same as, those possessed by the Legislature. The Law Court has consistently recognized that these amendments invested the Electors with **legislative** power: "the people reserved to themselves the power to propose laws and to enact or reject the same at the polls independent of the legislature." *Farris ex rel. Dorsky v. Goss,* 143 Me. 227, 230 (1948). Explaining further, the Law Court stated, "[i]n short, the **sovereign**, which is the people, has taken back, subject to the terms and limitations of the amendment, a power which the people vested in the legislature when Maine became a state." *Id*. at 230-31 (emphasis supplied).

Subject to the terms and conditions of those amendments, the people's power to enact laws is "absolute and all embracing."   *Town of Warren v. Norwood*, 138 Me. 180, 192-193 (1941); *see also Opinion of the Justices*, 623 A.2d 1258, 1262 (Me. 1993).

In *Moulton v. Scully*, the Court held that the initiative power applied "only [to] the legislation, to the making of laws, whether it be a public act or a private resolve, having the force of law." 111 Me. 428, 89 A. 944, 953 (1914); *see also*, *Opinion of Justices*, 118 Me. 544, 107 A. 673, 674-676 (1919) (concluding that popular ratification of an amendment to the federal constitution was "in no sense legislation" and was invalid). Therefore, the powers of popular sovereignty set forth in amendments 17-22 of Article IV, Part Third of the Maine Constitution all concern the Electors' collective exercise of the sovereign's lawmaking powers.

Thus, when, individually and collectively, Electors exercise the powers set forth in these amendments, as well as the more longstanding power to ratify constitutional amendments and approve bonds, they are "the government" within the meaning of the First Amendment's guarantee of "the right to petition the Government for redress of grievances." U.S. Const, 1st Am.[28] Moreover, when acting in their capacities in the exercise of each of these powers, the Electors not only have the right to petition one another, they have the right to be petitioned by one another.

---

[28] The following arguments apply equally to Appellees' claims in Count VI that the Initiative violates their right to petition the government under Article I, Section 15 of the Maine Constitution and, as noted above, Appellees assert that the protections afforded in the Maine Constitution are at least equal to and may more extensive than those provided in the First Amendment.

It is apparent, then, that the lawmaking power with respect to Ballot Measures held by Maine voters individually and collectively is same as that held by their elected representatives in the Legislature. Therefore, the Supreme Court's protection of political speech concerning the election of candidates for legislative office is equally applicable to political discourse on the merits of Ballot Measures.

Such discourse is "core political speech." *F.E.C. v. Wisc. Rt. to Life, Inc*., 551 U.S. 449, 477-78 (2007). Indeed, public discourse on Ballot Measures, which in no way involves candidate nominations and elections, is more closely akin to "issue advocacy." *Id* at 469 (*citing Bellotti,* 435 U.S. at 776); *see also Bluman v. F.E.C,* 800 F.Supp.2d 281, 290 (D.D.C 2011) ("speak[ing] on issues of general public interest" is a "quite different context" from "participation in a political campaign for election to public office" (*quoting Bellotti*, 435 U.S. at 788, n. 26)). Indeed, "speech is an essential mechanism of democracy—it is **the means** to hold officials accountable to the people—political speech must prevail against laws that would suppress it by design or inadvertence. *Citizens United v. F.E.C*. 558 U.S, 310, 339 (2010).

It necessarily follows, therefore, as the Supreme Court has observed "[i] n a republic where the people are sovereign, the ability of the citizenry to make **informed** choices among candidates for office is essential". *Citizens United*, 558 U.S. at 339 (*quoting Buckley,* 424 U.S. at 14-15 (emphasis supplied)); *cf. Virginia Board*, 425 U.S. at 770.

Here, by way of illustration, the Initiative's comprehensive reach must be considered in the context of the constitutional procedures for governing Maine initiatives. The Initiative applies to "direct initiatives". 21-A M.R.S. § 1064(1)I)(2).

Article IV, Part Third, Section 18 of the Maine Constitution authorizes Electors at large to initiate proposed legislation for consideration by Electors at a general election. Although this initiative process is often described as a "direct initiative", it is, in fact, an indirect initiative. That is because, once petitioners have obtained the requisite number of valid signatures, the proposed legislation is not presented directly to the voters; instead, it must first be presented to the Legislature. Me. Const., art. IV, pt. 3d, § 18(2)

Upon presentation, the Legislature then has three options: it may enact the proposed legislation without change; it may propose legislation of its own to the voters as a competing measure; or it may take no action. *Id.* Popular initiatives that must be presented to the legislature before being sent to the voters are termed "indirect initiatives." *See* James D. Gordon III & David B. Magleby, *Pre-Election Judicial Review of Initiatives and Referendums*, 64 Notre Dame L. Rev. 298, 299 (1989); *see also Tinkle*, *The Maine Constitution*, 103 (2d ed. 2013) ("[t]his type of initiative has been categorized as 'modified-direct' legislation.")

Where the Initiative is concerned, the indirect character of Maine's initiative process is no mere technical distinction. It means that the Legislature's consideration

of its three options in accordance with Article IV, Part Third, Section 18 initiative is an integral part of the "initiation and approval" process for such proposals.

Because Section 1064(2) applies to the entirety of the legislative process from "initiation to approval", it bars the Electors (and all others) from using Section 1064(2) communications to "influence" legislators and it bars all legislators from doing the same.[29]  Use of such communications to that end would run afoul of Sections 1064(3)-(5) and the civil and criminal sanctions in Section 1064(8)-(9).

The same would apply to the use of such communications "to influence" the Governor to veto (or not) an initiative the Legislature sends out for a popular vote. In short, when the Legislature considers an Initiative, the Initiative's comprehensive reach and punitive regime criminalizes to use of Section 1064(2) communications by Electors in attempting "to influence" their legislators, legislators in attempting "to influence" one another; and, all of them in attempting "to influence" the Governor.

This illustration demonstrates that the Initiative runs counter to the most fundamental First Amendment tenets. Rather than enhancing the public's knowledge on Ballot Measures, it **bans** the employment of Section 1064(2) communications "to influence" the "initiation and approval" of Ballot Measures. 21-A M.R.S. §§

---

[29] Appellees' use of the term "Section 1064(2) communications" includes the prohibitions on contributions and expenditures made to generate those communications. *See* 21-A M.R.S. § 1064(2).

1064(2)-(5). And, not content with that, it subjects FGIEs, interested parties, Electors, and the public at large to civil and criminal sanctions for transgressing that prohibition. 21-A M.R.S. §§ 1064(8)-(9). This is unlawful.

"When Government seeks to use its full power, including the criminal law, to command **where** a person may get his or her information or **what distrusted source** he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves." *Citizens United v. F.E.C.*, 558 U.S. 310, 356 (2010) (emphases supplied).

All the foregoing principles apply with especial force where the electorate's consideration of a proposed Ballot Measures which, if approved, will be binding on all to whom it applies. *Bellotti,* 435 U.S. at 784-85.

### C. Strict scrutiny applies to laws that ban or limit public discussion of Ballot Measures and the Initiative fails strict scrutiny

The Initiative's ban on Section 1064(2) communications (and contributions and expenditures connected thereto) applying to Ballot Measures must be examined under a strict scrutiny analysis. *Bellotti,* 435 U.S. at 786, 795.

"Laws that burden political speech are ordinarily subject to strict scrutiny requiring government to prove that any restriction 'serves a compelling interest and is narrowly tailored to meet that interest." *Sindicato Puertorriqueno de Trajadoes, SEIU v. Fortuno*, 699 F.3d 1, 11 (1st Cir. 2012) (*quoting Citizens United*, 558 U.S. at 340).

The interests that the State has offered as "compelling" are two-fold: 1) "protecting Maine **candidate** elections from foreign-government influence" and "preventing the appearance of foreign-government influence in its elections." State Brief at 30 (emphasis supplied). The State argued that these same interests justify the Initiative's application to Ballot Measures asserting that, "there is no reason to treat such campaigns differently." *Id.* at 34.

To a large extent, the State's reliance on these interrelated rationales rests on the three-judge court's decision in *Bluman v. F.E.C.* State Brief at 31. In particular, the State relies on *Bluman*'s validation of a federal law banning foreign nationals from contributing to candidates or parties to support candidate elections on the grounds that the Government could exclude such persons from activities "intimately related to the process of democratic self-government." State Brief at 32 (*citing Bluman,* 800 F. Supp. 2d at 287).

Notwithstanding the State's contention that there was "no reason" that *Bluman*'s rationale should not be applied to Ballot Measures as readily as to candidate elections, that is not the way the *Bluman* Court saw it. On this point, *Bluman* could not have been clearer. To the foreign national plaintiffs' concern that an adverse ruling would bar them from "issue advocacy and speaking out on issues of public policy", the Court said, "[o]ur holding does not address such questions, and our holding should not be read to support such bans." *Id.* at 292.

*Bluman* held "the government may bar foreign citizens (at least those who are not lawful permanent residents of the United States) from participating in the **campaign process** that seeks to influence how voters will cast their ballots in the elections." *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 287 (D.D.C. 2011) (Kavanaugh, J.) (emphasis added), aff'd, 565 U.S. 1104 (2012). Judge Kavanaugh began his opinion by making clear, that *Bluman* in no way related to "issue advocacy." In fact, the federal statute at issue in *Bluman* did not "bar foreign nationals from issue advocacy—that is, speech that does not expressly advocate the election or defeat of a specific candidate." *Id.* at 284-285. As such, the contention that any compelling interest could be drawn from the *Bluman* holding to justify prohibitions related to ballot measures is entirely unfounded, as the issue was not before the *Bluman* court.

However, at the close of the opinion, the court acknowledged the foreign national plaintiffs' concern that the decision may be read to bar them from participating in "issue advocacy." Commenting on this concern, and anticipating the very arguments now asserted by Appellants, the Court said:

> "[Plaintiffs] similarly express concern that Congress might bar them from issue advocacy and speaking out on issues of public policy. Our holding does not address such questions, **and our holding should not be read to support such bans**."

*Id*. at 292 (emphasis supplied). Notwithstanding this express disclaimer, that is precisely the interpretation of *Bluman* that the Initiatives proponents now assert.

Moreover, "influence", by itself, much less the "appearance" thereof, is simply an unworkable standard. That is because, "influencing" lawmakers on public policy is not inherently wrongful. To the contrary, they are integral and, indeed, indispensable to policymaking in a democracy. As the Supreme Court has explained, "[f]avoritism and influence are…not avoidable in representative government." *Citizens United*, 558 U.S. at 359. Indeed, such influence is "in the nature of" representative democracy. *Id.* Indeed, far from being inherently pernicious, "[t]he fact that a corporation, or any other speaker, is willing to spend money to try to persuade voters presupposes that **the people** have the ultimate influence **over** elected officials." *Id.* at 360. (emphases supplied) This is especially the case when the voters, themselves, are the lawmakers.

For this reason, the Court cautioned "[r]eliance on a 'generic favoritism or influence theory…is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle.'" *Id.* (*quoting McConnell,* 540 U.S. at 296). *Bellotti* recognized this very point when it matter-of-factly observed, "[t]o be sure, corporate advertising may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it." 435 U.S. at 790. [30]

---

[30] The district court assumed that limiting foreign government influence was "compelling." Add. at 31. This Court need not determine that question to sustain injunctive relief.

As tenuous as FGIE "influence" and the "appearance" thereof clearly are in justifying the Initiative's application to candidate nominations and elections, they are wholly inapposite as a justification to ban Section 1064(2) communications with respect to the "initiation and approval" of Ballot Measures. This incompatibility arises from the nature of proposals that are approved by the voters at large. As *Bellotti* explained, "[t]he risk of quid pro corruption perceived in cases involving candidate elections [citations omitted] simply is not present in a popular vote on a public issue." 435 U.S. at 790; *accord Citizens Against Rent Control v .City of Berkeley*, 454 U.S. 290, 297-98 (1981); *see also Bluman*, 800 F.Supp.2d at 290 (quoting *Bellotti,* 435, U.S. at 788, n. 26) ("speak[ing] on issues of general public interest" is a "quite different context" from "participation in a political campaign for election to public office").

As the Supreme Court has recognized in the context of popular initiatives, speech of this sort—necessarily including speech covered by Section 1064(2)— "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 346 (1995).

Seen in this context—that is, in the framework of our democratic form of government which Maine has augmented through each instance of popular sovereignty covered by the Initiative—efforts to "influence" the "initiation or approval" of Ballot Measures, far from being inherently pernicious, are

manifestations of the political reality that the **power** to approve or reject lies with the voters.

This does not mean that the State is without recourse. *McIntyre,* 514 U.S. at 350 (recognizing state interest in preventing fraud and libel). More particularly, in the realm of political discourse, the Supreme Court has long recognized the government's compelling interest addressing a truly corrosive form of influence— quid pro quo corruption and the appearance thereof. *Buckley,* 424 U.S. at 26-27. Conduct that is inherently wrongful. Since *Buckley,* the Supreme Court has never wavered from recognition of the institutional risks that quid pro quo corruption and its appearance pose to public confidence in representative government and only recently held that these interrelated risks remain "only one permissible ground for restricting political speech." *F.E.C. v. Cruz*, 596 U.S. 289, 305 (2022); *see also Citizens United*, 558 U.S. at 359.

The Initiative fails, then, because it bans, rather than restricts speech and because its unqualified reliance on mere "influence", without more, does not constitute a compelling interest. For these reasons, Appellees have demonstrated a likelihood of success on the merits of their First Amendment claim based on the right to petition the government.

**D. Appellees are likely to succeed on their claims that the Initiative violates their First Amendment right to Freedom of Speech with respect to the initiation and approval of Ballot Measures**

In addition to violating Appellees' right to petition the government and, as Electors, to be petitioned, the Initiative also violates Appellees' rights to Freedom of Speech. Speech concerning Ballot Measures, including Section 1062(4) communications, constitute "core" political speech. *McIntyre*, 514 U.S. at 336.

As has been discussed above, restrictions on political speech concerning Ballot Measures are subject to strict scrutiny. *Bellotti*, 435 U.S. at 786, 795. The foregoing discussion of rights inherent in political speech and the State's proffered interests of FGIE "influence" or the appearance thereof are fully applicable here and are incorporated by reference. For those reasons, the Initiative fails strict scrutiny under the Freedom of Speech clause of the First Amendment.

Having said that, in addition, Appellees would note further that, as was stated in their right to petition argument, that by banning their right to receive Section 1064(2) communications, the Initiative violates their First Amendment right to receive information. In *Virginia Board*, the Supreme Court discussed the right to receive in considerable detail. 425 U.S. at 756-57. Among other things, the Court cited decisions in which it found that citizens had a right to receive information from hostile governments, *Lamont v. Postmaster General,* 318 U.S. 301 (1965), and found

that persons communicating with inmates had the right to receive correspondence from them. *Procunier v. Martinez,* 416 U.S. 396, 408-409 (1974).

In the context of political discussion, the Supreme Court has observed that, "[i]n a republic where the people are sovereign, the ability of the citizenry **to make informed choices** among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." *McIntyre,* 514 U.S. at 347 (emphasis supplied). Where the initiation and approval of Ballot Measures is concerned, this same principle applies with full force.

In addition, the Initiative is underinclusive in that it does not bar FGIE communications intended "to influence" the "initiation and approval" of proposed legislation by other lawmaking authority—**the Legislature**. *cf., Bellotti*, 435 U.S at 793.

On the other hand, the Initiative is also overinclusive. The letter that certain Maine legislators sent to the Premier of Quebec proves the point. Add. at 04. The district court noted that the legislators "demand[ed]" that Hydro-Quebec 'cease all further campaign activities in Maine' regarding the CMP Corridor initiative. *Id.* Written with reference to a particular Ballot Measure, this letter could be seen as "soliciting" a communication from an FGIE in violation of Section 1064(2). Equally problematical, any response from the Quebec Premier would have run afoul of Section 1064(2)'s plain terms.

Yet another example is Avangrid's opposition to the original initiative intended to stop the CMP Corridor. As has been seen, Section 1064(2) applies to the "initiation and approval" of any Ballot Measure. Avangrid opposed that initiative in several different ways including, ultimately, successfully challenging its constitutionality before the Law Court. *Avangrid Networks, Inc. v. Secretary of State*, 2020 ME 109, 237 A.3d 882.

Although, through Avangrid's efforts, this initiative was declared unconstitutional and the Secretary of State declined to submit it to the voters, it appears certain that some or all of Avangrid's opposition to this initiative would have come within the comprehensive embrace of Section 1064(2), opening Avangrid and those who disseminated Avangrid's Section 1064(2) communications to civil and criminal sanctions.

For these reasons and those set forth in its right to petition argument, Appellees have demonstrated a likelihood of success on the merits of their First Amendment claim based on the right to petition the government.

### E. Appellees are likely to succeed on their claims that the Initiative violates their First Amendment right to freedom of assembly with respect to the initiation and approval of Ballot Measures

Appellees also contend that the Initiative violates their First Amendment right to Freedom of Assembly. The arguments in support of Appellees' right to petition and freedom of speech apply fully to this argument, as well, and are incorporated by

reference. As do the right to petition the government and freedom of speech, freedom of assembly includes implied associational rights. *Thomas* 323 U.S. at 531.

That Ballot Measures implicate associational rights is made manifest by the statutory authorization for the formation and reporting obligations of "ballot question committees." 21-A M.R.S. § 1051, et seq.; *see also* 21-A M.R.S. § 1052(2-A), defining "ballot question committee." The Initiative bans Section 1064(2) communications and bans the use of such communications "to influence" the "initiation and approval" of Ballot Measures.

The Initiative thus would deprive Electors and others who wish to participate in a ballot question committee, to support or oppose an initiative to which an FGIE possesses relevant information and would subject them to severe civil and criminal sanctions for doing so, all in violation of the First Amendment right to freedom of assembly and related associational rights.

For these reasons and those set forth in its right to petition argument, Appellees have demonstrated a likelihood of success on the merits of their First Amendment claim based on the right to freedom of assembly.

### F. Appellees are likely to succeed on their claims that the Initiative violates their First Amendment right to freedom of press.

By placing duties and restrictions on television, radio broadcasting stations, providers of cable or satellite television, print news outlets, and Internet platforms, the Initiative is intended to and will have the effect of chilling the press, discouraging

them from proving information from Foreign Entities prohibited by Section 1064(2) to the public. 21-A M.R.S. § 1064(7).

In their individual capacities and as registered voters and Electors, the First Amendment protects Appellees' right to be free of any unwarranted and insufficiently justified "limitation on their right to the unfettered exercise of [their] First Amendment rights." *Lamont v. Postmaster General,* 381 U.S. at 307. The Supreme Court has long held that information is essential to a vital and robust public discussion, but this premise assumes that the public has access to the information and materials essential to that discussion. *See*, *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390 (1969) ("It is the right of the public to receive suitable access to social, political, aesthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged either by Congress or by the FCC."). Section 7 of the Initiative violates Appellees' right to a free press, both in their individual capacities and in the exercise of their duties and responsibilities as Electors.

For the foregoing reasons, Appellees are likely to succeed on the merits of their claim that the Initiative violates their First Amendment right to a free press.

### G. Appellees are likely to succeed on the merits of their claims that the Initiative violates their rights to due process of law.

The Initiative places all persons, including Appellees, at risk for serious criminal and civil sanctions. As such, the Initiative must satisfy basic notice

standards imposed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution as well as the Due Process and Law of the Land provisions of the Constitution of Maine.  U.S. Const., XIV Am.; Me Const., art. I, §§ 6, 6-A. In particular, the Initiative must set standards with sufficient clarity so that the general public, including Appellees, have "fair notice of what is prohibited", and prevents discriminatory, standardless enforcement.  *Federal Communications Commission v. Fox Television Stations*, Inc., 567 U.S. 239, 253-254 (2012); *see also*, *Connally v. General Construction*, 269 U.S. 385, 393 (1926).  The Initiative presents two serious due process issues, both of which result in the Initiative failing to supply Electors with fair notice, as constitutionally required.

The Initiative lists the entities that may qualify as "Foreign government-influenced entities." This list includes "[a] firm, partnership, corporation, association, organization or other entity." 21-A M.R.S. §1064(1)(E)(2).  The terms "association", "organization", and "other entity" are all terms undefined by Maine law. Further, these terms lack any common or ordinary meaning. By example, two individuals carrying business with one another create a partnership. A partnership requires no organizing documents, or any other manifestation of intent to create it. By failing to define "association", "organization", "other entity", Electors are left to guess if a partnership falls within the prohibited group of entities, and, therefore, the

Initiative is inherently ambiguous. This ambiguity presents for all other assemblies of individuals.

Further, the Initiative applies to "[a] firm, partnership, corporation, association, organization or other entity" that "[d]irects, dictates, controls or, directly or indirectly participates in the decision-making process with the regard to the activities of the firm, partnership, corporation, association, organization or other entity." 21-A M.R.S. §1064(1)(E)(2)(B). The foregoing standard lacks any reference to an authoritative source by which a person, including Appellees in their capacities as registered voters and Electors, can obtain the information necessary to make this determination.

In addition, as has been noted, the meaning of the word "influence", in the context of political discourse, is virtually standardless.

Due process "demands … that [a] law shall not be unreasonable arbitrary, or capricious and that the means selected shall have a real and substantial relation to the object sought to be attained." *Nebbia v. New York*, 291 U.S. 502, 510-11 (1934). With no means of predicting when an Elector may run afoul of the Initiative, a Class C crime, the Initiative is facially arbitrary and violates due process.

The Initiative provides that if a "foreign government" or "[a] firm, partnership, corporation, association, organization or other entity" that "[h]olds, owns, controls, or otherwise has direct or indirect beneficial ownership of 5% or

more of the total equity, outstanding voting shares, membership units or other applicable ownership interests" then that entity is deemed a "foreign government influenced entity" and is thus prohibited by the Initiative.    21-A M.R.S. §1064(1)(E)(2)(a).

Likewise, this standard provides no reliable source on which State officials may rely to initiate criminal or civil proceedings, raising the risk of arbitrary and discriminatory enforcement. Further, an Elector has no possible means of looking within a business entity and determining the ownership makeup of that entity, much less the methods in which contributions are made and who has influence over those decisions. As no feasible method of determining percentage ownership of an entity exists, let alone the influence that may cause a contribution to be made, the Initiative is "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt …." *Teneco Oil Co., Inc. v. Dep't of Consumer Affairs*, 876 F.2d 1013 1021 (1st Cir. 1989) (quoting, *Pennell  v. City of San Jose*, 390 U.S. 485 U.S. 1, 11 (1988)).

Both due process issues, the ambiguous and undefined terms as well as the impossible to ascertain threshold for criminality, leave the Initiative unconstitutionally vague as "it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the

punishment of constitutionally protected conduct." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).

Appellants submit they are likely to success on the merits of this claim.

## I. Absent injunctive relief, Appellees will incur irreparable harm

The Supreme Court has made clear that, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *see also Asociación de Educación Privada de Puerto Rico, Inc. v. García–Padilla,* 490 F.3d 1, 21 (1st Cir.2007) (applying *Elrod* to irreparable harm component of permanent injunction analysis); *Maceira v. Pagan,* 649 F.2d 8, 18 (1st Cir.1981) ("It is well established that the loss of first amendment freedoms constitutes irreparable injury."). As made clear by the discussion above, Appellees' rights and freedoms are indeed violated by the Initiative.

## II. The balance of equities favors the issuance of injunctive relief

Under the balance of harms prong, the moving party must show that, "the balance of equities tips in his favor." *Voice of the Arab World, Inc. v. MDTC Medical News Now, Inc.*, 645 F.3d 32. Given the importance of First Amendment rights, "[w]hen a party raises serious First Amendment questions, that alone compels a finding that the balance of hardships tips sharply in its favor." *Meinecke v. City of Seattle*, 99

F.4th 514, 526 (9th Cir. 2024) (cleaned up). The balance of harms therefore favors an injunction in this case as the district court correctly determined.

## III.    The public interest favors the issuance of injunctive relief

"It is hard to conceive of a situation where the public interest would be served by the enforcement of an unconstitutional law or regulation." *Condon v. Andino*, 961 F.Supp. 323, 331 (D. Me. 1997).  The public interest prong is effectively determined by the Supreme Court's determination that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. at 373.

## IV.    The Initiative is not Severable

"Severability is a matter of state law." *Rhode Island Med. Soc. v. Whitehouse*, 239 F.3d 104, 106 (1ˢᵗ Cir. 2001) (citing *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam)). In Maine, courts review the statute as a whole to determine whether "the remainder [of the statute] can be given effect without the invalid provision." *Bayside Enters., Inc. v. Maine Agr. Bargaining Bd*., 513 A.2d 1355, 1360 (Me. 1986). "If the invalid provision is such an integral part of the statute that the Legislature would only have enacted the statute as a whole, then the entire statute is invalid." *Id*. (citing *Town of Windham v. LaPointe*, 308 A.2d 286, 291 (Me. 1973)); *see In re Opinion of the Justs.*,132 Me. 502, 167 A. 174, 175 (1933) ("When legislative provisions are so related in substance and object that it is impossible to suppose that the statute would

have been enacted except as an entirety, if one portion offends the Constitution, the whole must fall."); *Ayotte v. Planned Parenthood of N. New Engl.*, 546 U.S. 320, 329, 330 (2006) (court must ask "[w]ould the legislature have preferred what is left of its statute to no statute at all") (internal citations omitted); *Villas at Parkside Partners v. City of Farmers Branch*, 496 F. Supp. 2d 757 (N.D. Tex. 2007) (declining to rely on *Ayotte* where enjoining only the unconstitutional applications involved, among other things, reading "eligible immigration status" as "immigration status"). The *Ayotte* Court noted, a court cannot rewrite a law to "conform it to constitutional requirements" in order to "salvage it." *Ayotte*, 546 U.S. at 329.

Section 1064(2) is the heart of the Initiative and, for the reasons set forth above, it violates the right to petition the government, the right to freedom of speech, the right to freedom of assembly, freedom of the press, and the related associational rights of each of these rights as well violating the due process clause. Without Section 1064(2), the Initiative cannot be applied and its remaining provisions, all of which are dependent on it, fail.

## V. A comprehensive injunction barring enforcement of the Initiative in its entirety is required.

In *Ayotte v. Planned Parenthood* of *N. New England*, 546 U.S. 320 (2006), the Supreme Court considered the circumstances under which a selective, as opposed to a comprehensive, injunction may issue. In sum, *Ayotte* required that fashioning the tailored injunction determine "how easily we can articulate the remedy" *Id.* at 329.

Next, it required that any such limited remedy be "faithful to legislative intent"; that is, "whether [the] legislature intended the statute to be susceptible to such a remedy." *Id.* at 331. A selective injunction would not be easy to fashion and would not be consistent with the intent of the Maine Electors who approved it. For the reasons set forth above, the Initiative meets neither standard.

## SUMMARY

The Initiative broadly bans communications from Foreign Government-Influenced Entities "to influence" the "initiation and approval" of Ballot Measures. For the reasons set forth above, the Initiative violates Appellees' First Amendment right to petition the government and, as Electors, to be petitioned with respect to Ballot Measures, including implied associational rights. The Initiative also violates Appellees' right to freedom of speech and implied associational rights, including their right as individuals and as Electors to receive speech with respect to Ballot Measures. The Initiative violates Appellees' right to freedom of assembly and the implied associational rights. The Initiative violates Appellees' right to a free press by imposing investigative duties and reporting responsibilities on the press for FGIE communications that the Initiative bans. The Initiative, which imposes civil and criminal penalties, employs vague terms and fails to provide constitutionally sufficient notice to Appellees as to the standards with they must comply.

The constitutionally defective provisions of the Initiative cannot be severed; the Initiative as a whole must fall and a comprehensive injunction is required because a selective injunction would not be easy to fashion and would not be consistent with the intent of the Maine Electors who approved it.

Respectfully submitted,

 /s/ *Timothy C. Woodcock*
Timothy C. Woodcock
P. Andrew Hamilton
Jonathan Pottle
William F. Campbell

**EATON PEABODY**
p80 Exchange Street
Bangor, ME 04401
(207) 947-0111

twoodcock@eatonpeabody.com
ahamilton@eatonpeabody.com
jpottle@eatonpeabody.com
bcampbell@eatonpeabody.com

*Counsel for Plaintiffs Jane Pringle, Kenneth Fletcher, Bonnie Gould, Brenda Garrand, and Lawrence Wold*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains a total of 12,951 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word (Office 2000) in Times New Roman style, font size 14.

  /s/ *Timothy C. Woodcock*

## CERTIFICATE OF SERVICE

I certify that this brief has been electronically filed with the Clerk of the Court on July 24, 2024. All attorneys listed below are ECF filers and will receive service by electronic means pursuant to Rule 4 of this Court's Rules Governing Electronic Filing:

Jack I. Bartholet
Jonathan R. Bolton
John C. Bonifaz
Peter J. Brann
Katherine E. Cleary
Ben T. Clements
Scott D. Dolan
Joshua D. Dunlap
Courtney M. Hostetler
Thomas A. Knowlton
Shannon E. Liss-Riordan
Tara Malloy
Amira M. Mattar
Megan P. McAllen
Paul McDonald
Peter L. Murray
Nolan L. Reichl
Paul E. Suitter
KatieLynn B. Townsend
Sean R. Turley
John A. Woodcock, III
Sigmund D. Schutz

*/s/ Timothy C. Woodcock*