Appeal No. 24-1265

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

CENTRAL MAINE POWER COMPANY; VERSANT POWER; ENMAX CORPORATION; MAINE PRESS ASSOCIATION; MAINE ASSOCIATION OF BROADCASTERS; JANE PRINGLE, individually and in her capacity as a registered voter and elector; KENNETH FLETCHER, individually and in his capacity as a registered voter and elector; BONNIE S. GOULD, individually and in her capacity as a registered voter and elector; BRENDA GARRAND, individually and in her capacity as a registered voter and elector; LAWRENCE WOLD, individually and in his capacity as a registered voter and elector,

Plaintiffs-Appellees

v.

MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES; WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; SARAH LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; STACEY D. NEUMANN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in his official capacity as Attorney General for the State of Maine,

Defendants-Appellants

On Appeal from the United States District Court, District of Maine

## BRIEF OF APPELLEE CENTRAL MAINE POWER COMPANY

Joshua D. Dunlap
Nolan L. Reichl
Katherine E. Cleary
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, Maine 04101
(207) 791-1100
*Attorneys for Appellee*
*Central Maine Power Company*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellee Central Maine Power Company ("CMP") hereby states that CMP Group owns 100% of CMP's shares of common stock. Avangrid Networks, Inc. ("Avangrid Networks") currently holds 100% of the equity interests in CMP Group. Avangrid, Inc. ("Avangrid") currently holds 100% of the equity interests in Avangrid Networks. Avangrid is a publicly held corporation listed on the NYSE (NYSE:AGR). No other entities or individuals own 10% or more of the stock of Central Maine Power Company.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ........................................................................... v

STATEMENT OF THE ISSUES ...................................................................... 1

STATEMENT OF THE CASE .......................................................................... 1

    I.    Introduction. ........................................................................................ 1

    II.   Factual Background. ............................................................................ 3

          A.   Central Maine Power Company. ................................................ 3

               1.    CMP's corporate structure. .................................................. 3

               2.    CMP's history of political engagement. ............................... 4

          B.   The Initiative. ........................................................................... 5

               1.    The Initiative's background: anti-CMP referenda. ............... 5

               2.    The Initiative's effect: silencing one side of a debate. ......... 6

               3.    The Initiative's ban: silencing speech by U.S. companies. ............................................................................. 8

    III.  Procedural Background. ................................................................... 10

SUMMARY OF THE ARGUMENT ............................................................... 11

ARGUMENT ................................................................................................ 13

    I.    The District Court correctly concluded that CMP is likely to succeed on the merits of its First Amendment claims. ........................... 13

          A.   The Initiative's ban on political speech is subject to strict scrutiny, but fails both strict and exacting scrutiny. ...................... 15

B.  The State cannot justify the Initiative's ban on political speech by U.S. companies with passive foreign investors. ........... 17

  1.  The State lacks a compelling, or sufficiently important, interest justifying a ban on U.S. companies' political speech. .................................................. 17

    a.  The State does not have a sufficient interest in silencing a U.S. company's speech regarding candidate elections. ...................................................... 18

    b.  The State does not have a sufficient interest in silencing a U.S. company's speech regarding referenda. .................................................................. 22

    c.  The State lacks a sufficient interest in avoiding the appearance of foreign government influence. .................................................................. 25

  2.  The State has not provided competent evidence supporting its asserted interests in banning speech by U.S. companies. .................................................. 27

  3.  The Initiative's ban on speech by U.S. companies is not appropriately tailored to the State's asserted interests. .................................................................. 29

    a.  Section 1064(2) is overinclusive. ............................... 30

    b.  Section 1064(2) is underinclusive. ............................. 37

    c.  Section 1064(2) is not the least restrictive alternative. .................................................................. 38

  4.  The Initiative's vague definitions exacerbate its First Amendment flaws. .................................................. 39

C.  The Initiative's disclaimer provision is unconstitutional because it fails both strict and exacting scrutiny. ........................... 41

1.      Strict scrutiny applies to the disclaimer requirement because it compels companies to convey a government message. ........................................................... 42

2.      The State lacks a sufficient justification for the disclaimer requirement. ........................................... 43

3.      The disclaimer requirement does not adequately fit the State's asserted interest. ..................................... 44

   D.      The Initiative is facially unconstitutional. ....................................... 45

II.    The District Court's injunction was not overbroad. ............................... 47

III.   The District Court correctly concluded that the remaining preliminary injunction factors are satisfied. .................................. 48

CONCLUSION ........................................................................................... 49

CERTIFICATE OF COMPLIANCE WITH RULE 32 ............................................. 50

CERTIFICATE OF SERVICE ....................................................................... 51

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
   591 U.S. 430 (2020) ........................................................................... 14, 20

*Ams. for Prosperity Found. v. Bonta,*
   594 U.S. 595 (2021) ............................................................. 18, 29, 44, 45

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
   564 U.S. 721 (2011) ...................................................................................... 25

*Auburn Police Union v. Carpenter,*
   8 F.3d 886 (1st Cir. 1993) ................................................................. 21, 24

*Avangrid Networks, Inc. v. Sec'y of State,*
   237 A.3d 882 (Me. 2020) ............................................................................. 5

*Black v. BPL,*
   288 A.3d 346 (Me. 2022) ........................................................................... 7

*Bluman v. FEC,*
   800 F. Supp. 2d 281 (D.D.C. 2011), *aff'd,* 565 U.S. 1104 (2012) .................. *passim*

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ................................................................... 16, 25, 38

*Calvary Holdings, Inc. v. Chandler,*
   948 F.2d 59 (1st Cir. 1991) ............................................................. 33, 34

*Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley,*
   454 U.S. 290 (1981) ..................................................................... 3, 12, 22

*Citizens United v. FEC,*
   558 U.S. 310 (2010) ..................................................................... *passim*

*Daggett v. Comm'n on Gov'tl Ethics & Elec. Pracs.,*
   205 F.3d 445 (1st Cir. 2000) ....................................................................... 29

*Davis v. FEC,*
   554 U.S. 724 (2008) ..................................................................... 18, 25

Page(s)

*Edwards v. District of Columbia*,
　755 F.3d 996 (D.C. Cir. 2014) .................................................................................. 27

*Elrod v. Burns*,
　427 U.S. 347 (1976) .................................................................................................. 48

*FEC v. Beaumont*,
　539 U.S. 146 (2003) .................................................................................................. 16

*FEC v. Cruz*,
　596 U.S. 289 (2022) ............................................................................................ *passim*

*First Nat'l Bank of Boston v. Bellotti*,
　435 U.S. 765 (1978) ............................................................................................ *passim*

*Foley v. Connelie*,
　435 U.S. 291 (1978) .................................................................................................. 17

*Frese v. Formella*,
　53 F.4th 1 (1st Cir. 2022) ......................................................................................... 39

*Frisby v. Schultz*,
　487 U.S. 474 (1988) .................................................................................................. 30

*Gaspee Project v. Mederos*,
　13 F.4th 79 (1st Cir. 2021) ................................................................ 18, 30, 42, 44

*Let's Help Fla. v. McCrary*,
　621 F.2d 195 (5th Cir. 1980) ................................................................................... 23

*Mandel v. Bradley*,
　432 U.S. 173 (1977) .............................................................................................21, 24

*McCutcheon v. FEC*,
　572 U.S. 185 (2014) ............................................................................................ *passim*

*McIntyre v. Ohio Elections Comm'n*,
　514 U.S. 334 (1995) .............................................................................................14, 31

*Meinecke v. City of Seattle*,
　99 F.4th 514 (9th Cir. 2024) ................................................................................... 48

Page(s)

*Members of City Council of City of L.A. v. Taxpayers for Vincent,*
466 U.S. 789 (1984) ................................................................................. 45

*Mich. State Chamber of Com. v. Austin,*
832 F.2d 947 (6th Cir. 1987) .................................................................. 23

*Mills v. Alabama,*
384 U.S. 214 (1966) ................................................................................. 14

*Minn. Chamber of Com. v. Choi,*
2023 WL 8803357 (D. Minn. Dec. 20, 2023) ................................. *passim*

*N.H. Right to Life Pol. Action Comm. v. Gardner,*
99 F.3d 8 (1st Cir. 1996) ........................................................................ 47

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
585 U.S. 755 (2018) ...................................................................12, 37, 42

*Nat'l Org. for Marriage v. McKee,*
649 F.3d 34 (1st Cir. 2011) ............................................................. 39, 44

*NECEC Transmission LLC v. BPL,*
2023 WL 3439632 (Me. B.C.D. Apr. 20, 2023) ...................................... 6

*NECEC Transmission LLC v. BPL,*
281 A.3d 618 (Me. 2022) ..............................................................5, 6, 24

*Nixon v. Shrink Missouri Government PAC,*
528 U.S. 377 (2000) ................................................................................ 29

*OneAmerica Votes v. State,*
518 P.3d 230 (Wash. Ct. App. 2022) .................................................... 20

*Op. of the Justs.,*
850 A.2d 1145 (Me. 2004) ...............................................................13, 47

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,*
475 U.S. 1 (1986) ............................................................................. 13, 43

*Packgen, Inc. v. Bernstein, Shur, Sawyer & Nelson,*
209 A.3d 116 (Me. 2019) ........................................................................ 40

Page(s)

*R.I. Med. Soc'y v. Whitehouse,*
239 F.3d 104 (1st Cir. 2001) .................................................................. 47

*Randall v. Sorrell,*
548 U.S. 230 (2006) ............................................................................... 47

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ............................................................................... 37

*Reno v. ACLU,*
521 U.S. 844 (1997) .......................................................................... 46, 47

*Robidoux v. Muholland,*
642 F.3d 20 (1st Cir. 2011) .................................................................... 41

*Rossiter v. Potter,*
357 F.3d 26 (1st Cir. 2004) .................................................................... 24

*SD Voice v. Noem,*
380 F. Supp. 3d 939 (D.S.D. 2019) ....................................................... 23

*Showtime Ent., LLC v. Town of Mendon,*
769 F.3d 61 (1st Cir. 2014) .................................................................... 37

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
699 F.3d 1 (1st Cir. 2012) ............................................................... *passim*

*Third Point LLC v. Ruprecht,*
2014 WL 1922029 (Del. Ch. May 2, 2014) ........................................... 36

*Thompson v. Hebdon,*
7 F.4th 811 (9th Cir. 2021) ............................................................. *passim*

*Tornetta v. Musk,*
310 A.3d 430 (Del. Ch. 2024) ............................................................... 35

*U.S. v. Alvarez,*
567 U.S. 709 (2012) ............................................................................... 27

*U.S. v. Castillo-Martinez,*
16 F.4th 906 (1st Cir. 2021) .................................................................. 41

Page(s)

*U.S. v. Playboy Ent. Grp., Inc.,*
　　529 U.S. 803 (2000) .......................................................................... 15

*U.S. v. Stevens,*
　　559 U.S. 460 (2010) ...................................................................13, 45, 46

*U.S. v. Williams,*
　　553 U.S. 285 (2008) .......................................................................... 39

*Vill. of Schaumburg v. Citizens for a Better Envt.,*
　　444 U.S. 620 (1980) .......................................................................... 45

*Voigt v. Metcalf,*
　　2020 WL 614999 (Del. Ch. Feb. 10, 2020) ............................................ 35

*Williams-Yulee v. Fla. Bar,*
　　575 U.S. 433 (2015) .......................................................................... 25

**STATUTES**

1 M.R.S. § 71(9) ................................................................................. 40

13-C M.R.S. § 831(1) ........................................................................... 32

17-A M.R.S. § 1604 ............................................................................. 10

17-A M.R.S. § 1704 ............................................................................. 10

17-A M.R.S. § 1705 ............................................................................. 10

21-A M.R.S. § 1064 ....................................................................... *passim*

15 U.S.C. § 78m(d) ............................................................................. 33

22 U.S.C. § 612(a) ............................................................................. 42

47 U.S.C. § 310(b)(3) .......................................................................... 34

52 U.S.C. § 30121 ........................................................................... 8, 39

Page(s)

## REGULATIONS

11 C.F.R. § 110.20(i) ............................................................... 39

17 C.F.R. § 240.14a-8(i)(7) ..................................................... 35

94-270 C.M.R. ch. 1 § 16 (2024), *available at*
   https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-
   files/94-
   270%20Ch.%201%20%20amended%20section%20numbering%20FOR
   %20POSTING_0.pdf ............................................ 9, 40, 41, 43

## LEGISLATIVE DOCUMENTS

L.D. 194 (130th Me. Legis. 2021) ............................................. 6

L.D. 1610 (131st Me. Legis. 2023) ........................................... 7

LD 1708, *An Act to Create the Pine Tree Power Company*, 130th Me. Legis. (2021)
   (Testimony of Sen. Richard A. Bennett), *available at*
   https://www.mainelegislature.org/legis/bills/getTestimonyDoc.asp?id=
   166183 .......................................................................... 7

## OTHER AUTHORITIES

3 *Fletcher Cyc. Corp.*, § 837.60 ................................................. 32

ABA, Model Business Corporation Act, § 8.30(a) ..................... 32

Avangrid, Inc., S.E.C. Current Report on Form 8-K (May 17, 2024),
   *available at* https://tinyurl.com/yvxjfjdk ............................. 4

*CMP et al. Request for Section 708 Exemption*, Me. P.U.C. Dkt. No. 2024-00117,
   Petition (May 31, 2024), *available at* https://tinyurl.com/b6rthdkx ...................... 4

Edward B. Rock, *Adapting to the New Shareholder-Centric Reality*, 161 U. Pa. L.
   Rev. 1907 (2013) .......................................................... 32

FEC Advisory Op. No. 2006-15 (May 19, 2006) ..................... 39, 41

Global SWF, 2024 Annual Report, at 5, *available at*
   https://globalswf.com/reports/2024annual .......................... 46

Page(s)

Joseph K. Leahy, *Corporate Political Contributions as Bad Faith*, 86 U. Colo. L. Rev. 477 (2015) .................................................................................................. 33

*Justice Department Leads Efforts Among Federal, International, and Private Sector to Disrupt Covert Russian Government-Operated Social Media Bot Farm*, DOJ Press Release No. 24-850 (July 9, 2024), *available at* https://tinyurl.com/jf47hsm .................................................................. 37

Norges Bank, https://www.nbim.no/en/the-fund/investments/#/2023/investments/equities ............................................... 46

Sarah C. Haan, *Shareholder Proposal Settlements and the Private Ordering of Public Elections*, 126 Yale L.J. 262 (2016) .......................................................... 35

Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 11:7 (2023).................. 34

## STATEMENT OF THE ISSUES

1.      Whether the District Court properly exercised its discretion in preliminarily enjoining enforcement of 21-A M.R.S. § 1064 because it violates the First Amendment by prohibiting, upon pain of criminal penalties, certain U.S. companies with passive investments by foreign entities such as public pension funds from engaging in political speech regarding candidate and referendum elections.

2.      Whether the District Court's decision to preliminarily enjoin enforcement of 21-A M.R.S. § 1064 is also justified because it requires certain U.S. companies to include an inaccurate, pejorative disclaimer on non-electioneering communications.

3.      Whether the District Court properly exercised its discretion in preliminarily enjoining enforcement of 21-A M.R.S. § 1064 in its entirety because it is unconstitutional in a substantial number of its applications as compared to its paltry number of constitutional applications.

## STATEMENT OF THE CASE

### I.      Introduction.

In November 2023, Maine voters approved a bill (the "Initiative") placed on the ballot by political opponents of Central Maine Power Company ("CMP"). The Initiative, codified at 21-A M.R.S. § 1064, strikes at the heart of the First Amendment by imposing a gag on certain U.S. companies with investments by foreign entities such as public pension funds, forbidding them from engaging in political speech regarding candidate and referenda elections—under the threat of criminal penalties.

The Initiative was enacted in response to the efforts of CMP, a 124-year-old Maine company, to defend itself against two referenda. The first purported to ban CMP's $1 billion transmission corridor project well after construction began. The second posed an existential threat to CMP by proposing the forced sale of its assets to a quasi-governmental utility. CMP faced a choice: engage in political speech to protect its property or do nothing and lose its property. Unsurprisingly, CMP chose the former. The Initiative now forces CMP, and others, to stand mute in the face of such threats.

The Initiative muzzles CMP by design. Rather than simply prohibit campaign spending by foreign governments, foreign government-owned entities ("FGOEs") such as public pension funds, or companies directed or controlled by them, the Initiative bans political speech by so-called "foreign government-influenced entities" ("FGIEs")—*i.e.*, U.S. companies with a 5% ownership interest by a foreign government or FGOE. This is a central feature of the Initiative; indeed, as initially proposed, it targeted *only* companies partially owned by foreign governments. The Initiative's proponents did not add a ban on direct foreign government spending until later.

The State's post-hoc justifications for the Initiative fall flat. The State asserts that the Initiative protects democratic self-government from foreign interference. But this interest cannot justify stripping CMP, as a U.S. company run by U.S. citizens, of its First Amendment rights. To make matters worse, the State's "evidence" supporting its justification consists of campaign spending by CMP and other companies as a *defensive* exercise of their First Amendment rights in response to hostile referenda.

The Initiative cannot be redeemed by invoking democratic legitimacy: "the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 295 (1981). The injunction should be affirmed.

## II.    Factual Background.

### A.    Central Maine Power Company.

CMP is a Maine corporation. A.17, ¶¶ 15-17. It traces its origins to 1899, when two Mainers bought a hydroelectric generator to provide electric services in Oakland, Maine. A.17, ¶ 15. It is now Maine's largest electric utility. A.15 at ¶¶ 4.

#### 1.    CMP's corporate structure.

CMP incorporated in Maine in 1905 and has remained a Maine corporation since that time. A.17, ¶ 16. By operation of Maine law, CMP's daily operations are directed by its board of directors and executive officers, all of whom are U.S. citizens. *Id.* ¶ 18.

Unsurprisingly, the persons holding an equity interest in CMP have changed over time. A.17, ¶ 19. Currently, its common stock is 100% owned by CMP Group, Inc., which is wholly owned by Avangrid Networks, Inc., both Maine corporations. *Id.* ¶¶ 20-21. Avangrid Networks is wholly owned by Avangrid, Inc. ("Avangrid"), a publicly traded New York corporation. A.18, ¶¶ 22-23. Iberdrola, S.A. ("Iberdrola"), a publicly traded corporation based in (but not owned by) Spain, owns approximately 81.6% of Avangrid's shares. *Id.* ¶ 23. Qatar Investment Authority ("QIA"), a sovereign wealth fund, and Norges Bank, Norway's central bank, have invested in Iberdrola: QIA and

Norges Bank own approximately 8.7% and 3.6%, respectively, of its shares. *Id.* ¶ 24. Mathematically, QIA's shares in Iberdrola equate to an indirect ownership interest in CMP of 7.1%.[1] No representative or designee of QIA or Norges Bank serves as an officer or director of CMP or any Avangrid companies. *Id.* ¶ 25.

### 2.    CMP's history of political engagement.

As a major utility, CMP is closely regulated under Maine law and is frequently the subject of proposed legislation. A.17-18, ¶ 26. CMP's activities are routinely impacted by legislation addressing energy issues such as electric grid reliability and modernization, renewable generation development and interconnection, beneficial electrification, and greenhouse gas emission reduction. A. 19, ¶ 29. CMP has a wealth of experience on energy issues, and therefore regularly engages in related political advocacy—including at the request of policymakers. A.19, 21, ¶¶ 29-30, 35.

Given the legislative issues it confronts, CMP routinely makes political contributions and expenditures. A.20, ¶ 31. For example, CMP has contributed more

---

[1] The State calculates QIA's ownership interest in CMP as 10.8% by adding QIA's 3.7% interest in Avangrid. State Br. at 9. These percentages are subject to change. For example, Iberdrola's percentage ownership of Avangrid's common stock has fluctuated based on the total number of shares of Avangrid common stock issued and outstanding at a particular time. *See CMP et al. Request for Section 708 Exemption*, Me. P.U.C. Dkt. No. 2024-00117, Petition at 1 n.1 (May 31, 2024), *available at* https://tinyurl.com/b6rthdkx. Further, pursuant to a merger agreement that is subject to the affirmative vote of Avangrid's shareholders and applicable regulatory approvals, Iberdrola has agreed to purchase all remaining issued and outstanding shares of Avangrid not currently owned by Iberdrola. *See* Avangrid, Inc., S.E.C. Current Report on Form 8-K, at 2-3 (May 17, 2024), *available at* https://tinyurl.com/yvxjfjdk. By virtue of QIA's investment in Iberdrola, the State will likely continue to deem CMP an FGIE.

than $25,000 to political action committees supporting candidates for public office since 2013. *Id.* ¶ 32. CMP has also expended more than $500,000 since 2021 on public communications regarding matters of state policy, apart from specific campaigns, including regarding legislation in the Maine Legislature. A.20-21, ¶ 34. CMP intends to continue expending funds for these purposes. A.20, 27, ¶¶ 32, 34, 60, 63. As discussed below, however, the Initiative bars such election advocacy. A.27, ¶ 60.

### B.    The Initiative.

The Initiative was introduced and adopted as part of a spate of referenda proposals targeting CMP. These anti-CMP referenda posed an existential threat to its business and involved heated political controversy over CMP's operations.

#### 1.    The Initiative's background: anti-CMP referenda.

The first in the series of anti-CMP initiatives, proposed in 2020, would have revoked one of CMP's permits for the New England Clean Energy Connect transmission line project (the "CMP Corridor"), a billion-dollar joint project with H.Q. Energy Services (U.S.) Inc. ("HQUS") to bring clean energy into New England. After CMP challenged the initiative, it was invalidated as unconstitutional. *See Avangrid Networks, Inc. v. Sec'y of State*, 237 A.3d 882, 884-86, 895-96 (Me. 2020); A.19, ¶ 28. Undeterred, CMP's opponents introduced another initiative purporting to ban completion of the CMP Corridor—*after* $450 million had been spent on construction. A.19, ¶ 28; *see NECEC Transmission LLC v. BPL*, 281 A.3d 618, 622-28 & n.3. (Me. 2022). Although this initiative was approved by 59% of Maine voters in 2021, it too was

5

found unconstitutional. *NECEC Transmission LLC*, 281 A.3d at 622, 637; *NECEC Transmission LLC v. BPL*, 2023 WL 3439632 (Me. B.C.D. Apr. 20, 2023). Then, in 2023, CMP's opponents advanced—but voters rejected—an initiative that would have liquidated CMP as well as Versant Power, Maine's other public utility, by creating a new quasi-governmental entity to seize their assets. A.19, 58, ¶¶ 27, 93-94.

Unsurprisingly, given the massive business ramifications these initiatives would have on the company, CMP engaged in political advocacy opposing these initiatives. A.19, ¶¶ 27-28. It faced an onslaught of spending by NextEra Energy Resources LLC, Calpine Corporation, and Vistra Corporation—competitor energy companies that dumped over $27 million into the campaigns to ban the CMP Corridor. A.140; *see NECEC Transmission LLC*, 281 A.3d at 623-24 & n.4. Seeking to defend itself in the political arena, CMP contributed more than $7 million to ballot question and political action committees involved in the referendum campaigns targeting its business interests over the past several years (in addition to contributions by other Avangrid companies). A.20, ¶ 33 & n.1. The Initiative, however, criminalizes CMP's advocacy. A.27, ¶ 60.

### 2.     The Initiative's effect: silencing one side of a debate.

The Initiative silenced CMP because of its opposition to these referenda. A.25-26, ¶ 55; *see* A.19, ¶¶ 27-28. The Initiative's progenitor, L.D. 194, proposed only to ban political speech by companies with foreign government ownership of 10% or more. A.184 (L.D. 194 (130th Me. Legis. 2021)). L.D. 194 did not propose to ban campaign spending by foreign governments. *Id.* A later iteration, L.D. 1610, was revised to lower

the threshold to 5% and to ban—apparently as an afterthought—campaign spending by foreign governments. A.247-49 (L.D. 1610 (131st Me. Legis. 2023)). The Initiative's targeted 5% threshold left CMP's opponents and competitors, including out-of-state energy companies like NextEra, free to continue engaging in political speech.

The Initiative's sponsors made clear that the law was meant to silence CMP on matters of concern to it and the public. A.25-26, ¶ 55. They specifically cited CMP's advocacy opposing referenda targeting its business as a justification for the Initiative. A.22, 26 at ¶¶ 41, 56-59. The Initiative's principal sponsor, state senator Richard Bennett,[2] argued that the bill was necessary to halt spending opposing the campaign "to stop the appalling CMP Corridor." *Id.* ¶¶ 41, 56. He further argued that "CMP and Versant spend more time working for their owners—the governments of Calgary, Qatar, and Norway—than the people of Maine." A.26, ¶ 58. As one supporter candidly stated, "I know the current bill is aimed at thwarting CMP . . . ." *Id.* ¶ 57; *see* A.272.

As noted in the testimony concerning LD 194 and LD 1610, the Initiative was a maneuver to silence spending by supporters of the CMP Corridor (and opponents of the public power bill) while leaving CMP's political opponents free to advocate for seizing its assets. A.186-87, 190-92, 196-97, 201-204, 206-10, 223, 243-44, 274-75.

---

[2] Senator Bennett was a named plaintiff in litigation opposing the CMP Corridor and a principal sponsor of the legislation that would have seized CMP's assets. *Black v. BPL*, 288 A.3d 346, 351 n.2 (Me. 2022); LD 1708, *An Act to Create the Pine Tree Power Company*, 130th Me. Legis. (2021) (Testimony of Sen. Richard A. Bennett), *available at* https://www.mainelegislature.org/legis/bills/getTestimonyDoc.asp?id=166183.

### 3. The Initiative's ban: silencing speech by U.S. companies.

Federal law already prohibits foreign nationals, *i.e.*, non-U.S. citizens, including foreign governments and foreign corporations, from making campaign expenditures and contributions in federal, state, and local elections. 52 U.S.C. § 30121. The Initiative goes much further, banning certain domestic companies—like CMP—from engaging in political speech regarding candidate and referendum elections in Maine.

Specifically, Section 1064(2) prohibits a "foreign government-influenced entity" from making, "directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence" two election activities: (1) "the nomination or election of a candidate," or (2) "the initiation or approval of a referendum." 21-A M.R.S. § 1064(2). The Initiative defines "foreign government-influenced entity" broadly, to include not only a "foreign government" but also any company "with respect to which a foreign government or foreign government-owned entity"[3] either (1) "[h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity" or "other applicable ownership interests," or (2) "[d]irects, dictates, controls or directly or indirectly participates in the decision-making process" regarding activities relating to candidate elections or referenda. *Id.* § 1064(1)(E)(1), (2)(a)-(b).[4]

---

[3] An FGOE is an "entity in which a foreign government owns or controls more than 50% of its equity or voting shares." 21-A M.R.S. § 1064(1)(F).

[4] The Commission on Governmental Ethics and Election Practices (the "Commission") has adopted rules providing further definitions. The Commission's initial proposed

To promote this ban on campaign spending and electioneering communications, the Initiative includes other related prohibitions. It makes it unlawful to knowingly solicit, accept, or receive a prohibited contribution or donation. *Id.* § 1064(3). It further makes it unlawful to knowingly or recklessly provide substantial assistance in the making, solicitation, acceptance, or receipt of a prohibited contribution, expenditure, or electioneering communication. *Id.* § 1064(4). And it makes it unlawful to "structure" a transaction to evade any of the preceding prohibitions. *Id.* § 1064(5).

Section 1064(6) also imposes a content-based disclaimer requirement. If an FGIE "disburses funds to finance a public communication not otherwise prohibited . . . to influence the public or any state, county or local official or agency regarding the formulation, adoption or amendment of any state or local government policy or regarding the political or public interest of or government relations with a foreign country or a foreign political party," the communication must "clearly and conspicuously" disclose the speaker's name and label it as a "foreign government-influenced entity," *i.e.*, an actor under the aegis of a foreign state. *Id.* § 1064(6).

A violation of the Initiative is punishable by a fine of up to $5,000 or double the amount of the contribution, expenditure, electioneering communication, donation, or

rules were extraordinarily broad. ECF No. 60-1; *see infra* Part I.B.4. After the District Court noted substantial flaws in the rules, Add.37, the Commission re-wrote the proposed rules to try to save the Initiative. 94-270 C.M.R. ch. 1 § 16 (2024), *available at* https://www.maine.gov/ethics/sites/maine.gov.ethics/files/inline-files/94-270%20Ch.%201%20%20amended%20section%20numbering%20FOR%20POSTING_0.pdf.

disbursement, whichever is greater. *Id.* § 1064(8). Additionally, the Initiative makes knowing violations Class C felonies punishable by up to five years of incarceration and a fine of up to $20,000. *Id.* § 1064(9); *see* 17-A M.R.S. §§ 1604, 1704-05.

## III.    Procedural Background.

Following adoption of the Initiative, CMP filed its Verified Complaint and a motion for preliminary injunction. A.14-35; ECF No. 4. CMP argued that (1) the Initiative's ban on campaign spending and disclaimer requirement violate the First Amendment; (2) certain definitions in the Initiative are unconstitutionally vague, in violation of the Due Process Clause; and (3) the Initiative's ancillary provisions cannot be severed from its unconstitutional provisions. A.28-33; ECF No. 4. The District Court granted CMP's motion, as well as those filed by other plaintiffs. Add.40.

As to CMP's arguments, the District Court (Torresen, J.) concluded as follows. The court first determined that strict scrutiny applies to CMP's First Amendment claims. Add.27. The court then concluded that limiting foreign government influence in candidate elections was a compelling interest, Add.29-30, and assumed without deciding that limiting such influence in referenda is also a compelling interest, Add.31. The court also concluded, however, that—although a ban on foreign government spending in state elections is narrowly tailored—a ban on campaign spending by (1) all entities with 5% or more foreign government ownership, and (2) entities with respect to which a foreign government "directly or indirectly participates in the decision-making process" was substantially overbroad. Add.32-38. The court held that it is not

permissible to ban speech by U.S. citizens absent actual influence by a foreign government. Add.35, 37-38. Because of the Initiative's major constitutional infirmities, the court entered a preliminary injunction. Add.40.

## SUMMARY OF THE ARGUMENT

The District Court did not abuse its discretion in granting CMP's motion for preliminary injunction. The Initiative violates the First Amendment because it deprives U.S. citizens of the right to engage in political speech.

The court correctly applied strict scrutiny to the Initiative. This Court's precedent makes clear that strict scrutiny applies to a law that "forbids juridical persons from spending *any* money on political campaigns." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 12 (1st Cir. 2012). That is precisely what the Initiative does. The Initiative, however, would also fail exacting scrutiny.

First, the State has no compelling—or sufficiently important—interest supporting Section 1064(2)'s ban on the political speech of U.S. companies with passive, minority foreign ownership interests. *Citizens United v. FEC*, 558 U.S. 310, 362 (2010). Any state interest in preventing foreign participation in U.S. candidate elections extends only to preventing *foreign nationals* (such as governments) from participating in candidate elections—not U.S. companies, which are "members of the American political community." *Bluman v. FEC*, 800 F. Supp. 2d 281, 290 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012). Foreign nationals do not participate in elections simply by investing in a U.S. company. Further, "there is no significant state or public interest in curtailing

11

debate . . . of a ballot measure" because referenda involve only a debate over ideas. *Citizens Against Rent Control*, 454 U.S. at 299. In any event, the State proffered no evidence of foreign government control of U.S. companies via minority ownership interests that supports its asserted justification.

Second, Section 1064(2) is not tailored to the State's asserted interests. The Initiative is overinclusive because it regulates U.S. companies with purely passive investors, and thereby prohibits the speech of Maine corporations relating to Maine referenda affecting their operations in Maine—enforced by the threat of a criminal conviction. The 5% threshold imposed by the Initiative is arbitrary; there is no basis to conclude that the threshold is a reasonable proxy for foreign interference in U.S. elections. The Initiative is also underinclusive; most notably, it leaves FGIEs free to engage in lobbying on legislation adopted by regular legislative process, and thereby fails to address the most significant form of "foreign influence." These flaws are magnified by the Initiative's vague definitions.

Third, the disclaimer provision in Section 1064(6) is also unconstitutional. Rather than imposing a *factual* disclaimer requirement—*e.g.*, a disclosure regarding the level of foreign government ownership of a corporation—it instead requires U.S. companies to convey a government message. U.S. companies must label themselves as "foreign government influenced," even if that label is misleading or even false. Requiring a company to convey such a message violates the First Amendment. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 766, 779 (2018).

The court properly issued a preliminary injunction barring enforcement of the Initiative. The Initiative is facially unconstitutional; for the same reason that the law is overinclusive, it is also substantially overbroad. *See United States v. Stevens*, 559 U.S. 460, 481-82 (2010). Moreover, because the invalid provisions in Section 1064(2) and 1064(6) are "integral to the initiated bill," there is no basis to sever other, ancillary provisions of the Initiative. *Op. of the Justs.*, 850 A.2d 1145, 1152 (Me. 2004).

## ARGUMENT

This Court reviews the grant of a preliminary injunction for abuse of discretion. *Fortuño*, 699 F.3d at 10. "Under that rubric, findings of fact are reviewed for clear error and issues of law are reviewed de novo." *Id.* (quotation marks omitted). The Court examines (1) the plaintiff's likelihood of success; (2) the potential irreparable harm to the plaintiff if the injunction is denied; (3) the balance of that harm against any hardship to the defendant; and (4) the public interest. *Id.* Likelihood of success is the "linchpin of the preliminary injunction analysis" in First Amendment cases. *Id.* The District Court correctly concluded that each prong favors entry of preliminary injunctive relief.

## I. The District Court correctly concluded that CMP is likely to succeed on the merits of its First Amendment claims.

"Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978)).

13

Although "foreign organizations . . . have no First Amendment rights," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020), U.S. companies have a First Amendment right to engage in political speech, *Citizens United*, 558 U.S. at 336-62.

"The First Amendment affords the broadest protection to . . . political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (alterations and quotation marks omitted); *see Mills v. Alabama*, 384 U.S. 214, 218 (1966). The First Amendment "has its fullest and most urgent application precisely to the conduct of [political] campaigns." *McIntyre*, 514 U.S. at 347 (quotation marks omitted). Thus, laws limiting speech regarding candidate and referendum elections strike at the "essence of First Amendment expression." *Id.*

"If the First Amendment has any force, it prohibits [the State] from fining or jailing citizens, or associations of citizens, for simply engaging in political speech." *Citizens United*, 558 U.S. at 349.

> When Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves.

*Fortuño*, 699 F.3d at 11 (quoting *Citizens United*, 558 U.S. at 356). Contrary to this fundamental proposition, the Initiative imposes criminal penalties (including possible incarceration) for engaging in political speech simply because public pension funds and sovereign wealth funds passively invest in those companies.

When it restricts speech, "the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000). The State failed to carry its burden of proof.

### A.     The Initiative's ban on political speech is subject to strict scrutiny, but fails both strict and exacting scrutiny.

The District Court correctly concluded that strict scrutiny applies to Section 1064(2)'s ban on campaign spending. Although regulation of expenditures typically receives greater scrutiny than regulation of contributions, *see McCutcheon v. FEC*, 572 U.S. 185, 196-97 (2014) (plurality opinion),[5] this Court has held that strict scrutiny applies to a law that "forbids juridical persons from spending *any* money on political campaigns, be they direct contributions, independent expenditures, or otherwise" without satisfying burdensome regulatory requirements, *Fortuño*, 699 F.3d at 12.

This Court would have to overrule *Fortuño* to apply anything other than strict scrutiny to the Initiative's ban on political speech. If, as the Court held in *Fortuño*, a law banning *most* political spending is subject to strict scrutiny even if it is theoretically possible to avoid the ban by satisfying byzantine regulations, then it necessarily follows that a law prohibiting *all* campaign spending is "subject to strict scrutiny." *Id.* at 11; *see id.* at 13-15. Only laws imposing lesser burdens, such as disclosure requirements or limits on candidate contributions, are subject to lesser "exacting scrutiny." *Id.* at 12.

---

[5] This distinction does not apply in the context of referenda. Strict scrutiny applies to limits on contributions to ballot question committees. *Bellotti*, 435 U.S. at 786, 795.

*Fortuño* is consistent with Supreme Court precedent, which distinguishes between limits on expenditures and contributions because of the burden such limits place on speech. *Id.* at 11-12 (citing *Citizens United*, 558 U.S. at 355-56). Lesser scrutiny applies to laws that have a "'limited effect upon First Amendment freedoms,'" *id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 29 (1976)), because they "'impose no ceiling on campaign related activities and do not prevent anyone from speaking,'" *id.* (quoting *Citizens United*, 558 U.S. at 366). But that rationale does not apply where, as here, the law imposes the greatest possible burden on speech—a ban enforced by criminal penalties. Where "[t]he purpose and effect of [the challenged] law is to prevent corporations . . . from presenting both facts and opinions to the public," then strict scrutiny applies. *Citizens United*, 558 U.S. at 355; *see id.* at 340; *Fortuño*, 699 F.3d at 11-12.[6]

The State provides no valid reason to disregard *Fortuño*. The fact that the Initiative does not apply to all U.S. companies, State Br. at 29, is irrelevant. The question is not *how many* companies' political speech have been burdened, but the *extent of the burden* on any given company's speech. *See Fortuño*, 699 F.3d at 12. Further, the fact that the Initiative has some relation to alienage, State Br. at 27, does not mean that lesser scrutiny applies. The State cites no First Amendment case holding that lesser scrutiny

---

[6] The State previously relied on *FEC v. Beaumont*, 539 U.S. 146 (2003), to argue that a ban on campaign contributions, rather than a just a cap on contributions, is subject to exacting scrutiny. *Beaumont*, however, pre-dates *Citizens United* and *Fortuño*. In any event, *Beaumont* did not hold that contribution bans are not subject to strict scrutiny; rather, the Supreme Court rejected the argument that the law at issue imposed a ban. *Id.* at 162.

applies to regulation of political speech by U.S. citizens that have some relationship to a foreign entity; the State instead relies on *Foley v. Connelie*, 435 U.S. 291, 294-96 (1978), which involved an equal protection claim. Contrary to the State's position, *Citizens United* applied strict scrutiny in assessing speech restrictions on U.S. companies despite the asserted interest in preventing foreign influence on U.S. elections. 558 U.S. at 362.

**B.  The State cannot justify the Initiative's ban on political speech by U.S. companies with passive foreign investors.**

In any event, the Initiative fails both strict and exacting scrutiny. In a decision the State references only in passing, the first court to address a law banning "foreign-influenced corporations" from engaging in state-level campaign spending enjoined the law. *Minn. Chamber of Com. v. Choi*, 2023 WL 8803357, at *1 (D. Minn. Dec. 20, 2023). The court held that the law, which applied to companies with a 5% aggregate foreign ownership interest (or 1% individually), *id.* at *2, likely violated the First Amendment, *id.* at *10. The law failed strict and exacting scrutiny, *id.* at *5, because (1) the state lacked a compelling interest in banning speech by U.S. companies with passive foreign shareholders, *id.* at *6; (2) the state had not shown that foreign shareholders had exerted influence over corporate election spending, *id.* at *7; and (3) the law was overinclusive and underinclusive, *id.* at *8-9. The Initiative is similarly flawed.

**1.  The State lacks a compelling, or sufficiently important, interest justifying a ban on U.S. companies' political speech.**

To satisfy strict scrutiny, the State must prove that the Initiative "'furthers a compelling interest,'" *Fortuño*, 699 F.3d at 11 (quoting *Citizens United*, 558 U.S. at 340).

17

The Supreme Court has sharply limited the interests which may be recognized as compelling, holding that the "only" acceptable justification for limiting political speech is prevention of *quid pro quo* corruption or its appearance. *FEC v. Cruz*, 596 U.S. 289, 305 (2022); *see McCutcheon*, 572 U.S. at 192; *Thompson v. Hebdon*, 7 F.4th 811, 826-27 (9th Cir. 2021).[7] The State instead proffers two other justifications: (1) protecting democratic self-government from foreign government interference, and (2) preventing the appearance of such interference. State Br. at 30. These justifications, however, are too limited to sustain the Initiative's broad provisions. In any event, the State has not offered any evidence supporting its asserted justifications.

### a.   The State does not have a sufficient interest in silencing a U.S. company's speech regarding candidate elections.

There is a disconnect between the State's proffered justifications, which apply to foreign governments and corporations controlled by them, and the Initiative's ban on speech by U.S. companies with a 5% ownership interest by passive foreign investors. *See* 21-A M.R.S. § 1064(1)(E)(2). In the abstract, there may be a state interest in preventing foreign governments from participating in candidate elections. Even if this interest were compelling under the Supreme Court's precedent, *cf.*, *Cruz*, 596 U.S. at 305, however, the State impermissibly cites this justification to silence *U.S. citizens*.

---

[7] Exacting scrutiny requires the State to demonstrate a "sufficiently important governmental interest," *Gaspee Project v. Mederos*, 13 F.4th 79, 85 (1st Cir. 2021) (citing *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021)). "[T]he strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Davis v. FEC*, 554 U.S. 724, 744 (2008).

*Citizens United* makes clear that the State's proffered interest in preventing foreign influence on elections does not justify laws restricting speech by U.S. companies with minority shareholders like foreign public pension funds. In that case, the Supreme Court concluded that it need not determine "whether the Government has a compelling interest in preventing foreign individuals or associations from influencing our Nation's political process" because the ban on corporate expenditures at issue was "not limited to corporations or associations that were created in foreign countries or funded *predominantly* by foreign shareholders." 558 U.S. at 362 (emphasis added). The law was therefore overbroad. *Id.* This language is not dicta; the Supreme Court held that the asserted state interest cannot justify a law restricting speech by U.S. companies not "predominantly" foreign owned. Thus, the State's proffered interest does not justify silencing U.S. companies with minority foreign ownership. As in *Choi*, the 5% threshold at issue here "is a far cry from predominately." 2023 WL 8803357, at *6.

By depriving U.S. companies of their free speech rights based on a minority shareholder interest, the Initiative—contrary to the State's assurances—does in fact do "indirectly what *Citizens United* forbade directly." State Br. at 29. This is made patently clear by *amici*, who argue that a company loses its speech rights if it has even one non-citizen shareholder. PME Br. at 12; FSFP Br. at 6, 11, 14. But "[t]here is no support for the proposition that corporations lose their First Amendment protections merely because a foreign national purchases some share or interest, no matter how small." *Choi*,

19

2023 WL 8803357, at *4 (citing *Citizens United*, 558 U.S. at 342).[8] "[N]o case holds that a corporation ceases to be 'American' by virtue of any quantum of foreign ownership." *Id.* Although *amici* emphasize the Supreme Court's description of a corporation as an "association of citizens," they would eviscerate *Citizen United*'s conclusion: that the state cannot ban the speech of a company not "predominantly" owned by foreign investors. The Initiative is indeed an "end-run" around *Citizens United. See* State Br. at 29.

In support of its argument, the State relies upon *Bluman v. FEC, see* State Br. at 31-33, but stretches that decision far beyond its holding. *See Thompson*, 7 F.4th at 827 n.7. In *Bluman*, which involved a ban on campaign spending by foreign nationals only, then-Judge Kavanaugh concluded that there is a compelling interest in "limiting the participation of *non-Americans* in the activities of democratic self-government." 800 F. Supp. 2d at 290; *see id.* at 288 (the government has a "compelling interest . . . in limiting the participation of *foreign citizens* in activities of American democratic self-government" (emphasis added)). This conclusion hinged on the notion that foreign nationals are not members of the American political community and have no "long-term stake in the

---

[8] The law in *Agency for International Development*—cited by an *amicus*, FSFP Br. at 11—did not "appl[y] to *American* organizations"; it had previously been found unconstitutional to the extent it restricted speech by U.S. affiliates of foreign organizations. 591 U.S. at 431-33, 438-39. *Agency for International Development* emphasized that organizations "separately incorporated" in the U.S. should not be conflated with foreign entities, *id.* at 435—which is precisely what the Initiative does. The law in *OneAmerica Votes v. State* also did not broadly ban speech by U.S. companies. 518 P.3d 230, 237 (Wash. Ct. App. 2022) (banning spending that was made directly by foreign nationals, was financed by foreign nationals, or involved participation by foreign nationals).

flourishing of American society." *Id.* at 291. *Bluman* left open the possibility that foreign nationals who are lawful permanent residents may not be subject to a ban on political contributions, as participants in U.S. political community, *id.* at 290-91; and, importantly, the court stated that it had "no occasion to analyze the circumstances under which a corporation may be considered a *foreign* corporation for purposes of First Amendment analysis," *id.* at 292 n.4; *see Choi*, 2023 WL 8803357, at *6.

Despite the careful limits on *Bluman*'s holding and rationale, the State now relies on *Bluman* to justify a ban on speech by U.S. companies with passive foreign investors.[9] But such companies are differently situated than the foreign citizens regulated in *Bluman*: a company organized under and subject to U.S. law, but with some foreign ownership, has a long-term stake in American society. *Bluman* itself acknowledges that, in contrast to foreign nationals, U.S. companies are "members of the American political community." 800 F. Supp. 2d at 290. That is certainly true of CMP, a 124-year-old Maine utility led by U.S. citizens, which has a long history of participating in Maine's public affairs. A.15, 17-19, ¶¶ 4, 15, 18, 26-30. *Bluman*'s rationale is therefore inapplicable to U.S. companies, like CMP, which necessarily have a substantial stake in the conduct of domestic affairs. *See Thompson*, 7 F.4th at 827 n.7.

---

[9] Because the State relies on *Bluman* in a new context, the Supreme Court's summary affirmance of *Bluman* is irrelevant. A summary affirmance does "not control later lower court cases involving significantly dissimilar facts." *Auburn Police Union v. Carpenter*, 8 F.3d 886, 894 (1st Cir. 1993) (citing *Mandel v. Bradley*, 432 U.S. 173, 176 (1977)).

A careful reading of *Citizens United* and *Bluman* leads to the conclusion "that preventing . . . First Amendment-protected political speech by a corporation with foreign shareholders, without more, does not alone represent a compelling interest." *Choi*, 2023 WL 8803357, at *6. It "does not follow" from *Bluman* "that a foreign shareholder indirectly participates in our national political process simply by possessing shares." *Id.* The interest in "prevent[ing] foreign nationals from participating in our national political process" is thus limited in that it only "extends to preventing *foreign nationals*—including foreign shareholders of domestic corporations—from controlling or exercising influence over a corporation's election-expenditures." *Id.* (emphasis added). It does not justify silencing U.S. companies with passive foreign investors.

**b.    The State does not have a sufficient interest in silencing a U.S. company's speech regarding referenda.**

Even if the limited justification recognized in *Bluman* supported silencing a U.S. company's speech regarding candidate elections, it does not apply to referenda. *Bluman*, which dealt solely with candidate elections, carefully distinguished referenda. 800 F. Supp. 2d at 291 (observing that any "risk of undue foreign influence" may be "greater in the context of candidate elections than it is in the case of ballot initiatives"). The Supreme Court has been clear that referenda are different. "Whatever may be the state interest or degree of that interest in regulating and limiting contributions to or expenditures of a candidate . . . there is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Citizens Against Rent Control*, 454 U.S. at 299.

The reason for this is simple: referenda do not risk the possibility of "buying" influence. In *Bellotti*, the Supreme Court struck down Massachusetts' ban on corporate contributions and expenditures regarding referenda, 435 U.S. at 767, reasoning that, because referenda are "held on issues, not candidates for public office," it follows that "[t]he risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue," *id.* at 790.[10] Likewise, foreign spending on a referendum does not raise the risk of candidates beholden to foreign interests. It is true that speech regarding referenda "may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it." *Id.* Any state interest in preserving the "integrity of the electoral process" thus cannot support a ban on campaign spending on referenda. *Id.* at 788-91. The State's "claimed interest in protecting democratic self-government does not constitute a compelling interest justifying interference with political speech" on referenda. *SD Voice v. Noem*, 380 F. Supp. 3d 939, 948-49 (D.S.D. 2019).

On the other hand, the public has a strong interest in receiving information regarding referenda. *See Citizens United*, 558 U.S. at 339 (citizens' right "to hear" is a "precondition to enlightened self-government"). Political speech is "indispensable to decisionmaking in a democracy," regardless of its source, because "[t]he inherent worth of the speech in terms of its capacity for informing the public" does not depend on the

---

[10] *See also Mich. State Chamber of Com. v. Austin*, 832 F.2d 947, 949 (6th Cir. 1987); *Let's Help Fla. v. McCrary*, 621 F.2d 195, 199-200 (5th Cir. 1980).

speaker's identity. *Bellotti*, 435 U.S. at 776-77. Accordingly, in *Bellotti*, the Supreme Court rejected the asserted interest in ensuring that corporations did not unduly influence referendum elections. Direct democracy "increases the need" for dissemination of "diverse and antagonistic" information. *Id.* at 790 n.29 (quotation marks omitted). The First Amendment leaves "the responsibility for judging and evaluating the relative merits of conflicting arguments" to "the people in our democracy." *Id.* at 791. "[I]f there be any danger that the people cannot evaluate the information and arguments advanced," that danger is "contemplated by . . . the First Amendment." *Id.* at 792.[11]

This reasoning cannot be swept aside as dicta reflecting an outdated view "that preventing corruption and the appearance of corruption" are the only recognized state interests in restricting political speech. State Br. at 37-38. First, the Supreme Court's reasoning was necessary to its holding, and therefore was not dicta—and, even if it were, considered dicta also binds this Court. *Rossiter v. Potter*, 357 F.3d 26, 31 & n.3 (1st Cir. 2004). Second, *quid pro quo* corruption and the appearance of such corruption remain the "only" grounds for restricting political speech of U.S. citizens recognized by the Supreme Court—as reiterated after *Bluman*. *Cruz*, 596 U.S. at 305; *Thompson*, 7 F.4th at 826-27. The summary affirmance in *Bluman* "should not be understood as breaking new ground." *Auburn Police Union*, 8 F.3d at 894 (quoting *Mandel*, 432 U.S. at 176).

---

[11] *Bellotti*'s reasoning is supported by the State's evidence: despite CMP's spending in opposition to the second anti-CMP Corridor initiative, the voters approved the initiative. *See NECEC Transmission*, 281 A.3d at 626; A.137, ¶ 22.

Nor is *Bellotti* distinguishable because Massachusetts failed to show that corporations engaged in "overwhelming" spending, while the State did so here. State Br. at 35-36. Although noting the failure of proof, the Supreme Court went on to conclude that Massachusetts' arguments were not "supported by the precedents of this Court." *Bellotti*, 435 U.S. at 790. Further, the Supreme Court has "rejected the premise that the Government has an interest 'in equalizing the relative ability of individuals and groups to influence the outcome of elections.'" *Citizens United*, 558 U.S. at 350 (quoting *Buckley*, 424 U.S. at 48 and citing *Bellotti*, 435 U.S. at 791 n.30); *see Davis*, 554 U.S. at 741-42; *Thompson*, 7 F.4th at 825-26. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley*, 424 U.S. at 48-49 (quotation marks omitted); *see Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 749-50 (2011). Evidence regarding the amount of spending is not a valid consideration.

### c. The State lacks a sufficient interest in avoiding the appearance of foreign government influence.

The State's proffered interest in avoiding the "appearance of influence" stretches the interest far beyond its origins in *Buckley v. Valeo*. An interest in preventing corruption or appearance of corruption is limited to *quid pro quo* corruption. *Citizens United*, 558 U.S. at 359; *see Cruz*, 596 U.S. at 305-08; *McCutcheon*, 572 U.S. at 207-208.[12] The State,

---

[12] Judicial elections are an exception "because the role of judges differs from the role of politicians." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 446 (2015).

however, would have this Court find a compelling state interest on the basis that Maine voters may conclude that their voices are being "drowned out." State Br. at 40.

"Reliance on a generic . . . influence theory is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle." *Citizens United*, 558 U.S. at 359 (cleaned up). The State's new theory of "appearance of influence," absent some tie to *quid pro quo* corruption or even actual electoral interference by minority shareholders, *see infra* Part I.B.2, is similarly unbounded—the State would use it to bar speech by U.S. corporations over which no foreign government exercises control, and even as to independent expenditures. This contravenes *Citizens United*, which rejected the argument that the state can limit speech by corporations not "funded predominately by foreign shareholders," as well as the argument that independent expenditures undermine voter confidence. *Id.* at 360-62.

The State's "appearance of influence" argument is just another version of the argument that the government can level the political playing field. It is not enough that people believe that campaign spending by certain individuals reduces their voice in elections. A.258-59. Again, this consideration is impermissible. *Citizens United*, 558 U.S. at 350; *Thompson*, 7 F.4th at 825-26. Although "the line between *quid pro quo* corruption and general influence may seem vague at times, . . . the distinction must be respected in order to safeguard basic First Amendment rights." *Cruz*, 596 U.S. at 308 (quotation marks omitted).

26

### 2. The State has not provided competent evidence supporting its asserted interests in banning speech by U.S. companies.

The State also failed to support its proffered justifications. To carry its burden, the State "must do more than simply posit the existence of the disease sought to be cured"; it "must instead point to record evidence or legislative findings demonstrating the need to address a special problem." *Id.* at 307. The State did not do so.

First, the State failed to provide evidence that foreign governments have influenced political spending by U.S. companies through minority ownership. For a law to be necessary to advance a state interest, "[t]here must be a direct causal link between the restriction imposed and the injury to be prevented." *Choi*, 2023 WL 8803357, at *7 (quoting *United States v. Alvarez*, 567 U.S. 709, 725 (2012)). As discussed below, the State identifies ways foreign shareholders could theoretically influence political spending. "But explaining how foreign minority shareholders *could* exercise influence over corporations is not enough to justify [the Initiative]'s ban on corporations' political speech." *Id.* Instead, the State must "offer evidence that minority foreign shareholders have . . . exercised influence or control over a corporation's election expenditures." *Id.*; *see Edwards v. District of Columbia*, 755 F.3d 996, 1003 (D.C. Cir. 2014).

It has not provided a single shred of such evidence. The State has not identified "how, or if" QIA or Norges Bank "exercised control or influence over [CMP]'s election-related expenditures." *Choi*, 2023 WL 8803357, at *7. The State points only to the spending itself, without evidence that QIA or Norges Bank controlled or

participated in that spending. State Br. at 7-9. With respect to CMP, the only evidence is that political spending decisions were made by U.S. management. A.17, 21, ¶¶ 18, 37. The notion that CMP needed direction from investors in its parent's parent's parent's parent company to oppose the relevant initiatives borders on the ludicrous.

Second, the State cannot justify the Initiative based on spending relating to anti-CMP referenda. As discussed above, and as the State itself acknowledges, the Initiative—backed by CMP's opponents—was enacted as a response to the spending by CMP and others opposing measures which would have (1) rendered a $450 million investment by CMP into a joint project with HQUS valueless, and (2) expropriated the assets of both CMP and Versant. A.25-26, ¶ 55. Given the referenda that were the subject of the spending highlighted by the State, it is apparent that the spending is not evidence of foreign meddling. Rather, it is evidence that U.S. companies such as CMP have legitimate reasons to engage in the political process to protect their U.S. business interests. As the State would have it, CMP cannot win: it must either remain silent as its property is taken, or have its opposition used to justify a deprivation of its of free speech rights. Further, the State's argument is circular: it argues that, because the Initiative classifies CMP as an FGIE, the spending by CMP is proof that foreign governments have been interfering in U.S. elections. But in reality all that the spending shows is that U.S. companies are active in U.S. elections. The Court should reject the State's self-serving effort to justify the Initiative based on CMP's legitimate political speech.

Third, the State has failed to show actual undue influence, as it must to justify a law meant to avoid the appearance of undue influence. *Citizens United*, 558 U.S. at 360-61; *Cruz*, 596 U.S. at 308-10. The State must make a showing of actual foreign election interference to justify a prophylactic measure addressing the appearance of such influence. For example, in *Nixon v. Shrink Missouri Government PAC*, the Supreme Court considered evidence of the popular vote on an initiative imposing campaign contribution limits only *after* noting evidence of actual pay-for-play and kick-back scandals. 528 U.S. 377, 393-94 (2000); *see Daggett v. Comm'n on Gov'tl Ethics & Elec. Pracs.*, 205 F.3d 445, 456-57 (1st Cir. 2000) (citing *Nixon* and additional evidence of undue influence in Maine). The State has simply skipped that step in this case, suggesting instead that voter perceptions—regardless of their basis in reality—are alone sufficient. But First Amendment rights cannot rest on such a thin reed. *Nixon*, 528 U.S. at 394 ("[M]ajority votes do not, as such, defeat First Amendment protections.").

### 3. The Initiative's ban on speech by U.S. companies is not appropriately tailored to the State's asserted interests.

A law that restricts political speech without avoiding "unnecessary abridgment of First Amendment rights . . . cannot survive rigorous review." *McCutcheon*, 572 U.S. at 199 (cleaned up). To satisfy strict scrutiny, a law must be the least restrictive means to achieving the state's interest. *Bonta*, 594 U.S. at 607; *see Citizens United*, 558 U.S. at 340.[13]

---

[13] To satisfy exacting scrutiny, the law must "fit" the state interest in a manner that "is in proportion to the interest served" and that "employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective." *Bonta*,

The Initiative's 5% threshold is shockingly ill-tailored to any valid purpose. A law that is over- or underinclusive violates the First Amendment. *See Citizens United*, 558 U.S. at 362 (finding lack of fit between asserted interest in avoiding foreign influence in elections and the scope of the law, which banned speech by U.S. companies); *Bellotti*, 435 U.S. at 790-94. Section 1064(2) is both over- and underinclusive.

> ### a.    Section 1064(2) is overinclusive.

If the Initiative is meant to protect democratic self-governance from foreign government interference, a narrowly tailored law would "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy," *Frisby v. Schultz*, 487 U.S. 474, 485 (1988), by focusing on foreign government activities. But the Initiative does no such thing. Instead, it sweeps in U.S. companies—like CMP—that are incorporated in Maine, that are governed by directors and officers who are U.S. citizens, and that make independent decisions concerning political spending, A.17, 21 at ¶¶ 16-18, 37, simply because they have a 5% ownership interest by a foreign public pension fund or sovereign wealth fund. Under Section 1064(2), it does not matter whether a foreign government investor is completely passive. The scope of the Initiative thus turns on happenings in the stock market—developments beyond a company's control—rather than a real link to foreign control or influence. Perversely, the more sound a company

---

594 U.S. at 609 (quotation marks omitted); *see Gaspee Project*, 13 F.4th at 85. Under both strict and exacting scrutiny, a court must "assess the fit between the stated governmental objective and the means selected to achieve that objective." *McCutcheon*, 572 U.S. at 199.

is as an investment, the more likely it will be to attract foreign investors and lose its First Amendment rights, even if those investors care nothing about its political spending. The mismatch between the State's asserted end and the means employed shows that the ban is overinclusive. *See McIntyre*, 514 U.S. at 350-52.

The State's defense of the 5% threshold fails at the outset because, as discussed *supra*, it lacks evidentiary support. Because the State "failed to identify evidence that minority foreign shareholders regularly (or ever) exercise influence or control over corporations' political expenditures, the challenged provisions . . . sweep far too broadly." *Choi*, 2023 WL 8803357, at *8. Absent such evidence, the State asks the Court to infer that foreign interference occurs by virtue of shareholder influence generally.

The "influence" standard invoked, but never defined, by the State and its *amici* is an infinitely malleable standard for depriving U.S. citizens of their First Amendment rights. For the State, minority ownership by a foreign government necessarily buys the investor "influence" over political spending decisions, automatically transforming a U.S. company into a foreign national for purposes of First Amendment doctrine. State Br. at 44-52. The State applies the concept of "influence" in a manner reminiscent of the butterfly effect—namely, because a foreign investor purchases some shares of stock in a company, a series of mysterious and invisible follow-on effects transform the company into an alter ego of the minority foreign government shareholder (even if another minority shareholder holds a contrary political view). Fundamentally, the State's standard—for which it offers no authority—is too ill-defined to provide a workable

31

basis for depriving U.S. citizens of their right to free speech. Taken at face value, the "influence" standard would permit the State to deprive natural persons of their First Amendment rights because they were "influenced" by, for example, a cousin who works for the Canadian government or an op-ed published by a foreign dignitary. But this approach does not square with *Citizens United*, which focused on foreign direction or control (not just influence) by rejecting the regulation of U.S. companies not "predominantly" owned by a foreign entity. 558 U.S. at 362.

To make matters worse, the State seeks to justify a *presumption* of influence based on the mere *potential* for such influence. The State has failed to establish that the 5% threshold in Section 1064(1)(E)(2)(a) is a valid proxy for actual influence.

First, although the State argues that "U.S. managers are inextricably linked to their foreign-government investors by the duty of loyalty," State Br. at 48, directors need not follow the directives of any specific investor. A director's fiduciary duty flows to the corporation itself, ahead of the interests of specific investors. *See* 13-C M.R.S. § 831(1) (board members must act "in the best interests of the corporation"); ABA, Model Business Corporation Act ("MBCA"), § 8.30(a) (same); 3 *Fletcher Cyc. Corp.*, § 837.60. Thus, "directors owe fiduciary duties to the corporation, for the benefit of the shareholders *as a group* (not 'and to the shareholders')." Edward B. Rock, *Adapting to the New Shareholder-Centric Reality*, 161 U. Pa. L. Rev. 1907, 1956-57 (2013) (emphasis added). This is so because shareholders may hold differing views, rendering it impossible to honor the wishes of each shareholder. MBCA, § 8.30(a) cmt. 1 (directors have "wide

discretion" to determine the "best interests of the corporation" because "the interests of various groups of shareholders … may differ"). Fiduciary duties do not require directors or officers of a U.S. corporation to follow any given investor's wishes.

Relatedly, there is no basis to conclude that board members of U.S. companies have a fiduciary duty to "anticipate and infer the wishes" of specific investors with respect to political spending decisions—a proposition for which the State cites no authority. State Br. at 50. As Justice Stevens observed in *Citizens United*, "the internal authority wielded by boards and managers and the expansive protections afforded by the business judgment rule" allows them to make decisions concerning corporate political activity without regard to shareholder's wishes. 558 U.S. at 475, 477 (Stevens, J., concurring in part and dissenting in part). Basic principles of corporate law thus permit corporate directors and officers to *disregard* the wishes of specific investors concerning political spending.[14]

Second, the use of various ownership thresholds in federal law does not demonstrate that 5% ownership serves as a reasonable proxy for substantial influence.

The State's primary example is the Williams Act. State Br. at 51; *see* 15 U.S.C. § 78m(d). The Williams Act addresses abuses in the use of cash tender offers as a means to effect a takeover of a publicly-traded corporation. *See Calvary Holdings, Inc. v. Chandler*,

---

[14] Critics of *Citizens United* have attacked the decision on this basis, arguing that a director's fiduciary duties are insufficient to permit shareholders to influence corporate political spending decisions. *See* Joseph K. Leahy, *Corporate Political Contributions as Bad Faith*, 86 U. Colo. L. Rev. 477 (2015).

948 F.2d 59, 62-63 (1st Cir. 1991). The Williams Act does not concern foreign government ownership; instead, it provides investors in publicly traded companies with transparency concerning potential "takeover bidders." *Id.* Although the Williams Act requires those who own 5% or more of a company to register with the SEC, it employs that threshold not because Congress determined that 5% constituted control, but rather because Congress determined that those with ownership interests of 5% or more may seek to obtain control over the company *in the future. See* Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 11:7 (2023) (noting that the Williams Act gives "investors and the public markets *an early warning* of a major stock acquisition that *could be a first step* in acquiring control" (emphases added)). Congress thus adopted the 5% threshold to allow investors to identify "takeover bidders" well in advance of an actual takeover. *Id.* The State confuses the *potential* for a *future* takeover bid with *present* control.

*Amici* also rely on provisions of federal law prohibiting the Federal Communications Commission from issuing radio licenses to entities more than 20% owned by foreign nationals or foreign governments. *See* FSFP Br. at 11. But there is a significant quantitative difference between the federal law's 20% threshold, *see* 47 U.S.C. § 310(b)(3), and the Initiative's 5% threshold. If anything, it shows that concern with foreign ownership arises only at a far higher level than that imposed by the Initiative.

The federal regulation regarding shareholder proposals cited by the State also does not support its argument. State Br. at 46 n.15. The relevant regulation permits the company to *exclude* a shareholder proposal if it "deals with a matter relating to the

company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). And "most shareholder proposals—and virtually all social and environmental proposals—are precatory, which means that they are recommendations and are not binding on management." Sarah C. Haan, *Shareholder Proposal Settlements and the Private Ordering of Public Elections*, 126 Yale L.J. 262, 273 (2016). The regulation does not show that de minimis investors wield anything close to significant influence over business operations.

Third, the State's mishmash of case law, press releases, newspaper articles, and law review pieces do not evidence real influence by 5% shareholders. State Br. at 45-48.

The State's reliance on Delaware cases is misplaced. Generally, Delaware law recognizes that assessment of control is a wholistic analysis that involves a wide variety of factors—not only ownership stake, but also the right to designate officers, decisional rules in governing documents, and the like. *See Tornetta v. Musk*, 310 A.3d 430, 500 (Del. Ch. 2024). The Initiative replaces this nuanced analysis with a blunt instrument based on one measure, and it magnifies this error by employing a threshold far lower than is typically recognized as indicative of control even when combined with other relevant factors. *See id.* at 498 n.556. In *Voigt v. Metcalf*, the court concluded that a plaintiff sufficiently alleged the defendant to be a fiduciary because of the defendant's 34.8% equity interest, taken together with other facts. 2020 WL 614999, at *14-19 (Del. Ch. Feb. 10, 2020). This was a "fact-intensive" inquiry, and the court noted that shareholders with a greater than 45% interest might not have control. *Id.* at *17. But even if the only factor was the defendant's equity interest, it is irrelevant: 35% is

materially larger than 5%. *Third Point LLC v. Ruprecht* is even further afield. 2014 WL 1922029 (Del. Ch. May 2, 2014). There, a so-called "activist hedge fund" owning 9.6% in Sotheby's alleged that Sotheby's board violated its fiduciary duties by adopting a stockholder rights plan disadvantageous to the shareholder. *Id.* at *1-2. The court's ruling *against* the shareholder, *see id.*, demonstrates that investors often *cannot* bend a board to their will. It hardly supports the notion that a 5% shareholder calls the shots.

The State's citations to articles and newspaper reports are similarly unconvincing, even if they were admissible evidence. The academic articles are based on anecdotal evidence, and do not address, much less draw conclusions concerning, the ownership threshold at which a shareholder may direct a corporation's political spending. Moreover, each paper demonstrates that activist hedge funds must resort to highly aggressive tactics just to claw their way into the peripheral decision-making process of a corporation; again, hardly evidence that limited ownership stakes provide a clear avenue for investor influence over operational decisions. And the 12-year-old newspaper article relating to QIA involved two European companies and has no nexus to Maine or U.S. corporate, securities, or campaign finance law.[15] Given that QIA is one of the few sovereign wealth funds identified as relevant to this litigation, the State's paucity of evidence regarding influence-seeking demonstrates its dearth of support.

---

[15] Further, the press releases cited by the State for the first time on appeal are irrelevant. State Br. at 45. Even if properly presented, they show only that Iberdrola voluntarily collaborates with an investor on business opportunities; they do not show that QIA has any say regarding CMP's political spending.

**b.     Section 1064(2) is underinclusive.**

An underinclusive law lacks the necessary fit between the state's ends and means. *NIFLA*, 585 U.S. at 774. "[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015) (quotation marks omitted). Thus, failure to address a significant source of the damage allegedly addressed by the law casts doubt on the state interest. *Id.*; *Showtime Ent., LLC v. Town of Mendon*, 769 F.3d 61, 73 (1st Cir. 2014).

The Initiative's ban on political speech is meaningfully underinclusive to any state interest in preventing foreign interference in democratic self-governance because it does not restrict the most prevalent form of influencing the democratic process, namely, lobbying.[16] In *Bellotti*, the Supreme Court concluded that a ban on corporate campaign spending on referenda was fatally underinclusive because it left corporations free to engage in lobbying. 435 U.S. at 793; *see also Citizens United*, 558 U.S. at 355. The same flaw exists with the Initiative. The vast majority of laws are adopted through regular legislative process, yet the Initiative does not preclude FGIEs from participating

---

[16] Lobbying is just one example of the Initiative's under-inclusivity. For example, the Initiative addresses equity ownership, but does not restrict speech based on a company's foreign creditors or customers. 21-A M.R.S. § 1064(1)(E)(2)(a). Moreover, while silencing U.S. companies, the Initiative does nothing to deal with real foreign government interference, such as social media bots. *See Justice Department Leads Efforts Among Federal, International, and Private Sector to Disrupt Covert Russian Government-Operated Social Media Bot Farm*, DOJ Press Release No. 24-850 (July 9, 2024), *available at* https://tinyurl.com/jf47hsm.

in that process by engaging in speech in the halls of the Maine state house or the Governor's mansion. As such, the Initiative shields one part of the legislative process from "influence"—such as it is—by foreign governments, but not the most substantial.

The Initiative's under-inclusivity is not saved by the principle that a legislature may proceed "piecemeal." That principle has the most force in the context of equal protection and due process. *See, e.g.*, *Buckley*, 424 U.S. at 90, 93-94, 105-106 (rejecting equal protection claim). In any event, the State cannot credibly suggest that there is a difference in proof regarding foreign government influence in campaign activities as compared to lobbying. It claims that spending by CMP and Versant in referenda is proof of invidious foreign influence; if that is so, why is the evidence in this case of lobbying by CMP and Versant not also proof of the same? *See* A.21, ¶ 35; A.58, ¶ 92. The State's claim that the Initiative addresses the most significant threat would hold more weight if it had "proffered evidence that minority foreign shareholders controlling or exercising influence over domestic corporations' political expenditures was the most serious risk of foreign influence." *Choi*, 2023 WL 8803357, at *9. But it did not.

### c.      Section 1064(2) is not the least restrictive alternative.

The State had less restrictive means to address its asserted interest. The State could have, but did not, simply ban foreign governments from becoming meaningfully involved in state elections. The law in *Bluman* illustrates what an appropriately tailored law would look like. The federal law upheld in that case targeted only campaign spending by *foreign nationals*, and excluded domestic subsidiaries of foreign corporations

whose contributions and expenditures were derived from funds generated by U.S. operations and whose decisions regarding political spending were made by U.S. citizens. 800 F. Supp. 2d at 284; *see* 52 U.S.C. § 30121 (formerly codified at 2 U.S.C. § 441e); 11 C.F.R. § 110.20(i); FEC Advisory Op. No. 2006-15, at *2 (May 19, 2006). Likewise, the Initiative could have banned foreign government spending, while leaving independent, U.S.-directed political spending unregulated. The State thus could have protected its asserted interest by regulating "the source of the foreign influence rather than banning [U.S.] corporations' political speech" based on passive ownership interests. *Choi*, 2023 WL 8803357, at *9. The Initiative is a blunderbuss, not a scalpel.

### 4.     The Initiative's vague definitions exacerbate its First Amendment flaws.

A law must "provide a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see Nat'l Org. for Marriage v. McKee (NOM)*, 649 F.3d 34, 62 (1st Cir. 2011). "To prevent the chilling of constitutionally protected speech," courts apply a "heightened standard" for clarity "in cases involving the First Amendment"—particularly when criminal penalties may be imposed. *Frese v. Formella*, 53 F.4th 1, 6 (1st Cir. 2022) (quotation marks omitted). The State's proffered definitions for the vague provisions in the Initiative demonstrate the overinclusive and underinclusive nature of the law.

First, the Initiative defines an FGIE as an entity with respect to which "a foreign government or foreign government-owned entity" holds an ownership interest of 5%

or more. 21-A M.R.S. § 1064(1)(E)(2)(a). But this definition is unclear on a crucial point: whether a company qualifies as an FGIE (1) if multiple foreign governments or FGOEs own more than a 5% interest in the aggregate, or, alternatively, (2) only if a single foreign government or FGOE owns more than a 5% interest. A company with multiple foreign ownership interests totaling 5% in the aggregate could be classified as an FGIE because, under Maine law, singular words ("a foreign government") include the plural. 1 M.R.S. § 71(9); *see Packgen, Inc. v. Bernstein, Shur, Sawyer & Nelson*, 209 A.3d 116, 124 n.10 (Me. 2019). If the Initiative requires more than a 5% ownership interest by a single foreign entity, as the Commission's current rules provide, *see* 94-270 C.M.R. ch. 1, § 16(2), then the Initiative leaves a massive loophole: it would allow a company with multiple foreign government ownership interests totaling more than 5% to engage in campaign spending. The law is thus either vague or underinclusive.

Second, the Initiative defines an FGIE to include a U.S. company with respect to which a foreign government or FGOE "directly or indirectly participates" in decision-making regarding involvement with candidate campaigns or referenda. 21-A M.R.S. § 1064(1)(E)(2)(b). The Commission initially proposed a sweeping definition for "participation" that included, without any limit, communication of a "preference" by a foreign government or FGOE regarding campaign spending. *See* Add.37.[17] After the

---

[17] Under the proposed rule, if an FGOE (*e.g.*, HQUS) simply sent an unsolicited email to a U.S. company (*e.g.*, NextEra) about an election-related issue, then the U.S. company would immediately lose its First Amendment rights. Add.37.

Initiative was enjoined, the Commission re-defined participation in terms of "deliberat[ing] or vot[ing] on a decision" regarding campaign spending. 94-270 C.M.R. ch. 1, § 16(1)(L). The Commission's shifting positions illustrate the vagueness of the Initiative. And the new definition fails to remedy that vagueness: for example, does participation in a company's "deliberation" include expressions of opinion by an executive of a domestic, but foreign-owned, corporation to an executive of a domestic, and U.S.-owned, corporation on a political matter of mutual interest? The proposed construction proffered by an *amicus* illustrates the problem by equating "participation" with "influence." PME Br. at 20-21. Resort to FEC precedents will not help clarify this term; although federal law allows U.S. subsidiaries of foreign corporations to engage in campaign spending if U.S. citizens make final decisions, *see* FEC Advisory Op. 2006-15 at *2, the Commission's rules are not so limited. The definition is vague, and illustrates the Initiative's over-inclusivity.

## C. The Initiative's disclaimer provision is unconstitutional because it fails both strict and exacting scrutiny.

The State argues that, even if the 5% threshold is flawed, the Initiative is otherwise constitutional. State Br. at 61. Not so. The requirement in Section 1064(6) that FGIEs place disclaimers on public communications influencing the formulation of public policy is also unconstitutional, as it fails both strict and exacting scrutiny.[18]

---

[18] This issue is fairly raised on appeal; the Court may reach questions of law argued but not addressed below. *United States v. Castillo-Martinez*, 16 F.4th 906, 915 (1st Cir. 2021); *Robidoux v. Muholland*, 642 F.3d 20, 23 n.2 (1st Cir. 2011).

41

1.    **Strict scrutiny applies to the disclaimer requirement because it compels companies to convey a government message.**

The Court should apply strict scrutiny to Section 1064(6). Although disclaimer requirements that simply require a speaker to disclose facts (such as its name) on the communication are subject to exacting scrutiny because they are minimally burdensome, *see Citizens United*, 558 U.S. at 366-71; *Gaspee Project*, 13 F.4th at 83, 90-92, 95, the Initiative mandates no ordinary disclaimer.

The disclaimer requirement is a content-based speech regulation. *See NIFLA*, 585 U.S. at 766. Section 1064(6) requires U.S. companies qualifying as FGIEs to label themselves as a "foreign government-influenced entity," regardless of any actual influence by a foreign government. 21-A M.R.S. § 1064(6). The Initiative thus compels U.S. companies to convey a government message—namely, that the company is suspect because it has some relation to a foreign government, no matter how attenuated and no matter whether that government has any real influence. The pejorative label is invalid for the same reason as the law at issue in *NIFLA*; it requires regulated entities such as CMP to convey a message with which they strongly disagree. *See* 585 U.S. at 774-75.

The characterization mandated by the Initiative is particularly damaging to a company's reputation because it implies a level of foreign control that may be misleading or even false (as is the case with CMP). A.21, ¶ 37.[19] The misleading nature

---

[19] One amicus analogizes the state interest to the Foreign Agents Registration Act ("FARA"), *see* PME Br. at 27, but elides a key point: FARA applies to persons *acting as an agent of a foreign principal*. 22 U.S.C. § 612(a). The Initiative, however, is not so limited.

of the disclaimer is not mitigated by the circular logic that the label is accurate because the Initiative classifies CMP as an FGIE. The Initiative cannot be used to justify the Initiative, any more than a law requiring any nonprofit to describe itself as a "tax evader" can be justified simply because the same law defines "tax evader" to mean any nonprofit. Nor is the misleading message ameliorated because the speaker could explain why the label is inaccurate. As an initial matter, the Commission's rules preclude the possibility of providing any clarification to mitigate harm from the compelled message. 94-270 C.M.R. ch. 1, § 16(7)(B). But even if it were possible, a private entity cannot be compelled to convey a message and thereby be "forced either to appear to agree . . . or to respond." *Pac. Gas & Elec. Co.*, 475 U.S. at 15; *see id.* at 16 (the government cannot "require speakers to affirm in one breath that which they deny in the next").

### 2.  The State lacks a sufficient justification for the disclaimer requirement.

Section 1064(6) fails any applicable scrutiny. The State does not have a sufficiently important interest in requiring companies to adopt a pejorative label.

First, Section 1064(6) fails strict scrutiny because it does not serve a compelling interest. Regulations of political speech can be justified only by anti-corruption interests, *see Citizens United*, 558 U.S. at 356-61, but communications regarding public policy do not risk *quid pro quo* corruption. Speech relating to public policy is just that—speech. The people of Maine are capable of listening to speech, assessing its persuasive value, and making an informed judgment. *Bellotti*, 435 U.S. at 790-91.

43

Second, Section 1064(6) fails exacting scrutiny because it does not serve a substantial state interest. The primary justification for disclaimers is informing the electorate, *Gaspee Project*, 13 F.4th at 86-88, but this interest does not justify subsection 6. That subsection does not even apply to electioneering communications, which are completely prohibited, 21-A M.R.S. § 1064(2); instead, it applies only to communications regarding public policy issues outside the election context, *id.* § 1064(6); *cf. NOM*, 649 F.3d at 40, 41-44 (upholding disclosure and disclaimer laws applicable to "election-related advocacy"). That means that CMP would likely be required to label itself as a "foreign government-influenced entity" every time it runs an ad, given that CMP is a highly regulated company. A.18-19, ¶ 26. The requirement does not address—much less inform—any electorate.

### 3. The disclaimer requirement does not adequately fit the State's asserted interest.

Further, even assuming Section 1064(6) serves a sufficient state interest, it fails both strict scrutiny and exacting scrutiny because the disclaimer requirement is overinclusive. *Bonta*, 594 U.S. at 610-15; *Gaspee Project*, 13 F.4th at 84.

Section 1064(6) does not target just those companies that are actually influenced by a foreign government. As discussed *supra*, the 5% ownership threshold means that the Initiative captures many companies with passive investors. Section 1064(6) slaps these companies with a pejorative label—even though that label is less informative than a factual disclosure regarding the amount of a company's foreign ownership.

44

Moreover, Section 1064(6) applies to communications unrelated to the speaker's status as a "foreign government-influenced entity," even if that term is taken at face value. Communications regarding "*any* state or local government policy," not just those affecting foreign interests, are subject to the requirement. 21-A M.R.S. § 1064(6) (emphasis added). This means that a U.S. company that happens to have investments by a foreign public pension fund is prohibited from speaking on *any* matter of public policy without including a disclaimer that is irrelevant to the topic at hand.

## D.    The Initiative is facially unconstitutional.

A law is facially unconstitutional if it is overbroad, *i.e.*, if there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court," *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984), in a "substantial number of its applications" as compared to its "plainly legitimate sweep," *Bonta*, 594 U.S. at 615 (quoting *Stevens*, 559 U.S. at 473). The step from the conclusion that a law is overinclusive to the conclusion that it is overbroad is not significant. *Id.*; *see Stevens*, 559 U.S. at 481-82; *Citizens United*, 558 U.S. at 362; *Vill. of Schaumburg v. Citizens for a Better Envt.*, 444 U.S. 620, 634-36 (1980). Subsections 2 and 6 are unconstitutional as to a substantial number of U.S. companies—more than any known lawful applications.

First, the Initiative presents real, not hypothetical, unlawful applications. There is no question that it bans speech of U.S. companies with passive investors. The State's

evidence shows that the Initiative would have silenced CMP, preventing it from engaging in multiple referenda that posed an existential threat to its business.

Second, the disproportionately unlawful sweep of the Initiative is clear. As of the end of 2023, FGOEs such as sovereign wealth funds and public pension funds have assets under management of $11.2 trillion and $23.1 trillion, respectively.[20] The scale of such investments inevitably means that many U.S. companies qualify as FGIEs because of foreign investment; for example, as of 2023, Norges Bank alone has a greater than 5% interest in 22 U.S. companies, including Unum Group, another Maine company.[21] Although the precise number of companies covered by the Initiative cannot be ascertained without reviewing the filings of every publicly held U.S. company (an exercise which still would not identify privately held U.S. companies qualifying as FGIEs), the only possible inference is that a significant number of U.S. companies would be silenced. In contrast, there is *no* evidence regarding the number of known, real-world foreign government interventions that would be constitutionally prohibited.

The Court should reject the State's invitation to save the Initiative by conducting surgery. Courts do not "rewrite a law to conform it to constitutional requirements," particularly in the context of facial challenges. *Reno v. ACLU*, 521 U.S. 844, 883-85 (1997) (cleaned up); *see Stevens*, 559 U.S. at 481 (re-writing a law "would constitute a

---

[20]    Global SWF, 2024 Annual Report, at 5, *available at* https://globalswf.com/reports/2024annual.
[21]    Norges Bank, https://www.nbim.no/en/the-fund/investments/#/2023/investments/equities.

serious invasion of the legislative domain, and sharply diminish [the Legislature's] incentive to draft a narrowly tailored law in the first place" (cleaned up)). The State asks the Court to reform the Initiative's definitions, arbitrarily replacing the 5% threshold with a 20% threshold. State Br. at 57-58. But the State provides no authority authorizing a court to assume the legislative prerogative by revising unconstitutional provisions. Such a step would go well beyond the ken of the judiciary. *See Reno*, 521 U.S. at 883-84.

## II.    The District Court's injunction was not overbroad.

Given the fatal flaws of subsections 2 and 6, the District Court properly concluded that the Initiative should be enjoined in its entirety. *See Randall v. Sorrell*, 548 U.S. 230, 262 (2006) (plurality opinion); *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 19 (1st Cir. 1996). Under Maine law, which controls whether the Initiative's provisions are severable, *see R.I. Med. Soc'y v. Whitehouse*, 239 F.3d 104, 106 (1st Cir. 2001), a statute with one unconstitutional provision must fall as a whole when its provisions "are so related in substance and object that it is impossible to determine that the legislation would have been enacted except as an entirety," *Op. of the Justs.*, 850 A.2d at 1152. Thus, the entire Initiative must be invalidated if (1) the invalid provisions are "integral to the initiated bill," and (2) the remaining provisions cannot "function and be given effect absent the invalid provisions." *Id.* The Initiative's provisions revolve around its ban on campaign spending and disclaimer requirements. Given the law's clear intent to silence CMP's political speech and the constitutional flaws with subsections 2 and 6—not to mention the flaws raised by various parties relating to the

Initiative's other provisions—no workable portion of the Initiative can survive. Absent subsections 2 and 6, the Initiative's provisions relating to solicitations, substantial assistance, structuring, due diligence, and penalties make no sense. 21-A M.R.S. § 1064(3)-(5), (7)-(9). Thus, the Initiative's provisions are not severable.

## III. The District Court correctly concluded that the remaining preliminary injunction factors are satisfied.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Fortuño*, 699 F.3d at 10–11. Thus, "irreparable injury is presumed" upon a showing of likely success on First Amendment claim. *Fortuño*, 699 F.3d at 11. That presumption is fully justified in this case, given the Initiative's criminal penalties. A.23, ¶ 47.

Further, given the importance of First Amendment rights, "[w]hen a party raises serious First Amendment questions, that alone compels a finding that the balance of hardships tips sharply in its favor." *Meinecke v. City of Seattle*, 99 F.4th 514, 526 (9th Cir. 2024) (cleaned up). The balance of harms therefore favors an injunction in this case. *See Fortuño*, 699 F.3d at 16.

Finally, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Meinecke*, 99 F.4th at 526. "[S]uppression of political speech harms not only the speaker, but also the public to whom the speech would be directed." *Fortuño*, 699 F.3d at 15 (citing *Citizens United*, 558 U.S. at 339).

## CONCLUSION

The Initiative strikes at the heart of the First Amendment's protections for political speech. The Court should affirm the preliminary injunction.

DATED:  July 24, 2024

Respectfully submitted,

*/s/ Joshua D. Dunlap*
Joshua D. Dunlap
Nolan L. Reichl
Katherine E. Cleary
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial St.
Portland, ME 04101
Phone: 207-791-1100
Email: jdunlap@pierceatwood.com
Email: nreichl@pierceatwood.com
Email: kcleary@pierceatwood.com

*Attorneys for Appellee*
*Central Maine Power Company*

## CERTIFICATE OF COMPLIANCE WITH RULE 32

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), as it contains 12,967 words, excluding the parts of the brief exempted by Fed. R. App. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Garamond size 14 font.

Dated:  July 24, 2024

*/s/ Joshua D. Dunlap*
Joshua D. Dunlap
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial St.
Portland, ME 04101
Phone: 207-791-1100
Email: jdunlap@pierceatwood.com

*Attorney for Appellee*
*Central Maine Power Company*

## CERTIFICATE OF SERVICE

I certify that the within brief has been electronically filed with the Clerk of the Court on July 24, 2024. All attorneys listed below are ECF filers and will receive service by electronic means pursuant to Rule 4 of this Court's Rules Governing Electronic Filing:

| | |
|---|---|
| Jack Ives Bartholet | Amira Marcella Mattar |
| Jonathan Richard Bolton | Megan Patricia McAllen |
| John C. Bonifaz | Paul McDonald |
| Peter J. Brann | Peter L. Murray |
| Ben T. Clements | Benjamin Robbins |
| Scott D. Dolan | Sigmund D. Schutz |
| Alexandra A. Harriman | Paul Suitter |
| Courtney M. Hostetler | KatieLynn B. Townsend |
| Thomas A. Knowlton | Sean R. Turley |
| Shannon Erika Liss-Riordan | John Alden Woodcock, III |
| Tara Malloy | Timothy C. Woodcock |

Dated:  July 24, 2024

*/s/ Joshua D. Dunlap*
Joshua D. Dunlap
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial St.
Portland, ME 04101
Phone: 207-791-1100
Email: jdunlap@pierceatwood.com

*Attorney for Appellee*
*Central Maine Power Company*