No. 24-1265

# United States Court of Appeals
# For the First Circuit

CENTRAL MAINE POWER COMPANY; VERSANT POWER; ENMAX CORPORATION; MAINE PRESS ASSOCIATION; MAINE ASSOCIATION OF BROADCASTERS; JANE P. PRINGLE, individually and in her capacity as a registered voter and elector; KENNETH FLETCHER, individually and in his capacity as a registered voter and elector; BONNIE S. GOULD, individually and in her capacity as a registered voter and elector; BRENDA GARRAND, individually and in her capacity as a registered voter and elector; LAWRENCE WOLD, individually and in his capacity as a registered voter and elector,

Plaintiffs - Appellees,

v.

MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES; WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; SARAH LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; STACEY D. NEUMANN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in his official capacity as Attorney General for the State of Maine,

Defendants - Appellants.

*On appeal from the United States District Court, District of Maine*

## BRIEF OF APPELLEES VERSANT POWER AND ENMAX CORPORATION

Paul McDonald
John A. Woodcock III
Bernstein Shur
100 Middle Street Portland, Maine 04101
(207) 774-1200
pmcdonald@bernsteinshur.com
jwoodcock@bernsteinshur.com
*Counsel for Versant Power and ENMAX Corporation*

## <u>RULE 26.1 DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1(a), Appellees Versant Power and ENMAX Corporation hereby state that: (i) ENMAX US Holdco, Inc. owns approximately 98% of the stock of Versant Power; (ii) ENMAX Corporation owns 100% of the stock of ENMAX US Holdco, Inc.; and (iii) The City of Calgary, Alberta, Canada, owns 100% of the stock of ENMAX Corporation.

# TABLE OF CONTENTS

Table of Authorities ............................................................................. iii

Statement of the Issues Presented For Review ..................................... 1

**Statement of the Case** ......................................................................... 2

A. Introduction .................................................................................... 2

B. Statement of Facts ........................................................................... 5

  1. Versant and ENMAX's Corporate Structure and Relationship ............... 5

  2. Versant and ENMAX's Past and Future Political Speech .......................... 7

  3. The Act ........................................................................................... 8

C. Procedural History .......................................................................... 11

  1. The Complaints and Preliminary-Injunction Motions .......................... 11

  2. The District Court's Preliminary-Injunction Order ............................. 14

    a. First Amendment Facial Challenge ....................................... 14

    b. The Preemption Challenge ..................................................... 17

    c. Appropriateness of the Preliminary Injunction ................... 18

**Summary of the Argument** ................................................................ 18

**Argument** ........................................................................................... 21

A. The Standard of Review .................................................................. 21

B. The District Court Did Not Abuse Its Discretion In Determining The Act Likely Violates The First Amendment ................................ 23

  1. Strict Scrutiny Applies To The Act ....................................................... 23

  2. The District Court Appropriately Rejected Defendants' Overbroad Assertion of Compelling Governmental Interests ...................................... 26

    a. *Bluman v. F.E.C.* ............................................................... 26

    b. The District Court's Application of *Bluman* ......................... 27

      i. Candidate Elections ....................................................... 27

      ii. Ballot Measures ............................................................. 29

      iii. Appearance of Influence ............................................. 32

  3. The District Court Correctly Found The Act Is Likely Not Narrowly Tailored ................................................................................ 35

    a. The Act's 5% Ownership Threshold ..................................... 35

    b. The Act's Alternative Measure of "Foreign-Government Influence" ................................................................................ 42

i

C. The District Court Correctly Found That FECA Expressly Preempted The Act As To Federal Elections ...................................................................46

D. The District Court Did Not Abuse Its Discretion In Finding The Act Facially Invalid And Declining To Sever It At This Preliminary Stage..54

    1. A Substantial Number Of The Act's Applications Are Likely Unconstitutional When Judged Against Its Legitimate Sweep (If Any).........................................................................................54

    2. The District Court Acted Within Its Discretion In Declining To Sever The Act At This Preliminary Stage .......................................55

E. Alternatively, The District Court's Preliminary Injunction Should Be Affirmed Because The Act Violates The Foreign Dormant Commerce Clause...........................................................................................................58

F. Alternatively, The Act Is Unconstitutional As Applied to Versant ...........66

G. The Remaining Preliminary Injunction Factors Favor The Injunction ....67

**Conclusion**.......................................................................................................68

Certificate of Compliance with Rule 32(a) .....................................................70

Certificate of Service .........................................................................................71

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abramski v. United States,*
   573 U.S. 169 (2014) ................................................................... 53

*Am. College of Obstetricians and Gynecologists v. F.D.A.,*
   506 F. Supp. 3d 328 (D. Md. 2020) ..................................... 46

*Arizona v. United States,*
   567 U.S. 387 (2012) ................................................................... 61

*Atl. Cleaners & Dyers v. United States,*
   286 U.S. 427 (1932) ................................................................... 50

*Austin v. Mich. Chamber of Commerce,*
   494 U.S. 652 (1990) ................................................................... 24

*Biden v. Texas,*
   597 U.S. 785 (2022) ................................................................... 30

*Bl(a)ck Tea Soc'y v. City of Bos.,*
   378 F.3d 8 (1st Cir. 2004) ................................................. 21, 22

*Bluman v. F.E.C.,*
   800 F. Supp. 2d 281 (D.D.C. 2011) ............................... Passim

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ............................................... 23, 24, 34

*Buckley v. Valeo,*
   519 F.2d 821 (D.C. Cir. 1975) ............................................. 34

*Carrozza v. CVS Pharmacy, Inc.,*
   992 F.3d 44 (1st Cir. 2021) ..................................................... 49

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
   370 F.3d 151 (1st Cir. 2004) ................................................... 22

*Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley,*
   454 U.S. 290 (1981) ................................................................... 31

*Citizens United v. F.E.C.,*
   558 U.S. 310 (2010) .......................................................... Passim

*Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo,*
    551 F.3d 10 (1st Cir. 2008) ............................................................... 45

*Condon v. Andino, Inc.,*
    961 F. Supp. 323 (D. Me. 1997) ...................................................... 68

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) ............................................................................ 49

*Corp. Techs., Inc. v. Harnett,*
    731 F.3d 6 (1st Cir. 2013) ................................................................ 22

*Cutter v. Wilkinson,*
    544 U.S. 709 (2005) ............................................................................ 45

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................................ 67

*F.E.C. v. Cruz,*
    596 U.S. 289 (2022) .................................................................... 30, 35

*F.E.C. v. Wis. Right to Life, Inc.,*
    551 U.S. 449 (2007) .................................................................... 24, 67

*FCC v. AT&T Inc.,*
    562 U.S. 397 (2011) ............................................................................ 47

*FemHealth USA, Inc. v. Williams,*
    83 F.4th 551 (6th Cir. 2023) ............................................................ 45

*First Nat'l Bank of Bos. v. Bellotti,*
    435 U.S. 765 (1978) .................................................................... 24, 31

*Francisco Sanchez v. Esso Std. Oil Co.,*
    572 F.3d 1 (1st Cir. 2009) ................................................................ 58

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ............................................................................... 60

*Holmes v. Jennison,*
    39 U.S. 540 (1840) ............................................................................... 62

*Japan Line Ltd. v. Cnty. of Los Angeles,*
    441 U.S. 434 (1999) ............................................................................ 59

*Johnson v. United States,*
    559 U.S. 133 (2010) ............................................................................ 48

*Kemlon Prods. & Dev. Co. v. United States,*
    646 F.2d 223 (5th Cir. 1981) ........................................................... 44

iv

*LeBeau v. Spirito,*
　703 F.2d 639 (1st Cir. 1983) ................................................................ 44

*Lorelei Corp. v County of Guadalupe,*
　940 F.2d 717 (1st Cir. 1991) ................................................................ 44

*McConnell v. F.E.C.,*
　540 U.S. 93 (2003) ....................................................................... 23, 24

*McCutcheon v. F.E.C.,*
　572 U.S. 185 (2014) ............................................................... 30, 32, 33

*Me. Forest Prods. Counsel v. Cormier,*
　51 F.4th 1 (1st Cir. 2022) .................................................................. 46

*Minn. Chamber of Commerce v. Choi,*
　2023 WL 8803357 ...................................................................... 41, 42

*Nano Dimension Ltd. v. Murchinson Ltd.,*
　681 F. Supp.3d 168 (S.D.N.Y. 2023) ................................................... 40

*Nat'l Fire Adjustment Co. v. Cioppa,*
　357 F. Supp. 3d 38 (D. Me. 2019) ...................................................... 57

*Nat'l Foreign Trade Counsel v. Natsios,*
　181 F.3d 38 (1st Cir. 1999) ............................................. 58, 59, 60, 65

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
　699 F.3d 1 (1st Cir. 2012) ...........................................................Passim

*Sullivan v. Stroop,*
　496 U.S. 478 (1990) ......................................................................... 50

*Trahan v. Wayfair Me., LLC,*
　957 F.3d 54 (1st Cir. 2020) ............................................................... 30

*United States v. Apel,*
　571 U.S. 359 (2014) ......................................................................... 53

*United States v. Muriel-Cruz,*
　412 F.3d 9 (1st Cir. 2005) ............................................................ 44, 45

*United States v. Playboy Entm't Grp., Inc.,*
　529 U.S. 803 (2000) ......................................................................... 32

*United States v. Singh,*
　979 F.3d 697 (9th Cir. 2020) ............................................................. 61

*United States v. Stevens,*
　559 U.S. 460 (2010) .................................................................... 49, 53

v

*Williams v. Taylor*,
   529 U.S. 362 (2000) ................................................................................. 48

## Statutes

1 M.R.S. § 71(8) ....................................................................................... 55
13-A M.R.S. § 843(1)(C) ........................................................................... 39
13-C M.R.S. § 831(1)(B) ........................................................................... 39
17-A M.R.S. § 1604(1)(C) .......................................................................... 11
21 M.R.S. § 1064 ....................................................................................... 8
21-A M.R.S. § 1011 ............................................................................. 48, 52
21-A M.R.S. § 1051 ......................................................................... 48, 51, 52
21-A M.R.S. § 1064 ..................................................................................... 1
21-A M.R.S. §§ 1012(2)-(3), 1052(3)-(4) ............................................. 10, 11
35-A M.R.S. § 708(2)(C)(2) ........................................................................ 6
52 U.S.C. § 30101(3) ............................................................................... 47
52 U.S.C. § 30143(a) ............................................................................... 47

## Constitutional Provisions

U.S. Const. art. VI, cl. 2 ........................................................................ 47

## Rules

Fed. R. Civ. P. 62.1 ................................................................................ 46

## Regulations

Contribution Limitations and Prohibitions,
   67 Fed. Reg. 69,928 (Nov. 19, 2002) ................................................... 60

## **STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1.      Whether the district court abused its discretion by preliminarily enjoining enforcement of 21-A M.R.S. § 1064 (the "Act"), which bars all campaign spending of a domestic corporation if 5% or more of its stock is owned by certain foreign entities or such a foreign entity directly or indirectly participates in its campaign-spending decisions, on the grounds that the Act facially violates the corporation's First Amendment rights.

2.      Whether the district court abused its discretion in determining that the Act is expressly preempted by federal law as applied to federal elections when the Act's plain text does not limit its application to state elections.

3.      Whether the district court's decision enjoining the Act should be affirmed on two alternative grounds left unaddressed by the district court: (i) the Act violates the United States Constitution's "dormant foreign commerce clause," Article I, Section 8, Clause 3; and (ii) the Act, as applied to Versant Power, violates its rights under the First Amendment.

## STATEMENT OF THE CASE

### A.  Introduction

Plaintiff-Appellee Versant Power ("Versant"), formerly known as Emera Maine ("Emera"), is an electrical utility serving customers in northern and eastern Maine for almost a century.  In March 2020, after obtaining approval from Maine's Public Utilities Commission ("PUC"), a wholly owned, indirect, subsidiary of Plaintiff-Appellee ENMAX Corporation ("ENMAX"), a Canadian corporation, purchased Emera.  ENMAX's sole shareholder is the City of Calgary, Alberta, Canada (the "City").  Given Emera's indirect foreign ownership, the PUC's approval of ENMAX's purchase addressed the issue of local control of Emera.  In short, the conditions of purchase required that neither the City nor ENMAX could have any operational or managerial control over Emera (now Versant).

Notwithstanding this ringfencing, four years later, Versant and ENMAX were targeted by a citizen's ballot initiative—later codified as the Act—that muzzles their ability to speak in campaigns.  The Act deems ENMAX and Versant "foreign government-influenced" entities by virtue of

the City's ultimate ownership of them.  As such, they are prohibited under the Act from all campaign spending.

The Act would silence core political speech which Versant and ENMAX had just voiced on an existential issue—to combat a ballot initiative aimed at appropriating all of Versant's assets.  In the 2023 general election, after voting on whether to approve the Act (Question 2), Maine's voters then turned to the next question on the ballot (Question 3): "An Act to Create the Pine Tree Power Company, a Nonprofit Customer—owned Utility" (the "Pine Tree Power Initiative" or "Initiative").  This Initiative would have created an entity to acquire, by eminent domain, the assets of Maine's investor-owned electrical utilities, including Versant's.  Versant's fate rested in the hands of Maine's voters.  Of course, Versant and ENMAX spoke on this crucial issue.  They made payments and in-kind donations to a ballot-question committee formed to oppose the Initiative.  Versant and ENMAX's efforts were a success, insofar as voters overwhelming rejected the Pine Tree Power Initiative.

The Act, however, which voters approved, makes all such spending a crime.  And if the advocates of Pine Tree Power try again, which they say they will, the Act would prevent Versant and ENMAX from similarly voicing their opposition.

Shortly after the Act's passage, Versant and ENMAX, along with Maine's other major electrical utility Central Maine Power ("CMP"), a group of Maine voters in their capacity as Electors, and the Maine Press Association and Maine Association of Broadcasters, moved to enjoin the Act.  After extensive briefing and oral argument, the district court (Torresen, J.) preliminarily enjoined the Act, finding that it likely facially violated the First Amendment.

The district court acted within its discretion in issuing the preliminary injunction.  There is no evidence in the record of any "pernicious" foreign-government influence that is not already addressed by federal election law.  The Act's sweeping ban on core political speech is thus not narrowly tailored to any compelling governmental interest.  The district court correctly

determined that the Act likely facially violates the First Amendment and is expressly preempted by federal election law.

Moreover, two additional reasons, which the district court did not consider, support affirming the injunction. One, the Act violates the dormant foreign commerce clause. Two, the Act, as applied to Versant, violates Versant's First Amendment rights.

## B.   **Statement of Facts**

### 1.   **Versant and ENMAX's Corporate Structure and Relationship**

Two major electrical utility companies serve Maine and have since the early 1900s. Add. 2. Versant is one. *Id.* at 3. Versant is a Maine corporation and it and its predecessors have operated exclusively in Maine for over 99 years. *Id.*

In 2020, an indirect subsidiary of ENMAX purchased all the common stock of Emera. App. 53. Emera then changed its name to Versant. *Id.* The City of Calgary is the sole shareholder of ENMAX. *Id.* at 52. ENMAX's acquisition of Versant was subject to regulatory approval by the PUC. *Id.* at 53. PUC approval required an examination of whether the proposed

transaction would "result in a loss of local control of the utility's management and operations in a manner that limits the ability of local management to protect the interests of the utility's ratepayers." 35-A M.R.S. § 708(2)(C)(2).

To address concerns regarding local control, ENMAX, among others including the Public Advocate, jointly stipulated to place limitations on the operations, management, and governance of ENMAX and Emera to ensure the City had no ability whatsoever to participate in the operations or management of ENMAX or the operations, management, or governance of Emera (now Versant). Add. 3; App. 56–57. This stipulation and its related agreements remain in full force and effect. App. 57. Thus, representatives of the City may not serve—and none has served—as an officer or director of Versant and are otherwise prohibited from participating—and none has participated—in its operations or management. Add. 3. Likewise, no representative of ENMAX has served as an officer of Versant. *Id.*

**2.    Versant and ENMAX's Past and Future Political Speech**

Versant has engaged in lawful political expression in Maine, making contributions or expenditures in connection with federal, state, or local elections of candidates.  App. 58.  Versant has also contributed, both by in-kind contributions and cash, to a ballot-question committee, Maine Energy Progress ("MEP").  *Id.*  Though federal law prohibits alien corporations from spending money in candidate elections, it does not prohibit them from spending on ballot initiatives.  *Id.*  Accordingly, ENMAX contributed to MEP in the same manner as Versant.  *Id.*  Notwithstanding its ownership of ENMAX's common stock, the City has had no influence on Versant or ENMAX's decisions regarding political spending in Maine.  *Id.* at 59.

MEP was formed to oppose and defeat the Pine Tree Power Initiative.  *Id.* at 58.  The Initiative was placed on the November 2023 ballot as Question 3, which immediately followed the Act, Question 2.  *Id.*  Maine's voters rejected the Pine Tree Power Initiative.  *Id.*  But had it passed, it would have required, among other things, forming an entity to acquire, by eminent domain, the assets of Maine's two major electric utilities, including Versant.

*Id.* Versant and ENMAX's ability to express their political opposition to the Initiative was critical to preserving and protecting Versant's very existence, let alone their collective property rights. *Id.* at 58–59. And if Pine Tree Power's proponents try a government takeover by ballot initiative again, as they say they will, Versant and ENMAX intend to respond by committing campaign spending to again defeat any such initiative. *Id.* at 59, 69–70.

### 3. **The Act**

The Maine Constitution requires that the legislature first consider any proposed ballot initiative before it is presented to the voters. Add. 5. Thus, the Act was presented to the legislature as L.D. 1610; it passed by a majority. *Id.* The governor, however, vetoed the law voicing her concern that it violated the First Amendment. *See id*; App. 47. The Act was then placed on the November 2023 ballot. Maine's voters approved Question 2, enacting the Act. *Id.* But for the district court's injunction, the Act would have taken effect in January 2024 and would be codified at 21 M.R.S. § 1064. Add. 6.

The Act defines a new species of political actor, a foreign government-influenced entity, which is prohibited from engaging in electioneering

activities.  *See generally* Act.  The Act defines a "foreign government-influenced entity" to include a "foreign government,"[1] a "foreign government-owned entity,"[2] and any entity in which a foreign government or foreign government-owned entity:

> (i)     "Holds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more of the total equity, [or] outstanding voting shares"; or

> (ii)    "Directs, dictates, controls or directly or indirectly participates in the decision-making process with regard to" the entity's activities "to influence the nomination or election of a candidate or the initiation or approval of a referendum."

Act § (1)(E).[3]

---

[1] A "foreign government" includes "any person or group of persons exercising sovereign *de facto* or *de jure* political jurisdiction over any country other than the United States or over any part of such country and includes any subdivision of any such group and any group or agency to which such sovereign *de facto* or *de jure* authority or functions are directly or indirectly delegated."  Act § (1)(D).

[2] A "foreign government-owned entity" is "any entity in which a foreign government owns or controls more than 50% of its equity or voting shares."  Act § (1)(F).

[3] The Act is reproduced at page 41 of the Addendum.  For ease of reference, the Act will simply be cited herein as the "Act."

The "heart of the Act" is Subsection 2.  Defs. Br. at 12.  Subsection 2 bans a "foreign government-influenced entity" from making, "directly or indirectly, … any other donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum."  Act § (2).[4]  Subsection 6 of the Act imposes an obligation upon each foreign government-influenced entity to affix a designated label to any other public communications (i) made to "influence the public or any state, county or local official or agency regarding the formulation, adoption or amendment of any state or local government policy" or (ii) "regarding the political or public interest of or government relations with a foreign country or a foreign political party."  Act § (6).  The mandated branding "must clearly and conspicuously contain the words 'Sponsored by' immediately followed by the name of the foreign government-influenced entity that made the

---

[4] The Act adopts existing definitions of "contribution" and "expenditure" found at Title 21-A, thereby specifically banning any foreign government-influenced entity from making any "purchase, payment, distribution, loan, advance, deposit or gift of money or anything of value made for the purpose of influencing the nomination or election of any person to state, county or municipal office."  Act § (1)(A), (C) (referring to 21-A M.R.S. §§ 1012(2)-(3), 1052(3)-(4)).

disbursement and a statement identifying that foreign government-influenced entity as a 'foreign government' or a 'foreign government-influenced entity.'" *Id.*

The Act empowers the Maine Commission on Governmental Ethics and Election Practices (the "Commission") to impose a penalty for violations of the greater of $5,000 or double the amount of the donation or disbursement.  Act § (8).  The Act also empowers the Maine Attorney General to charge a person who knowingly violates subsections 2 through 5 of the Act with a Class C crime, which carries a penalty of up to five years' imprisonment.  Act § (9); *see also* 17-A M.R.S. § 1604(1)(C).

## C.    Procedural History

### 1.    The Complaints and Preliminary-Injunction Motions

In December 2023, before the Act took effect, several plaintiffs separately moved for preliminary relief, arguing the Act was likely unconstitutional and should be enjoined.  R. Docs. 1, 22, 25 & 27.  CMP brought the first complaint against the Commission, the members of the Commission, and the Maine Attorney General (collectively, "Defendants").

R. Doc. 1.  CMP alleged that the Act facially violated the First Amendment. *See generally* App. 14–34.  That same day, Versant and ENMAX also filed a complaint seeking declaratory and injunctive relief.  *See generally id.* at 42–68.  Versant likewise alleged that the Act facially violated the First Amendment.  *Id.* at 61–62.  Versant also challenged the Act on an as-applied basis.  *Id.*  And both Versant and ENMAX alleged that federal election law preempted the Act, which also violated the foreign dormant commerce clause.  *Id.* at 60–61, 64–65.

In addition to the electric utility plaintiffs, two other groups of plaintiffs sued and moved to preliminarily enjoin the Act.  The Maine Press Association and Maine Association of Broadcasters (collectively, the "Media Plaintiffs") filed a complaint against the Defendants focusing on Section 7 of the Act.  *See* Add. 9.  The Media Plaintiffs alleged that section violated their First Amendment rights.  *Id.*  A final group of plaintiffs—five individual Maine voters acting in their capacities as electors under the Maine Constitution—then filed suit alleging that the Act violated a slew of rights

afforded to them under both the Maine and U.S. Constitutions.  App. 85–126.

The district court consolidated these cases.  R. Doc. 20.  Defendants agreed to refrain from enforcing the Act through February 2024 to allow time for the parties to fully brief and the district court to rule on the motions for injunctive relief.  Add. 10.  The Defendants then filed a consolidated brief opposing Plaintiffs' motions for injunctive relief.  R. Doc. 47.  Following completion of briefing from the parties and the acceptance of two amicus briefs supporting Defendants,[5] and one supporting the Media Plaintiffs,[6] the district court held oral argument on the preliminary injunction motions.  R. Doc. 59.

_____

[5] These amici were: Free Speech for the People and Protect Maine Elections. R. Docs. 45 & 46.  Both amici have also filed briefs in this appeal.
[6] Reporters Committee for Freedom of the Press joined as an amicus.  R. Doc. 50.

**2.**     **The District Court's Preliminary-Injunction Order**

**a.**     **First Amendment Facial Challenge**

Thereafter, the district court granted the preliminary injunction motions and enjoined enforcement of the Act.  Add. 40.  The court determined that Versant and CMP's argument that the Act facially violated the First Amendment was likely to succeed.  Add. 39–40.

The district court's review of relevant authorities, including this Court's decision in *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1 (1st Cir. 2012), led it to apply strict scrutiny to the Act.  Add. 27.  The court found Defendants had advanced a compelling governmental interest—limiting foreign interference in elections.  Add. 29–30.  Relying on a case which upheld a federal ban on foreign nationals' contributions to candidates, *Bluman v. F.E.C.*, 800 F. Supp. 2d 281 (D.D.C. 2011), the district court found that the compelling interest the *Bluman* court recognized in limiting foreign citizens' participation in U.S. elections likely extended to the Defendants' interest in limiting foreign-government influence in candidate elections.  Add. 30.  "A much closer question," however, was whether *Bluman*

14

could further extend to support a compelling interest in limiting foreign-government influence in ballot measures. *Id.* The district court assumed so, without deciding the issue. *Id.* at 31.

But the court rejected the Defendants' other proffered compelling governmental interest. The court found no authority supporting a compelling interest in avoiding the "appearance of" foreign-government influence. *Id.* at 31–32.

The district court then proceeded to analyze whether the tailoring of the Act's restrictions was sufficiently narrow. In that respect, the district court separately analyzed the three types of foreign government-influenced entities targeted by the Act: "(1) foreign governments; (2) entities that are 5% or more foreign government-owned; and (3) entities with actual foreign government influence." Add. 32 (footnotes omitted).

As to foreign governments, the court found the Act was narrowly tailored. *Id.* at 33. Like the foreign citizens in *Bluman*, the district court found that foreign governments are "not members of the American political

community" and, therefore, "likely can be barred from election spending in Maine." *Id.*

Not so, however, as to entities with a 5% or more foreign-government ownership interest. *Id.* at 33–35. The court found that threshold "would prohibit a substantial amount of protected speech." *Id.* at 34. And a law that barred campaign spending by domestic corporations directed and managed by U.S. citizens was incompatible with *Citizens United*—up to 95% of U.S. shareholders would thus be deprived of their First Amendment right to engage in campaign spending. *Id.* "Simply put, it would be overinclusive." *Id.* The court found no adequate justification for the 5% threshold, particularly when the Defendants offered no evidence that a foreign government-influenced "entity with less than full ownership of a domestic entity has exerted influence over that entity's election spending in Maine." *Id.* at 35.

The district court also found that the Act's conduct-based definition of foreign government-influenced entity swept too broadly and would likely

stifle the speech of domestic entities without any actual foreign-government influence.  Add. 37–38.

### b.  The Preemption Challenge

The district court also addressed Versant and ENMAX's express and implied preemption arguments.  The court rejected Defendants' argument that the Act did not encompass federal candidate elections because it did not contain express language saying that it did so.  Add. 14.  Thus, it concluded that "FECA [the Federal Election Campaign Act] likely expressly preempts the Act insofar as the Act covers foreign spending in elections for federal office." *Id.*

The district court's implied preemption analysis was more involved. First, the court addressed the applicability of presumptions for and against preemption.  *Id.* at 15–17.  The court found both a presumption and an inference against implied preemption.  *Id.*  Applying these presumptions, the court found that there was likely no implied federal preemption over ballot questions because federal election law did not regulate ballot measures.  *Id.* at 19–21.  And, although recognizing it to be a close call, the court held that

federal election laws concerning foreign nationals—which did govern state and local candidate elections—likely did not preempt the Act. *Id.* at 21–24.

### c.      <u>Appropriateness of the Preliminary Injunction</u>

Ultimately, the district court found that "a substantial number of the Act's applications are likely unconstitutional judged against the Act's plainly legitimate sweep." Add. at 38. And the court declined Defendants' request to sever the Act at the preliminary-injunction stage. *Id.* at 39. Accordingly, the court preliminarily enjoined the Act in full. *Id.* at 40.

Defendants then appealed. R. Doc. 66.

## <u>SUMMARY OF THE ARGUMENT</u>

The district court acted within its discretion to preliminarily enjoin the Act in full because the Act facially violates the First Amendment.

The Act silences core First Amendment expression by banning expenditures and contributions to candidates and prohibiting spending on ballot questions. Strict scrutiny thus applies to the Act.

In applying strict scrutiny, the district court appropriately recognized the limits of the compelling governmental interest recognized in *Bluman*.

That decision—which found a compelling interest in preventing foreign aliens from influencing candidate elections—supported the district court's finding of an abstract compelling interest in preventing foreign influence in candidate elections. But the district court properly declined to decide whether *Bluman*'s reasoning extended to ballot questions.

The district court also correctly rejected Defendants' argument that *Bluman* supported a compelling interest in ameliorating a perceived "appearance" of foreign-government influence. No decisional authority supports the creation of such a compelling governmental interest. Nor do these facts. As the district court found, the record is devoid of any evidence of a foreign government exerting election influence through a minority stake in a domestic corporation. The unsupported impression that such influence *could* exist cannot justify curtailing speech. The First Amendment demands more than the "appearance" of a symptom to restrict expression; there must be evidence of an underlying disease.

The district court also correctly determined that the Act was likely not narrowly tailored to the compelling interest it recognized—preventing

foreign-government influence in elections.  The five-percent threshold of ownership is—as the district court found—incompatible with settled law that domestic corporations and associations have the right to speak in campaigns under the First Amendment.  Defendants' ruminations about ways a foreign government *could* exert influence by means of a five-percent ownership interest in a domestic corporation cannot substitute for evidence that they have done so.

The Act's alternative definition of a "foreign-government influenced" company is similarly not narrowly tailored to staunching actual foreign-government influence.  Defendants' argument now is not so much that the district court erred in finding this portion of the Act likely unconstitutional, but that they have since performed a patchwork job to solve the problems the district court recognized.  But this after-the-fact fixing was not presented to the district court and is outside the record.  Defendants cannot now upend a preliminary ruling on the basis that it did not consider the new evidence Defendants now proffer.

Moreover, the district court did not abuse its discretion in finding that the Act—which does not carve out federal elections—was preempted by federal law as to federal elections.     Recognizing the multiple unconstitutional applications of the Act, which overwhelms its legitimate sweep (if any), the district court properly concluded that the Act was likely facially unconstitutional.  And the court did not abuse its discretion by declining to sever the Act at this preliminary stage.

There are two alternative reasons for affirming the district court's preliminary injunction, both of which the district court did not decide.  First, the Act infringes upon the federal government's ability to "speak with one voice" in violation of the dormant foreign commerce clause.  Second, although the Act is facially unconstitutional, Versant has also submitted unrebutted evidence that the Act is unconstitutional as applied to it.

## ARGUMENT

### A.     The Standard of Review

This Court reviews a district court's entry of a preliminary injunction for an abuse of discretion.  *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 11 (1st

Cir. 2004).  In doing so, it "scrutinize[s] abstract legal matters de novo, findings of fact for clear error, and judgment calls with considerable deference to the trier."  *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013).  "This is a deferential standard of review, and the deference that it entails is most appropriate with respect to issues of judgment and the balancing of conflicting factors."  *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 158 (1st Cir. 2004).  In reviewing a preliminary injunction determination on a First Amendment issue, this Court has reviewed a court's judgment and balancing of factors inherent in determining narrow tailoring for an abuse of discretion.  *Bl(a)ck Tea,* 378 F.3d at 14 ("We instead assess only whether the district court's balance of this and other factors was so unreasonable as to constitute an abuse of discretion.  We conclude that it did not, and, thus, we uphold the district court's determination that the security measures undertaken by the City, though extreme, were nonetheless narrowly tailored.")

**B.** **The District Court Did Not Abuse Its Discretion In Determining The Act Likely Violates The First Amendment**

      **1.**     <u>Strict Scrutiny Applies To The Act</u>

The district court correctly determined that precedent from both the Supreme Court and this Court compels application of strict scrutiny to the Act. Defendants' reliance on case law distinguishing the scrutiny applied to regulation of campaign contributions (closely drawn) and independent expenditures (strict) is misplaced. Defs. Br. at 26–28.

Unlike laws merely limiting contributions (which are subject to lesser scrutiny) the Act imposes an outright ban on all types of campaign spending, including independent expenditures. In *Buckley*, the Supreme Court applied closely drawn scrutiny to a state law placing *limits* on campaign contributions to candidates because contribution limits, unlike limits on expenditures, "entail[] only a marginal restriction upon the contributor's ability to engage in free communication." *Buckley v. Valeo*, 424 U.S. 1, 20 (1976) (superseded by statute); *see also McConnell v. F.E.C.*, 540 U.S. 93, 134–41 (2003), *overruled on other grounds by Citizens United v. F.E.C.*, 558 U.S. 310

(2010).[7]  Here, however, the Act outright prohibits all campaign spending by a "foreign government-influenced entity."  The Supreme Court has applied strict scrutiny to state laws that, like the Act, regulate speech based on the speaker's identity.  *Citizens United*, 558 U.S. at 341; *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784–85 (1978).  And the Court has consistently applied strict scrutiny to regulations curtailing independent expenditures.  *F.E.C. v. Wis. Right to Life, Inc.* ("*WRTF*"), 551 U.S. 449, 476–81 (2007); *McConnell*, 540 U.S. at 205; *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 655 (1990), *overruled on other grounds by Citizens United*, 558 U.S. at 365–66.  This Supreme Court precedent forecloses using a more deferential standard of review to examine the Act.  *See Citizens United*, 558 U.S. at 341.

---

[7] The Court so reasoned because a "contribution serves as a general expression of support for the candidate … but does not communicate the underlying basis for the support." *Buckley*, 424 U.S. at 21.  The size of a contribution is only a rough proxy for a contributor's support for the candidate.  *Id.*  Therefore, limits on the amount of money a contributor gives to a candidate or campaign organization "involve[] little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by [the] contribution." *Id.*

So too does precedent from this Court.  In *Fortuño*—a case expressly relied on by the district court—this Court applied strict scrutiny to Puerto Rico's "Law 222," which forbade labor unions "from spending *any* money on political campaigns, be they direct contributions, independent expenditures, or otherwise, without the process the statute prescribes."  699 F.3d at 12.  Even though Law 222 was less restrictive than the Act—inasmuch as it imposed oppressive regulations on political speech as opposed to an outright ban—this Court determined that strict scrutiny applied because the "challenged provisions are designed to regulate the if and how of … political speech."  *Id.  Fortuño*, as the district court held, demands application of strict scrutiny to the Act.

Defendants trumpet the Act's purported aim at foreign interests to try and lower the applicable scrutiny.  Defs. Br. at 27–28.  But the Act directly targets *domestic* corporations and associations.  Defendants cite no authority that lowers the First Amendment scrutiny bar based on alleged foreign ownership of or influence on such domestic entities.  *Id.*  The district court correctly applied strict scrutiny to the Act.

**2.** **The District Court Appropriately Rejected Defendants'** <u>**Overbroad Assertion Of Compelling Governmental Interests**</u>

a.    <u>*Bluman v. F.E.C.*</u>

Defendants ground the Act's alleged constitutionality in *Bluman*. But that decision is too narrow a foundation to support the weight Defendants place upon it. *Bluman* addressed the constitutionality of a federal law banning spending on candidate election campaigns by foreign nationals living in the United States. 800 F. Supp. 2d at 283, *aff'd*, 565 U.S. 1104 (2012). Writing for a three-judge panel, then-Judge Kavanaugh framed the case as raising a "preliminary and foundational question about the definition of the American political community and, in particular, the role of foreign citizens in the U.S. electoral process." *Id.* at 286. After surveying Supreme Court law on the bounds of foreign citizens' rights in the United States, the court concluded that these cases established "that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government." *Id.* at 288. It followed, therefore, that there was "a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of

American democratic self-government, and in thereby preventing foreign influence over the U.S. political process." *Id.* The court, however, took care to recognize the limits of this holding: "[A] law that is justified as applied to aliens may not be justified as applied to citizens of the United States, or entities made up of such citizens." *Id.* at 290. The court further cautioned that it "ha[d] no occasion to analyze the circumstances under which a corporation may be considered a *foreign* corporation for purposes of First Amendment analysis." *Id.* at 292 n.4.

### b.    <u>The District Court's Application of *Bluman*</u>

#### i.)    <u>Candidate Elections</u>

*Bluman* recognized a compelling interest in limiting aliens' participation in U.S. democratic self-government. *Id.* at 288. The district court found, in the abstract, that this interest "extends to the State interest here in limiting foreign government influence in candidate elections." Add. 29.

Responding to the argument that this interest did not apply to domestic corporations with "just some foreign government ownership," the

district court determined that the challenge to the foreign government ownership threshold was better analyzed under the narrow tailoring prong, as opposed to the compelling interest prong.[8]  Add. 29–30 & n.12.  At this preliminary stage and for purposes of this appeal, Versant and ENMAX do not challenge the district court's articulation of the abstract compelling interest it found.   However, Versant and ENMAX argued below that Defendants had failed to show that there was a compelling interest for this restriction because they did not demonstrate that FECA's existing ban on "foreign nationals"—which includes "foreign principals"—directly or indirectly contributing or donating money in connection with federal, state or local elections did not already adequately prevent actual foreign-government influence in Maine candidate elections.   R. Doc. 53 at 1–2.  Therefore, Versant and ENMAX contended, "because Congress has already legislated on the subject and in the absence of any evidence showing a need to double-up on FECA's protections, Defendants cannot demonstrate a

---

[8] Accordingly, Versant and ENMAX here (like the district court) assess the compelling interest in the abstract and the Act's thresholds for foreign-government influence in the narrow-tailoring analysis.

compelling interest in preventing foreign-government influence in Maine candidate elections." *Id.* at 3. The district court's preliminary injunction order did not address this argument, which Versant and ENMAX expressly reserve.

### ii.)  <u>Ballot Measures</u>

Given the initial stage of the case and exigencies of its preliminary injunction order, the district court assumed, without deciding, that "limiting foreign government influence in referenda elections is a compelling interest." Add. 31. The court noted that *"Bluman* 'does not address' and 'should not be read to support' bans on 'issue advocacy' or 'speaking out on issues of public policy' by foreign individuals." *Id.* at 30 (quoting *Bluman*, 800 F. Supp. 2d at 292). But the court also suggested a countervailing reading. *Bluman*, the court noted, supported excluding those not part of the "American political community" from democratic participation in self-

government.  Add. 30.  And participation in ballot measures was a form of democratic self-government.  *Id.* at 30–31.

Defendants argue that the district court should have recognized a compelling interest in regulating ballot measures.  Defs. Br. at 34–39.  They are mistaken.  For starters, Defendants do not, and logically cannot, say how the district court's First Amendment analysis would have been altered by expressly recognizing the compelling interest it assumed.  Defendants' cries to correct an assumption of a legal argument *in their favor* can do them no good.[9]

But had the court further analyzed and decided the issue, it would have found no support for a compelling interest in limiting speech over issues such as ballot measures.  There is "only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance."  *F.E.C. v. Cruz*, 596 U.S. 289, 305 (2022) (citing *McCutcheon v.*

---

[9] Courts routinely assume things for argument's sake.  *See, e.g.*, *Trahan v. Wayfair Me., LLC*, 957 F.3d 54, 64 (1st Cir. 2020); *see also Biden v. Texas*, 597 U.S. 785, 803 (2022).  This practice is particularly practical here given the time constraints of the preliminary injunction proceedings.

*F.E.C.*, 572 U.S. 185, 207 (2014)).  Ballot measures simply do not invoke the specter of *quid pro quo* corruption, which involves a direct exchange of an official act for money.  A ballot-measure voter neither gives nor receives anything—there can be no *quid pro quo*.  *See Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 300 (1981) (Blackmun, J. and O'Connor, J., concurring) ("[C]urtailment of speech and association in a ballot measure campaign, where the people themselves render the ultimate political decision, cannot be justified on [the] basis [of preventing corruption]").  Thus, "[t]he risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *Bellotti*, 435 U.S. at 790 (citations omitted).  Similarly, *Citizens United* concluded that independent expenditures on issues "do not give rise to corruption or the appearance of corruption."  558 U.S. at 357.

Moreover, the First Amendment does not permit the government's silencing speech on the political issues of the day because it deems the speaker politically unpalatable.  "What the Constitution says is that value judgments are for the individual to make, not for the Government to decree,

even with the mandate or approval of a majority." *McCutcheon*, 572 U.S. at 206 (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 818 (2000) (cleaned up)). On issues such as the Pine Tree Power Initiative, it is for the voters themselves, not the government, to decide which speakers and information should guide how they cast their ballots. To exclude those entities with the most skin in the game—such as Versant and ENMAX— because they are branded "foreign government-influenced" is to "deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration" in violation of the First Amendment. *See Citizens United*, 558 U.S. at 341. In short, there is no compelling interest in the Act's ban on speech directed at issues on ballot measures.

### iii.)   <u>**"Appearance" Of Influence**</u>

*Bluman*, as the district court held, is no authority for Defendants' additionally asserted compelling governmental interest—the "appearance" of foreign-government influence. Add. 31–32. Defendants counter with a flawed syllogism that purports to engraft the *Bluman*-recognized interest in limiting aliens' participation in U.S. democratic self-government onto the

line of authority recognizing an interest in limiting the appearance of *quid pro quo* corruption. This argument does not withstand scrutiny.

First, as Defendants concede, the appearance-of-corruption interest has been limited to just that—the appearance of *quid pro quo* corruption. *See Citizens United*, 558 U.S. at 359; *McCutcheon*, 572 U.S. at 207–08. "When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption." *Citizens United*, 558 U.S. at 359. There is no authority for Defendants' radical reinvention of the appearance-of-corruption interest to apply to a wholly separate interest—preventing foreign influence.

But even if there were, the facts here cannot support a compelling governmental interest in staunching foreign-government influence—Defendants presented no evidence that there is foreign-government influence in Maine elections via minority interests in domestic corporations. *Buckley* provides a foil. The campaign-finance restrictions in *Buckley* arose directly in response to public revelations of corruption infecting the 1972

presidential campaign. *See Buckley v. Valeo*, 519 F.2d 821, 838–40 (D.C. Cir. 1975). "[H]uge contributions from the dairy industry, a number of corporations (illegally) and ambassadors and potential ambassadors, made the 1972 election a watershed for public confidence in the electoral system." *Id.* at 839–40 (footnotes omitted). Thus, the Supreme Court in recognizing a compelling interest in preventing *quid pro quo* corruption and its appearance had ample evidence before it, after the 1972 election, "that the problem [was] not an illusory one." *Buckley*, 424 U.S. at 27.

Here, in stark contrast, Defendants presented no evidence to the district court that a foreign government via a minority interest in a Maine corporation actually influenced campaign spending decisions. In *Buckley*, there was *evidence* of corruption justifying an interest in limiting even the *appearance* of corruption. Here, there is no evidence of such influence that would justify a compelling interest in limiting the "appearance" of such influence. Accepting a compelling government interest in the "appearance" of a problem without evidence of the underlying problem itself could improperly justify unbounded restrictions on speech. A general feeling of

the majority of what *appears* to be cannot justify the curtailment of a minority's right to engage in core political speech.

### 3. The District Court Correctly Found The Act Is Likely Not Narrowly Tailored

Defendants attempt to justify the Act's sweeping restrictions not based on actual evidence of foreign-government influence, but the theoretical potential or possibility of such influence. This falls far short of the high bar required under the First Amendment. Because the government is defending the speech restrictions in the Act as "necessary to prevent an anticipated harm, it must do more than simply posit the existence of the disease sought to be cured." *Cruz*, 596 U.S. at 307 (citation omitted). Rather, it must point to "record evidence" demonstrating the need to address the problem. *Id.* Conjecture cannot carry a First Amendment burden. *Id.*

### a. The Act's 5% Ownership Threshold

The district court found that Defendants failed to offer "any evidence that a foreign-government or foreign government-owned entity with less than full ownership of a domestic entity has exerted influence over that entity's election spending in Maine." Add. 35. That finding alone supports

its conclusion that the Act's labeling of an entity as "foreign government-influenced" by a 5% direct or indirect foreign government ownership is not narrowly tailored.  *See id.*

Nothing Defendants offer now undermines this conclusion.  Lacking any record evidence, Defendants instead advance a parade of postulations.  But none of these suppositions supports a reasonable inference that passive investment equates to actual foreign-government influence over an entity's campaign spending decisions.

Defendants assert that the "main problem" with the district court's analysis is that it failed to recognize that large publicly held corporations are beholden to their large investors.  Defs. Br. at 44–45.  They try to support this claim now with public partnership pronouncements between Qatar and Iberdrola, which they did not present to the district court.  *Id.*  But any mutual understanding between Iberdrola and Qatar is continents away from the relevant question here: Whether Qatar itself exerted influence over CMP's campaign spending decisions to oppose Maine ballot questions targeted at CMP.  No logic supports that inferential leap.

Nor does the amount of Qatar's investment.  If investment alone were a proxy for influence, the reign of Harald V would extend far beyond Norway to reach across every global financial center—Norway's sovereign wealth fund holds an average 1.5% stake in all listed companies.[10]  This includes, for example, a 6.69% ownership stake[11] in one of Maine's ten largest employers,[12] Unum Group.  Because investment analysts in Norway found it a worthy investment, Unum is branded a "foreign government-influenced entity" under the Act.  Act § 1(E).  Other public companies are certain to be similarly branded due to passive sovereign wealth fund investment.  Such a minority investment cannot serve as a freestanding substitute for evidence of actual foreign-government influence over a U.S. corporation's political spending.

Defendants' assertion that a minority investor—particularly an activist investor seeking or weighing in on fundamental corporate change—may

---

[10] https://tinyurl.com/2cmptt47.

[11] https://tinyurl.com/4w856hh5 (reporting reflecting data at the end of 2023).

[12] R. Doc. 53 at 10 n.9 & n.10.

assert its influence is of no moment.  Defs. Br. at 47–48.  Well known activist investor Carl Ichan's decade-old (failed) bid to change Ebay's business via a proxy battle says nothing about foreign governments influencing political spending decisions.  *Id.* at 47.  And the lone instance cited by Defendants of a foreign-government investor (Qatar) playing a role in a corporate takeover undercuts Defendants' argument that doing so shows a proclivity to engage in management decisions such as campaign spending.  *Id.*  Quite the opposite.  While Qatar Holding held out for a larger price in a takeover bid, experts saw this action as limited.  The fund had a "lack of management expertise to run companies" and was "not interested in running companies they own and do not have the management expertise for it."  *See* Dinesh Nair, *Qatar flexes muscle in shock Glencore move*, Reuters (June 27, 2012); Defs. Br. at 47.  It does not follow from these stray examples—long since past— that foreign-government investors are in fact influencing management's decisions about campaign spending.  On the contrary, this purported support underscores just how flimsy the record is for the Act's sweeping prohibitions on free expression.

Defendants' reliance on corporate managers' fiduciary duties as purported support for the Act fares no better.  Defs. Br. at 48–49.  Directors and officers do not have the duty to follow the political whims of *particular* shareholders in managing a corporation.   Rather, the Maine Business Corporation Act makes clear that both a director and officer's duty of loyalty is to the corporation itself, not to its individual shareholders.  *See* 13-C M.R.S. § 831(1)(B) (setting standards of conduct for directors); 13-A M.R.S. § 843(1)(C) (setting standards of conduct for officers).[13]  Maine has adopted the Model Business Corporations Act (as has every other state in New England and thirty-five states in total), which makes clear that directors' and officers' duties shall be in the best interest of the corporation itself.  MBCA §§ 8.30, 8.42.  The "corporation" is "a surrogate for the business enterprise as well as a frame of reference encompassing the shareholder body."  MBCA

---

[13] Similarly, Canadian corporate law, which applies to ENMAX, requires directors to act in the best interest of the corporation (rather than the shareholder).  *See* Alberta Business Corporations Act § 122(1)(a) ("Every director and officer of a corporation in exercising the director's or officer's powers and discharging the director's or officer's duties shall (a) act honestly and in good faith with a view to the best interests of the corporation.")

§ 8.30 cmt. 1. Defendants' suggestion that corporate management must bend to the political wishes of individual shareholders over that of the corporate body runs headfirst into basic corporate law.

Likewise, the Williams Act offers no answer to the district court's finding that the 5% threshold was arbitrarily chosen. Section 78m(d) of the Williams Act is an early warning system that protects the informational interests of shareholders and management of publicly traded corporations regarding actual or *potential* changes in control. *See Nano Dimension Ltd. v. Murchinson Ltd.*, 681 F. Supp. 3d 168, 180–81 (S.D.N.Y. 2023). The Williams Act's disclosure requirement in no way represents a Congressional finding that 5% share ownership is a proxy for corporate control. And the fact that other states' or municipalities' statutes purporting to limit or ban foreign influence in elections[14] employ ownership thresholds that may be equal or even lower by comparison is no means of proving narrow tailoring. *See* Defs. Br. at 52.

---

[14] Defendants point to no decisional authority upholding these restrictions.

The district court's conclusion "that a 5% foreign ownership threshold would prohibit a substantial amount of protected speech" is well supported. Add. 34. Moreover, as the district court noted, this threshold would contravene *Citizens United* by, in effect, prohibiting up to 95% of other shareholders of Maine corporations managed and directed by U.S. citizens of their First Amendment right to engage in collective campaign spending. *Id.* The district court's conclusion that "[s]imply put, [the Act] would be overinclusive" is well founded. *Id.*

A related case, *Minnesota Chamber of Commerce v. Choi*, further supports the district court's finding that the Act is not narrowly tailored. *Minn. Chamber of Com. v. Choi*, 2023 WL 8803357, at *6 (D. Minn. Dec. 20, 2023). Although Defendants only mention *Choi* in a single footnote, Defs. Br. at 53 n.19, *Choi* addressed a similar state law passed in Minnesota that barred campaign spending for entities with 1% foreign ownership. 2023 WL 8803357, at *1. Like the district court in this action, the Minnesota district court preliminary enjoined the campaign-spending restrictions enacted in Minnesota. *Id.* The *Choi* court found the Minnesota law was not narrowly

tailored to the "abstract" compelling governmental interest in preventing foreign influence.  *Id.*  Its rationale is just as applicable here:

> [The law's] prohibition on corporate independent expenditures, backed by criminal penalties, infringes on those corporations' First Amendment rights.  *Citizens United*, 558 U.S. at 339, 130 S. Ct. 876.  A domestic corporation with a foreign shareholder holding one percent of its shares is banned from speaking, even if that foreign national is a passive investor who exercises no influence or control over the corporation's election expenditures. Because the Board has failed to identify evidence that minority foreign shareholders regularly (or ever) exercise influence or control over corporations' political expenditures, the challenged provisions of [the law] sweep far too broadly.

*Id.* at *8.  The *Choi* court's holding further supports the district court's finding that the Act is likely not narrowly tailored.

### b.    The Act's Alternative Measure Of "Foreign-Government Influence"

The district court found that the Act's alternative test for "foreign government-influenced" similarly was not narrowly tailored.  Add. 35–38. This other measure is not based on ownership but rather the alleged participation in an organization's election spending.  Specifically, the Act deems an organization "foreign government-influenced" if a foreign government or foreign government-influenced entity "directly" or

42

"indirectly" participates in the "decision-making process with regard to the activities of the [organization] or other entity to influence the nomination or election of a candidate or the initiation or approval of a referendum, such as decisions concerning the making of contributions, expenditures, independent expenditures, electioneering communications or disbursements." Act § (1)(E)(2)(b). The district court found that this definition, particularly when coupled with the Act's proposed rules, swept so broadly that an unsolicited communication to a domestic corporation from a foreign government-owned entity would transform the domestic corporation into one that was "foreign government-influenced." Add. 36–37. As such, the district court found the definition overbroad and "likely to stifle the speech of domestic corporations regardless of whether a member of a foreign government or foreign government-owned entity has any actual influence over their decision-making on campaign spending." *Id.* at 37–38.

On appeal, Defendants do nothing to dispute the district court's reasoning that this alternative measure for foreign-government influence was likely unconstitutional. Rather, they now argue that new clarifying

definitions purportedly fix the multiple constitutional flaws the district court identified in its order granting preliminary injunctive relief.  Defs. Br. at 55. But these newly minted rules were not presented to the district court, are not part of the record in this appeal, and would only come into effect "if and to the extent the injunction is lifted."  Defs. Br at 55 n.20.  Under the time-worn rule that an appellate court will not consider material on appeal that is outside the district court's record, this Court should not consider these proposed rules.  *See Lorelei Corp. v Cnty. of Guadalupe*, 940 F.2d 717, 721 n.4 (1st Cir. 1991); *Kemlon Prods. & Dev. Co. v. United States*, 646 F.2d 223, 224 (5th Cir. 1981) ("A court of appeals will not ordinarily enlarge the record on appeal to include material not before the district court") (collecting cases). In reviewing a preliminary injunction order, this Court accordingly assesses "probable outcomes based on the record *as it existed before the district court.*" *LeBeau v. Spirito*, 703 F.2d 639, 643 (1st Cir. 1983) (emphasis added).

And although in "extraordinary circumstances" this Court will go beyond "the record extant at the time the district court rendered its decision," no such circumstances exist here.  *See United States v. Muriel-Cruz,*

412 F.3d 9, 12 (1st Cir. 2005).  This Court is "a court of review, not of first view."  *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005).  This Court need not take that first view now.  Rather, on remand to the district court, Defendants could attempt to show that a "significant change either in factual conditions or in law" merits modification of the preliminary injunction.  *See Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo*, 551 F.3d 10, 16 (1st Cir. 2008) (citation omitted); *see also FemHealth USA, Inc. v. Williams*, 83 F.4th 551, 556 (6th Cir. 2023) ("district courts retain the power to modify or dissolve preliminary injunctions to account for significant intervening changes in the law or facts and the courts of appeals have jurisdiction from district courts' exercise (or not) of that power") (citations omitted).

This Court should decline Defendants' invitation to reverse the district court's preliminary injunction ruling based on newly proposed rules which are not in effect and were not presented to the district court.  Defendants should not be able to upend a preliminary ruling by advancing one set of

rules before the district court and another set of rules to this Court.[15] Properly focused on what was presented to the district court, Defendants have no answer to the court's preliminary finding that Section (1)(E)(2)(b) of the Act "casts an overly broad net" and was not narrowly tailored. Add. 37–38.

## C. The District Court Correctly Found That FECA Expressly Preempted The Act As To Federal Elections

This Court is well familiar with the general principles of pre-emption the district court applied. In a system of "overlapping federal and state sovereignties," state law could possibly conflict or be at cross purposes with federal law. *Me. Forest Prods. Counsel v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022). In such instances, the U.S. Constitution commands that the conflicting state

---

[15] Indeed, in a pending appeal, there is a specific procedure for modifying an injunction in the district court based on significant legal or factual changes. Under Fed. R. Civ. P. 62.1, a party may seek such an action in the district court and, in turn, the court may state "either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Civ. P. 62.1(a). That ruling is then conveyed to the appeals court. Fed. R. Civ. P. 62.1(b). Defendants could have, but did not make such a motion to the district court pointing to the newly adopted rules. *See, e.g.*, *Am. College of Obstetricians and Gynecologists v. F.D.A.*, 506 F. Supp. 3d 328, 338 (D. Md. 2020).

law give way; federal law is the "supreme Law of the Land." *Id.* (citing U.S. Const. art. VI, cl. 2).

A federal law may expressly state its preemptive effect. FECA contains such a provision: "the provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to Federal office." 52 U.S.C. § 30143(a). "Federal office" means "the office of President, or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress." 52 U.S.C. § 30101(3).

The Act, as the district court noted, "does not exclude federal elections, so on its face the Act would apply to the election of a candidate to federal office." *See generally* Act; Add. 13. This determination alone is enough to affirm the district court's order. The Act prohibits contributions, expenditures, communications, or "any other donation or disbursement of funds to influence the nomination or *election of a candidate*" by any foreign government-influenced entity. Act § 1 (emphasis added). There are no limitations on this ban. Therefore, it applies to any election, federal, state, or local. *See FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011) ("When a statute does

not define a term, the Court typically gives the phrase its ordinary meaning." (quoting *Johnson v. United States*, 559 U.S. 133, 138 (2010))).   These words must be given effect.  *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) (noting the "cardinal principle … that courts must give effect, if possible, to every clause and word of a statute").

But the district court went further and correctly rejected Defendants' argument that *other* sections of Maine's election laws have express limitations that effectively carve out federal elections from the Act's reach. Add. 14.  These sections do not carry the day.  As the district court noted, other sections of Title 21-A are not so limited.  *Id.*  And the "application" section which purportedly limits the Commission's jurisdiction sits in a different subchapter (Subchapter 2) than the Act (Subchapter 4), which has a different "application" section.  *Compare* 21-A M.R.S. § 1011 *with* 21-A M.R.S. § 1051.

Apparently recognizing that foraging beyond the Act's text yields a meagre harvest, Defendants make a new argument regarding the Act's "applicability" section that they did not advance before the district court.

That argument is thus waived.  *Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 59 (1st Cir. 2021).  But even if not waived, this new argument is of no help to Defendants.    Employing  the  associated-words  cannon  of  construction (*noscitur a sociis*), Defendants argue that "persons" as that term is used in the Act, means something entirely different from its ordinary meaning.  They argue that because the Act's final section states that it applies to "all persons" including a variety of specific persons and entities as defined under Maine election law, that "persons" is limited to "participants in state and local elections."  Defs. Br. at 64–65.

There are multiple errors with this forced analysis.  First, there is no ambiguity  to  Section  11;  it  applies  to  all  persons,  including  the  various persons and entities specifically statutorily defined.  Act § 11.  There is no need to go further.  "When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (cleaned up).  The *noscitur a sociis* cannon, like others, applies only to give meaning to an *ambiguous* term. *United States v. Stevens*, 559 U.S. 460, 474 (2010).  Defendants (mis)apply this

interpretive cannon not to define an ambiguous term (persons) but to make a different point entirely—that "if the drafters had intended to include participants in federal elections within the scope of the Act, they would have mentioned them in § 1064(11)'s otherwise broad list of 'persons.'" Defs. Br. at 65. But without showing that there is any ambiguity in "persons," Defendants' argument fails from the start.

In fact, there is no ambiguity because the term "person" is used unambiguously seven separate times before it is used in Section 11 of the Act. It is fundamental that "identical words used in different parts of the same act are intended to have the same meaning." *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932); *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990).

Defendants' construction of "persons" as those "limited to participants in state and local elections" would make no sense if applied in every other part of the Act that uses that term. Take, for instance, the definition of "foreign government" which includes "any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any

country other than the United States." Act § (1)(D). These persons are not limited to participants in state or local elections. Nor is a "person" who "may not structure or attempt to structure a solicitation, contribution, expenditure, independent expenditure, electioneering communication, donation, disbursement or other transaction to evade the prohibitions and requirements in this section." Act § 5. The meaning Defendants seek to imbue on "persons" to limit the Act's application to state elections makes no sense considering the Act's full text and use of that term. Rather, the specific examples provided in Section 11, such as "authorized committees," "party committees," and "committees," broadens the ordinary meaning of "persons." Act § 11. This is directly counter to Defendants' reading, which serves to limit "persons" to only those who participate in state and local elections.

Finally, Section 11 begins with language that it applies "notwithstanding section 1051." Defendants previously argued that this type of language would have indicated the Act's application to federal elections. Before the district court, Defendants argued that "had the drafters

of the Act wished to regulate federal elections, they would have needed to include express language indicated that the Act applies to federal elections '*notwithstanding sections 1011 and 1051'*" (emphasis added).  R. Doc. 47 at 53; *see also* R. Doc. 47-1 ¶ 9 ("In the view of Commission staff, a new campaign finance law placed within Chapter 13 would need to expressly state that it applied to federal elections 'notwithstanding § 1011 and § 1051,' or some similar language, in order to overcome Chapter 13's express limitations on the Commission's jurisdiction.").  Now, however, Defendants argue that a provision containing similar "notwithstanding" language points precisely in the opposite direction—that it indicates the Act's limitation to state and local elections.

Defendants' ever-shifting interpretive arguments lend particular credence to the district court's refusal to accept the Commission's interpretation of the Act—that it will not apply to federal elections.  Add. 14.  The court rightly concluded that such a limiting construction could apply "only if [the statute] was 'readily susceptible' to such a construction" and that a court will not "uphold an unconstitutional statute merely because the

Government promises to use it responsibly." *Id.* (quoting *United States v. Stevens*, 599 U.S. 460, 480–81 (2010)).  Moreover, the Act includes criminal penalties, and so any deference to the Commission's interpretation would be inappropriate.  As the Supreme Court has noted, it has "never held that the Government's reading of a criminal statute is entitled to any deference." *United States v. Apel*, 571 U.S. 359, 369 (2014).  Rather, "criminal laws are for the courts, not for the Government, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014).  Nor would the Commission's interpretation be binding on the Act's criminal enforcer, the state Attorney General.

In short, Defendants' newly proffered and inventive interpretation of Section 11 fails to support a conclusion that the Act's text is limited to state and local elections.

**D.** **The District Court Did Not Abuse Its Discretion In Finding The Act Facially Invalid And Declining To Sever It At This Preliminary Stage**

    **1.** **A Substantial Number Of The Act's Applications Are Likely Unconstitutional When Judged Against Its Legitimate Sweep (If Any)**

The district court's determination that two out of the three foreign government-influenced entity categories were likely unconstitutional led to its inexorable finding that "a substantial number of the Act's applications are likely unconstitutional judged against the Act's plainly legitimate sweep." Add. 38. Thus, the district court found the Act was likely facially unconstitutional. *Id.*

This determination was well supported. The district court found that Defendants adduced no evidence showing that foreign governments had used a minority stake in a corporation as a Trojan horse to influence that entity's political spending. Add. 35. And yet, the Act would prohibit a "substantial amount of protected speech" via its 5% foreign ownership threshold. *Id.* at 34. It would deprive a domestic corporation and up to 95% of its U.S. citizen shareholders of their fundamental First Amendment rights. *Id.* The alternative measure for foreign-government influence, the district

54

court found, would sweep up U.S. companies without regard to any "actual influence" by a foreign government over campaign spending.  *Id.* at 38. Moreover, the court found that FECA expressly preempted the Act as to federal elections.  *Id.* at 14.

Having made these determinations, the district court acted well within its discretion in determining that a substantial number of the Act's applications were unconstitutional when judged against its legitimate scope. The court's judgment that the Act was likely facially unconstitutional was correct, and certainly not an abuse of discretion.

## 2.    The District Court Acted Within Its Discretion In Declining To Sever The Act At This Preliminary Stage

Seeking to dodge the result of this conclusion, Defendants now argue that Maine law required the district court to parse finely through the Act and determine if any of its numerous sections were likely constitutional and could be severed from the likely unconstitutional sections.  Defs. Br. at 68–70.  But while Maine substantive law provides that Maine statutes are severable, it says nothing directly about when that determination must be made as a matter of procedure.  *See* 1 M.R.S. § 71(8).  Indeed, the text of that

law signals its application to final determinations of invalidity, not preliminary findings of likely invalidity. *Id.* ("If any provision of the statutes or of a session law *is invalid* … ." (emphasis added)).

A finding that the district court had a duty to undertake the severability analysis would be incongruous with the procedural posture of the case, including that the court only granted preliminary relief. The district court specifically stated that it would forego a severability analysis for the moment "given the expedited and preliminary nature of this proceeding." Add. 38–39. Versant and ENMAX are aware of no authority which would compel the district court to undertake a severability analysis within the context of a preliminary injunction motion. Nor do Defendants cite to any such authority.

Defendants' complaint that the district court failed to engage in a section-by-section severability exercise ignores the exigencies of its ruling on the preliminary injunction motions. Defendants effectively imposed the tight deadline for resolution of the preliminary injunction motions for four separate plaintiff groups—Defendants would only agree to "voluntarily

refrain from enforcing the Act as to actions occurring during a brief period, running until February 29, 2024, to allow for full consideration of the issues raised by all parties."  R. Doc. 13 at ¶4.  The expedited briefing of the preliminary injunction motions was not completed until January 31 and oral argument was heard three weeks later, on February 23.  *Id.* ¶6; R. Docs. 51–54; Add. 11.  On February 29, the final day of Defendants' voluntary non-enforcement, the district court issued its forty-page order granting the preliminary injunction motions.  Add. 40.

The district court's failure to engage in a severability analysis under these narrow time constraints was not an abuse of discretion.  Indeed, the court was unable to address the additional constitutional arguments raised by multiple parties in its order.  *Id.*  To properly engage in a severing analysis would have required the court to address each of these separate challenges; assess what (if anything) of the Act survived all these challenges; and then assess if any non-offending provisions were severable from what it deemed likely unconstitutional.  *See Nat'l Fire Adjustment Co. v. Cioppa*, 357 F. Supp. 3d 38, 49 n.13 (D. Me. 2019).  Given the limited time it had to make its

preliminary-injunction ruling, discretion favored the district court's declination to apply a scalpel to the Act when time did not allow for such intricate surgery.

Nor would it have made sense within the context of addressing a preliminary injunction. "[T]he purpose of a preliminary injunction is to preserve the status quo *before* the merits have been resolved." *Francisco Sanchez v. Esso Std. Oil Co.*, 572 F.3d 1, 19 (1st Cir. 2009). The district court preserved the status quo by enjoining enforcement of the Act and left the issue of severability, vel non, for another day. Such determination met the purpose of the preliminary injunction analysis and certainly fell within the district court's discretion.

## E.    Alternatively, The District Court's Preliminary Injunction Should Be Affirmed Because The Act Violates The Foreign Dormant Commerce Clause

As mentioned above, due to time constraints, the district court did not pass on Versant and ENMAX's argument that the Act violated the foreign dormant commerce clause. Consideration of this argument—which is grounded in this Court's decision in *National Foreign Trade Council v.*

*Natsios*—alternatively supports affirmance of the district court's preliminary injunction.  181 F.3d 38, 74 (1st Cir. 1999).

In *Natsios*, this Court recognized that under the foreign dormant commerce clause, a state law must not interfere with the "federal government's ability to 'speak with one voice' in foreign affairs."  *Id.* at 68.  Such state laws "harm[ ] 'federal uniformity in an area where federal uniformity is essential.'"  *Id.* (quoting *Japan Line Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448–49 (1999)).  This "one voice" inquiry under the Commerce Clause is "similar to, but distinct from, the argument that the law violates the foreign affairs power of the federal government."  *Id.*

The underpinning of the "one voice" principle is that the federal government's right to conduct foreign policy must not be infringed upon.  *See* Federalist No. 42 (J. Madison) ("If we are to be one nation in any respect, it clearly ought to be in respect to other nations.").  "Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from

local interference." *Natsios*, 181 F.3d at 50 (quoting *Hines v. Davidowitz*, 312 U.S. 52 (1941)). The Act is contrary to these principles of federalism. It directly affects at least two federal foreign affairs policies.

*First*, through FECA, Congress has defined the composition of the community that may participate in electioneering, expressly excluding foreign nationals and foreign principals. On the contrary, Congress did not extend the foreign national proscriptions of the Bipartisan Campaign Reform Act of 2002 ("BCRA") to touch U.S. subsidiaries of foreign corporations, and expressly "rejected a ban on U.S. subsidiary participation." Contribution Limitations and Prohibitions, 67 Fed. Reg. 69,928, 69,943 (Nov. 19, 2002). The Act, however, draws a different line entirely. On the one hand, the Act focuses on a narrower class of foreigners—foreign governments. Act § (1)(D)-(E). On the other hand, the Act extends much further to ensnare domestic corporate subsidiaries with nominal foreign-government ownership interests. *Id*. § (1)(E).

Congress's power to regulate foreign national's participation in U.S. elections in BCRA flows directly from its power over foreign affairs. In

*United States v. Singh*, a foreign national challenged Congress's very power to enact BCRA's prohibition on foreign nationals' participation in U.S. elections. 979 F.3d 697 (9th Cir. 2020). The Ninth Circuit, however, rejected this argument, finding that the "federal government has the 'inherent power as sovereign to control and conduct relations with foreign nations.'" *Id.* (quoting *Arizona v. United States*, 567 U.S. 387, 395 (2012)). Thus, in the case of FECA's foreign-national prohibition, where "Congress has made a judgment on a matter of foreign affairs and national security by barring foreign nationals from contributing to our election process, it retains a broad power to legislate." *Id.* Congress, therefore, was well "within its power" to protect the nation's elections from "foreign interference." *Id.*

Expressly encroaching on Congress's foreign affairs power, which it exercised in BCRA's prohibition of foreign nationals' participation in U.S. elections, the Act takes a different approach. The Act redefines how one state of fifty regulates the political speech of foreign governments and their business interests. This state-specific regulation of foreign affairs is contrary to the federal government's exclusive foreign policy domain. "It was one of

61

the main objects of the Constitution to make us, so far as regarded our foreign relations, one people, and one nation." *Holmes v. Jennison*, 39 U.S. 540, 575 (1840).

*Second*, the Act interferes with the United States' long-standing policy of treating foreign investors no differently than domestic investors. Over forty years ago, President Reagan announced a *Statement on International Investment Policy*. There, he stated that "international direct investment plays a vital and expanding role in the world economy."[16] President Reagan announced that "[t]he United States welcomes foreign direct investment that flows according to market forces. The United States accords foreign investors the same fair, equitable, and non-discriminatory treatment it believes all governments should accord foreign direct investment under international law." *Id*. He affirmed that "[t]he basic tenet for treatment of

---

[16] Ronald Reagan, President, Statement on International Investment Policy (Sept. 9, 1983), available at https://www.reaganlibrary.gov/archives/speech/statement-international-investment-policy.

investment is the national treatment principle: foreign investors should be treated no less favorably than domestic investors in like situations." *Id*.

These principles remain U.S. foreign policy today. In 2021, President Biden announced a statement on the United States' Commitment to Open Investment, reaffirming the nation's commitment to foreign investment.[17] President Biden affirmed "a pledge to treat all investors fairly and equitably under the law." *Id.* President Biden "reiterate[d] [his] administration's commitment to ensuring that the United States remains the most attractive place in the world for businesses to invest and grow … ." President Biden specifically noted the contributions U.S. subsidiaries of foreign-owned companies make to our nation's economy: they "employ almost 8 million Americans and help boost U.S. innovation by investing $70 billion in research and development. They contribute to all sectors of the U.S. economy and are responsible for nearly 24% of all U.S. goods exports." *Id.*

---

[17] Joe Biden, President, Statement by President Joe Biden on the United States' Commitment to Open Investment (June 8, 2021), available at https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/08/statement-by-president-joe-biden-on-the-united-states-commitment-to-open-investment/.

Accordingly, President Biden concluded that foreign investment may raise national security concerns, which will be protected by specific review of certain investments. *Id*. Nonetheless, the United States "will also maintain a level playing field" with regard to foreign investments. *Id.*

These entrenched principles are not merely aspirational—they are incorporated into various trade treaties between the United States and foreign governments. For example, the United States-Mexico-Canada Agreement ("USMCA") (the successor to NAFTA) contains a provision establishing "national treatment"; *i.e.*, that each party to the USMCA "shall accord to investors of another Party treatment no less favorable than it accords, in like circumstances, to its own investors with respect to the establishment, acquisition, expansion, management, conduct, operations, and sale or other disposition of investments in its territory." USMCA art. 14.4(1), July 1, 2020, available at http://tinyurl.com/mr2hvvf7.

The Act is contrary to these principles. It directly impedes the long-standing U.S. policy of affording foreign investors' investment in the United

States the same playing field as domestic investors.[18]  The Act would strip away a domestic corporation's First Amendment rights based on nothing more than a passive investment by a foreign-government investor.  Maine would thus undermine federal uniformity by treating foreign-government investment less favorably than domestic investments.  The Act would undermine the nation's ability to speak with one voice on a key foreign policy tenet announced and adhered to for over forty years—that foreign investors and their investments should be treated no less favorably than domestic investors in like situations.

These precepts are not abstract.  The Pine Tree Power Initiative underscores how the Act directly (and negatively) would affect foreign investment in the United States.  Four years ago, when ENMAX made the decision to invest in both Maine and the United States by purchasing Versant, it did so understanding that if certain citizen initiatives that directly undermined the profitability or business operations of Versant made their

---

[18] In this way, the federal interest is even more paramount that the singular Burma law that this Court found state law affronted in *Natsios*.  *See* 181 F.3d at 66–67.

way to the ballot, both companies would be able speak out against them. Versant and ENMAX would have the same rights as domestic companies to oppose ballot measures that they saw as detrimental to their business.

But the Act strips away those rights. And it thus places ENMAX's investment in a particularly precarious political position—Maine's major electric utilities have been directly targeted, multiple times over, in the past few election cycles. *See* Defs. Br. 7–9, 15–16. Foreign investment in Maine is not afforded the same treatment if a domestic corporation can actively oppose the risks posed by such ballot measures, while a company with foreign-government investment must sit on the sidelines in silence, even on a question of whether that company should be appropriated. This unequal treatment violates the foreign dormant commerce clause.

F.    **Alternatively, The Act Is Unconstitutional As Applied To Versant**

Without entry of an injunction, Versant's First Amendment rights would be immediately infringed upon. Defendants have not even attempted to rebut the evidence that the City of Calgary is prohibited from consulting or participating in way in Versant's decisions to make contributions or

expenditures in Maine candidate elections or Maine ballot initiatives.  App. 58–59.  Nor have they contested that the City has "no decision making authority or even the right to participate in the operations or management of ENMAX or the operations, management, or governance, of Versant." App. 56.  Thus, as applied to Versant's intended conduct in contributing to candidates and spending money to speak on ballot measures the Act is unconstitutional because it is not narrowly tailored to the interest of preventing foreign-government influence in elections; the City of Calgary cannot influence Versant.  *See WRTL,* 551 U.S. at 481.

## G.    <u>The Remaining Preliminary Injunction Factors Favor The Injunction</u>

Because the district court found a likelihood of success on the merits on Plaintiffs' First Amendment claim, "it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well." *Fortuño*, 699 F.3d at 15.  The loss of First Amendment freedoms "constitutes irreparable injury."  *Id.* at 11 (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). And in determining balance of the harms and public interest, "the suppression of political speech harms not only the speaker, but also the

public to whom that speech would be directed." *Id.* at 15 (citing *Citizens United*, 558 U.S. at 349). Thus, "[i]t is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation." *Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997). Applying these principles, the district court did not abuse its discretion in finding that they supported preliminarily enjoining the Act.

## CONCLUSION

For all the foregoing reasons, the Court should affirm the preliminary injunction issued by the district court.

Dated: July 29, 2024                    Respectfully submitted,


                                        /s/ Paul McDonald
                                        Paul McDonald
                                        John A. Woodcock III
                                        BERNSTEIN SHUR
                                        100 Middle Street
                                        P.O. Box 9729
                                        Portland, ME 04104
                                        207-774-1200
                                        pmcdonald@bernsteinshur.com
                                        jwoodcock@bernsterishur.com

                                        Counsel for Versant Power and
                                        ENMAX Corp.

## Certificate of Compliance with Rule 32(a)

This brief contains 12,165 words, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this brief is prepared in a proportionately spaced typeface using Microsoft Word with a 14-point typeface and Palatino Linotype style.

_/s/ Paul McDonald_
Paul McDonald
BERNSTEIN SHUR
100 Middle Street
P.O. Box 9729
Portland, ME 04104
207-774-1200
pmcdonald@bernsteinshur.com

Counsel for Versant Power and
ENMAX Corp.

## Certificate of Service

I hereby certify that on July 29, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Paul McDonald*

Paul McDonald

Counsel for Versant Power and ENMAX Corp.