# UNITED STATES COURT OF APPEALS

## FOR THE FIRST CIRCUIT

No. 24-1265

CENTRAL MAINE POWER COMPANY; VERSANT POWER; ENMAX
CORPORATION; MAINE PRESS ASSOCIATION; MAINE ASSOCIATION OF
BROADCASTERS; JANE P. PRINGLE, individually and in her capacity as a
registered voter and elector; KENNETH FLETCHER, individually and in his
capacity as a registered voter and elector; BONNIE S. GOULD, individually and
in her capacity as a registered voter and elector; BRENDA GARRAND,
individually and in her capacity as a registered voter and elector; LAWRENCE
WOLD, individually and in his capacity as a registered voter and elector,

Plaintiffs–Appellees,

v.

MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION
PRACTICES; WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the
Maine Commission on Governmental Ethics and Election Practices; DAVID R.
HASTINGS, III, in his official capacity as a Member of the Maine Commission
on Governmental Ethics and Election Practices; SARAH LECLAIRE, in her
official capacity as a Member of the Maine Commission on Governmental
Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a
Member of the Maine Commission on Governmental Ethics and Election
Practices; STACEY D. NEUMANN, in her official capacity as a Member of the
Maine Commission on Governmental Ethics and Election Practices; AARON M.
FREY, in his official capacity as Attorney General for the State of Maine,

Defendants–Appellants.

On Appeal from The United States District Court for the District of Maine

## BRIEF OF APPELLEES MAINE PRESS ASSOCIATION AND MAINE ASSOCIATION OF BROADCASTERS

Sigmund D. Schutz
sschutz@preti.com
Alexandra A. Harriman
aharriman@preti.com

Preti Flaherty
P.O. Box 9546
Portland, ME 04101
207.791.3000

**CORPORATE DISCLOSURE STATEMENT**

Maine Association of Broadcasters and Maine Press Association are non-governmental entities that have no parent corporation, and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………………………..ii

STATEMENT OF THE ISSUES PRESENTED…………..…………………......……..1

STATEMENT OF THE CASE………………………………………………..………..1

SUMMARY OF THE ARGUMENT.................................................................…..2

ARGUMENT……………………………………………….……………………......2

     I.     Subsection 7 is unconstitutionally vague………………………………..2

     II.    If it is not unconstitutionally vague, subsection 7 imposes
           an unconstitutional burden on news outlets…………………………….4

CONCLUSION………………………………………………………..………....…10

CERTIFICATE OF COMPLIANCE……………………………………………......12

CERTIFICATE OF SERVICE…………………………………………………….....13

i

# TABLE OF AUTHORITIES

## Cases

*Bartnicki v. Vopper,* 532 U.S. 514 (2001)...............................................................8

*Braun v. Soldier of Fortune Mag., Inc.,* 968 F.2d 1110 (11th Cir. 1992)...............6

*Buckley v. Valeo,* 424 U.S. 1 (1976)........................................................................2

*Citizens United v. Fed. Election Comm'n,* 558 U.S. 310 (2010)............................8

*Grayned v. City of Rockford,* 408 U.S. 104 (1972)...............................................2, 4

*McCoy v. Town of Pittsfield,* 59 F.4th 497 (1st Cir. 2023)....................................7

*In re Perry,* 859 F.2d 1043 (1st Cir. 1988).............................................................8

*Rideout v. Gardner,* 838 F.3d 65 (1st Cir. 2016)................................................7, 8

*Time, Inc. v. Hill,* 385 U.S. 374 (1967)...................................................................6

*Washington Post v. McManus,* 944 F.3d 506 (4th Cir. 2019)...............................7

## Statutes

21-A M.R.S. § 1064.......................................................................................*passim*

## STATEMENT OF THE ISSUES PRESENTED

This appeal potentially, if the Court were to address them, raises the following issues of interest to Maine Association of Broadcasters and Maine Press Association (the "Media Plaintiffs"):

1.      Whether the requirement in subsection 7 of the Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution (21-A M.R.S. § 1064 (the "Act")) that a news outlet that runs a political ad must "establish due diligence policies, procedures and controls that are reasonably designed to ensure" that the ad was not paid for by a foreign government-influenced entity is unconstitutionally vague.

2.      Whether subsection 7 unconstitutionally burdens news outlets.

## STATEMENT OF THE CASE

The district court enjoined enforcement of the Act without addressing the arguments made by the Media Plaintiffs about subsection 7. The Media Plaintiffs support the district court's order: as key forums for political speech, the Media Plaintiffs' members object to a law that restricts or burdens their ability to publish truthful political advertisements that meet their standards for publication. The order, by enjoining enforcement of the Act, solves the problem that led the Media Plaintiffs to sue. The Media Plaintiffs submit this

brief to ensure that, if the Court vacates the district court's order enjoining enforcement of the Act, it is aware of their position that enforcement of subsection 7 should continue to be enjoined until the district court or this Court rules on the First Amendment issues the Media Plaintiffs have raised.

## SUMMARY OF THE ARGUMENT

Subsection 7 is either unconstitutionally vague or unconstitutionally burdensome.

## ARGUMENT

Because the district court did not address the constitutionality of subsection 7, the Media Plaintiffs present the key points of their argument to ensure that the Court is aware of their position in the event it vacates or modifies the district court's order.

### I. Subsection 7 is unconstitutionally vague.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id*. "Where First Amendment rights are involved, an even greater degree of specificity is required." *Buckley v. Valeo*, 424 U.S. 1, 77 (1976) (quotation marks omitted).

Key provisions of subsection 7 are unconstitutionally vague. Because the terms are not defined, the Media Plaintiffs are left to guess at the meaning of the phrase "due diligence policies, procedures and controls," or how they would go about complying with that requirement or ascertaining whether they had succeeded in doing so. *See* Decl. of Jody Jalbert (Ex. A to the Media Plaintiffs' motion for preliminary injunction) ¶¶ 10–13; Decl. of Judith Meyer (Ex. B) ¶¶ 12–15; Decl. of Timothy Moore (Ex. C) ¶¶ 9–14; Decl. of Courtney Spencer (Ex. D) ¶¶ 11–14. Are news outlets required to hire investigators and attorneys to determine who owns and influences every prospective political advertiser? How extensive must their investigation be? What standards should guide it? What investigative steps must be taken? What are "policies, procedures and controls," and what is the difference between these things? The Act makes none of this at all clear.

As Maine news outlets have never used policies, procedures, or controls to determine whether advertisers are "foreign government-influenced," and are unaware of any news outlets anywhere that have done so, there is no known precedent for news outlets to consult in construing subsection 7. "[D]ue diligence policies, procedures and controls" is not a term of art in the news business, and in the absence of a definition the Media Plaintiffs have no idea what it means. Because this crucial provision of subsection 7 is

inscrutable, Maine news outlets do not know what they have to do to avoid

being fined under subsection 8. The upshot is that the Act forces new outlets

to "steer far wide[] of the unlawful zone," *Grayned*, 408 U.S. at 109, and

incentivizes them to stop running political ads altogether. Because subsection

7 does not establish a narrow, objective and definite standard for establishing

"due diligences policies, procedures, and controls," it is unconstitutional.

II.     **If it is not unconstitutionally vague, subsection 7 imposes an unconstitutional burden on news outlets.**

If subsection 7 is not unconstitutionally vague, it places an

unconstitutional burden on news outlets. If "due diligence policies, procedures

and controls" means anything, the plain import of the words would indicate

that news outlets are required to investigate the global ownership structure of

each prospective political advertiser before publishing their speech. That is

not something Maine news outlets can realistically do.

Modern business entities often have complex ownership structures that

require extensive research, investigation, and legal training to uncover and

understand. Many businesses and organizations keep their ownership

structure secret, or obscure their true beneficial owners under layers of

interrelated legal entities about which little or no information is available to

outsiders. To reasonably "ensure" that a political ad was not paid for by a

4

"foreign government-influenced entity," if it is even possible to do so, would require an extraordinary amount of work that Maine news outlets have neither the personnel, the expertise, nor the financial capacity to perform. *See* Decl. of David Abel (Ex. E to the Media Plaintiffs' motion for preliminary injunction) ¶¶ 6–10; Jalbert Decl. ¶¶ 14–21; Meyer Decl. ¶¶ 17–25; Moore Decl. ¶¶ 15–23; Spencer Decl. ¶¶ 15–25.

If required to expend their own resources to do what should be the State's job of enforcing its rule against foreign government-influenced entities paying for political ads, news outlets would seemingly have to hire and train staff and retain outside investigators and attorneys. This would divert scarce resources away from the core First Amendment activity of reporting the news. Even if news outlets had unlimited personnel and financial resources to do the massive amount of work that would be required just to begin to attempt to figure out who owns or "indirectly participates in the decision-making process" of every prospective political advertiser, it is unclear how it would be possible for a news outlet to reasonably "ensure" that it has not missed some owner or indirect decision-making participant.

To be clear, the extent of what the Act demands is extraordinary. It does not just require news outlets to determine whether a foreign government *owns* as little as five percent of an advertiser. Instead, the Act defines a

"foreign government-influenced entity" as *either* an entity five percent or more of which is owned by a foreign government (or another foreign government-owned entity), *or* an entity where a foreign government (or another foreign government-owned entity) "[d]irects, dictates, controls or directly or *indirectly participates in the decision-making process with regard to* the activities of the . . . entity to influence the nomination or election of a candidate or the initiation or approval of a referendum . . . ." 21-A M.R.S. § 1064(1)(E). The Act thus requires news outlets to ascertain, for every political advertiser, whether a foreign government (or another foreign government-influenced entity), even if it has no ownership stake in the advertiser, "indirectly participates in the decision-making process with regard to" the advertiser's activities. That is not a task news outlets can plausibly be expected to complete, or a burden the State may constitutionally impose. *See Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967) ("We create a grave risk of serious impairment of the indispensable service of a free press in a free society if we saddle the press with [an] impossible burden . . . ."); *Braun v. Soldier of Fortune Mag., Inc.*, 968 F.2d 1110, 1117 (11th Cir. 1992) ("[I]f state . . . law places too heavy a burden on publishers with respect to the advertisements they print, the fear of liability might impermissibly impose a form of self-censorship on publishers.") (citation and quotation marks omitted).

The Act targets political speech, which is subject to the highest level of constitutional scrutiny. Restrictions on speech that are "content-based" are subject to strict scrutiny. *McCoy v. Town of Pittsfield*, 59 F.4th 497, 506 (1st Cir. 2023). "A restriction that targets speech is content-based if it 'applies to particular speech because of the topic discussed or the idea or message expressed[.]'" *Id*. at 505 (quoting *City of Austin, Tex. v. Reagan Nat'l Advert.*, 596 U.S. 61, 69 (2022)). The Act is content-based because it specifically targets speech about political campaigns. *See Washington Post v. McManus*, 944 F.3d 506, 513 (4th Cir. 2019) (statute that "singles out one particular topic of speech—campaign-related speech—for regulatory attention" was "a content-based regulation on speech"). "[C]ontent-based laws are 'presumptively unconstitutional.'" *Id.* (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)). And "content-based regulations that target *political* speech are especially suspect." *Id*. Strict scrutiny of content-based regulations of speech requires the government to demonstrate "a compelling interest and . . . narrow[] tailor[ing] to achieve that interest." *Rideout v. Gardner*, 838 F.3d 65, 70 (1st Cir. 2016) (quotation marks omitted). In particular, "[n]arrow tailoring in the strict scrutiny context requires the statute to be 'the least restrictive means among available, effective alternatives.'" *Id*. (quoting *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004)).

The problem the Act purports to identify and solve is foreign

government-influenced entities spending money to influence Maine elections.

The Media Plaintiffs take no position on whether there is a compelling

governmental interest in banning spending by foreign government-influenced

entities to influence Maine elections.[1] But if there is, there are more tailored

and less restrictive ways to address the issue. One option would be to ban

such expenditures, as the Act does, but penalize just the advertisers, not the

news outlets. *See Bartnicki v. Vopper*, 532 U.S. 514, 539 (2001) ("The normal

method of deterring unlawful conduct is to impose an appropriate

punishment on the person who engages in it."); *Rideout,* 838 F.3d at 74-75. Or

political advertisers could be required to file *with the State* a certification

attesting that they are not foreign government-influenced before paying for

political advertisements. These approaches would be less restrictive in that

they would impose less of a burden on news outlets and would not

substantially delay the running of political ads, as the due diligence process

required by subsection 7 often would. Spencer Decl. ¶ 14; Jalbert Decl. ¶ 13;

*see In re Perry*, 859 F.2d 1043, 1047 (1st Cir. 1988) ("Without question, the

---

[1] This is an unsettled question. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 362 (2010).

right to free speech includes the right to *timely* speech on matters of current importance.") (emphasis added). The Media Plaintiffs do not endorse these alternatives, and take no position at this time on whether they would be constitutional, but offer them as examples of less restrictive means the State could (if constitutional) employ to achieve its objectives.

　　If the State believes its interest in preventing foreign government-influenced entities from spending money in Maine elections is so compelling that investigation, not just self-certification, is necessary, the government could achieve that objective in a way that is less restrictive of the Media Plaintiffs' First Amendment rights by simply doing that investigative work itself.[2] As a practical matter this would be a much better way to achieve the Act's objectives, as the State—unlike news outlets, many of which are very small operations—has investigators and attorneys who may know how to conduct the sort of work the Act appears to require. Having the State do the investigating would also avoid the inconsistent interpretation and application of the Act that would inevitably ensue if hundreds of Maine news outlets with varying resources were each to conduct their own investigation. The impact of

---

[2] The Media Plaintiffs would have First Amendment concerns with this approach too, but it would be less burdensome than forcing news outlets to undertake such investigations.

the Act if investigation and enforcement activities were undertaken by each individual news outlet would be both overbroad (some domestic entities would be prevented from or delayed in engaging in political speech because a news outlet could not ensure that they were not foreign government-influenced) and underinclusive (some foreign government-influenced entities would inevitably slip through the large cracks in any plausible vetting process news outlets could establish). It would be far less restrictive of First Amendment activities for the State to do (and pay for) this investigative work itself, rather than commandeering under-resourced and unqualified news outlets to do it for them. The outsourcing to news organizations of the job of investigating whether advertisers are violating the Act is not the least restrictive way of dealing with the issue of foreign government-influenced campaign expenditures. Nor is it narrowly tailored.

## CONCLUSION

If the Court vacates the district court's order enjoining enforcement of the Act, enforcement of subsection 7 should continue to be enjoined until either the district court or this Court has ruled on the Media Plaintiffs' argument that subsection 7 is either unconstitutionally vague or unconstitutionally burdensome.

Dated: July 29, 2024

Respectfully submitted,


<u>*/s/ Sigmund D. Schutz*</u>
Sigmund D. Schutz, Bar No. 52684
Alexandra A. Harriman, Bar No. 1196232
Preti Flaherty
One City Center, PO Box 9546
Portland, ME 04112-9546
(207) 791-3000

11

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains a total of 2,815 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word (Office 2000) in Cambria style, font size 14.

*/s/ Sigmund D. Schutz*
Sigmund D. Schutz, Bar No. 52684

**CERTIFICATE OF SERVICE**

I certify that this brief has been electronically filed with the Clerk of the

Court on July 29, 2024. All attorneys listed below are ECF filers and will

receive service by electronic means pursuant to Rule 4 of this Court's Rules

Governing Electronic Filing:

Jack I. Bartholet
Jonathan R. Bolton
John C. Bonifaz
Peter J. Brann
Katherine E. Cleary
Ben T. Clements
Scott D. Dolan
Joshua D. Dunlap
Courtney M. Hostetler
Thomas A. Knowlton
Shannon E. Liss-Riordan
Tara Malloy
Amira M. Mattar
Megan P. McAllen
Paul McDonald
Peter L. Murray
Nolan L. Reichl
Paul E. Suitter
KatieLynn B. Townsend
Sean R. Turley
John A. Woodcock, III
Timothy C. Woodcock

*/s/ Sigmund D. Schutz*
Sigmund D. Schutz, Bar No. 52684