# United States Court of Appeals for the First Circuit

CENTRAL MAINE POWER COMPANY; VERSANT POWER; ENMAX CORPORATION; MAINE PRESS ASSOCIATION; MAINE ASSOCIATION OF BROADCASTERS; JANE P. PRINGLE, individually and in her capacity as a registered voter and elector; KENNETH FLETCHER, individually and in his capacity as a registered voter and elector; BONNIE S. GOULD, individually and in her capacity as a registered voter and elector, BRENDA GARRAND, individually and in her capacity as a registered voter and elector, LAWRENCE WOLD, individually and in his capacity as a registered voter and elector,

*Plaintiffs–Appellees*,

v.

MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES; WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; SARAH LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; STACEY D. NEUMANN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in his official capacity as Attorney General for the State of Maine,

*Defendants–Appellants*.

Appeal from the U.S. District Court for the District of Maine
Case No. 1:23-cv-00450 (Hon. Nancy Torresen)

## BRIEF FOR *AMICUS CURIAE* MAINE STATE CHAMBER OF COMMERCE SUPPORTING APPELLEES AND AFFIRMANCE

David T. Raimer
  *Counsel of Record*
E. Stewart Crosland
Ethan D. Beck
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001
+1.202.879.3939
dtraimer@jonesday.com

*Counsel for* Amicus Curiae *Maine State Chamber of Commerce*

## CORPORATE DISCLOSURE STATEMENT

The Maine State Chamber of Commerce is a not-for profit corporation organized under the laws of the State of Maine. It has no parent corporation and no publicly held company possesses a ten percent or greater interest in it.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF AMICUS CURIAE ......................................................1

INTRODUCTION ...............................................................................3

ARGUMENT .......................................................................................5

I.    THE INITIATIVE'S 5% THRESHOLD IS NOT NARROWLY
TAILORED TO ADVANCE THE STATE'S ASSERTED
INTEREST .................................................................................6

    A.    Efforts to Limit Foreign-Government Influence in State
Elections Are Fatally Overbroad Where They Extend Beyond
U.S. Companies Effectively Controlled by a Foreign Power ..............6

    B.    The Initiative's 5% Ownership Threshold Is Not a Reliable
Proxy for Effective Control over Corporate Affairs .........................13

    C.    The Contrary Arguments of the State and Its Amici Lack Merit ......17

CONCLUSION ...................................................................................27

CERTIFICATE OF COMPLIANCE....................................................29

CERTIFICATE OF SERVICE ............................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
591 U.S. 430 (2020)...............................................................7, 9, 11, 13

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)...............................................................6, 7

*Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*,
2018 WL 3326693 (Del. Ch. July 6, 2018) .......................................15

*Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*,
210 F.3d 18 (1st Cir. 2000)...................................................13

*Blair v. Infineon Techs. AG*,
720 F. Supp. 2d 462 (D. Del. 2010)...................................................13

*Bluman v. FEC*,
800 F. Supp. 2d 281 (D.D.C. 2011)...........................................3, 9, 19

*Calesa Assocs., L.P. v. Am. Cap., Ltd.*,
2016 WL 770251 (Del. Ch. Feb. 29, 2016).......................................15

*Citizens United v. FEC*,
558 U.S. 310 (2010)...............................................................*passim*

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003).........................................................................7

*FEC v. Cruz*,
596 U.S. 289 (2022).........................................................................8

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978).........................................................................1

*Frederick Hsu Living Tr. v. ODN Holding Corp.*,
    2017 WL 1437308 (Del. Ch. Apr. 14, 2017)....................................................20

*Frisby v. Schultz*,
    487 U.S. 474 (1988)..........................................................................................6, 16

*Hollinger Inc. v. Hollinger Int'l, Inc.*,
    858 A.2d 342 (Del. Ch. 2004) ............................................................................19

*In re AWTR Liquidation Inc.*,
    548 B.R. 300 (Bankr. C.D. Cal. 2016) ..............................................................20

*In re CNX Gas Corp. S'holders Litig.*,
    2010 WL 2291842 (Del. Ch. 2010)....................................................................19

*In re Cognizant Tech. Sols. Corp. Derivative Litig.*,
    101 F.4th 250 (3d Cir. 2024) ..............................................................................14

*In re Franchise Servs. of N. Am., Inc.*,
    891 F.3d 198 (5th Cir. 2018) ..............................................................................16

*In re Lear Corp. S'holder Litig.*,
    967 A.2d 640 (Del. Ch. 2008) ............................................................................19

*In re Morton's Rest. Grp. S'holder Litig.*,
    74 A.3d 656 (Del. Ch. 2013) ..............................................................14, 15, 16

*In re Orchard Enters., Inc. S'holder Litig.*,
    88 A.3d 1 (Del. Ch. 2014) ..................................................................................18

*In re PMTS Liquidating Corp.*,
    526 B.R. 536 (D. Del. 2014)...............................................................................16

*In re PNB Holding Co. S'holders Litig.*,
    2006 WL 2403999 (Del. Ch. Aug. 18, 2006)....................................................15

*In re Trados Inc. S'holder Litig.*,
    73 A.3d 17 (Del. Ch. 2013) .........................................................................18, 19

*In re W. Nat'l Corp. S'holders Litig.*,
 2000 WL 710192 (Del. Ch. May 22, 2000) ........................................................16

*In re Xtreme Power Inc.*,
 563 B.R. 614 (Bankr. W.D. Tex. 2016) ................................................13, 14, 18

*Indah v. U.S. SEC*,
 661 F.3d 914 (6th Cir. 2011) ...........................................................................11

*Kahn v. Lynch Commc'n Sys., Inc.*,
 638 A.2d 1110 (Del. 1994) ........................................................13, 14, 15

*McConnell v. FEC*,
 540 U.S. 93 (2003) ........................................................................7, 16

*McCoy v. MIT*,
 950 F.2d 13 (1st Cir. 1991) ..............................................................................9

*McCullen v. Coakley*,
 573 U.S. 464 (2014) ........................................................................................6

*McCutcheon v. FEC*,
 572 U.S. 185 (2014) ...................................................................................6, 12

*McRitchie v. Zuckerberg*,
 315 A.3d 518 (Del. Ch. 2024) ......................................................................18

*Minn. Chamber of Com. v. Choi*,
 2023 WL 8803357 (D. Minn. Dec. 20, 2023) ...........................................*passim*

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
 475 U.S. 1 (1986) .............................................................................................3

*Paramount Commc'ns Inc. v. Time Inc.*,
 1989 WL 79880 (Del. Ch. July 14, 1989) .....................................................18

*Paramount Commc'ns, Inc. v. Time Inc.*,
 571 A.2d 1140 (Del. 1989) ......................................................................18, 20

*Piper v. Chris-Craft Indus., Inc.*,
    430 U.S. 1 (1977)................................................................21

*Platten v. HG Bermuda Exempted Ltd.*,
    437 F.3d 118 (1st Cir. 2006)..............................................11

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
    115 A.3d 535 (Del. Ch. 2015) ...........................................20

*Rondeau v. Mosinee Paper Corp.*,
    422 U.S. 49 (1975)..............................................................21

*Tornetta v. Musk*,
    310 A.3d 430 (Del. Ch. 2024) ......................................16, 17

*Trinity Wall St. v. Wal-Mart Stores, Inc.*,
    792 F.3d 323 (3rd Cir. 2015)...............................................25

*TW Servs., Inc. v. SWT Acquisition Corp.*,
    1989 WL 20290 (Del. Ch. Mar. 2, 1989) .......................18, 19

*U.S. v. Morrison*,
    529 U.S. 598 (2000)...............................................................8

*United Food & Com. Workers Union & Participating Food Indus.*
    *Emps. Tri-State Pension Fund v. Zuckerberg*,
    262 A.3d 1034 (Del. 2021) ..................................................17

*Voigt v. Metcalf*,
    2020 WL 614999 (Del. Ch. Feb. 10, 2020).........................11

*Williams Companies S'holder Litig.*,
    2021 WL 754593 (Del. Ch. Feb. 26, 2021).........................27

**STATUTES**

8 Del. C. § 141 .........................................................................17

13-C M.R.S. § 801 ....................................................................17

13-C M.R.S. § 831 ...........................................................................................17

13-C M.R.S. § 832 ...........................................................................................20

15 U.S.C. § 78m.........................................................................................21, 22

21-A M.R.S. § 1064 ...............................................................................3, 5, 7, 14

46 U.S.C. § 55102 ...........................................................................................22

46 U.S.C. §55103 .............................................................................................22

47 U.S.C. § 310.................................................................................................23

52 U.S.C. § 30116 ............................................................................................11

52 U.S.C. § 30125 ............................................................................................12

**OTHER AUTHORITIES**

11 C.F.R. § 110.3 .............................................................................................12

11 C.F.R. § 110.5 .............................................................................................11

11 C.F.R. § 300.2 .............................................................................................12

17 C.F.R. § 240.14a-8 ..................................................................................24, 25

Affiliated Committees, Transfers, Prohibited Contributions, Annual
    Contribution Limitations and Earmarked Contributions,
    54 Fed. Reg. 34098 (Aug. 17, 1989) .................................................................12

American Heritage College Dictionary (4th ed. 2007)...........................................10

*Coastwise Trade*, U.S. Customs and Border Protection (Jan. 2009).......................22

Maine Int'l Trade Ctr., Canada Desk...................................................................2

Merriam-Webster's Collegiate Dictionary (11th ed. 2003)....................................10

Model Business Corporation Act § 8.30................................................................17

Procedural Requirements and Resubmission Thresholds Under
Exchange Rule 14a-8,
84 Fed. Reg. 66458 (Dec. 4, 2019)....................................................................24

Procedural Requirements and Resubmission Thresholds under
Exchange Act Rule 14a-8,
85 Fed. Reg. 70240 (Nov. 4, 2020) ..................................................................25

*Report and Order*, Fed. Commc'ns Comm'n 16-128 (Sept. 30, 2016)...................23

Review of Foreign Ownership Policies,
82 Fed. Reg. 12512 (Mar. 6, 2017)....................................................................23

*Senators King, Cramer Launch American Canadian Economy*
*Security Caucus*, Angus King (June 22, 2023)......................................................2

Webster's Third New Int'l Dictionary (1986) .........................................................10

# INTEREST OF *AMICUS CURIAE*[1]

The Maine State Chamber of Commerce is a statewide nonprofit organization that represents the interests of over 5,000 businesses of all sizes across Maine. An essential component of the Chamber's mission is to make Maine an affordable and prosperous place to do business. It thus has an interest in opposing laws that would make the State a less friendly environment for foreign investment. And as a preeminent business association, the Chamber also has a strong interest in defending the corporate free speech rights recognized in *Citizens United v. FEC*, 558 U.S. 310 (2010).

The Chamber is concerned the law at issue in this litigation will be doubly harmful to Maine businesses. Most obviously, it bars those with as little as 5% foreign ownership from engaging in political speech, denying them a privilege ordinarily available to all U.S. persons. That constitutional harm also degrades Maine's political discourse: political "speech [is] indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 777 (1978).

---

[1] All parties consented to the filing of this brief. No party's counsel authored this brief in whole or in part. No person other than *amicus curiae* or its counsel contributed money for this brief.

The de minimis threshold for stripping speech rights will also discourage foreign investment in Maine's economy, as non-U.S. entities will be hesitant to place their capital in the hands of politically defenseless corporations. Reduced capital investments for Maine's businesses translates to reduced growth for the State and reduced job opportunities for its citizens. In particular, the measure may fracture longstanding economic ties with Canada, "Maine's largest trade and investment partner." Maine Int'l Trade Ctr., Canada Desk, https://tinyurl.com/3x5htkvj. Besides sharing a border, Maine and Canda share a uniquely integrated economy. As Maine Senator Angus King has explained, that "economic partnership creates millions of jobs and supports countless industries" across the United States. *Senators King, Cramer Launch American Canadian Economy Security Caucus*, Angus King (June 22, 2023), https://tinyurl.com/4scdydkt.

In the end, businesses weighing the loss of political speech rights or the loss of foreign investment may choose neither—leaving the State entirely. Accordingly, the Chamber submits this brief to defend the political and economic interests of its stakeholders.

## INTRODUCTION

"American corporations" are "members of the American political community." *Bluman v. FEC*, 800 F. Supp. 2d 281, 290 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012). Like individuals, "[c]orporations and other associations," "contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (citation omitted). Indeed, the Supreme Court has expressly "rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" *Citizens United v. FEC*, 558 U.S. 310, 343 (2010). To the contrary, the Court has explained that "[i]f the First Amendment" means anything at all, it means that a state may not "fin[e] or jail[] citizens, or associations of citizens, for simply engaging in political speech." *Id.* at 349.

That, however, is exactly what the State of Maine seeks to do. Under a recently enacted voter initiative, the State purports to prohibit—on pain of monetary penalties or imprisonment—what it describes as "foreign government-influenced entit[ies]" from speaking or spending on Maine elections. 21-A M.R.S. § 1064(1) (the "Initiative"). Ipse-dixit descriptors aside, the effect of the Initiative is to bar entities protected by the First Amendment from engaging in political speech if a

3

foreign government or "foreign government-owed" entity holds as little as 5% of their outstanding shares. The upshot is that the Initiative would preclude even companies "incorporated in Maine, governed by a Board of Directors comprised of United States citizens shareholders and run by United States citizen executive officers who reside in Maine" from participating in Maine elections. Add.34.

As the district court recognized, that result cannot be "reconcile[d]" with the U.S. Constitution. *Id.* "There is no support for the proposition that corporations lose their First Amendment protections merely because a foreign national purchases some share or interest, no matter how small." *Minn. Chamber of Com. v. Choi*, 2023 WL 8803357, at *4 (D. Minn. Dec. 20, 2023). Rather, where the government "burden[s] political speech" it must "prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United*, 558 U.S. at 340 (citation omitted). And under that standard, state efforts to reduce foreign-government influence on their elections by restricting corporate political speech are fatally "overbroad" where they extend beyond the functional equivalent of "corporations or associations that were created in foreign countries or funded predominately by foreign shareholders." *Id.* at 362. Because the Initiative is not so limited, this Court should affirm the decision below.

# ARGUMENT

In 2023, Maine voters approved a referendum ostensibly aimed at ensuring the integrity of the State's elections. At its "heart," State Br. 12, the Initiative prohibits so-called "foreign government-influenced entit[ies]" from making "directly or indirectly, a contribution, expenditure, independent expenditure, electioneering communication or any other donation or disbursement of funds to influence the nomination or election of a candidate or the initiation or approval of a referendum." 21-A M.R.S. § 1064(2). A "foreign government-influenced entity" includes not only foreign governments, but also any "firm, partnership, corporation, association, organization or other entity with respect to which a foreign government or foreign government-owned entity: [h]olds, owns, controls or otherwise has direct or indirect beneficial ownership of 5% or more." *Id.* § 1064(1)(E).[2] The Initiative backs up its restrictions with the threat of financial sanctions and a term of incarceration of up to five years. *Id.* § 1064(8)–(9); 17-A M.R.S. § 1604(1)(C).

To justify this drastic restriction on core political speech, the State asserts an interest in "preventing foreign-government influence in Maine elections." State Br. 30. But its chosen means are ill-suited to that end. The Initiative extends far beyond foreign governments (or even foreign corporations) to sweep in American businesses

---

[2] A foreign government-owned entity is one "in which a foreign government owns or controls more than 50% of its equity or voting shares." 21-A M.R.S. § 1064(1)(F).

with even passive foreign investors, and its 5% threshold provides no basis for the State to strip a U.S. company of its First Amendment rights.  Simply put, the Initiative is anything but narrowly tailored, and the district court correctly concluded that the State's arguments to the contrary cannot withstand scrutiny.

## I. THE INITIATIVE'S 5% THRESHOLD IS NOT NARROWLY TAILORED TO ADVANCE THE STATE'S ASSERTED INTEREST.

The First Amendment protects the right of U.S. corporations and other business associations to engage in political speech. *Citizens United*, 558 U.S. at 362. Whether evaluated under strict or even lesser forms of scrutiny, a law depriving them of that right must be "narrowly tailored" to achieve the government's asserted interest. *Id.* at 340; *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014) (plurality op.); *see also Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 609–10 (2021). The Initiative fails that test.

### A. Efforts to Limit Foreign-Government Influence in State Elections Are Fatally Overbroad Where They Extend Beyond U.S. Companies Effectively Controlled by a Foreign Power.

For purposes of the First Amendment, a law is "narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).  In other words, narrow tailoring "demand[s] a close fit between ends and means." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).  Even a compelling interest "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."

*Bonta*, 594 U.S. at 609. Where a law "sweeps too broadly" it is "overinclusive" and thus is not narrowly tailored. *McConnell v. FEC*, 540 U.S. 93, 232 (2003).

At the outset, there is a "mismatch" here between "the interest that the [State] seeks to promote and the [regulatory] regime that [it] has implemented in service of that end." *Bonta*, 594 U.S. at 612. While the State asserts an interest in limiting the influence of *foreign governments* on domestic elections, State Br. 30, the Initiative extends beyond such entities to regulate the conduct of *U.S. companies*, 21-A M.R.S. § 1064(1). Of course, the U.S. companies at issue are those in which a foreign government (or a separate entity that government allegedly controls) holds a direct or indirect ownership stake. But it is "[a] basic tenet of American corporate law" that a "corporation and its shareholders are distinct entities," *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003), "with distinct legal rights and obligations," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 435 (2020) (applying U.S. corporate law to evaluate the First Amendment rights of corporate entities). Absent extraordinary circumstances, the conduct of one is not to be imputed to the other. *See id.*

What the State is regulating, therefore, is not the influence of foreign governments on Maine's elections, but the purported influence of U.S. companies who could (in theory) be influenced by a foreign government—or by corporate parent(s) who themselves might be under the influence of a foreign power. Such an

"attenuated" fit between means and ends would fail even the most lenient review. *U.S. v. Morrison*, 529 U.S. 598, 612 (2000). And lenient review is not in the cards: When drawing lines in this area, "the First Amendment requires [that courts] err on the side of protecting political speech rather than suppressing it." *FEC v. Cruz*, 596 U.S. 289, 308 (2022). As "yet another in a long line of 'prophylaxis-upon-prophylaxis approach[es]' to regulating campaign finance," the claim that regulating U.S. companies is a narrowly tailored means to quell foreign influence in domestic elections should be met with "skepticism." *Id.* at 306.

And indeed, it already has been. In *Citizens United*, the federal government asserted that its ban on corporate expenditures for "electioneering communications" was tailored to "prevent[] foreign individuals or associations from influencing our Nation's political process." 558 U.S. at 362. The Court rejected that argument out of hand. Even "assum[ing], *arguendo*, that the Government has a compelling interest in limiting foreign influence over our political process," the Court concluded that the law at issue was "overbroad" because it was "not limited to corporations or associations that were created in foreign countries or funded predominately by foreign shareholders." *Id.*[3]

---

[3] Because this reasoning rejected an asserted defense, it was necessary to the Court's holding. That being the case, the State cannot brush it aside as "dicta," State Br. 50. In any event, "federal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly

So too here.  As in *Citizens United*, the State claims that an interest in limiting foreign influence in domestic politics justifies the Initiative's restrictions on the rights of U.S. companies.  State Br. 30.  But as then-Judge Kavanaugh explained in a similar context, whatever interest the government may have in "restraining foreign nationals' participation in American elections," that interest "does not apply equally" to other parties, including U.S. "corporations."  *Bluman*, 800 F. Supp. 2d at 290.  Among other reasons, it has "long [been] established that the government's legislative and regulatory prerogatives are at their apex in matters pertaining to alienage."  *Id.*  "It is hardly surprising, therefore, that a law that is justified as applied to" foreigners (or to foreign governments) "may not be justified as applied to citizens of the United States, or entities made up of such citizens."  *Id.*

To be clear, this does not necessarily mean that U.S. companies with foreign shareholders will always be exempt from laws targeting foreign-government influence.  The Supreme Court has suggested that entities "funded predominately by foreign shareholders" could be subject to additional regulation.  *Citizens United*, 558 U.S. at 362.  And there may be circumstances in which a state could set aside the normal rule that the acts of one legal entity should not be attributed to another.  *E.g.*, *Agency for Int'l Dev.*, 591 U.S. at 435–36 (noting the possibility of "pierc[ing] the

when … a dictum is of recent vintage and not enfeebled by any subsequent statement."  *McCoy v. MIT*, 950 F.2d 13, 19 (1st Cir. 1991).

corporate veil"). But a state certainly cannot silence a U.S. company in the name of limiting foreign-government influence in the absence of one of these scenarios (or their functional equivalent). *Cf. Choi*, 2023 WL 8803357, at *6 ("[P]reventing … First Amendment-protected political speech by a corporation with foreign shareholders, *without more*, does not alone represent a compelling interest." (emphasis added)).

Significantly, both scenarios described above include situations in which a foreign owner has substantial and pervasive *control* over the affairs of the U.S. entity. Take first a company "funded predominately" by foreign shareholders. To "predominate" is, at minimum, to hold a "controlling" (if not majority) stake in an enterprise. Webster's Third New Int'l Dictionary 1786 (1986) ("to exert controlling power or influence: [to] exercise superiority (as in strength or authority): [to] govern"); Merriam-Webster's Collegiate Dictionary 978 (11th ed. 2003) ("to hold advantage in numbers or quality"; "to exert controlling power or influence"; or "to exert control over: [to] dominate"); American Heritage College Dictionary 1097 (4th ed. 2007) ("[t]o have or gain controlling power or influence" or "to dominate or prevail over [another]"). A shareholder in such a position "has the ability to exercise affirmative control" over corporate affairs, including the appointment and removal of directors, the adoption of charter amendments, the approval of mergers, the sale

of significant assets, and the dissolution of the corporation. *Voigt v. Metcalf*, 2020 WL 614999, at *17 (Del. Ch. Feb. 10, 2020).

Likewise, to overcome the "presumption that a corporation is legally "separate[]" from its shareholders, a court must determine whether the shareholder exercises "pervasive control" over the company. *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 129 (1st Cir. 2006). Only then will the court "pierce the corporate veil" and treat the corporation and its shareholders as one and the same, *Agency for Int'l Dev.*, 591 U.S. at 435–36; *see also Indah v. U.S. SEC*, 661 F.3d 914, 921 (6th Cir. 2011) (explaining that the alter-ego doctrine applies where the parent "exerts so much control over the subsidiary that the two do not exist as separate entities").

This need to establish some form of controlling influence before discarding legal distinctions is familiar to election law. At the federal level, the concept of "affiliation" embodies the same insight. *See* 11 C.F.R. § 110.5(g)(2) (explaining that entities are "affiliated" where one is "established, financed, maintained, or controlled" by another). If two entities are "affiliated," they are treated as one for purposes of federal campaign finance restrictions. Thus, while the general rule is that each candidate or committee has a separate contribution limit, 52 U.S.C. § 30116(a), "affiliated" entities share a single cap, 11 C.F.R. § 110.5(g)(2); 52 U.S.C. § 30116(a)(5). Similarly, if any entity or other group (like a Super PAC) is

found to be "affiliated" with a candidate or party committee, all of the funds raised or spent by that entity or group must be attributed to the candidate or committee. *See* 52 U.S.C. § 30125; 11 C.F.R. § 300.2(c). To make these determinations, the Federal Election Commission applies a fact-specific, multi-factor test that considers, inter alia, whether one entity "owns controlling interest in [another's] voting stock" or "has the authority or ability to hire, appoint, demote or otherwise control the officers" of the other entity. *See* 11 C.F.R. § 110.3(a)(3)(ii)(A)–(J) (listing ten non-exhaustive factors). Put simply, to decide whether two entities are "affiliated" the FEC considers whether one has the ability to effectively exercise control over the other. *See* Affiliated Committees, Transfers, Prohibited Contributions, Annual Contribution Limitations and Earmarked Contributions, 54 Fed. Reg. 34098, 34100 (Aug. 17, 1989) (stating that the FEC "revised" its test to move from "influence" to "control" "because 'control' is a more specific term that more accurately describes the kind of involvement that could lead to affiliation").

In sum, when dealing with laws restricting the political speech of U.S. companies, "fit matters." *McCutcheon*, 572 U.S. at 218. And that fit is not present where a law designed to stamp out foreign-government influence applies with equal force to U.S. companies that are not subject to the kind of substantial or pervasive foreign control described above.

**B.  The Initiative's 5% Ownership Threshold Is Not a Reliable Proxy for Effective Control over Corporate Affairs.**

Considered against this backdrop, the Initiative's 5% threshold is plainly deficient.  Most obviously, the mere existence of a 5% ownership stake is in no way analogous to the circumstances in which a court would "pierce the corporate veil" or "invoke [an]other relevant exception" to the "fundamental corporate law principle" that a corporation is distinct from its shareholders.  *Agency for Int'l Dev.*, 591 U.S. at 435–36.  That is because stock ownership, "by itself," is categorically "insufficient to pierce the veil."  *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 29 (1st Cir. 2000).  While "no single factor is dispositive," *id.* at 29, courts typically look for evidence that the shareholder "exercised crippling control," essentially using the corporation as a "façade" for his own activity, *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 472–73 (D. Del. 2010).  The Initiative, however, requires nothing of the kind before "attribut[ing]" the interests of a foreign investor to a U.S. company.  *Bhd. of Locomotive Eng'rs*, 210 F.3d at 25.

Moreover, a 5% ownership stake is "a far cry" from one that would allow an investor to "predominate[]" (i.e., exercise effective control) over corporate affairs.  *Choi*, 2023 WL 8803357, at *6.  To qualify as a "controlling shareholder," an entity must either (1) own more than 50% of the corporation's voting power; or (2) exercise actual control over business operations.  *In re Xtreme Power Inc.*, 563 B.R. 614, 643 (Bankr. W.D. Tex. 2016) (applying Delaware law); *Kahn v. Lynch Commc'n Sys.*,

*Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994); *see also In re Cognizant Tech. Sols. Corp. Derivative Litig.*, 101 F.4th 250, 259 n.38 (3d Cir. 2024) (noting the propriety of "pay[ing] special heed" to Delaware corporate law, given its influence and the fact that "most public companies are incorporated in Delaware"). The Initiative's 5% threshold fails to satisfy either standard.

*First*, a shareholder could possess control if he owned more than 50% of the "voting power" of the corporation. *Xtreme Power Inc.*, 563 B.R. at 643; *Kahn*, 638 A.2d at 1113–14 ("A shareholder who owns less than 50% of a corporation's outstanding stocks does not, without more, become a controlling shareholder of that corporation."). Importantly, this threshold is 10 times higher than the standard articulated in the Initiative. *See* 21-A M.R.S. § 1064(1)(E)(2)(a). It is also more precise because it measures voting power. The Initiative's much lower standard includes all shares—even those that cannot exercise any control whatsoever, including non-voting shares, shareholders who are contractually bound not to vote, and other purely passive investors. *See id.*

*Second*, a minority shareholder could be "a controlling stockholder" if "it exercises 'such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control.'" *In re Morton's Rest. Grp. S'holder Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013).

This test "is not an easy one to satisfy." *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006). Mere potential to exercise control will not suffice. *See, e.g.*, *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *26 (Del. Ch. July 6, 2018) ("[T]he *potential* ability to exercise control is not sufficient."); *Morton's Rest. Grp.*, 74 A.3d at 664 (same). Instead, there must be evidence of "domination by a minority shareholder through actual control of corporation conduct." *Kahn*, 638 A.2d at 1114. This showing requires a fact specific, multi-factor analysis to determine whether a stockholder possesses control. *Calesa Assocs., L.P. v. Am. Cap., Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) ("[T]here is no magic formula to find control; rather, it is a highly fact specific inquiry.").

The Initiative turns all of this on its head, automatically assuming that a foreign shareholder with 5% ownership exercises such control over a U.S. corporation that the State may revoke the business's speech rights. In doing so, it does not require courts to engage in a "fact specific inquiry." *Id.* It does not identify evidence of "actual control of corporation conduct." *Kahn*, 638 A.2d at 1114. And instead of a multi-factor analysis, it treats minority ownership as dispositive of a shareholder's ability to steer corporate operations. Corporate law, however, recognizes that "[r]arely (if ever) will any one source of influence or indication of

control, standing alone, be sufficient." *Tornetta v. Musk*, 310 A.3d 430, 500–01 (Del. Ch. 2024).

Given all of the above, it should not be surprising that no party or amicus has identified a case finding that a shareholder could exercise effective control over a corporation with an ownership percentage of as little as 5%. *See* State Br. 46. The closest the State's supporters come is 10%, double the threshold here. *See* Corporate & Securities Br. 18–19. More instructive, courts have found that ownership shares far *larger* than 5% failed to convey true control. *See, e.g.*, *In re PMTS Liquidating Corp.*, 526 B.R. 536, 544 (D. Del. 2014) (29%); *Morton's Rest. Grp.*, 74 A.3d at 665 (27.7%); *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *1, *29–30 (Del. Ch. May 22, 2000) (46%); *In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 211 (5th Cir. 2018) (49.76%).

This is significant, because again, the question is whether the Initiative targets "no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485. Even assuming there were some hypothetical circumstances in which a shareholder with a 5% ownership stake could exercise controlling influence over a corporation, the analysis above demonstrates such a scenario would be exceedingly rare. In the main, the Initiative "sweeps too broadly" and thus cannot be described as narrowly tailored. *McConnell*, 540 U.S. at 232.

**C. The Contrary Arguments of the State and Its Amici Lack Merit.**

Despite all this, the State and its Amici insist that the Initiative passes muster. Tellingly, they scrupulously avoid claiming that 5% ownership is enough to give an investor "control" over a U.S. corporation. Instead, they press an assortment of theories as to why 5% ownership is an appropriate threshold. They then move on to presenting a smorgasbord of supposed analogs that purportedly justify their standard. None have merit.

*First*, after effectively conceding the "cardinal precept" of corporate law "that directors, rather than shareholders, manage the business and affairs of the corporation," *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021); 13-C M.R.S. § 801(2); 8 Del. C. § 141(a); Model Business Corporation Act § 8.30(a), the State argues that foreign shareholders will still call the shots because directors will be "inextricably linked to their foreign-government investors … by their legal obligations," State Br. 48. Not so.

It is of course true that corporate law "imposes … fiduciary obligations" on a corporation's board of directors. *Tornetta*, 310 A.3d at 498. But those duties bind directors to act "in the best interests *of the corporation*," not any particular shareholder. 13-C M.R.S. § 831(B) (emphasis added). Any obligation to shareholders is collective and derivative. In other words, "the interest of the

shareholders *as a class* are seen as congruent with those of the corporation in the long run." *TW Servs., Inc. v. SWT Acquisition Corp.*, 1989 WL 20290, at *7 (Del. Ch. Mar. 2, 1989) (emphasis added). Accordingly, the "interests of the corporation and its shareholders takes precedence over any interest [of a particular] shareholder [that is] not shared by the stockholders generally." *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014); *McRitchie v. Zuckerberg*, 315 A.3d 518, 550 (Del. Ch. 2024) (explaining that "[a] director need not consider" a stockholder's individual "interests," including "as a diversified investor, employee, customer, or participant in the economy").

Because directors must act in the best interests of the corporation, there is no duty to do the bidding of a particular shareholder. *Xtreme Power Inc.*, 563 B.R. at 639 ("Delaware courts routinely reject arguments that attempt to impose upon directors a duty to [act] on the request of one or more shareholders."); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 38 (Del. Ch. 2013) ("The duty to act for the ultimate benefit of stockholders does not require that directors fulfill the wishes of a particular subset of the stockholder base."); *Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1149–50 (Del. 1989) (recognizing that a board of directors need not "jettison its plan and put the corporation's fate in the hands of its stockholders"). In fact, directors are not even "obligated to follow the wishes of a *majority* of shares." *Paramount Commc'ns Inc. v. Time Inc.*, 1989 WL 79880, at *30 (Del. Ch.), *aff'd*,

565 A.2d 280 (Del. 1989); *Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 387 (Del. Ch. 2004) ("The reality is that controlling stockholders have no inalienable right to usurp the authority of boards of directors that they elect."); *In re CNX Gas Corp. S'holders Litig.*, 2010 WL 2291842, at *15 (Del. Ch. 2010) (same).[4]

*Second*, pushing back, the State claims that corporate managers nonetheless "can be expected to anticipate and infer the wishes and interests of their largest owners and act accordingly," even absent any "express[]" direction. State Br. 50. But the State offers no empirical support for that factual assertion. There is surely no basis for it in corporate law, which recognizes that "[d]irectors are not thermometers, existing to register the ever-changing sentiments of stockholders." *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 655 (Del. Ch. 2008); *TW Servs.*, 1989 WL 20290, at *8 n.14 (explaining that "a corporation is not a New England town meeting; directors, not shareholders, have responsibilities to manage the business and affairs of the corporation"). Nor are directors required to "cater to stockholder whim." *Trados Inc.*, 73 A.3d at 38. And for good reason. Shareholders "may have idiosyncratic" preferences that are not aligned with the corporation's long-term interests, *id.*, and they often disagree amongst themselves about the best course of

---

[4] This reality also belies the State's claim that the "same" concerns that justify barring foreign nationals "from election spending" apply equally here. State Br. 49. While foreign nationals may "have primary loyalty to other national political communities," *id.* (quoting *Bluman*, 800 F. Supp. 2d at 291), a director's primary loyalty is to the corporation as a whole.

action, *see Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *21 (Del. Ch. Apr. 14, 2017) (recognizing that shareholders are often "[d]iverse and atomistic"); *In re AWTR Liquidation Inc.*, 548 B.R. 300, 327 (Bankr. C.D. Cal. 2016) ("Most decisions of significance implicate conflicts between classes of investors.").

Far from being duty-bound to infer and act upon a shareholder's every desire, directors "may not" delegate their duty to control the business to shareholders. *Paramount Commc'ns*, 571 A.2d at 1154. Directors are required to exercise "independent" judgment in assessing the interests of the corporation. *Frederick Hsu Living Tr.*, 2017 WL 1437308, at *21. In fact, directors can be personally liable if they lack "independence" due to the "domination or control [of] another person having a material interest" in the result of a decision, including a shareholder. 13-C M.R.S. § 832(B)(3); *see id.* § 832(1)(A)(2)(a); *see Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 549 (Del. Ch. 2015) (explaining that a director can be liable if he was "not independent of someone who was … interested in [a] transaction").

*Finally*, the State and its Amici present a litany of examples in which some level of corporate ownership triggers some level of legal obligation. None move the needle. Not one demonstrates that the Initiative's 5% threshold is a reliable proxy for control, much less justifies denying domestic corporations the right to engage in political speech.

To begin, the State notes that two states and two cities have adopted similar foreign ownership thresholds.  State Br. 52.  But these parallels cut against the State. One of these laws has already been enjoined for violating the First Amendment, *see Choi*, 2023 WL 8803357, at *1 (enjoining Minnesota's law), and even the State refuses to endorse the breadth of the remaining three, noting that they raise "difficult legal questions," State Br. 52–53.

Looking elsewhere to justify its 5% threshold, the State points to the Williams Act.  15 U.S.C. § 78m(d).  That statute requires individuals who obtain a 5% share in a publicly traded company to file a disclosure statement with the Securities and Exchange Commission.  *Id.*  It has nothing to do with corporate control, let alone restricting political speech.  The Act's "sole purpose" is to inform a company's other shareholders about the identity of the purchaser in case that purchaser also offers to buy their stock.  *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 35 (1977); *see Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58 (1975) ("The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party.").  In light of this limited purpose, the Act provides exceptions, authorizing the SEC to reduce the information required in the disclosure or "exempt[]" a purchase entirely if the Commission finds

that it was "not comprehended within the purposes of [the Act]." 15 U.S.C. § 78m(d)(6); *see id.* § 78m(d)(5).

Nothing similar is happening here. The Initiative's 5% threshold does not trigger a disclosure from an investor; it strips a company of its speech rights based on another entity's investment. The purpose of the Initiative is not to inform the electorate; rather, its effect is to suppress the viewpoints of U.S. corporations in state politics. State Br. 51 (acknowledging "that the purposes of the Williams Act are not the same as the purposes of" the Initiative here). And, unlike the Williams Act, the Initiative provides for no exemptions. The Williams Act, in short, has no bearing on the viability of the Initiative's 5% percent ownership threshold.

The State's Amici point to other federal statutes that are even further afield. One points to portions of the Jones Act, a federal maritime statute that generally bars foreign-owned companies from transporting merchandise or passengers between U.S. ports. FSFP Br. 11; *see* 46 U.S.C. §§ 55102, 55103. The "intent" of the Jones Act "was to protect U.S. shipping interests" through "highly protectionist provisions" that create a "'monopoly' in order to protect and develop the American merchant marine [and] shipbuilding." *Coastwise Trade*, U.S. Customs and Border Protection (Jan. 2009), https://tinyurl.com/3y8h6dtb. That Congress exercised its commerce power to create a shipping monopoly in favor of U.S. businesses says

nothing about the State's power to restrict the First Amendment rights of U.S. businesses.

The State and one Amicus next point to the Communications Act of 1934, which generally requires the Federal Communications Commission to deny certain broadcast and radio licenses to applicants with more than 20% foreign ownership. State Br. 58; FSFP Br. 11; *see* 47 U.S.C. § 310. Importantly, the 20% threshold applies only to *direct* ownership in the licensee. *See id.* § 310(b)(3), (b)(4). A far-more relaxed standard applies to *indirect* ownership. The Commission may authorize foreign entities to own up to 100% of the stock of a U.S. company that holds a controlling interest in the licensee. *See Report and Order*, Fed. Commc'ns Comm'n 16-128, at 5 (Sept. 30, 2016), https://tinyurl.com/4vdaswbv. In exercising its discretion to permit indirect foreign ownership, the Commission conducts a "fact-specific, individualized" review. *Id.* at 7. And even the 20% cap on direct ownership is not as categorical as it first appears due to the Commission's "forbearance," which excludes categories of otherwise covered licenses from the Act's scope. *See* Review of Foreign Ownership Policies, 82 Fed. Reg. 12512, 12513 (Mar. 6, 2017) (describing the Commission's forbearance approach to various licenses types, including common carrier radio station licenses).

Once again, this federal law bears no resemblance to the Initiative. A 20% threshold for direct ownership is four times larger than a 5% threshold and says

nothing about whether a 5% threshold is legitimate. The 20% threshold, moreover, applies only to *direct* ownership, while the Initiative's 5% threshold applies equally to *direct* and *indirect* ownership. The result is that the Initiative would strip a U.S. company of its speech rights if it is 100% owned by a U.S. company that is in turn 5% owned by a foreign-government entity. Under the Communications Act, by contrast, such indirect ownership would not trigger scrutiny until it reached 25% and even then the Commission would retain discretion to allow far larger ownership. While the FCC provides for exceptions (even to the 20% direct ownership threshold), the Initiative's unbending 5% threshold permits no discretion and no exceptions.

The State and its Amici also point to federal regulations that allow a shareholder with a stake of at least $2,000 to present a written proposal when the company holds a shareholder meeting. State Br. 46 n.15; PME Br. 16 n.7; Corporate & Securities Br. 6–7; FSFP Br. 17–18; *see* 17 C.F.R. § 240.14a-8. But this standard is not designed to track control or even influence. Instead, it ensures that a shareholder possesses "some meaningful 'economic stake or investment interest' in a company before the shareholder" may submit a proposal. Procedural Requirements and Resubmission Thresholds Under Exchange Rule 14a-8, 84 Fed. Reg. 66458, 66462 (Dec. 4, 2019).

A minority shareholder's ability to offer a proposal, moreover, is not the ability to control, nor even the ability to influence corporate decisions. The company can exclude many proposals, including proposals that "deal[] with a matter relating to the company's ordinary business operations," as well as proposals that "relate[] to operations which account for less than 5 percent of the company's total assets … and is not otherwise significantly related to the company's business." 17 C.F.R. § 240.14a-8(i)(5), (i)(7); *see Trinity Wall St. v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 327 (3rd Cir. 2015) (explaining other grounds for exclusion). Even if a proposal related to campaign spending avoided exclusion on these grounds, no proposal becomes operative unless it is approved by the directors or the shareholders. Contrary to one Amici's suggestion, *see* Corporate & Securities Br. 17–18, the reality that directors adopt some (but not all) proposals without a shareholder vote does not prove that directors are under the thumb of shareholders; rather, it shows that, when confronted with a proposal, directors exercise their independent judgment, accepting and rejecting proposals based on their view about what is best for the company *as a whole*. *See supra* pp. 18–20.

Regardless, the analogy proves too much. The SEC has calculated that $2,000 equals 0.0001% of the total stock of the smallest company in the S&P 500. *See* Procedural Requirements and Resubmission Thresholds under Exchange Act Rule 14a-8, 85 Fed. Reg. 70240, 70246 (Nov. 4, 2020). If such a minuscule ownership

percentage provides sufficient "influence" under the State's theory to justify stripping a U.S. company of its speech rights, is any amount too small? Does a foreign entity need to have any stock at all when it can exert influence by "simply picking up the phone"? FSFP Br. 19. That cannot be correct, else there is nothing left of *Citizens United*'s holding that U.S. corporations are entitled to engage in political speech. *Cf. Choi*, 2023 WL 8803357, at *4 ("[N]o case holds that a corporation ceases to be 'American' by virtue of any quantum of foreign ownership.").[5]

Amici also cite to a supposed rise in shareholder "activism" and more widespread shareholder engagement in the election of directors to defend a 5% ownership threshold. Corporate & Securities Br. 22–26; FSFP Br. 18–22. Their grab-bag of anecdotal support does little to prove the point. But even if true, it would not change the calculus. First, engagement in corporate affairs from "holders of smaller and smaller percentages of a corporation's stock" will tend to decrease the influence of any one shareholder, including any foreign shareholders. Corporate &

---

[5] Other everyday examples reveal the breadth of the State's influence theory. Is a U.S. company under foreign-government influence if it "operates in [a] foreign country"? *See* Corporate & Securities Br. 3, 20 (noting the potential for "greater-than-average influence"). What if a U.S. company is seeking regulatory approval for an undertaking abroad? Or operates only in the U.S. but exports the bulk of its goods to a particular nation? In the State's world where corporate managers "anticipate and infer" unspoken "wishes and interests," State Br. 50, opportunities for foreign-government "influence" abound—any one of which, by the State's lights, would apparently authorize the revocation of First Amendment rights.

Securities Br. 9. Second, corporate boards are far from defenseless. Many corporations have developed tools specifically to protect against such shareholder activism in order to ensure that directors maintain their independence to act in the best interest of the company. *See Williams Companies S'holder Litig.*, 2021 WL 754593, at *1 (Del. Ch. Feb. 26, 2021) (describing some of the "powerful" and "muscular" responses boards have employed).

As for the remaining examples offered by the State and its Amici, they prove little more than that five is a common number. For example, one Amicus explains that some States grant shareholders with a 5% ownership stake the ability to inspect and copy a corporation's records. Corporate & Securities Br. 5. It also notes that the Internal Revenue Code's provisions on tax shelters consider whether a 5% change occurred in the company's ownership. *Id.* at 7 n.13. The Amicus provides no explanation for including these examples except that they involve a 5% ownership stake.

## CONCLUSION

For these reasons, this Court should affirm the decision below.

July 31, 2024                          Respectfully submitted,


                                       */s/ David T. Raimer*
                                       David T. Raimer
                                       E. Stewart Crosland
                                       Ethan D. Beck
                                       JONES DAY
                                       51 Louisiana Avenue, N.W.
                                       Washington, DC  20001
                                       +1.202.879.3939
                                       dtraimer@jonesday.com

                                       *Counsel for* Amicus Curiae *Maine
                                       State Chamber of Commerce*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,403 words, excluding the parts of the brief exempted by Appellate Rule 32(a)(7)(B)(iii). This brief also complies with the typeface requirements of Appellate Rule 32(a)(5) and the type-style requirements of Appellate Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: July 31, 2024

*/s/ David T. Raimer*
David T. Raimer

*Counsel for* Amicus Curiae *Maine State Chamber of Commerce*

# CERTIFICATE OF SERVICE

On July 31, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send a notification of such filing to all counsel of record.

Dated: July 31, 2024

*/s/ David T. Raimer*
David T. Raimer

*Counsel for* Amicus Curiae *Maine State Chamber of Commerce*