No. 24-1265

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

CENTRAL MAINE POWER COMPANY; VERSANT POWER; ENMAX CORPORATION; MAINE PRESS ASSOCIATION; MAINE ASSOCIATION OF BROADCASTERS; JANE P. PRINGLE, individually and in her capacity as a registered voter and elector; KENNETH FLETCHER, individually and in his capacity as a registered voter and elector; BONNIE S. GOULD, individually and in her capacity as a registered voter and elector; BRENDA GARRAND, individually and in her capacity as a registered voter and elector; LAWRENCE WOLD, individually and in his capacity as a registered voter and elector,

*Plaintiffs – Appellees*,

v.

MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES; WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; SARAH LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; STACEY D. NEUMANN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in his official capacity as Attorney General for the State of Maine,

*Defendants – Appellants*.

On Appeal from the United States District Court for the District of Maine
Case No. 1:23-cv-450-NT (Hon. Nancy Torresen)

**BRIEF OF AMICUS CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS IN SUPPORT OF APPELLEES MAINE ASSOCIATION OF BROADCASTERS AND MAINE PRESS ASSOCIATION URGING AFFIRMANCE**

[Caption continued on next page]

Katie Townsend, #1190822
   *Counsel of Record*
Mara Gassmann\*
Julia Dacy\*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, D.C. 20005
(202) 795-9300
ktownsend@rcfp.org

   \**Of Counsel*

Scott D. Dolan, Esq., #1211904
Petruccelli, Martin & Haddow LLP
Two Monument Square, Ste. 900
Portland, ME 04101
(207) 775-0200
sdolan@pmhlegal.com

*Counsel for Amicus Curiae Reporters Committee for Freedom of the Press*

# CORPORATE DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association of reporters and editors with no parent corporation and no stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... iii

TABLE OF AUTHORITIES ........................................................................................v

IDENTITY AND INTEREST OF AMICUS CURIAE .............................................1

SOURCE OF AUTHORITY TO FILE ......................................................................2

INTRODUCTION AND SUMMARY OF THE ARGUMENT ...............................3

ARGUMENT ..................................................................................................................4

    I.    The Act's requirements for the press are unconstitutionally vague. ...............4

    II.   Conscripting the media, as the Act attempts to do, inflicts unconstitutional harm and imposes significant practical costs. ......................6

CONCLUSION ............................................................................................................10

CERTIFICATE OF COMPLIANCE .........................................................................12

CERTIFICATE OF SERVICE ...................................................................................13

# TABLE OF AUTHORITIES

**Cases**

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ................................................................................5

*Mills v. Alabama*,
  384 U.S. 214 (1966) ................................................................................8

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ................................................................................7

*Reno v. Am. C.L. Union*,
  521 U.S. 844 (1997) ................................................................................5

*Wash. Post v. McManus*,
  944 F.3d 506 (4th Cir. 2019) ..........................................................7, 9, 10

*Whitman v. Am. Trucking Ass'ns, Inc.*,
  531 U.S. 457 (2001) ................................................................................6

**Statutes**

21-A M.R.S. § 1064 ................................................................................3, 5

Colo. Rev. Stat. § 1-45-103.7 (2023) ........................................................9

Minn. Stat. § 211B.15 (2023) ....................................................................9

S.B. 875, Reg. Sess. (Md. 2018) ...............................................................9

**Other Authorities**

Bill Arthur, *How Local News Fares in the Cities*, Northwestern Local News
  Initiative (Dec. 5, 2023),
  https://perma.cc/CW4H-Z2JK ................................................................8

David Sharp, *Maine's biggest newspaper group is now a nonprofit under the
  National Trust for Local News*, AP (Aug. 1, 2023),
  https://perma.cc/WX5F-K982 .................................................................8

Elisa Shearer et al., *Americans' Changing Relationship with Local News*,
   Pew Rsch. Ctr. (May 7, 2024),
     https://perma.cc/34SR-2FU2 ................................................................................8

Letter from Jonathan Wayne, Exec. Dir. of Me. Comm'n on Governmental
   Ethics & Election Pracs. (May 17, 2024),
     https://perma.cc/AT89-75F6 ................................................................................6

Mary Ellen Klas, *Less Local News Means Less Democracy*,
   NiemanReports (Sept. 20, 2019),
     https://perma.cc/TES4-LAHJ ............................................................................8, 9

# IDENTITY AND INTEREST OF AMICUS CURIAE

The Reporters Committee for Freedom of the Press (the "Reporters Committee") was founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The Reporters Committee writes in support of Appellees the Maine Press Association and the Maine Association of Broadcasters (hereinafter, collectively, the "Maine Media Appellees"). As an organization dedicated to defending the First Amendment and newsgathering rights of the press, the Reporters Committee has a significant interest in ensuring that states do not enact legislation that imposes unconstitutional burdens on journalists and news organizations. The Reporters Committee frequently files amicus curiae briefs in federal courts in matters concerning government action that impinges on newsgathering and editorial rights. *See, e.g.*, Br. of Amici Curiae Reporters Comm. for Freedom of the Press, First Amend. Coal., Media Law Res. Ctr. & News Media Alliance, *U.S. News & World Report, L.P. v. Chiu*, No. 24-2928 (9th Cir. July 10, 2024); *see also*

Br. of Amici Curiae News Media Alliance & 16 Media Orgs., *Wash. Post v. McManus*, 944 F.3d 506 (4th Cir. 2019) (No. 19-1132).[1]

## SOURCE OF AUTHORITY TO FILE

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), the Reporters Committee has obtained the consent of the parties to file this amicus curiae brief.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4), the Reporters Committee states that no party's counsel authored this brief in whole or in part, and no party, party's counsel, or any other person, other than amicus curiae, its members, or its counsel, contributed money that was intended to fund preparing or submitting the brief.

# INTRODUCTION AND SUMMARY OF THE ARGUMENT

The District Court enjoined implementation and enforcement of Maine's Act to Prohibit Campaign Spending by Foreign Governments and Promote an Anticorruption Amendment to the United States Constitution, 21-A M.R.S. § 1064 (the "Act"). In doing so, the District Court did not specifically address the provision of the Act targeting the press—21-A M.R.S. § 1064(7) ("Subsection 7")—the constitutionality of which has been challenged in this litigation by the Maine Media Appellees. This Court, likewise, may affirm the District Court's ruling without addressing that provision. In the event the Court reaches it, however, the Reporters Committee writes to underline the constitutional infirmities of Subsection 7, as well as the practical harms it will inflict on the press and urges this Court to maintain the District Court's injunction at least as to that provision of the Act.

Subsection 7 imposes "due diligence" and compliance obligations on all news organizations that accept issue and political advertising. As written, it is impermissibly vague. And the obligations it imposes on news organizations that accept such advertising are exceedingly burdensome: Subsection 7 would saddle news organizations large and small with compliance obligations they are ill equipped —and may be entirely unable—to fulfill. The significant financial and other burdens the Act imposes on news organizations would inevitably deter them from accepting

political and issue advertising—an important source of information for the public, and an important source of revenue for local reporting.

While smaller local and regional newsrooms—many of which are already facing challenging economic circumstances—are likely to be hardest hit if forced to choose between attempting to comply with the Act's imprecise requirements or declining to accept political and issue advertising at all, larger news outlets also will suffer. And, most importantly, the public will suffer, too. News organizations that must divert (or forgo) financial resources due to the steep costs of compliance with the Act will produce less local news. And by incentivizing (or forcing) some news organizations to reject issue and political advertising entirely, the Act will harm Mainers who want to engage in or receive political speech through advertising and will find no outlet to do so. These harms necessitate an injunction to prohibit enforcement of Subsection 7 of the Act.

## ARGUMENT

### I. The Act's requirements for the press are unconstitutionally vague.

Should this Court disagree with the District Court's order enjoining enforcement of the Act in its entirety, it should nevertheless uphold the injunction as to Subsection 7, which imposes unconstitutional "due diligence" obligations on the press. Subsection 7 requires, *inter alia*, news organizations to "establish due diligence policies, procedures and controls that are reasonably designed to ensure"

that they do not accept political or issue advertisements from "foreign government-influenced entit[ies]." 21-A M.R.S. § 1064(7).[2] These vague, undefined requirements do not tell news organizations—even if they *could* feasibly comply with the Act—*how* to comply with it. They, thus, run afoul of the Constitution.

A law is impermissibly vague under the Fourteenth Amendment's Due Process Clause "if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). And a law that does not provide "fair warning" of what conduct is required or proscribed cannot survive constitutional scrutiny. *Id.* When a statute implicates the exercise of First Amendment rights—as Subsection 7 does—vagueness concerns are heightened because speakers, including journalists and news organizations, are likely to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109 (citations omitted); *accord, e.g.*, *Reno v. Am. C.L. Union*, 521 U.S. 844, 871–72 (1997) (noting that vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech"). The language of Subsection 7 provides insufficient guidance for news organizations to avoid running afoul of its requirements. It also impermissibly leaves the interpretation of what constitutes "reasonable" compliance

---

[2] Monetary fines may be imposed for a violation of the Act. *See* 21-A M.R.S. § 1064(8).

5

to the discretion of those enforcing the Act.³ These imprecise obligations will necessarily be interpreted broadly by news organizations seeking to steer clear of the unlawful zone, resulting in precisely the kind of harm the vagueness doctrine was intended to protect against.

**II.  Conscripting the media, as the Act attempts to do, inflicts unconstitutional harm and imposes significant practical costs.**

Subsection 7 improperly seeks to co-opt the news media by requiring the press to perform investigative and regulatory functions on behalf of the government. If the injunction prohibiting its enforcement is lifted, Subsection 7 would saddle news organizations with untenable burdens that would hinder their ability to inform the public.⁴ For example, it would force at least some news organizations to decline

---

³ Appellants' brief makes passing reference to a rulemaking that was not briefed by the parties below. Even if it were properly a part of the record before this Court, however, that rulemaking would not remedy this constitutional defect. *Cf. Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 458 (2001) (holding under a nondelegation theory that an agency rule could not save a constitutionally infirm statute). And, even if it could, the rulemaking referenced by Appellants does not resolve the vagueness concerns raised by the Maine Media Appellees below. *See* Letter from Jonathan Wayne, Exec. Dir. of Me. Comm'n on Governmental Ethics & Election Pracs. (May 17, 2024), https://perma.cc/AT89-75F6.

⁴ Appellants argued below that compliance with the Act is costless. *See* State Defs.' Combined Opp'n to Mots. for Prelim. Relief, ECF No. 47 at 45 (filed Jan. 12, 2024). Appellants are wrong, as the Maine Media Appellees argue, *see* Br. of Appellees Me. Press Ass'n & Me. Ass'n of Broads. at 4–5 (filed July 30, 2024), and for the reasons set forth herein and in the Reporters Committee's amicus brief below, *see* Amicus Curiae Br. of Reporters Comm. for Freedom of the Press, ECF No. 50 (hereinafter, "RCFP Amicus Br.") at 9–10 (filed Jan. 22, 2024). If this Court does not affirm the District Court's injunction as to Subsection 7, it should

political and issue advertisements altogether, chilling political speech and depriving news organizations of an important revenue source. Political and issue advertising are an essential part of the information ecosystem; they contribute to the marketplace of ideas and often initiate or further public debate on matters of the utmost public concern; if the press ceases to distribute such advertising because of the Act, the public will lose access to that information. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269–70 (1964) (recognizing the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open" in a case involving applying a heightened First Amendment standard to political advertising).

Subsection 7 would force news organizations to either forgo political and issue advertisements—a vital source of revenue for many—for fear of running afoul of the Act's requirements or incur compliance costs that would make it more expensive to disseminate political advertising than other kinds of speech. *See Wash. Post v. McManus*, 944 F.3d 506, 516 (4th Cir. 2019) (recognizing "the predominant purpose of hosting ads is to raise revenue," and criticizing Maryland electioneering statute for "mak[ing] certain political speech more expensive to host than other

---

remand for full consideration of the facts and to assess the adequacy of the intervening rulemaking that purported to address some of the concerns raised by the news media and others, including Maine's Governor. *See* RCFP Amicus Br. at 10.

7

speech because [of] compliance costs"). And to the extent news organizations simply decide not to accept such advertising, they would be losing an important revenue stream for journalism at a financially perilous time for the industry. *See* Bill Arthur, *How Local News Fares in the Cities*, Northwestern Local News Initiative (Dec. 5, 2023), https://perma.cc/CW4H-Z2JK; David Sharp, *Maine's biggest newspaper group is now a nonprofit under the National Trust for Local News*, AP (Aug. 1, 2023), https://perma.cc/WX5F-K982 (discussing the "local news . . . crisis with the nation losing a quarter of its newspapers since 2005 and advertising revenue declining by as much as 80% over a decade" which, in 2023, prompted Maine's largest newspaper group to experiment with a non-profit business model). Indeed, the financial hardships imposed on the press by Subsection 7, including but not limited to the potential diversion of resources away from newsgathering, would be felt acutely by the public who rely on robust reporting to stay informed. *See Mills v. Alabama*, 384 U.S. 214, 219 (1966) ("The Constitution specifically selected the press . . . to play an important role in the discussion of public affairs."); *see also* Elisa Shearer et al., *Americans' Changing Relationship with Local News*, Pew Rsch. Ctr. (May 7, 2024), https://perma.cc/34SR-2FU2 (finding that a significant number of Americans see value and quality in local news but only about 15 percent of adults in the U.S. have paid for local news in the last year); Mary Ellen Klas, *Less Local News Means Less Democracy*, NiemanReports (Sept. 20, 2019),

https://perma.cc/TES4-LAHJ ("[T]here's the evidence that as local news disappears and political information becomes more nationalized, voter polarization increases.").

The government cannot justify imposing these burdens on the news media. Other states have accomplished the Appellants' stated goals here—protecting elections—by regulating advertisers directly rather than requiring news organizations to enforce laws. *See, e.g.*, Minn. Stat. § 211B.15 (2023) (prohibiting foreign-influenced corporations from making direct independent expenditures including for or against ballot measures); Colo. Rev. Stat. § 1-45-103.7 (2023) (banning contributions by U.S.-operated LLCs with foreign owners).

In considering legislation materially similar to Subsection 7, the U.S. Court of Appeals for the Fourth Circuit rejected it on the grounds that the state of Maryland's efforts were not narrowly tailored to meet its goals. *See Wash. Post*, 944 F.3d 506. In that case, Maryland expanded its campaign finance laws with the passage of the Online Electioneering Transparency and Accountability Act, which imposed record-keeping and disclosure requirements on online platforms, including those hosted by news organizations. S.B. 875, Reg. Sess. (Md. 2018). The Baltimore Sun and The Washington Post sued to prevent enforcement of the disclosure obligations. *See Wash. Post*, 944 F.3d at 522. The Fourth Circuit held that diligence measures that target neutral third-party platforms rather than political actors "pose[] First Amendment problems" and that that statute could not pass

9

constitutional muster. *Id.* at 515 ("[T]he Act burdens *platforms* rather than political actors. So when [a campaign] want[s] to place an online campaign advertisement with the *Carroll County Times*, it is the *County Times* that has to shoulder the bulk of the disclosure and recordkeeping obligations created by the sections of the Act challenged here.").

Like the statutory provisions that sought to co-opt news organizations and other online platforms that were struck down in *Washington Post*, Subsection 7 of the Act is riddled with "First Amendment infirmities." *Id.* at 520. While limiting foreign interference in elections, or even the appearance of foreign interference, may, as Appellants argue, Br. of Defs.-Appellants at 30, be a compelling state interest, statutes aimed at furthering that interest must not unduly sweep up news organizations and obligate them to perform government functions.

## CONCLUSION

For the foregoing reasons, the Reporters Committee urges this Court to affirm the District Court's order enjoining the implementation and enforcement of the Act, or, in the alternative, enter an Order preserving the injunction as to Subsection 7. Respectfully submitted,

Dated: July 31, 2024

        */s/ Katie Townsend*
        Katie Townsend
          *Counsel of Record*
        Mara Gassmann\*
        Julia Dacy\*

Reporters Committee for
Freedom of the Press
1156 15th Street NW, Ste. 1020
Washington, D.C. 20005
(202) 795-9300
ktownsend@rcfp.org

*Of Counsel*

Scott D. Dolan, Esq., #1211904
Petruccelli, Martin & Haddow LLP
Two Monument Square, Ste. 900
Portland, ME 04101
(207) 775-0200
sdolan@pmhlegal.com

*Counsel for Amicus Curiae
Reporters Committee for
Freedom of the Press*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 2,210 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with Times New Roman in size 14 font.

Dated: July 31, 2024　　　　　　　　　　*/s/ Katie Townsend*
　　　　　　　　　　　　　　　　　　　Katie Townsend
　　　　　　　　　　　　　　　　　　　*Counsel of Record for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I, Katie Townsend, hereby certify that I have filed the foregoing Brief of Amicus Curiae electronically with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. All participants who are registered ECF Filers will be served via the CM/ECF system.

Dated: July 31, 2024  /s/ *Katie Townsend*
Katie Townsend
*Counsel of Record for Amicus Curiae*

13