No. 24-1265

# United States Court of Appeals
## For the First Circuit

CENTRAL MAINE POWER COMPANY; VERSANT POWER; ENMAX CORPORATION; MAINE PRESS ASSOCIATION; MAINE ASSOCIATION OF BROADCASTERS; JANE PRINGLE, individually and in her capacity as a registered voter and elector; KENNETH FLETCHER, individually and in his capacity as a registered voter and elector; BONNIE S. GOULD, individually and in her capacity as a registered voter and elector; BRENDA GARRAND, individually and in her capacity as a registered voter and elector; LAWRENCE WOLD,

Plaintiffs – Appellees,

v.

MAINE COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES; WILLIAM J. SCHNEIDER, in his official capacity as Chairman of the Maine Commission on Governmental Ethics and Election Practices; DAVID R. HASTINGS, III, in his official capacity as a Member of the Maine Governmental Ethics and Election Practices; SARAH LECLAIRE, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; DENNIS MARBLE, in his official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; STACEY D. NEUMANN, in her official capacity as a Member of the Maine Commission on Governmental Ethics and Election Practices; AARON M. FREY, in his official capacity as Attorney General for the State of Maine,

Defendants – Appellants.

*On appeal from the United States District Court, District of Maine*

## REPLY BRIEF OF DEFENDANTS-APPELLANTS

<table>
<tr><td></td><td>AARON M. FREY<br>Attorney General</td></tr>
<tr><td>Thomas A. Knowlton<br>Deputy Attorney General</td><td>Jonathan R. Bolton & Paul Suitter<br>Assistant Attorneys General<br>6 State House Station</td></tr>
<tr><td>Of Counsel</td><td>Augusta, Maine 04333-0006<br>(207) 626-8800<br>jonathan.bolton@maine.gov<br>paul.suitter@maine.gov</td></tr>
<tr><td></td><td>*Attorneys for Appellants*</td></tr>
</table>

# Table of Contents

Table of Contents .......................................................................i

Table of Authorities................................................................. iii

Introduction...........................................................................1

Reply Argument ......................................................................2

I.      The district court abused its discretion in concluding that the Act
        is likely facially unconstitutional....................................................2

        A.      The district court erred in concluding that the Act is subject
                to strict scrutiny. ..................................................................2

        B.      The district court erred by failing to recognize the full scope
                of Maine's compelling interests in regulating foreign
                government–influenced corporations. ...................................4

                1.      The district court correctly recognized Maine's
                        compelling interest in preventing foreign-government
                        influence in candidate elections...................................4

                2.      The district court should have recognized Maine's
                        equally compelling interest in regulating its
                        referendum elections......................................................7

                3.      The district court erred by rejecting Maine's compelling
                        interest in preventing the appearance of foreign-
                        government influence in its elections. ...........................9

        C.      The district court erred by concluding that the Act is  likely
                not narrowly tailored. ..........................................................12

                1.      The Act's 5% ownership threshold is narrowly
                        tailored. .....................................................................12

                2.      The ban on foreign-government participation in
                        corporate decision-making is narrowly tailored..........20

D.    Even if the Act likely has some unconstitutional applications, it is not facially invalid.....................23

II.    The Act is not preempted by federal law ........................25

III.    The district court's injunction is overbroad....................30

IV.    The Court should reject Appellees' alternative arguments for affirmance........................................................33

    A.    The Act's disclaimer requirements do not violate the First Amendment. ........................................33

    B.    The Electors' alternative First Amendment arguments fail. ........................................................39

        1.    The Electors misconstrue the scope of the Act............39

        2.    The Act does not violate the right to petition.............41

        3.    The Act does not violate Electors' right to receive information.................................................43

        4.    The Act does not violate freedom of assembly............44

        5.    The Act does not violate freedom of the press............45

    C.    The Act is not unconstitutionally vague...............45

    D.    The Act does not unconstitutionally burden news outlets...50

    E.    The Act does not violate the dormant foreign commerce clause.........................................................52

    F.    The Act is not unconstitutional as applied to Versant.........56

Conclusion ....................................................................58

Certificate of Compliance with Rule 32(a)............................59

Certificate of Service Form for Electronic Filing...................60

# Table of Authorities

## CASES

*Abrams v. McGuireWoods LLP*,
    518 B.R. 491 (N.D. Ind. 2014) .......................................... 6, 57

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    591 U.S. 430 (2020) ................................................................ 9

*Alden v. Maine*, 527 U.S. 706 (1999) ...................................... 5

*Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*,
    717 F.3d 851, 870 (11th Cir. 2013) ...................................... 31

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*,
    512 U.S. 298 (1994) .............................................................. 55

*Black United Fund of New Jersey, Inc. v. Kean*,
    763 F.2d 156 (3d Cir. 1985) ................................................. 23

*Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011),
    *aff'd*, 565 U.S. 1104 (2012) ...................................... 5, 8, 18, 19

*Buckley v. Valeo*, 424 U.S. 1 (1976) ................................... 9, 10

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .......................... 30

*Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley,
    Cal.*, 454 U.S. 290 (1981) .................................................... 41

*Citizens United v. FEC*, 558 U.S. 310 (2010) ............ 2, 6, 9, 17, 18, 34, 37

*Colautti v. Franklin*, 439 U.S. 379 (1979) ............................ 49

*Com. of Mass. v. Andrus*, 594 F.2d 872 (1st Cir. 1979) .......... 22

*Daggett v. Comm'n on Govtl. Ethics & Election Pracs.*,
    205 F.3d 445 (1st Cir. 2000) ................................................ 11

*Duryea v. Guarnieri*, 564 U.S. 379 (2011) ............................ 42

*FEC v. Cruz*, 596 U.S. 289 (2022) ......................................... 7

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)...... 3, 9, 41

*Foley v. Connelie*, 435 U.S. 291, 295–96 (1978) ........................ 2

*Frissell v. Rizzo*, 597 F.2d 840, 848 (3d Cir. 1979) ................................ 44

*Gaspee Project v. Mederos*, 13 F.4th 79 (1st Cir. 2021) .................... 34, 35

*Georgia v. President of the United States*,
46 F.4th 1283 (11th Cir. 2022) ............................................ 31

*Gonzales v. Carhart*, 550 U.S. 124 (2007)................................... 49

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936)................................... 38

*Japan Line, Ltd. v. L.A. Cty.*, 441 U.S. 434 (1979)................................ 53

*Kemlon Prods. & Dev. Co. v. United States*,
646 F.2d 223 (5th Cir. 1981) ................................................ 22

*Lee v. Driscoll*, 871 F.3d 581 (8th Cir. 2017) ......................................... 42

*Lochhead v. Alacano*, 662 F. Supp. 230, 232 (D. Utah 1987)................ 15

*Lorelei Corp. v. Cnty. of Guadalupe*, 940 F.2d 717 (1st Cir. 1991) ........ 22

*Meese v. Keene*, 481 U.S. 465 (1987) ................................................ 35, 36

*Minnesota Chamber of Commerce v. Choi*,
707 F. Supp. 3d 846 (D. Minn. 2023)........................................... 17, 18

*NAACP, Los Angeles Branch v. Jones*,
131 F.3d 1317 (9th Cir. 1997)................................................ 44

*Nat'l Org. for Marriage, Inc. v. McKee*,
669 F.3d 34 (1st Cir. 2012) ................................................ 48

*National Foreign Trade Council v. Natsios*,
181 F.3d 38 (1st Cir. 1999), *aff'd*, 530 U.S. 363 (2000) ........... 52, 53, 55

*National Institute of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018)................................................................ 34

iv

*National Organization for Marriage v. McKee*,
649 F.3d 34 (1st Cir 2011) ...................................................... 37

*New Energy Co. of Ind. v. Limbach*, 486 U.S. 269 (1988)....................... 55

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000)...................... 10, 11

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ................................................. 56

*Pharm. Care Mgmt. Ass'n v. Maine Att'y Gen.*,
324 F. Supp. 2d 71 (D. Me. 2004) ....................................................... 30

*Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) ...... 38

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
217 F.3d 8 (1st Cir. 2000) ............................................................. 30, 31

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
699 F.3d 1 (1st Cir. 2012) ..................................................................... 3

*Spargo v. N.Y. State Comm'n on Jud. Conduct*,
351 F.3d 65 (2d Cir. 2003) ................................................................. 44

*Thomas v. Collins*, 323 U.S. 516 (1945)................................................. 45

*United States v. Any & All Radio Station Transmission Equip.*,
204 F.3d 658 (6th Cir. 2000)......................................................... 44, 45

*United States v. Muriel-Cruz*, 412 F.3d 9 (1st Cir. 2005)...................... 22

*United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103 (1801)............. 23

*United States v. Williams*, 553 U.S. 285 (2008)........................... 4, 23, 46

*United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990) ...................... 44, 56

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)................................................................. 43

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .............................. 46

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) .............................. 8, 43

## STATUTES

1 M.R.S.A. § 71 ................................................................. 32, 33, 46

10 M.R.S.A. § 963-A .......................................................... 48

13 M.R.S.A. § 1501 ............................................................ 48

21-A M.R.S.A. § 1 ............................................................... 26

21-A M.R.S.A. § 1001 ......................................................... 26

21-A M.R.S.A. § 1011 ................................................ 26, 29, 30

21-A M.R.S.A. § 1051 ......................................................... 27

21-A M.R.S.A. § 1052 ............................................... 40, 41, 48

21-A M.R.S.A. § 1064 ........ 1, 25, 32, 33, 34, 39, 40, 41, 46, 47, 48, 49, 51

24-A M.R.S.A. § 2381-C ..................................................... 48

5 M.R.S.A. § 1782 ............................................................. 48

5 M.R.S.A. § 8002 ............................................................. 21

## OTHER AUTHORITIES

3 *Fletcher Cyc. Corp.* § 848 ................................................. 15

Model Business Corporations Act Annotated, § 8.30 ............................. 16

## RULES

94-270 C.M.R. ch. 1, § 16 ..................................... 21, 36, 41, 46, 47, 50, 51

## CONSTITUTIONAL PROVISIONS

Me. Const. art. IV, pt. 3, § 19 ............................................. 40

U.S. Const., Art. I, § 8, cl. 3 ............................................. 55

# Introduction

Despite nearly 200 combined pages of briefing, Appellees fail to rebut the State Defendants' showing that the district court abused its discretion by enjoining enforcement of the entirety of 21-A M.R.S.A. § 1064 (the "Act") in the face of undisputed evidence that Maine has been the target of massive efforts by foreign government–influenced and controlled corporations to sway its recent elections. As Maine voters overwhelmingly recognized at the polls, the Act protects Maine's compelling interest in ensuring that its elections are decided not by influence campaigns orchestrated by foreign-government proxies, but by robust speech and debate within the bounds of Maine's own domestic political community.

Because the Act is narrowly tailored to achieve that compelling goal, and because none of the myriad alternative bases for affirmance proffered by the Appellees have merit, the Court should vacate the preliminary injunction issued by the district court. Or, if the Court does not vacate the injunction entirely, it should narrow the injunction to correspond only with those constitutional flaws it may find in the Act.

# Reply Argument

## I. The district court abused its discretion in concluding that the Act is likely facially unconstitutional.

### A. The district court erred in concluding that the Act is subject to strict scrutiny.

State Defendants demonstrated in their principal brief that the district court erred by applying strict scrutiny to the entirety of the Act, despite Supreme Court caselaw applying a lower level of scrutiny to (1) state laws that limit foreigners' ability to participate in "democratic political institutions," *Foley v. Connelie*, 435 U.S. 291, 295–96 (1978), and to (2) restrictions on candidate contributions—a key part of the Act, *FEC v. Beaumont*, 539 U.S. 146, 161 (2003).

Appellees respond by citing decisions in which the Supreme Court has applied strict scrutiny to laws that bear similarities to some aspects of the Act. Versant Br. at 23–24; CMP Br. at 15–17. But in each case, the cited decision considered campaign-finance restrictions aimed at curbing corruption within the American political community; the Act, in contrast, is aimed at curbing pernicious influences coming from outside of that political community—specifically, from foreign governments. Thus, decisions like *Citizens United v. FEC*, which considered a broad prohibition on independent expenditures by corporations generally, 558

U.S. 310, 318 (2010), and *First National Bank of Boston v. Bellotti*, which considered a similarly broad ban on corporate referendum spending, 435 U.S. 765, 767–68 (1978), have little to say about the correct level of scrutiny that should apply to a law specifically targeting foreign-government influence in elections.

Similarly, while a law targeting independent expenditures generally may be subject to strict scrutiny under the caselaw cited by Versant, *see* Versant Br. at 24, none of those decisions considered independent-expenditure restrictions aimed specifically at curbing foreign influence in American elections. As *Foley* teaches, the latter types of restrictions are subject to a lower level of scrutiny.

What is more, none of Appellees effectively rebut State Defendants' showing that the Act's restrictions on candidate contributions are subject to, at most, "closely drawn" scrutiny. *Beaumont*, which upheld FECA's total ban on corporate and union contributions, stands directly for that proposition. 539 U.S. at 161. And *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1 (1st Cir. 2012), relied upon by the district court and Appellees, was seemingly not asked to consider Law 222's application to candidate

contributions separately from its applications to other forms of election spending.

Here, in contrast, State Defendants are arguing that the validity of those contribution restrictions matters for purposes of analyzing both Appellees' claim of facial invalidity—where constitutional applications must be weighed against potentially unconstitutional ones, *see United States v. Williams*, 553 U.S. 285, 292 (2008)—and for purposes of determining the proper scope of the preliminary injunction. *See* Parts I.D & III below. Even if the Act likely has some unconstitutional applications, it is not facially invalid. In this context, *Fortuño*'s approach of applying a single level of scrutiny to all provisions, regardless of whether they burden "core" or "marginal" speech rights, *Beaumont*, 539 U.S. at 161, does not make sense.

### B. The district court erred by failing to recognize the full scope of Maine's compelling interests in regulating foreign government–influenced corporations.

#### 1. *The district court correctly recognized Maine's compelling interest in preventing foreign-government influence in candidate elections.*

The district court correctly determined that Maine has a compelling interest in preventing foreign-government influence in candidate elections. Add. 29. Versant takes issue with even this

modest conclusion—derived directly from *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012)—by arguing that Maine's interest is not compelling unless it can show that FECA's federal ban on foreign-national spending in candidate elections is inadequate to protect Maine's interest. Versant Br. at 28. Versant cites no authority for its remarkable proposition that states cannot legislate unless they can show that existing federal law is inadequate.

Under Versant's theory, a state could not enact criminal laws barring threatening conduct without showing that federal laws on the same subject did not "adequately prevent" such conduct. *Id.* A state could not enact reasonable firearms regulations without showing that federal firearms laws did not "adequately prevent" the same harms. Simply put, Maine, as a separate sovereign, *see Alden v. Maine*, 527 U.S. 706, 751 (1999), need not demonstrate that federal law is inadequate to independently protect its own compelling state interests.

In any event, FECA is not adequate to fully protect Maine's interest in preventing foreign-government influence in its elections. For one thing, Maine has no control over how vigorously federal officials enforce FECA's prohibitions. For another, FECA's ban on foreign

involvement in elections does not extend even to wholly owned U.S. subsidiaries of foreign government–owned corporations, even though such subsidiaries exist solely to pursue the interests of their foreign-government owners. *See Abrams v. McGuireWoods LLP*, 518 B.R. 491, 501 (N.D. Ind. 2014).

Appellees Pringle *et al.* (the "Electors") also take issue with the district court's conclusion that preventing foreign-government influence was a compelling interest. Electors Br. at 40. They cite *Citizens United*'s rejection of a "generic favoritism or influence theory." *Id.* (quoting *Citizens United*, 558 U.S. at 359). But that rejection occurred in a case involving a domestic entity with no disclosed foreign-government ties seeking to influence the election.

Maine, in contrast, offers not a "generic" theory of influence but a specific one. It seeks to prevent foreign governments, with no stake in Maine's political community, from directly or indirectly manipulating those elections through election spending. That interest is compelling, even if a "generic" goal of preventing undue influence by *any* speaker is not. Were it otherwise, Maine would be powerless to combat even the

most brazen attempt by a hostile foreign government to drown out bona fide political discourse with disinformation.

2. *The district court should have recognized Maine's equally compelling interest in regulating its referendum elections.*

Although the district court merely assumed that Maine had a compelling interest in regulating referendum elections, State Defendants have shown that the court would have been justified in deciding that question outright in State Defendants' favor. In trying to rebut that showing, Appellees assert that referendum elections, by their nature, do not create opportunities for *quid pro quo* corruption or its appearance, making it impossible that the Act could further such interests. Versant Br. at 31; CMP Br. at 23.

But, as State Defendants have already explained, the Act is principally aimed at preventing foreign-government influence, not preventing corruption. And despite the dicta cited by Appellees from *FEC v. Cruz*, 596 U.S. 289, 305 (2022),[1] *quid pro quo* corruption is not

---

[1] And it is dicta, contrary to CMP's assertion. CMP Br. at 24. *Cruz* contains no indication that the government defended the challenged statute on any basis other than its anti-corruption interest.

the only state interest that can be served by campaign-finance laws. The Supreme Court has recognized (albeit sparingly) other permissible interests. *See, e.g.*, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (recognizing compelling interest in "public confidence in the integrity of the judiciary"). The Court's summary affirmance of *Bluman* confirms that preventing "foreign influence over the U.S. political process" is one of these rare alternate interests that can support limits on election spending. *Bluman*, 800 F. Supp. 2d at 288, *aff'd*, 565 U.S. 1104.

Given *Bluman*, Versant's suggestion of an absolute right of "the voters themselves . . . to decide which speakers and information should guide how they cast their ballots" rings hollow. Versant Br. at 32. By affirming the district court judgment in *Bluman*, the Supreme Court deprived the public of deciding whether to be guided by the flyers that one plaintiff wished to post supporting a presidential candidate. *See* 800 F. Supp. 2d at 285. It did so precisely because the interest in preventing foreign influence in elections is so weighty. And that interest—unlike the interest in curbing corruption—is just as applicable to referendum elections as it is to candidate elections.

Finally, CMP's attempt to minimize the significance of *Bellotti*'s observation that Massachusetts could have prevailed with a stronger evidentiary showing fails. CMP Br. at 25. While Supreme Court precedent may not endorse measures to "equalize" the speech of different groups, *see Citizens United*, 558 U.S. at 350, that precedent assumes that the groups at issue are "elements of our society," *Bellotti*, 435 U.S. at 791. The Act seeks not to equalize speech between different groups within American society, but to prevent speech that may be attributable to foreign governments—who have no First Amendment rights at all, *see Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020)—from drowning out the speech of legitimate participants in the public discourse. *Bellotti* leaves the door open for such a law.

3. *The district court erred by rejecting Maine's compelling interest in preventing the appearance of foreign-government influence in its elections.*

State Defendants showed in their principal brief that, just as the appearance of corruption is of "almost equal concern" to actual corruption, *Buckley v. Valeo*, 424 U.S. 1, 27 (1976), the appearance of

foreign influence in elections should have been recognized by the district court as a nearly equal concern to actual foreign influence.

Appellees call this a "flawed syllogism," Versant Br. at 32, but offer little explanation for why they think so. Given the novelty of the question, the lack of caselaw recognizing such an interest means nothing. To undersigned's knowledge, no state has previously asserted such an interest—probably because no other state's electorate has been so bombarded by election messages funded by entities linked to foreign governments. Moreover, the effects of a widespread perception that foreign governments are manipulating elections outcomes are the same as a perception that politics are infected with corruption: disillusionment with and disengagement from the democratic process. *Cf. Buckley*, 424 U.S. at 27; *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 390 (2000).

Appellees further argue that Maine cannot assert such an interest due to alleged lack of record evidence "that there is foreign-government influence in Maine elections via minority interests in domestic corporations." Versant Br. at 33; *see* CMP Br. at 26. Here, again, Appellees demand a showing beyond what the law requires. The record

in this case shows extraordinary levels of spending in recent Maine elections by corporations with not just minority foreign-government ownership, but from companies like HQUS and EXMAX, which are 100% foreign-government owned.  A140.  These undisputed facts, combined with the historic margin of victory at the ballot box for the Act and the record evidence of public concern, provide an ample basis to conclude that Maine people do in fact perceive Maine's elections to be infected with foreign-government influence.  *See Shrink Mo. Gov't PAC*, 528 U.S. at 394 (relying upon a referendum vote as supporting a public perception of corruption, among other evidence); *Daggett v. Comm'n on Govtl. Ethics & Election Pracs.*, 205 F.3d 445, 458 (1st Cir. 2000) (same).

Moreover, Mainers' perception is reasonable, even with regard to entities with minority foreign-government blockholders.  State Defendants show in their principal brief and at Part C.1 below that minority blockholders can wield substantial power over corporate affairs.  Whether or not any particular foreign-government blockholder used that power to influence any particular Maine election is beside the point; the record shows that the potential is real.  Voters have no way of

knowing whether a foreign-government blockholder is, at any particular point in time, behaving as a "passive" investor, *see* CMP Br. at 18, or taking an active role in corporate affairs. The Act's restrictions on such entities—like its restrictions on other types of foreign-government controlled or influenced entities—thus directly further Maine's interest in reducing voters' perception of foreign influence.

## C. The district court erred by concluding that the Act is likely not narrowly tailored.

### 1. *The Act's 5% ownership threshold is narrowly tailored.*

State Defendants showed in their principal brief that the Act's 5% foreign-government ownership threshold is a narrowly tailored proxy for an investor's real-world ability to exercise influence or control over a corporation. State Br. at 44–53.

Appellees accuse the State Defendants of failing to offer sufficient record evidence supporting their argument that the threshold is narrowly tailored. Specifically, they assert that, to justify the threshold, the State was required to offer proof that specific foreign governments with 5% ownership stakes in Maine companies directed those companies' election spending decisions. Versant Br. at 36; CMP Br. at 27.

Without the benefit of discovery, State Defendants do not yet know, for example, the extent to which Qatar's sovereign wealth fund—a roughly 10% owner of CMP and its affiliates—may have explicitly directed or encouraged CMP's affiliates' massive election spending on the 2020 and 2021 powerline referenda. But particularly in the context of a facial challenge to the Act, State Defendants' likelihood of success does not rise or fall on whether any particular company with foreign-government blockholders received directives from those blockholders about election spending in a specific election. Rather, the narrow tailoring inquiry should turn on whether 5% is a reasonable estimate of the point at which a blockholder has enough of a stake in the corporation to influence its affairs.

And State Defendants have demonstrated that 5% is enough. They pointed to scholarly articles showing that activist investors with similar ownership stakes have had success in influencing corporate affairs. State Br. at 47. State Defendants have also cited news accounts of minority investors, including Qatar, CMP's indirect owner, seeking to influence corporate management on specific business decisions. *Id.* at 45–47. They have pointed out the Williams Act's use of

the same ownership threshold to trigger a public disclosure requirement

to alert investors of the possibility of a takeover bid.  *Id.* at 51.  Amici in

support of the State Defendants, including distinguished experts in

corporate and securities law,[2] only add to this weight of authority.  *See*

Amicus Brief of Corporate and Securities Law Experts.

Appellees' quibbles with this substantial authority are

unpersuasive.  That not all attempts by minority investors to influence

corporate affairs are successful or are made by foreign governments

specifically, *see* Versant Br. at 38; CMP Br. at 36, does not undermine

the point that corporate management must take seriously and

sometimes yield to such attempts when made by minority foreign-

government investors.  More specifically, the fact that Qatar was

reported to lack interest and experience in "run[ning] companies,"

Versant Br. at 38, in no way negates the fact that, as an 11% owner of a

company, it created a major obstacle to a merger pursued by corporate

management.  *See* State Br. at 47.  Foreign governments need not be

interested in running the companies in which they invest to demand or

---

[2]     Appellees objected to the filing of this amicus brief.  The Court allowed the
brief to be filed and indicated the panel would decide whether to consider it.

expect that corporate managers will yield to their wishes on issues of particular importance to them.

Appellees also fail to undermine the State Defendants' showing that corporate managers' duty of loyalty to shareholders also supports the 5% threshold. While some jurisdictions recognize that such duties "run to the corporation itself," Versant Br. at 39; *see* CMP Br. at 32, the law on this topic varies across jurisdictions. 3 *Fletcher Cyc. Corp.* § 848 (citing caselaw in many jurisdictions); *Lochhead v. Alacano*, 662 F. Supp. 230, 232 (D. Utah 1987) (recognizing "minority rule" that corporate managers owe duty of loyalty to individual shareholders). The Act does not regulate just companies domiciled in Maine or Alberta; it regulates any entity from any jurisdiction seeking to influence Maine elections.

Moreover, the comments to the Model Business Corporations Act concerning the duty of loyalty are less clear cut than Versant suggests. Versant Br. at 39–40. By stating that the "corporation" includes "the shareholder body," Versant Br. at 39, the comments leave open the possibility that the duty of loyalty could require action where the action would protect the interests of some shareholders without adversely

affecting the other shareholders or the corporation as a whole. Model Business Corporations Act Annotated, § 8.30, cmt. 1.

Appellees also fail to rebut State Defendants' showing that the district court erred in concluding that the 5% threshold was arbitrarily chosen. Add. at 35. Appellees do not dispute that other laws and proposed laws around the country predating the Act incorporate some version of the same 5% threshold. That these laws have not been challenged in court, Versant Br. at 40 n.14, is beside the point that the Act's drafters did not pull the percentage out of thin air. Similarly, the fact that the Williams Act—which also uses a 5% ownership threshold— is concerned with takeover threats and not foreign-government influence, Versant Br. at 40; CMP Br. at 33, does not make the Act's likely borrowing of that same threshold arbitrary. An investor with enough ownership to pose a takeover threat presumably also has substantial leverage over that corporation's management.

The observation in *Citizens United* that the federal law it struck down was overbroad because it was not "limited to corporations or associations that were created in foreign countries or funded *predominately* by foreign shareholders" does not compel a different

result.  558 U.S. at 362 (emphasis added).  Contrary to CMP's assertion, CMP Br. at 19, that observation is not part of the holding or binding precedent; the Supreme Court was considering a law that made no distinction at all between foreign and domestic entities and thus had no occasion to consider the nuances of what might make an entity sufficiently foreign influenced to permit more stringent regulation.

Similarly, the district court decision from another circuit relied on by Appellees, *Minnesota Chamber of Commerce v. Choi*, 707 F. Supp. 3d 846 (D. Minn. 2023), *see* CMP Br. at 17; Versant Br. at 41, should be accorded no weight.  Minnesota, unlike Maine, does not appear to have been responding to an acute problem of foreign influence in its own recent elections.  *See Choi*, 707 F. Supp. 3d at 861–62 (discussing Minnesota's evidentiary showing, which involved foreign influence in other states).

Moreover, the law enjoined in *Choi* is far more sweeping than the Act's modest restrictions.  That law bans election spending by corporations in which a single foreign national owns as little as 1% of the corporation, or foreign nationals collectively own as little as 5% of the corporation.  *Id*. at 854–55.  Given that such a law would bar nearly

all publicly traded corporations from independent election expenditures, *see id*. at 863, it is not surprising that the district court could not reconcile it with *Citizens United*, which held that corporations generally have a right to make such expenditures. 558 U.S. at 356. The Act, in contrast, targets both a more disturbing problem—foreign *government* influence—and does so in a more tailored way than the Minnesota law. Indeed, Appellees have been able to point to only one other corporation beyond themselves with a presence in Maine, *see* Versant Br. at 37, that would appear to be covered by the Act.

CMP's argument that *Bluman* is inapposite because CMP is a domestic U.S. corporation with a "substantial stake in the conduct of domestic affairs," CMP Br. at 21, misses the point. Whether or not that is true of CMP, it is certainly not true of Qatar, which owns over 10% of CMP through its sovereign wealth fund and thereby wields substantial influence over CMP's affairs. It is Maine's compelling interest in preventing foreign governments like Qatar from influencing or appearing to influence its elections that justifies restricting election spending that might be otherwise protected if engaged in by companies with less substantial foreign-government ownership.

CMP's argument that the Act is also underinclusive because it fails to ban lobbying by foreign government–influenced entities ("FGIEs") should be rejected. CMP Br. at 37. *Bluman* rejected a similar argument that FECA's ban on foreign-national election spending was underinclusive because it failed to include lawful permanent residents. Citing *Buckley*, *Bluman* notes that "Congress may proceed piecemeal in an area such as this involving distinctions between citizens and aliens." 800 F. Supp. 2d at 291. *Bluman*'s holding in a First Amendment context refutes CMP's suggestion that the right of the Legislature to proceed piecemeal "has the most force" in an equal protection challenge. CMP Br. at 38.

In any event, there is no record evidence that Maine has a problem with foreign-government influence among its lobbyists—and CMP has not identified any such problem. That the Act limits itself to addressing the specific problem Maine has experienced makes it more narrowly tailored, not less.

Finally, no less restrictive means is available to regulate the problem addressed by the Act. *See* CMP Br. at 38. A law banning just "foreign government spending," *id.*, would have been inadequate to

address the problem of U.S. subsidiaries of foreign-government entities acting to further the interests of their foreign-government patrons. And a law regulating only those entities in which foreign governments have controlling stakes would address neither the risk that minority foreign-government blockholders will use their considerable influence to demand certain types of election spending nor the undermining of voter confidence caused by the appearance of such influence.

### 2. *The ban on foreign-government participation in corporate decision-making is narrowly tailored.*

State Defendants demonstrated in their principal brief that the Act's ban on a foreign government or foreign government–owned entity ("FGOE") directing, dictating, controlling, or directly or indirectly participating in corporate election spending decisions was narrowly tailored. State Br. at 54–56. State Defendants pointed out that the Act mirrors longstanding prohibitions in federal regulations implementing FECA and that the Commission has adopted implementing rules that would track the federal government's interpretation of that language in important respects. *Id.* at 55. Those Commission rules, which have now been published by the Maine Secretary of State, *see* 94-270 C.M.R.

ch. 1, § 16,[3] have the full force of law and will bind the Maine Attorney General and Commission if the injunction is lifted. 5 M.R.S.A. § 8002(9) (Westlaw August 31, 2024) (defining a "rule" to be "judicially enforceable").

Versant does not dispute the constitutionality of the relevant provision of the Act as interpreted by the new rules. Rather, it argues that this Court must ignore those rules and consider only the draft rules reviewed by the district court, even though that draft never became law. Versant Br. at 42–45. In other words, Versant would have the State Defendants defend the constitutionality of what is now a purely academic interpretation of the Act that conflicts with the Commission's binding rules.

The Court should not require such an empty exercise. Versant relies on caselaw holding that appellate review is generally confined to the factual record before the district court. *See* Versant Br. at 44. But those cases involved attempts by parties to introduce or rely on adjudicative facts that were not part of the record below. *See Lorelei*

---

[3] *Available at* https://www.maine.gov/sos/cec/rules/90/94/270/270c001-2024-160%20(AMD).docx.

*Corp. v. Cnty. of Guadalupe*, 940 F.2d 717, 721 n.4 (1st Cir. 1991);

*Kemlon Prods. & Dev. Co. v. United States*, 646 F.2d 223, 224 (5th Cir.

1981); *United States v. Muriel-Cruz*, 412 F.3d 9, 12 (1st Cir. 2005).

That is not what State Defendants are doing here.  State

Defendants are asking the Court to consider a purely legal

development: the final adoption of a judicially enforceable rule that

clarifies the State's interpretation of the Act in a manner that will bind

the Commission and the Attorney General in any future enforcement

action.  This development is no different than a legislative amendment

to the challenged statute or the issuance of an authoritative

interpretation of the statute by a state court.

Because the adoption of the final rule was a change (or at least

clarification) in applicable law, the rule against enlarging the factual

record on appeal does not apply.  As this Court has recognized, the

entry of a preliminary injunction must be reviewed "under the law as it

presently is, not as it once was." *Com. of Mass. v. Andrus*, 594 F.2d 872,

883 (1st Cir. 1979).  Similarly, the Third Circuit, in considering changes

to the law occurring after a district court's entry of a preliminary

injunction, has recognized the "controlling principle" that "if subsequent

to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied." *Black United Fund of New Jersey, Inc. v. Kean*, 763 F.2d 156, 160 (3d Cir. 1985) (quoting *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110 (1801)). The Court should follow those authorities and consider the binding interpretation of the Act contained in the published rules in determining its likely constitutionality. Because those rules make clear that a corporation must consent or acquiesce to foreign-government influence, the Act cannot be construed in the manner that the district court held to be likely unconstitutional.

### D. Even if the Act likely has some unconstitutional applications, it is not facially invalid.

A law is facially unconstitutional for overbreadth only if the overbreadth is "*substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292. State Defendants have shown that, even if the Court rules that the 5% ownership threshold is too low, the myriad legitimate applications of the Act—which includes a disclaimer provision that the

district court did not opine on at all—far outstrip any unconstitutional applications resulting from the 5% threshold.  State Br. 57–61.

Versant nevertheless contends that the Act's application to companies in which foreign governments own a "minority stake," combined with the district court's ruling on the "direct and indirect participation" ban and express preemption, is by itself enough to support a facial challenge.  Versant Br. at 54.  CMP makes a similar argument.  CMP Br. at 45–46.  The Court should reject these arguments.  Contrary to CMP's suggestion that the Act is unconstitutional "as to a substantial number of U.S. companies," CMP Br. at 46, Appellees have managed to identify just two companies, CMP and Unum Group, that have a presence in Maine and are covered by the Act due to a minority stake by a foreign government.  Versant Br. at 37.  That is hardly a "substantial number" of potentially unconstitutional applications (under the district court's reasoning).  Add. 38.  Indeed, it is the same number of corporate families that the record identifies as having engaged in substantial election spending in Maine despite being 100% beneficially owned by foreign governments.  A52–53, 136 (Versant/ENMAX); A173 (HQUS).

Nor do the two other findings of unconstitutional applications of the Act by the district court support facial invalidation. The district court's express preemption ruling applies only "insofar as" that the Act applies to federal elections, Add. 14, which the State Defendants have shown is not at all. *See* State Br. at 62–67 & Part II, below. And the State Defendants have further shown that the Commission's rules implementing the ban on foreign-government participation in corporate election spending decisions moot the district court's conclusion on that prong of the law. *See* State Br. at 54–56.

## II. The Act is not preempted by federal law

Versant alone defends the district court's erroneous holding that the Act is expressly preempted under FECA "insofar as the Act covers foreign spending in elections for federal office." Add. at 14. As State Defendants showed in their principal brief, the framers of the Act placed it within a larger statutory framework that regulates only state and local elections. State Br. at 62–67. Read in its statutory context, the Act cannot be interpreted to apply to federal candidates.

Versant counters that the Act's application to the "election of a candidate" in § 1064(2) must be interpreted, in the alleged absence of

statutory definitions, to include election of federal candidates.  Versant Br. at 47–48.  But Versant is wrong that "election" is not a statutorily defined term.  That definition, which expressly applies to the Act "unless context indicates otherwise," is limited to "any primary, general or special election for *state or county office or municipal office* [in certain municipalities] and any referendum [including certain municipal referendums]."  21-A M.R.S.A. § 1001(2) (Westlaw Aug. 24, 2024) (emphasis added).[4]  Federal elections are not included.  By starting with an incorrect premise, Versant disproves its own argument.

Versant's claim that the Act applies to federal candidates is even more implausible given the Commission's express lack of jurisdiction "over financial activities to influence the nomination or election of candidates for federal office."  21-A M.R.S.A. § 1011 (Westlaw Aug. 31, 2024).  Versant counters that this removal of jurisdiction only applies to

---

[4]  Title 21-A also defines "candidate."  But that definition is less illuminating, as it appears at the beginning of Title 21-A and defines "candidate" for purposes of both Title 21-A's election-administration provisions (which apply to federal candidates) as well as its campaign-finance provisions (which do not).  *See* 21-A M.R.S.A. § 1(5).  It thus conjoins two somewhat incongruous definitions: an election-administration definition based on whether a candidate has filed for ballot access and a campaign-finance definition based on whether the candidate has accepted contributions or made expenditures regulated by chapter 13 of Title 21-A.

provisions contained in subchapter 2 of chapter 13 of Title 21-A—which governs contributions to and expenditures by candidates—and not subchapter 4—which contains the Act and otherwise governs the activities of political action committees (PACs) and their referenda-influencing equivalent, ballot question committees (BQCs).  Versant Br. at 49; *see* 21-A M.R.S.A. § 1051 (Westlaw Aug. 24, 2024).  But while the restriction on jurisdiction was placed near some provisions that apply only to subchapter 2, the text of the jurisdiction-limiting provision itself contains no similar limitation.  To the contrary, the jurisdictional limitation is sweeping, covering all manner of "financial activities" to influence elections, which would plainly include the PAC and BQC activities regulated by subchapter 4.

Versant also takes issue with State Defendants' point that the Act's "applicability" language in subsection 11—which applies the Act to "all persons," followed by a list of examples that are limited to participants in state and local elections—must be interpreted consistently with the statutory framework's overall exclusion of federal elections from the scope of regulation.  Versant Br. at 48–53.

Versant may be correct that "all persons" could theoretically encompass anyone, regardless of whether they are regulated by the remainder of chapter 13. *See id.* at 51. But that does not undermine the significance of the list of examples that follows that phrase. To understand why, it is necessary to consider the function of subsection 11 in the statutory framework.

Subsection 11's opening phrase states that it applies "[n]otwithstanding section 1051, . . . ." 21-A M.R.S.A. § 1064(11). Section 1051 in turn provides that "this subchapter"—meaning subchapter 4 of chapter 13, which includes the Act—applies only to the activities of PACs and BQCs. 21-A M.R.S.A. § 1051. Since the Act is intended to apply to activities beyond those of PACs or BQCs, subsection 11 ensures there is no ambiguity on this point. It confirms, for example, that a state legislative candidate who knowingly solicits a contribution from a FGIE in violation of § 1064(3) could not raise as defense that they are not a PAC or BQC, and therefore could not have violated the Act in light of § 1051.

Once subsection 11's function is understood, the correct interpretation of "all persons" becomes clear. The use of "all persons" is

not an expansion of the scope of the Act's substantive provisions beyond state and local elections. Rather, it clarifies that no one is exempt from those substantive provisions by virtue of not being a PAC or BQC.

But although anyone can be a potential violator of the Act, it does not follow that FGIE efforts to influence a federal—as opposed to a state or local—election violate the substance of the Act. That question ultimately turns on the meaning of the Act's substantive provisions, primarily subsection 2.

The list of examples in subsection 11 is relevant to the interpretation of subsection 2 because it reflects the kinds of "persons" that the drafters thought most likely to be involved in violations. That all the examples involve persons involved in campaigns for state and local elections is thus no coincidence; rather, it further confirms that the drafters understood section 2 to target those elections only.

A correct understanding of subsection 11's function in the statutory framework also refutes any argument that it operates as the sort of express expansion of the Commission's jurisdiction that would negate the limitation in 21-A M.R.S.A. § 1011. *See* Versant Br. at 52. Because subsection 11's function is to clarify that "persons" other than

PACs and BQCs can violate the Act, and not to define what types of elections are regulated by the Act, subsection 11 cannot be understood to disturb § 1011's limit on the Commission's jurisdiction to state and local elections.

## III. The district court's injunction is overbroad.

State Defendants showed in their principal brief that, even if the district court were correct that certain provisions of the Act are facially unconstitutional, its preliminary injunction of enforcement of the entire Act was overbroad. State Br. at 68–70.

Contrary to Versant's suggestion that no authority supports conducting a severability analysis at the preliminary injunction stage, Versant Br. at 56, this Court has recognized that "[i]njunctions must be tailored to the specific harm to be prevented." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir. 2000); *see also Pharm. Care Mgmt. Ass'n v. Maine Att'y Gen.*, 324 F. Supp. 2d 71, 73 (D. Me. 2004) ("a court's preliminary injunction preventing enforcement of a state statute should not go beyond the scope of the reasoning that found fault with the statute"); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("the scope of injunctive relief is dictated by the extent of the violation

established"); *Georgia v. President of the United States*, 46 F.4th 1283, 1292 (11th Cir. 2022) ("It is 'well-settled that a district court abuses its discretion when it grants relief that is improperly or even unnecessarily broad.'" (quoting *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 870 (11th Cir. 2013)).

Under this well-settled principle, consideration of severability was not "incongruous with the procedural posture of the case," Versant Br. at 56, but rather a necessary step in determining the scope of an injunction against a law that, by the district court's own holding, contained at least one important provision that is likely constitutional, *see* Add. at 33, and another, the disclosure provision, that the court did not address at all. If the Act, like most Maine statutes, is severable, a blanket injunction of both constitutional and unconstitutional provisions of the Act was an abuse of discretion, as it was not "tailored" to the "specific harm" of violating plaintiffs' likely constitutional rights. *Ross-Simons*, 217 F.3d at 14. The court's failure to even consider severability was therefore also an abuse of discretion.

Contrary to Versant's argument, Versant Br. at 57, the district court had adequate time to consider severability. Briefing on

severability was completed a month before the court issued its decision. A011. And, if anything, given the default rule in Maine that statutes are severable, *see* 1 M.R.S.A. § 71(8) (Westlaw Aug. 31, 2024), to the extent full consideration of severability was impossible the court should have erred on the side of assuming severability rather than the opposite.

CMP and the Electors do not try to defend the district court's failure to conduct a severability analysis but merely argue that the Act is inseverable under Maine law. CMP Br. at 47; Electors Br. at 53. Both briefs, however, seem to assume that the only way to sever the Act would be to treat subsection 2 (and, for CMP, subsection 6 as well) as invalid *in toto* and then look at whether other provisions of the Act could survive. But they use the wrong starting point. The district court should have considered whether the definition of a FGIE, which contains three distinct, independent prongs, *see* 21-A M.R.S.A. § 1064(1)(E), could be severed, thereby limiting the scope of subsection 2 and subsection 6 as the court might find necessary.

Maine law also allows the Court to sever "application" of the ownership-threshold prong of the FGIE definition to only companies

with at least 20% or 50% foreign-government ownership if needed.  *See* 1 M.R.S.A. § 71(8).  But even if the Court were unwilling to adjust the numerical threshold itself, severing out the entire percentage-ownership prong of the FGIE definition from the other two prongs would be a routine application of the severability doctrine that would still leave the Act with important remaining applications.  And there can be no serious doubt that the Mainers who overwhelmingly approved the Act would prefer a narrowed version of the Act to nothing at all.

## IV. The Court should reject Appellees' alternative arguments for affirmance.

### A. The Act's disclaimer requirements do not violate the First Amendment.

CMP argues that subsection 6 of the Act is likely unconstitutional, though the district court did not address the issue.  CMP Br. at 41. That provision requires "public communications" funded by FGIEs that influence the public or public officials regarding "the formulation, adoption or amendment of any state or local government policy or regarding the political or public interest of or government relations with a foreign country or a foreign political party" to include a conspicuous disclaimer identifying the sponsor as a FGIE.  21-A M.R.S.A. § 1064(6).

"Public communication" is defined in the Act to refer to various types of advertising. *Id*. § 1064(1)(H).

CMP first argues that strict scrutiny applies to the disclaimer provision. CMP Br. at 42. This assertion directly contravenes authoritative caselaw, which recognizes on-ad disclaimer requirements as a "less restrictive alternative" to prohibiting speech that are subject to the more deferential "exacting scrutiny" standard. *Citizens United*, 558 U.S. at 366–68; *Gaspee Project v. Mederos*, 13 F.4th 79, 85 (1st Cir. 2021).

CMP attempts to rely for its contrary assertion on *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018), CMP Br. at 42, in which the Supreme Court applied strict scrutiny to a law requiring organizations opposed to abortion to provide clients with a "government drafted script" with information on how to obtain a state-sponsored abortion. *Id*. at 766. But the Act's requirement that FGIEs include disclaimers in their advertisements disclosing— accurately—that they are partly owned by a foreign-government or FGOE (or otherwise influenced by them) is nothing like a law requiring an organization to speak in a manner antithetical to its deeply held

beliefs.  Indeed, it is little different than the requirement upheld in *Gaspee* that the speaker disclose the identity of its largest donors.  In either case, voters could conceivably draw false conclusions about the level of influence held by the investor/donor.  *See Gaspee Project*, 13 F.4th at 92 (rejecting argument that on-ad disclosure of donors might "mislead a viewer").

CMP is also mistaken that the required disclaimer could be "misleading or even false."  CMP Br. at 42.  The disclaimer requires the FGIE to accurately state that it falls within the statutory definition of an FGIE, nothing more.  And, even if a viewer might read more into it, they would not be mistaken to do so; State Defendants have demonstrated that a corporation with a substantial foreign-government blockholder is necessarily subject to that investor's influence.  *See* Part I.C.1 above.  There is no requirement that the FGIE make a false statement or otherwise misled recipients.

Moreover, the Supreme Court has made clear that statutory classifications do not violate the First Amendment merely because they could be interpreted to have negative connotations.  In *Meese v. Keene*, it held that the government's classification of certain types of materials

as "political propaganda" did not violate the First Amendment by placing those materials "beyond the pale of legitimate discourse." 481 U.S. 465, 479 (1987). Among other things, the Court cited in support of its decision the right of foreign content creators to "go beyond the disclosures required by statute and add any further information they think germane," *id*. at 481, as well as the "respect we normally owe to the Legislature's power to define the terms that it uses in legislation," *id*. at 484.

Although subsection 6 of the Act differs slightly from the law in *Meese*, in that the required disclaimer includes the objected-to term, its reasoning it still instructive. As in *Meese*, the FGIE speaker is free to contextualize the disclaimer with additional speech, including even in the disclaimer itself. Indeed, the Commission's rules expressly allow the disclaimer to indicate that "foreign government–influenced entity" is a defined term in Maine law. 94-270 C.M.R. ch. 1, § 16(7)(B). And *Meese*'s observation that "it is axiomatic that the statutory definition of the term excludes unstated meanings of that term," 481 U.S. at 484, applies equally here. As with the statute in *Meese*, subsection 6's

disclaimer communicates no more to the public than that the speaker meets a statutory definition.

CMP also argues that the state's interest in an informed citizenry does not extend beyond electoral contexts. CMP Br. at 44. But this Court has discussed the public's informational interests in broader terms. In *National Organization for Marriage v. McKee*, in the course of affirming a Maine campaign-finance law, it explained that the public's informational interest "is not limited to informing the choice between candidates for political office":

> [T]here is an equally compelling interest in identifying the speakers behind **politically oriented messages**. In an age characterized by the rapid multiplication of media outlets and the rise of internet reporting, the "marketplace of ideas" has become flooded with a profusion of information and political messages. Citizens rely ever more on a message's source as a proxy for reliability and a barometer of political spin. Disclosing the identity and constituency of a speaker engaged in political speech thus "enables the electorate to make informed decisions and give proper weight to different speakers and messages."

649 F.3d 34, 57 (1st Cir. 2011) (emphasis added) (quoting *Citizens United*, 558 U.S. at 371), *abrogation on other grounds recognized by*

*Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 51 (1st Cir. 2024);

*see also Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) ("informed

public opinion is the most potent of all restraints upon

misgovernment").

Advertising seeking to influence Mainers to contact their

legislators, attend public hearings, or simply to form an opinion

favorable to the FGIE on a policy matter can only be characterized as

"politically oriented messages," even if the advertising is not connected

with a specific election.  Requiring FGIEs engaged in such public

messaging to identify themselves and their nature is well within

Maine's important interest in arming its citizens with the information

they need to evaluate such messages.  Indeed, as amicus Protect Maine

Elections has pointed out, it is precisely the same governmental interest

that underlies the federal Foreign Agent Registration Act, which

similarly requires disclaimers in non-electoral contexts.  PME Br. at 27.

Finally, subsection 6 is not overinclusive because it applies to

companies with foreign-government "passive investors."  CMP Br. at 44.

As State Defendants have shown, substantial ownership alone is

sufficient to create influence. And, in any event, "passive investor" is not an immutable status but a choice that the investor can reconsider at any time. Maine people have a strong informational interest in knowing whether the political advertisements that they see are subject to such influence.

**B.    The Electors' alternative First Amendment arguments fail.**

The Electors, who challenge only the constitutionality of the Act's application to referenda, raise several purported alternative First Amendment bases for affirmance not considered in the district court's decision. All lack merit.

1.    *The Electors misconstrue the scope of the Act.*

As a preliminary matter, the Electors' arguments are premised on fundamental misreadings of the Act's scope. They assert, for example, that the Act criminalizes lobbying activities intended to influence members of the Maine Legislature while they are considering bills that could trigger referenda, including bills concerning bonds, constitutional amendments, and citizens' initiatives. Electors Br. at 20 & 36.

The Act does no such thing. Although § 1064(2) regulates "initiation" of referenda, chapter 13 defines "initiate" as follows:

"'Initiate' includes the collection of signatures and related activities to qualify a state or local initiative or referendum for the ballot." 21-A M.R.S.A. § 1052(4-B). Lobbying legislators on a constitutional amendment or a bond issue is not "the collection of signatures," "related activities," or anything similar to those categories. *Id*.

Moreover, the Act's regulation of the "approval of a referendum" in the context of a citizens' initiative, 21-A M.R.S.A. § 1064(2), plainly refers to efforts to influence the *popular vote* on that initiative, not a legislative enactment of the initiative obviating the need for a popular vote. "Approv[al]" is the Maine Constitution's term for a successful popular vote on an initiative, not a successful legislative enactment. *See* Me. Const. art. IV, pt. 3, § 19. And the process of legislative enactment of a bill is not a "referendum."

Finally, the Electors suggest that the Act's restrictions are so broad as to criminalize actions having little to do with spending money to influence elections, such as the letter that Maine legislators sent to Hydro-Québec demanding that it cease interfering in Maine elections. *See* A175. The Electors' apparent theory is that the legislators "knowingly solicit[ed]" a "contribution or donation" from the letter's

FGIE recipients by demanding a response. Electors Br. at 44; *see* 21-A M.R.S.A. § 1064(3). This reading of the Act is absurd. A responsive letter would not have been a "contribution or donation." Those terms require, at a minimum, a "gift, subscription, loan, advance or deposit of money or anything of value." 21-A M.R.S.A. § 1052(3)(A); 94-270 C.M.R. ch. 1, § 16(1)(D). A letter does not satisfy those definitions.

In assessing the plausibility of the Electors' arguments, the Court should bear in mind that they are premised on a significant overreading of the Act's scope.

2. *The Act does not violate the right to petition.*

The Electors try to reframe the First Amendment analysis around the right to petition the government, rather than the rights of free speech and free association that undergird the Supreme Court's analysis of campaign-finance regulations, including those targeting referenda elections. *Bellotti*, 435 U.S. at 777 (analyzing referendum law as a speech restriction); *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley, Cal.*, 454 U.S. 290, 295 (1981) (analyzing referendum law as a restriction on association).

As an initial matter, the Electors' argument stretches the right to petition beyond recognition. While Maine voters may in a sense act as the "government" when they vote on referenda, the Petition Clause protects the right of the people to make petitions, not the right of the government to receive petitions. *See Lee v. Driscoll*, 871 F.3d 581, 586 n.2 (8th Cir. 2017) ("an elected official has no First Amendment petition or free-speech right to participate in non-public government meetings in her official capacity"). It follows that electors acquire no additional rights beyond what they already possess as citizens merely because they are in some sense acting as the government in a referendum election. Nor do the Electors cite any authority for the proposition that an FGIE is somehow petitioning the government for a redress of grievances when it contributes to a BQC or PAC.

In any event, the Electors seem to ultimately agree that the well-worn constitutional standards applicable to other campaign-finance laws should apply here. Electors Br. at 37–42; *see Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011) (holding that same legal test applies to First Amendment claims by public employees whether brought under the Speech or Petition Clause). Because the Act furthers a compelling

governmental interest in a narrowly tailored manner, *see* Part I above, it is just as consistent with the right to petition as it is with the rights to free speech and association.

3. *The Act does not violate Electors' right to receive information.*

The Electors also try to add a new gloss to the First Amendment claims by contending that the Act violates their right to receive information from FGIEs. Electors Br. at 43. Like the right to petition argument, this contention adds nothing to the analysis.

The First Amendment protects a "reciprocal right" to receive information. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976). But that right is always implicated when the government regulates speech, including in those cases where the speech regulation is found to satisfy the applicable level of scrutiny. Under *Williams-Yulee*, for example, the government can properly deprive potential donors to judicial candidates of the ability to hear messages from those candidates as to why they deserve the donor's support. 575 U.S. at 454.

Indeed, the right to receive information is "entirely derivative" of "whatever rights that [the speaker] may have to engage in the

prohibited speech and political activity." *Spargo v. N.Y. State Comm'n on Jud. Conduct*, 351 F.3d 65, 83–84 (2d Cir. 2003); *see also United States v. Any & All Radio Station Transmission Equip.*, 204 F.3d 658, 666 (6th Cir. 2000) ("nobody has a First Amendment right to hear radio broadcasts from a station that does not have a First Amendment right to broadcast them"); *NAACP, Los Angeles Branch v. Jones*, 131 F.3d 1317, 1322 (9th Cir. 1997) ("voter plaintiffs, as recipients of campaign speech, have no greater rights than the candidates to have candidates publish statements in the Sample ballot"); *Frissell v. Rizzo*, 597 F.2d 840, 848 (3d Cir. 1979) ("the right to hear flows from and depends upon the right to speak"). If the Act's restrictions are constitutional as applied to FGIEs, they are constitutional as applied to the small minority of Mainers who voted to hear such speech.

> 4.      *The Act does not violate freedom of assembly.*

The Electors make a cursory argument that the Act violates their freedom of assembly. *Id.* at 46. To the extent this argument is not waived due to inadequate briefing, *see United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990), Electors do not explain how the Act impairs this right. The lone authority that Electors cite considered government

interference in a "mass meeting" of potential union members. *Thomas v. Collins*, 323 U.S. 516, 522 (1945). The Act regulates election spending, not holding meetings. In any event, even if the right to assemble were implicated by the Act, it would not change the constitutional analysis.

5. *The Act does not violate freedom of the press.*

In another argument waived due to inadequate briefing, Electors argue that the Act interferes with their right to receive information from the media, and thus the freedom of the press. Because the right to hear media speech is generally contingent upon the media's right to broadcast it, *Any & All Radio Station Transmission Equip.*, 204 F.3d at 666, this claim too adds nothing to the constitutional analysis.

**C.    The Act is not unconstitutionally vague.**

The Electors, CMP, and Appellees Maine Press Association and Maine Association of Broadcasters ("Media Plaintiffs") all argue that the Act is unconstitutionally vague, although, tellingly, their arguments as to *which* provisions are vague have no overlap. CMP Br. at 39–41; Media Br. 2–4; Electors Br. 47–51. A statute is unconstitutionally vague only when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or

45

encourages seriously discriminatory enforcement." *Williams*, 553 U.S.

at 304. And "perfect clarity and precise guidance have never been

required even of regulations that restrict expressive activity." *Id.*

(quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).

CMP claims that, despite the Act's specification that "a" foreign

government or FGOE must own more than 5% of an entity for it to meet

the definition of a FGIE, 21-A M.R.S.A. § 1064(1)(E)(2), the Act is

ambiguous as to whether the ownership threshold is also triggered

when multiple foreign governments collectively own more than 5% of

the company. CMP Br. at 40. CMP relies on a rule of construction

allowing singular words in Maine statutes to be read as plural.

1 M.R.S.A. § 71(9). But that rule does not apply if "such construction is

inconsistent with the plain meaning." *Id.* § 71. Reading "a foreign

government" in § 1064(E)(2) to mean "one or more foreign governments"

is inconsistent with the statute's plain meaning.

Moreover, as CMP acknowledges, CMP Br. at 40, the

Commission's rules expressly adopt the plain-meaning interpretation

described above. 94-270 C.M.R. ch. 1, § 16(2). And CMP's assertion

that the Commission's interpretation renders the statute

underinclusive (CMP Br. at 40) is mistaken; five foreign governments with disparate interests each holding 1% of a corporation do not wield the same level of influence as a single foreign government with a 5% stake.

CMP also claims that the phrase "direct and indirect participation" is vague. CMP Br. at 40. But these terms have been extensively defined in Commission rules, eliminating any possible vagueness concerns. 94-270 C.M.R. ch. 1, § 16(1)(C), (H) & (L). Most notably, "unsolicited" communications by foreign-government actors are categorically excluded from the definition of "participate," clarifying that corporate entities have complete control over whether they qualify as FGIEs under § 1064(1)(E)(2)(b). *See id*. § 16(1)(L)(2). This clarification resolves CMP's question about whether any stray "expression of opinion" counts as "deliberation." *See* CMP Br. at 41. Unless the foreign-government or FGOE input was solicited by the U.S. company, there is no danger that it could be covered by the Act.

The Electors claim that the words "association," "organization," and "other entity" render the Act unconstitutionally vague. Electors Br. at 48. But the lack of a statutory definition does not render these terms

vague; laypersons can readily understand that the full list of entity types covered by the Act—which include the allegedly vague terms—is collectively meant to sweep broadly to capture any type of legal entity whose expenditures are subject to Maine law. *See* 21-A M.R.S.A. § 1064(2). What is more, these terms are used—and often specifically defined—throughout the Maine Revised Statutes. *See, e.g.*, 13 M.R.S.A. § 1501(1) (Westlaw Aug. 4, 2024); 5 M.R.S.A. § 1782(4) (Westlaw Aug. 4, 2024); 24-A M.R.S.A. § 2381-C(1) (Westlaw Aug. 4, 2024); 10 M.R.S.A. § 963-A(24) (Westlaw Aug. 4, 2024). Under the Electors' theory, any Maine statute that uses these terms should be struck down as unconstitutional, an absurd result.

Electors also claim the term "influence" is unconstitutionally vague, Electors Br. at 49, even though it is defined in statute, 21-A M.R.S.A. § 1052(4-A), and this Court has previously held that the same term, as interpreted by the Commission in guidance materials, is not unconstitutionally vague. *Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34, 44 (1st Cir. 2012). This claim fails as well.

Electors further assert that the Act is vague because an elector "has no possible means of looking within a business entity and

determining the ownership makeup of that entity." Electors Br. at 50. But if this is so, Electors are at no risk of violating the Act given the Act's scienter requirements. *See* 21-A M.R.S.A. § 1064(3) & (4). As the Supreme Court has observed, "scienter requirements alleviate vagueness concerns." *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007); *see also Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("[The Supreme] Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea."). If Electors cannot know whether an entity is a FGIE, then they cannot violate the statute.

The Media Plaintiffs point to different allegedly vague terms: the "due diligence policies, procedures and controls" that the Act requires media companies to implement to avoid publishing illegal advertisements under the Act. Media Br. at 3. Media Plaintiffs complain that they would need to "hire investigators and attorneys" to determine which advertisers are FGIEs. *Id.*

The Commission's rules dispose of these objections. Those rules contain a "safe harbor" provision specifying a set of policy provisions that will be deemed to satisfy the requirement. That provision makes

clear that no investigators and attorneys are required.  Rather,

publishers can simply require advertisers to check a box on a form

certifying that they are not FGIEs, subject only to the caveat that

publishers cannot rely on a self-certification if they have actual

knowledge that it is false.  94-270 C.M.R. ch. 1, § 16(8).  By providing

media companies with a template for a compliant due-diligence policy,

the safe harbor provision in the Commission's rules eliminates any

conceivable vagueness concern.

### D.    The Act does not unconstitutionally burden news outlets.

The Media Plaintiffs argue that subsection 7 of the Act, regulating

media outlets, imposes an unconstitutional burden on news outlets.

Media Br. at 4–10.

As with the Media Plaintiffs' vagueness arguments, the

Commission's rules make these arguments untenable.  The Media

Plaintiffs complain about the "extraordinary amount of work" that

would be involved in the "extensive research, investigation, and legal

training" necessary to determine which advertisers were FGIEs.  Media

Br. at 4–5.  But the Commission's rules on this subject conclusively

establish that a reasonably drawn policy need not require the sorts of

efforts posited by the Media Plaintiffs. Under those rules, as long as news outlets' policies require them to act when they have actual knowledge that an advertiser is violating the Act, those policies may otherwise rely on self-certification by advertisers that they are not FGIEs. 94-270 C.M.R. ch. 1, § 16(8). The Media Plaintiffs concede that such a system is "less burdensome" (though they still claim to have unspecified "First Amendment concerns" with it). Media Br. at 9 n.2.

Finally, the Media Plaintiffs' argument that subsection 7 is not the least restrictive means of achieving the Act's goals, Media Br. at 9, should be rejected. The requirement that news outlets have a due-diligence policy requiring advertisers to self-certify that they are not FGIEs serves Maine's compelling governmental interest in preventing foreign-government influence in two ways: by (1) dissuading FGIEs from violating the Act in the first instance; and (2) demonstrating criminal intent by the FGIE if it falsely self-certifies in the course of violating the Act. *See* 21-A M.R.S.A. § 1064(9).

### E. The Act does not violate the dormant foreign commerce clause.

Versant argues that the Act violates the dormant foreign commerce clause by allegedly interfering with the federal government's conduct of foreign affairs. Versant Br. at 58.

Versant's theory is solely grounded in the rationale expressed by this Court in *National Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999), *aff'd*, 530 U.S. 363 (2000), that "a state law must not interfere with the 'federal government's ability to 'speak with one voice' in foreign affairs.'" Versant Br. at 59 (quoting *Natsios*, 181 F.3d at 68).

The Massachusetts law at issue in *Natsios* barred the Massachusetts government's ability "to purchase goods or services from individuals or companies that engage in business with Burma." *Natsios*, 181 F.3d at 45. The law's sponsor identified the engagement in foreign policy as a primary purpose of his bill and that the "'identifiable goal' of the law was 'free democratic elections in Burma.'" *Id*. at 46. Meanwhile, the United States had adopted its own set of policies aimed at the Burmese government that, while having similar goals, were different in substance and scope. *Id*. at 47–48.

This Court held that the state law "imped[ed] the federal government's ability to 'speak with one voice' in foreign affairs, because such state action harms 'federal uniformity in an area where federal uniformity is essential.'" *Id*. at 68 (quoting *Japan Line, Ltd. v. L.A. Cty.*, 441 U.S. 434, 448-49 (1979)). In other words, it was inappropriate for Massachusetts to enact a state law that attempted to exert changes in a foreign nation's domestic affairs when the United States had already attempted to do so in a different, even if aligned, manner.

Versant's "speaking with one voice on foreign affairs" argument fails as a threshold matter. The Act targets activities solely within the borders of Maine—state and local elections. In no way is Maine attempting to inject itself into foreign affairs by shaping domestic policies within the borders of a foreign nation, as intended by the Massachusetts law. Indeed, the Act does the inverse: it *defends* Maine from foreign governments' efforts to shape Maine's domestic policies.

But even assuming Versant's novel theory does not fail at this threshold level, its specific arguments are also unsound.

*First*, Versant suggests that the Act conflicts with a United States policy of welcoming foreign-government influence in state and local

elections, except where prohibited by FECA. But no such policy exists. Versant's sole evidence for such a policy is that Congress has so far been unable enact anything as robust as the Act to prevent such influence. Versant Br. at 60. Mere absence of a prohibition is not evidence of an affirmative foreign policy—especially in an area like state and local elections that is traditionally regulated at the state level. Rather, as the district court correctly concluded in rejecting Versant's implied preemption argument, "it is likely that Congress intended FECA's prohibition as a floor, and did not intend to prohibit states from doing more to regulate foreign government influence on state and local elections." Add. at 24.

*Second*, Versant argues that the Act "interferes with the United States' long-standing policy of treating foreign investors no differently than domestic investors." Versant Br. at 62. Again, Versant has described a *domestic* policy targeting activity within the United States. Beyond this, Versant presents a shotgun theory as to why the Act violates such a policy, gesturing from a presidential "Statement" made forty years and six administrations ago, to an unrelated trade

agreement that focused on the flow of goods and commodities across the North American continent.[5]  *See* Versant Br. at 62–65.

What Versant fails to do is point to any caselaw where the "speaking with one voice on foreign affairs" principles of *Natsios* have been applied in any context resembling anything close to the issues here.  Nor does Versant point to any federal statute or explicit federal policy that constructs procedures for conducting state and local elections that are undercut by the Act.

Finally, even if the Act could credibly be described as discriminating against foreign commerce, it is "demonstrably justified' because it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Natsios*, 181 F.3d 38 at 70 (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988)).  *Bluman* establishes that the Act's purpose is "legitimate."  *See* Part I.  And it is a "local" purpose.  As Justice Black

---

[5] Even if the presidential statements cited by Versant could accurately be described as constituting any individual president's approach to "foreign affairs," such statements nevertheless do not constitute the "federal government's policy," since "[t]he Constitution expressly grants Congress, not the President, the power to 'regulate Commerce with foreign Nations.'"  *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 329 (1994) (quoting U.S. Const., Art. I, § 8, cl. 3).

observed, "[n]o function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution . . . the nature of their own machinery for filling local public offices." *Oregon v. Mitchell*, 400 U.S. 112, 125 (1970) (opinion of Black, J.). Finally, there is no "nondiscriminatory" alternative to achieving the Act's goal: one cannot prevent foreign-government influence in elections without regulating foreign governments differently than domestic actors.

**F.    The Act is not unconstitutional as applied to Versant.**

Versant asserts, in a single paragraph, that the Act is unconstitutional as applied to Versant (though not ENMAX), even if it is not facially unconstitutional. Versant Br. at 66–67. Particularly where Versant is pressing an alternative basis for affirmance not addressed by the district court, Versant has waived this argument by presenting it in only the most perfunctory manner. *Zannino*, 895 F.2d at 17.

In any event, the argument is meritless. The City of Calgary's alleged restrictions on directing Versant's political activities do not preclude efforts to *influence* those activities. *See* A53–58. And even if

they did, 100% wholly owned subsidiaries such as Versant do not need to be told to pursue the interests of their ultimate owner. *See Abrams*, 518 B.R. at 501.

## Conclusion

For the foregoing reasons and those set forth in State Defendants'
opening brief, the Court should vacate the preliminary injunction issued
by the district court.

DATED:  September 6, 2024

AARON M. FREY
Attorney General

/s/ Jonathan R. Bolton
_____

JONATHAN R. BOLTON
PAUL SUITTER
Assistant Attorneys General
6 State House Station
Augusta, Maine 04333-0006
Tel.  (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov
paul.suitter@maine.gov

*Attorneys for Defendants-
Appellants*

## Certificate of Compliance with Rule 32(a)

1. Pursuant to the enlargement of word-count to 11,000 words granted by this Court, this brief contains 10,981 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 with 14-point typeface and Century Schoolbook type style.

/s/ Jonathan R. Bolton
JONATHAN R. BOLTON
Assistant Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov

**Certificate of Service Form
for Electronic Filing**

I hereby certify that on September 6, 2024, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

**Versant Power & ENMAX Corporation**
Paul McDonald, Esq.
John A. Woodcock, III, Esq.
Bernstein Shur
100 Middle Street
P.O. Box 9729
Portland, ME 04104-5029

**Maine Press Association & Maine Association of Broadcasters**
Sigmund D. Schutz, Esq.
Alexandra A. Harriman, Esq.
Benjamin S. Piper, Esq.
Preti, Flaherty
One City Center
P.O. Box 9546
Portland, ME 04112-9546

**Jane P. Pringle, Kenneth Fletcher, Bonnie S. Gould, Brenda Garrand, and Lawrence Wold**
Timothy C. Woodcock, Esq.
Eaton Peabody
P.O. Box 1210
Bangor, ME 04402

**Central Maine Power Company**
Joshua D. Dunlap, Esq.
Katherine E. Cleary, Esq.
Nolan L. Reichl, Esq.
Pierce Atwood LLP
254 Commercial Street
Portland, ME 04101

/s/ Jonathan R. Bolton
JONATHAN R. BOLTON
Assistant Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov